UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

|  |  |
|---|---|
| TOM G. PALMER, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 09-01482 (HHK) |
| | ) |
| DISTRICT OF COLUMBIA, *et al.*, | ) |
| | ) |
| Defendants. | ) |

---

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56(b), defendants (collectively, "the District") hereby move this Honorable Court for summary judgment on the claims in this matter, and oppose plaintiffs' motion for summary judgment.

The grounds and the reasons are set forth more fully in the accompanying Memorandum of Points and Authorities and proposed Order. The memorandum also serves as defendants' Opposition to plaintiffs' Motion for Summary Judgment.

As required by LCvR 56.1, a Statement of Material Facts As to Which There is No Genuine Issue ("SMF") has been provided, as has defendants' Opposition to plaintiffs' Separate Statement of Undisputed Material Facts ("PSMF").

The Court should grant summary judgment to the District because its regulation of firearms does not violate either the Second Amendment or *Heller v. District of Columbia*, ___ U.S. ___, 128 S. Ct. 2783 (Jun. 26, 2008). As the Supreme Court recognized, "[l]ike most rights, the right secured by the Second Amendment is not unlimited. [T]he right [i]s not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 2816.

Despite this language, plaintiffs baldly claim that the "Second Amendment guarantees the right to carry handguns in public for self-defense." P.Mem. at 6. That conclusion is incorrect. Plaintiffs attempt to stretch the language of *Heller* far beyond what the Supreme Court found to be protected by the Second Amendment—"the right of law-abiding, responsible citizens to use arms in defense of hearth and home." 128 S. Ct. at 2821. Plaintiffs' invocation of various snippets of language from *Heller*—that "the right to keep and carry arms" authorizes the public carrying of weapons—is not supported by that decision, or any other controlling decision. Plaintiffs rely almost exclusively on legal treatises or inapposite, outdated decisions from other jurisdictions.

The District's regulation of handguns at issue here is squarely in the mainstream and eminently reasonable, minimally intruding on the right announced in *Heller* to bear arms for the protection of "hearth and home," while at the same time safeguarding public safety under traditional police powers.

DATE: September 9, 2009        Respectfully submitted,

PETER J. NICKLES
Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General, Civil Litigation Division


       /s/ Ellen A. Efros
ELLEN A. EFROS, D.C. Bar No. 250746
Chief, Equity Section I
441 Fourth Street, N.W., 6th Floor South
Washington, D.C. 20001
Telephone: (202) 442-9886

_____/s/ Andrew J. Saindon_____
ANDREW J. SAINDON, D.C. Bar No. 456987
Assistant Attorney General
Equity I Section
441 Fourth Street, N.W., 6th Floor South
Washington, D.C. 20001
Telephone: (202) 724-6643
Facsimile: (202) 730-1470
andy.saindon@dc.gov

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                    )
TOM G. PALMER, *et al.*              )
                                    )
            Plaintiffs,              )
                                    )
      v.                             )        Civil Action No. 09-01482 (HHK)
                                    )
DISTRICT OF COLUMBIA, *et al.*,      )
                                    )
            Defendants.              )
_____)

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND
IN OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Defendants (collectively, "the District"), pursuant to Fed. R. Civ. P. 56(b), move this

Court for summary judgment.[1] This memorandum of points and authorities is provided in

support of the defendants' dispositive motion in accordance with LCvR 7.1(a), and in opposition

to plaintiffs' motion for summary judgment. As required by LCvR 56.1, a Statement of Material

Facts As to Which There is No Genuine Issue ("SMF") has been provided, as well as the

District's Opposition to Plaintiffs' Separate Statement of Undisputed Material Facts.

---

[1]        Defendants are the District of Columbia and Cathy Lanier, Chief of the
Metropolitan Police Department ("MPD"). Although plaintiff purports to sue defendant Lanier in
her individual capacity, "nothing in the complaint would support an allegation that [she] acted
outside of [her] official capacit[y] or outside of [her] official authority," hence the claims should
be construed "as if they were brought against the defendan[t] only in [her] official capacit[y]."
*Thomas v. Knight*, 257 F.Supp.2d 86, 88 (D.D.C. 2003) (citing *Briggs v. Goodwin*, 569 F.2d 10,
15 (D.C. Cir. 1977)).

I. <u>Factual and Procedural Background</u>

In *District of Columbia v. Heller*, ___ U.S. ___, 128 S. Ct. 2783 (Jun. 26, 2008) ("*Heller*"), the Supreme Court concluded that the Second Amendment protects the right to possess a firearm for the purpose of self-defense within the home. *Heller*, 128 S. Ct. at 2818; SMF ¶ 1. The Court ruled out "rational basis" review but otherwise declined to establish a level of scrutiny for examining firearms regulation under the Second Amendment. *Heller*, 128 S. Ct. at 2817–18 & n.27; SMF ¶ 2.

The Court confirmed that the Second Amendment has various limits. "Like most rights, the right secured by the Second Amendment is not unlimited [and] not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 128 S. Ct. at 2816; SMF ¶ 3. The Court explicitly noted that it was *not* exhaustively analyzing the scope of any right guaranteed by the Second Amendment, but did reaffirm "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools or government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Heller*, 128 S. Ct. at 2816–17 & n.26; SMF ¶ 4. The Court also acknowledged the "problem of handgun violence in this country," and that "[t]he Constitution leaves the District of Columbia a variety of tools for combating that problem . . . ." *Heller*, 128 S. Ct. at 2822; SMF ¶ 5.

*District Law After Heller*

In response to *Heller*, the Council of the District of Columbia acted swiftly to amend the District's gun laws, adopting a number of emergency and temporary measures to bring the District into compliance. *See* Council of the District of Columbia, Committee on Public Safety

and the Judiciary, Report on Bill 17-843, the "Firearms Control Amendment Act of 2008," November 25, 2008 ("FCAA Rep."), at 2 (*available online at* http://www.dccouncil.washington. dc.us/images/00001/20090513152155.pdf); SMF ¶ 6.

The Council took action because in *Heller* the Supreme Court ruled that "District citizens have the right to register handguns for the purpose of self defense in their home." Council of the District of Columbia, Committee on Public Safety and the Judiciary, Report on Bill 17-593, the "Inoperable Pistol Amendment Act of 2008," November 25, 2008, at 3 ("IPAA Rep.") (*available online at* http://www.dccouncil.washington.dc.us/images/00001/20090518113852.pdf); SMF ¶ 7.

The Council held a number of public hearings on amending the District's gun laws, "in order to receive as much public comment as possible . . . ." FCAA Rep. at 3; SMF ¶ 8. The Council heard from dozens of witnesses, including defendant Cathy Lanier, Chief of the MPD. Comm. Rep. at 11–12; SMF ¶ 8. It used such testimony to help craft "laws that reflect standard gun safety practices." Comm. Rep. at 2.

The IPAA was passed unanimously and signed by the Mayor on January 16, 2009. *See* 56 D.C. Reg. 1162 (Feb. 6, 2009); SMF ¶ 9. The IPAA was transmitted to Congress for review on or about February 4, 2009. 155 Cong. Rec. H1040-03 (Feb. 4, 2009). After Congress did not disapprove the act, the law became effective on May 20, 2009. *See* 56 D.C. Reg. 4438 (June 12, 2009); SMF ¶ 9.

The IPAA was passed, *inter alia*, to clarify "that one may carry their own registered firearm in their home and for lawful recreational purposes in light of [*Heller*]." *See* IPAA Rep. at 1; SMF ¶ 10. Nevertheless, "persons should not be carrying real weapons on the street . . . ." IPAA Rep. at 3; SMF ¶ 7. The IPAA also repealed District Official Code § 22-4506 (2001 ed.), which had authorized the Chief of Police to issue licenses to carry a pistol in the District.

"Without repeal, the provision gives the impression that ordinary people (as opposed to law enforcement personnel, the military, certain investigators, etc.) may obtain a license to carry a concealed weapon. Given the unique character of the District, such activity would be unwise."

IPAA Rep. at 4; SMF ¶ 10.

