# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| DICK ANTHONY HELLER *et al.*, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 08-1289 (RMU) |
| | : | | |
| v. | : | Re Document Nos.: | 23, 25 |
| | : | | |
| DISTRICT OF COLUMBIA *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

## MEMORANDUM OPINION

### DENYING THE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT; GRANTING THE DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

This matter comes before the court on the motion for summary judgment filed by the plaintiffs and the cross-motion for summary judgment filed by the defendants. In June 2008, the Supreme Court in *District of Columbia v. Heller* issued a watershed decision establishing that law-abiding, responsible citizens have the right, under the Second Amendment to the Constitution, to use arms "in defense of hearth and home." The defendants, the District of Columbia ("the District" or "D.C.") and Mayor Adrian Fenty, then promulgated new firearms restrictions in an effort to cure the constitutional deficits that the Supreme Court had identified in *Heller*. The plaintiffs in this case, Dick Heller, Absalom Jordan, William Carter and Mark Snyder, now challenge three provisions of the new laws: (1) the firearms registration procedures; (2) the prohibition on assault weapons; and (3) the prohibition on large capacity ammunition

feeding devices.[1]  In addition, the plaintiffs claim that the laws violate § 1-303.43 of the D.C.

Code, which requires that all measures regulating firearms in the District be "usual and

reasonable."

        The plaintiffs and the defendants have now filed cross-motions for summary judgment.

Upon consideration of the parties' submissions, the court concludes that the regulatory provisions

that the plaintiffs challenge permissibly regulate the exercise of the core Second Amendment

right to use arms for the purpose of self-defense in the home.  As a consequence, the court denies

the plaintiffs' motion for summary judgment and grants the defendants' cross-motion for

summary judgment.


## II.  FACTUAL & PROCEDURAL BACKGROUND

### A.  *Heller* and the District of Columbia's Response Thereto

        In *Heller*, the Supreme Court held that "the District's ban on handgun possession in the

home violate[d] the Second Amendment, as [did] its prohibition against rendering any lawful

firearm in the home operable for the purpose of immediate self-defense."  *District of Columbia v.*

*Heller*, 128 S. Ct. 2783, 2821-22 (2008).[2]  Following the issuance of the *Heller* decision, the

D.C. Council ("the Council") enacted a series of temporary, emergency measures in an effort to

---

[1]     In their second amended complaint, the plaintiffs also challenge the prohibition of pistols not
        included on the California Roster of Handguns Certified for Sale.  *See* 2d Am. Compl. ¶¶ 36-47,
        73-76.  In the plaintiffs' motion for summary judgment, however, the plaintiffs withdraw that
        claim, stating that "the District has ameliorated that prohibition to the extent that it is now moot."
        Pls.' Mot. at 21 n.20.  Accordingly, the court will not address that portion of the second amended
        complaint.

[2]     The court will discuss the *Heller* decision in more detail in Part III.B.1.

regulate firearms in a manner consistent with the Supreme Court's ruling. *See* COUNCIL OF D.C.,

COMMITTEE ON PUBLIC SAFETY & THE JUDICIARY, REPORT ON BILL 17-843, Nov. 25, 2008

("Committee Report") at 1, 10-11. On September 18, 2008 and October 1, 2008, the Council's

Committee on Public Safety and the Judiciary held two days of public hearings[3] during which it

heard the testimony of twenty-one witnesses – both for and against the regulation of firearms –

and considered the written statements of four others "in order to receive as much public comment

as possible in crafting [the] bill." *Id.* at 3; *see also id.* at 11-14. The Council then passed, and

Mayor Fenty signed, the Firearms Registration Amendment Act of 2008 ("the Act")[4] on January

28, 2009. *See* 56 D.C. Reg. 3438 (May 1, 2009). After Congress declined to disapprove of the

Act during the prescribed period of congressional review, it became law on March 31, 2009. *See*

*id.*

### B. The Instant Action

The plaintiffs commenced this action on July 28, 2008, *see generally* Compl., and filed an

amended complaint the following day, *see generally* Am. Compl. Following the District's

promulgation of the Act, the plaintiffs again amended their complaint on March 25, 2009.[5] *See*

*generally* 2d Am. Compl. The plaintiffs claim that the firearms registration scheme, the

---

[3]     The Committee Report states that in addition, the Committee on Public Safety and the Judiciary held "one hearing on gun control generally." COUNCIL OF D.C., COMMITTEE ON PUBLIC SAFETY & THE JUDICIARY, REPORT ON BILL 17-843, Nov. 25, 2008 ("Committee Report") at 3.

[4]     The Act was introduced as the Firearms Control Amendment Act of 2008, *see* Committee Report at 1, and the plaintiffs refer to the Act by the name under which it was introduced, *see, e.g.*, Pls.' Mot. at 1.

[5]     The court also consolidated this case with Civil Action No. 09-0454, *see* Minute Order (July 30, 2009), but shortly thereafter the claims brought by the plaintiffs in Civil Action No. 09-0454 were voluntarily dismissed without prejudice, *see* Notice (Aug. 5, 2009). Accordingly, only the claims brought by the original plaintiffs in this action remain.

prohibition on assault weapons and the prohibition on large capacity ammunition feeding devices violate the Second Amendment, both facially and as applied to the plaintiffs. The plaintiffs filed a motion for summary judgment on July 31, 2009, *see generally* Pls.' Mot., the defendants filed a cross-motion for summary judgment on August 5, 2009, *see generally* Defs.' Cross-Mot., and the parties filed their respective oppositions and replies in September 2009, *see generally* Defs.' Opp'n to Pls.' Mot. ("Defs.' Opp'n"); Pls.' Reply in Support of Pls.' Mot. ("Pls.' Reply"); Pls.' Opp'n to Defs.' Cross-Mot. ("Pls.' Opp'n"); Defs.' Reply in Support of Defs.' Cross-Mot. ("Defs.' Reply"). As both motions are now ripe for adjudication, the court turns to the applicable legal standards and the parties' arguments.

## III. ANALYSIS

### A. Legal Standard for a Motion for Summary Judgment

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995). To determine which facts are "material," a court must look to the substantive law on which each claim rests. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248.

