

1 of 2 DOCUMENTS

**UNITED STATES OF AMERICA, Plaintiff, v. RICHARD TIMOTHY WEAVER, ELMER LUKE MOORE, KIM H. BERRYMAN, STEVEN LYNN KNIGHT, BRIAN SCOTT MITCHELL, and, MICHAEL LEE PHELPS. Defendants.**

**CRIMINAL ACTION NO. 2:09-cr-00222**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA, CHARLESTON DIVISION**

*2012 U.S. Dist. LEXIS 29613*

**March 06, 2012, Filed**

**NOTICE:**

Decision text below is the first available text from the court; it has not been editorially reviewed by LexisNexis. Publisher's editorial review, including Headnotes, Case Summary, Shepard's analysis or any amendments will be added in accordance with LexisNexis editorial guidelines.

**OPINION**
 [*1]

### MEMORANDUM OPINION AND ORDER

Pending before the Court are Defendant Weaver's Motions to Dismiss Counts 19 and 21

[Dockets 619, 2855]1 and Defendant Mitchell's Motion to Dismiss Counts 19 and 21 on

Constitutional Grounds [Docket 2860]. The United States responded to the motions, and the Court

held a hearing on February 27, 2012, to facilitate its review of the motions. For the reasons that

follow, the motions are **DENIED**.

*I. FACTUAL BACKGROUND & PROCEDURAL HISTORY*

Defendants Weaver, Moore, Berryman, Knight, Mitchell, and Phelps (together "Defendants")

are among fifty-six members and associates of the Pagans Motorcycle Club (PMC) charged in this

---

1Defendants Berryman, Mitchell, and Phelps filed motions to join in the second Motion to Dismiss [Dockets 2872, 2874, 2876]. All three motions to join are **GRANTED**.

Case 1:09-cv-01482-FJS   Document 29-2   Filed 03/08/12   Page 2 of 16

Page 2
2012 U.S. Dist. LEXIS 29613, *1

case. Defendants are charged in Count 19 of the superseding indictment with conspiring to possess firearms while being employed for a convicted felon in violation of *18 U.S.C.§§ 371* and *922(h)*. Except for Defendant Weaver, they are also charged in Count 21 of the superseding indictment with violating *§ 922(h)* by actually possessing firearms while being employed for a convicted felon. *Section 922(h)* [*2] provides:

(h) It shall be unlawful for any individual, who to that individual's knowledge and while being employed for any person described in any paragraph of subsection (g) of this section, in the course of such employment-

(1) to receive, possess, or transport any firearm or ammunition in or affecting interstate or foreign commerce; or

(2) to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

*18 U.S.C. § 922(h)*.2

According to the allegations in the superseding indictment, the *§ 922(h)* charges stem from orders given to Defendants by Floyd Moore, who was then the national vice president of the PMC.3

By virtue of his position in the PMC hierarchy, Floyd Moore was able to issue orders and assign tasks to lower-ranking PMC members. He is also a convicted felon prohibited from possessing a firearm. In an apparent attempt to circumvent the firearm prohibition, the superseding indictment alleges that Moore ordered a number of PMC members in the club's Charleston, West Virginia, chapter to obtain concealed firearms permits and to carry those firearms on their persons for his protection. On at least one trip from West Virginia to Virginia, [*3] allegedly armed members of the

2 Some defendants are also charged with violating subsections of *18 U.S.C. § 922(g)*. The legal analysis and ultimate holding of this opinion are applicable only to the *§ 922(h)* counts.

3 Floyd Moore was a defendant in this case. He entered a plea of guilty to Count One of the original indictment, which charged him with racketeering in violation of *18 U.S.C. § 1962(c)*. The Court sentenced Moore on February 25, 2011, and he is currently serving that sentence.

2

PMC, Defendants among them, accompanied Floyd Moore, acting as bodyguards. Moore is alleged to have told various PMC members that he did not need to carry a firearm because other members carried guns for him.

Since the inception of this case, Defendants have raised a litany of challenges to the counts charging violations of *§ 922(h)*. Among other issues, they argued that the charges are factually deficient, that *§ 922(h)* is unconstitutionally vague on its face and as applied, that the statute is overbroad, and that it violates the *Second Amendment* right to keep and bear arms. Perhaps most notably, Defendants argued that the phrases "while being employed for" and "in the course of such employment" contained [*4] in *§ 922(h)* must be interpreted to require an employer-employee relationship, necessarily including the exchange of wages or other tangible compensation. This Court initially agreed, but the Fourth Circuit did not. *See generally United States v. Weaver, 659 F.3d 353 (4th Cir. 2011)*. Although it declined to define the term "employ" as used in *§ 922(h)*, the Fourth Circuit in *Weaver* held that "compensation cannot be the sine qua non" of employment. The court of appeals also discussed case law that adopted a more expansive definition of "employ," namely as meaning "to make use of," "to use advantageously," "to use or engage the services of," " to provide with a job that pays wages or a salary," and "to devote or direct toward a particular activity or person." *See Weaver, 659 F.3d at 357-58* (quoting *United States v. Murphy, 35 F.3d 143, 145 (4th Cir. 1994))*.

On remand, Defendants raise many of the same challenges to *§ 922(h)*: they argue that it violates the *Second Amendment* pursuant to *Heller* and its progeny in the Fourth Circuit, that it is overbroad for reaching a large swath of

constitutionally-protected behavior, and that it is vague on

3

its face and as applied to Defendants. The parties  [*5] argued their respective positions at the hearing on February 27, 2012, and the motions are now ripe for disposition.

