IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:10-CV-265-H

| | | |
|---|---|---|
| MICHAEL BATEMAN, VIRGIL GREEN, FORREST MINGES, JR., GRNC/FFE, INC., and SECOND AMENDMENT FOUNDATION, INC., | ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| | ) | **ORDER** |
| v. | ) | |
| | ) | |
| BEVERLY PERDUE &  REUBEN F. YOUNG, | ) ) | |
| | ) | |
| Defendants. | ) | |

This is an action under 42 U.S.C. § 1983 challenging North Carolina statutes restricting firearms during states of emergency. Before the court are defendants' motion to dismiss or, in the alternative, for summary judgment, and plaintiffs' cross-motion for summary judgment. Appropriate responses and replies have been filed, and the time for further filings has expired.

## BACKGROUND

### I.   The Emergency Declaration Statutes

At issue in this case are North Carolina statutory provisions enacted in 1969 as part of the Riot Control Act of 1969. The first statute, North Carolina General Statute

§ 14-288.7, makes it a Class 1 misdemeanor "for any person to transport or possess off his own premises any dangerous weapon or substance in any area" in which a state of emergency has been declared.   The other statutes at issue in this case authorize government officials to impose further "prohibitions and restrictions[] . . . [u]pon the possession, transportation, sale, purchase, storage, and use of dangerous weapons and substances" during a state of emergency.   N.C. Gen. Stat. § 14-288.12(b) (municipal ordinances); see also N.C. Gen. Stat. § 14-288.13(b) (county ordinances); N.C. Gen. Stat. § 14-288.14(a) (authorizing extension of municipal ordinances by chairman of board of county commissioners); N.C. Gen. Stat. § 14-288.15(d) (gubernatorial powers).   Violation of a prohibition or restriction imposed pursuant to one of the latter statutes is punishable as a Class 2 misdemeanor if declared by the Governor and as a Class 3 misdemeanor if declared by a municipality or county.

For purposes of the challenged statutes "dangerous weapons and substances" includes "deadly weapon[s] ammunition, explosive[s], incendiary device[s], radioactive material or device[s]," and other instruments or substances threatening serious bodily injury or destruction of property.   See N.C. Gen. Stat. § 14-288.1(2).

2

A state of emergency may be declared by the Governor, a municipality or a county whenever it is determined that due to "public crisis, disaster, rioting, catastrophe, or similar public emergency, public safety authorities [will be] unable to maintain public order or afford adequate protection for lives or property."   N.C. Gen. Stat. § 14-288.1(10) (defining state of emergency).   Due to natural disasters and severe weather, states of emergency are declared with some frequency in North Carolina.[1] In 2010, for example, the Governor of the State of North Carolina issued four statewide emergency declarations and one declaration covering a fifteen-county area in western North Carolina.   See Exec. Order No. 47 (N.C. Jan. 30, 2010) (statewide - winter storm); Exec. Order No. 62 (N.C. Sept. 1, 2010) (statewide - Hurricane Earl); Exec. Order No. 66 (N.C. Sept. 29, 2010) (statewide - Tropical Storm Nicole); Exec. Order No. 75 (N.C. Dec. 25, 2010) (statewide - winter storm); Exec. Order No. 44 (N.C. Jan. 10, 2010) (counties of Allegany, Avery, Ashe, Buncombe, Burke, Caldwell, Haywood, Jackson, Madison, McDowell, Transylvania, Watauga, Rutherford and Yancey - winter storm).   Additionally, a number of states of emergency were declared by local officials for similar reasons.   See, e.g., Exec. Order No. 56 (N.C. Apr. 8, 2010) (Guilford and Davidson

---

[1]A state of emergency must be declared in order to qualify for federal disaster assistance.   (Aff. Doug Hoell [DE #55] ¶ 5.)

