# Defendants' Exhibit No. 2

Nos. 12-1269 & 12-1788

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

MICHAEL MOORE, CHARLES HOOKS, PEGGY FECHTER, JON MAIER,
SECOND AMENDMENT FOUNDATION, INC. and ILLINOIS CARRY,

Plaintiffs-Appellants,

v.

LISA MADIGAN, in her Official Capacity as Attorney General of the State of Illinois,
and HIRAM GRAU, in his Official Capacity as Director of the Illinois State Police,

Defendants-Appellees.

MARY SHEPARD and the ILLINOIS STATE RIFLE ASSOCIATION,

Plaintiffs-Appellants,

v.

LISA M. MADIGAN, in her Official Capacity as Attorney General of the State
of Illinois, PATRICK L. QUINN, in his official capacity as Governor of the State of
Illinois, TYLER R. EDMONDS, in his official capacity as the State's Attorney of Union
County, Illinois, and SHERIFF DAVID LIVESAY, in his official capacity as Sheriff of
Union County,

Defendants-Appellees.

Appeals from the United States District Court
for the Central District of Illinois
No. 3:11-CV-3134, the Honorable Sue E. Myerscough, Judge Presiding, and
for the Southern District of Illinois
No. 11-CV-405-WDS, the Honorable William D. Stiehl, Judge Presiding.

_____

**BRIEF AMICI CURIAE OF THE CITY OF CHICAGO, LEGAL COMMUNITY
AGAINST VIOLENCE, MAJOR CITIES CHIEFS ASSOCIATION, BOARD OF
EDUCATION OF THE CITY OF CHICAGO, AND CHICAGO TRANSPORTATION
AUTHORITY IN SUPPORT OF DEFENDANTS-APPELLEES**

_____

STEPHEN R. PATTON
Corporation Counsel
 of the City of Chicago
BENNA RUTH SOLOMON
30 North LaSalle Street, Suite 800
Deputy Corporation Counsel
Chicago, Illinois 60602
MYRIAM ZRECZNY KASPER
(312) 744-8519
 Chief Assistant Corporation Counsel
SUZANNE M. LOOSE
 Assistant Corporation Counsel
Of Counsel

[additional counsel listed on the inside cover]

## CIRCUIT RULE 26.1   DISCLOSURE STATEMENT

Appellate Court No: 12-1269 & 12-1788

Short Caption: Moore, et al. v. Madigan, et al./Shepard, et al. v. Madigan, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[  ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Legal Community Against Violence

The Major Cities Chiefs Association

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Katten Muchin Rosenman LLP

(3)   If the party or amicus is a corporation:

   i)   Identify all its parent corporations, if any; and

None

   ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

None

Attorney's Signature:  s/ Jonathan K. Baum                    Date: May 15, 2012

Attorney's Printed Name: Jonathan K. Baum

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes  X   No _____

Address:   Katten Muchin Rosenman LLP, 525 West Monroe Street, Chicago, IL 60661-3693

Phone Number: 312-902-5479                    Fax Number: 312-902-1061

E-Mail Address: jonathan.baum@kattenlaw.com

rev. 01/08 AK

PATRICK J. ROCKS
  General Counsel
LEE ANN LOWDER
  Deputy General Counsel
Board of Education of
  the City of Chicago
125 South Clark Street
7th Floor
Chicago, IL 60603
(773) 553-1700
*Counsel for the Board of Education
  of the City of Chicago*


KAREN G. SEIMETZ
  General Counsel
STEPHEN L. WOOD
  Chief Attorney, Labor, Policy & Appeals
RACHEL L. KAPLAN
  Chief Attorney, Labor, Policy & Appeals
Chicago Transit Authority
567 West Lake Street
6th Floor
Chicago, IL 60661
(312) 681-2900
*Counsel for Chicago Transportation
  Authority*

JONATHAN K. BAUM
Katten Muchin Rosenman LLP
525 West Monroe Street
Chicago, IL 60661
(312) 902-5200
*Counsel for Legal Community Against
  Violence and Major Cities
  Chiefs Association*

# TABLE OF CONTENTS

———

Page

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

INTEREST OF AMICI CURIAE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

I.   CARRYING FIREARMS OUTSIDE ONE'S HOME FOR SELF-
     DEFENSE PURPOSES IS NOT WITHIN THE SCOPE OF THE
     SECOND AMENDMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

     A.   Heller Did Not Hold That The Second Amendment Protects A
          Right To Carry Outside The Home For Self-Defense Purposes. . . . . .  5

     B.   The Historical Evidence Demonstrates That Public Carry For
          Self-Defense Is Not Within The Scope Of The Second
          Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

II.  EVEN IF CARRYING FIREARMS IN PUBLIC IS WITHIN THE
     SCOPE OF SECOND AMENDMENT PROTECTION, THE UUW AND
     AUUW PROVISIONS ARE CONSTITUTIONAL. . . . . . . . . . . . . . . . . . . .  14

     A.   Intermediate Scrutiny Applies. . . . . . . . . . . . . . . . . . . . . . . . . . .  14

     B.   The UUW And AUUW Statutes Satisfy Intermediate Scrutiny. . . . .  16

     C.   Even If The Complaints Are Reinstated, The District
          Court Properly Denied A Preliminary Injunction. . . . . . . . . . . . . . .  24

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

# TABLE OF AUTHORITIES

————

Page

## CASES

Andrews v. State,
    50 Tenn. 165 (1871). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

Board of Trustees v. Fox,
    492 U.S. 469 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

Commonwealth v. Couture,
    552 N.E.2d 538 (Mass. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

District of Columbia v. Heller,
    554 U.S. 570 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

English v. State,
    35 Tex. 473 (1872). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

Ezell v. City of Chicago,
    651 F.3d 684 (7th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Fife v. State,
    31 Ark. 455 (1876). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

Girl Scouts of Manitou Council v. Girl Scouts of the U.S.A.,
    549 F.3d 1079 (7th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

Hill v. State,
    53 Ga. 472 (1874). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

Illinois Association of Firearms Retailers v. City of Chicago,
    No. 10 CV 4184 (N.D. Ill.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

Kachalsky v. Cacace,
    No. 10-CV-5413, 2011 WL 3962550 (S.D.N.Y. 2011). . . . . . . . . . . . . . . .  7, 16

Little v. United States,
    989 A.2d 1096 (D.D.C. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

McDonald v. City of Chicago,
    130 S. Ct. 3020 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Payton v. New York,
     445 U.S. 573 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

People v. Aguilar,
     944 N.E.2d 816 (Ill. App. Ct. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

People v. Mimes,
     953 N.E.2d 55 (1st Dist. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

People v. Yarbrough,
     169 Cal. App. 4th 303 (Cal. Ct. App. 2008) . . . . . . . . . . . . . . . . . . . . . . . . 7

Peruta v. County of San Diego,
     758 F. Supp. 2d 1106 (S.D. Cal. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Piszczatoski v. Filko,
     No. 10-6110, 2012 WL 104917 (D.N.J. Jan. 12, 2012) . . . . . . . . . . . . . . . 7, 16

Sir Knight's Case,
     87 Eng. Rep. 75 (1686) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

