Defendants' Exhibit
No. 3

**No. 12-1269 and 12-1788**

IN THE

# United States Court of Appeals for the Seventh Circuit

| | | |
|---|---|---|
| MICHAEL MOORE, et al., | ) | Appeal from the United States |
| Plaintiffs-Appellants | ) | District Court for the |
| | ) | Central District of Illinois |
| v. | ) | |
| | ) | No. 11-3134 |
| LISA MADIGAN and HIRAM GRAU | ) | |
| Defendants-Appellees. | ) | The Honorable Susan E. |
| | ) | Myerscough, Judge Presiding. |
| MARY E. SHEPARD and ILLINOIS | ) | Appeal from the United States |
| STATE RIFLE ASSOCIATION, | ) | District Court for the |
| Plaintiffs-Appellants, | ) | Southern District of Illinois |
| | ) | |
| v. | ) | No. 11-405 |
| | ) | |
| LISA MADIGAN and HIRAM GRAU | ) | The Honorable William D. |
| Defendants-Appellees. | ) | Stiehl, Judge Presiding. |

## BRIEF OF *AMICI CURIAE* BRADY CENTER TO PREVENT GUN VIOLENCE, INTERNATIONAL BROTHERHOOD OF POLICE OFFICERS, MAJOR CITIES CHIEFS ASSOCIATION, NATIONAL ASSOCIATION OF WOMEN LAW ENFORCEMENT EXECUTIVES, NATIONAL BLACK POLICE ASSOCIATION, AND POLICE FOUNDATION IN SUPPORT OF APPELLEES

JONATHAN E. LOWY
DANIEL R. VICE
Brady Center to Prevent Gun Violence
Legal Action Project
1225 Eye Street, N.W., Suite 1100
Washington, D.C. 20005

JONATHAN L. DIESENHAUS
MATTHEW C. SULLIVAN
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004

ALEXANDER D. MARKS, of
BURKE, WARREN, MACKAY &
SERRITELLA, P.C.
330 N. Wabash, 22nd Floor
Chicago, IL 60611

May 16, 2012

Counsel for *Amici Curiae*

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: No. 11-3134; No. 11-405

Short Caption: Michael Moore, et al. v. Lisa Madigan, et al. ; Mary Shepard, et al. v. Lisa Madigan, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[ ] PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Brady Center To Prevent Gun Violence, International Brotherhood of Police Officers, Major Cities Chiefs Association, National Association of Women Law Enforcement Executives, National Black Police Association, and Police Foundation

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Hogan Lovells US LLP; Burke, Warren, MacKay & Serritella, P.C.; Harris Winick LLP

(3)   If the party or amicus is a corporation:

i)   Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

The organizations are not subsidiaries or affiliates of any publicly owned corporation, and no publicly held corporation is a holder of stock.

Attorney's Signature:  /s/ Alexander D. Marks _____Date: 5/16/12 _____

Attorney's Printed Name: Alexander D. Marks _____

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** X___  **No**

Address: 330 N. Wabash Ave., 22nd Floor, Chicago, IL 60611

Phone Number: 312-840-7000   Fax Number: 312-840-7900

E-Mail Address: amarks@burkelaw.com

**CONSENT TO FILE**

Pursuant to Rule 29(a) of the Federal Rules of Appellate Procedure, *amici* received

consent from all parties to file this brief.  No party's counsel authored this brief in whole or in

part.  No party, party's counsel, or person other than *amici*, its members, or its counsel,

contributed money intended to fund preparation of this brief.

# TABLE OF CONTENTS

STATEMENT OF INTEREST OF *AMICI CURIAE* ................................................................ 1

SUMMARY OF ARGUMENT ............................................................................................ 2

ARGUMENT ................................................................................................................... 3

   I.    720 ILCS 5/24-1 AND 720 ILCS 5/24-1.6(A) ARE PERMISSIBLE REGULATIONS
        THAT WOULD WITHSTAND THE APPROPRIATE LEVEL OF SCRUTINY............ 3

      A.  If the Court Determines That the Laws At Issue Here Implicate Protected Second
          Amendment Activity, They Are Not Subject to Strict Scrutiny. ...................................... 4

      B.  The Laws At Issue Here Are Backed By Compelling Evidence Substantially Related to
          Illinois' Public Safety Goals. ........................................................................................ 5

      C.  In Light of the Overwhelming Evidence Supporting Illinois' Law, *Amicus* NRA's
          Policy Disputes Are Irrelevant, and In Any Event Are Deeply Flawed. ...................... 10

   II.    THE ILLINOIS UNLAWFUL USE OF WEAPONS STATUTES ARE IN KEEPING
        WITH SUPREME COURT PRECEDENT AND  HISTORICALLY RECOGNIZED
        POLICE POWER AUTHORITY. ............................................................................. 14

CONCLUSION .............................................................................................................. 20

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)(B)................................................21

CIRCUIT RULE 31(e) CERTIFICATION ...........................................................................22

i

## TABLE OF AUTHORITIES

Page(s)

CASES

*Andrews v. State*,
    50 Tenn. 165, 1871 WL 3579, 8 Am.Rep. 8 (1871) .................................................18

*Aymette v. State*,
    21 Tenn. 154 (1840).................................................................................................17

*Bateman v. Perdue*,
    No. 5:10-CV-265-H, slip op. at 9-10 (E.D.N.C. Mar. 29, 2012).....................15, 16

*Bliss v. Commonwealth*,
    12 Ky. 90 (1822).....................................................................................................18

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)...................................................................................... *passim*

*English v. State*,
    35 Tex. 473 (1871)...............................................................................2, 16, 17, 18

*Ezell v. City of Chicago*,
    651 F.3d 684 (7th Cir. 2011) ..................................................................................14

*Fife v. State*,
    31 Ark. 455 (1876)..................................................................................................17

*Hill v. State*,
    53 Ga. 472 (1874) ...................................................................................................17

*McDonald v. City of Chicago*,
    130 S. Ct. 3020 (2010).................................................................................. *passim*

*Moore v. Madigan*,
    --- F. Supp. 2d ----, 2012 WL 344760 (C.D. Ill. Feb. 3, 2012)............................3, 15

*Nunn v. State*,
    1 Ga. 243 (1846) .....................................................................................................18

*People v. Aguilar*,
    944 N.E.2d 816 (Ill. App. Ct. 2011) ......................................................................14

*People v. Dawson*,
    934 N.E.2d 598 (Ill. App. Ct. 2010) ......................................................................14

*People v. Mimes,*
   953 N.E.2d 55 (Ill. App. Ct. 2011). ....................................................................5

*People v. Williams,*
   --- N.E.2d ----, 2011 WL 6945667 (Ill. App. Ct. Dec. 30, 2011) .............................5

*People v. Yarbrough,*
   169 Cal. App. 4th 303 (2008) ............................................................................5

*Piszczatoski v. Filko,*
   --- F. Supp. 2d ----, 2012 WL 104917 (D.N.J. Jan. 12, 2012) ...............................2

*Trinen v. City of Denver,*
   53 P.3d 754 (Colo. Ct. App. 2002) ....................................................................4

*Robertson v. Baldwin,*
   165 U.S. 275 (1897) .............................................................. 2, 14, 15, 16

*Robertson v. City & County of Denver,*
   874 P.2d 325 (Colo. 1994) .................................................................................4

*Shepard v. Madigan,*
   No. 11–CV–405–WDS, 2012 WL 1077146 (S.D. Ill. Mar. 30, 2012) ...................3