> The District shares the problem of gun violence with other dense, urban jurisdictions—a problem which is quite different than the experience in the rest of suburban and rural America. The District, however, has a unique distinction: as the nation's capital it hosts a large presence of government and diplomatic officials. Sadly, the District is no stranger to attacks on such officials—the assassinations for Presidents Lincoln and Garfield, attempted assassination of President Reagan, the assassination of former Chilean official Letelier, etc. Government officials and diplomats are constantly moving about the District. The threat of gun violence against them is an especial concern, and one of which we are reminded almost daily in the international news.

IPAA Rep. at 4; SMF ¶ 11.

Congress, in H.R. 6691, the "Second Amendment Enforcement Act," 110th Cong., 2nd Sess. (July 31, 2008), proposed to limit the District's ability to regulate firearms. SMF ¶ 13. That legislation had 135 co-sponsors. *Id.* In testimony in opposition, defendant Lanier cogently explained how much harder her job would be if the legislation was enacted:

> [I]t would be far more difficult for MPD and Federal law enforcement agencies in the District of Columbia to ensure safety and security in the Nation's Capital.

> [P]rotecting government officials and infrastructure is a challenge for every city in the United States. But in Washington, DC, the likelihood of attack is higher, and the challenges to protecting the city are greater.

> [T]he high-profile human targets—from the Nation's top elected leaders to the more than 400 foreign dignitaries that make official visits to DC each year—are also an obvious and attractive target.

> [I]n addition to assisting the Secret Service with daily movements of the President and Vice President around the city, and protecting foreign dignitaries, MPD also provides security support for more than 4,000 special events annually. [I]magine how difficult it will be for law enforcement to safeguard the public, not to mention the new President at the Inaugural Parade, if carrying semi-automatic rifles were to suddenly become legal in Washington.

> [A]llowing [weapons] to be carried in a large number of places outside the home will make this job much more dangerous and difficult.
>
> It is clear to me and others engaged every day in securing DC against terrorism that our city is unique.

*Hearing on the Impact of Proposed Legislation on the District of Columbia's Gun Laws Before the House Comm. on Oversight & Government Reform* (Sept. 9, 2008) (Testimony of Cathy L. Lanier, Chief of Police) at 2–4 (a copy of Chief Lanier's congressional testimony is attached to the FCAA Report online); SMF ¶ 14. The Chief noted the irony that even she was prohibited from carrying her gun into the Supreme Court to hear the arguments in *Heller*:

> The Federal Government considers the Court building to be so sensitive that, no matter who you are, you cannot wear your firearm in the building.
>
> I would argue that similar caution should apply to the District of Columbia. [T]he District of Columbia, as the seat of the Federal government, with its multitude of critical official and symbolic buildings, monuments, and events, and high-profile public officials traversing its streets every day, is a city filled with "sensitive" places. Our laws should reflect that reality.

Testimony at 5; SMF ¶ 15.

The Committee on Public Safety and the Judiciary noted its belief that the District's firearms laws "comply with [*Heller*], while at the same time allow[ing] the District to protect its citizens and maximize public safety with reasonable and sensible gun policy." FCAA Rep. at 10; SMF ¶ 17.

District law currently allows a person holding a valid registration for a firearm to carry the firearm "[w]ithin the registrant's home; [w]hile it is being used for lawful recreational purposes; [w]hile it is kept at the registrant's place of business; or [w]hile it is being transported for a lawful purpose as expressly authorized by District or federal statute . . . ." D.C. Official

Code § 22-4504.01; SMF ¶ 20. Exemptions also allow current and retired law-enforcement officers to carry weapons. D.C. Official Code § 22-4505.[2]

The first suit challenging the District's efforts to comply with *Heller* was filed a month after that decision, just two weeks after the District's first emergency legislation. *See* FCAA Rep. at 2; *Heller v. District of Columbia*, 08-01289 (RMU) (D.D.C.) (Complaint filed July 28, 2008).[3]

Plaintiffs in the instant matter filed suit on August 6, 2009, pursuant to 42 U.S.C. § 1983. Specifically, plaintiffs allege that the District's refusal to register the guns of non-residents violates plaintiffs' "rights to travel and equal protection," Complaint ¶ 42, and that the District's "complete ban on the carrying of handguns in public by almost all individuals" *id.* ¶ 39, violates their rights under the Second Amendment to the Constitution.

Plaintiffs filed their Motion for Summary Judgment on August 26, 2009.

## II. Summary of Argument

The District's regulation of firearms is subject to "reasonableness" review. The specific provisions challenged survive Second Amendment review. While the District of Columbia is

---

[2]    The IPAA also "revis[ed] the requirements pertaining to the transportation of firearms to more closely parallel federal law . . . ." IPAA Rep. at 4. District law now provides that persons not otherwise prohibited "shall be permitted to transport a firearm for any lawful purpose from any place where he may lawfully possess and carry the firearm to any other place where he may lawfully possess and carry the firearm . . . ." D.C. Official Code § 22-4504.02(a). If transportation is to occur by vehicle, the firearm must be unloaded, and neither the firearm nor any ammunition "shall be readily accessible or directly accessible . . . ." *Id.*, § 22-4504.02(b)(1). If transportation is in a manner other than in a vehicle, the firearm must be unloaded, inside a locked container, and separate from any ammunition. *Id.*, § 22-4504.02(c). *Cf.* Firearms Owners' Protection Act, *codified at* 18 U.S.C. § 926A *et seq.*

[3]    Plaintiffs in No. 08-1289 similarly brought suit under 42 U.S.C. § 1983 and challenged almost every substantive provision of the District's revised gun laws under the Second Amendment and *Heller*. Dispositive briefing is ongoing in that case.

unique—as the seat of the federal government—it also shares characteristics of other dense, urban jurisdictions. This *sui generis* combination of factors more than justifies the District's reasonable regulation of handguns challenged here.

In enacting the provisions at issue, Congress and the Council responded to the dangers posed by handguns (and other dangerous weapons) and sensibly concluded that residency requirements and a continuing prohibition on carrying such weapons in public would mitigate those potential dangers, while still allowing the exercise of the right enunciated in *Heller*. Because these judgments about how best to protect public health and safety are reasonable and entitled to substantial deference, the law should be upheld.

Plaintiffs provide no controlling or persuasive authority for their conclusion that the right to bear arms universally encompasses the right to carry handguns in public; for over a century and a half, it has been illegal to do so in the nation's capital. Such longstanding law and policy cannot be overturned on the basis of plaintiffs' flimsy showing.

Plaintiffs' right to travel is in no way impeded by District law. Notwithstanding its unique position, the District's gun regulations should not be based on a "lowest common denominator" analysis.

The Council properly acted to reduce the many potential harms of handguns while still allowing residents to exercise their Second Amendment rights. Its reasonable legislative judgment should be upheld.

### III. Argument

#### A. Summary Judgment Principles and Principles Related to Facial and As-Applied Challenges and Equal-Protection Analysis

While a court "must assume the truth of all statements proffered by the party opposing summary judgment," it need not consider wholly conclusory statements for which no supporting

evidence is offered. *Greene v. Dalton*, 164 F.3d 671, 674–75 (D.C. Cir. 1999). It is insufficient, to avoid summary judgment, that some factual issues remain in the case; an issue must be both *genuine* and *material* to preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–248 (1986).

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A "complete failure of proof concerning an essential element of the non-moving party's case necessarily renders other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Plaintiffs allege that the District's "residency restriction" and carry prohibition, facially, and as applied to them, violate the Second Amendment. It remains axiomatic that "[a] facial challenge to a legislative Act is . . . the most difficult to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). If the First Amendment is not implicated, a party can demonstrate that a statute is facially invalid *only* by showing that it is unconstitutional in all of its applications. *See also, e.g., Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 699–700 (1995). "[A] facial challenge must fail where the statute has a "'plainly legitimate sweep.'" *Washington State Grange v. Washington State Republican Party*, ___ U.S. ___, 128 S. Ct. 1184, 1190 (Mar. 18, 2008) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 739–40 & n.7 (1997) (Stevens, J., concurring in judgments)). *See, e.g., Howerton v. United States*, 964 A.2d 1282, 1288 (D.C. 2009) (rejecting appellant's facial Second Amendment

challenge, based on *Heller*, to his conviction under firearms registration and licensing laws); *Sims v. United States*, 963 A.2d 147, 150 (D.C. 2008) (same).