In ruling on cross-motions for summary judgment, the court shall grant summary judgment only if one of the parties is entitled to judgment as a matter of law upon material facts

4

that are not genuinely disputed.  *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*, 658 F. Supp. 2d 217, 224 (D.D.C. 2009) (citing *Rhoads v. McFerran*, 517 F.2d 66, 67 (2d Cir.1975)).  To prevail on a motion for summary judgment, the moving party must show that the opposing party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.  By pointing to the absence of evidence proffered by the opposing party, a moving party may succeed on summary judgment.  *Id.*

The opposing party may defeat summary judgment through factual representations made in a sworn affidavit if he "support[s] his allegations . . . with facts in the record," *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) (quoting *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993)), or provides "direct testimonial evidence," *Arrington v. United States*, 473 F.3d 329, 338 (D.C. Cir. 2006).

### B.  Analytical Framework for Second Amendment Challenges

### 1.  The Supreme Court's *Heller* Decision

The court begins its inquiry into the analytical framework governing this action by reviewing the Supreme Court's ruling in *Heller*.  Dick Heller, the plaintiff in the prior *Heller* action and the lead plaintiff in this case, brought a Second Amendment challenge to the District's laws making it a crime to carry an unregistered firearm, prohibiting the registration of firearms and requiring that lawful firearms in the home be disassembled or bound by a trigger lock at all times, rendering them inoperable.  *Heller*, 128 S. Ct. at 2788.

After an exhaustive discussion of the text of the Second Amendment and the eighteenth-century sources of its original meaning, the Court held that the Amendment guarantees an individual right of armed defense that is not limited to militia service.  *Id.* at 2801.  The Court

5

began its analysis with the language of the "operative clause" of the Second Amendment, which

states that "the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST.

amend. II. After consulting numerous historical authorities to illuminate the meaning of this

language at the time it was adopted, the Court concluded:

> Putting all of these textual elements together, we find that they guarantee the
> individual right to possess and carry weapons in case of confrontation. This meaning
> is strongly confirmed by the historical background of the Second Amendment. We
> look to this because it has always been widely understood that the Second
> Amendment, like the First and Fourth Amendments, codified a *pre-existing* right.

*Heller*, 128 S. Ct. at 2797.

Next, the Court examined the historical meaning of the "prefatory clause" of the Second

Amendment, which reads, "[a] well regulated Militia, being necessary to the security of a free

State . . . ." *Id.* at 2799-2801 (quoting U.S. CONST. amend. II). The Court concluded that the

prefatory clause described the purpose of codifying the Amendment, which was "to prevent

elimination of the militia" by taking away citizens' arms. *Id.* at 2801. Self-defense, however,

remained the "central component" of the Amendment. *Id.* The Court determined that because

"the inherent right of self-defense has been central to the Second Amendment right" and because

the District's ban on handgun possession "extend[ed] . . . to the home, where the need for

defense of self, family, and property is most acute," that ban was invalid. *Id.* at 2817. For the

same reason, the District's "prohibition against rendering any lawful firearm in the home

operable for the purpose of immediate self-defense" also violated the Second Amendment. *Id.* at

2821-22. The Court concluded that "whatever else [the Second Amendment] leaves to future

evaluation, it surely elevates above all other interests the right of law-abiding, responsible

citizens to use arms in defense of hearth and home." *Id.* at 2821.

While the Court recognized that the Second Amendment protects a natural right of an individual to keep and bear arms in the home in defense of self, family and property, it cautioned that that right is not unlimited.  *See id.* at 2797-99.  The Court noted that the Second Amendment does not "protect those weapons not typically possessed by law-abiding citizens for lawful purposes."  *Id.* at 2816.  Nor should *Heller* "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."  *Id.* at 2816-17.  And in a footnote, the Court specified that its list of "presumptively lawful regulatory measures" was not meant to be exhaustive.  *Id.* at 2817 n.26.  Additionally, the Court endorsed prohibitions on carrying "dangerous and unusual weapons" and extended the right to keep and carry arms only to those sorts of weapons "in common use at the time."  *Id.* at 2817 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)).

The Court expressly reserved the question of what standard of review to apply, concluding that the laws were invalid "[u]nder any of the standards of scrutiny that [the Court has] applied to enumerated constitutional rights."  *Id.* at 2817.  The Court did, however, rule out rational-basis review: "[i]f all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect."  *Id.* n.27.  Additionally, the Court rejected the "interest-balancing inquiry" proposed by Justice Breyer in dissent.  *Id.* at 2821.  This "judge-empowering" standard is inappropriate, the majority concluded, because "[a] constitutional guarantee subject to future judges' assessments of its usefulness is no

7

constitutional guarantee at all." *Id.* The *Heller* Court acknowledged that its opinion left "many applications of the right to keep and bear arms in doubt," but stated that it intends to clarify the scope of the right in subsequent cases. *Id.*

### 2. Standard Governing the Court's Review of the Challenged Laws

This court, like many others to have considered Second Amendment challenges in the nearly two years since the *Heller* decision was issued, must determine what standard of review to apply to the plaintiffs' claims notwithstanding the fact that no clear directive is contained in the *Heller* decision itself. The plaintiffs strenuously argue that the court should apply strict scrutiny to the laws at issue, *see* Pls.' Mot. at 12-13, while the defendants ask the court to apply "reasonableness review," the level of scrutiny that state courts applied almost uniformly to laws regulating firearms prior to the *Heller* decision, *see* Defs.' Cross-Mot. at 15-20. In the alternative, the defendants argue that the court should apply intermediate scrutiny to the challenged laws. *See id.* at 20.

### a. Post-*Heller* Approaches to Second Amendment Challenges

In adjudicating Second Amendment challenges in the wake of *Heller*, lower courts have formulated a range of approaches, falling into the five categories summarized below. Many courts have managed to rule on the constitutional issues without determining what standard of review applies by, for instance, comparing the challenged provision to the "presumptively lawful regulatory measures" identified in *Heller*. *See, e.g.*, *United States v. Masciandaro*, 648 F. Supp. 2d 779, 787-90 (E.D. Va. 2009) (upholding the challenged law "under any elevated level of constitutional scrutiny"); *United States v. Booker*, 570 F. Supp. 2d 161, 162-63 (D. Me. 2008) (stating that "[r]ather than tackle th[e] complex and unanswered question" of what level of

scrutiny to apply, "[a] useful approach is to ask whether a statutory prohibition against the possession of firearms by felons and the mentally ill is similar enough to the statutory prohibition [challenged in that case] to justify its inclusion in the list of 'longstanding prohibitions' that survive Second Amendment scrutiny"). Similarly, some courts have concluded that the Second Amendment right does not encompass the conduct that the challenged laws prohibit. *See, e.g.*, *United States v. Fincher*, 538 F.3d 868, 874 (8th Cir. 2008) (concluding that "[m]achine guns are not in common use by law-abiding citizens for lawful purposes and therefore fall within the category of dangerous and unusual weapons that the government can prohibit for individual use").