## II.  DISCUSSION

### A.  Summary of Defendants' Arguments

Defendants contend first that *18 U.S.C. § 922(h)* violates their fundamental *Second Amendment* right to keep and bear arms for self defense, as recognized in *District of Columbia v. Heller, 554 U.S. 570 (2008)*. According to Defendants, they fall within the "core right" of the *Second Amendment*, which is the right of every "law-abiding, responsible citizen to possess and carry a weapon for self-defense." *United States v. Chester, 628 F.3d 673, 683 (4th Cir. 2010)*. Proceeding from the premise that they have a *Second Amendment* right to possess weapons for self-defense, Defendants argue that *§ 922(h)* must be subjected to strict scrutiny, which they contend it cannot survive. The United States responds that even if the *Second Amendment* right to keep and bear arms extends beyond the home, a point it does not concede, the statute need only survive intermediate scrutiny pursuant to the Fourth Circuit's decision in *United States v. Masciandaro, 638 F.3d 458 (4th Cir. 2011)*.

Defendants also argue that the Court should entertain facial  [*6] vagueness and overbreadth challenges to *§ 922(h)*. This unprecedented jurisprudential leap is based on Defendants' assertion that the Fourth Circuit heavily drew upon *First Amendment* law in deciding *Chester*, and the court of appeals therefore implicitly endorsed facial vagueness and overbreadth challenges to laws burdening *Second Amendment* rights. The United States argues against any facial challenge to *§ 922(h)* on the basis "that a statute cannot be held unconstitutional if it has constitutional application." *Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449 (2008)*.

4

### B.  As-Applied Second Amendment Challenge to § 922(h)

#### 1.  Applicable Law

The *Second Amendment to the United States Constitution* provides: "A well regulated

Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms,

shall not be infringed." *U.S. Const. Amend. II*. The Supreme Court in *Heller* held for the first time

that the *Second Amendment* secures an individual right to keep and bear arms. *Id. at 595*.

Interpreting the text of the amendment in light of how it would have been viewed by "ordinary

citizens in the founding generation," *id. at 577*, the *Heller* Court held  [*7] that the "core" of the Second

Amendment's protections was "the right of law-abiding, responsible citizens to use arms in the

defense of hearth and home." *Id. at 634*.

The *Second Amendment* right as identified in *Heller* is "limited in scope and subject to some

regulation." *Chester*, 628 F.3d at 676. For example, the *Heller* Court identified a non-exhaustive,

illustrative list of "longstanding prohibitions on the possession of firearms" as "presumptively lawful

regulatory measures." *Heller*, 544 U.S. at 626-27 & n.26. The Fourth Circuit in *United States v.*

*Chester* provided guidance to district courts within its jurisdiction regarding the proper framework

for deciding as-applied *Second Amendment* challenges. *See 628 F.3d at 678*. The Fourth Circuit

later described the two-part framework from *Chester* as follows:4

The first part asks "whether the challenged law imposes a burden on conduct falling within the scope of the *Second Amendment's* guarantee." Putting meat on the bones of this question, we explained that it is a "historical inquiry" that "seeks to determine whether the conduct at issue was understood to be within the scope of the right at the

4 At least two other circuits have adopted this two-step  [*8] approach to evaluating *Second Amendment* challenges to firearm regulations. *See United States v. Marzzarella, 614 F.3d 85 (3d Cir. 2010)*; *United States v. Skoien, 587 F.3d 803 (7th Cir. 2009), vacated by 614 F.3d 638 (7th Cir. 2010)* (en banc).

5

time of ratification." If the challenged law does not impose a burden on conduct falling within the scope of the *Second Amendment's* guarantee as historically understood, that is the end of the matter. However, if the challenged law does impose a burden on conduct falling within the scope of the *Second Amendment's* guarantee as historically understood, then the second part of the two-part approach comes into play.

The second part of the two-part approach involves application of the appropriate form of means-end scrutiny. In *Chester* [], we held that intermediate scrutiny is the appropriate standard to analyze a challenge to *§ 922(g)(9)* under the *Second Amendment*. Under the formulation of intermediate scrutiny that we adopted in *Chester* [], the government bears the burden of showing "a reasonable fit between the challenged regulations and a substantial government objective." In meeting its burden under intermediate scrutiny, the government is not required  [*9] to show the regulation is "the least intrusive means of achieving the relevant government objective, or that there be no burden whatsoever on the individual right in question." *United States v. Masciandaro, 638 F.3d 458, 474 (4th Cir. 2011)*.

*United States v. Staten, 666 F.3d 154, 159 (4th Cir. 2011)* (citations omitted) (all quotes are

attributable to *Chester*, 628 F.3d at 680, 683).