Counties – tornadoes); Exec. Order No. 59 (N.C. May 25, 2010) (Hoke County – wind storm); Exec. Order No. 60 (N.C. May 25, 2010) (Town of Highlands – winter storm); Exec. Order No. 68 (N.C. Oct. 4, 2010) (City of Saluda – ice storm); Exec. Order No. 71 (N.C. Nov. 17, 2010) (Lincoln County – tornado); Exec. Order No. 82 (N.C. Feb. 23, 2011) (Bertie County and Town of Windsor – flooding from Tropical Storm Nicole).[2]

## II.  The Litigation

Plaintiffs are three North Carolina residents: Michael Bateman of Washington, North Carolina, Virgil Green of New Bern, North Carolina, and Forrest Minges, Jr., of Stokes County, North Carolina; and two organizations, GRNC/FFE, Inc., and Second Amendment Foundation, Inc.  GRNC/FFE, Inc., and Second Amendment Foundation are nonprofit organizations whose members and supporters include firearms enthusiasts.  Among other activities, these organizations are engaged in the promotion and advocacy of Second Amendment rights.

Plaintiffs filed this action against the Governor of North Carolina, the Secretary of North Carolina's Department of Crime Control and Public Safety, Stokes County, North Carolina, and the City of King, North Carolina, seeking declaratory and injunctive relief prohibiting the enforcement of the emergency

---

[2]These Executive Orders are available at http://www.governor.state.nc.us/NewsItems/ExecutiveOrderList.aspx (last visited Mar. 20, 2012).

4

declaration statutes.   Plaintiffs Bateman and Minges are avid hunters and reside in North Carolina's coastal region.   (Compl. ¶ 21.)   They assert they have been denied their rights to keep and bear arms for the purposes of self-defense and hunting as a result of declared states of emergency, including in January 2010, when Governor Perdue declared a state of emergency throughout the state for up to thirty days.  (Compl. ¶¶ 19, 23.) Plaintiff Green maintains that he has also been repeatedly deprived of his Second Amendment rights, including in February 2010, when the City of King (an area that Green frequently travels through) declared a state of emergency and forbade the sale or purchase of firearms and ammunition, as well as the possession of firearms and ammunition off an individual's premises.  (Compl. ¶¶ 20, 23.)

In sum, plaintiffs' complaint alleges that the individual plaintiffs and members and supporters of the plaintiff associations "have been impacted by declared states of emergency curtailing their ability to possess, buy, and sell firearms and ammunition" for lawful purposes, including self-defense and hunting.   (Compl. ¶¶ 23, 25.)   But for North Carolina's emergency declaration laws, plaintiffs assert that during declared states of emergency they "would carry functional

5

handguns in public for self-defense[3] and would buy and sell guns and ammunition."   (Compl. ¶ 23; see also Decl. Michael Bateman [DE #45-3] ¶¶ 3, 4; Decl. Virgil Green [DE #45-4] ¶¶ 3, 4; Decl. Forrest Minges [DE #45-5] ¶¶ 3, 4.)

This court previously dismissed plaintiffs' claims against Stokes County and the City of King on the ground that plaintiffs had not challenged any ordinance, regulation, policy or custom of either of those governmental bodies.   Consequently, the only claims remaining before the court are plaintiffs' claims against the state defendants, Governor Beverly Perdue and Reuben F. Young, Secretary of North Carolina's Department of Crime Control and Public Safety.

## COURT'S DISCUSSION

The Second Amendment provides:   "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. Amend. II.   In District of Columbia v. Heller, 554 U.S. 570 (2008), the Supreme Court recognized the Second Amendment as conferring an individual, as opposed to a collective, right.   At issue in Heller were District of Columbia laws making it a crime to   carry   an   unregistered   firearm   and   prohibiting   the

---

[3]Under North Carolina law, individuals are generally allowed to carry handguns and other weapons in public so long as they are not concealed.

registration of handguns.  Considering the right of self-defense to be an inherent and central component of the Second Amendment, the Supreme Court rejected the argument that the Second Amendment's right to keep and bear arms was simply a means of preserving the militia.  Instead, the Court concluded that the Second Amendment confers an individual right to keep and bear arms.  The Court then held that the "District's ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense."  Heller, 554 U.S. at 635.