State v. Workman,
     35 W. Va. 367 (1891) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Turner Broadcasting Systems, Inc. v. FCC,
     520 U.S. 180 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 25

United States v. Masciandaro,
     638 F.3d 458 (4th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

United States v. Salerno,
     481 U.S. 739 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

United States v. Skoien,
     614 F.3d 638 (7th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

United States v. Ubiles,
     224 F.3d 213 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

United States v. Williams,
     616 F.3d 685 (7th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

United States v. Yancey,
        621 F.3d 681 (7th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14, 15

Ward v. Rock Against Racism,
        491 U.S. 781 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

Williams v. State,
        10 A.3d 1167 (Md. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

## STATUTES, ORDINANCES, AND PROCLAMATIONS

Statute of Northampton, 2 Edw. 3, c. 3 (1328) (Eng.). . . . . . . . . . . . . . . . . . . . . .  10

Proclamation of Elizabeth I (Dec. 2, 1594).. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

Ark. Act of Apr. 1, 1881, ch. 96, § 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

Laws of the State of New York, Vol. II, Ch. 43 (1786). . . . . . . . . . . . . . . . . . . . .  14

1879 Tenn. Pub. Acts ch. 186, § 1.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

Tex. Act of Apr. 12, 1871, ch. 34, § 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

1876 Wyo. Comp. Laws ch. 52, § 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

Municipal Code of Chicago, Ill. Art. XX (1881). . . . . . . . . . . . . . . . . . . . . . . . .  14

Dodge City, Kan., Ordinance No. 16, § XI (Sept. 22, 1876).. . . . . . . . . . . . . . . .  13

Act and Laws of Massachusetts-Bay, Chap X, Firing of Guns (1746). . . . . . . . . .  14

## LAW REVIEWS AND OTHER JOURNALS

Patrick J. Charles, The Faces of the Second Amendment Outside the Home:
        History Versus Ahistorical Standards of Review,
        60 Cleveland State L. Rev. 1 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

Patrick J. Charles, Scribble Scrabble, the Second Amendment, and
        Historical Guideposts: A Short Reply to Lawrence Rosenthal and
        Joyce Lee Malcolm,
        105 Nw. U.L. Rev. Colloquy 227 (2011).. . . . . . . . . . . . . . . . . . . . . . . . . .  12

iv

Jacqueline Cohen & Jens Ludwig, <u>Policing Crime Guns</u> in Jens Ludwig &
    Philip J. Cook, <u>Evaluating Gun Policy</u>, 217 (2003)...................... 21

Philip J. Cook & Jens Ludwig, <u>The Social Costs of Gun Ownership</u>,
    J. Pub. Econ. 379 (2006)............................................ 19

Philip J. Cook, Jens Ludwig, & Anthony A. Braga, <u>Criminal Records of</u>
    <u>Homicide Offenders</u>,
    294 J. Am. Med. Assoc. 598 (2005). ................................. 23

Philip J. Cook, Jens Ludwig, Sudhir Venkatesh, & Anthony A. Braga,
    <u>Underground Gun Markets</u>,
    117 Economic J. F558 (2007)........................................ 20

Mark Duggan, <u>More Guns, More Crime</u>,
    109 J. Pol. Econ. 1086 (2001)....................................... 19

Carole Emberton, <u>The Limits of Incorporation: Violence, Gun Rights, and</u>
    <u>Gun Regulation in the Reconstruction South</u>,
    17 Stan. L. & Pol'y Rev. 615 (2006)................................. 12

Edmund F. McGarrell, Steven Chermak, & Alexander Weiss, <u>Reducing</u>
    <u>Gun Violence: Evaluation of the Indianapolis Police Department's</u>
    <u>Directed Patrol Project</u> (2002)..................................... 21

Matthew Miller, Deborah Azrael, & David Hemenway, <u>Firearm Availability</u>
    <u>and Unintentional Firearm Deaths</u>,
    33 Accident Analysis & Prevention 477 (July 2000).................... 19

Matthew Miller, Deborah Azrael, David Hemenway, <u>Road Rage in Arizona:</u>
    <u>Armed and Dangerous</u>,
    34 Accident Analysis & Prevention 807 (2002)........................ 23

Matthew Miller, David Hemenway, Deborah Azrael, <u>State-Level Homicide</u>
    <u>Victimization Rates in the United States in Relation to Survey</u>
    <u>Measures of Household Firearm Ownership, 2001-2003</u>,
    64 Social Science & Medicine 656 (2007). ........................... 19

Andrew V. Papachristos, Tracey L. Meares, & Jeffrey Fagan, <u>Attention</u>
    <u>Felons: Evaluating Project Safe Neighborhoods in Chicago</u>,
    4 J. Empirical Legal Stud. 223   (2007)............................. 20

Lawrence Rosenthal, <u>Second Amendment Plumbing After Heller: Of</u>
<u>Standards of Scrutiny, Incorporation, Well-Regulated Militias, and</u>
<u>Criminal Street Gangs,</u>
41 Urb. Lawyer 1 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

**TREATISES**

William Blackstone, <u>Commentaries on the Laws of England</u> (1769). . . . . . . . . . . 10

Lord Edward Coke, 3 <u>Institutes of the Law of England</u> (1797). . . . . . . . . . . . . . . . 10

Robert Gardiner, <u>The Compleat Constable</u> (3d ed. 1708). . . . . . . . . . . . . . . . . . . . 12

William Hawkins, 1 <u>Treatise of the Pleas of the Crown</u>, ch. 63 (1716). . . . . . . . . . 10

John Norton Pomeroy, <u>An Introduction to the Constitutional Law of the</u>
<u>United States</u> (1868). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**OTHER**

Chicago Police Department, <u>Annual Report 2010</u> . . . . . . . . . . . . . . . . . . . . . . . . . 18

Chicago Police Department, <u>Crime at a Glance:  District 1</u> (Jan.-June 2010). . . . . 18

FBI, Uniform Crime Reports, Law Enforcement Officers Feloniously Killed,
Type of Weapon, 2001-2010, Table 27. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Michael Luo, <u>Guns in Public, and Out of Sight,</u>
N.Y. Times, Dec. 26, 2011. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

National Law Enforcement Officers Memorial Fund,  December 2010
eNewsletter, <u>Law Enforcement Fatalities Spike in 2010.</u>. . . . . . . . . . . . . . 18

Sam Quinones & Michael Muskal, <u>Jared Loughner to be Charged in Arizona</u>
<u>Shootings Targeting Gabrielle Giffords,</u>
L.A. Times, Jan. 9, 2011. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

U.S. Dep't of Health & Human Servs., Center for Injury Prevention &
Control, Web-Based Injury Statistics Query & Reporting System
(fatal injury reports 2009, and non-fatal injury report 2010). . . . . . . . . . . . 17

## INTEREST OF AMICI CURIAE

_____

The City of Chicago, the third largest city in the United States, faces a serious problem of firearms violence.[1]  More than 300 people are murdered with firearms each year in Chicago, and the vast majority of those occur outside the home.  In order to keep firearms out of the hands of gang members, criminals, and others who may misuse them to kill or injure others, Chicago police officers actively enforce the Illinois provisions at issue here, and the City has an ordinance that similarly prohibits firearms possession outside the home.  See Municipal Code of Chicago, Ill. §§ 8-20-020, 8-20-030.  These firearms restrictions play an important role in attempting to reduce the devastating impact of firearms in Chicago.