*State v. Buzzard,*
   4 Ark. 18 (1842)..............................................................................................18

*State v. Cole,*
   665 N.W.2d 328 (Wis. 2003) .......................................................................4-5

*State v. Dawson,*
   159 S.E.2d 1 (N.C. 1968) ..................................................................................4

*State v. Hamdan,*
   665 N.W.2d 785 (Wis. 2002) .............................................................................4

*State v. Jumel,*
   13 La. Ann. 399 (1858)...................................................................................18

*State v. Workman,*
   35 W. Va. 367 (1891) .....................................................................................17

*United States v. Chester,*
   628 F.3d 673 (4th Cir. 2010) .............................................................................4

*United States v. Hayes,*
   555 U.S. 415 (2009)..........................................................................................1

*United States v. Marzzarella*,
   614 F.3d 85 (3d Cir. 2010)..................................................................................4

*United States v. Masciandaro*,
   638 F.3d 458 (4th Cir. 2011), *cert. denied*, 132 S. Ct. 756 (U.S. Nov. 28, 2011)..............2, 15

*United States v. Reese*,
   627 F.3d 792 (10th Cir. 2010) .............................................................................4

*United States v. Skoien*,
   614 F.3d 638 (7th Cir. 2010) (en banc) ...........................................................4, 5

*Woollard v. Sheridan*,
   --- F. Supp. 2d ----, 2012 WL 695674 (D. Md. Mar. 2, 2012)................................15

STATUTES

520 ILCS 5/1.1 et seq..........................................................................................6

720 ILCS 5/24-1 et seq. ....................................................................................3, 6

720 ILCS 5/24-1.6 ..............................................................................................3

Ala. Code § 9-11-304..........................................................................................6

Ala. Code § 13A-11-52.........................................................................................6

Ala. Code § 13A-11-59.........................................................................................6

Ala. Code §§ 13A-11-73 – 13A-11-75 .....................................................................6

Ark. Act of Apr. 1, 1881 .....................................................................................17

Cal. Penal Code §§ 12050 – 12054........................................................................6

Cal. Penal Code § 12590......................................................................................6

Conn. Gen. Stat. §§ 29-28 – 29-30 ........................................................................6

Conn. Gen. Stat. §§ 29-32 – 29-32b .......................................................................6

Conn. Gen. Stat. § 29-35......................................................................................6

Conn. Gen. Stat. § 29-37......................................................................................6

D.C. Code § 22-4504 ..........................................................................................14

Del. Code Ann. tit. 11, § 1441 ..............................................................................6

Haw. Rev. Stat. Ann. § 134-9 ...............................................................................6

Kan., Ordinance No. 16, § XI ..............................................................................17

Mass. Gen. Laws ch. 140, §§ 131, 131C, 131P ....................................................6

Mass. Gen. Laws ch. 269, § 10 .............................................................................6

Md. Code Ann., Pub. Safety §§ 5-301 – 5-314 .....................................................6

N.J. Stat. Ann. § 2C:39-5 ......................................................................................6

N.J. Stat. Ann. § 2C:58-3 ......................................................................................6

N.J. Stat. Ann. § 2C:58-4 ......................................................................................6

N.Y. Penal Law § 265.01 .......................................................................................6

N.Y. Penal Law § 265.20 .......................................................................................6

N.Y. Penal Law § 400.00 .......................................................................................6

R.I. Gen. Laws §§ 11-47-8 – 11-47-18 .................................................................6

Stat. of Northampton, 2 Edw. 3, c.3...........................................................16, 18, 19

Tex. Act of Apr. 12, 1871 ....................................................................................17

Wyo. Comp. Laws ch. 52, § 1 ..............................................................................17

CONSTITUTIONAL PROVISIONS

Ky. Const. of 1850, art. XIII, § 25 ......................................................................18

U.S. Const., amend. II ..................................................................................... *passim*

OTHER AUTHORITIES

Adam Winkler, *Scrutinizing the Second Amendment*, 105 MICH. L. REV. 683 (2007) ..................4

Brady Campaign to Prevent Gun Violence, *Alabama Scorecard 2011* ..........................................6

Charles C. Branas *et al.*, *Investigating the Link Between Gun Possession and Gun Assault*, 99 AMER. J. PUB. HEALTH 2034 (Nov. 2009)..............................................................9

Charles F. Wellford *et al.*, *Firearms and Violence: A Critical Review* (2004) ............................8

Community Preventive Services Task Force, *Systematic Review Methods* (Mar. 2012) ..............10

v

Darrell A. H. Miller, *Guns As Smut: Defending the Home-Bound Second Amendment*, 109 COLUM. L. REV. 1278 (2009)................................................................ 18-19, 20

David Hemenway & Deborah Azrael, *The Relative Frequency of Offensive and Defensive Gun Uses: Results From a National Survey*, 15 VIOLENCE & VICTIMS 257 (2000)..............7

David Hemenway, *Road Rage in Arizona: Armed and Dangerous*, 34 ACCIDENT ANALYSIS AND PREVENTION 807 (2002).....................................................9

David Hemenway, *Survey Research and Self-Defense Gun Use: An Explanation of Extreme Overestimates*, 87 J. CRIM. L. & CRIMINOLOGY 1430 (1997)....................................11

David McDowall *et al.*, *Easing Concealed Firearms Laws: Effects on Homicide in Three States*, 86 J. CRIM. L. & CRIMINOLOGY 193 (1995).............................................8, 9

Don B. Kates, *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 MICH. L. REV. 204 (1983) ..............................................19

Ernst Freund, *The Police Power, Public Policy and Constitutional Rights* (1904)......................19

Federal Bureau of Investigation (FBI), *Uniform Crime Reports* .................................13

Florida Department of Agriculture and Consumer Services Division of Licensing, *Concealed Weapon or Firearm License Summary Report* (Oct.1987 – Apr. 2012)...............13

Gary Kleck, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. CRIM. L. & CRIMINOLOGY 150 (Fall 1995) ....................................11

Hashem Dezhbakhsh & Paul Rubin, *Lives Saved or Lives Lost? The Effects of Concealed-Handgun Laws on Crime*, 88 AM. ECON. REV. 468 (May 1998)...........................8

Hon. John Dillon, *The Right to Keep and Bear Arms for Public and Private Defense (Part 3),* 1 CENT. L. J. 259 (1874) ..............................................19

Jens Ludwig, *Concealed-Gun-Carrying Laws and Violent Crime: Evidence from State Panel Data*, 18 INT'L REV. L. & ECON. 239 (1998) ....................................8

Jim DeFede, *A Night Inside South Florida's Gang Wars* (May 7, 2012).......................7

Joel Prentiss Bishop, *Commentaries on the Criminal Law* § 125 (1868).....................18

John Donohue, *Guns, Crime, and the Impact of State Right-To-Carry Laws*, 73 FORDHAM L. REV. 623 (2004) ..............................................9

John Donohue, *The Impact of Concealed-Carry Laws*, EVALUATING GUN POLICY EFFECTS ON CRIME AND VIOLENCE 289 (2003)...........................................8

John Norton Pomeroy, *An Introduction to the Constitutional Law of the United States* (1868)..............................................19

Lisa M. Hepburn & David Hemenway, *Firearm Availability and Homicide:  A Review of the Literature*, 9 AGGRESSION & VIOLENT BEHAV. 417 (2004). ................................................7

Mark Duggan, *More Guns, More Crime*, 109 J. POL'Y. ECON. 1086 (2001)..................................7