In an apparent attempt to meet the *Salerno* standard, plaintiffs vastly overstate their case, without controlling legal support. For instance, plaintiffs argue that "[t]he problem before the Court is a total ban on the exercise of the right to bear all arms, by all people, at all times, for all purposes." P.Mem. at 1. Such nonsensical rhetoric does little more than cloud the important issues at hand. As explained below, there is far more nuance to this case.

An equal-protection challenge "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Heller v. Doe*, 509 U.S. 312, 320 (1993). "Where, as here, a statute or regulation has some concededly constitutional applications, a successful challenger must demonstrate that the statute is unconstitutional as 'applied to the particular facts of [its] case.'" *Steffan v. Perry*, 41 F.3d 677, 693 (D.C. Cir. 1994) (*en banc*). In an as-applied constitutional challenge, a claimant must prove that similarly situated individuals were treated differently. *Id*. at 695 ("[I]n making an as-applied challenge, it is [plaintiff's] burden . . . to show exactly how the [regulations] were applied against him illegally.").

Plaintiffs complain of the differential treatment of residents and non-residents, but such classification here "is accorded a strong presumption of validity . . . ." *Heller v. Doe*, 509 U.S. at 320. *Cf. United States v. Morrison*, 529 U.S. 598, 607 (2000) (a court may invalidate an otherwise lawful enactment "only upon a plain showing that [the legislature] has exceeded its constitutional bounds."). Plaintiffs have failed to meet their "heavy burden of proof." *United States v. Grace*, 778 F.2d 818, 822 & n.7 (D.C. Cir. 1985).

Moreover, "those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be

conceived to be true by the governmental decisionmaker." *Vance v. Bradley*, 440 U.S. 93, 111 (1979) (citations omitted). Plaintiffs cannot meet this test; the District's differential treatment of residents and non-residents is amply supported by law, history, and common sense, as discussed herein.

In reviewing the constitutionality of a statute, "courts must accord substantial deference to the predictive judgments" of the legislature. *Turner Broadcasting Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997) (quoting *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 665 (1994)). Such deference is due because the legislature "'is far better equipped than the judiciary to 'amass and evaluate the vast amounts of data' bearing upon' legislative questions." *Id*. (quoting *Walters v. National Ass'n of Radiation Survivors*, 473 U.S. 305, 331, n.12 (1985)). *See also Gonzalez v. Carhart*, 550 U.S. 124, 163–64 (2007) (legislature should receive deference in absence of expert consensus). "Even in the realm of First Amendment questions . . . deference must be accorded to [the legislature's] findings as to the harm to be avoided and to the remedial measures adopted for that end . . . ." *Turner*, 520 U.S. at 665. "Local officials, by virtue of their proximity to, and their expertise with, local affairs, are exceptionally well qualified to make determinations of public good 'within their respective spheres of authority.'" *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 544 (1989) (quoting *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 244 (1984)).


B. The District's Firearms Laws Are Subject to "Reasonableness" Review.

Plaintiffs argue that the Second Amendment guarantees a "fundamental right," hence "strict scrutiny" should apply. P.Mem. at 14. That argument is incorrect as a matter of law. Instead, this Court should apply reasonableness review. Under that level of scrutiny, a firearm regulation should be upheld where the regulation or law does not interfere with the "core right"

the Second Amendment protects by depriving the people of reasonable means to defend themselves in their homes. In the alternative, intermediate scrutiny at most should apply.[4]

The Supreme Court has never determined—and did not determine in *Heller*—that the right to bear arms is a "fundamental right" under the Constitution. In fact, prior to *Heller*, the federal circuits unanimously found that the right to bear arms under the Second Amendment was *not* fundamental. *See, e.g., Olympic Arms v. Buckles*, 301 F.3d 384, 388–89 (6th Cir. 2002) ("Sixth Circuit precedent does not recognize a fundamental right to individual weapon ownership"); *United States v. Hancock*, 231 F.3d 557, 565–66 (9th Cir. 2000) (same); *Gillespie v. City of Indianapolis*, 185 F.3d 693, 709 (7th Cir. 1999) (finding that the right to possess a firearm is not fundamental); *United States v. Toner*, 728 F.2d 115, 128 (2nd Cir. 1984) ("the right to possess a gun is clearly not a fundamental right"). *Compare Nordyke v. King*, 563 F.3d 439, 457 (9th Cir. 2009) (the right to keep and bear arms "is indeed fundamental"), *vacated pending rehearing* en banc (July 29, 2009), *with NRA v. Chicago*, 567 F.3d 856, 859 (7th Cir. 2009) (disagreeing with *Nordyke*), *petitions for cert. filed* ((Jun. 3 & 9, 2009) (No.s 08-1497, 08-1521).[5]

---

[4]    Plaintiffs also claim that the "Fifth Circuit utilizes a version of strict scrutiny to evaluate gun laws under the Second Amendment . . . ." P.Mem. at 14 n.3 (citing *United States v. Emerson*, 270 F.3d 203, 261 (5th Cir. 2001)). This, too, is incorrect as a matter of law. *See United States v. Darrington*, 351 F.3d 632, 635 (5th Cir. 2003):

> [E]*merson* is a carefully and laboriously crafted opinion, and if it intended to recognize that the individual right to keep and bear arms is a "fundamental right," in the sense that restrictions on this right are subject to "strict scrutiny" by the courts and require a "compelling state interest," it would have used these constitutional terms of art.

[5]    The Ninth Circuit's panel opinion also found that the Second Amendment is incorporated against the States, a question bypassed by the Supreme Court. *Nordyke*, 563 F.3d at 457; *see Heller*, 128 S. Ct. at 2813 n. 23. The Defendants here preserve the argument that the

The numerous jurisdictions that have concluded that the "right to bear arms" under state constitutions is not a fundamental right have consistently found that such a right "is not absolute and that reasonable regulatory control by the Legislature to promote the safety and welfare of its citizens uniformly has been upheld." *Mosby v. Devine*, 851 A.2d 1031, 1044 (R.I. 2004) (citing cases). The Court here should do the same.

Moreover, "[e]ven in jurisdictions that have declared the right to keep and bear arms to be a fundamental constitutional right, a strict scrutiny analysis has been rejected in favor of a reasonableness test . . . ." *Id.* Strict scrutiny analysis is not always applied to alleged incursions on fundamental rights. Adam Winkler, *Fundamentally Wrong About Fundamental Rights*, 23 Const. Comment 227, 232 (2006). For instance, strict scrutiny is not always applied to restrictions on free speech and the free exercise of religion. *Id.* It thus would not necessarily follow that strict scrutiny is always (or even usually) proper under the Second Amendment, even if the right it protects is fundamental. As one court has explained, the constitutional text is subject to a rule of reason because the common law right to self-defense is subject to that rule. *Benjamin v. Bailey*, 662 A.2d 1226, 1232–35 (Conn. 1995).

As noted, the Supreme Court expressly declined to establish what standard of review was appropriate in Second Amendment cases, only ruling out "rational basis" review. *Heller*, 128 S. Ct. at 2817–18 & n.27. *See also, e.g., Brown v. United States*, __ A.2d ___, 2009 WL 2610856, *slip op.* at 16 (D.C. Aug. 27, 2009) (*Heller* "did not explicitly designate a level of scrutiny," but strict scrutiny "is not appropriate") (*citing United States v. Miller*, 604 F.Supp.2d 1162, 1170 (W.D. Tenn. 2009)). The Supreme Court found that many traditional types of firearm regulation

---

Second Amendment should not apply to the District if it is not incorporated against the States, as the District argued in *Heller*.

would pass muster, 128 S. Ct. at 2816–17 & n.26, but did not establish the standard to be used.

As Justice Breyer noted in dissent, strict scrutiny apparently was rejected by the majority:

> Respondent proposes that the Court adopt a "strict scrutiny" test, which would require reviewing with care each gun law to determine whether it is "narrowly tailored to achieve a compelling governmental interest." But the majority implicitly, and appropriately, rejects that suggestion by broadly approving a set of laws—prohibitions on concealed weapons, forfeiture by criminals of the Second Amendment right, prohibitions on firearms in certain locales, and governmental regulation of commercial firearm sales—whose constitutionality under a strict scrutiny standard would be far from clear.