Other courts have attempted to navigate the uncharted waters of what standard of review applies in the Second Amendment context. A minority of those courts have applied strict scrutiny[6] based on the fact that the majority opinion in *Heller* describes the Second Amendment right as a "pre-existing right," *Heller*, 128 S. Ct. at 2797, 2804, analogizes the Second Amendment right to other fundamental rights, *id.* at 2797, 2817 n.27, 2821, and states that the right to have arms was "fundamental for English subjects" at the time of the founding, *id.* at 2798, *see, e.g.*, *United States v. Engstrum*, 609 F. Supp. 2d 1227, 1231-32 (D. Utah 2009). Many other courts, however, have rejected the strict scrutiny approach and concluded that intermediate scrutiny[7] is the proper standard of review. *See, e.g.*, *United States v. Miller*, 604 F. Supp. 2d 1162, 1171 (W.D. Tenn. 2009); *United States v. Marzzarella*, 595 F. Supp. 2d 596, 606 (W.D.

---

[6]     Strict scrutiny requires that a law be narrowly tailored to serve a compelling governmental interest to survive a constitutional challenge. *Abrams v. Johnson*, 521 U.S. 74, 91 (1997).

[7]     A law survives intermediate scrutiny if it is substantially related to an important governmental interest. *Clark v. Jeter*, 486 U.S. 456, 461 (1988).

Pa. 2009); *United States v. Schultz*, 2009 WL 35225, at *5 (N.D. Ind. Jan. 5, 2009). Still others

have applied elements of the "undue burden" test applicable in the abortion context.[8] *Nordyke v.*

*King*, 563 F.3d 439, 459-60 (9th Cir. 2009), *reh'g en banc granted*, 575 F.3d 890 (9th Cir. 2009);

*People v. Flores*, 86 Cal. Rptr. 3d 804, 809 (Ct. App. 2008). Finally, some courts have

formulated hybrids of the approaches listed above. *See, e.g.*, *United States v. Skoien*, 587 F.3d

803, 812 (7th Cir. 2009) (applying intermediate scrutiny after determining that "[l]aws that

restrict the right to bear arms are subject to meaningful review, but unless they severely burden

the core Second Amendment right of armed defense, strict scrutiny is unwarranted").

### b. The Court Applies Intermediate Scrutiny to the Challenged Laws

For the reasons explained below, this court joins numerous other courts in concluding

that intermediate scrutiny is the appropriate standard of review. As an initial matter, the court

rejects the defendants' contention that the "reasonableness test" should be applied to Second

Amendment challenges in the post-*Heller* era. The reasonableness test, as the defendants

characterize it, would require the court to uphold a law regulating firearms so long as the

legislature had "articulated proper reasons for acting, with meaningful supporting evidence," and

the measure did "not interfere with the 'core right' the Second Amendment protects by depriving

the people of reasonable means to defend themselves in their homes." Defs.' Cross-Mot. at 15.

Prior to *Heller*, this was the test used almost uniformly by state courts. *See id.* at 18. In *Heller*,

however, the Court emphasized for the first time that some form of heightened scrutiny is

---

[8]     The "undue burden" test, which is based on the principle that "not every law which makes a right
more difficult to exercise is, *ipso facto*, an infringement of that right," *Planned Parenthood of Se.
Pa. v. Casey*, 505 U.S. 833, 873 (1992), provides that a law is constitutionally permissible so
long as it does not have the "purpose or effect of placing a substantial obstacle in the path" of the
individual seeking to engage in the constitutionally protected conduct, *id.* at 877.

necessary in light of the fact that the right at issue is a specific, constitutionally enumerated right. *Heller*, 128 S. Ct. at 2817 & n.27. The reasonableness test subjects firearms laws to only a marginally more heightened form of review than rational-basis review. As one commentator remarked prior to *Heller*,

> [w]hile there is a difference in focus between [the reasonableness test and rational-basis review], in ordinary practice both standards are extremely deferential. Rational basis review has been characterized as "virtually none in fact" because nearly every law subject to it survives judicial scrutiny. Similarly, nearly all laws survive the reasonable regulation standard, thus giving wide latitude to legislatures. As the Illinois Supreme Court noted, the right to bear arms is subject to "substantial infringement." Like rational basis, the reasonable regulation standard tends to be, more than anything else, shorthand for broad judicial deference.

Adam Winkler, *Scrutinizing the Second Amendment*, 105 MICH. L. REV. 683, 718-19 (2007). Because the court believes that the reasonableness test would subject the contested provisions to a more lenient measure of scrutiny than that envisioned by the *Heller* Court, the court rejects the defendants' assertion that the reasonableness test applies to laws regulating firearms in the post-*Heller* era.

Nor does the court read *Heller* as advocating a test akin to the "undue burden" test used in the abortion context. The *Heller* majority squarely rejected Justice Breyer's proposed "interest-balancing" framework, under which courts would "ask[] whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests." *Heller*, 128 S. Ct. at 2821. Justice Breyer's proposed "interest-balancing inquiry" bears a resemblance to the "undue burden" test, under which a state may promulgate laws advancing its interests so long as those enactments do not "place a substantial obstacle in the path of" an individual seeking to exercise his or her constitutionally

11

protected right. *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 878 (1992); *see also id.* at 876 (stating that "the undue burden standard is the appropriate means of reconciling the State's interest with the [individual's] constitutionally protected liberty"). Given this resemblance, this court strongly doubts that the *Heller* majority envisioned the undue burden standard when it left for another day a determination of the level of scrutiny to be applied to firearms laws.

Instead, the *Heller* majority suggested that one of the two "traditionally expressed levels" of heightened scrutiny – intermediate scrutiny and strict scrutiny – should be applied to laws implicating the Second Amendment right. *See Heller*, 128 S. Ct. at 2821; *id.* at 2817 n.27 (acknowledging that "this law, like almost all laws, would pass rational-basis scrutiny," but rejecting that standard as applied to restrictions on the Second Amendment right). Thus, the court turns to an analysis of whether intermediate scrutiny or strict scrutiny is the most appropriate standard to be used to evaluate restrictions on the exercise of the Second Amendment right.