2. *Application & Analysis*

Under the two-part approach from *Chester*, the first question is whether *§ 922(h)* burdens

or regulates conduct that falls within the scope of the *Second Amendment* as it was understood at

the time of ratification. In this case, the relevant conduct is possession of a firearm while "employed

for" a convicted felon. The Fourth Circuit has expressed wariness of finding felons, a class of

persons expressly recognized as being subject to a longstanding prohibition in *Heller*, entirely

beyond the scope of *Second Amendment* protection. *See Chester*, 628 F.3d at 681 ("[T]he historical

Case 1:09-cv-01482-FJS   Document 29-2   Filed 03/08/12   Page 5 of 16

Page 5
2012 U.S. Dist. LEXIS 29613, *9

data is not conclusive on the question of whether the founding era understanding was that the *Second Amendment* did not apply to felons."). With that holding in mind, this Court likewise cannot find that individuals acting  [*10] in the employ of convicted felons are *per se* beyond the scope of the *Second Amendment* as it was understood at the time of ratification.

6

However, the inquiry as it relates to part one of the *Chester* framework does not end there.

In its response to Defendant Weaver's second Motion to Dismiss, the United States argues that because all of the charged conduct occurred outside the home, the *Second Amendment* affords Defendants no protection. In making its argument, the United States points out that, although it has faced the question several times, the Fourth Circuit has never held that the *Second Amendment* extends beyond the home. *See United States v. Mahin*, ___ F.3d ___, 2012 WL 336151, at *4 (4th Cir. Feb. 3, 2012) ("[T]he Supreme Court has not clarified, and we have not held, that the Second Amendment extends beyond the home . . . .").

While it is true that the Fourth Circuit has so far stopped short of expressly recognizing a *Second Amendment* right to keep and bear arms outside the home,5 this Court has no such hesitation. The Supreme Court itself has acknowledged a *Second Amendment* right to protect oneself not only from private violence, but also from public violence. *See Heller, 554 U.S. at 594*  [*11] (stating that, by the time of the founding, the right to have arms was "fundamental" and "understood to be an individual right protecting against both public and private violence."). The *Heller* Court additionally mentioned militia membership and hunting as key purposes for the existence of the right to keep and bear arms. *See id. at 598*. Confining the right to the home would unduly eliminate such purposes from the scope of the *Second Amendment's* guarantee. Furthermore, the Court finds entirely

---

5 In fact, the Fourth Circuit has expressly declined to address the first step in the *Chester* analysis at least four times. *See Carter*, 2012 WL 207067, at *4 (summarizing the Fourth Circuit's deferral in reaching any conclusion about the scope of the *Second Amendment's* protection under step one in *Chester, 628 F.3d 673, Masciandaro, 638 F.3d 458*, and *Staten, 666 F.3d 154*). Despite those declinations, this Court is in agreement with Judge Niemeyer's statements in *Masciandaro* that such constitutional avoidance is inappropriate when, as here, a federal court is directly confronted with the contention that a firearm regulation violated a defendant's *Second Amendment* rights. *See 638 F.3d at 468* n.* (Niemeyer,  [*12] J., writing separately as to Part III.B.).

7

persuasive Judge Niemeyer's separate opinion as to Part III.B. in *Masciandaro, 638 F.3d at 467-68*

(Niemeyer, J., writing separately as to Part III.B.). There, Judge Niemeyer makes several

observations drawn from the text of the Supreme Court's opinion in *Heller*, including those

mentioned above. In addition, Judge Niemeyer notes that "the *Heller* Court's description of its

actual holding also implies that a broader right exists":

> The Court stated that its holding applies to the home, where the need "for defense of self, family, and property *is most acute*, suggesting that some form of the right applies where that need is not "most acute." Further when the Court acknowledged that the *Second Amendment* was not unlimited, it listed as examples of regulations that were presumptively lawful, those "laws forbidding the carrying of firearms in sensitive places such as *schools and government buildings*." If the *Second Amendment* right were confined to self defense *in the home*, the Court would not have needed to express a reservation for "sensitive places" outside of the home.

*Id*. *at 468* (emphasis in original) (internal citation omitted). He concludes that "the  [*13] general

preexisting right to keep and bear arms for participation in militias, for self-defense, and for hunting

is thus not strictly limited to the home environment but extends in some form to wherever those

activities or needs occur . . . ." *Id. at 468; see also United States v. Carter*, ___ F.3d ___, 2012 WL

207067, at *2 (4th Cir. Jan. 23, 2012) (recognizing *Heller's* notation that the right to keep and bear

arms was understood by the founding generation to encompass "self defense and hunting" as well

as militia service).6 The Court joins in Judge Niemeyer's conclusion and holds that the Second

Amendment, as historically understood at the time of ratification, was not limited to the home.7

6 Moreover, there may well be other purposes for keeping and bearing firearms outside the home that are protected by the *Second Amendment*. However, determining the exact extent of those purposes must await another day.

7 The fact that courts may be reluctant to recognize the protection of the *Second Amendment* outside the home says more about the courts than the *Second Amendment*. Limiting this fundamental right to the home would be akin to limiting the protection of *First Amendment* freedom of speech to

(continued...)

8

Accordingly,  [*14] Defendants are entitled to some measure of *Second Amendment* protection under the first part of the *Chester* framework.

The second part of the two-part approach from *Chester* is to apply an appropriate form of means-end scrutiny to the regulation that burdens protected conduct. The Supreme Court in *Heller* expressly avoided deciding what level of scrutiny to apply when reviewing a law that burdens the right to keep and bear arms, but it did make clear that rational basis cannot apply. *554 U.S. at 628 n.27*. This is an issue of first impression-no court has applied any standard of review to *§ 922(h)*. However, the Fourth Circuit has instructed that the level of scrutiny to apply depends on the character of the *Second Amendment* question presented. *Masciandaro, 638 F.3d at 469-70*.