While the Heller Court did not define the outer limits of the Second Amendment right to keep and bear arms, it did note that "[l]ike most rights, the right secured by the Second Amendment is not unlimited."  Heller, 554 U.S. at 626.  It is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  Id.  An absolute ban on the possession and use of handguns for self-defense in the home is not reconcilable with the Second Amendment.  But, the same cannot be said for other firearm restrictions, such as "prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or

7

laws imposing conditions and qualifications on the commercial sale of arms." Id. at 626-27.

The Supreme Court reiterated the permissibility of reasonable restrictions on firearm possession in McDonald v. City of Chicago, 130 S. Ct. 3020 (2010), when it applied the Second Amendment right to keep and bear arms to the states by virtue of the Fourteenth Amendment. Noting that "[s]tate and local experimentation with reasonable firearms regulations will continue under the Second Amendment," id. at 3046, the court rejected the municipal respondents' "doomsday proclamations," stating that incorporation of the Second Amendment into the Fourteenth Amendment "does not imperil every law regulating firearms," id. at 3047.

Plaintiffs challenge North Carolina's emergency declaration statutes, claiming both that the statutes are unconstitutional on their face and as applied to them. With regard to their as-applied claims, plaintiffs assert that the emergency declaration laws deprive them of their right to keep and bear arms for the purposes of self-defense and hunting. "[F]or reasons relating both to the proper functioning of courts and to their efficiency," the court first considers whether the statutes are constitutional as applied to plaintiffs. Bd. of Trs. of State Univ. of N.Y. v. Fox, 492 U.S. 469, 485 (1989).

8

## I.   As-applied Challenge

In evaluating plaintiffs' claims, the court is guided by the Fourth Circuit's decision in United States v. Chester, 628 F.3d 673 (2010), in which the court adopted a two-part test for deciding as-applied claims under the Second Amendment.   First, the court "inquire[s] whether the statute in question 'imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." Chester, 628 F.3d at 680 (quoting United States v. Marzzarella, 614 F.3d 85, 89 (3d Cir. 2010)).   This is a historical inquiry in which the court seeks to determine "whether the conduct at issue was understood to be within the scope of the right at the time of ratification" of the Second Amendment   Id.   If it was not, the inquiry is complete.   If, however, the law burdens conduct within the scope of the Second Amendment, then the court must evaluate the law under the appropriate means-end scrutiny.

It cannot be seriously questioned that the emergency declaration laws at issue here burden conduct protected by the Second Amendment.   Although considerable uncertainty exists regarding the scope of the Second Amendment right to keep and bear arms, it undoubtedly is not limited to the confines of the home.   In Heller, the Supreme Court found that the Second Amendment includes "the right to 'protect[] [oneself] against both *public* and private violence,' thus extending the right in

9

some form to wherever a person could become exposed to public or private violence." United States v. Masciandaro, 638 F.3d 458, 467 (4th Cir. 2011) (Niemeyer, J., writing separately as to Part III.B) (quoting Heller, 128 S. Ct. at 2799) (alterations in original) (citation omitted). "Moreover, the right to keep and bear arms was found to have been understood to exist not only for self-defense, but also for membership in a militia and for hunting, neither of which is a home-bound activity." Id. at 468 (citation omitted); see also Heller, 128 S. Ct. at 2801 (noting that the right to keep and bear arms was valued not only for preserving the militia, but "more important[ly] for self-defense and hunting"). Therefore, the Second Amendment right to keep and bear arms "is not strictly limited to the home environment but extends in some form to wherever those activities or needs occur." Masciandaro, 638 F.3d at 468 (Niemeyer, J., writing separately as to Part III.B).

Under the laws at issue here, citizens are prohibited from engaging, outside their home, in any activities secured by the Second Amendment. They may not carry defensive weapons outside the home, hunt or engage in firearm related sporting activities. Additionally, although the statutes do not *directly* regulate the possession of firearms within the home, they effectively prohibit law abiding citizens from purchasing and transporting to their homes firearms and ammunition needed for self-defense.