Legal Community Against Violence ("LCAV") is a national law center dedicated to preventing gun violence.  Founded after an assault weapon massacre at a San Francisco law firm in 1993, LCAV provides legal and technical support for gun-violence prevention.  LCAV tracks and analyzes federal, state, and local firearms legislation, as well as legal challenges to firearms laws.  As an amicus, LCAV has provided informed analysis to the courts in a variety of Second Amendment cases, including District of Columbia v. Heller, 554 U.S. 570 (2008); McDonald v. City of Chicago, 130 S. Ct. 3020 (2010); and Wilson v. Cook County,

_____

[1]  All parties in appeal Nos. 12-1269 and 12-1788 have consented to the filing of this brief.  This brief is submitted under Fed. R. App. P. 29(a).  No party's counsel authored this brief in whole or in part, nor did any party or its counsel, or any person other than amici, contribute money intended to fund preparing or submitting the brief.

1

No. 112026 (Ill.).

The Major Cities Chiefs Association ("MCCA") is a professional association of chiefs and sheriffs of seventy of the largest law enforcement agencies in the United States and Canada.  Its members serve over 76.5 million people (68 U.S., 8.5 Canada) with a workforce of 177,150 (159,300 U.S., 17,850 Canada) officers and non-sworn personnel.  Because firearms are the primary tools used in serious assaults and homicides, MCCA has a long term interest in public policy effecting their possession and use.

Amicus Board of Education of the City of Chicago educates more than 404,000 children in 675 elementary and high schools.  So far this school year, 17 Chicago public school students have been killed and 221 have been injured by firearms.

Amicus Chicago Transit Authority ("CTA") operates the nation's second largest public transportation system, providing over 515 million trips per year and serving 40 suburbs, in addition to the City of Chicago.  On an average weekday, 1.6 million rides are taken on CTA.  The CTA strives to provide transportation to the public that is, above all, safe and secure. The carrying of firearms onto crowded buses or train cars would expose CTA passengers to injury from possible accidental or inadvertent discharge of a firearm.  The firearm restrictions at issue in this case play an important role in supporting the CTA's mission to provide safe transportation to its passengers

# ARGUMENT

————

To address an epidemic of gun violence that has killed thousands of its residents, the State of Illinois has placed stringent restrictions on the ability of individuals to carry firearms in public.  Under Illinois law, carrying firearms in most places outside one's home is prohibited, and will constitute the offense of unlawful use of a weapon ("UUW"), 720 ILCS 5/24-1(a)(4); id. § 24-1(a)(10); it is aggravated unlawful use of a weapon ("AUUW"), when the firearm is carried in a vehicle or on a person while uncased, loaded, and immediately accessible, id. § 24-1.6(a).  These provisions are a valuable component of effective policing strategies aimed at keeping guns out of the hands of gang members and other criminals before shootings occur.  These restrictions are, therefore, crucial to the State's objective of reducing gun violence, and plaintiffs' Second Amendment challenges to them should be rejected.

This court has applied a two-step inquiry to such Second Amendment challenges.  First, the court determines whether the regulated activity is covered by the Amendment at all – that is, whether it is within the "scope" of the Second Amendment.  Ezell v. City of Chicago, 651 F.3d 684, 701 (7th Cir. 2011).  If within the scope, an "appropriate standard of review" must be selected, and the regulation judged by it.  Id. at 706.  The court takes a sliding-scale approach to determining the appropriate level of scrutiny.  Laws that impose a "severe burden" on the Second Amendment right of armed self-defense "require an extremely strong public-interest justification and a close fit between the government's means and its end."

3

Id. at 708.  On the other hand, "laws restricting activity lying closer to the margins
. . . may be more easily justified."  Id.

Plaintiffs' challenges fail at both steps of the inquiry.[2]  The historical
evidence about the public understanding of the pre-existing right to keep and bear
arms as it was understood in England before the Framing, and during the Framing-
era in America, demonstrates that tight restrictions on public carry coexisted
alongside the right to keep and bear arms and were not considered off-limits under
that right.  Moreover, even if some public carry of firearms falls within the scope of
Second Amendment protection, stringent regulations – even prohibitions – of
carrying firearms in public are constitutional.  Such firearms regulations are
substantially related to the important governmental interest of reducing firearms
violence because they curtail the presence of firearms in public and, as a result,
decrease death and injury from firearms violence.

## I.      CARRYING FIREARMS OUTSIDE ONE'S HOME FOR SELF-DEFENSE PURPOSES IS NOT WITHIN THE SCOPE OF THE SECOND AMENDMENT.

The scope of the Second Amendment is determined by examining Second
Amendment "text and relevant historical materials," to discern "how the
Amendment was understood at the time of ratification."  Ezell, 651 F.3d at 700.
That is because "[t]he Constitution was written to be understood by the voters,"
Heller, 554 U.S. at 576, and "Constitutional rights are enshrined with the scope

_____

[2]  We refer to the plaintiffs in Moore v. Madigan, No. 12-1269, as "Moore"; to
the plaintiffs in Shepard v. Madigan, No. 12-1788, as "Shepard"; and to both sets of
plaintiffs, collectively, as "plaintiffs."

4

they were understood to have when the people adopted them," id. at 634-35.

Nothing in Heller or in the history of the right to keep and bear arms supports a

broad expansion of the Heller-recognized right to keep and bear arms in the home

for self-defense to also protect carrying guns for self-defense outside the home,

where most firearms violence occurs.

> **A.** **Heller Did Not Hold That The Second Amendment**
> **Protects A Right To Carry Outside The Home For Self-**
> **Defense Purposes.**

In Heller, the Court held that the Second Amendment protects "the right of

law-abiding, responsible citizens to use arms in defense of hearth and home."  554

U.S. at 635.  The Court did not decide whether carrying firearms for other purposes

or in public places lies within the scope of Second Amendment protection.

Plaintiffs attempt to stretch the bounds of Heller into a holding that "bear

arms" means to carry outside the home, including in public for self-defense.  Moore

Br. 26; Shepard Br. 23.  They base this on the Court's refusal in Heller to assign a

strictly militia-related meaning to the term "bear arms," and its conclusion that the

meaning of the words "bear arms" in the Second Amendment means to "wear, bear,

or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of

being armed and ready for offensive or defensive action in a case of conflict with

another person."  554 U.S. at 584 (citation omitted).  Neither this quote, nor any

other part of Heller, decides whether the *public* carrying of firearms was

historically understood to be protected under the right to keep and bear arms

codified in the Second Amendment.  In fact, the Court made clear that the scope of

the right did not include all carrying, declaring that the right to keep and bear arms is not "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." Id. at 626 (citation omitted). The Court cautioned against reading too much into its decision, expressly noting, that nothing in its holding should "cast doubt" on a non-exhaustive list of "longstanding prohibitions," which are "presumptively lawful." Id. at 626-627; id. at 627 n.26; see also McDonald v. City of Chicago, 130 S. Ct. 3020, 3047 (2010) (plurality opinion) ("repeat[ing] those assurances"). The Court further noted that most "19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues." Heller, 554 U.S. at 626.