Matthew Miller *et al.*, *Firearm Availability and Unintentional Firearm Deaths*, 33 ACCIDENT ANALYSIS & PREVENTION 477 (Jul. 2000)..................................7

Matthew Miller *et al.*, *Rates of Household Firearm Ownership and Homicide Across US Regions and States*, *1988–1997*, 92 AM. J. PUB. HEALTH 1988 (Dec. 2002)............................7

Matthew Miller *et al.*, *State-Level Homicide Victimization Rates in the US in Relation to Survey Measures of Household Firearm Ownership, 2001-2003*, 64 SOC. SCI. & MED. 656 (Feb. 2007) ................................7

Patrick J. Charles, *The Faces of the Second Amendment Outside the Home*, 60 CLEVELAND ST. L. REV. ___ (forthcoming Mar. 2012)..................................19

Patrick J. Charles, *Scribble Scrabble, the Second Amendment, and Historical Guideposts: A Short Reply to Lawrence Rosenthal and Joyce Lee Malcolm*, 105 NW. U. L. REV. COLLOQUY 225 (2011) ................................20

Philip Cook *et al.*, *Gun Control After Heller: Threats and Sideshows from a Social Welfare Perspective*, 56 UCLA L. REV. 1041 (2009)..................................9

Philip Cook & Jens Ludwig, *The Social Costs of Gun Ownership*, 90 J. PUB. ECON. 379 (2006)..................................9

Robert Hahn *et al.*, *Firearms Laws and the Reduction of Violence: A Systematic Review*, 28 AM. J. PREV. MED. 40 (2005) ................................10

U.S. Census Bureau, *Population Change for the United States, Regions, States, and Puerto Rico: 2000 to 2010* (2010 data)..................................6

Utah Dep't of Pub. Safety, *Concealed Firearm Permit and Brady Bill Statistical Data* (Oct. 2010) ................................13

Violence Policy Center, *Concealed Carry Killers* (2012) ..................................8

Violence Policy Center, *State Firearm Death Rates, Ranked by Rate* (2009) ................................6

## STATEMENT OF INTEREST OF *AMICI CURIAE*

*Amicus* Brady Center to Prevent Gun Violence is the nation's largest non-partisan, non-profit organization dedicated to reducing gun violence through education, research, and legal advocacy.  Through its Legal Action Project, the Brady Center has filed numerous *amicus curiae* briefs in cases involving firearms regulations, including *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010), *United States v. Hayes*, 555 U.S. 415, 427 (2009) (citing Brady Center brief), and *District of Columbia v. Heller*, 554 U.S. 570 (2008).  *Amicus* brings a broad and deep perspective to the issues raised by this case and has a compelling interest in ensuring that the Second Amendment does not impede reasonable governmental action to prevent gun violence.

*Amicus* International Brotherhood of Police Officers ("IBPO") is one of the largest police unions in the country, representing more than 50,000 members.

*Amicus* Major Cities Chiefs Association ("MCCA") is a professional association representing the largest cities in the United States and Canada.  MCCA membership is comprised of chiefs and sheriffs of the 70 largest law enforcement agencies in the United States and Canada.  Together they serve more than 76.5 million people (68 U.S., 8.5 Canada) with a combined sworn workforce of 177,150 (159,300 U.S., 17,850 Canada) officers.

*Amicus* National Association of Women Law Enforcement Executives ("NAWLEE") is the only organization established to address the unique needs of women holding senior management positions in law enforcement.  It is in its 17th year and has over 500 members.

*Amicus* National Black Police Association represents approximately 35,000 individual members and more than 140 chapters.

*Amicus* Police Foundation is a national, non-partisan, non-profit organization with a long history of promoting public policies that enhance the safety of law enforcement officers and the public they serve.

## SUMMARY OF ARGUMENT

As law enforcement officers tasked with protecting the public from crime and organizations that work to reduce gun violence, *amici* recognize all too well that the right to keep and bear arms recognized in *District of Columbia v. Heller*, 554 U.S. 570 (2008), "is unique among all other constitutional rights to the individual because it permits the user of a firearm to cause serious personal injury—including the ultimate injury, death—to other individuals, rightly or wrongly." *Piszczatoski v. Filko*, --- F. Supp. 2d ----, 2012 WL 104917, at *2 (D.N.J. Jan. 12, 2012).   While the Supreme Court held in *Heller* that the Second Amendment protects a limited right of law-abiding, responsible people to possess a gun *in the home* for self-defense, it has *never* recognized a far broader right to carry guns in public places.  *Heller*, 554 U.S. at 635.  As recognized by numerous courts construing *Heller* as limited to the home, the dangers of firearms "would rise exponentially as one moved the right from the home to the public square," *United States v. Masciandaro*, 638 F.3d 458, 475 (4th Cir. 2011), *cert. denied*, 132 S. Ct. 756 (U.S. Nov. 28, 2011).  Neither *Heller* nor the historical record undermine the longstanding police power authority of states to restrict or prohibit public carrying of guns.

Such restrictions and prohibitions on public carrying have deep roots in English and early American statutes and case law, and have long been recognized *not* to infringe the right to bear arms.  The Court's decision in *Heller* stands firmly in that unbroken line of history.  It left intact longstanding precedent that "the right of the people to keep and bear arms (article 2) is not infringed by laws prohibiting the carrying of concealed weapons," *Robertson v. Baldwin*, 165 U.S. 275, 281-82 (1897), and laws restricting public gun carrying, *English v. State*, 35 Tex. 473 (1871) (cited in *Heller*, 554 U.S. at 627), and approved of cases upholding "prohibitions on carrying concealed weapons," as well as "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.' " *Heller*, 554 U.S. at 626-27 & n.26.

2

The District Courts correctly upheld the Illinois statutes challenged by Appellants.  An

expansion of the Second Amendment that deprives states of the ability to bar public carrying of

guns would constrain law enforcement in its efforts to protect the public, and would run counter

to the "assurances" of *Heller* and *McDonald* that "reasonable firearms regulations" will remain

permissible, and to the Court's longstanding recognition that the exercise of protected activity

must be balanced against legitimate public interests—chief among which is public safety.

*McDonald*, 130 S. Ct. at 3047; *Heller*, 554 U.S. at 626-27 & n.26.  Illinois law governing the

public carrying of weapons is precisely the sort of regulation that courts should uphold.

## ARGUMENT

This Court should affirm the District Courts' holding that the provisions challenged

here—720 ILCS 5/24-1, prohibiting Unlawful Use of Weapons ("UUW"), and 720 ILCS 5/24-

1.6, prohibiting Aggravated Unlawful Use of Weapons ("AUUW")—are constitutional.  *Moore

v. Madigan*, --- F. Supp. 2d ----, 2012 WL 344760 (C.D. Ill. Feb. 3, 2012); *Shepard v. Madigan*,

No. 11–CV–405–WDS, 2012 WL 1077146 (S.D. Ill. Mar. 30, 2012).  The provisions further

important governmental interests recognized by Illinois' legislature, and are fully in keeping with

the historically understood meaning of the right to keep and bear arms.

**I.      720 ILCS 5/24-1 and 720 ILCS 5/24-1.6(a) ARE PERMISSIBLE REGULATIONS
         THAT WOULD WITHSTAND THE APPROPRIATE LEVEL OF SCRUTINY.**

The Illinois provisions do not infringe on protected Second Amendment activity, as that

right, properly understood, does not restrict states from prohibiting the carrying of guns in

public.  *See* Appellees' Br. 5-33.  However, the laws at issue should be upheld even if this Court

determines that they fall within the bounds of the Second Amendment.  Those provisions

withstand any appropriate level of scrutiny.