*Heller*, 128 S. Ct. at 2851 (Breyer, J., dissenting) (citations omitted).

Although the Supreme Court has not decided the proper standard of review, the standard has been established in the D.C. Circuit. In the decision affirmed in *Heller*, the Court stated: "The protections of the Second Amendment are subject to the same sort of *reasonable restrictions* that have been recognized as limiting, for instance, the First Amendment." *Parker v. District of Columbia*, 478 F.3d 370, 399 (D.C. Cir. 2007) (emphasis added) (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). "[R]easonable regulations" of firearms "promote the government's interest in public safety consistent with our common law tradition. Just as importantly, however, they do not impair the core conduct upon which the right was premised." *Id.* at 399. Because the Supreme Court's decision did not undercut that portion of the D.C. Circuit's decision, this Court must adhere to it.

Moreover, reasonableness would *still* be the proper standard of review, even if the D.C. Circuit had not so decreed. The rights protected by the Bill of Rights have "from time immemorial been subject to certain well-recognized exceptions arising from the necessities of the case." *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897). There can be little question that preventing crime and promoting public safety are important government goals. *See, e.g., Salerno*, 481 U.S. at 750; *Schall v. Martin*, 467 U.S. 252, 264 (1984).

State courts interpreting right-to-bear-arms provisions in state constitutions thus have uniformly applied a deferential reasonableness standard, in decisions going back decades.[6] It does not appear that *any* state's courts apply strict scrutiny or another type of heightened review to firearms laws. Winkler, *Scrutinizing the Second Amendment*, *supra*, at 686–87. *See, e.g., Bleiler v. Chief, Dover Police Dep't.*, 927 A.2d 1216, 1222 (N.H. 2007) ("We agree with every other state court that has considered the issue: strict scrutiny is not the proper test to apply" and "the New Hampshire state constitutional right to bear arms 'is not absolute and may be subject to restriction and regulation.'") (quoting *State v. Smith*, 571 A.2d 279, 281 (N.H. 1990)); *Mosby*, 851 A.2d at 1044 (strict scrutiny not appropriate; "the right to possess a handgun, whether a fundamental liberty interest or not, is not absolute and subject to reasonable regulation."); *State v. Cole*, 665 N.W.2d 328, 337 (Wis. 2003) (applying reasonableness test) ("If this court were to utilize a strict scrutiny standard, Wisconsin would be the only state to do so."); *Robertson v. City & County of Denver*, 874 P.2d 325, 331 (Colo. 1994) (*en banc*) (strict scrutiny not appropriate; "The right to bear arms may be regulated by the state under its police power in a reasonable manner."). *Cf. McIntosh v. Washington*, 395 A.2d 744, 756 (D.C. 1978) ("The Supreme Court has indicated that dangerous or deleterious devices or products are the proper subject of regulatory measures adopted in the exercise of a state's 'police powers.'") (citations omitted).

There is similar precedent in the federal courts in addition to the D.C. Circuit's decision in *Parker*. The Ninth Circuit in the now-vacated *Nordyke* panel opinion, 563 F.3d at 460, rejected a challenge to a county ordinance prohibiting possession of firearms on county property,

---

[6]    *See* Adam Winkler, *Scrutinizing the Second Amendment*, 105 Mich.L.Rev. 683, 686–87 & n.12 (2007) (describing "hundreds of opinions" by state supreme courts with "surprisingly little variation" that have adopted the "reasonableness" standard of review for right-to-bear-arms cases).

finding that the law "does not meaningfully impede the ability of individuals to defend themselves in their homes with usable firearms, the core of the right as *Heller* analyzed it." *Cf. United States v. Masciandaro*, ___ F.Supp. 2d ___, 2009 WL 2750958, * 5 (E.D. Va. Aug. 26, 2009) ("[*H*]*eller's* narrow holding is explicitly limited to vindicating the Second Amendment 'right of law-abiding, responsible citizens to use arms in defense *of hearth and home*.'") (emphasis in original).

Identically here, District law does not meaningfully impede the ability of individuals to defend themselves with firearms in their homes. As the Supreme Court has long recognized, "not every law which makes a right more difficult to exercise is, *ipso facto*, an infringement of that right." *Planned Parenthood of SE Pa. v. Casey*, 505 U.S. 833, 873 (1992) (joint opinion of O'Connor, Kennedy, & Souter, JJ.).

Because the firearms provisions at issue here do not materially infringe the exercise of the "core right" identified in *Heller*, that right passes review for reasonableness. *Parker*, 478 F.3d at 399. *Cf. United States v. Moore*, ___ F.Supp.2d ___, 2009 WL 1033363, * 3 (W.D.N.C. Apr. 17, 2009) (strict-scrutiny review "not appropriate;" court joins "majority of courts" in using intermediate scrutiny for challenge to federal statute prohibiting convicted felons from possessing firearms); *United States v. Mazzarella*, 595 F.Supp.2d 596, 604 (W.D.Pa. 2009) (strict scrutiny not applicable to challenge of indictment for "knowingly possessing a firearm with an obliterated serial number").

It appears that only one federal or state decision reached after *Heller* has applied strict scrutiny, but it *still* upheld the challenged regulation. *See United States v. Engstrum*, 609 F.Supp.2d 1227, 1231 (D.Utah 2009) (applying strict scrutiny, but rejecting challenge to federal statute prohibiting possession of firearms by those with domestic-violence convictions).

-15-

The deference due to legislative judgments inherent in reasonableness review is particularly appropriate given the intensity of views about gun control. As one court explained:

> [M]ost legislation will assert broad safety concerns and broad gun control measures to match, covering both 'good' and 'bad' gun possessors and 'good' and 'bad' guns. Such legislation cannot be narrowly tailored to reach only the bad people who kill with their innocent guns. [D]ue to the intensity of public opinion on guns, legislation is inevitably the result of hard-fought compromise in the political branches. To expect such legislation to reflect a tight fit between ends and means is unrealistic.

*United States v. Miller*, 604 F.Supp.2d at 1172 n.13 (quotation marks and citations omitted).

Thus, the United States advocated a form of reasonableness review in its *amicus* brief in *Heller*. U.S. Brief at 8, 20–27 ("Under that intermediate level of review, the 'rigorousness' of the inquiry depends on the degree of burden on protected conduct, and important regulatory interests are typically sufficient to justify reasonable restrictions.") (citing *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)).

At most, intermediate scrutiny would be appropriate. To survive intermediate scrutiny, the challenged provision must be substantially related to the achievement of important government interests. *Hutchins v. District of Columbia*, 188 F.3d 531, 541 (D.C. Cir. 1999) (*en banc*) (citing *Craig v. Boren*, 429 U.S. 190, 197 (1976) and *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982)). *See also Clark v. Jeter*, 486 U.S. 456, 461 (1988) ("To withstand intermediate scrutiny, a statutory classification must be substantially related to an important government objective.").

Maintaining public safety and preventing crime are clearly important (if not paramount) government interests. *See, e.g., Salerno*, 481 U.S. at 750; *Schall v. Martin*, 467 U.S. 253, 264 (1984); *Kelley v. Johnson*, 425 U.S. 238, 247 (1976) ("The promotion of safety of persons and property is unquestionably at the core of the State's police power . . . .").

-16-

C. <u>The District's Regulation of Handguns Is Reasonable And, In Any Event, Passes Intermediate Scrutiny.</u>

The District is not alone in prohibiting the registration of firearms by non-residents, and declining to issue "carry" licenses, or recognize such licenses from other jurisdictions. The Second Amendment does not "guarante[e] the right to carry handguns in public for self-defense" P.Mem. at 6, nor are the District's (and Congress') policy choices here as far outside the mainstream as plaintiffs' argue.

Plaintiffs argue: "Surveying the history of concealed carry prohibitions, it appears time and again that such laws have always been upheld as mere regulations of the manner in which arms are carried—with the understanding that a complete ban on the carrying of handguns is unconstitutional." P.Mem. at 10. Such a fatally deficient syllogism should be rejected by the Court. If plaintiffs' point were as obvious as they insist, there would be controlling language on point. There is none.