As many courts have recognized, the Supreme Court did not explicitly hold that the Second Amendment right is a fundamental right, despite the fact that it stated that "[b]y the time of the founding, the right to have arms had become fundamental for English subjects" and noted that Blackstone "cited the arms provision of the Bill of Rights as one of the fundamental rights of Englishmen." *Id.* at 2798. If the Supreme Court had wanted to declare the Second Amendment right a fundamental right, it would have done so explicitly. The court will not infer such a significant holding based only on the *Heller* majority's oblique references to the gun ownership rights of eighteenth-century English subjects. *See Miller*, 604 F. Supp. 2d at 1170 n.10 (citing *United States v. Darrington*, 351 F.3d 632, 635 (5th Cir. 2003) (stating that "if [a court] intended

12

to recognize that the individual right to keep and bear arms is a 'fundamental right,' in the sense that restrictions on this right are subject to 'strict scrutiny' by the courts and require a 'compelling state interest,' it would have used these constitutional terms of art")).

Moreover, as the *Heller* dissent and numerous other courts and legal scholars have pointed out, a strict scrutiny standard of review would not square with the majority's references to "presumptively lawful regulatory measures" such as laws prohibiting firearms possession by felons and the mentally ill, forbidding the carrying of firearms in schools or government buildings and imposing conditions and qualifications on the commercial sale of arms. *Heller*, 128 S. Ct. at 2851 (Breyer, J., dissenting); *see also Skoien*, 587 F.3d at 812 (noting that the court did "not see how the listed laws could be 'presumptively' constitutional if they were subject to strict scrutiny"); *Marzzarella*, 595 F. Supp. 2d at 604 (observing that "the Court's willingness to presume the validity of several types of gun regulations is arguably inconsistent with the adoption of a strict scrutiny standard of review"); Dennis A. Henigan, *The Heller Paradox*, 56 UCLA L. REV. 1171, 1197-98 (2009) (stating that "the *Heller* majority . . . implicitly rejected strict scrutiny" by describing certain gun control measures as presumptively lawful); Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 HASTINGS L.J. 1371, 1379 (2009) (opining that "it is doctrinally impossible to conclude that strict scrutiny governs Second Amendment claims, while also upholding" the presumptively lawful exceptions specified in *Heller*). Therefore, the court rejects the plaintiffs' assertion that strict scrutiny is warranted with respect to the challenged laws.

13

Instead, the court joins the majority of courts to have considered this issue in holding that intermediate scrutiny is the most appropriate standard of review to apply to the challenged laws.[9] This standard satisfies the *Heller* Court's directive that courts apply an exacting measure of scrutiny to laws limiting the exercise of this specific, constitutionally enumerated right, *see Heller*, 128 S. Ct. at 2817 & n.27, while avoiding the inconsistencies that would arise were it to apply strict scrutiny, *see, e.g.*, *Marzzarella*, 595 F. Supp. 2d at 604. Intermediate scrutiny will come into play, of course, only in cases in which the law implicates the core Second Amendment right, namely, "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller*, 128 S. Ct. at 2821.

In sum, to assess the constitutionality of each of the challenged provisions, the court will begin by determining whether the provision at issue implicates the core Second Amendment right. If it does not, then the court will uphold the regulation. If the regulation does, however, implicate the core Second Amendment right, the court will apply intermediate scrutiny to determine whether the measure is substantially related to an important governmental interest.

---

[9]     The court notes that the outcome of these proceedings would be no different if it were to apply the hybrid test formulated by the Seventh Circuit in *United States v. Skoien*, 587 F.3d 803 (7th Cir. 2009). The *Skoien* court held that strict scrutiny applies only to laws that "severely burden the core Second Amendment right of armed defense." *Id.* at 812. In all other cases, the *Skoien* court held, intermediate scrutiny applies. *Id.* In this case, because the registration requirements merely regulate the exercise of the core Second Amendment right, those requirements could not reasonably be considered a "severe burden" on the exercise of that right. *See infra* Part III.C.1. Likewise, the bans on assault weapons and large capacity ammunition feeding devices merely restrict the types of weapons available to individuals seeking to exercise their core Second Amendment right. *See infra* Part III.C.2. Because neither law constitutes a severe burden on the core Second Amendment right, strict scrutiny would be unwarranted even under the *Skoien* framework.

## C. The Court Denies the Plaintiffs' Motion for Summary Judgment and Grants the Defendants' Cross-Motion for Summary Judgment[10]

### 1. The Registration Requirements Are Constitutional

In Count One of their second amended complaint, the plaintiffs claim that the District's procedures for registering a firearm are unconstitutional. *See* 2d Am. Compl. ¶¶ 13-35, 68-72. More specifically, the plaintiffs challenge the following requirements:[11]

- The registrant must submit fingerprints and two photographs for identification purposes. D.C. CODE § 7-2502.04.
- All pistols must be submitted to the Metropolitan Police Department ("MPD") for a ballistics identification procedure, for which the registrant must pay a reasonable fee. *Id.* § 7-2502.03(d).
- The registrant must "demonstrate satisfactorily a knowledge of the laws of the District of Columbia pertaining to firearms and, in particular, the safe and responsible use, handling, and storage of the same in accordance with training, tests, and standards prescribed by" MPD. *Id.* § 7-2502.03(a)(10).
- The registrant must have "vision better than or equal to that required to obtain a valid driver's license under the laws of the District of Columbia." *Id.* § 7-2502.03(a)(11).
- The registrant must have "completed a firearms training or safety course or class conducted by a state-certified firearms instructor or a certified military

---

[10]     Because the plaintiffs mount both a facial and an as-applied challenge to the regulations, the court must "determine first whether the law is constitutional as applied to the challenging party's conduct, and then only if the as-applied challenge fails, . . . determine whether it is necessary to consider the facial challenge." *United States v. Masciandaro*, 648 F. Supp. 2d 779, 786 (E.D. Va. 2009) (citing *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 485 (1989)). "[A] plaintiff can only succeed in a facial challenge by 'establish[ing] that no set of circumstances exists under which the Act would be valid,' *i.e.*, that the law is unconstitutional in all of its applications." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). As discussed below, the court concludes that the challenged regulations, as applied to the plaintiffs in this case, do not violate the Second Amendment. As a result, the plaintiffs' facial challenge must also fail. *See Masciandaro*, 648 F. Supp. 2d at 792 (observing that because the plaintiff's as-applied challenge failed, "it necessarily follow[ed] that [the challenged regulation] ha[d] at least *some* constitutional applications").