Defendants urge the Court to apply strict scrutiny in the instant case, arguing that "[t]he Second [A]mendment right is a fundamental right that does not take less-protected forms. Either you carry a firearm or you don't." (Docket 2855 at 7 n.6.) They argue that the exercise of their fundamental *Second Amendment* right has not just been burdened, it has been criminalized, and therefore *§ 922(h)* is subject to strict scrutiny.  [*15] (*Id.*) However, as the United States argues, Defendants cannot square their position with the Fourth Circuit's holding in *United States v. Masciandaro*.

The defendant in *Masciandaro* was convicted of possessing a loaded handgun in a motor vehicle within a national park area in violation of federal law. *638 F.3d at 459*. On appeal, the defendant challenged his conviction as violating his *Second Amendment* right to keep and bear arms

7(...continued)

political speech or college campuses.

9

for self-defense.8 In addressing the appropriate level of means-end scrutiny to apply to the federal law at issue, the *Masciandaro* court agreed with these Defendants that any law burdening the fundamental, core right of the *Second Amendment* should be subject to strict scrutiny. *Id. at 470*. However, in the same breath, the *Masciandaro* court reaffirmed the limited scope of that fundamental right-it is the "core right of self-defense *in the home* by a law-abiding citizen" that warrants strict scrutiny. *Id.* (emphasis added). The court elaborated:

[A]s we move outside the home, firearm rights have always been more limited, because public safety interests often outweigh individual interests in self- defense. Since historical  [*16] meaning enjoys a privileged interpretive role in the *Second Amendment* context, this longstanding out-of-the-home/in- the-home distinction bears directly on the level of scrutiny applicable. Indeed, one of the principal cases relied upon in *Heller* upheld a state concealed carry ban after applying review of a decidedly less-than-strict nature.

*Id.* (internal citations omitted). To require the application of strict scrutiny to every law burdening firearm possession outside the home would subject an extraordinary number of regulations to fatal scrutiny, a result that the *Masciandaro* court acknowledged and warned against. The ultimate holding of *Masciandaro*, then-which this Court is bound to apply-is that "a lesser showing [than strict scrutiny] is necessary with respect to laws that burden the right to keep and bear arms outside the home." *Id. at 471*.

At the hearing on these motions, Defendants argued that the *Masciandaro* holding was simply the product of the law at issue in that case, which prohibited possession of a firearm in a "sensitive place."9 In Defendants' view, that the law at issue prohibited firearm possession in a

8 The defendant in *Masciandaro* was not a prohibited person under any subsection  [*17] of *18 U.S.C. § 922(g)*.

9 Defendants also argue that the Fourth Circuit has described the "core right" secured by the Second

(continued...)

10

national park was the Fourth Circuit's central reason for applying intermediate (rather than strict)

scrutiny in *Masciandaro*. Unfortunately for Defendants, this interpretation finds no support in the

*Masciandaro* decision itself. There, the court of appeals acknowledged that among *Heller*'s

"presumptively lawful regulatory measures" are "laws forbidding the carrying of firearms in

sensitive places such as schools and government buildings." *Masciandaro, 638 F.3d at 472-73*. The

Fourth Circuit briefly considered whether the "sensitive places" doctrine limits the scope of the right

or otherwise alters the *Chester* analysis, but it ultimately declined to resolve the questions it raised.

Instead, the *Masciandaro* court stated, "even if [the national park] is not a sensitive place . . . [the

firearm prohibition] still passes constitutional muster under the intermediate scrutiny standard." *Id.*

at 473. This statement makes clear that the Fourth Circuit's decision to apply intermediate scrutiny

was a result of the out-of-the-home/in-the-home dichotomy set forth previously,  [*18] rather than a

function of the "sensitive place" doctrine or similar considerations.10 In short, intermediate scrutiny

9(...continued)

   Amendment apart from the home in other cases. *See Chester, 628 F.3d at 683* (describing the "core right identified in *Heller*" as "the right of a law abiding, responsible citizen to possess and carry a weapon for self -defense."). However, in the very passage referenced by the *Chester* court, *Heller* stated the "core right" secured by the *Second Amendment* is "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *554 U.S. at 635*. Furthermore, the Fourth Circuit's decision in *Masciandaro* fully obstructs Defendants' argument by adopting home defense as the "core right" and applying intermediate scrutiny to regulations burdening firearm possession outside the home.

   10 Of course, if a law burdening *Second Amendment* rights is limited to certain locations, that fact can and should play a role when subjecting the law to the appropriate level of means-end scrutiny. The *Masciandaro* court did just that: after determining that intermediate scrutiny applied based on the out-of-the-home/in-the -home distinction, it stated that "the government  [*19] has a substantial interest in providing for the safety of individuals who visit and make use of the national parks." *638 F.3d at 473*.

11

applied in *Masciandaro* because the firearm prohibition at issue related to conduct outside the home, not because it related to conduct in a national park.

Based on the foregoing discussion, and in light of the United States's representation that none of the charges in this case relate to firearm possession within the home, intermediate scrutiny is appropriate in this as-applied challenge to *§ 922(h)*.