10

As such, these laws burden conduct protected by the Second Amendment.

Having determined that the conduct is within the scope of the Second Amendment, the court now turns to the second part of the Second Amendment framework - the means-end analysis. Courts have generally recognized three levels of review. The first, and least stringent, is rational basis. Under rational basis a statute must, at a minimum, "be rationally related to a legitimate governmental purpose." Clark v. Jeter, 486 U.S. 456, 461 (1988). At the other end of the spectrum is strict scrutiny. In order to survive strict scrutiny, a statute must be narrowly tailored to achieve a compelling government interest. Citizens United v. Fed. Election Comm'n, 130 S. Ct. 876, 898 (2010). "Between these extremes of rational basis review and strict scrutiny lies a level of intermediate scrutiny." Clark, 486 U.S. at 461. Intermediate scrutiny requires a "substantial," or "important" government interest[4] and a "reasonable fit" between the regulation and the government interest. Chester, 628 F.3d at 683. The fit between the challenged restriction and the asserted interest need not be perfect, but the regulation may not burden more protected

---

[4]Among the descriptive terms used to characterize the requisite governmental interest for purposes of intermediate scrutiny are "significant," "serious," "strong," "compelling," and "cogent." See United States v. O'Brien, 391 U.S. 367, 376-77 (1968).

conduct than is reasonably necessary.   Marzzarella, 614 F.3d at 98, cited with approval in Chester, 628 F.3d at 683; see also Turner Broad. Sys. v. FCC, 512 U.S. 622, 662 (1994).

From Heller, we know that laws burdening the right to keep and bear arms are subject to some form of heightened scrutiny. The Court explained:  "If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect." Heller, 128 S. Ct. at 2817, n.27.   Heller did not, however, formulate a standard for reviewing Second Amendment claims. Concluding that the law at issue there would fail under any of the standards traditionally applied to enumerated constitutional rights, the Supreme Court avoided reaching the issue of the applicable standard of review.   Heller, 128 S. Ct. at 2818.

Addressing the issue of means-end analysis in Masciandaro, the Fourth Circuit concluded that Second Amendment claims are susceptible to different standards of review depending upon "the character of the Second Amendment question presented." Masciandaro, 638 F.3d at 470.

> "Gun control regulations impose varying degrees of burden on Second Amendment rights, and individual assertions of the right will come in many forms.  A severe burden on the core Second Amendment right of armed self-defense should require strong justification.  But less severe burdens on the right, laws that merely regulate rather than restrict, and

12

> laws that do not implicate the central self-defense
> concern of the Second Amendment, may be more easily
> justified."

Chester, 628 F.3d at 682 (quoting United States v. Skoien, 587
F.3d at 814 (7th Cir. 2009)).   Therefore, a law that burdens the
"fundamental" or "core" Second Amendment right - a law abiding
citizen's right to self-defense in the home - is subject to
strict scrutiny.   Masciandaro, 638 F.3d at 470.   "But, as we
move outside the home, firearm rights have always been more
limited, because public safety interests often outweigh
individual interests in self-defense."   Id.   So, a law that
burdens only the right to keep and bear arms outside of the home
will survive constitutional challenge upon a lesser showing by
the government.   Id. at 471.

     As in Masciandaro, the statutes involved in this case
burden the rights of law abiding citizens.   As such, they merit
stricter scrutiny than would similar laws targeting felons,
domestic violence misdemeanants or other individuals posing
public safety concerns.   See Masciandaro, 638 F.3d at 470
(noting differences between Masciandaro and Chester, -
Masciandaro was law abiding citizen whereas Chester was not, but
Chester was in his home whereas Masciandaro was not -
intermediate scrutiny found applicable in both cases).