Plaintiffs argue that the word "bear" would be read out of the Second Amendment if carrying firearms in public were not protected. Moore Br. 25; Shepard Br. 23. That is not correct. To "bear" arms under the Second Amendment has at least two meanings other than the right to go about armed in public places at all times. First, consistent with the purpose of codifying the Second Amendment – namely, to preserve the militia, see Heller, 554 U.S. at 599 – carrying arms during government-related militia service is protected. Second, Heller holds the Second Amendment protects carrying arms "in defense of hearth and home." Id. at 635. Indeed, the remedy ordered by the Court was to allow Heller "to register his handgun" and "issue him a license to *carry it in the home*." Id. (emphasis added). So, clearly, the term "bear" has meaning; just not the meaning plaintiffs assign it.

6

Given that Heller did not announce a broad right to carry guns in public, it is

not surprising that courts have repeatedly declined to read the Court's decision to

include such a right.  See Piszczatoski v. Filko, No. 10-6110, 2012 WL 104917, *22

(D.N.J. Jan. 12, 2012) (Heller "does not recognize or even suggest a broad general

right to carry arms."); Kachalsky v. Cacace, 817 F. Supp. 2d 235, 264 (S.D.N.Y.

2011) (open carrying of firearms is "outside the core Second Amendment concern

articulated in Heller"); Williams v. State, 10 A.3d 1167, 1177 (Md. 2011), cert.

denied, 132 S. Ct. 93 (2011) (rejecting argument that Heller and McDonald

recognized a right to carry guns in public); Little v. United States, 989 A.2d 1096,

1101 (D.C. App. Ct. 2010) (defendant who was "not in his own home" was "outside

the bounds identified in Heller"); People v. Yarbrough, 169 Cal. App. 4th 303,

313-19 (Cal. Ct. App. 2008) (restrictions on public carry of loaded and concealed

weapons in public places did not implicate Second Amendment right recognized in

Heller).

### B.   The Historical Evidence Demonstrates That Public Carry For Self-Defense Is Not Within The Scope Of The Second Amendment.

Heller interpreted the meaning of the Second Amendment based on historical

documents that reflected how the public understood the right to keep and bear arms

at the time of Second Amendment ratification.  See 554 U.S. at 579-619.[3]  The

---

[3]  Ezell stated that, for States, the scope "depends on how the right was understood when the Fourteenth Amendment was ratified" in 1868, rather than when the Second Amendment was ratified in 1791.  651 F.3d at 702.  McDonald rejects the argument that a different version of the Bill of Rights applies to the States, and held that the Fourteenth Amendment incorporates "the Second

historical understanding of the *pre-existing* English right to keep and bear arms was crucial, since "the Second Amendment was not intended to lay down a novel principle, but rather codified a right inherited from our English ancestors," id. at 599 (internal quotations omitted), and "it has always been widely understood that the Second Amendment . . . codified a pre-existing right" in English law, id. at 592. Thus, if history indicates that the public understanding of the right to keep and bear arms was that it did not extend to a certain activity, then that activity is not protected by the Second Amendment, either.  Applying this methodology here, the historical evidence reveals that the Framing-era public did not understand the right to keep and bear arms to include the right to carry guns in public for self-defense.

While modern regulations need not "mirror limits that were on the books in 1791," United States v. Skoien, 614 F.3d 638, 641 (7th Cir. 2010) (en banc), this court can extrapolate some guiding principles from the evidence about Framing-era understandings.  For example, Framing-era regulations reflect that "public safety was a paramount value . . . that, in some circumstances, trumped the Second Amendment right to discharge a firearm in a particular place." Ezell, 651 F.3d at 714 (Rovner, J., concurring).  And in Skoien, this court determined that, historically, the legislature could prohibit some categories of individuals from having firearms, and concluded that the legislature is still afforded substantial

---

Amendment right recognized in Heller," 130 S. Ct. at 3048, 3050.  Thus the original meaning as understood in 1791 applies to States, even if the Second Amendment did not apply to them until 1868.

leeway in deciding whether to expand upon those categories, 614 F.3d at 640. Here, too, the historical record reveals that the government has been afforded substantial leeway in deciding whether to prohibit carrying of firearms outside the home based on public safety concerns.

For centuries before the Framing-era, England criminalized the practice of carrying arms in public. The Statute of Northampton provided that, except while on the King's business, no man was permitted to "go nor ride armed by night nor by day, in fairs, markets, nor in the presences of the justices or other ministers, nor in no part elsewhere, upon pain to forfeit their armour to the King, and their bodies to prison at the King's pleasure." Statute of Northampton, 2 Edw. 3, c. 3 (1328) (Eng.). The Crown frequently called for the enforcement of the Statute of Northampton, especially in towns. <u>See</u> Patrick Charles, <u>The Faces of the Second Amendment Outside the Home:  History Versus Ahistorical Standards of Review</u>, 60 Cleveland State L. Rev. 1, 14-22 (2012) (available on SSRN.com) (discussing orders and proclamations of Richard II, Henry IV, Elizabeth I). In <u>Sir Knight's Case</u>, 87 Eng. Rep. 75 (1686), the Chief Justice noted that carrying arms in public was not merely banned by the Statute of Northampton, but was "likewise a great offence at the common law," and an insult to the sovereign: "as if the King were not able or willing to protect his subjects." The Statute of Northampton was "but an affirmance" of the common law rule that there is no right to carry weapons in public, <u>id.</u>, although it did not apply to Sir Knight, who was "cloaked with governmental authority," Charles, <u>The Faces of the Second Amendment Outside the</u>

Home, supra, at 28 (citations omitted).

Prominent English scholars agreed that there was no right to carry weapons for self-defense outside the home.  William Blackstone, a "preeminent authority on English law for the founding generation," Heller, 554 U.S. at 593-94 (citation omitted), confirmed the continued applicability of the Statute of Northampton. "The offence of riding or going armed, with dangerous or unusual weapons," he wrote, "is a crime against the public peace, by terrifying the good people of the land; and is particularly prohibited by the Statute of Northampton, . . . upon pain of forfeiture of the arms and imprisonment during the king's pleasure: in like manner as, by the laws of Solon, every Athenian was finable who walked about the city in armour."  Blackstone, Commentaries on the Laws of England 148-49 (1769).

Lord Edward Coke, who was "widely recognized by the American colonists as the greatest authority of his time on the laws of England," Payton v. New York, 445 U.S. 573, 593-94 (1980) (citation omitted), confirmed that one could not "goe nor ride armed by night nor by day . . . in any place whatsoever."  Coke, 3 Institutes of the Law of England 160 (1797).  Coke explained that one could defend one's home, id. at 161, but would be guilty if he went armed in public even for "safeguard of his life," id. at 162.  Thus, even if self-defense was a valid purpose for carrying firearms in the home, it was not elsewhere.