**A.**    **If the Court Determines That the Laws At Issue Here Implicate Protected Second Amendment Activity, They Are Not Subject to Strict Scrutiny.**

*Heller* implicitly rejected any form of heightened scrutiny that would require the government to ensure that firearms legislation has a tight fit between means and ends, as the Court recognized that the Constitution provides legislatures with "a variety of tools for combating" the "problem of handgun violence," *Heller*, 554 U.S. at 636, and deemed a host of existing firearms regulations to be "presumptively lawful" without subjecting those laws to any analysis, much less heightened scrutiny. *Id.* at 626-27 & n.26. In the aftermath of *Heller* and *McDonald*, this Court and a majority of others have rejected strict scrutiny. *See, e.g.*, *United States v. Skoien*, 614 F.3d 638, 641-42 (7th Cir. 2010) (en banc); *United States v. Chester*, 628 F.3d 673, 682-83 (4th Cir. 2010); *United States v. Reese*, 627 F.3d 792, 802 (10th Cir. 2010); *United States v. Marzzarella*, 614 F.3d 85, 98 (3d Cir. 2010).

While these courts have applied some form of intermediate scrutiny, it bears note that state courts construing analogous state rights to bear arms have long applied a more deferential "reasonable regulation" test.[1] By that test, a state "may regulate the exercise of [the] right [to bear arms] under its inherent police power so long as the exercise of that power is reasonable." *Robertson v. City & County of Denver*, 874 P.2d 325, 328 (Colo. 1994).[2]

---

[1]    *See* Adam Winkler, *Scrutinizing the Second Amendment*, 105 MICH. L. REV. 683, 686-87, n. 12 (2007) (describing "hundreds of opinions" by state courts with "surprisingly little variation" that have adopted the "reasonableness" standard for right-to-bear-arms cases).

[2]    Though more deferential than intermediate scrutiny, the test is more demanding than rational basis, and does not possess the fatal flaw in the "interest balancing" test suggested by Justice Breyer's *Heller* dissent, because it does not permit states to prohibit all firearm ownership. On the contrary, under "reasonable regulation" laws that "eviscerate," *State v. Hamdan*, 665 N.W.2d 785, 799 (Wis. 2002), render "nugatory," *Trinen v. City of Denver*, 53 P.3d 754, 757 (Colo. Ct. App. 2002), or result in the effective "destruction" of a Second Amendment right, *State v. Dawson*, 159 S.E.2d 1, 11 (N.C. 1968), would be struck down. The test focuses on whether "the restriction . . . is a reasonable exercise of the State's inherent police

4

**B.     The Laws At Issue Here Are Backed By Compelling Evidence Substantially Related to Illinois' Public Safety Goals.**

By any measure, the laws at issue are constitutional.  The people of Illinois, through their elected officials, have decided to protect public safety by restricting guns in public.  This life-saving policy choice is reasonable and supported by "logic and data" that "establish a substantial relation" between Illinois' law and its public safety goals.  *Skoein*, 614 F.3d at 642.

In light of the logic and overwhelming evidence supporting public gun carry restrictions, courts after *Heller* have continued to recognize the profound public safety basis for laws restricting armed gunmen in public:

> In his home, an individual generally may be better able to accurately assess a threat to his safety due to his familiarity with his surroundings and knowledge of his household's occupants. In public, however, there is no comparable familiarity or knowledge, and, thus, an increased danger that an individual carrying a loaded firearm will jump to inaccurate conclusions about the need to use a firearm for self-defense. The extensive training law enforcement officers undergo concerning the use of firearms attests to the degree of difficulty and level of skill necessary to competently assess potential threats in public situations and moderate the use of force.

*People v. Williams*, --- N.E.2d ----, 2011 WL 6945667 (Ill. App. Ct. Dec. 30, 2011) (quoting *People v. Mimes*, 953 N.E.2d 55, 77 (Ill. App. Ct. 2011).  *See also People v. Yarbrough*, 169 Cal. App. 4th 303, 314 (2008) ("Unlike possession of a gun for protection within a residence, carrying a concealed firearm presents a recognized threat to public order, and is prohibited as a means of preventing physical harm to persons other than the offender.  A person who carries a concealed firearm on his person or in a vehicle, which permits him immediate access to the firearm but impedes others from detecting its presence, poses an imminent threat to public safety. . . .") (citations omitted).

---

powers." *State v. Cole*, 665 N.W.2d 328, 338 (Wis. 2003).

5

In Illinois and the ten other states (making up one-third of the nation's population) that restrict public gun carrying,[3] law enforcement may pre-emptively remove illegal guns from the streets before they are used to cause harm, through highly effective community policing targeting illegal street guns.  In these states where public gun carrying may be restricted, possession of a concealed firearm by an individual in public is sufficiently unusual as to create a reasonable suspicion of danger, allowing police to investigate and remove illegal guns from the streets before a shooting occurs.  Like Illinois, nearly all of the states that restrict public gun carrying have achieved gun death rates below the national average.[4]

By contrast, under an expansive Second Amendment regime, an officer might not be deemed to have cause to arrest, search, or stop a person seen carrying a loaded gun, even though far less risky behavior could justify police intervention.  In Florida, for example, where law enforcement has no discretion to limit public gun carrying, "gangs have learned how to structure

---

[3]      Although *amicus* NRA states that Illinois is the only state that prohibits public gun carrying, NRA Br. at 6, the laws of nearly a dozen states restrict civilian handgun carrying in public.  Illinois bans public carrying, while "may issue" states likewise greatly limit public carrying by giving police the discretion to deny carry permit applications.  *See* Ala. Code §§ 9-11-304, 13A-11-52, 13A-11-59, 13A-11-73 – 13A-11-75; Cal. Penal Code §§ 12050 – 12054, 12590; Conn. Gen. Stat. §§ 29-28 – 29-30, 29-32 – 29-32b, 29-35, 29-37; Del. Code Ann. tit. 11, § 1441; Haw. Rev. Stat. Ann. § 134-9; 720 ILCS 5/24-1 et seq.; 520 ILCS 5/1.1 et seq.; Md. Code Ann., Pub. Safety §§ 5-301 – 5-314; Mass. Gen. Laws ch. 140, §§ 131, 131C, 131P, ch. 269, § 10; N.J. Stat. Ann. §§ 2C:58-3, 2C:58-4, 2C:39-5; N.Y. Penal Law §§ 400.00, 265.01, 265.20; R.I. Gen. Laws §§ 11-47-8 – 11-47-18; U.S. Census Bureau, *Population Change for the United States, Regions, States, and Puerto Rico: 2000 to 2010*, *available at* http://www.census.gov/prod/cen2010/briefs/c2010br-01.pdf (2010 data).

[4]      States with restrictions on public carrying of loaded guns have the lowest gun death rates in the nation.  Indeed, the five states with the lowest gun death rates all restrict public gun carrying (Connecticut, New York, New Jersey, Hawaii and Massachusetts).  Violence Policy Center, *State Firearm Death Rates, Ranked by Rate* (2009), *available at* http://www.vpc.org/fadeathchart12.htm (last accessed May 11, 2012) (of these states, only Alabama, whose carry law is undermined by other weak gun laws, has a gun death rate substantially higher than the national average).  *See* Brady Campaign to Prevent Gun Violence, *Alabama Scorecard 2011*, *available at* http://bradycampaign.org/stategunlaws/scorecard/AL/ (last accessed May 15, 2012).

their crews so that at least one of them can be legally armed.  One member of a crew will have a

concealed weapons permit . . . .  The traffic stop ends with the guy holding the cocaine going to

jail while the man with the concealed weapons permit was given back his gun and let go."[5]  If

guns were permitted to flood the streets of Illinois, law enforcement's ability to prevent gun

deaths by pre-emptively removing illegal guns from the streets could be greatly restricted.