Indeed, the infirmity of plaintiffs' position is evident in their choice of words. Plaintiffs state: "*Most* states recognize at least some handgun carry permits issued by other states, and *numerous* states issue handgun carry permits to non-residents . . . ." P.Mem. at 2 (emphasis added). To state the obvious, "most" and "numerous" are a far cry from the seeming unanimity that plaintiffs declare. Although plaintiffs may not like it, all citizens are subject to one or more "restrictions" on their Second Amendment rights; indeed, the majority of Americans live in states that entirely prohibit the carrying of concealed weapons. "Guide to Right-to-Carry Reciprocity and Recognition," at 1, National Rifle Association of America, Institute for Legislative Action (Apr. 2009) ("NRA Right-to-Carry") (available online at *http://www.nraila.org/recmap/Recguide.pdf*).

-17-

Contrary to plaintiffs' implications, the United States is a patchwork of various degrees of handgun regulation. Thus, plaintiffs' flip comment that "[t]his lawsuit seeks nothing more than to secure for individuals in the District the same right already enjoyed, without incident, by people in [various cities]," P.Mem. at 2, should be rejected out of hand.[7]

Numerous states have restrictions similar to the District's. Seven states prohibit the grant of "carry" permits to non-residents. *See* NRA Right-to-Carry (Alabama, California, Hawaii, Illinois, Nebraska, New York, and Wisconsin); SMF ¶ 21.[8] Many more states refuse to recognize such permits from other jurisdictions. NRA Right-to-Carry; SMF ¶ 22 (California, Connecticut, Hawaii, Illinois, Iowa, Maryland, Massachusetts, Nebraska, New Jersey, New York, Oregon, Rhode Island, and Wisconsin). And at least 15 states prohibit the open carrying of weapons (Connecticut, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Maryland, Massachusetts, Minnesota, New Jersey, New York, Rhode Island, South Carolina, and Texas). NRA, PRACTISING LAW INSTITUTE: MUNICIPAL LAW INSTITUTE 2009, at 207–211; SMF ¶ 23.[9]

Additionally, many urban centers generally do not allow the carrying of concealed weapons. *See* Legal Community Against Violence, *Regulating Guns in America: An Evaluation and Comparative Analysis of Federal, State and Selected Local Gun Laws*, at xv (Feb. 2008)

---

[7]     The phrase "without incident," of course, is subjective. *Cf.* Violence Policy Center, "Law Enforcement and Private Citizens Killed by Concealed Handgun Permit Holders" (July 2009) (from May 2007 to April 2009, concealed handgun permit holders shot and killed seven law-enforcement officers and 42 private citizens).

[8]     The NRA also indicates, for a number of states, that "[p]ermits are technically available for non-residents, but are rarely granted." *Id*. (Massachusetts, New Jersey, Rhode Island).

[9]     California, North Dakota, Oklahoma, and Utah prohibit the open carrying of *loaded* weapons. *Id*.

("LCAV") (discussing Chicago, Cleveland, Columbus, Hartford, New York City, and Omaha) (*available online at* http://www.lcav.org/library/reports_analyses/regulating_guns.asp).

Illinois and Wisconsin are two states that "have no permit system and prohibit carrying." NRA Right-to-Carry, at 1; LCAV at 203.[10] Consequently, case law from these jurisdictions upholding these restrictions is helpful in limning the "right to bear arms."

In November 1998, the Wisconsin Constitution was amended to add the following provision: "The people have the right to keep and bear arms for security, defense, hunting, recreation or any other lawful purpose." *State v. Fisher*, 714 N.W.2d 495, 497 (Wis. 2006) (quoting Wis. Const., Art. I, § 25). Although the Wisconsin law prohibiting the carrying of concealed weapons predated the adoption of the constitutional amendment by 120 years, it remains valid, because the state's "broad police power to regulate the ownership and use of firearms and other weapons continues . . . ." *Id.* at 508 (citations omitted).

The Supreme Court of Wisconsin has consistently found that the right to keep and bear arms is not absolute. *Id.* at 498 (citing *Cole*, 665 N.W.2d at 337). That court has determined that the test of constitutionality for a regulation of the right

> [D]epends on whether the regulation is a reasonable exercise of the state's inherent police power. This reasonableness test . . . focuses on a balancing of the

---

[10]    *See* Wisc. Stat. § 941.23 ("Any person except a peace officer who goes armed with a concealed and dangerous weapon is guilty of a Class A misdemeanor."); Ill. Comp. Stat. § 5/24-1.6:

> A person commits the offense of aggravated unlawful use of a weapon when he or she knowingly . . . Carries on or about his or her person or in any vehicle or concealed on or about his or her person except when on his or her land or in his or her abode or fixed place of business any pistol, revolver, stun gun or taser or other firearm [and] the firearm was possessed uncased, loaded and immediately accessible [or] the firearm possessed was uncased, unloaded and the ammunition was immediately accessible . . . .

> interests at stake: the authority of the state to enact legislation for the health, safety, and welfare of the public . . . against the right to keep and bear arms.

*Fisher*, 714 N.W.2d at 498. *See also State v. Comeau*, 448 N.W.2d 595, 597 (Neb. 1989) (using reasonableness test to uphold gun-control statutes) ("There are very few rights which are absolute, and this is of necessity. In every phase of everyday experience, there are extremes beyond which some restraint or regulation is necessary for the common good."); *State v. McAdams*, 714 P.2d 1236, 1237 (Wyo. 1986) (courts must balance the individual's right against the interest of society in enacting laws to "ensure some semblance of order").[11]

The Wisconsin court also "repeatedly emphasized the special status of two locations for purposes of the right to keep and bear arms for security: one's home and one's privately owned business." *Fisher*, 714 N.W.2d at 500 (citing *State v. Hamdan*, 665 N.W.2d 785 (Wis. 2003) ("a citizen's desire to exercise the right to keep and bear arms for purposes of security is at its apex when undertaken to secure one's home or privately owned business.")).

The Supreme Court of Wisconsin presaged *Heller* when it stated:

> If the constitutional right to keep and bear arms for security is to mean anything, it must, as a general matter, permit a person to possess, carry, and sometimes conceal arms to maintain the security of his private residence or privately operated business, and to safely move and store weapons within these premises.

*Hamdan*, 665 N.W.2d at 808.

The District's firearms regulation scheme allows all these things, in accord with the right guaranteed under Second Amendment, as found in *Heller*. *See* D.C. Official Code § 22-4504.01.

---

[11]    The District avers that these statements succinctly summarize the problems with the instant plaintiffs' absolutist view of the Second Amendment, and how use of the "reasonableness" test helps assure the "common good."

*The Second Amendment Does Not Guarantee the Right to Carry Handguns in Public.*

Protecting the public peace has long been recognized as a purpose which will usually count heavily in weighing the rights of any individual gun carrier:

> the purpose [of the statute] was, as far as may be consistent with the right of the citizen to bear arms, absolutely to prohibit the carrying of deadly weapons, with a view to prevent acts of violence and bloodshed, which are too apt to be committed by persons under excitement when they have at hand such effectual means of perpetrating such acts.

*State v. Johnson*, 16 S.C. 187, ___ (S.C. 1881).

This concept—protection of the public peace—is mirrored in state gun laws prohibiting the carrying of weapons. "The possession and use of weapons inherently dangerous to human life constitutes a sufficient hazard to society to call for prohibition unless there appears appropriate justification created by special circumstances." *People v. Price*, 873 N.E.2d 453, 460 (Ill. App. 2007) (quoting 720 ILL. COMP. STAT. ANN. 5/24, Committee Comments—1961, at 7 (2003), *appeal denied*, 226 Ill.2d 602 (Ill. 2007)).

Illinois courts, like those in Wisconsin, recognize that the "core" of the right to bear arms surrounds the need to protect "hearth and home." In reviewing comments made by legislators concerning the concealed-weapon statute, one court concluded: "these statements strongly suggest a legislative intent to criminalize most instances of firearm possession—absent the special circumstances where a person possessed a weapon out of fear for the safety of his person and possessions inside his place of ongoing residence, *i.e.*, his home." *Price*, 873 N.E.2d at 461.