[11]     The court summarizes only those registration requirements that the plaintiffs claim are unconstitutional. The entire registration provision is available at §§ 7-2501.01 *et seq.* of the D.C. Code.

firearms instructor that provides, at a minimum, a total of at least one hour of firing training at a firing range and . . . at least 4 hours of classroom instruction." *Id.* § 7-2502.03(a)(13)(A).

- The registrant must specify, *inter alia*, any business or occupation in which he or she has engaged during the previous five years, the intended use of the firearm, where the firearm will generally be kept and any other information that MPD deems necessary to carry out the registration provisions. *Id.* § 7-2502.03(b).

- Unless the registrant is a new resident of the District, MPD "shall register no more than one pistol per registrant during any 30-day period." *Id.* § 7-2502.03(e).

- Registration certificates expire three years after the date they are issued, unless the registrant renews the registration. *Id.* § 7-2502.07a(a).

- The registrant may renew his or her registration if he or she continues to satisfy all of the initial registration requirements. *Id.* § 7-2502.07a(b)-(c).

- The registrant must submit to a background check once every six years to confirm that he or she continues to meet the registration qualifications. *Id.* § 7-2502.07a(d).

- The registrant must notify MPD if his or her firearm is sold, transferred, lost, stolen or destroyed, or if the information submitted to procure the registration changes. *Id.* § 7-2502.08(1).

*See* 2d Am. Compl. ¶¶ 13-35, 68-72; Pls.' Mot. at 2-4. The plaintiffs claim that these registration requirements, both individually and in the aggregate, are so unduly burdensome that they cannot withstand heightened scrutiny. *Id.* at 13-21. The defendants maintain that the registration scheme places permissible limits on the right to own and operate a firearm. Defs.' Cross-Mot. at 21-27.

Before beginning the analysis of whether the District's registration requirements survive intermediate scrutiny, a few preliminary observations are in order. First, although the Supreme Court has yet to squarely address the constitutionality of firearms registration requirements, it suggested in *Heller* that such requirements are not unconstitutional as a general matter. *See Heller*, 128 S. Ct. at 2822 (concluding that "[a]ssuming that Heller is not disqualified from the exercise of Second Amendment rights, the District must permit him to *register his handgun* and

16

must *issue him a license* to carry it in the home") (emphasis added). Second, in *Parker v. District of Columbia*, the District of Columbia Circuit opinion that the Supreme Court affirmed in *Heller*, the Circuit classified registration requirements as a "reasonable restriction" on the Second Amendment right. 478 F.3d 370, 399 (D.C. Cir. 2007) (noting that "[t]he protections of the Second Amendment are subject to the same sort of reasonable restrictions that have been recognized as limiting, for instance, the First Amendment"). Third, several other courts have upheld registration and licensing requirements in the wake of *Heller*, concluding that because registration requirements only regulate, rather than prohibiting, the possession of firearms, they do not infringe the Second Amendment right. *Justice v. Town of Cicero*, 577 F.3d 768, 774 (7th Cir. 2009); *Young v. Hawaii*, 2009 WL 874517, at *5 (D. Haw. Apr. 1, 2009); *Williams v. State*, 982 A.2d 1168, 1173 (Md. Ct. Spec. App. 2009); *People v. Perkins*, 880 N.Y.S.2d 209, 210 (2009); *see also Fincher*, 538 F.3d at 874 (expressing "doubt that any . . . attack [on the federal firearms registration requirements] would succeed in light of *Heller*"). Finally, the Supreme Court has held that registration and licensing schemes are permissible in other contexts so long as they do not excessively impinge on the constitutional right. *Cox v. New Hampshire*, 312 U.S. 569, 576-78 (1941) (holding that a parade permit requirement did not violate the First Amendment); *cf. Zablocki v. Redhail*, 434 U.S. 374, 388 (1978) (invalidating, under strict scrutiny, a marriage licensing scheme because it "unnecessarily impinge[d] on the right to marry"). Against this backdrop, the court turns its attention to the question of whether the District's registration requirements implicate the core Second Amendment right and, if so, whether they survive intermediate scrutiny.

17

Because no individual may possess an unregistered firearm in the District, the registration requirements plainly implicate the core Second Amendment right, that is, the right to defend one's self in one's home. Proceeding, therefore, to the intermediate scrutiny analysis, the court must first examine whether there is an important governmental interest in promulgating the registration requirements. *Clark v. Jeter*, 486 U.S. 456, 461 (1988). The Committee Report that the Committee on Public Safety and the Judiciary issued concerning the Act explains that the Council's intent in promulgating the registration scheme was to

> give[] law enforcement essential information about firearm ownership, allow[] officers to determine in advance whether individuals involved in a call may have firearms, facilitate[] the return of lost or stolen firearms to their rightful owners, assist[] law enforcement in determining whether registered owners are eligible to possess firearms or have fallen into a prohibited class, permit[] officers to charge individuals with a crime if an individual is in possession of an unregistered firearm, and permit[] officers to seize unregistered weapons.

Committee Report at 3-4. The court has no trouble concluding that these goals constitute an important governmental interest. *See, e.g.*, *United States v. Salerno*, 481 U.S. 739, 748-50 (1987) (noting that "the Government's regulatory interest in community safety can, in appropriate circumstances, outweigh an individual's liberty interest" and holding that the government's interest in preventing crime is not only important, but compelling); *Schall v. Martin*, 467 U.S. 253, 264 (1984) (remarking that "[t]he legitimate and compelling state interest in protecting the community from crime cannot be doubted" (citations and quotation marks omitted)).

The court must next determine whether the District's registration scheme is substantially related to the goal of public safety. In answering this question, the court is mindful that legislative bodies are "far better equipped than the judiciary to amass and evaluate the vast

18

amounts of data bearing upon legislative questions." *Turner Broad. Sys., Inc. v. Fed. Commc'ns Comm'n*, 520 U.S. 180, 195 (1997) (citations and quotation marks omitted). Even in cases such as this one in which laws are subjected to intermediate scrutiny because they implicate constitutional rights, the Supreme Court has specified that "deference must be accorded to [congressional] findings as to the harm to be avoided and to the remedial measures adopted for that end, lest [the courts] infringe on traditional legislative authority to make predictive judgments when enacting nationwide regulatory policy." *Id.* The same principle holds true for the findings of the Council in this case.