Intermediate scrutiny requires the government to establish the existence of a reasonable fit between an important government goal and the statute's actual restrictions. *Chester*, 628 F.3d at 683; *see also Marrzzarella*, 614 F.3d at 98 ("Although [the various forms of intermediate scrutiny] differ in precise terminology, they essentially share the same substantive requirements. They all require the asserted governmental end to be more than just legitimate, either 'significant,' 'substantial,' or 'important' . . . [and] require the fit between the challenged regulation and the asserted objective be reasonable, not perfect.").

First, there is no question that the [*20] government has a substantial interest in "'protecting the community from crime' by keeping guns out of the hands of dangerous persons," *Carter*, 2012 WL 207067, at *5, an interest Congress pursued with the Gun Control Act of 1968 and subsequent firearms regulations currently codified at *18 U.S.C. §§ 921-931*. The lynchpin of federal firearms regulation is found in *§ 922(g)*, which prohibits several classes of persons-including convicted felons such as Floyd Moore-from possessing or receiving firearms shipped in interstate commerce. It is now clear that, based on the structure and purpose of the statute, *18 U.S.C. § 922(h)* "is meant to prevent the individuals listed in subsection (g) from circumventing the firearm prohibition by employing armed bodyguards." *Weaver*, 659 F.3d at 357. Thus, *§ 922(h)* is intended to close a loophole that allowed prohibited persons, in this case convicted felons, to possess firearms by proxy.

12

*See id.* The governmental interest to which *§ 922(h)* is directed, then, is similar to that to which any subsection (g) offense is directed-both subsections aim to diminish gun violence by removing firearms from the possession and control of those "persons classified as [*21] potentially irresponsible and dangerous." *See Barrett v. United States, 423 U.S. 212, 218 (1976)*. With the enactment of *§ 922(h)*, Congress simply acknowledged that prohibited persons may surround themselves with armed surrogates and that such armed surrogates present a serious danger to the public.

Next, the question of fit between the stated government interest and the content of *§ 922(h)* is a more difficult issue. As stated previously, the United States must show that *§ 922(h)* "reasonabl[y] fits" its stated goal of reducing gun violence by prohibiting vicarious firearm possession by prohibited persons. "[T]he nature and quantity of any showing required by the government 'to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised.'" *Carter*, 2012 WL 207067, at *6 (quoting *Nixon v. Shrink Mo. Gov't PAC, 528 U.S. 377, 391 (2000)*). However, even when applying strict scrutiny, "the government may, in appropriate circumstances, carry its burden by relying solely on history, consensus, and simple common sense." *Id.* (quoting *Fla. Bar v. Went For It, Inc. 515 U.S. 618, 628 (1995)*) (internal quotations omitted).

Defendants [*22] argue that *§ 922(h)* sweeps so broadly that it cannot survive even intermediate scrutiny. According to Defendants, *§ 922(h)* criminalizes a status-being employed by a prohibited person-and contains no scienter requirement. (Docket 2888 at 6.) Accordingly, under certain idiosyncratic circumstances posed by Defendants in their many creative hypotheticals, an individual may be subject to prosecution under *§ 922(h)* for simply possessing a firearm and associating with an individual they know to be prohibited from possessing a firearm. The United States responds by

13

pointing to several limiting factors in *§ 922(h)*, including: (1) the prohibition applies only to a

narrow class of people who are employed for a prohibited person; (2) the employee must know that

his employer is prohibited (a requirement that Defendants do not contest from the statute's plain

language); (3) the employee must possess the firearm while he is employed for the prohibited

person; and (4) the employee's possession of the firearm must be in the course of his employment

for the prohibited person. (Docket 2877 at 12-13.)

As to Defendants' argument that *§ 922(h)* contains no scienter requirement, this contention

is an oversimplification [*23] of the statute and common law principles of agency that guide its

application. *See Weaver, 659 F.3d at 358* (suggesting that elements of agency law may play a role

in determining the existence of an employment relationship under *§ 922(h)*). It is paradigmatic that

any agency relationship-that is, a relationship whereby one individual acts on behalf of another-

requires "the manifestation of consent by one person to another that the other shall act on his behalf

and subject to his control, and consent by the other so to act." Restatement (Second) of Agency §

1(1) (1958). Thus, implicit in the concept of "employment" is an additional knowledge requirement

into *§ 922(h)*: the defendant must know that he is carrying a firearm on behalf of a known prohibited

person.11

Furthermore, the United States is correct to highlight the various limitations on *§ 922(h)*'s

reach. Most striking among these limitations is that *§ 922(h)* does not permanently disarm persons

---

11 At the hearing on these motions, the United States represented that it could and would prove at trial that Defendants knew they were acting on behalf of Floyd Moore-that is, "while employed for" him-when they possessed and transported firearms, as [*24] set forth in the superseding indictment. Whether the United States proposes to prove this fact as an additional element of the crime, or whether it falls under the broader "employment" rubric is inconsequential. Either way, there can be no employment without knowledge that Defendants were acting on Moore's behalf.

14

who function as employees for prohibited persons. In *United States v. Carter*, the Fourth Circuit

paid special attention to this feature in *§ 922(g)(3)*, stating:

By contrast [to other subsections of *§ 922(g)], § 922(g)(3)* does not permanently disarm all persons who, at any point in their lives, were unlawful drug users or addicts. Instead, it only applies to persons who are currently unlawful drug users or addicts. This feature of *§ 922(g)(3)* contributes to its proportionality for two reasons.