     Applying the Fourth Circuit's reasoning in Masciandaro, the
court finds that the statutes at issue here are subject to

13

strict scrutiny.   North Carolina General Statute § 14-288.7 prohibits the transportation or possession of both "deadly weapons" and ammunition off one's own premises.   This prohibition applies equally to all individuals and to all classes of firearms, not just handguns.   It is not limited to a certain manner of carrying weapons or to particular times of the day.   Most significantly, it prohibits law abiding citizens from purchasing and transporting to their homes firearms and ammunition needed for self-defense.

Additionally,   Sections   14-288.12(b),   14-288.13(b), 14-288.14(a) and 14-288.15(d) of the North Carolina General Statutes authorize even more intrusive measures.   Acting pursuant to these statutes, government officials may outright ban the possession, transportation, sale, purchase, storage or use of dangerous firearms and ammunition during a declared state of emergency - even within one's home "where the need for defense of self, family, and property is most acute."   Heller, 128 S. Ct. at 2817.

While the bans imposed pursuant to these statutes may be limited in duration, it cannot be overlooked that the statutes strip peaceable, law abiding citizens of the right to arm themselves in defense of hearth and home, striking at the very core of the Second Amendment.   As such, these laws, much like those involved in Heller, are at the "far end of the spectrum of

14

infringement on protected Second Amendment rights."
Marzzarella, 614 F.3d at 97.

    That being the case, the emergency declaration statutes are
presumed invalid, and defendants bear the burden of rebutting
that presumption by showing that the laws are narrowly tailored
to serve a compelling government interest. This defendants have
failed to do.

    There is no dispute that defendants have a compelling
interest in public safety and general crime prevention. See
Schenck v. Pro-Choice Network of Western New York, 519 U.S. 357,
376 (recognizing "significant governmental interest in public
safety"). "'[P]rotecting the community from crime' by keeping
guns out of the hands of dangerous persons is an important
governmental interest." United States v. Carter, 669 F.3d 411,
417 (2012).

    The problem here is that the emergency declaration
statutes, are not narrowly tailored to serve the government's
interest in public safety. They do not target dangerous
individuals or dangerous conduct. Nor do they seek to impose
reasonable time, place and manner restrictions by, for example,
imposing a curfew to allow the exercise of Second Amendment
rights during circumscribed times. Rather, the statutes here
excessively intrude upon plaintiffs' Second Amendment rights by
effectively banning them (and the public at large) from engaging

in conduct that is at the very core of the Second Amendment at a time when the need for self-defense may be at its very greatest. See Heller, 128 S. Ct. at 2799 ("[A]mericans understood the 'right of self-preservation' as permitting a citizen to 'repe[l] force by force' when 'the intervention of society in his behalf, may be too late to prevent an injury.'" (quoting 1 Blackstone's Commentaries 145-146, n.42 (1803)) (second alteration in original)). Consequently, the emergency declaration laws are invalid as applied to plaintiffs.

## II.  Facial Challenge

Plaintiffs have also lodged a facial attack on the emergency declaration laws. Defendants move to dismiss this claim, arguing that plaintiffs are unable to demonstrate that there are no set of circumstances under which the emergency declaration statutes would be valid. See United States v. Salerno, 481 U.S. 739, 745 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."). Given the court's invalidation of the emergency declaration laws as applied to plaintiffs, the court need not consider plaintiffs' facial challenge. See Brockett v. Spokane Arcades, Inc., 472 U.S. 491, 503 ("[A] federal court should not

16

extend its invalidation of a statute further than necessary to dispose of the case before it.").

## CONCLUSION

For the foregoing reasons, the court GRANTS plaintiffs' motion for summary judgment [DE #44] and hereby DECLARES N.C. Gen. Stat. §§ 14-288.7, 14-288.12(b), 14-288.13(b), 14-288.14(a) and 14-288.15(d) unconstitutional as applied to plaintiffs. The court DENIES defendants' motion to dismiss or, in the alternative, for summary judgment [DE #52].  The clerk is directed to close this case.

This 29TH day of March 2012.

MALCOLM J. HOWARD
Senior United States District Judge

At Greenville, NC
#31

17