William Hawkins similarly explained that the Statute of Northampton permitted one to defend himself "in his own House" because "a man's house is as his castle," but did not allow one to "excuse the wearing [of] such Armour in Publick,"

10

even if he claimed "such a one threatened him, and that he wears it for the Safety of his Person from Assault."  Hawkins, 1 <u>Treatise of the Pleas of the Crown</u>, ch. 63, § 8 (1716).  Moore selectively quotes Hawkins, Moore Br. 37, highlighting the statement that "Persons of Quality" may carry "common Weapons" for "Ornament or Defence, in such Places, and upon such Occasions, in which it is the common Fashion to make use of them, without causing the least Suspicion of an intention to commit any Act of Violence or Disturbance of the Peace," Hawkins, <u>supra</u> § 9.  And Shepard quotes Hawkins' statement suggesting a right to kill another in self-defense, when his assailant "shews an Intent to murder him."  Shepard Br. 29 (citation omitted).  It is clear from section 8, however, that carrying firearms in public for self-defense was generally prohibited.  Thus, whether or not an individual could be criminally liable for killing an assailant in self-defense, and whatever "places" or "occasions" it was "common fashion" for "Persons of Quality" to make use of firearms, Hawkins was clear that neither of those principles suggested a general right to carry guns in public for self-defense purposes.

Moore suggests that the Statute of Northampton was "limited to prohibit the carrying of arms only with evil intent," conduct which would amount to "the ancient common law offense of affray."  Moore Br. 36.  Under the plain language of the statute, however, "bring[ing] force in affray" and "go[ing] [or] rid[ing] armed" were separately prohibited.  2 Edw. 3, c. 3 (1328) (Eng.).  "[C]ommon carrying," in-and-of-itself, was considered "to the terrour of all people professing to travel and live peacably."  Proclamation of Elizabeth I (Dec. 2, 1594).  And Coke listed "affray"

11

separately from the additional offense of going or riding "armed by night [or] by day."  Coke, supra, at 160.  In the 18th Century, urban constables could arrest, not only persons who went "arm[ed] offensively" and "in affray of Her Majesties Subjects," but also all persons who wore or carried "any Daggers, Guns or Pistols Charged."  Robert Gardiner, The Compleat Constable, 18 (3d ed. 1708).

For over 200 years since the Framing, the States likewise have exercised their police power to restrict the carrying of guns in public.  Following the adoption of the Constitution, Massachusetts, North Carolina, and Virginia continued to prohibit going armed in public.  See Patrick J. Charles, Scribble Scrabble, the Second Amendment, and Historical Guideposts: A Short Reply to Lawrence Rosenthal and Joyce Lee Malcolm, 105 Nw. U.L. Rev. Colloquy 227, 237 (2011) (citations omitted).  After the Civil War, army prohibitions in certain locations included the sale and carrying of guns.  See Carole Emberton, The Limits of Incorporation: Violence, Gun Rights, and Gun Regulation in the Reconstruction South, 17 Stan. L. & Pol'y Rev. 615, 621 (2006).  And several States severely restricted the public carrying of pistols and other weapons.  See, e.g., Tex. Act of Apr. 12, 1871, ch. 34, § 1 (prohibiting carrying of pistols unless there are "immediate and pressing" reasonable grounds to fear attack or for militia service); 1876 Wyo. Comp. Laws ch. 52, § 1 (forbidding "concealed or open[]" bearing of "any fire arm or other deadly weapon, within the limits of any city, town or village"); 1879 Tenn. Pub. Acts ch. 186, § 1 (prohibiting carrying "publicly or privately, any . . . belt or pocket pistol, revolver, or any kind of pistol, except the army or navy

pistol usually used in warfare"); Ark. Act of Apr. 1, 1881, ch. 96, § 1 (prohibiting

"wear[ing] or carry[ing]" of "any pistol . . . except such pistols as are used in the

army or navy"). Even in the "Old West," often mythologized for its gun culture,

cattle towns like Dodge City, Kansas, banned the public carrying of guns. E.g.,

Dodge City, Kan., Ordinance No. 16, § XI (Sept. 22, 1876). State courts often

upheld restrictions on the carrying of non-militia-related pistols and revolvers. See,

e.g., Fife v. State, 31 Ark. 455, 461 (1876); Hill v. State, 53 Ga. 472, 475 (1874);

Andrews v. State, 50 Tenn. 165, 186 (1871); English v. State, 35 Tex. 473, 478

(1872); State v. Workman, 35 W. Va. 367, 373 (1891).[2] And John Norton Pomeroy's

treatise, cited in Heller as representative of "post-Civil War 19th-century sources"

commenting on the right to bear arms, 554 U.S. at 618, stated that the right to keep

and bear arms "is certainly not violated by laws forbidding persons to carry

dangerous or concealed weapons . . . ." Pomeroy, An Introduction to the

Constitutional Law of the United States 152-53 (1868).

In addition, bans on discharging guns in public, which contained no

exceptions for self-defense, were common, especially in urban areas, showing that

the right to keep and bear arms did not include use of firearms for self-defense

beyond the home. For example, in 1787, the discharge of guns was banned in New

---

[2] Moore places Andrews on his side of the ledger, characterizing it as holding
a weapons ban unconstitutional as applied to a revolver. Moore Br. 33. Andrews
held that the ban on carrying "'a belt or pocket pistol,' is constitutional," except as
applied to a revolver that is a part of the "usual equipment of the soldier." 50 Tenn.
at 188-89. That holding does not support the notion that the public carrying of
weapons other than those used in militia service was protected.

York City streets, lanes, alleys, gardens, and "any other place where persons frequently walk." Laws of the State of New York, Vol. II, Ch. 43 (1886) (enacted 1786). Similarly, in Boston in 1746, it was illegal to "discharge any gun or pistol" except during approved training, because "the Lives and Limbs of many Persons have been lost, and others have been in great Danger" by the "indiscreet firing of Guns." Act and Laws of Massachusetts-Bay, Chap. X, Firing of Guns (1746). See also Municipal Code of Chicago, Art. XX (1881) ("No person shall fire or discharge any gun, pistol, fowling-piece or other fire-arm within the corporate limits of the city of Chicago . . .").

In sum, stringent controls – even bans – on carrying guns in public have long been considered a proper exercise of the police power for the sake of public safety, the Second Amendment notwithstanding. For this reason, the public carrying of guns for self-defense lies outside the scope of Second Amendment protection.

## II.   EVEN IF CARRYING FIREARMS IN PUBLIC IS WITHIN THE SCOPE OF SECOND AMENDMENT PROTECTION, THE UUW AND AUUW PROVISIONS ARE CONSTITUTIONAL.