Unlike firearms in the home, which are primarily a threat to gun owners, their families,

and guests,[6] guns in public threaten law enforcement and the community at large.  Guns in public

expose all members of society to great risks, as guns are "used far more often to intimidate and

threaten than they are used to thwart crimes."  David Hemenway & Deborah Azrael, *The

Relative Frequency of Offensive and Defensive Gun Uses: Results From a National Survey*, 15

VIOLENCE & VICTIMS 257, 271 (2000).[7]  In the last five years, concealed handgun permit holders

---

[5]     Jim DeFede, *A Night Inside South Florida's Gang Wars* (May 7, 2012), *available at*
http://miami.cbslocal.com/2012/05/07/a-night-inside-south-floridas-gang-wars/ (last accessed
May 15, 2012).

[6]     *See, e.g.,* Matthew Miller *et al.*, *State-Level Homicide Victimization Rates in the US in
Relation to Survey Measures of Household Firearm Ownership, 2001-2003*, 64 SOC. SCI. & MED.
656 (Feb. 2007) ("States with higher rates of firearm ownership had significantly higher
homicide victimization rates"); Lisa M. Hepburn & David Hemenway, *Firearm Availability and
Homicide:  A Review of the Literature*, 9 AGGRESSION & VIOLENT BEHAV. 417 (2004)
("[H]ouseholds with firearms are at higher risk for homicide, and there is no net beneficial effect
of firearm ownership"); Matthew Miller *et al.*, *Rates of Household Firearm Ownership and
Homicide Across US Regions and States, 1988–1997*, 92 AM. J. PUB. HEALTH 1988, 1988 (Dec.
2002) ("[I]n areas where household firearm ownership rates were higher, a disproportionately
large number of people died from homicide."); Mark Duggan, *More Guns, More Crime*, 109 J.
POL'Y. ECON. 1086 (2001); Matthew Miller *et al.*, *Firearm Availability and Unintentional
Firearm Deaths*, 33 ACCIDENT ANALYSIS & PREVENTION 477 (Jul. 2000) ("A statistically
significant and robust association exists between gun availability and unintentional firearm
deaths.").

[7]     The NRA criticizes a separate statement in this study that guns are used "far more often
to kill and wound innocent victims than to kill and wound criminals" and in self-defense. NRA
Br. at 14.  The NRA falsely claims that the underlying study "was thoroughly discredited," when
in fact the National Research Council committee's review cited by the NRA concluded that "the

have shot and killed over 400 people, including a dozen law enforcement officers. *See* Violence Policy Center, *Concealed Carry Killers* (2012), *available at* http://vpc.org/ccwkillers.htm (last accessed May 15, 2012). The shooting death of unarmed teenager Trayvon Martin is only the most publicized killing by a licensed concealed gun carrier. *Id.*

Carrying firearms in public is not an effective form of self-defense and, in fact, repeatedly has been shown to *increase* the chances that one will fall victim to violent crime. Most states that broadly allow concealed carrying of firearms in public appear to "experience increases in violent crime, murder, and robbery when [those] laws are adopted." John Donohue, *The Impact of Concealed-Carry Laws*, EVALUATING GUN POLICY EFFECTS ON CRIME AND VIOLENCE 289, 320 (2003). Laws broadly allowing concealed carrying of weapons "have resulted, if anything, in an *increase* in adult homicide rates." Jens Ludwig, *Concealed-Gun-Carrying Laws and Violent Crime: Evidence from State Panel Data*, 18 INT'L REV. L. & ECON. 239 (1998). Likewise, "firearms homicides increased in the aftermath of [enactment of these] laws," and such laws may "raise levels of firearms murders" and "increase the frequency of homicide." David McDowall *et al.*, *Easing Concealed Firearms Laws: Effects on Homicide in Three States*, 86 J. CRIM. L. & CRIMINOLOGY 193, 202-203 (1995). Similarly, "[f]or robbery, many states experience increases in crime" after concealed carry laws are enacted. Hashem Dezhbakhsh & Paul Rubin, *Lives Saved or Lives Lost? The Effects of Concealed-Handgun Laws on Crime*, 88 AM. ECON. REV. 468 (May 1998).

---

facts are in no doubt," and instead took issue with broader conclusions related to overall "crime and injury" rather than "[s]imple death counts." Charles F. Wellford *et al.*, *Firearms and Violence: A Critical Review* (2004) (hereinafter "NRC") at 118. While this committee may have chosen to limit its report to broader societal questions, the NRA is wrong to suggest that Illinois cannot base its public safety goals on lowering "death counts."

8

Analyses of the connection between increased gun prevalence and crime "indicate a rather substantial increase in robbery," John Donohue, *Guns, Crime, and the Impact of State Right-To-Carry Laws*, 73 FORDHAM L. REV. 623, 633 (2004), while "policies to *discourage* firearms in public may help prevent violence." McDowall *et al.*, *Easing Concealed Firearms Laws*, 86 J. CRIM. L. & CRIMINOLOGY at 203. Another study found that "gun possession by urban adults was associated with a significantly increased risk of being shot in an assault," and that "guns did not seem to protect those who possessed them from being shot in an assault." Charles C. Branas *et al.*, *Investigating the Link Between Gun Possession and Gun Assault*, 99 AMER. J. PUB. HEALTH 2034 (Nov. 2009). Likewise, another study found that:

> Two-thirds of prisoners incarcerated for gun offenses reported that the chance of running into an armed victim was very or somewhat important in their own choice to use a gun. Currently, criminals use guns in only about 25 percent of noncommercial robberies and 5 percent of assaults. If increased gun carrying among potential victims causes criminals to carry guns more often themselves, or become quicker to use guns to avert armed self-defense, the end result could be that street crime becomes more lethal.

Philip Cook *et al.*, *Gun Control After Heller: Threats and Sideshows from a Social Welfare Perspective*, 56 UCLA L. REV. 1041, 1081 (2009).

The carrying of firearms in public negatively implicates other social issues and portends societal ills unlike firearms in the home. For one, if drivers carry loaded guns, road rage can become a more serious and potentially deadly phenomenon. David Hemenway, *Road Rage in Arizona: Armed and Dangerous*, 34 ACCIDENT ANALYSIS AND PREVENTION 807-14 (2002). Increases in gun prevalence in public may cause an intensification of criminal violence. Philip Cook & Jens Ludwig, *The Social Costs of Gun Ownership*, 90 J. PUB. ECON. 379, 387 (2006).

**C.      In Light of the Overwhelming Evidence Supporting Illinois' Law, *Amicus* NRA's Policy Disputes Are Irrelevant, and In Any Event Are Deeply Flawed.**

Despite this overwhelming evidence supporting Illinois' law, *amicus* National Rifle Association ("NRA") lobbies this Court to make an essentially legislative finding that flooding the streets with loaded, hidden handguns would "promote[] public safety."  NRA Br. at 6.  In so doing, the NRA criticizes studies cited by the Brady Center and argues that this Court should instead rely on the NRA's selection of studies.  *Id.* at 5 n.1.  That is an argument for a legislature, not a court, and even if it were relevant the NRA's claims and studies are deeply flawed.