In other words, outside of the primary locations of home and work, a gun owners' desire to carry a weapon is usually subordinate to the need to protect public safety.

> The legislature's purpose in enacting the [statute] was to prevent any person from carrying a loaded weapon on his person or in his vehicle due to "the inherent dangers to police officers and the general public." [T]his statute was designed to prevent the situation where one has a loaded weapon that is immediately

accessible, and thus can use it at a moment's notice and place other unsuspecting citizens in harm's way.

*People v. Smythe*, 817 N.E.2d 1100, 1103–1104 (Ill.App. 2004) (citations omitted), *appeal denied*, 829 N.E.2d 793 (Ill. 2004). *See also People v. Marin*, 795 N.E.2d 953, 958–59 (Ill.App. 2003) ("The overall purpose of the [statute] is to protect the public from gun violence. [T]his purpose is accomplished . . . by prohibiting the accessibility to loaded weapons in public places by society at large."), *appeal denied*, 806 N.E.2d 1070 (Ill. 2003).

The court in *Marin* rejected the defendant's contention that the statute contained an implicit *mens rea* requirement; if "intent" were required to show a violation, the statute would fail to prevent many of the situations the statute would otherwise protect against, *e.g.*,

> accidents with loaded guns on public streets or the escalation of minor public altercations into gun battles or, as the legislature pointed out, the danger of a police officer stopping a car with a loaded weapon on the passenger seat. [T]hus, otherwise "innocent" motivations may transform into culpable conduct because of the accessibility of weapons as an outlet for subsequently kindled aggression. [T]he underlying activity of possessing or transporting an accessible and loaded weapon is itself dangerous and undesirable, regardless of the intent of the bearer since it may lead to the endangerment of public safety. [A]ccess to a loaded weapon on a public street creates a volatile situation vulnerable to spontaneous lethal aggression in the event of road rage or any other disagreement or dispute. The prevention of the potential metamorphosis of such "innocent" behavior into criminal conduct is rationally related to the purpose of the statute, which is to enhance public safety. Because the legislature has a compelling interest in preventing the possession of guns in public under any such circumstances, the statute is reasonably related to the legislature's purpose of "mak[ing] communities in this state safer and more secure for their inhabitants."

*Marin*, 795 N.E.2d at 962 (citations omitted). *See also Marshall v. Walker*, 958 F.Supp. 359, 365 (N.D. Ill. 1997) (rejecting constitutional challenge to landlord's arrest outside his apartment building for violations of Illinois' concealed-weapons statute) (individuals should be able to walk in public "without apprehension of or danger from violence which develops from unauthorized carrying of firearms and the policy of the statute to conserve and maintain public peace on

sidewalks and streets within the cities . . . .") (quoting *People v. West*, 422 N.E.2d 943, 945 (Ill.App. 1981)).

*The District Properly Prohibits Carrying Weapons in Public.*

It has been illegal to carry "deadly or dangerous weapons" in public in the District since before the Civil War. *See* Act of Nov. 18, 1858, CORPORATION LAWS OF THE CITY OF WASHINGTON, at 114 ("it shall not hereafter be lawful for any person or persons, to carry or have concealed about their persons any deadly or dangerous weapons, such as a dagger, pistol, bowie-knife, dirk-knife or dirk, colt, slung-shot, or brass or other metal knuckles, within the city of Washington . . .") (Robert A. Waters 1853 & 1860); SMF ¶ 24.

That law was amended after the turn of the century to make it unlawful to carry a concealed weapon, or "carry openly any such weapon, with intent to unlawfully use the same . . . ." *Cooke v. United States*, 275 F.2d 887, 888 n.1 (D.C. Cir. 1960) (quoting § 855, THE CODE OF LAW FOR THE DISTRICT OF COLUMBIA, at 222–23 (GPO 1911)). Legislation by Congress in 1932 repealed that law, and enacted what became D.C. Official Code § 22-4504, still in effect today, eliminating the requirement that the weapon be carried with intent to use it illegally. *See Cooke*, 275 F.2d at 888 n.1 (discussing Act of July 8, 1932, Pub. L. No. 72-275, 47 Stat. 651); SMF ¶ 25.[12] That law contained an exception for a person carrying such a weapon "in his dwelling

---

[12]     Because Congress originally enacted this law for the District of Columbia, and because, in the instant suit, "the constitutionality of a[n] Act of Congress affecting the public interest is drawn in question," 28 U.S.C. § 2403(a), the District avers that the Court is required to certify such fact to the Attorney General and permit the United States to intervene. Thus, plaintiffs failed to comply with Fed. R. Civ. P. 5.1, which requires a party "drawing into question the constitutionality of a federal" statute to file and serve notice on the Attorney General of the United States, if the United States is not a party to the suit. *See* Fed. R. Civ. P. 5.1(b), (c) ("court must, under 28 U.S.C. § 2403, certify to the appropriate attorney general that a statute has been

house or place of business or on other land possessed by him . . . ." *See* House Rep. No. 767, at 1 (72nd Congress, 1st Sess., Mar. 11, 1932); SMF ¶ 25.[13]

Congress enacted the law to "provid[e] additional safeguards and more stringent restrictions concerning the sale and possession of dangerous weapons. It was introduced at the request of the Commissioners of the District of Columbia and the need for such legislation is apparent to all citizens." House Rep. No. 767, at 2; SMF ¶ 26.

Ample local and federal case law demonstrates a "history of anti-weapons legislation evidencing the clearest intent to drastically tighten the ban on carrying dangerous weapons [in the District of Columbia]." *Cooke*, 275 F.2d at 889. *See also, e.g., United States v. Shannon*, 144 A.2d 267, 268 (Mun.App. 1958) ("the purpose of the [1953] legislation was to strengthen rather than supplant existing law and to provide 'tighter controls over the possession of dangerous weapons.'") (citing House Rep. No. 3244 (81st Congress, May 31, 1951); House Rep. No. 538 (82nd Congress, May 31, 1951); Senate Rep. No. 1989 (82nd Congress, June 30, 1952)). *Cf. United States v. Walker*, 380 A.2d 1388, 1390 n.3 (D.C. 1977) ("the object of the statute . . . is not to prohibit the carrying of a pistol with intent to use it as a weapon, but to forestall the temptation to use it as such by forbidding possession of such an object outside the possessor's home or place of business." (quoting *Mitchell v. United States*, 302 A.2d 216, 217 (D.C. 1973)).[14]

---

questioned.") (United States may intervene "within 60 days after the notice is filed or after the court certifies the challenge, whichever is earlier.").

[13]    That exception, and the exemption for law-enforcement officers, remains in place. *See* D.C. Official Code §§ 22-4504.01, 22-4505.

[14]    *See also Worthy v. United States*, 420 A.2d 1216, 1218 (D.C. 1980) ("Congress enacted this provision to enforce drastically a prohibition against carrying particular dangerous weapons within the District of Columbia.").

The District's prohibition on carrying guns in public easily meets the reasonableness test. There is a "compelling state interest in protecting the public from the hazards involved with certain types of weapons, such as guns." *Cole*, 665 N.W.2d at 344. While the typical plaintiff complains that a prohibition on carrying weapons infringes his right of self-defense in case of a public attack, that contention is outweighed by two primary considerations: "[T]he danger of widespread presence of weapons in public places and police protection against attack in these places. [P]lace and manner regulations which do not restrict possession in homes or businesses do not seem to subvert unduly the self-defense purpose." *Id.* (quoting Michael D. Ridberg, "The Impact of State Constitutional Right to Bear Arms Provisions on State Gun Control Legislation," 38 U. CHI. L. REV. 185, 204 (1970)).

> In exempting property owners or persons in their fixed place of business, the legislature was mindful of the need of people to defend their homes and businesses from unlawful intruders and the fact that the police cannot protect every home and every business 24 hours a day. [T]he legislature sought to prevent . . . the mass possession of weapons, which would pose a danger to the public and the police alike. In limiting the allowable possession of weapons to property in which one has ownership, the legislature has balanced a person's need to protect his home or business with the need of the general public and the police to be protected from potential use of weapons in situations unrelated to protecting one's property or business.