Moreover, "intermediate scrutiny, by definition, permits [legislative bodies] to paint with a broader brush" than strict scrutiny. *Miller*, 604 F. Supp. 2d at 1172. "[T]he quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments [varies] up or down with the novelty and plausibility of the justification raised." *Nat'l Ass'n of Mfrs. v. Taylor*, 582 F.3d 1, 15 (D.C. Cir. 2009) (citing *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 391 (2000)). As a consequence, the degree of fit between the registration scheme in this case and the well-established goal of promoting public safety need not be perfect; it must only be substantial. *See Miller*, 604 F. Supp. 2d at 1172 (rejecting a Second Amendment challenge to a felon-in-possession statute despite the fact that "prohibiting gun possession by nearly all felons might not be the most precisely focused means to achieve th[e] end" of crime prevention); *see also Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989) (holding, in the First Amendment context, that because commercial speech is a field traditionally subjected to governmental regulation, the government must provide "not necessarily the single best disposition but one whose scope is in proportion to the interest served . . . . Within these bounds

19

we leave it to governmental decisionmakers to judge what manner of regulation may best be employed") (citations and quotation marks omitted); *Hutchins v. District of Columbia*, 188 F.3d 531, 543 (D.C. Cir. 1999) (en banc) (applying intermediate scrutiny and noting that "the District is not obliged to prove a precise fit between the nature of the problem and the legislative remedy – just a substantial relation").

These principles compel the court to conclude that the District's registration requirements withstand intermediate scrutiny. The Council, based on the testimony received during the hearings on the Act, concluded that the registration scheme is "critical" to accomplishing the District's public safety goals. Committee Report at 3. In particular, the Council determined, based on extensive testimony at the hearings, that it expects the ballistics identification component of the registration requirements to "enable law enforcement to link bullets and shell casings recovered at crime scenes to the firearm that fired them." *Id.* at 5. The Council also found that the three-year expiration and re-registration provisions of the Act are the most effective way of promoting public safety without imposing undue burdens on firearms owners: "[b]y having renewable registration of firearms, the District will be able to better track where firearms are located and allow MPD to have a better sense of whether a registered gun owner has become ineligible to own a firearm (e.g. due to a felony conviction or [civil protection order] in another state)." *Id.* at 4.[12]

As for the prohibition on registering more than one firearm per month, the Council noted that "[s]tudies show that laws restricting multiple purchases or sales of firearms are designed to

---

[12]    In reaching this conclusion, the Council rejected the more restrictive measure advocated by the Legal Community Against Violence. *See* Committee Report at 4.

reduce the number of guns entering the illegal market and to stem the flow of firearms between states . . . .  Studies also show that handguns sold in multiple sales to the same individual purchaser are frequently used in crime." *Id.* at 10.  And the fee provisions of the Act, the Council concluded, are intended to compensate the District for the costs of fingerprinting registrants, performing ballistics tests, processing applications and maintaining a database of firearms owners. *Id.* at 9.

The Council referenced, and appended to the Committee Report, the testimony of MPD Chief Cathy Lanier, in which she stated that the registration scheme would allow MPD to accomplish four important public safety goals. *See id.*, Attach. 2(e) ("Lanier Test.") at 2.  First, the registration scheme allows MPD to "verify[] the eligibility of the owner to legally possess the firearm." *Id.*  Chief Lanier clarified that "the criminal background check performed by MPD, which is based on fingerprints, is more effective than that performed by a gun dealer, which is merely based on a social security number." *Id.*  Chief Lanier added that local background checks have been found to reduce homicide and suicide rates. *Id.* at 2, 5.  Second, the registration scheme allows MPD to "ensur[e] that owners have a common body of knowledge" concerning firearms. *Id.* at 2.  This capability is vital, Chief Lanier explained, because in addition to criminal gun violence, MPD is concerned about a "potential increase in accidental injuries and their impact on public health and economic outcomes." *Id.*  Third, the firearms registration requirements enable law enforcement officers to "readily distinguish between a registered owner legally transporting a firearm, and someone carrying an illegal firearm," which Chief Lanier described as "critical to public safety in the District." *Id.* at 3.  Finally, Chief Lanier testified that

21

the process of "tracking legal firearms that may be lost, stolen, or used in a crime" yields important public safety benefits. *Id.* at 3-5.

The Council acknowledged that the District's registration requirements are more burdensome than those of most cities and states. Committee Report at 3. These rigorous firearms regulations are justified, the Council explained, not only because the District is a densely populated, urban locale, but also because "as the nation's capital it hosts a large presence of government and diplomatic officials." *Id.* Therefore, MPD must have "every tool to protect all citizens from violence," as well as "to protect these officials from assassination." *Id.*

Because the Council provided ample evidence of the ways in which the registration requirements will effectuate the goal of promoting public safety, and because public safety is a quintessential matter of public regulation, the court concludes that there is at least a substantial nexus between the registration requirements and the important governmental interest underlying those requirements. As a result, the court denies the plaintiffs' motion for summary judgment and grants the defendants' cross-motion for summary judgment on Count One of the second amended complaint.

### 2. The Bans on Assault Weapons and Large Capacity Ammunition Feeding Devices Are Constitutional

In Count Two of their second amended complaint, the plaintiffs challenge as unconstitutional the Act's prohibition on assault weapons,[13] *see* D.C. CODE § 7-2502.02(a)(6),

---

[13] The Act sets forth a lengthy definition of "assault weapons," which includes certain specified models of pistols, rifles and shotguns and variations thereon. *See* D.C. CODE § 7-2501.01(3A)(A). The definition also contains a "feature test" provision banning non-specified weapons that have any one of a list of military-style features, such as the capacity to accept a detachable magazine. *Id.*

22

and large capacity ammunition feeding devices,[14] *see id.* § 7-2506.01(b); *see also* 2d Am. Compl. ¶¶ 48-67, 73-76. The defendants maintain that the prohibitions on assault weapons and large capacity ammunition feeding devices constitute a permissible restriction on the types of firearms available to individuals seeking to exercise their core Second Amendment right because they permit the registration of thousands of other types of firearms. *See* Defs.' Cross-Mot. at 27-35.