First, the limited temporal reach of *§ 922(g)(3)* necessarily means that it is less intrusive than other statutes that impose a permanent prohibition on the possession of firearms. By initially disarming unlawful drug users and addicts while subsequently restoring their rights when they cease abusing drugs, Congress tailored the prohibition to cover only the time period during which it [*25] deemed such persons to be dangerous.

Second and in a similar vein, application of *§ 922(g)(3)* tracks the ongoing choices of individuals either to remain

drug users or to quit drug abuse. . . . [I]t is significant that *§ 922(g)(3)* enables a drug user who places a high value on their right to bear arms to regain that right by parting ways with illicit drug use.

*Carter*, 2012 WL 207067, at *6-7. *Section 922(h)* is similarly limited in both respects: temporally,

an individual is only precluded from possessing a firearm while acting in the course of his

employment for a prohibited person, and he is free to regain his right to possess firearms by simply

parting with the employment relationship.12 To be quite clear, even an individual who maintains an

employment relationship with a prohibited person may lawfully possess firearms, provided he is not

acting in the course of employment *at the time of the firearm possession*. From this discussion, it

is clear that Congress tailored the prohibition in *§ 922(h)* to cover only certain individuals at certain

times and when they act in certain ways. In other words, the scope of *§ 922(h)* is effectively limited

to vicarious possession by prohibited persons, although  [*26] it penalizes the proxy rather than the

12 On this latter point, it is clear that the prohibition contained in *§ 922(h)* is conduct-based, not status -based as Defendants argue, although the import of such a distinction is not apparent to the Court outside a vagueness challenge.

15

prohibited person. It is a commonsense extension of the prohibitions contained in *§ 922(g)*. Just as *§ 922(g)* strips firearms from the *possession* of prohibited persons, *§ 922(h)* effectively strips firearms from their *control*.

The felon dispossession statute, *18 U.S.C. § 922(g)(1)*, has uniformly survived constitutional scrutiny, whether subjected to strict or intermediate scrutiny. *See United States v. Moore, 666 F.3d 313, 316-17 (4th Cir. 2012)* (compiling cases from every court of appeals finding *§ 922(g)(1)* constitutional). Here, *§ 922(h)* merely closes a loophole in *§922(g)(1)*, a plainly constitutional statute. *See id.* ("[W]e have no difficulty in concluding that *§ 922(g)(1)* is constitutionally valid on its face."). With this in mind, and acknowledging that a "reasonable fit" is not the least intrusive means, nor must it be a "perfect fit" to meet the interest served, *Staten, 666 F.3d at 159*, the Court finds that [*27] the foregoing limitations provide a reasonable fit between the restriction and the government's interest in reducing gun violence by fully disarming felons.

*C. Facial Vagueness and Overbreadth Challenges in the Second Amendment Context*

In addition to an as-applied challenge to *§ 922(h)* under the *Second Amendment*, Defendants argue that the Court should hold *§ 922(h)* unconstitutional as facially overbroad and void for vagueness. They argue that such facial challenges are appropriate since *First Amendment* law now guides the *Second Amendment* analysis.13

13 At the hearing on these motions, defense counsel plainly stated that the facial vagueness challenge is not derived from the *Due Process Clause of the Fifth Amendment*. Rather, it is anchored simply to the *Second Amendment* analysis, which Defendants argue mirrors *First Amendment* law in every respect, including the applicability of overbreadth and facial vagueness.

16

Facial challenges are disfavored. *See Richmond Med. Ctr. For Women v. Herring*, 570 F.3d

165, 173 (4th Cir. 2009) (en banc).14 The Supreme Court has expressed a strong preference for

avoiding facial challenges:

> Facial challenges are disfavored for several reasons. Claims of facial [*28] invalidity often rest on speculation. As a consequence, they raise the risk of "premature interpretation of statutes on the basis of factually barebones records." Facial challenges also run contrary to the fundamental principle of judicial restraint that courts should neither "'anticipate a question of constitutional law in advance of the necessity of deciding it'" nor "'formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.'" Finally, facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution. We must keep in mind that "'[a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people.'"

*Wash. State Grange, 552 U.S. at 449* (internal citations omitted). Nevertheless, facial challenges

have been permitted in certain rare circumstances. First, a litigant can succeed in a facial vagueness

challenge by "establish[ing] that no set of circumstances exists under which [a law] would be valid,"

*United States v. Salerno, 481 U.S. 739, 745 (1987)*; in other words, by demonstrating [*29] that a law is

unconstitutional in all of its applications. *Accord Village of Hoffman Estates v. Flipside, Hoffman*

*Estates, Inc., 455 U.S. 489, 497 (1982)* ("To succeed [in a vagueness challenge], the complainant

must demonstrate that the law is impermissibly vague in all of its applications."); *United States v.*

*Klecker, 348 F.3d 69, 71 (4th Cir. 2003)* ("Facial vagueness challenges to criminal statutes are

allowed only when the statute implicates *First Amendment* rights."). Second, when claims are based

on the assertion of a *First Amendment* right, a litigant is permitted to challenge as facially overbroad

14 Contrary to the assertion of counsel for Defendant Moore, the Fourth Circuit's decision in *Richmond Medical* does not support Defendants' position. The quotation relied upon by counsel and recited to the Court at the hearing was from the panel decision in *Richmond Medical, 527 F.3d 128*, which was vacated and ultimately rejected by the full court sitting en banc, *570 F.3d 165*.