### A.   Intermediate Scrutiny Applies.

If this court concludes that the public carrying of firearms for self-defense is within the scope of the Second Amendment, intermediate scrutiny should be applied. In all but one case, this court has applied no more than intermediate scrutiny to laws restricting Second Amendment rights, even for laws that regulate the right to keep and bear arms for self-defense in the home. See United States v. Yancey, 621 F.3d 681, 683 (7th Cir. 2010) (applying intermediate scrutiny to uphold

statute barring narcotics addicts from possessing firearms); <u>United States v.</u>
<u>Williams</u>, 616 F.3d 685, 692-93 (7th Cir. 2010) (applying intermediate scrutiny to
uphold a statute barring felons from possessing firearms); <u>Skoien</u>, 614 F.3d at 641
(accepting government's concession that intermediate scrutiny is appropriate for
reviewing statute prohibiting possession of firearms by domestic violence
misdemeanants).  <u>Ezell</u> applied more stringent review under its sliding scale
approach, reasoning that a gun range ban placed a severe burden on the Second
Amendment right to a handgun for self-defense in the home.  651 F.3d at 709.  The
UUW and AUUW provisions do not affect self-defense in the home, and so less
stringent scrutiny is appropriate here.

Plaintiffs argue that no scrutiny needs to be applied at all because Illinois
restrictions on public carry fail under any standard as a "wholesale prohibition of a
constitutional right."  Moore Br. 41; <u>see also</u> Shepard Br. 47.  This argument cannot
be squared with this court's cases, which make clear that even severe restrictions
on Second Amendment rights are assessed to determine whether the regulation
serves important public safety and crime-prevention objectives.  <u>Yancey</u>, <u>Williams</u>,
and <u>Skoien</u>, for example, involved laws that completely stripped certain categories
of individuals of the ability to exercise Second Amendment rights, and each of those
laws were subject to intermediate scrutiny.  Moreover, applying intermediate
scrutiny gives force to <u>Heller</u>'s recognition that States retain "a variety of tools for
combating" the serious problem of gun violence.  554 U.S. at 636.  And intermediate
scrutiny falls in line with historical understandings of the right to keep and bear

15

arms because, given the serious harm that deadly weapons inflict, the "full

understanding of the citizenry at that time" reflects that "public safety was seen to

supercede gun rights at times," Ezell 651 F.3d at 714 (Rovner, J., concurring).

### B.   The UUW And AUUW Statutes Satisfy Intermediate Scrutiny.

Under intermediate scrutiny, the State must show that the UUW and AUUW

provisions are "substantially related to an important governmental objective."

Skoien, 614 F.3d at 641.  The vast majority of courts applying this standard to

restrictions on carrying firearms in public have upheld those restrictions against

Second Amendment challenges.  See United States v. Masciandaro, 638 F.3d 458,

475 (4th Cir. 2011) (upholding restrictions on carrying firearms in national park

area); Piszczatoski, 2012 WL 104917, at *1 (rejecting Second Amendment challenge

to restrictions on public carrying of firearms); Kachalsky, 817 F. Supp. 2d at 271-72

(rejecting Second Amendment challenge to restrictions on handgun permits); Peruta

v. County of San Diego, 758 F. Supp. 2d 1106, 1117 (S.D. Cal. 2010) (rejecting

Second Amendment challenge to restrictions on concealed carry).  Indeed, since

McDonald, the Illinois Appellate Court has twice upheld the very AUUW statute at

issue here.  See People v. Mimes, 953 N.E.2d 55, 75-77 (1st Dist. 2011); People v.

Aguilar, 944 N.E.2d 816 (Ill. App. Ct. 2011), petition for leave to appeal allowed,

949 N.E.2d 1099 (Ill. 2011).[3]  Illinois restrictions similarly pass muster under

---

[3] Two recent decisions fall out of line with the vast majority.  Woollard v.
Sheridan, No. 10-2068, 2012 WL 695674 (D. Md. 2012), struck down a law limiting
public carry to those with a good and substantial reason, such as a particularized
need for personal protection.  That ruling is inconsistent with Masciandaro, which

16

intermediate scrutiny.

The government interest in reducing gun violence is indisputably important. As this court explained in <u>Skoien</u>, "no one doubts" that "preventing armed mayhem" is "an important governmental objective." 614 F.3d at 642. Indeed, the government interest in preventing crime is "compelling." <u>United States v. Salerno</u>, 481 U.S. 739, 750 (1987). Gun violence poses a serious threat to public safety in Illinois and nationwide, where firearms are responsible for more than 30,000 deaths and almost 70,000 injuries each year. <u>See</u> U.S. Dep't of Health & Human Servs., Center for Injury Prevention & Control, Web-Based Injury Statistics Query & Reporting System (fatal injury reports 2009, and non-fatal injury report 2010).[4] That includes thousands killed in Illinois. Between 1999-2007, for example, there were 10,086 firearms-related deaths in Illinois. <u>See id.</u> (fatal injury reports 1999-2007, search restricted to firearms deaths in Illinois). Many of those occur in Chicago, where 354 people were murdered by firearms in 2010 alone. Chicago Police Department,

---

applied intermediate scrutiny and upheld a similar restraint on public carry, <u>see</u> 638 F.3d at 475. Defendants appealed, and the matter is pending in the Fourth Circuit. <u>See</u> <u>Woollard v. Gallagher</u>, No. 12-1437 (4th Cir.). In <u>Bateman v. Perdue</u>, No. 10-CV-265-H (E.D.N.C.) (Mar. 29, 2012 order), the court struck down a restriction on gun-carrying during declared states of emergency as applied to the plaintiff. The court applied strict scrutiny, not because it thought restrictions on public carry alone warranted that level of review, but because the law "[m]ost significantly" prohibited "purchasing and transporting *to their homes* firearms and ammunition needed for self-defense." <u>Id.</u> at 14 (emphasis added). The court's ruling with respect to those portions of the law restricting public carry are inconsistent with <u>Masciandaro</u> as well.

[4] Data available at http://www.cdc.gov/injury/wisqars/fatal.html.

17

Annual Report 2010 22.[5]  Most of these murders occurred somewhere outside the

home.  See, e.g., Chicago Police Department, Crime at a Glance:  District 1 13 (Jan.-

June 2010) (82.7% of Chicago murders between January and June 2010 occurred in

street, alley, automobiles, or other location aside from a residence).[6]

Moreover, gun violence poses a grave risk to law enforcement officers.  In

2010, four members of CPD were shot and killed in the line of duty.  CPD, Annual

Report 2010 (dedication).  Nationwide, 498 officers were killed in the line of duty by

firearms between 2001-2010.  See FBI, Uniform Crime Reports, Law Enforcement

Officers Feloniously Killed, Type of Weapon, 2001-2010, Table 27.[7]  In 2010, 20% of

fatal shootings of officers were due to ambush-style attacks on officers.  National

Law Enforcement Officers Memorial Fund, December 2010 eNewsletter, Law

Enforcement Fatalities Spike in 2010.[8]

Illinois' prohibitions on carrying firearms in public are substantially related

to the State's important public-safety objectives in reducing firearms violence.  To

establish a substantial relationship, it is not necessary that "the statute's benefits

are first established by admissible evidence," or "proof, satisfactory to a court" that

---

[5]  Report available at https://portal.chicagopolice.org/portal/page/portal/
ClearPath/News/Statistical%20Reports/Annual%20Reports/10AR.pdf.