The NRA "relies principally" on findings by a National Research Council committee ("NRC") in a review of gun studies and a related survey, *id.* at 8 n.2, but the NRA's argument that this Court should limit itself to the NRC's general conclusions is contradicted by the NRC itself, which expressly examined broader questions about "how to improve the empirical foundation for discussions about firearms policy," while specifically cautioning that it was "not intended to, nor does it reach any conclusions about the issue of gun control."  NRC at ix, 114. The NRC was not charged with and did not undertake a legislative policy-making inquiry about how to protect public safety.  That is the Illinois legislature's role—and it has acted to protect public safety now based on the best available evidence of the severe risks of public gun carrying.[8]

The NRA claims that this Court should rely on a so-called "leading study" by Gary Kleck, which the NRA asserts is persuasive because it has been "replicated" 19 times.  NRA Br.

---

[8]      Similarly, the NRA cites to a Centers for Disease Control review that was focused on a "public health" analysis rather than legislative policymaking and which cautioned that its conclusion "does NOT mean that the intervention does not work."  Robert Hahn *et al.*, *Firearms Laws and the Reduction of Violence: A Systematic Review*, 28 AM. J. PREV. MED. 40, 61 (2005); Community Preventive Services Task Force, *Systematic Review Methods* (Mar. 2012), *available at* http://www.thecommunityguide.org/about/methods.html#categories (last accessed May 15, 2012).

at 6.  Yet the NRC debunked Kleck, finding that this claim of repetition gave them "no comfort" because "[m]ere repetition does not eliminate bias."  NRC at 113.  The NRC found Kleck's work to be plagued by substantial bias that clouded his facts, figures, and conclusions.  Thus, while the NRA claims Kleck found "roughly 2.5 million defensive gun uses" per year, NRA Br. at 6, the NRC found Kleck's conclusion to be prone to "invalid response errors" and "high degrees of sampling error" because of the "relatively small subsamples of persons who report using firearms defensively."  NRC at 112.  Similarly, the NRC also concluded that the NRA's assertion that guns protect crime victims, NRA Br. at 9-10, is subject to "obvious concerns about inaccurate reporting associated with subjective questions."  NRC at 117.[9]

One critique similarly found that Kleck's sample size was so small that his purported self-defensive gun uses amounted to only 1.33% of those surveyed, allowing him to reach a result of 2.5 million defenses gun uses only by multiplying 1.33% by about 200 million adults, massively magnifying error and bias.[10]  Furthermore, the NRC was extremely concerned about error and bias in Kleck's claims, pointing out that even Kleck admits that "respondents may be inclined to 'remember with favor their marksmanship' and may tend to exaggerate the seriousness of the event."  NRC at 112.  Yet Kleck failed to screen his data so that it may include supposed self-defense claims by people who actually were engaging in "illegal carrying and possession" and "some uses against supposed criminals may legally amount to aggravated assault," such that a purported defender may actually be "a perpetrator."  NRC at 106.  The NRC

---

[9]     Moreover, while the NRA claims that Kleck found that "as many as 63% [of self-defense gun uses] involve citizens carrying a firearm while outside their homes," NRA Br. at 6, Kleck himself admitted that a majority of these actually "may or may not have entailed public carrying" at all.  Gary Kleck, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. CRIM. L. & CRIMINOLOGY 150, 174 (Fall 1995).

[10]    David Hemenway, *Survey Research and Self-Defense Gun Use: An Explanation of Extreme Overestimates*, 87 J. CRIM. L. & CRIMINOLOGY 1430 (1997).

worried that Kleck used "potentially error ridden" data, yet he "assumes these data are fully accurate" and thus uses the data "to make implausible and unsubstantiated assumptions about the accuracy of self-reported measures of resistance" which "may lead to substantial biases."  NRC at 116-17.

The NRC also takes issue with the NRA's claim that public carrying may reduce crime, finding possible "offsetting adverse consequences" which "may motivate more criminals to carry firearms and thereby *increase* the amount of violence that is associated with crime" and "allowing individuals to carry concealed weapons may *increase* accidental injuries or deaths or *increase* shootings during arguments."  NRC at 120 (emphasis added).  The NRA's assertions that gun carrying may prevent crime are largely based on studies by John Lott which the NRC specifically refuted: "Lott's and Whitley's figure shows estimated trends in crime levels before and after adoption of right-to carry laws, and they claim that these trends support the conclusion that adoption of right-to-carry laws reduces crime.  The committee disagrees."  NRC at 137.  The NRC noted that other researchers found that "the use of plausible alternative data, control variables, specifications, or methods of computing standard errors, weakens or reverses the results" found by Lott.  NRC at 127.

While the NRA cannot deny that hundreds of people have been killed by concealed carry licensees and thousands of licensees have committed crimes requiring license revocation, the NRA essentially argues that not enough people have been killed or victimized to justify a public safety response.  NRA Br. at 17-18.  The NRA urges the Court to disregard evidence that at least a dozen law enforcement officers and more than 400 people have been killed by concealed carry licensees, arguing that some shootings were accidental and thus somehow irrelevant, even though accidental shootings involved small children who accessed a permit holder's gun and

killed themselves.  The NRA likewise argues that suicides are irrelevant, even though dozens

involved murder-suicides where many innocent people were killed.

     The NRA also points to several thousand concealed carry licensees in a few states it

selected who had licenses revoked to argue against a legislative response.  NRA Br. at 18-19.

The NRA even misrepresents this data, for example, citing only 168 Florida revocations for

permit holders who committed gun crimes when in fact 6,143 Florida permit holders committed

a crime after receiving a concealed carry permit.[11]  Further, 522 had licenses revoked for

committing a crime before they even received their Florida license.  Similarly, Utah revoked

2,796 concealed carry licenses since 2007, including for crimes of kidnapping, murder, and child

abuse.[12]  As Utah's experience shows, people licensed to carry guns have committed crimes

dangerous enough to warrant license revocation and they pose a threat to public safety even if

their victim suffered crimes other than gun crimes, such as kidnapping or child abuse.[13]

     States have significant interests in averting the gun crimes and accidental shootings that

result from unrestricted public carrying.  The people's representatives in Illinois have decided on

---

[11]     Fla. Dep't of Agric. and Consumer Serv. Div. of Licensing, *Concealed Weapon or Firearm License Summary Report* (Oct.1987 – Apr. 2012), *available at* http://licgweb.doacs.state.fl.us/stats/cw_monthly.pdf.

[12]     Utah Dep't of Pub. Safety, *Concealed Firearm Permit and Brady Bill Statistical Data*, *available at* http://publicsafety.utah.gov/bci/brady_statistics.html (last accessed May 15, 2012).

[13]     A comparison of New York and Florida is worth noting.  In 1987, Florida and New York ranked as the top two states in the nation for violent crime rates.  Federal Bureau of Investigation (FBI), *Uniform Crime Reports*, *available at* http://www.fbi.gov/about-us/cjis/ucr/ucr (last accessed May 15, 2012) (Brady Center calculations).  Florida broadly allowed concealed carrying in 1987, while New York maintained restrictions on public gun carrying.  Since then, Florida has ranked in the top five states for violent crime rates every year, while New York's violent crime rate has declined dramatically, with New York dropping out of the top ten states with the highest violent crime rates in 1996 and out of the top twenty in 2004.  *Id.*  New York now has a violent crime rate nearly half Florida's and one of the lowest gun death rates in the nation.  *Id.*

a life-saving policy that is well-tailored to accomplish their interest in fostering public safety and

is supported by a substantial body of evidence.  Any policy disagreements about this decision of

the people of Illinois should be raised in the legislature.  This Court should uphold the

constitutionality of Illinois's statutes.