*People v. Pulley*, 803 N.E.2d 953, 961 (Ill.App. 2004), *appeal denied*, 809 N.E.2d 1291 (Ill. 2004).

These same considerations apply in the District of Columbia. "Implicit in the statutory proscription . . . is a congressional recognition of the inherent risk of harm to the public of such dangerous instrumentality being carried about the community and away from the residence or business of the possessor." *Walker*, 380 A.2d at 1390. *See also, e.g., White v. United States*, 714 A.2d 115, 119–20 (D.C. 1998) (the "statute was intended 'to prevent a person's having a pistol or dangerous weapon so near him or her that he or she could promptly use it, if prompted to do

so by any violent motive.") (citations omitted)); *Roper v. United States*, 564 A.2d 726, 730 (D.C. 1989) ("It is essentially a crime of possession, designed to keep such dangerous items off the street."). The District avers that these justifications are even *more* compelling here, given the utterly unique status of the District of Columbia as the nation's capital.[15]

Legislation was introduced in Congress last year to substantially limit the ability of the District to regulate firearms. *See* H.R. 6691, the "Second Amendment Enforcement Act," 110th Cong., 2nd Sess. (July 31, 2008); SMF ¶ 13. That legislation—which had some 135 co-sponsors—would have, *inter alia*, repealed the District's prohibition on semiautomatic weapons, *id.,* § 4, repealed the registration requirement, *id.,* § 5, and eliminated criminal penalties for the possession of unregistered firearms, *id.,* § 8. "The District of Columbia shall not have authority to enact laws or regulations that discourage or eliminate the private ownership or use of firearms." *Id.*, § 3. Despite that seemingly draconian intrusion on self-rule, essentially requiring the District to define the Second Amendment as broadly as anywhere else in the country, that legislation and subsequent legislation expressly recognized the unique position of the District, and acknowledged the compelling need to continue to prevent the public carrying of dangerous weapons.

A version of the "Second Amendment Enforcement Act" was introduced in the Senate as an amendment, S.A. 575, to Senate Bill 160, which would have "provide[d] the District of

---

[15]    Notwithstanding the unique status of the District, plaintiffs are simply wrong to imply that no other city bars the carrying of weapons in public. *See, e.g.*, TOLEDO MUN. CODE §§ 549.02 (carrying concealed weapons prohibited), 549.18 (weapon possession in public places prohibited); MONTGOMERY COUNTY (MD.) CODE §§ 57-10 ("It shall be unlawful for any person to have upon his person, concealed or exposed, or in a motor vehicle where it is readily available for use, any gun designed to use explosive ammunition . . . ."), 57-11(a) ("A person must not sell, transfer, possess, or transport a handgun, rifle, or shotgun, or ammunition for these firearms, in or within 100 yards of a place of public assembly.").

Columbia a voting seat and the State of Utah an additional seat in the House of Representatives."
*See* 155 Cong. Rec. S2507-08, 2541 (Feb. 26, 2009); SMF ¶ 16. That amendment, which had 22
co-sponsors (and eventually passed by a vote of 62 to 36), explicitly noted: "Nothing in the
previous two sentences shall be construed to prohibit the District of Columbia from regulating or
prohibiting the carrying of firearms by a person, either concealed or openly, other than at the
person's dwelling place, place of business, or on other land possessed by the person." S.A. 575, §
3, 155 Cong. Rec. S2490 (Feb. 25, 2009); SMF ¶ 16.

Thus, even those members of Congress most supportive of the broad reading of the
Second Amendment urged by plaintiffs here recognize that continuing the prohibition on
carrying dangerous weapons in public in the District is in the best interests of public order and
safety.

The Supreme Court recognized the power of government to ban the carrying of weapons
in "sensitive places." *Heller*, 128 S. Ct. at 2817. While plaintiffs claim that such presumptions of
lawfulness may be overcome in "appropriate circumstances," P.Mem. at 8–9, they never identify
what those circumstances might be. Although plaintiffs argue that they should have the right to
carry weapons anywhere in the District, perhaps only certain "exclusion zones" within the
District would be appropriate "no carry" areas, depending on the proximity to critical facilities or
gatherings of "important" people. It should go without saying that the logistical and
administrative difficulties in defining and enforcing such a system would be monumental.

Defendants aver that the whole of the District of Columbia should be considered a
"sensitive" place, given its dense concentration of iconic structures, government facilities,
embassies, and regular meetings of diplomats and leaders from around the world. *See Hearing on
the Impact of Proposed Legislation on the District of Columbia's Gun Laws Before the House*

*Comm. on Oversight & Government Reform* (Sept. 9, 2008) (Testimony of Cathy L. Lanier,

Chief of Police) at 5 ("[T]he District of Columbia, as the seat of the Federal government, with its

multitude of critical official and symbolic buildings, monuments, and events, and high-profile

public officials traversing its streets every day, is a city filled with "sensitive" places. Our laws

should reflect that reality.").

*The District's Gun Laws Do Not Violate the Right to Travel.*

Plaintiffs assert that the District's "residence-based discrimination" in its firearms laws

violates their rights. P.Mem. at 14. Plaintiffs do not provide a single controlling or persuasive

case on point. Indeed, of the 16 pages of their brief, barely two and a half are devoted to this

topic.

A law implicates the right to travel in three situations—when it actually deters travel,

when impeding travel is its primary objective, or when it uses a classification that penalizes the

exercise of the right. *Attorney General of N.Y. v. Soto-Lopez*, 476 U.S. 898, 903 (1986); *Kansas*

*v. United States*, 16 F.3d 436, 441 (D.C. Cir. 1994). The District avers that, on its face, District

law does none of these things. Travel through or into the District is not deterred, in that any

citizen legally possessing a handgun may lawfully transport that weapon under the provisions of

federal law, as discussed *infra*. Nor were the restrictions *designed* to impede travel; their purpose

is the obvious and important goal of protecting public safety. The potential inconveniences

visited on plaintiffs by District law does not violate their right to travel. "[S]omething more than

a negligible or minimal impact on the right to travel is required . . . ." *Kansas*, 16 F.3d at 442

(quoting *Soto-Lopez*, 476 U.S. at 921 (O'Connor, J., dissenting)).

The long-recognized right to travel is frequently thought to be another manifestation of the rights guaranteed by the "privileges and immunities" language in the Constitution. *See Soto-Lopez*, 476 U.S. at 902 (citing Privileges and Immunities Clause, Art. IV, and Privileges and Immunities Clause of the Fourteenth Amendment) (citations omitted). But only those activities "sufficiently basic to the livelihood of the Nation" are encompassed in the right. *Supreme Court of Virginia v. Friedman*, 487 U.S. 59, 64 (1988) (quoting *Baldwin v. Montana Fish & Game Comm'n*, 436 U.S. 371, 388 (1978)). *Cf. Memorial Hosp. v. Maricopa County*, 415 U.S. 250, 221 (1974) (right to travel "must be seen as insuring new residents the same right to vital government benefits and privileges in the States to which they migrate as are enjoyed by other residents.").

A law will survive such a challenge if it has a "substantial" interest that is "closely" related to the means employed to differentiate between residents and non-residents. *Bach v. Pataki*, 408 F.3d 75, 88 n.27 (2nd Cir. 2005) (citing *Toomer v. Witsell*, 334 U.S. 385, 399 (1948) and *Friedman*, 487 U.S. at 65).

But non-residents are not guaranteed all the rights enjoyed by *bona fide* residents. *Toomer*, 334 U.S. at 396. Perhaps intentionally, plaintiffs conflate *bona fide* residence requirements (which differentiate between residents and nonresidents) with "durational," fixed-point or fixed-date residence requirements, which treat individuals differently depending on the time they entered the state. *See, e.g., Soto-Lopez*, 476 U.S. at 903 n.3. Only the *latter* are subject to "intensified scrutiny."

> A bona fide residence requirement, appropriately defined and uniformly applied, furthers the substantial state interest in assuring that services provided for its residents are enjoyed only by residents. Such a requirement . . . [generally] does not burden or penalize the constitutional right of interstate travel, for any person is free to move to a State and to establish residence there.