To assess the merits of the parties' positions, the court must first look to whether the bans on assault weapons and large capacity ammunition feeding devices implicate the core Second Amendment right, namely, "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller*, 128 S. Ct. at 2821. As the *Heller* Court made clear, the Second Amendment does not confer the right to use *any* type of firearm in self-defense. *Id.* at 2815. Rather, the Second Amendment protects only those weapons "in common use" and "typically possessed by law-abiding citizens for lawful purposes," *id.* at 2815-16, as opposed to weapons considered "dangerous and unusual,"[15] *id.* at 2817.

The Council chose to ban assault weapons and large capacity ammunition feeding devices after concluding that they are "military-style weapons of war, made for offensive military use." Committee Report at 7. Citing a report issued by the Bureau of Alcohol, Tobacco, Firearms and

---

[14]    The term "'large capacity ammunition feeding device' means a magazine, belt, drum, feed strip, or similar device that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition." *Id.* § 7-2506.01(b).

[15]    Elsewhere in the *Heller* opinion, the Court refers to "dangerous *or* unusual weapons," rather than "dangerous *and* unusual weapons." *District of Columbia v. Heller*, 128 S. Ct. 2783, 2815 (2008) (emphasis added). This ambiguity makes less of a difference than one may think, however, given the obvious point that all firearms can be dangerous. Therefore, the court interprets *Heller* to mean that the Second Amendment confers a right of self-defense using weapons that are commonly used and typically possessed by law-abiding citizens for lawful purposes, as opposed to weapons that are not in common use, are not typically possessed by law-abiding citizens for lawful purposes and are unusually dangerous.

23

Explosives and the testimony of Brian Siebel, Senior Attorney with the Brady Center to Prevent

Gun Violence, the Council found that "assault weapons are disproportionately likely to be used

by criminals" and "are not generally recognized as particularly suitable or readily adaptable to

sporting purposes." *Id.* Nor do assault weapons have any "legitimate use as self-defense

weapons." *Id.* To the contrary, the Council determined, assault weapons would "in fact increase

the danger to law-abiding users and innocent bystanders if kept in the home or used in self-

defense situations." *Id.*

Further, the Council found that assault weapons are unusually dangerous because they

place law enforcement officers at a particularly grave risk due to their high firepower. *Id.* In

addition, referencing the testimony of Chief Lanier, the Council predicted that the ban on large

capacity ammunition feeding devices would benefit MPD because even "the 2 or 3 second pause

to reload [ammunition] can be of critical benefit to law enforcement" officers. *Id.* at 9. As with

the registration requirements set forth in the Act, the Council acknowledged that the ban on

assault weapons in the District is more stringent than in most other cities and states, but

concluded that these restrictions are justified in light of the fact that the District faces unique

threats by virtue of the fact that it is the nation's capital. *Id.* at 7-8.

To support their claim that the bans on assault weapons and large capacity ammunition

feeding devices are unconstitutional, the plaintiffs offer a variety of arguments amounting to an

assertion that the Council's findings are inaccurate. Pls.' Opp'n at 20-31. The plaintiffs aver, for

example, that assault weapons and large capacity ammunition feeding devices "are not made or

designed for offensive military use," *id.* at 22, "are not disproportionately used in crime," *id.* at

28, and in fact are commonly used for lawful purposes such as target shooting, hunting and personal protection, Pls.' Mot. at 5-11; Pls.' Opp'n at 23-29.

The plaintiffs also analogize the ban on large capacity ammunition feeding devices to the District's previous requirement, invalidated in *Heller*, that firearms be bound by a trigger lock and unloaded at all times. Pls.' Opp'n at 30. The plaintiffs assert that requiring an individual to pause to reload a firearm after discharging ten rounds of ammunition, like the invalidated trigger lock regulation, "makes it impossible for citizens to use [firearms] for the core lawful purpose of self-defense and is hence unconstitutional." *Id.* (quoting *Heller*, 128 S. Ct. at 2818). This argument borders on the absurd. The trigger lock regulation made it functionally impossible to exercise the right of armed self-defense by "rendering [the firearm] inoperable." *Heller*, 128 S. Ct. at 2817. The ban on large capacity ammunition feeding devices, on the other hand, imposes a slight burden on individuals seeking to fire more than ten rounds of ammunition by requiring them to pause for a few seconds to reload the weapon. This plainly does not render a firearm "inoperable," any more than the burden of having to pull the trigger repeatedly to discharge each successive round of ammunition renders a semiautomatic firearm "inoperable" in comparison to a fully automatic machine gun.

Notwithstanding the fact that the plaintiffs are dissatisfied with the outcome of the legislative process in this case, for the reasons discussed below, the court is compelled to defer to the Council's findings. The Council held extensive hearings and heard from numerous witnesses on both sides of the gun control divide before determining that assault weapons and large capacity ammunition feeding devices constitute weapons that are not in common use, are not typically possessed by law-abiding citizens for lawful purposes and are "dangerous and unusual"

within the meaning of *Heller*. *See* Committee Report at 7-9. The court does not see fit to override that decision. *See Fox*, 492 U.S. at 478 (noting that the Supreme Court has "been loath to second-guess the Government's judgment" with respect to laws burdening constitutional rights); *Hutchins*, 188 F.3d at 542-44 (rejecting the plaintiffs' objections to "the factual premises upon which the legislature based its decision, the logical connection the remedy ha[d] to those premises, and the scope of the remedy employed"). As a result, the court concludes that assault weapons and large capacity ammunition feeding devices fall outside the scope of the core Second Amendment right, and the plaintiffs' constitutional claims with respect to the bans on these weapons must therefore fail. *Cf. People v. James*, 94 Cal. Rptr. 3d 576, 585-86 (Ct. App. 2009) (rejecting the plaintiffs' Second Amendment challenge to California's ban on assault weapons based on the legislative findings that led to the ban); *see also United States v. McCartney*, 2009 WL 4884336, at *2 (9th Cir. Nov. 20, 2009) (upholding the ban on machine guns, silencers, grenades and directional mines after concluding that those weapons are "dangerous and unusual" and are not "typically possessed by law-abiding citizens for lawful purposes," and therefore are not protected by the Second Amendment); *United States v. Tagg*, 572 F.3d 1320, 1326 (11th Cir. 2009) (holding that pipe bombs are not protected by the Second Amendment because "[u]nlike the handguns in *Heller*, pipe bombs are not typically possessed by law-abiding citizens for lawful purposes"); *Fincher*, 538 F.3d at 874 (holding that "[m]achine guns are not in common use by law-abiding citizens for lawful purposes and therefore fall within the category of dangerous and unusual weapons that the government can prohibit for individual use").