17

a law that is unconstitutional in a "substantial number" of its applications, even if the law is constitutional as applied to the litigant. *See New York v. Ferber, 458 U.S. 747, 770-71 (1982)*;

*Broadrick v. Oklahoma, 413 U.S. 601, 615 (1973)*. [*30] Neither the Supreme Court nor the Fourth Circuit has curtailed these limitations on facial challenges, and accordingly, until a majority of the Supreme Court directs otherwise, a party challenging the validity of a law on vagueness or overbreadth grounds outside the domain of the *First Amendment* must demonstrate that the law is unconstitutional in all of its applications.

At the hearing on these motions, counsel for Defendants admitted that there is no authority, binding or otherwise, for extending either principle (facial vagueness or overbreadth) to the *Second Amendment*. They argue, however, that the Fourth Circuit intended this "novel notion," *see Masciandaro, 638 F.3d at 474*, by its reliance on *First Amendment* law in *Chester*. Defendants are incorrect. The words "*First Amendment*" appear six times in *Chester*'s majority opinion.

On two occasions, the *Chester* court referenced the *First Amendment* to illustrate that, like the *First Amendment*, the right secured by the *Second Amendment* is not unlimited.15The remaining four instances of "*First Amendment*" appear in the *Chester* court's analysis and application of means-end scrutiny.16Nowhere in *Chester* does the Fourth Circuit condone facial  [*31] vagueness or overbreadth

15 *See 628 F.3d at 676* ("[W]e do not read the *Second Amendment* to protect the right of citizens to carry arms for any sort of confrontation, just as we do not read the *First Amendment* to protect the right of citizens to speak for any purpose.") (quoting *Heller, 554 U.S. at 595*); *id*. *at 678* ("[T]he preexisting right guaranteed by the *Second Amendment* 'was not limited, just as the *First Amendment's* right of free speech was not.'") (quoting *Heller, 554 U.S. at 595*).

16 *See id*. *at 682* ("Given Heller's focus on 'core' *Second Amendment* conduct and the Court'sfrequent references to *First Amendment* doctrine, we agree with those who advocate for looking to the *First Amendment as a guide in developing a standard of review for the Second Amendment*.") (emphasis added); *id*. ("In the analogous *First Amendment* context, the level of scrutiny we apply

(continued...)

18

challenges in the *Second Amendment* context. To the contrary, in *United States v. Masciandaro*,

decided months after *Chester*, the Fourth Circuit declined to entertain an overbreadth challenge in

similar circumstances:

Without entertaining the novel notion that an overbreadth challenge could be recognized "outside the limited  [*32] context of the *First Amendment*," *Salerno, 481 U.S. at 745*, we conclude that a person . . . to whom a statute was constitutionally applied, "will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court." *Broadrick, 413 U.S. at 610*.

*Masciandaro, 638 F.3d at 474*. Furthermore, the Court fails to perceive either *Heller* or*McDonald*

as supporting the extension of facial challenges to the *Second Amendment* context. Accordingly,

this Court declines to consider the facial constitutionality of *§ 922(h)*, as well as the extensive

hypothetical situations Defendants posit in their briefing.

*D. As-Applied Vagueness Challenge to § 922(h)*

Although not argued by Defendants in their recent briefs, the motion to dismiss filed in late

2009 fairly sets forth an as-applied vagueness challenge to *§ 922(h)*. In that motion, Defendants

argue that "[i]f . . . *§ 922(h)* criminalizes any person acting as a substitute or undertaking an errand

or a favor for a prohibited person, it is void for vagueness." (Docket 619 at 5.) Contrary to

Defendants' assertions at the hearing, vagueness is an outgrowth "not of the First [or Second]

Amendment,  [*33] but of the *Due Process Clause of the Fifth Amendment*. *United States v. Williams*, 553

U.S. 285, 304 (2008). In general terms, "[t]he void-for-vagueness doctrine requires that penal

16(...continued)

depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right."); *id.* ("Likewise, a law regulating commercial speech is subject to a more lenient intermediate standard of scrutiny in light of 'its subordinate position in the scale of *First Amendment* values.'") (citation omitted).

19

statutes define crimes so that ordinary people can understand the conduct prohibited and so that arbitrary and discriminatory enforcement is not encouraged." *Klecker, 348 F.3d at 71* (quoting

*United States v. McLamb, 985 F.2d 1284, 1291 (4th Cir. 1993))*. However, due process does not require perfect clarity and precise guidance. *Grayned v. City of Rockford, 408 U.S. 104, 110 (1972)*. Additionally, the Supreme Court has implemented a limitation on vagueness challenges outside the *First Amendment* context: "One to whose conduct a statute clearly applies may not successfully challenge it for vagueness." *Parker v. Levy, 417 U.S. 733, 756 (1974)*. "The rationale [for this limitation [*34] on vagueness challenges] is evident: to sustain such a challenge, the complainant must prove that the enactment is vague 'not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all.'" *Hoffman Estates, 455 U.S. at 495 n.7* (quoting *Coates v. City of Cincinnati, 402 U.S. 611, 614 (1971))*. When reviewing a statute for vagueness, the court must "indulge a presumption of constitutionality." *Baggett v. Bullitt, 377 U.S. 360, 372 (1964)*.