[6]  Report available at https://portal.chicagopolice.org/portal/page/portal/
ClearPath/News/Statistical%20Reports/Crime%20At%20A%20Glance/Crime%20At
%20A%20Glance%202010%20by%20District/CAAG_Dist_01.pdf.

[7]  This report available at http://www.fbi.gov/about-us/cjis/ucr/leoka/
leoka-2010/tables/table27-leok-feloniously-type-of-weapon-01-10.xls.

[8]  This report available at http://www.nleomf.org/newsroom/newsletters/
enewsletters/dec-2010-enewsletter-1-2.html.

a regulation is "vital to the public safety." <u>Skoien</u>, 614 F.3d at 641.  A substantial

relationship can be shown with "logic and data." <u>Id.</u> at 642.  Even when there is

competing evidence, and one can "draw[] two inconsistent conclusions from the

evidence," regulation is justified under intermediate scrutiny.  <u>Turner Broadcasting</u>

<u>Systems, Inc. v. FCC</u>, 520 U.S. 180, 211 (1997).

        There is ample evidence that, when the number of guns increases, there are

more victims of gun violence.  For example, one study showed that "States with

higher rates of household firearms ownership had significantly higher homicide

victimization rates."  Matthew Miller, David Hemenway, & Deborah Azrael, <u>State-</u>

<u>Level Homicide Victimization Rates in the United States in Relation to Survey</u>

<u>Measures of Household Firearm Ownership, 2001-2003</u>, 64 Social Science &

Medicine 656, 660 (2007).  <u>See also</u> Mark Duggan, <u>More Guns, More Crime</u>, 109 J.

Pol. Econ. 1086, 1112 (2001) (study demonstrating "that increases in gun ownership

lead to substantial increases in the overall homicide rate").  And another study

showed that "an increase in gun prevalence causes an *intensification* of criminal

violence – a shift toward a greater lethality, and hence greater harm to a

community."  Philip J. Cook & Jens Ludwig, <u>The Social Costs of Gun Ownership</u>, J.

Pub. Econ. 379, 387 (2006).  States with more guns also have a higher rate of

unintentional firearm deaths.  Matthew Miller, Deborah Azrael, & David

Hemenway, <u>Firearm Availability and Unintentional Firearm Deaths</u>, 33 Accident

Analysis & Prevention 477, 480 (July 2000) (study showing individuals

"significantly more likely to die from unintentional firearms injuries if they lived in

states with more rather than fewer guns"). The State thus has an interest in reducing the number of guns in public places because there are more deaths and injuries from firearms when more guns are present.

The UUW and AUUW provisions reduce these harms by deterring individuals from carrying their guns in public, and enabling police officers to take these lethal weapons off the street before a shooting occurs. As the State explains, when a police officer encounters a person suspected of carrying a gun in public, that officer has reasonable suspicion to believe a law is being violated and may stop and frisk. Madigan Br. 45 (citations omitted). Then, upon finding the gun, the officer can make an arrest and remove the gun from the street. Id. Policing strategies often prioritize confiscating illegally-carried guns in high-crime areas. Chicago's Project Safe Neighborhoods is one example. See Andrew V. Papachristos, Tracey L. Meares, & Jeffrey Fagan, Attention Felons: Evaluating Project Safe Neighborhoods in Chicago, 4 J. Empirical Legal Stud. 223, 232-33 (2007). Aggressive enforcement of gun laws increases the likelihood that gang members will keep their guns at home; and, when they do not, their guns may be taken from them before they are used in crimes. See Lawrence Rosenthal, Second Amendment Plumbing After Heller: Of Standards of Scrutiny, Incorporation, Well-Regulated Militias, and Criminal Street Gangs, 41 Urb. Lawyer 1, 30-48 (2009). See also Philip J. Cook, Ludwig, Sudhir Venkatesh, & Anthony A. Braga, Underground Gun Markets, 117 Economic J. F558, F581-82 (2007) ("law enforcement efforts targeted at reducing gun availability at the street level seem promising").

Shepard's argument to the contrary – that "individuals who are disposed toward violent crime . . . will not be deterred by the relatively minor sanctions imposed for unlawfully carrying a firearm," Shepard Br. 57 – should be rejected.  In fact, there is ample evidence that such aggressive policing strategies drive down firearms-related activity in the streets.  In New York City, for example, patrols targeting illicit gun carrying have been a prominent feature of policing in the last two decades, and that city has enjoyed a substantial reduction in violent crime.  See Rosenthal, supra, at 4-5, 25-44.  And in Pittsburgh, the police department created a Firearm Suppression Patrol targeting illegal carrying with increased patrols during high-crime periods, and in two high-crime areas of the City.  Jacqueline Cohen & Jens Ludwig, Policing Crime Guns in Jens Ludwig & Philip J. Cook, Evaluating Gun Policy, 217-50 (2003).  A study of that policing strategy concluded that the tactic "may have reduced shots fired by as much as 34 percent and gunshot injuries by as much as 71 percent in the targeted areas." Id. at 238.  Indianapolis conducted a similar experimental intervention in 1997, and experienced a 29% reduction in gun crimes in a district with increased patrols targeting suspicious behavior.  Edmund F. McGarrell, Steven Chermak, & Alexander Weiss, Reducing Gun Violence: Evaluation of the Indianapolis Police Department's Directed Patrol Project 10 (2002).

These policing strategies can be more effective if public carry is also prohibited, rather than when carrying is allowed with a license or permit.  That is because when carrying is allowed there is some question whether the mere

suspicion of a gun is a sufficient reason to stop an individual, or whether the officer must also suspect the possessor is unlicensed or that any other crime has occurred. See, e.g., United States v. Ubiles, 224 F.3d 213, 217-18 (3d Cir. 2000) (officers' suspicion that defendant had gun in crowded street festival was not a reason to believe criminal activity was afoot since there was no reason to believe defendant was unlicensed); Commonwealth v. Couture, 552 N.E.2d 538, 541 (Mass. 1990) ("The mere possession of a handgun was not sufficient to give rise to a reasonable suspicion that the defendant was illegally carrying that gun [without a license] . . . ."). Thus, the ability of police officers to stop, frisk, and arrest gang members and other criminals they see with guns could be undermined if carrying firearms were not unlawful, at least when there is no reason to believe another crime has been committed. Allowing public carry, therefore, could eliminate critical opportunities to remove guns from the streets before gun crimes occur.