## II.   THE ILLINOIS UNLAWFUL USE OF WEAPONS STATUTES ARE IN KEEPING WITH SUPREME COURT PRECEDENT AND HISTORICALLY RECOGNIZED POLICE POWER AUTHORITY.

As courts in Illinois and across the nation have recognized, *Heller*'s limited holding does

not restrict the state's police power authority to limit or prohibit carrying guns in public.  *See,*

*e.g.*, *People v. Dawson*, 934 N.E.2d 598 (Ill. App. Ct. 2010); *People v. Aguilar*, 944 N.E.2d 816

(Ill. App. Ct. 2011).   *Heller* recognized that the Second Amendment protects "the right of law-

abiding, responsible citizens to use arms *in defense of hearth and home*," and the Court only

recognized Heller's right "*to carry* [] *in the home*,"  *Heller*, 554 U.S. at 635 (emphasis added).

*See also Ezell v. City of Chicago*, 651 F.3d 684, 701, 715 (7th Cir. 2011).  The right of

individuals "to keep and bear arms to defend their homes, families or themselves" is not

infringed by Illinois's restrictions on public carrying.   *Heller*, 554 U.S. at 615 (internal quotation

marks omitted).

*Heller* did not disturb *Robertson v. Baldwin*, 165 U.S. at 281-82, which recognized the

long understood view that "the right of the people to keep and bear arms (article 2) is not

infringed by laws prohibiting the carrying of concealed weapons."  Indeed, *Heller*, though

expounding upon a wide range of gun laws beyond those directly at issue, and aware that District

law barred Mr. Heller from carrying guns in public, explicitly stated that it only recognized his

right to "carry [] in the home," without as much as hinting that the District's ban on public

carrying was constitutionally suspect.  *Heller*, 554 U.S. at 635; D.C. Code § 22-4504.

14

In *McDonald*, the Court "repeat[ed]" *Heller*'s "assurances" regarding its limited scope, and agreed that "state and local experimentation with reasonable firearms regulations will continue under the Second Amendment." *McDonald*, 130 S. Ct. at 3046-47 (internal citation omitted). Similarly, the Court did not question either *Robertson* or Illinois's ban on the public carrying of firearms.

The District Courts' holdings are in line with the reasoning of numerous courts in and outside of Illinois that have upheld restrictions or prohibitions on public gun carrying, post-*Heller*.[14] *See, e.g.*, *Moore*, 2012 WL 344760, at *7 (collecting cases). These courts have recognized the potentially grave risks to the public in expanding the right into public spaces. In refusing to "push *Heller* beyond its undisputed core holding," the Fourth Circuit properly reasoned:

> This is serious business. We do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we miscalculated as to Second Amendment rights. It is not far-fetched to think the *Heller* Court wished to leave open the possibility that such a danger would rise exponentially as one moved the right from the home to the public square.

*United States v. Masciandaro*, 638 F.3d 458, 475 (4th Cir. 2011), *cert. denied*, 132 S. Ct. 756 (U.S. Nov. 28, 2011).[15]

This reading of the Second Amendment as not restricting public carry laws such as Illinois' is in keeping with the historical tradition embraced by the Supreme Court. The Supreme

---

[14]   On three occasions, the *Moore* Appellants state that reading *Heller* as limited to the home is an inappropriate restriction of *Heller* "to its facts." *See* Moore, et al. Br. at 8, 15, 30. To the contrary, that interpretation is a proper construction of the holding, as stated by the Court itself.

[15]   Two district courts within the Fourth Circuit have improperly disregarded their Circuit court's warning, and relied instead on Judge Niemeyer's minority views expressed in his *Masciandaro* concurrence. *Bateman v. Perdue*, No. 5:10-CV-265-H, slip op. at 9-10 (E.D.N.C. Mar. 29, 2012); *Woollard v. Sheridan*, --- F. Supp. 2d ----, 2012 WL 695674, at *6 (D. Md. Mar. 2, 2012).

Court has stated that the Second Amendment was a preexisting right, "inherited from our English ancestors . . . subject to certain well-recognized exceptions . . . which continue to be recognized as if they had been formally expressed." *Robertson*, 165 U.S. at 281; *see also Heller*, 554 U.S. at 592-95, 600-03, 605-19, 626-28 (tracing the right to bear arms through Anglo-American origins and state analogues); *McDonald*, 130 S. Ct. at 3056 ("[T]raditional restrictions" on the Second Amendment "show the scope of the right," just as they do "for *other* rights.") (Scalia, J., concurring). The *Heller* Court stated specifically that its opinion was not "to cast doubt on longstanding prohibitions" in the history of Anglo-American jurisprudence. *Id.*

Among the "longstanding prohibitions" cited in *Heller* were "prohibitions on carrying concealed weapons." *Heller*, 554 U.S. at 626; *see also Robertson*, 165 U.S. at 281-82 (identifying "laws prohibiting the carrying of concealed weapons" as one such prohibition). *Heller* also recognized the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,' " a limitation construed to allow for prohibitions on the public carrying of handguns.

*Heller* cited as authority for this "historical tradition" the 19th-century case *English v. State*, 35 Tex. 473 (1871) (cited in *Heller*, 554 U.S. at 627), in which the Texas Supreme Court upheld a conviction for carrying a pistol in public under a statute banning the public carry of deadly weapons, including handguns. In reaching that conclusion, the court traced the history of analogous statutes, noting that Blackstone had characterized "the offense of riding around or going around with dangerous or unusual weapons" as a crime. 35 Tex. at 476. *English* traced the roots of such statutes back further through "the statute of Northampton (2 Edward III, c.3)," the "early common law of England," and even to "the laws of Solon" in ancient Greece. *Id.* The court was dismissive of the argument that the Second Amendment prohibited such laws, noting

16

that it was a "little short of ridiculous, that any one should claim the right to carry upon his

person any of the mischievous devices inhibited by the statute, into a peaceable public assembly,

as, for instance into a church . . . or any other place where ladies and gentlemen are congregated

together." *Id.* at 478-79.  The *English* court recognized that prohibiting the public carry of

deadly weapons was important to prevent crime, quoting John Stewart Mill: " 'It is one of the

undisputed functions of government, to take precautions against crime before it has been

committed, as well as to detect and punish afterwards,' " given " '[t]he right inherent in society

to ward off crimes against itself by antecedent precautions . . . .' "  35 Tex. at 478.