*Id.* (alteration in original) (quoting *Martinez v. Bynum*, 461 U.S. 321, 328–29 (1983)).

Here, the District's requirement that only residents are permitted to register their handguns easily fits this test as a *bona fide* residence requirement. In *Bach*, a resident of Virginia who possessed a concealed-weapon permit from that state alleged that New York's refusal to recognize such permits violated his right to travel. *Bach v. Pataki*, 289 F.Supp.2d 217, 222 (N.D.N.Y. 2003), *affirmed*, 408 F.3d 75 (2nd Cir. 2005), *cert. denied*, 546 U.S. 1174 (2006). The trial court rejected that claim, finding that

> New York's permit scheme bears a close relationship to substantial and valid reasons for the disparate treatment of nonresident travelers, beyond the mere fact that they are citizens of other states.
> * * *
> [The regulations are] designed to provide a method of recording information on the identity of persons possessing such weapons and the weapons themselves. Thus, the proper processing of permit applications is "vitally essential to public order and safety."

*Bach*, 289 F.Supp.2d at 227 (quoting *Federation of N.Y. State Rifle & Pistol Clubs, Inc. v. McGuire*, 420 N.Y.S.2d 602, 603 (N.Y.Sup.Ct. 1979) (additional citations omitted)).

The court agreed with the defendants that

> [t]he practical implications of requiring New York to accept applications from all nonresidents are apparent. First, the strain on investigatory resources would be significantly increased. More importantly, however, the ability to obtain, and verify, information would be negatively impacted were New York officials required to make inquiries in other states.

> [T]he administrative problems in investigating, monitoring, enforcing and revoking permits where the applicant does not have residency, employment or business ties with New York and the resultant likelihood of errors, would be inimical to New York's scheme of licensing firearms as a means of controlling their possession for the public good. Accordingly, as the state defendants contend, New York acted reasonably in denying the privilege to those with relatively remote contacts to New York. Likewise, allowing nonresidents with licenses from other states to carry weapons in New York without complying with New York requirements has the potential to present administrative problems and interfere with the achievement of New York's licensing goals.

*Bach*, 289 F.Supp. 2d at 227–28.

The Second Circuit affirmed, holding that "New York's interest in monitoring gun licensees is substantial and that New York's restriction of licenses to residents and persons working primarily within the State is sufficiently related to this interest . . . ." *Bach*, 408 F.3d at 87.

> The State can only monitor those activities that actually take place in New York. Thus, New York can best monitor the behavior of those licensees who spend significant amounts of time in the State. By limiting applications to residents and in-state workers, New York captures this pool of persons. It would be much more difficult for New York to monitor the behavior of mere visitors like Bach, whose lives are spent elsewhere.

*Id*. at 92.[16]

The identical situation obtains here. The District's interest in monitoring gun licensees has a substantial public-safety justification amply supporting the differential treatment of non-residents.[17] Consequently, each plaintiff's right to travel is not infringed. *See also Torraco v.*

---

[16]    The Second Circuit made its decision assuming (without deciding) "that entitlement to a New York carry license is a privilege under Article IV." *Id*. at 91.

[17]    *See* FCAA Rep. at 3–4:

> The Committee believes that the District must maintain a strong firearms' registration law because it is part of a sound gun policy. Registration is critical because it: gives law enforcement essential information about firearm ownership, allows officers to determine in advance whether individuals involved in a call may have firearms, facilitates the return of lost or stolen firearms to their rightful owners, assists law enforcement in determining whether registered owners are eligible to possess firearms or have fallen into a prohibited class, permits officers to charge individuals with a crime if an individual is in possession of an unregistered firearm, and permits officers to seize unregistered weapons.

*See also Hearing on the Firearms Control Amendment Act of 2008 Before the Council of the District of Columbia Committee on Public Safety & the Judiciary* (Oct. 1, 2008) (Testimony of Cathy L. Lanier, Chief of Police) ("I think that the registration process for firearms is vital and enhances public safety. It enables MPD to verify eligibility through a local background check, a process that has been found to reduce homicide rates. It also

*Port Authority of N.Y. & N.J.*, 539 F.Supp.2d 632, 652 (E.D.N.Y. 2008) ("refusal to allow the transport of a firearm is not sufficiently material to infringe upon that right [to travel]. It does not rise to the level of receiving medical care, or subsistence benefits, or earning a living.") (citations omitted); *Pencak v. Concealed Weapon Licensing Bd. of County of St. Clair*, 872 F.Supp. 410, 414 (E.D. Mich. 1994) ("Plaintiff has cited no authority for the proposition that denial of a concealed weapon permit deters migration, penalizes the right to travel, or that a concealed weapons permit is a 'vital government benefit and privilege.'"); *id.* ("A concealed weapons license is not even a government benefit that rises to the level of benefits deemed by the United States Supreme Court as not vital, such as lower university tuition, or suing for divorce.") (citations omitted).

Notwithstanding this conclusion, federal law provides protections for individuals who wish to transport their lawful firearms. Congress enacted the Firearms Owners' Protection Act, Pub. L. 99-360, § 1(a), 100 Stat. 766 (July 8, 1986), *codified at* 18 U.S.C. § 926A ("FOPA"), to allow what the plaintiffs here assert, at least implicitly, the right to do, *i.e.*, to transport their weapons from place to place without restriction by intervening jurisdictions. FOPA provides that a person

> shall be entitled to transport a firearm for any lawful purpose from any place where he may lawfully possess and carry such firearm to any other place where he may lawfully possess and carry such firearm if, during such transportation the firearm is unloaded, and neither the firearm nor any ammunition being transported is readily accessible or is directly accessible from the passenger compartment of such transporting vehicle: *Provided*, That in the case of a vehicle without a compartment separate from the driver's compartment the firearm or ammunition shall be contained in a locked container other than the glove compartment or console.

---

provides an opportunity to educate registrants about vital laws, responsibilities, and safety.").

-32-

18 U.S.C. § 926A.

Plaintiffs never mention FOPA, although the reasons for that omission are not hard to guess. *See* Complaint ¶ 32 (plaintiff Raymond was arrested with a loaded handgun in his car's center console). Other gun owners have tried, unsuccessfully, to invoke FOPA in claiming that a jurisdiction's gun restrictions violate their "right to travel." *See, e.g., Torraco*, 539 F.Supp.2d at 652; *In re Two Seized Firearms*, 602 A.2d 728, 731 (N.J. 1992) ("Although enacted to assure to gun owners freedom to travel from state to state with weapons legally possessed in the state of residence, the statute qualifies that freedom with the sensible accommodation of each state's right to ensure the safety, health, and welfare of its own citizens.").[18] Compliance with FOPA gives plaintiffs all the protections they are entitled to in travels to and through the District.


## IV. Conclusion

Prohibiting the carrying of weapons in public, and restricting registration of handguns to District residents, serve important goals of public safety, especially here, in the nation's capital. The District need not observe the lowest common denominator of gun control among the various states. For the foregoing reasons, defendants move for summary judgment. A proposed Order is attached hereto.

DATE: September 9, 2009                    Respectfully submitted,

                                           PETER J. NICKLES
                                           Attorney General for the District of Columbia

---

[18]    In this case, the defendant sought the return of two forfeited handguns. He argued that, because his home state of Florida did not prohibit carrying a loaded handgun in the glove compartment, New Jersey should permit such possession for non-residents travelling through the state. "We find that no principle of constitutional doctrine or of federal supremacy over the interstate transportation of weapons compels that result. New Jersey need not observe the lowest common denominator of gun control among the various states." *Id*. at 728–29.

GEORGE C. VALENTINE
Deputy Attorney General, Civil Litigation Division


_____/s/ Ellen A. Efros_____
ELLEN A. EFROS, D.C. Bar No. 250746
Chief, Equity Section I
441 Fourth Street, N.W., 6th Floor South
Washington, D.C. 20001
Telephone: (202) 442-9886

_____/s/ Andrew J. Saindon_____
ANDREW J. SAINDON, D.C. Bar No. 456987
Assistant Attorney General
Equity I Section
441 Fourth Street, N.W., 6th Floor South
Washington, D.C. 20001
Telephone: (202) 724-6643
Facsimile: (202) 730-1470
andy.saindon@dc.gov