Because the bans on assault weapons and large capacity ammunition feeding devices do not implicate the core Second Amendment right, the court need not assess whether these laws

survive intermediate scrutiny.  It is worth noting, however, that even if the court were to conduct

the intermediate scrutiny analysis, the plaintiffs' claims would still fail for the same reason the

claims concerning the registration requirements fail.  Namely, as previously discussed, it is

beyond dispute that public safety is an important – indeed, a compelling – governmental interest,

*see supra* Part III.C.1, and the Committee Report amply demonstrates that there is at least a

substantial fit between that goal and the bans on assault weapons and large capacity ammunition

feeding devices, *see* Committee Report at 7-9; *cf. Marzzarella*, 595 F. Supp. 2d at 606 (holding

that a statute prohibiting possession of a firearm with an obliterated serial number survived

intermediate scrutiny).  As a result of the foregoing, the court denies the plaintiffs' motion for

summary judgment and grants the defendants' cross-motion for summary judgment on Count

Two of the second amended complaint.

### 3.  The Challenged Laws Are Authorized by D.C. Code § 1-303.43

In Count Three of their second amended complaint, the plaintiffs claim that the District

lacked the authority to enact the challenged measures because they are not "usual and reasonable

police regulations . . . necessary for the regulation of firearms" within the meaning of D.C. Code

§ 1-303.43.[16]  *See* 2d Am. Compl. ¶¶ 77-80.  The plaintiffs argue that although some other cities

and states have promulgated laws requiring the licensing and registration of firearms and barring

certain types of dangerous weapons, none of those laws are as restrictive as the District's.  Pls.'

Mot. at 27-32.  The defendants respond by arguing that the laws are "usual and reasonable" and

---

[16]     Section 1-303.43 authorizes the Council "to make, and the Mayor of the District . . . to enforce,
all such usual and reasonable police regulations, in addition to those already made under §§
1-303.01 to 1-303.03 as the Council may deem necessary for the regulation of firearms,
projectiles, explosives, or weapons of any kind in the District of Columbia."  D.C. CODE § 1-
303.43.

therefore that the District acted within its legislative power in promulgating them. *See* Defs.'
Cross-Mot. at 35-38.

As an initial matter, the court rejects the plaintiffs' assertion that the challenged
measures are not "reasonable." As the court previously determined, these provisions satisfy the
intermediate scrutiny standard of review. *See supra* Part III.C.1-2. And because intermediate
scrutiny subjects laws to a more rigorous inquiry than reasonableness review, *see supra* Part
III.B.2.b, laws that satisfy intermediate scrutiny are plainly "reasonable." Accordingly, the only
remaining question is whether the challenged laws are "usual" within the meaning of § 1-303.43.

While no court has had occasion to parse the meaning of the word "usual" in the context
of § 1-303.43, the court can proceed by analogizing to the separate D.C. Code provisions
referenced in that section.[17] Courts interpreting the term "usual" in the context of the District's
police powers have asked not whether the District's laws are more or less restrictive than laws in
other jurisdictions, but instead, whether other jurisdictions have laws that address subject matter
similar to that addressed in the District's laws. For example, the D.C. Court of Appeals in
*Filippo v. Real Estate Commission of the District of Columbia* concluded that a regulation
"prohibit[ing] any person, for reasons of race, color, religion or national origin, to[] [r]efuse or
fail to transfer an interest in real property, or require different terms for such tansfer [sic], or
falsely represent that such interest is not available for such transfer," was "usual" because other
jurisdictions had promulgated ordinances prohibiting discrimination on account of race. 223

---

[17]     Section 1-303.01 authorizes the District to promulgate "usual and reasonable police regulations"
in nine enumerated subject matter areas. *Id.* § 1-303.01. Similarly, § 1-303.03 authorizes the
District to make and enforce "all such reasonable and usual police regulations . . . as the Council
may deem necessary for the protection of lives, limbs, health, comfort, and quiet of all persons
and the protection of all property within the District of Columbia." *Id.* § 1-303.03.

A.2d 268, 273-74 (D.C. 1966). In other words, the court focused on whether other jurisdictions

had enacted laws aimed at combating race discrimination, not whether the content of those laws

was similar to the District's regulation. *Id.*

The D.C. Court of Appeals conducted a similar analysis in *Glover v. District of

Columbia*, in which it upheld the imposition of a curfew – during the riots following the

assassination of Dr. Martin Luther King, Jr. – barring all persons from the streets of the District

except for specified public safety personnel. 250 A.2d 558, 559-60 (D.C. 1969). The court held

that the District's curfew was a "usual" police regulation because "the curfew ha[d] become a

usual device employed by municipalities to quell riots." *Id.* at 560. In *Glover*, as in *Filippo*, the

court did not examine whether other cities' regulatory measures were more or less restrictive than

the regulation imposed in the District. *See id.* Rather, the court held that the curfew was "usual"

solely by virtue of the fact that curfews existed in other cities. *Id.*

Applying the reasoning of *Filippo* and *Glover* to this case, the court concludes that the

challenged measures are "usual" within the meaning of § 1-303.43. As the plaintiffs concede,

*see* Pls.' Mot. at 28; Pls.' Opp'n at 34-35, several other cities and states require the registration

and licensing of firearms and prohibit certain categories of dangerous firearms, *see* Committee

Report at 8. That the District's laws are more restrictive than those of some other jurisdictions –

which, as explained in detail in the Committee Report, is a product of the fact that the District is

an urban locale that faces a unique set of threats – is of no moment. In short, the challenged laws

are both "usual" and "reasonable" within the meaning of § 1-303.43. Therefore, the court denies

the plaintiffs' motion for summary judgment and grants the defendants' cross-motion for

summary judgment on Count Three of the second amended complaint.

## IV.  CONCLUSION

For the foregoing reasons, the court denies the plaintiffs' motion for summary judgment and grants the defendants' cross-motion for summary judgment.  An Order consistent with this Memorandum Opinion is separately and contemporaneously issued this 26th day of March, 2010.


RICARDO M. URBINA
United States District Judge