To be clear, the facts proffered to the Court or alleged in the superseding indictment are as follows. The PMC is an outlaw motorcycle club organized in a hierarchical manner. At all times relevant to these counts, Floyd Moore was the PMC national vice president, and he was a convicted felon precluded from carrying a firearm under *18 U.S.C. § 922(g)(1)*. Defendants occupied various roles in the PMC hierarchy, but they all were subordinate to Floyd Moore. Defendants also knew that Floyd Moore was a convicted felon. According to the superseding indictment, Defendants armed themselves for the purpose of protecting Floyd Moore, and [*35] they did so at the express demand of Moore. On or about June 6, 2008, Defendants (except for Weaver) traveled to Virginia with Floyd Moore, carrying firearms and acting as his bodyguards.

20

Defendants do not argue that it is unclear whether or not they fall within the ambit of *§ 922(h)*. Instead, they argue that it is unclear what "employed for" means, as that phrase appears in

*§ 922(h)*. (*See* Docket 619 at 5-6.) Following from that general argument, Defendants pose dozens of hypothetical situations to demonstrate that the precise contours of the statute are unclear. (*See generally* Docket 2855.) Such analysis is properly classified as a facial vagueness challenge, which the Court will not consider in the *Second Amendment* context. Furthermore, Defendants' challenge does not implicate *First Amendment* concerns, and they therefore must contend with the general rule that "[o]ne to whose conduct a statute clearly applies may not successfully challenge it for vagueness." *Parker, 417 U.S. at 756*.

The allegations in this case are sufficient to place Defendants squarely within *§ 922(h)*'s prohibition on carrying firearms while "employed for" a convicted felon, and accordingly, their as-applied vagueness [*36] challenge must fail. "Employ" is defined as (in order of appearance): "to make use of," "to use . . . advantageously," "to use or engage the services of," "to provide with a job that pays wages or a salary," and "to devote to or direct toward a particular activity or person." Webster's Third New International Dictionary 743 (2002). "Employment" is defined as: "use, purpose" and "activity in which one engages and employs his time and energies [including "work

. . . in which one's labor or services are paid for by an employer" and also "activity engaged in as an avocation, pastime, habit, or expedient"]. *Id.* As the Fourth Circuit recognized in *Weaver*, then, "employ" is fairly understood as "to make use of" or "to use advantageously," whether for compensation or not. Since *§ 922(h)* is not limited to employment

for compensation, whatever else

*§ 922(h)* may criminalize, it certainly captures these Defendants, who knowingly armed themselves to act as Floyd Moore's bodyguards at his direction. Accordingly, Defendants' vagueness challenge

21

cannot succeed, as "even if the outermost boundaries of *[§ 922(h)]* may be imprecise, any such uncertainty has little relevance here, where [Defendants'] conduct [*37] falls squarely within the 'hard core' of the statute's proscriptions." *Broadrick, 413 U.S. at 608*); *see also Hill v. Colorado, 530 U.S. 703, 733 (2000)*. The premise of Defendants' argument-that the statute is vague if it applies to one merely "undertaking an errand or a favor for a prohibited person"-is not at issue in this case.

At the hearing, the Court asked the United States (hypothetically) whether these Defendants, had they consulted *§ 922(h)* prior to arming themselves on Floyd Moore's behalf, would have known their conduct was in violation of federal law. Regardless of the United States's response, it is clear to the Court that Defendants-or at least "ordinary persons exercising ordinary common sense"-would have so known. *See, e.g., Broadrick, 413 U.S. at 608*. No matter how "employed for" is defined, provided it does not require the payment of wages or tangible compensation, *cf. Weaver, 659 F.3d at 358* (compensation may be considered but is not dispositive of "employment"), the conduct at issue in this case clearly falls within the purview of *§ 922(h)*. The pertinent issue in this case is not whether a reasonable person would know exactly where the "employed for" line is drawn;  [*38] rather, the issue in this particular as-applied challenge is whether a reasonable person would know that acting as an armed bodyguard for a known felon runs afoul of *§ 922(h)*. *See United States v. Nat'l Dairy Prods. Corp., 372 U.S. 29, 32 (1963)* ("Void for vagueness simply means that criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed."). On these allegations and proffered facts, Defendants clearly were "employed for" Floyd Moore-their firearm possession was

22

on behalf of Floyd Moore and within his control, all of which was known to them.17 The statute

provides fair notice that such conduct is prohibited, and therefore the as-applied vagueness challenge

must fail.

*III. CONCLUSION*

For the foregoing reasons, Defendant Weaver's Motions to Dismiss Counts 19 and 21

[Dockets 619, 2855] and Defendant Mitchell's Motion to Dismiss Counts 19 and 21 on

Constitutional Grounds [Docket 2860] are **DENIED**.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to the Defendant and counsel,

the United States Attorney, the United States Probation Office, and the United States Marshal.

ENTER: March 7, 2012

_____

2012 U.S. Dist. LEXIS 29613, *38

THOMAS  [*39] E. JOHNSTON

UNITED STATES DISTRICT JUDGE


17 To the extent Defendants argue that they were simply carrying firearms and hanging around Floyd Moore, that is an issue to be tried, not least of all because the United States contends it has evidence showing otherwise. Although not argued by Defendants, the Court is likewise satisfied that § 922(h) is not susceptible of arbitrary enforcement. The requirement that defendants must know they are being employed for a prohibited person when they wield firearms is adequate in this regard.

23