Even though the prohibition on carrying guns also reaches individuals who are not likely to misuse guns, it is constitutional. Intermediate scrutiny tolerates laws that are over-inclusive so long as they are nevertheless "not broader" than the government "reasonably could have determined to be necessary." Board of Trustees v. Fox, 492 U.S. 469, 480 (1989) (citation omitted). The government is not required to adopt less restrictive alternatives when its important objective "would be achieved less effectively absent the regulation." Ward v. Rock Against Racism, 491 U.S. 781, 797, 799 (1989). And, as the State explains, Madigan Br. 46-47, the State's important interest would not be as effectively served by less-restrictive laws

22

that allow public carry while attempting to weed out "numerous dangerous or irresponsible individuals who may properly be denied the right to keep functional handguns," Moore Br. 45; see also Shepard Br. 56.  That is because it is impossible to identify in advance every person who will be dangerous and irresponsible with firearms.  One need look no further than the shooting of Congresswoman Gabrielle Giffords, one of 20 shot, including a 9-year-old child, by a perpetrator who was legally carrying a firearm in public outside a Tucson supermarket, to understand the dangers of weak state laws permitting guns in public places.  Sam Quinones & Michael Muskal, Jared Loughner to be Charged in Arizona Shootings Targeting Gabrielle Giffords, L.A. Times, Jan. 9, 2011.  Indeed, Shepard's *amici* point to statistics revealing more than 2,200 individuals in five states who had been issued licenses or permits, and who were later deemed not entitled to hold those licenses. See Brief *Amici Curiae* of Michael Hall, et al., at 18-19.  And at least one study has shown that interventions to prevent violent crime that target only convicts or arrestees "leave a large portion of the problem untouched," and concluded that "[b]roader prevention strategies, including general deterrence and the regulation of the markets for 'criminogenic commodities' (firearms, alcohol, and drugs), may also be warranted."  See Philip J. Cook, Ludwig, & Braga, Criminal Records of Homicide Offenders, 294 J. Am. Med. Assoc. 598, 600 (2005).

Road rage incidents, too, can turn deadly when drivers carry guns.  See Matthew Miller, Deborah Azrael, David Hemenway, Road Rage in Arizona: Armed and Dangerous, 34 Accident Analysis & Prevention 807, 814 (2002) (findings

23

suggest that "carrying a gun in a vehicle" is among the characteristics of drivers that "strongly predict which drivers are likely to behave aggressively toward other drivers"). Those with aggression and a gun at hand may just use it. For instance, one disgruntled motorist with a license to carry a gun shot at Alan Simons while he was on a bicycle ride with his 4-year-old son, hitting Simons's bicycle helmet and narrowly missing his head. Michael Luo, Guns in Public, and Out of Sight, N.Y. Times, Dec. 26, 2011.

In sum, Illinois properly exercised its police power to limit possession of firearms outside the home to address an epidemic of gun violence. The number of deaths caused by firearms is staggering. By enforcing the UUW and AUUW provisions, the police are able to protect the public and themselves before a weapon is used to commit a crime. These restrictions are, therefore, substantially related to important governmental objectives.

### C.    Even If The Complaints Are Reinstated, The District Court Properly Denied A Preliminary Injunction.

If it is not clear enough from the publically available empirical data alone that the challenged provisions survive intermediate scrutiny, the denial of a preliminary injunction nevertheless should be affirmed, and the cases remanded. To obtain a preliminary injunction, plaintiffs must show, among other things, that they are likely to succeed on the merits of their claim. Girl Scouts of Manitou Council v. Girl Scouts of the U.S.A., 549 F.3d 1079, 1086 (7th Cir. 2008). Plaintiffs are not likely to succeed on the merits. There is ample evidence that the UUW and

AUUW provisions satisfy intermediate scrutiny, as we explain above.

Indeed, Moore points to no evidence showing that public carry prohibitions are not substantially related to the State's interests in reducing firearms violence. In lieu of evidence, Moore highlights that States take a variety of approaches to allowing guns in public places, and argues that none other is quite as restrictive as Illinois.  Moore Br. 42-43.  Intermediate scrutiny does not measure the popularity of a law among the States.  It leaves open to States a vast range of options – even when one State's approach may differ greatly from others – to deal with difficult problems in their jurisdictions, so long as those options are substantially related to important governmental interests.  And, even if most States are not as restrictive as Illinois today, the historical record contains an array of similar regulations that co-existed alongside the right to keep and bear arms in England and America, as we explain in part I.B.

Shepard cites a couple of studies which claim a lack of evidence to show that carrying guns outside the home would impact social welfare.  Shepard Br. 54-55.  But other studies, such as the ones we discuss above, provide support for prohibiting the carrying of guns.  That kind of support is sufficient to survive intermediate scrutiny, even when there is evidence on both sides and "two inconsistent conclusions" can be drawn "from the evidence."  Turner Broadcasting Systems, 520 U.S. at 211.

Accordingly, if the dismissals of the cases are reversed, the denial of a preliminary injunction should be affirmed.  Moreover, this court should not rule on

25

whether plaintiffs are entitled to a permanent injunction on this record, as plaintiffs urge.  Moore Br. 44; Shepard Br. 64.  The cases should be remanded for discovery.  Thereafter, the evidence, along with publicly available information, can be presented on whether the provisions survive intermediate scrutiny.  As in Illinois Association of Firearms Retailers v. City of Chicago, No. 10 CV 4184 (N.D. Ill.), in which summary judgment briefing is underway, such evidence can inform the court about the role of the UUW and AUUW provisions in policing strategies, and their relation to reducing gun violence.

# CONCLUSION

The district court's judgment should be affirmed.

Respectfully submitted,

STEPHEN R. PATTON
Corporation Counsel
  of the City of Chicago

BY: /s/ Suzanne M. Loose_____
SUZANNE M. LOOSE
Assistant Corporation Counsel
30 North LaSalle Street
Suite 800
Chicago, Illinois 60602
(312) 744-8519
*Counsel for the City of Chicago*

PATRICK J. ROCKS
General Counsel
LEE ANN LOWDER
Deputy General Counsel
Board of Education
  of the City of Chicago
125 South Clark Street
7th Floor
Chicago, IL  60603
(773) 553-1700
*Counsel for the Board of Education*
  *of the City of Chicago*

KAREN G. SEIMETZ
  General Counsel
STEPHEN L. WOOD
  Chief Attorney, Labor, Policy & Appeals
RACHEL L. KAPLAN
  Chief Attorney, Labor, Policy & Appeals
Chicago Transit Authority
567 West Lake Street
6th Floor
Chicago, IL 60661
(312) 681-2900
*Counsel for Chicago Transportation*
  *Authority*

JONATHAN K. BAUM
Katten Muchin Rosenman LLP
525 West Monroe Street
Chicago, IL  60661
(312) 902-5200
*Counsel for Legal Community Against*
  *Violence and Major Cities Chiefs*
  *Association*

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)
_____

   In accordance with Fed. R. App. P. 32(a)(7), I certify that the Brief of Amici Curiae the City of Chicago, Legal Community Against Violence, Major Cities Chiefs Association, Board of Education of the City of Chicago, and Chicago Transportation Authority complies with the type-volume limitation set forth in Fed. R. App. P. 29(d) because it contains 6,934 words, beginning with the words "INTEREST OF AMICI CURIAE" on page 1 and ending with the words "Respectfully submitted" on page 27.  In preparing this certificate, I relied on the word count of the word-processing system used to prepare the brief, which was WordPerfect X3.

              /s/ Suzanne M. Loose_____
              SUZANNE M. LOOSE, Attorney


## CERTIFICATE OF SERVICE
_____

   I certify that on May 16, 2012, I electronically filed the attached Brief of Amici Curiae with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.  Participants in this appeal who are registered CM/ECF users will be served by the CM/ECF system.

              /s/ Suzanne M. Loose_____
              SUZANNE M. LOOSE, Attorney