      *English* recognized that restrictions and prohibitions on public carrying were widespread:

"It is safe to say that almost, if not every one of the states of this Union have a similar law upon

their statute books, and, indeed, so far as we have been able to examine them, they are more

rigorous than the act under consideration." *Id.* at 479.  Indeed, even Wyatt Earp prohibited gun

carrying in Dodge City.  *See* Dodge City, Kan., Ordinance No. 16, § XI (Sept. 22, 1876); *see*

*also* 1876 Wyo. Comp. Laws ch. 52, § 1 (1876 Wyoming law prohibiting anyone from

"bear[ing] upon his person, concealed or openly, any firearm or other deadly weapon, within the

limits of any city, town or village"); Ark. Act of Apr. 1, 1881; Tex. Act of Apr. 12, 1871; *Fife v.*

*State*, 31 Ark. 455 (1876) (upholding carrying prohibition as a lawful "exercise of the police

power of the State without any infringement of the constitutional right" to bear arms); *Hill v.*

*State*, 53 Ga. 472, 474 (1874) ("at a loss to follow the line of thought that extends the

guarantee"—the state constitutional "right of the people to keep and bear arms"—"to the right to

carry pistols, dirks, Bowieknives, and those other weapons of like character, which, as all admit,

are the greatest nuisances of our day."); *State v. Workman*, 35 W. Va. 367, 373 (1891); *Aymette*

*v. State*, 21 Tenn. 154, 159-61 (1840) ("The Legislature, therefore, have a right to prohibit the

wearing or keeping weapons dangerous to the peace and safety of the citizens, and which are not

usual in civilized warfare, or would not contribute to the common defence."); *State v. Buzzard*, 4

Ark. 18, 21 (1842); *State v. Jumel*, 13 La. Ann. 399, 400 (1858).[16]

Another authority cited by *Heller*, 554 U.S. at 608, 613, 629, *Andrews v. State*, 50 Tenn.

165, 1871 WL 3579, 8 Am.Rep. 8, 10 (1871), similarly drew a sharp distinction between

carrying firearms at home and in public, explaining that "no law can punish" a man "while he

uses such arms at home or on his own property,"

> Yet, when he carries his property abroad, goes among the people in public assemblages
> where others are to be affected by his own conduct, then he brings himself within the pale
> of public regulation, and must submit to such restriction on the mode of using or carrying
> his property as the people through their Legislature, shall see fit to impose for the general
> good.

Accordingly, the historic scope of the right to keep and bear arms properly includes the

understanding that restricting and—as seen in *English*—the banning of public carry was not

understood to implicate the right.[17]  *See* Patrick J. Charles, *The Faces of the Second Amendment*

*Outside the Home*, 60 CLEVELAND ST. L. REV. ___ (forthcoming Mar. 2012) (hereinafter

Charles, *Outside the Home*), manuscript at 7 (quoting 2 Edw. 3, c.3 (1328) (Eng.)); Darrell A. H.

Miller, *Guns As Smut: Defending the Home-Bound Second Amendment*, 109 COLUM. L. REV.

---

[16]     *Bliss v. Commonwealth*, 12 Ky. 90, 91, 93 (1822), in which Kentucky's Supreme Court
held Kentucky's concealed-weapons ban in conflict with its Constitution, is recognized as an
exception to this precedent.  *See* Joel Prentiss Bishop, *Commentaries on the Criminal Law* § 125,
at 75-76 (1868). The legislature corrected the anomalous decision by amending its constitution to
allow a concealed weapons ban. *See* Ky. Const. of 1850, art. XIII, § 25.

[17]     *Heller* cited two other 19th-century cases that struck down severe restrictions, both of
which involved laws that could prohibit the carrying of guns in the home.  *Andrews v. State*, 50
Tenn. 165, 188–189 (1871) (law could severely punish a man "If a man should carry such a
weapon about his own home"); *Nunn v. State*, 1 Ga. 243, 246 (1846) (under the law "[i]t might
be insisted, and with much plausibility, that even sheriffs, and other officers therein enumerated,
might be convicted for keeping, as well as carrying, any of the forbidden weapons, while not in
the actual discharge of their respective duties").

1278, 1318 n.246 (2009) (noting that Blackstone compared the Statute of Northampton to "the laws of Solon," under which "every Athenian was finable who walked about the city in armour") (quoting 2 William Blackstone, Commentaries *149).

Noted scholars and commentators have long recognized that a right to keep and bear arms does not prevent states from restricting or forbidding guns in public places. For example, a treatise which *Heller* cited as representative of "post-Civil War 19th-century sources" commenting on the right to bear arms, 554 U.S. at 618, stated that the right to keep and bear arms "is certainly not violated by laws forbidding persons to carry dangerous or concealed weapons . . . ." John Norton Pomeroy, *An Introduction to the Constitutional Law of the United States* 152-53 (1868). Similarly, Judge John Dillon explained that even where there is a right to bear arms, "the peace of society and the safety of peaceable citizens plead loudly for protection against the evils which result from permitting other citizens to go armed with dangerous weapons." Hon. John Dillon, *The Right to Keep and Bear Arms for Public and Private Defense (Part 3),* 1 CENT. L. J. 259, 287 (1874). And an authoritative study published in 1904 concluded that the Second Amendment and similar state constitutional provisions had "not prevented the very general enactment of statutes forbidding the carrying of concealed weapons," which demonstrated that "constitutional rights must if possible be so interpreted as not to conflict with the requirements of peace, order and security." Ernst Freund, *The Police Power, Public Policy and Constitutional Rights* (1904).[18]

---

[18]      An authority cited by the *Heller* Court on the Second Amendment's original meaning concluded that the only public carrying of firearms protected by the Second Amendment "is such transportation as is implicit in the concept of a right to possess—*e.g.*, transporting them between the purchaser or owner's premises and a shooting range, or a gun store or gun smith and so on." Don B. Kates, *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 MICH. L. REV. 204, 267 (1983).

Such "restrictions began appearing on the carrying or using of 'arms' as a means to prevent public injury" since "the Norman Conquest."   Patrick J. Charles, *Scribble Scrabble, the Second Amendment, and Historical Guideposts: A Short Reply to Lawrence Rosenthal and Joyce Lee Malcolm*, 105 Nw. U. L. Rev. Colloquy 225, 227 (2011).  *See also* Darrell A. H. Miller, *supra*, at 1351, 1354 (2009) ("[S]tates and municipalities, far more sensitive to local needs and gun cultures, should be given free reign to design gun control policy that fits their specific demographic.").  To hold that the Constitution dictates that public carry *must* be permitted carves into stone a rule that prevents state and local governments from adopting arms regulations which have been recognized since antiquity as one of the ways in which government protects the public good.  The District Courts' holdings protect that legislative discretion that Appellants now seek to eliminate.

## CONCLUSION

For all of the foregoing reasons, as well as those contained in the brief of Appellees, this Court should affirm the decision of the District Courts.

Respectfully submitted,

/s/ Alexander D. Marks
Alexander D. Marks

Jonathan E. Lowy
Daniel R. Vice
Brady Center to Prevent Gun Violence
Legal Action Project
1225 Eye Street, N.W., Suite 1100
Washington, D.C. 20005

Jonathan L. Diesenhaus
Matthew C. Sullivan
Hogan Lovells US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004

Alexander D. Marks, of
Burke, Warren, MacKay & Serritella, P.C.
330 N. Wabash, 22nd Floor
Chicago, IL 60611

May 16, 2012

Counsel for *Amici Curiae*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1.      This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) because it contains 6,934 words, excluding the parts of the brief exempted by Fed. R.

App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32 as

modified by Circuit Rule 32(b) because it has been prepared in a proportionally spaced typeface

using Microsoft Office Word 2003 in Times New Roman 12-point font.

## CIRCUIT RULE 31(e) STATEMENT

The undersigned hereby certifies that he has filed electronically, pursuant to Circuit Rule 31(e), versions of the brief and all of the appendix items that are available in non-scanned PDF format.


/s/ Alexander D. Marks
Alexander D. Marks

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I certify that on May 16, 2012, I electronically filed the foregoing Brief of *Amici Curiae* with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


/s/ Alexander D. Marks
Alexander D. Marks

*Counsel for Amici Curiae*