No. 12-1269

# In the United States Court of Appeals for the Seventh Circuit

MICHAEL MOORE, CHARLES HOOKS, PEGGY FECHTER, JON MAIER, SECOND AMENDMENT FOUNDATION, INC., AND ILLINOIS CARRY,

Plaintiffs-Appellants,

v.

LISA MADIGAN, in her Official Capacity as Attorney General of the State of Illinois, and HIRAM GRAU, in his Official Capacity as Director of the Illinois State Police,

Defendants-Appellees.

---

Appeal from a Judgment of the United States District Court for the Central District of Illinois, The Hon. Sue E. Myerscough, District Judge
District Court No. 3:11-CV-3134

## APPELLANTS' BRIEF AND REQUIRED SHORT APPENDIX

David G. Sigale*
Law Firm of David G. Sigale, P.C.
739 Roosevelt Road, Suite 304
Glen Ellyn, IL 60137
630.452.4547/630.596.4445

*Counsel of Record

Alan Gura
Gura & Possessky, PLLC
101 N. Columbus St., Ste.405
Alexandria, VA 22314
703.835.9085/703.997.7665

David D. Jensen
David Jensen PLLC
61 Broadway, Suite 1900
New York, NY 10006
212.380.6615/917.591.1318

**CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 12-1269

Short Caption: Michael Moore, et al. v. Lisa Madigan, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ] **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Michael Moore, Charles Hooks, Peggy Fechter, Jon Maier, Second Amendment Foundation, Inc., Illinois Carry

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Gura & Possessky, PLLC

David Jensen, PLLC

Law Firm of David G. Sigale, P.C.

(3) If the party or amicus is a corporation:

i) Identify all its parent corporations, if any; and

None

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

None

---

Attorney's Signature: /s/ David G. Sigale Date: March 2, 2012

Attorney's Printed Name: David G. Sigale

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** X **No** ______

Address: 739 Roosevelt Road, Suite 304
Glen Ellyn, IL 60137

Phone Number: 630.452.4547 Fax Number: 630.596.4445

E-Mail Address: dsigale@sigalelaw.com

# TABLE OF CONTENTS

Table of Contents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Table of Authorities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Jurisdictional Statement.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Issues.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Statement of the Case.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

1. *The Regulatory Framework*.. . . . . . . . . . . . . . . . . . . . . . . . . . 4

2. *The Prohibition's Impact on Plaintiffs*. . . . . . . . . . . . . . . . . . 6

3. *The District Court's Decision*.. . . . . . . . . . . . . . . . . . . . . . . . 8

Summary of Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Argument.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

I. THE STANDARD OF REVIEW IS DE NOVO. . . . . . . . . . . . . . . . . . . . . . 11

II. PRECEDENT DOES NOT BAR, BUT RATHER MANDATES, THIS COURT'S CONDUCT OF MEANINGFUL SECOND AMENDMENT REVIEW.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

III. THE SECOND AMENDMENT SECURES THE RIGHT TO CARRY ARMS IN PUBLIC FOR SELF-DEFENSE. . . . . . . . . . . . . . . . . . . 18

A. The Right to Bear Arms Has Traditionally Extended Beyond the Home. . . . . . . . . . . . . . . . . . . . . . . . . 20

B. The Second Amendment's Original Public Meaning Confirms the Right to Publicly Carry Arms for Self-Defense. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

C. Historical Restrictions of the Right to Bear Arms Confirm Its Existence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*1. Concealed Carry*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*2. Dangerous and Unusual Weapons*. . . . . . . . . . . . . . . . . 36

IV. ILLINOIS' UNCONSTITUTIONAL PROHIBITION OF DEFENSIVE HANDGUN CARRY MUST BE ENJOINED. . . . . . . . . . . . . . . . . . . . . . . 40

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

# TABLE OF AUTHORITIES

Cases

*Adamson* v. *California*,
332 U.S. 46 (1947) . . . . . . . . . . 25

*Andrews* v. *State*,
50 Tenn. 165 (1871). . . . . . . . . . 33

*Aymette* v. *State*,
21 Tenn. 154 (1840). . . . . . . . . . 33

*Bliss* v. *Commonwealth*,
12 Ky. 90 (1822). . . . . . . . . . 28

*Buck* v. *Bell*,
274 U.S. 200 (1927). . . . . . . . . . 19

*Burlington N. & Santa Fe Ry. Co.* v. *Bhd. of Locomotive Eng'rs*,
367 F.3d 675 (7th Cir. 2004) . . . . . . . . . . 11

*City of Las Vegas* v. *Moberg*,
82 N.M. 626, 485 P.2d 737 (N.M. Ct. App. 1971). . . . . . . . . . 28

*Cohens* v. *Virginia*,
19 U.S. (6 Wheat.) 264 (1821). . . . . . . . . . 18

*Crane* v. *Indiana High School Athletic Ass'n*,
975 F.2d 1315 (7th Cir. 1992) . . . . . . . . . . 44

*District of Columbia* v. *Heller*,
554 U.S. 570 (2008) . . . . . . . . . . passim

*English* v. *State*,
35 Tex. 473 (1871) . . . . . . . . . . 39

*Ezell* v. *City of Chicago*,
651 F.3d 684 (7th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*FCC* v. *Fox Television Stations, Inc.*,
129 S. Ct. 1800 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*In re Application of McIntyre*,
552 A.2d 500 (Del. Super. 1988). . . . . . . . . . . . . . . . . . . . . . . . 34, 43

*In re Brickey*,
8 Idaho 597, 70 P. 609 (1902). . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Jamie S.* v. *Milwaukee Pub. Schs*, No. 09-2741,
2012 U.S. App. LEXIS 2089 (7th Cir. Feb. 3, 2012) . . . . . . . . . . . 11

*Johnson* v. *Eisentrager*,
339 U.S. 763 (1950). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Kachalsky* v. *Cacase*,
2011 U.S. Dist. LEXIS 99837 (S.D.N.Y. Sept. 2, 2011),
*appeal pending*, No. 11-3642 (2d Cir. filed Sept. 7, 2012). . . . . . 16

*Kolbe & Kolbe Health & Welfare Benefit Plan* v.
*Med. College of Wis., Inc.*, 657 F.3d 496 (7th Cir. 2011) . . . . . . . 11

*Malloy* v. *Hogan*,
378 U.S. 1 (1964). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Marbury* v. *Madison*,
5 U.S. (1 Cranch) 137 (1803). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*McDonald* v. *City of Chicago*,
130 S. Ct. 3020 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Minnesota* v. *Carter*,
525 U.S. 83 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Morris* v. *State*,
342 So. 2d 417 (Ala. Cr. App. 1977). . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Muscarello* v. *United States*,
524 U.S. 125 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Myers* v. *United States*,
272 U.S. 52 (1926). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Norris* v. *United States*,
687 F.2d 899 (7th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Nunn* v. *State*,
1 Ga. 243 (1846) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Owen* v. *State*,
31 Ala. 387 (1858). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*O'Neill* v. *State*,
16 Ala. 65 (1849) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Parker* v. *District of Columbia*,
478 F.3d 370 (D.C. Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Payton* v. *New York*,
445 U.S. 573 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Peruta* v. *County of San Diego*,
678 F. Supp. 2d 1046 (S.D. Cal. 2010). . . . . . . . . . . . . . . . . . . . . . . 24

*Peruta* v. *County of San Diego*,
758 F. Supp. 2d 1106 (S.D. Cal. 2010), *appeal pending*, No. 10-56971 (9th Cir. filed Dec. 14, 2010). . . . . . . . . . 31

*Rex* v. *Knight*,
90 Eng. Rep. 330 (K.B. 1686). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Richards* v. *County of Yolo*, No. 2:09-CV-01235
2011 U.S. Dist. LEXIS 51906 (E.D. Cal. May 16, 2011),
*appeal pending*, No. 11-16255 (9th Cir. filed May 16, 2011). . . . 15

*Robertson* v. *Baldwin*,
165 U.S. 275 (1897). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Schubert* v. *De Bard*,
398 N.E.2d 1339 (Ind. App. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Scott* v. *Sandford*,
60 U.S. (19 How.) 393 (1857) . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*Silverman* v. *United States*,
365 U.S. 505 (1961). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Simpson* v. *State*,
13 Tenn. 356 (1833) .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 39

*State ex rel. City of Princeton* v. *Buckner*,
180 W. Va. 457, 377 S.E.2d 139 (1988). . . . . . . . . . . . . . . . . . . . . 28

*State* v. *Bailey*,
209 Conn. 322, 551 A.2d 1206 (1988) . . . . . . . . . . . . . . . . . . . . . . 28

*State* v. *Blocker*,
291 Or. 255, 630 P.2d 824 (1981). . . . . . . . . . . . . . . . . . . . . . . . . 29

*State* v. *Chandler*,
5 La. Ann. 489 (1850).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*State* v. *Hogan*,
63 Ohio St. 202, 58 N.E. 572 (1900). . . . . . . . . . . . . . . . . . . . . 28, 40

*State* v. *Huntly*,
25 N.C. (3 Ired.) 418 (1843) . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 40

*State* v. *Jumel*,
13 La. Ann. 399 (1858) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*State* v. *Kessler*,
289 Or. 359, 614 P.2d 94 (1980). . . . . . . . . . . . . . . . . . . . . . . . . 29

*State* v. *Langford*,
10 N.C. (3 Hawks) 381 (1824) . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*State* v. *Lanier*,
71 N.C. 288 (1874) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*State* v. *Reid*,
1 Ala. 612 (1840) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 32

*State* v. *Rosenthal*,
55 A. 610 (Vt. 1903) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*State* v. *Schoultz*,
25 Mo. 128 (1857) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Staub* v. *City of Baxley*,
355 U.S. 313 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 44

*Tennessee Valley Auth.* v. *Hill*,
437 U.S. 153 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States* v. *Booker*,
375 F.3d 508 (7th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States* v. *Cruikshank*,
92 U.S. 542 (1876). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States* v. *Kaun*,
827 F.2d 1144 (7th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States* v. *Masciandaro,*
638 F.3d 458 (4th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*United States* v. *Miller*,
307 U.S. 174 (1939). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

*United States* v. *Rene E.*,
583 F.3d 8 (1st Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 21

*United States* v. *Skoien*,
614 F.3d 638 (7th Cir. 2010) (en banc). . . . . . . . . . . . . . 8, 9, 18, 19

*Utah* v. *Evans*,
536 U.S. 452 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Federal Constitutional Provisions

U.S. Const. amend. II. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 24

U.S. Const. amend. VI.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

U.S. Const. amend. VIII. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

U.S. Const. amend. XIV. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

State Constitutional Provisions

Ala. Const. of 1819, art. I, § 27. . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

Conn. Const. art. I, § 15 (1819).. . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Ky. Const. of 1799, art. XII, cl. 23. . . . . . . . . . . . . . . . . . . . . . . . . . 28

Mo. Const. of 1820, art. XIII, § 3. . . . . . . . . . . . . . . . . . . . . . . . . . 28

N.C. Declaration of Rights § 17 (1776). . . . . . . . . . . . . . . . . . . . . . . . 28

Or. Const. art. I, § 27 (1857). . . . . 29

Tenn. Const. of 1796, art. XI, § 26. . . . . 28

Vt. Const. c. 1, art. 16 (1777) . . . . . 28

Statutes and Rules

11 Del. Code Ann. § 1441 . . . . . 43

11 Del. Code Ann. § 1442. . . . . 43

18 Pa. Cons. Stat. Ann. § 6109(e). . . . . 42

21 Okla. Stat. Ann. § 1290.12(A)(12). . . . . 42

25 Me. Rev. Stat. Ann. § 2003(1). . . . . 42

28 U.S.C. § 1292(a)(1). . . . . 1

28 U.S.C. § 1331 . . . . . 1

28 U.S.C. § 1343. . . . . 1

28 U.S.C. § 2201. . . . . 1

28 U.S.C. § 2202. . . . . 1

42 U.S.C. § 1983.. . . . . 1

720 ILCS 5/24-1(a)(4). . . . . 4

720 ILCS 5/24-1.6(a). . . . . 5, 6

720 ILCS 5/24-1.6(a)(2). . . . . 5

720 ILCS 5/24-1.6(d). . . . . 6

720 ILCS 5/24-1(a). . . . . 5

720 ILCS 5/24-1(a)(10). . . . . 4

720 ILCS 5/24-1(b). . . . . 5

720 ILCS 5/24-1(c)(1.5). . . . . 5

730 ILCS 5/5-4.5-40.. . . . . 5

730 ILCS 5/5-4.5-45.. . . . . 6

730 ILCS 5/5-4.5-50(b). . . . . 5, 6

730 ILCS 5/5-4.5-55.. . . . . 5

Ala. Code § 13A-11-73.. . . . . 43

Ala. Code § 13A-11-75.. . . . . 43

Ark. Code Ann. § 5-73-309. . . . . 42

Colo. Rev. Stat. Ann. § 18-12-203(1). . . . . 42

Conn. Gen. Stat. § 29-32b(b).. . . . . 42

D.C. Code § 22-4504(a) (2008). . . . . 12

Fed. R. Civ. Proc. 12(b)(6). . . . . 3

Fed. R. Civ. Proc. 65(a)(2). . . . . 3

Fla. Stat. Ann. § 790.06(2). . . . . 42

Ga. Code Ann. § 16-11-129(d)(4).. . . . . 42

Idaho Code Ann. § 18-3302(1).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Ind. Code Ann. § 35-47-2-3(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Iowa Code Ann. § 724.7(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Kan. Stat. Ann. § 75-7c03(a).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Ky. Rev. Stat. Ann. § 237.110(4).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

La. Rev. Stat. Ann. § 40:1379.3(A)(1). . . . . . . . . . . . . . . . . . . . . . . . . 42

Mich. Comp. Laws Ann. § 28.422(3). . . . . . . . . . . . . . . . . . . . . . . . . . 42

Minn. Stat. § 624.714, subdiv. 2(b).. . . . . . . . . . . . . . . . . . . . . . . . . . 42

Miss. Code Ann. § 45-9-101(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Mo. Ann. Stat. § 571.101(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Mont. Code Ann. § 45-8-321(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

N.C. Gen. Stat. § 14-415.11(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

N.D. Cent. Code § 62.1-04-03(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

N.H. Rev. Stat. Ann. § 159.6(I). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

N.M. Stat. Ann. § 29-19-4(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Neb. Rev. Stat. § 69-2430(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Nev. Rev. Stat. Ann. § 202.3657(2).. . . . . . . . . . . . . . . . . . . . . . . . . . 42

Ohio Rev. Code Ann. § 2923.125(D)(1). . . . . . . . . . . . . . . . . . . . . . . . 42

Or. Rev. Stat. Ann. § 166.291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

R.I. Gen. Laws § 11-47-11(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

S.C. Code Ann. § 23-31-215(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

S.D. Codified Laws § 23-7-7. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Tenn. Code Ann. § 39-17- 1351(b). . . . . . . . . . . . . . . . . . . . . . . . . . 43

Tex. Gov't Code § 411.177(a).. . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 43

Tex. Penal Code § 46.035(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Utah Code Ann. § 53-5-704(1)(a). . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Va. Code Ann. § 18.2-308(D).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

W. Va. Code Ann. § 61-7-4(f).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Wash. Rev. Code Ann. § 9.41.070(1).. . . . . . . . . . . . . . . . . . . . . . . . 43

Wyo. Stat. Ann. § 6-8-104(b).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Other Authorities

BLACK'S LAW DICTIONARY (6th Ed. 1998). . . . . . . . . . . . . . . . . . . . . . . . 26

Charles Humphreys, A COMPENDIUM OF THE COMMON LAW IN FORCE IN KENTUCKY (1822). . . . . . . . . . . . . . . . . . . . . . . . . . 38

COLLECTED WORKS OF JAMES WILSON (K. Hall & M. Hall eds., 2007). . . . . . . . . . . . . . . . . . . . . . . . . . 27

David Caplan, *The Right of the Individual to Bear Arms: A Recent Judicial Trend*, 4 DET. C. L. REV. 789 (1982) . . . . . 36, 37

Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytic Framework and a Research Agenda*, 56 UCLA L. Rev. 1443 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*,11 TEX. REV. LAW & POL. 191 (2006). . . . . . . . . . . . . . . 28

John A. Dunlap, THE NEW-YORK JUSTICE (1815) . . . . . . . . . . . . . . . 37, 38

Joyce Lee Malcolm, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT (1994). . . . . . . . . . . . 37

PAPERS OF THOMAS JEFFERSON (J. Boyd ed., 1950) . . . . . . . . . . . . . . . . 26

THE AMERICAN STUDENTS' BLACKSTONE (G. Chase ed., 1884). . . . . . . . . 34

William Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND (1769) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

William Hawkins, TREATISE OF THE PLEAS OF THE CROWN (1716). . . . . 37

William Oldnall Russell, A TREATISE ON CRIMES AND INDICTABLE MISDEMEANORS (1826). . . . . . . . . . . . . . . . . . . . . . . . . 38

WORKS OF THE HONOURABLE JAMES WILSON (Bird Wilson ed., 1804). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

## APPELLANTS' BRIEF

## JURISDICTIONAL STATEMENT

Plaintiffs-Appellants ("Plaintiffs") seek declaratory and injunctive relief barring enforcement of Illinois laws that prohibit the carrying of handguns for self-defense. 42 U.S.C. § 1983; U.S. Const. amends. II, XIV. The District Court had jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1343, 2201 and 2202.

Plaintiff Second Amendment Foundation, Inc. ("SAF") is a non-profit corporation, organized under the laws of Washington with its principal place of business in Bellevue, Washington. Plaintiff Illinois Carry is a non-profit corporation, organized under the laws of Illinois with its principal place of business in Shelbyville, Illinois.

On February 3, 2012, the District Court denied Plaintiffs' motion for preliminary and/or permanent injunctive relief, granted Defendants-Appellees' ("Defendants") motion to dismiss the case, and entered final judgment. Short Appendix ("SA") 49. The same day, Plaintiffs timely filed their notice of appeal. Separate Appendix ("App.") 37. This Court has jurisdiction over the matter pursuant to 28 U.S.C. § 1291.

## Statement of Issues

Does the Second Amendment secure the right to carry functional handguns in public for the purpose of self-defense?

## Statement of the Case

The Second Amendment guarantees the people's fundamental right to carry handguns for self-defense. To be sure, history and tradition reveal that this right allows for a degree of regulation. Plaintiffs do not assert an absolute right to be free of gun regulations in the interest of public safety. As the Supreme Court advised, the right to bear arms can be excluded from sensitive places, limited to those arms, such as handguns, which would be in lawful common use for self-defense, barred to particularly dangerous individuals, and restricted to lawful purposes.

But the right's codification precludes its total prohibition. Illinois imposes a total ban on the exercise of the right to bear all arms, by all people, at all times, and for all purposes. Whatever else the Defendants may require with respect to the bearing of arms, enforcing this sort of prohibition lies beyond their authority.

Plaintiffs brought this action on May 11, 2011, as amended May 19, 2011, seeking declaratory and injunctive relief against Defendants' enforcement of Illinois statutes barring the carrying of functional handguns for self-defense. App. 1. On July 7, 2011, Plaintiffs moved for a preliminary and/or permanent injunction, specifically requesting that the court advance the matter to a trial on the merits at the hearing pursuant to Fed. R. Civ. Proc. 65(a)(2). App. 12. On July 27, 2011, Defendants moved to dismiss the case pursuant to Fed. R. Civ. Proc. 12(b)(6), for alleged failure to state a claim. App. 31.

The District Court heard the parties' motions on August 4, 2011. On August 23, 2011, Defendants filed a "motion to clarify" their position regarding the scope of the challenged provisions. App. 34.

On February 3, 2012, the District Court issued an opinion and order, in which it denied Plaintiffs' motion for preliminary and/or permanent injunctive relief, granted Defendants' motion to dismiss, and ordered the case closed. SA 1. Final judgment was issued pursuant to the District Court's opinion and order, SA 49, whereupon Plaintiffs noticed their appeal. App. 37.

## STATEMENT OF FACTS

### 1. *The Regulatory Framework*

Illinois is the only state[1] that forbids all civilians, at all times, to publicly carry functional handguns for self-defense in any manner.

Chapter 720 ILCS 5/24-1(a)(4) bars knowingly carrying or possessing handguns in any vehicle, or upon one's person in a concealed manner. Excluded from criminal liability are individuals possessing or carrying guns on their land, or in their abode, legal dwelling, or fixed place of business; certain private property invitees with permission to have guns; and individuals transporting guns that are non-functional, not immediately accessible, or that are unloaded and encased by licensed individuals.

Chapter 720 ILCS 5/24-1(a)(10) bars knowingly carrying or possessing handguns "upon any public street, alley, or other public lands within the corporate limits of a city, village or incorporated town." This provision contains the same exceptions as are found in subdivision

[1] Although not a state, the District of Columbia maintains a similar prohibition.

(a)(4), with an additional exemption for public property invitees with permission to display or sell guns.

A violation of either of these provisions constitutes the offense of "unlawful use of a weapon," 720 ILCS 5/24-1(a), generally punishable as a Class A misdemeanor by less than one year's incarceration and/or a fine of $2,500. 720 ILCS 5/24-1(b); 730 ILCS 5/5-4.5-55. However, violations occurring in particular locations are punishable as Class 3 felonies, punishable by a prison term ranging from two to five years, and a fine potentially reaching $25,000. 720 ILCS 5/24-1(c)(1.5); 730 ILCS 5/5-4.5-40, 5/5-4.5-50(b).

Chapter 720 ILCS 5/24-1.6(a) prohibits, inter alia, knowingly carrying a handgun in a vehicle or on one's person when the handgun is uncased, loaded, and immediately accessible. The prohibition applies equally to open and concealed carrying of usable handguns, and is subject to the same exceptions as are found in Section 5/24-1.[2]

---

[2]720 ILCS 5/24-1.6(a)(1) applies to guns "carrie[d] on or about his or her person . . . or concealed on or about his or her person . . ." The prohibition of 720 ILCS 5/24-1.6(a)(2) applies to carrying, generally, without reference to manner in which the gun is carried. As Defendants clarified, while 720 ICLS 5/24-1 does not forbid the open carrying of useable firearms in unincorporated areas, 720 ICLS 5/24-1.6 does forbid that conduct. App. 34-35.

A first offense under 720 ILCS 5/24-1.6(a), committed by an individual without a previous felony conviction, is at least a class 4 felony carrying a sentencing range of one to three years' imprisonment and possible fine up to $25,000. 720 ILCS 5/24-1.6(d); 730 ILCS 5/5-4.5-45, 5/5-4.5-50(b).

2. *The Prohibition's Impact on Plaintiffs*

Plaintiff Michael Moore is the Superintendent of the Champaign County (Illinois) Jail, and a former Corrections Officer and Deputy Sheriff of Cook County, Illinois. The latter position entitled Moore to publicly carry handguns for self-defense while off-duty, which he did. Moore continues to deal with violent criminals, drug traffickers, and other dangerous individuals who are often angry at the justice system and persons involved in its operation. Beyond the general risk of being victimized by crime, Moore is concerned that a former inmate may target him for a retaliatory attack. App. 15-16.

Plaintiff Peggy Fechter lives with her husband on the family's 1,800 acre farm in White County, Illinois. The farm is still worked by Fechter's three adult children. Fechter is concerned about her ability to defend herself on and around the farm, particularly as she fears that

"drug cooks" may target the farm's fertilizers and other chemicals useful for drug manufacturing. Following an incident in which the family confronted oddly-behaving trespassers milling about the farm buildings, Fechter obtained a handgun, and joined a rifle and pistol club for firearms training. App. 21-22.

Plaintiff Charles Hooks is a member of Plaintiff SAF. App. 19. Plaintiff Jon Maier is a member of Plaintiff Illinois Carry. App. 25. All four individual Plaintiffs possess an Illinois Firearms Owner Identification Card, App. 16-18, 20-24, 26, and refrain from publicly carrying loaded, operational handguns for self-defense for fear of arrest, prosecution, fine, and imprisonment by the Defendants under the challenged provisions. App. 16, 18-19, 22, 24-25.

Plaintiff SAF's core purpose is the promotion of the right to keep and bear arms, including via legal action. App. 27-28. SAF organized and was a plaintiff in *McDonald* v. *City of Chicago*, 130 S. Ct. 3020 (2010), and also organized and is a plaintiff in the ongoing litigation that has thus far produced the opinion in *Ezell* v. *City of Chicago*, 651 F.3d 684 (7th Cir. 2011). Plaintiff Illinois Carry is also organized for the purpose of protecting the right to keep and bear arms by various means,

including litigation. App. 29. In addition to Plaintiffs Hooks and Maier, other SAF and Illinois Carry members would publicly carry handguns in Illinois for self-defense, but like the individual Plaintiffs, refrain from doing so for fear of Defendants' enforcement of the challenged provisions. App. 28, 30.

3. *The District Court's Decision*

The District Court began its analysis of the merits by opining that "neither the United States Supreme Court nor any United States Court of Appeals has recognized" a right to carry handguns in public for self-defense. SA 14. It then opined that *District of Columbia* v. *Heller*, 554 U.S. 570 (2008) is limited to its facts of having a gun at home. SA 16.

Curiously, the District Court then cited this Court's holding that "the Second Amendment creates individual rights, *one of which* is keeping operable handguns at home for self-defense. What other entitlements the Second Amendment creates . . . *were left open*." SA 17 (quoting *United States* v. *Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc)) (emphasis added). The District Court asserted that *McDonald* applied against state actors "the right to possess a handgun in the home for self-defense." SA 17.

The District Court then offered that this Court's opinion in *Ezell* "did not make a finding regarding the scope of the Second Amendment outside of the home." SA 19. And *Ezell*'s citation to *Skoien*'s observation that "one of" the Second Amendment's rights is the right to having arms at home was said by the lower court to "support[] the conclusion that the Second Amendment right, as recognized by the Supreme Court, does not extend outside of the home." *Id.* The District Court confirmed its conclusion with citation to a number of opinions that similarly limited the Second Amendment. SA 19-22.

The District Court found that assuming that the Second Amendment secures rights outside the home, such rights would warrant no more than intermediate scrutiny. SA 38. The District Court then balanced any public Second Amendment right out of existence by finding that completely prohibiting the carrying of guns for self-defense is substantially related to the government's asserted public safety interest. SA 42. Denial of Plaintiffs' motion, and the granting of Defendants' motion, followed directly from this determination of the constitutional merits.

## SUMMARY OF ARGUMENT

The facts of this case are not in dispute. Plaintiffs refrain from carrying handguns for self-defense for fear of Defendants' enforcement of prohibitions on such conduct. The only question before the Court is whether the challenged provisions violate the Second Amendment.

They do. Without a doubt, Americans enjoy a fundamental right to publicly carry handguns for self-defense. The state may regulate the right to bear arms in any number of ways not relevant here, but the Supreme Court has already held, with reference to the Second Amendment, that "[a]t the time of the founding, as now, to 'bear' meant to 'carry.'" *Heller*, 554 U.S. at 584 (citations omitted).

Defendants can offer no alternative definition for the constitutional text, nor can they rebut the overwhelming weight of tradition and precedent that confirms Americans enjoy a fundamental right to carry arms for self-defense. If the state wishes to regulate the right to bear arms, then it should regulate—but not prohibit. The Court should reverse the judgment below and remand the case with instructions to enter a permanent injunction.

## ARGUMENT

### I. THE STANDARD OF REVIEW IS DE NOVO.

"We review the grant of a motion to dismiss for failure to state a claim *de novo*." *Kolbe & Kolbe Health & Welfare Benefit Plan* v. *Med. College of Wis., Inc.*, 657 F.3d 496, 502 (7th Cir. 2011) (quotation omitted).

"When we review the grant or denial of a preliminary or permanent injunction, as in any other case . . . the necessary legal conclusions are given *de novo* review." *United States* v. *Kaun*, 827 F.2d 1144, 1148 (7th Cir. 1987) (quotation and internal punctuation omitted). "No deference is due to a 'decision to deny a preliminary injunction that is premised on an error of law.'" *Burlington N. & Santa Fe Ry. Co.* v. *Bhd. of Locomotive Eng'rs*, 367 F.3d 675, 678 (7th Cir. 2004) (quotation omitted). "As with any order reviewed under this standard, if the district court's [permanent injunction] analysis turned on an error of law, the court necessarily abused its discretion." *Jamie S.* v. *Milwaukee Pub. Schs.*, No. 09-2741, 2012 U.S. App. LEXIS 2089 at *50 (7th Cir. Feb. 3, 2012).

## II. PRECEDENT DOES NOT BAR, BUT RATHER MANDATES, THIS COURT'S CONDUCT OF MEANINGFUL SECOND AMENDMENT REVIEW.

A persistent misreading of precedent undergirds the District Court's finding that the Second Amendment right is limited to the home. First, the court below relied heavily upon the Supreme Court's direction of relief that the District of Columbia "must issue [Heller] a license to carry [his handgun] in the home." *Heller*, 554 U.S. at 635; SA 16. But the District Court misunderstood the Supreme Court's reference.

Heller challenged, among other provisions, former D.C. Code § 22-4504(a) (2008), which had provided that carrying handguns *inside one's home* without a permit was a misdemeanor offense (in contrast to the felony offense of carrying a gun in public). Heller did *not* seek a permit to publicly carry a handgun. *Parker* v. *District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007), *aff'd sub nom Heller*. The reference to an in-home carry permit merely tracked Heller's prayer for relief. *See Heller*, 554 U.S. at 630-31.[3]

---

[3]The District of Columbia repealed the provision imposing criminal liability for carrying a gun inside the home without a permit.

This Court's holding that the right to have a gun at home is but "one of" the Second Amendment rights, SA 19, and that *Heller* "left open" the existence of others, SA 17, hardly supports a conclusion that a home-bound right is the only one that might exist—it negates the proposition. After all, the Supreme Court held that the "policy choices [taken] off the table" by the Second Amendment "*include* the absolute prohibition of handguns held and used for self-defense in the home," *Heller*, 554 U.S. at 636 (emphasis added). "[S]ince this case represents this Court's first in-depth examination of the Second Amendment, one should not expect it to clarify the entire field . . . ." *Id*. at 635.

The lower court's reliance on *Heller*'s recitation of presumptively lawful restrictions, for the proposition that a complete ban on carrying guns outside the home would be constitutional, is a non-sequitur. History might inform additional presumptively lawful restrictions beyond what the Supreme Court enumerated. *Heller*, 554 U.S. at 627 n.26. Yet the absence from the Supreme Court's list of what would be an obvious restriction, coupled with the admonition that "we do not undertake an exhaustive historical analysis today of the full scope

of the Second Amendment," *id.* at 626, indicates that the right is not so easily limited to the home.

Also erroneous, plainly, is the lower court's statement that *McDonald* applied against the states only "the right to possess a handgun in the home for self-defense." SA 17. *McDonald*'s holding is otherwise: "in [*Heller*], we *held* that the Second Amendment protects the right to keep and bear arms for self-defense . . . we hold that the Second Amendment right is fully applicable to the States." *McDonald*, 130 S. Ct. at 3026 (emphasis added); *id.* at 3058 (Second Amendment "fully applicable to the States") (Thomas, J., concurring in part and concurring in judgment).

The lower court's finding that *Ezell* "did not make a finding regarding the scope of the Second Amendment outside of the home," SA 19, is puzzling. In *Ezell*, this Court explicitly found a "right to acquire and maintain proficiency in [the] use [of firearms]." 651 F.3d at 704. It reached this conclusion in answering the question of "whether range training is categorically unprotected by the Second Amendment. *Heller* and *McDonald* suggest to the contrary." *Id*. Studying the topic, this Court rejected the notion that "target practice is wholly outside the

Second Amendment as it was understood when incorporated as a limitation on the States." *Id.* at 706. It thus enjoined Chicago's ban on gun ranges as "a serious encroachment on the right to maintain proficiency in firearm use," *id.* at 708, a right that obviously few if any people in Chicago can exercise at home.

The court was more accurate in its survey of other, non-binding and in any event non-persuasive decisions. Although the right to bear arms is widely accepted by the American public, as reflected in the laws prevailing throughout most of the country, the court fairly catalogued judicial resistance to accepting the Second Amendment as a normal part of the Constitution. For example, one court limiting *Heller* to its facts wrote, "Compared to many of this country's constitutional protections, the scope of rights under the Second Amendment is ambiguous and no doubt subject to change and evolution over time." *Richards* v. *County of Yolo*, No. 2:09-CV-01235, 2011 U.S. Dist. LEXIS 51906, *20 (E.D. Cal. May 16, 2011), *appeal pending*, No. 11-16255 (9th Cir. filed May 16, 2011); *contra Heller*, 554 U.S. at 576 (Second Amendment interpreted according to its original public meaning); *id.* at 629 n.27 (Second Amendment treated like other enumerated rights); *McDonald*, 130 S.

Ct. at 3045 (rejecting argument that "the Second Amendment differs from all of the other provisions of the Bill of Rights . . .").

Some courts go so far as to reject the Supreme Court's interpretation of the Second Amendment, finding *Heller*'s definition of "bear arms" to be limited to the one-time context of determining whether the right is individual or collective. *Kachalsky* v. *Cacase*, 2011 U.S. Dist. LEXIS 99837, *70-*71 (S.D.N.Y. Sept. 2, 2011), *appeal pending*, No. 11-3642 (2d Cir. filed Sept. 7, 2012); *but see Utah* v. *Evans*, 536 U.S. 452, 491 (2002) ("the Constitution is a written instrument. As such its meaning does not alter. That which it meant when adopted it means now.") (Thomas, J., concurring and dissenting in part) (quotation omitted); *see also Tennessee Valley Auth.* v. *Hill*, 437 U.S. 153, 174 n.18 (1978).

And yet other courts, fearing the outcome of straightforward constitutional interpretation, simply decline to consider the issue, and seek to turn the Supreme Court into the court of first resort for allegedly uncomfortable Second Amendment issues. A panel majority of the Fourth Circuit refused to consider public application of the right to bear arms, because "[t]his is serious business. We do not wish to be even minutely responsible for some unspeakably tragic act of mayhem

because in the peace of our judicial chambers we miscalculated as to Second Amendment rights." *United States* v. *Masciandaro,* 638 F.3d 458, 475 (4th Cir. 2011).

Plaintiffs endorse this sentiment, though not its application in *Masciandaro*. Miscalculating as to Second Amendment rights deprives Plaintiffs of the sense of security to which they are constitutionally entitled, and could leave them vulnerable to "unspeakably tragic acts of mayhem" without adequate arms for their defense.

In any event, the Supreme Court is "one of final review, not of first view," and it does not ordinarily "rush to judgment without a lower court opinion." *FCC* v. *Fox Television Stations, Inc.*, 129 S. Ct. 1800, 1819 (2009) (citation and internal quotation marks omitted). "Constitutional law is very largely a prediction of how the Supreme Court will decide particular issues when presented to it for decision." *Norris* v. *United States*, 687 F.2d 899, 904 (7th Cir. 1982).

> [A]pplication of the broader Second Amendment right discussed in *Heller* to factual settings arising outside the home involves precisely the kind of "difficult issue[ ]" the Supreme Court prefers to "mature through full consideration by the courts of appeals."

*Masciandaro*, 638 F.3d at 468 n.* (Niemeyer, J.) (citations omitted).

As the lower court repeatedly pointed out, this Court has acknowledged that the right to keep and bear arms is not limited to the home. *Skoien*, 614 F.3d at 640. And "[w]hen the Supreme Court says that it is not resolving an issue, it perforce confides the issue to the lower federal courts for the first pass at resolution." *United States* v. *Booker*, 375 F.3d 508, 513 (7th Cir. 2004), *aff'd*, 543 U.S. 220 (2005). As the Supreme Court long ago acknowledged,

> The judiciary cannot, as the legislature may, avoid a measure because it approaches the confines of the constitution. We cannot pass it by because it is doubtful. With whatever doubts, with whatever difficulties, a case may be attended, we must decide it, if it be brought before us. We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given . . . All we can do is, to exercise our best judgment, and conscientiously to perform our duty.

*Cohens* v. *Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821).

This Court must interpret the Second Amendment.

## III. THE SECOND AMENDMENT SECURES THE RIGHT TO CARRY ARMS IN PUBLIC FOR SELF-DEFENSE.

Answering whether an activity comes within the Second Amendment's protection "requires a textual and historical inquiry into original meaning." *Ezell*, 651 F.3d at 701. "*Heller* focused almost exclusively on the original public meaning of the Second Amendment,

consulting the text and relevant historical materials to determine how the Amendment was understood at the time of ratification." *Id.* at 700; *United States* v. *Rene E.*, 583 F.3d 8, 12-13 (1st Cir. 2009) (inquiring "whether the Founders would have regarded [the prohibition] as consistent with the Second Amendment right").[4]

In its alternative discussion assuming the existence of a right to carry guns for self-defense, and then immediately balancing that *right* into oblivion, the District Court did nothing less than use interest-balancing to determine the content of the Second Amendment right. But judicial assessment of what is optimally desirable can be a very poor substitute for recognizing rights based on our nation's historic traditions of liberty. *See, e.g. Buck* v. *Bell*, 274 U.S. 200 (1927). "'[T]he scope of the Second Amendment right' is determined by textual and historical inquiry, not interest-balancing." *Ezell*, 651 F.3d at 702 (quoting

[4]Critically, the cases cited by the lower court that have held the Second Amendment is limited to the home all reached that conclusion without examining the Amendment's text, or the history or tradition of the right to arms. They did so only by misreading *Heller*, in a way this court has already rejected. *Skoien*, 614 F.3d at 640. The Supreme Court has refused to acquiesce in the elimination of Second Amendment rights by a too-casual reading of its precedent, no matter how frequently lower courts repeated the error. *Heller*, 554 U.S. at 624 n.24.

*McDonald*, 130 S. Ct. at 3047). The Second Amendment does not "require judges to assess the costs and benefits of firearms restrictions and thus to make difficult empirical judgments in an area in which they lack expertise." *McDonald*, 130 S. Ct. at 3050.

> We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding "interest-balancing" approach. The very enumeration of the right takes out of the hands of government--even the Third Branch of Government--the power to decide on a case-by-case basis whether the right is *really worth* insisting upon. A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all . . . Like the First, [the Second Amendment] is the very *product* of an interest-balancing by the people . . .

*Heller*, 554 U.S. at 635 (emphasis original).

Text, history, tradition and precedent all confirm that Plaintiffs enjoy a right to publicly carry arms for their defense.

A. The Right to Bear Arms Has Traditionally Extended Beyond the Home.

Although "the need for defense of self, family, and property is *most acute*" in the home, *Heller*, 554 U.S. at 628 (emphasis added), and the Second Amendment right is secured "*most notably* for self-defense within the home," *McDonald*, 130 S. Ct. at 3044 (emphasis added), the Second Amendment is no different in this respect than other rights. "[I]t

is beyond dispute that the home is entitled to special protection as the center of the private lives of our people." *Minnesota* v. *Carter*, 525 U.S. 83, 99 (1998) (Kennedy, J., concurring). Thus, "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed," *Payton* v. *New York*, 445 U.S. 573, 585 (1980) (quotation omitted). "At the [Fourth Amendment's] very core stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman* v. *United States*, 365 U.S. 505, 511 (1961). But that does not mean people enjoy no Fourth Amendment rights in public.

*Heller* "read the [Second Amendment's] operative clause to 'guarantee the individual right to possess and carry weapons in case of confrontation.'" *Rene E.*, 583 F.3d at 11 (quotation omitted). The Supreme Court has always accepted that the right to guard against confrontation extends beyond the threshold of one's home.

As early as 1857, the infamous *Dred Scott* opinion reasoned that no Southern state would have adopted a constitution obligating it to respect privileges and immunities of citizenship held by African-Americans, including "the full liberty . . . to keep and carry arms

wherever they went." *Scott* v. *Sandford*, 60 U.S. (19 How.) 393, 417 (1857). While *Scott*'s odious holding was never correct, the opinion's recognition of citizens' right to publicly carry arms was no aberration.

Reviewing an indictment for violation of the Second Amendment rights of individuals disarmed and murdered while guarding a courthouse, "[w]e described the right protected by the Second Amendment as 'bearing arms for a lawful purpose.'" *Heller*, 554 U.S. at 620 (quoting *United States* v. *Cruikshank*, 92 U.S. 542, 553 (1876)) (footnotes omitted). Seventy-five years later, the Court observed that "during military occupation irreconcilable enemy elements, guerrilla fighters, and 'werewolves' could [not] require the American Judiciary to assure them . . . [the] right to bear arms as in the Second [Amendment] . . ." *Johnson* v. *Eisentrager*, 339 U.S. 763, 784 (1950). The reference was not limited to home self-defense.

The Supreme Court's first foray into Second Amendment law centered around the question of whether individuals had the right to transport a sawed-off shotgun between Claremore, Oklahoma and Siloam Springs, Arkansas—plainly, an activity that took place outside the home. *United States* v. *Miller*, 307 U.S. 174, 175 (1939). Whatever

else it might have held, *Miller* indicated that the Second Amendment has operative relevance on the highways.

The Supreme Court has also extolled various traditional outdoor firearms activities. The right was valued "for self-defense *and hunting*." *Heller*, 554 U.S. at 599 (emphasis added). "The settlers' dependence on game for food and economic livelihood, moreover, undoubtedly undergirded . . . state constitutional guarantees [of the right to arms]." *McDonald*, 130 S. Ct. at 3042 n.27. "No doubt, a citizen who keeps a gun or pistol under judicious precautions, *practices in safe places the use of it*, and in due time teaches his sons to do the same, exercises his individual right [to bear arms]." *Heller*, 554 U.S. at 619 (quotation omitted) (emphasis added). Hunting and target practice, at least with firearms, are activities not typically pursued at home.

Justice Stevens foresaw the Second Amendment's application beyond the home:

> Given the presumption that most citizens are law abiding, and the reality that the need to defend oneself may suddenly arise in a host of locations outside the home, I fear that the District's policy choice may well be just the first of an unknown number of dominoes to be knocked off the table.

*Heller*, 554 U.S. at 679-80 (Stevens, J., dissenting); *see also id.* at 677

n.38 (majority secures right to arms for "self-defense, recreation, and other lawful purposes") (Stevens, J., dissenting).[5]

"*Heller* does not preclude Second Amendment challenges to laws regulating firearm possession outside of home." *Peruta* v. *County of San Diego*, 678 F. Supp. 2d 1046, 1051 (S.D. Cal. 2010). For example, this Court enjoined Chicago's ban on the operation of gun ranges upon recognizing a Second Amendment right to practice shooting. "The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective." *Ezell*, 651 F.3d at 704.

B. The Second Amendment's Original Public Meaning Confirms the Right to Publicly Carry Arms for Self-Defense.

The Second Amendment's reference to "keep and bear," U.S. Const. amend. II, describes two distinct concepts. *Cf.* U.S. Const. amend. VI ("speedy and public trial"); U.S. Const. amend. VIII ("cruel and unusual punishment"). "It cannot be presumed that any clause in the

---

[5] Justice Stevens offered that the Amendment "*does* encompass the right to use weapons for certain military purposes," *Heller*, 554 U.S. at 636 (Stevens, J., dissenting), presumably, outside the home.

constitution is intended to be without effect; and therefore such construction is inadmissible, unless the words require it." *Marbury* v. *Madison*, 5 U.S. (1 Cranch) 137, 174 (1803). "[T]he usual canon of [constitutional] interpretation . . . requires that real effect should be given to all the words it uses." *Myers* v. *United States*, 272 U.S. 52, 151 (1926) (citations omitted).

The Second Amendment's "words and phrases were used in their normal and ordinary as distinguished from technical meaning." *Heller*, 554 U.S. at 576. "[A]n amendment to the Constitution should be read in a 'sense most obvious to the common understanding at the time of its adoption, . . . For it was for public adoption that it was proposed.'" *Adamson* v. *California*, 332 U.S. 46, 63 (1947) (Frankfurter, J., concurring) (quotation omitted), *overruled on other grounds by Malloy* v. *Hogan*, 378 U.S. 1 (1964).

Rejecting an argument that the term "bear arms" indicates an exclusively military undertaking, the Court held that "[a]t the time of the founding, as now, to 'bear' meant to 'carry.'" *Heller*, 554 U.S. at 584 (citations omitted).

> To "bear arms," as used in the Second Amendment, is to "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person."

*Id*. (quoting *Muscarello* v. *United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting); BLACK'S LAW DICTIONARY 214 (6th Ed. 1998)). Accordingly, the Court repeatedly referred to "the Second Amendment right, protecting only individuals' liberty to keep *and carry* arms." *Heller*, 554 U.S. at 604 (emphasis added); *see also id*. at 626.

This Court cannot overrule *Heller*'s definition of "bear arms," but it is worth noting that *Heller*'s definition comports with the term's original meaning. Perhaps the most instructive 18th-century usage of "bear arms" would be that of Second Amendment author James Madison. In 1785, Madison introduced in Virginia's legislature a hunting bill drafted by Thomas Jefferson. Regarding offenders, it stated:

> [I]f, within twelve months after the date of the recognizance he shall *bear a gun* out of his inclosed ground, unless whilst performing military duty, it shall be deemed a breach of the recognizance, and be good cause to bind him a new, and every such *bearing of a gun* shall be a breach of the new recognizance. . . .

*A Bill for Preservation of Deer* (1785), in 2 PAPERS OF THOMAS JEFFERSON 443-44 (J. Boyd ed., 1950) (emphases added).

Numerous sources upon which the Supreme Court relied to interpret the Second Amendment likewise reflect the right's inclusion of public self-defense. Had *Heller* intended to limit "bear arms" to the home, it would have been most natural to do so when explaining "that 'bear arms' did not refer only to carrying a weapon in an organized military unit." *Heller*, 554 U.S. at 585. Instead, the Court offered that

> Justice James Wilson interpreted the Pennsylvania Constitution's arms-bearing right . . . as a recognition of the natural right of defense "of one's person *or* house" — what he called the law of "self preservation."

*Id.* (emphasis added) (citing 2 COLLECTED WORKS OF JAMES WILSON 1142, and n.x (K. Hall & M. Hall eds., 2007)) (other citations omitted).

Indeed, *Heller* offered that "state constitutional provisions written in the 18th century or the first two decades of the 19th" were the examples "most prominent [and] most relevant to the Second Amendment" in defining the meaning of "bear arms." *Heller*, 554 U.S. at 584. None of these state constitutional provisions have been interpreted as relating solely to the home, but most, in addition to Pennsylvania's provision as noted by *Heller*, were held to secure the public carrying of arms in at least some manner. *State* v. *Reid*, 1 Ala. 612 (1840) (interpreting Ala.

Const. of 1819, art. I, § 27); *State* v. *Bailey*, 209 Conn. 322, 346, 551 A.2d 1206, 1218 (1988) (Conn. Const. art. I, § 15 (1819));[6] *Bliss* v. *Commonwealth*, 12 Ky. 90 (1822) (Ky. Const. of 1799, art. XII, cl. 23); *State* v. *Schoultz*, 25 Mo. 128, 155 (1857) (Mo. Const. of 1820, art. XIII, § 3); *State* v. *Huntly*, 25 N.C. (3 Ired.) 418, 423 (1843) (N.C. Declaration of Rights § 17 (1776)); *Simpson* v. *State*, 13 Tenn. 356 (1833) (Tenn. Const. of 1796, art. XI, § 26); *State* v. *Rosenthal*, 55 A. 610 (Vt. 1903) (Vt. Const. c. 1, art. 16 (1777)).

The same conclusion—that people enjoy a right to publicly carry arms for self-defense—was also reached interpreting state constitutional arms-bearing provisions with predecessors dating to the early republic. *See State* v. *Hogan*, 63 Ohio St. 202, 219, 58 N.E. 572, 575 (1900); *Schubert* v. *De Bard*, 398 N.E.2d 1339, 1341 (Ind. App. 1980). Later state constitutional "bear arms" provisions are likewise understood. *See, e.g. State ex rel. City of Princeton* v. *Buckner*, 180 W. Va. 457, 462, 377 S.E.2d 139, 144 (1988); *City of Las Vegas* v. *Moberg*,

---

[6]Revised in 1956 to change "defence" to "defense." Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 TEX. REV. LAW & POL. 191, 194 n.10 (2006).

82 N.M. 626, 627-28, 485 P.2d 737, 738-39 (N.M. Ct. App. 1971); *In re Brickey*, 8 Idaho 597, 599, 70 P. 609 (1902).

Particularly instructive is the Oregon Supreme Court's opinion in *State* v. *Blocker*, 291 Or. 255, 630 P.2d 824 (1981). That court had earlier held that possession of a billy club was secured by the constitutional guarantee that "[t]he people shall have the right to bear arms for the defence of themselves . . ." Or. Const. art. I, § 27 (1857); *see State* v. *Kessler*, 289 Or. 359, 614 P.2d 94 (1980). In *Blocker*, prosecutors argued that the right should be confined to *Kessler*'s facts, relating to home possession of a billy club, and not to the public carrying of the same arm. The court disagreed:

> The text of the constitution is not so limited; the language is not qualified as to place except in the sense that it can have no effect beyond the geographical borders of this state . . . In *Kessler* we started from the premise that under § 27 a person has a right to bear arms for defense of self . . . We then moved from that general proposition to the more particular one that a person had the constitutional right to have a billy in his home for defense.

*Blocker*, 291 Or. at 259, 630 P.2d at 825-26 (citation and footnote omitted).

Likewise, *Heller* announced a general proposition respecting constitutional protection for the possession of handguns, and applied it

to the home-bound facts of the case. *McDonald*'s description of *Heller* neatly parallels *Blocker*'s description of *Kessler*:

> [I]n [*Heller*], we held that the Second Amendment protects the right to keep and bear arms for the purpose of self-defense, and we struck down a District of Columbia law that banned the possession of handguns in the home.

*McDonald*, 130 S. Ct. at 3020. Extending this logic, there is no reason to suppose that the Supreme Court would suddenly limit *Heller* to its facts—and every reason to suppose that it would decide future Second Amendment cases from the baseline proposition that the Amendment secures the individual right to keep and carry arms for self-defense.

C. Historical Restrictions of the Right to Bear Arms Confirm Its Existence.

Debate over the right to bear arms historically concerned not whether, but how and under what circumstances, the right could be exercised in public for self-defense. Explaining that this right is "not unlimited," in that there is no right to "carry any weapon whatsoever in any manner whatsoever and for whatever purpose," *Heller*, 554 U.S. at 626 (citations omitted), the Court confirmed that there is a right to carry at least some weapons, in some manner, for some purpose. The Court then listed as "presumptively lawful," *id.* at 627 n.26, "laws

forbidding the carrying of firearms in sensitive places," *id.*, at 626, confirming that carrying bans are not presumptively lawful in non-sensitive places.

Particularly illuminating is *Heller*'s discussion of prohibitions on the carrying of concealed weapons, and prohibitions on carrying dangerous and unusual weapons. Upon examination, each doctrine relates to a manner of regulating an established right.

*1. Concealed Carry*

"[T]he right of the people to keep and bear arms (Article 2) is not infringed by laws prohibiting the carrying of *concealed* weapons . . . ." *Robertson* v. *Baldwin*, 165 U.S. 275, 281-82 (1897) (emphasis added). Yet concealed carry bans are only "presumptively" constitutional. *Heller*, 554 U.S. at 627 n.26.

> [N]ot *all* concealed weapons bans are presumptively lawful. *Heller* and the 19th-century cases it relied upon instruct that concealed weapons restrictions cannot be viewed in isolation; they must be viewed in the context of the government's overall scheme.

*Peruta* v. *County of San Diego*, 758 F. Supp. 2d 1106, 1114 (S.D. Cal. 2010), *appeal pending*, No. 10-56971 (9th Cir. filed Dec. 14, 2010) (emphasis in original).

Surveying the history of concealed carry prohibitions, it appears time and again that concealed carry prohibitions have been upheld as mere regulations of the manner in which arms are carried—with the understanding that a complete ban on the carrying of handguns, openly and concealed, is unconstitutional. *Heller* discussed, with approval, four state supreme court opinions that referenced this rule.

Upholding a ban on the carrying of concealed weapons, Alabama's high court explained:

> We do not desire to be understood as maintaining, that in regulating the manner of bearing arms, the authority of the Legislature has no other limit than its own discretion. A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defense, would be clearly unconstitutional. But a law which is merely intended to promote personal security, and to put down lawless aggression and violence, and to this end prohibits the wearing of certain weapons in such a manner as is calculated to exert an unhappy influence upon the moral feelings of the wearer, by making him less regardful of the personal security of others, does not come in collision with the Constitution.

*Reid*, 1 Ala. at 616-17.

Georgia's Supreme Court followed *Reid*, quashing an indictment for publicly carrying a pistol that failed to specify how the gun was carried:

> so far as the act . . . seeks to suppress the practice of carrying certain weapons *secretly*, that it is valid, inasmuch as it does not deprive the

> citizen of his *natural* right of self-defence, or of his constitutional right to keep and bear arms. But that so much of it, as contains a prohibition against bearing arms *openly*, is in conflict with the Constitution, and *void*.

*Nunn* v. *State*, 1 Ga. 243, 251 (1846) (emphasis original).

Tennessee's Supreme Court held unconstitutional the application of a weapons carrying ban to a man carrying a revolver, declaring:

> If the Legislature think proper, they may by a proper law regulate the carrying of this weapon publicly, or abroad, in such a manner as may be deemed most conducive to the public peace, and the protection and safety of the community from lawless violence. We only hold that, as to this weapon, the prohibition is too broad to be sustained.

*Andrews* v. *State*, 50 Tenn. 165, 187-88 (1871).[7]

Finally, as *Heller* observed,

> the Louisiana Supreme Court held that citizens had a right to carry arms openly: "This is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassinations."

---

[7] *Andrews* abrogated in large part *Aymette* v. *State*, 21 Tenn. 154 (1840), which upheld a prohibition on the concealed carry of daggers. But even *Aymette*, which found a state arms bearing right limited by a military purpose, deduced from that interpretation that the right to openly carry arms was protected. *Aymette*, 21 Tenn. at 160-61.

*Heller*, 554 U.S. at 613 (quoting *State* v. *Chandler*, 5 La. Ann. 489, 490 (1850)).

Other decisions reflected the rule of allowing concealed-carry prohibitions only as regulations of the manner of carrying guns. *See, e.g.* *State* v. *Jumel*, 13 La. Ann. 399, 400 (1858) (concealed carry prohibition "a measure of police, prohibiting only a *particular mode* of bearing arms which is found dangerous to the peace of society") (emphasis original); *Owen* v. *State*, 31 Ala. 387, 388 (1858) (concealed carry ban "a mere regulation of the manner in which certain weapons are to be borne").

For supporting the notion that concealed carrying may be banned, *Heller* further cited to THE AMERICAN STUDENTS' BLACKSTONE 84 n.11 (G. Chase ed., 1884), *Heller*, 554 U.S. at 626, which provides:

> [I]t is generally held that statutes prohibiting the carrying of *concealed* weapons are not in conflict with these constitutional provisions, since they merely forbid the carrying of arms in a particular manner, which is likely to lead to breaches of the peace and provoke to the commission of crime, rather than contribute to public or personal defence. In some States, however, a contrary doctrine is maintained.

This understanding survives. *See, e.g., In re Application of McIntyre*, 552 A.2d 500, 501 n.1 (Del. Super. 1988) ("'the right to keep and bear arms' does not of necessity require that such arms may be kept concealed").

Legislatures might prefer one form of carrying over another. Precedent reveals an ancient suspicion of weapons concealment where social norms viewed the wearing of arms as virtuous. But today, openly carrying handguns may alarm individuals unaccustomed to firearms. *See* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytic Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1523 (2009). A preference for concealed over open carrying has been adopted by some jurisdictions where the public acceptance of gun rights is relatively high. For example, in Texas, where concealed handgun permits are readily available on a "shall issue" basis, Tex. Gov't Code § 411.177(a), a permit holder who "intentionally fails to conceal the handgun" commits a misdemeanor. Tex. Penal Code § 46.035(a).

*Heller*'s recognition of a right to carry a handgun does not force states to allow the carrying of handguns in a manner that may cause needless public alarm, so long as a more socially-conducive option exists to allow people to exercise the right to bear arms.

*2. Dangerous and Unusual Weapons.*

*Heller* approvingly referenced "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 627 (citations omitted). This prohibition does not merely refer to types of weapons, but to types of *conduct* with weapons, reflecting the ancient common law offense of affray. Affray required as an element that arms be used or carried in such manner as to terrorize the population, rather than in a manner suitable for ordinary self-defense. Early sources, including some referenced by *Heller*, distinguished affrays from the legitimate public exercise of the right to bear arms.[8]

Blackstone offered that "[t]he offence of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, *by terrifying the good people of the land*." 4 William Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND 148 (1769) (emphasis added). Blackstone referenced the 1328 Statute of Northampton, which, by the time of the American Revolution, had long been limited to prohibit the carrying of arms only with evil intent, "in order to preserve the common

---

[8] *See Heller*, 554 U.S. at 620 ("bearing arms for a lawful purpose").

law principle of allowing 'Gentlemen to ride armed for their Security.'" David Caplan, *The Right of the Individual to Bear Arms: A Recent Judicial Trend*, 4 DET. C. L. REV. 789, 795 (1982) (citing *Rex* v. *Knight*, 90 Eng. Rep. 330 (K.B. 1686)).

> [N]o wearing of Arms is within the meaning of this Statute, unless it be accompanied with such circumstances as are apt to terrify the People; from whence it seems clearly to follow, that Persons of Quality are in no Danger of Offending against this Statute by wearing common Weapons . . . for their Ornament or Defence, in such Places, and upon such Occasions, in which it is the common Fashion to make use of them, without causing the least Suspicion of an intention to commit any Act of Violence or Disturbance of the Peace . . . .

William Hawkins, 1 TREATISE OF THE PLEAS OF THE CROWN, ch. 63, § 9 (1716); *see* Joyce Lee Malcolm, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT 104-05 (1994).

*Heller*'s subsequent sources for the "dangerous and unusual" doctrine, 554 U.S. at 627, are in accord. "[T]here may be an affray, where there is no actual violence; as where a man arms himself with dangerous and unusual weapons, *in such a manner, as will naturally diffuse a terrour among the people*." 3 WORKS OF THE HONOURABLE JAMES WILSON 79 (Bird Wilson ed., 1804) (footnote omitted) (emphasis added). "It is likewise said to be an affray, at common law, for a man to

arm himself with dangerous and unusual weapons, *in such manner as will naturally cause terror to the people*." John A. Dunlap, THE NEW-YORK JUSTICE 8 (1815) (emphasis added).

> Riding or going armed with dangerous or unusual weapons, is a crime against the public peace, by terrifying the people of the land . . . . But here it should be remembered, that in this country the constitution guarranties [sic] to all persons the right to bear arms; then it can only be a crime to exercise this right in such a manner, as to terrify the people unnecessarily.

Charles Humphreys, A COMPENDIUM OF THE COMMON LAW IN FORCE IN KENTUCKY 482 (1822); *Heller*, 554 U.S. at 588 n.10 (quoting same).

"[T]here may be an affray . . . where persons arm themselves with dangerous and unusual weapons, in such manner as will naturally cause a terror to the people." 1 William Oldnall Russell, A TREATISE ON CRIMES AND INDICTABLE MISDEMEANORS 271 (1826). But:

> it has been holden, that no wearing of arms is within [meaning of Statute of Northampton] unless it be accompanied with such circumstances as are apt to terrify the people; from whence it seems clearly to follow, that persons of quality are in no danger of offending against the statute by wearing common weapons . . . in such places, and upon such occasions, in which it is the common fashion to make use of them, without causing the least suspicion of an intention to commit any act of violence, or disturbance of the peace.

*Id*. at 272.

The other treatises *Heller* cites in support of the "dangerous and unusual" doctrine are in accord, as are the cases *Heller* cites. *See O'Neill* v. *State*, 16 Ala. 65, 67 (1849) (affray "probable" "if persons arm themselves with deadly or unusual weapons for the purpose of an affray, *and in such manner as to strike terror to the people*") (emphasis added); *State* v. *Lanier*, 71 N.C. 288, 290 (1874) (riding horse through courthouse, unarmed, is "very bad behavior" but "may be criminal or innocent" depending on whether people alarmed); *State* v. *Langford*, 10 N.C. (3 Hawks) 381, 383-384 (1824) (affray "when a man arms himself with dangerous and unusual weapons, *in such a manner as will naturally cause a terror to the people*") (emphasis added); *English* v. *State*, 35 Tex. 473, 476 (1871) ("terrifying the good people of the land").

Early courts took the view espoused in *Heller*, that securing the right to bear arms in public is consistent with the prohibition on provocative behavior with arms. "[N]either, after so solemn an instrument hath said the people may carry arms, can we be permitted to impute to the acts thus licensed, such a necessarily consequent operation as terror to the people to be incurred thereby." *Simpson*, 13 Tenn. at 360. "A man may

carry a gun for any lawful purpose, for business or amusement, but he cannot go about with that or any other dangerous weapon to terrify and alarm a peaceful people." *Hogan*, 63 Ohio St. at 219, 58 N.E. at 575-76.

> But although a gun is an "unusual weapon," it is to be remembered that the carrying of a gun per se constitutes no offence. For any lawful purpose--either of business or amusement--the citizen is at perfect liberty to carry his gun. It is the wicked purpose--and the mischievous result--which essentially constitute the crime.

*Huntly*, 25 N.C. (3 Ired.) at 422-23.

* * *

Without question, responsible law abiding individuals enjoy the right to carry handguns for self-defense.

## IV. ILLINOIS' UNCONSTITUTIONAL PROHIBITION OF DEFENSIVE HANDGUN CARRY MUST BE ENJOINED.

"[M]ere regulatory measures [are] distinguishable from [an] absolute prohibition." *Ezell*, 651 F.3d at 705.

> Both *Heller* and *McDonald* suggest that broadly prohibitory laws restricting the core Second Amendment right—like the handgun bans at issue in those cases, which prohibited handgun possession even in the home—are categorically unconstitutional.

*Id.* at 703. For example, the Supreme Court, finding that Washington, D.C.'s functional firearms ban contained no allowance for self-defense, summarily struck down the provision. "This makes it impossible for

citizens to use them for the core lawful purpose of self-defense and is hence unconstitutional." *Heller*, 554 U.S. at 630.

Likewise, the provisions here at issue flatly contradict an enumerated Second Amendment guarantee, and are thus unconstitutional. No interest-balancing was required in *Heller* to test a complete ban on the "keeping" of arms for self-defense. It follows that no interest-balancing may be required here to test a complete ban on the "bearing" of arms for self-defense. Once a right is found to exist, it cannot be totally prohibited upon some assertion of a regulatory interest.

Nonetheless, in the alternative, were Illinois' carrying prohibitions evaluated as a matter of "regulating" exercise of the right to bear arms, they would fail any standard of review for two simple reasons. First, whatever the state's interest in regulating the carrying of arms in the interest of public safety—an interest the existence of which Plaintiffs do not contest—the state cannot have any interest in the wholesale prohibition of a constitutional right.

Second, regardless of whether the right would be evaluated under strict scrutiny, "not quite" strict scrutiny, *Ezell*, 651 F.3d at 708, or

intermediate scrutiny, a total prohibition is not narrowly tailored, nor does it reasonably fit a compelling or important regulatory interest. That Illinois is the only state with such an extreme prohibition is telling. *Cf. Heller*, 554 U.S. at 629 ("[f]ew laws in the history of our Nation have come close to the severe restriction of the District's handgun ban"); *McDonald*, 130 S. Ct. at 3047 ("most striking . . . is the paucity of precedent sustaining bans comparable to those at issue here and in *Heller*").

The laws of forty-three states recognize that private citizens are generally entitled to carry handguns for self-defense. Of these: Thirty-seven states require officials to issue gun carry licenses to applicants meeting objective standards.[9] In some of these states, a license is

[9]Ark. Code Ann. § 5-73-309; Colo. Rev. Stat. Ann. § 18-12-203(1); Conn. Gen. Stat. § 29-32b(b); Fla. Stat. Ann. § 790.06(2); Ga. Code Ann. § 16-11-129(d)(4); Idaho Code Ann. § 18-3302(1); Ind. Code Ann. § 35-47-2-3(e); Iowa Code Ann. § 724.7(1); Kan. Stat. Ann. § 75-7c03(a); Ky. Rev. Stat. Ann. § 237.110(4); La. Rev. Stat. Ann. § 40:1379.3(A)(1); 25 Me. Rev. Stat. Ann. § 2003(1); Mich. Comp. Laws Ann. § 28.422(3); Minn. Stat. § 624.714, subdiv. 2(b); Miss. Code Ann. § 45-9-101(2); Mo. Ann. Stat. § 571.101(1); Mont. Code Ann. § 45-8-321(1); Neb. Rev. Stat. § 69-2430(3); Nev. Rev. Stat. Ann. § 202.3657(2); N.H. Rev. Stat. Ann. § 159.6(I); N.M. Stat. Ann. § 29-19-4(A); N.C. Gen. Stat. § 14-415.11(b); N.D. Cent. Code § 62.1-04-03(1); Ohio Rev. Code Ann. § 2923.125(D)(1); 21 Okla. Stat. Ann. § 1290.12(A)(12); Or. Rev. Stat. Ann. § 166.291(1); 18 Pa. Cons. Stat. Ann. § 6109(e); R.I. Gen. Laws § 11-47-11(a); S.C.

required only if a gun is carried concealed. Four states—Alaska, Arizona, Vermont and Wyoming—do not require permits to carry handguns of at least some people (Wyoming requires permits of visitors), although Arizona, Alaska and Wyoming issue permits for reciprocity purposes.[10] Two states—Alabama and Delaware—have discretionary statutes for licensing the carry of concealed handguns, but do not, without more, ban private citizens from openly carrying handguns.[11]

The remaining six states (California, Hawaii, Maryland, Massachusetts, New Jersey, and New York) license the carrying of firearms, but are embroiled in litigation as their licensing standards allow for unbridled discretion, and are often applied unevenly by local officials within those states. *Staub* v. *City of Baxley*, 355 U.S. 313, 322

Code Ann. § 23-31-215(A); S.D. Codified Laws § 23-7-7; Tenn. Code Ann. § 39-17-1351(b); Tex. Gov't Code § 411.177(a); Utah Code Ann. § 53-5-704(1)(a); Va. Code Ann. § 18.2-308(D); Wash. Rev. Code Ann. § 9.41.070(1); W. Va. Code Ann. § 61-7-4(f); Wis. Stat. § 175.60(2)(a).

[10]Alaska Stat. § 18.65.700(a); Ariz. Rev. Stat. § 13-3112(A); Wyo. Stat. Ann. § 6-8-104(b).

[11]Ala. Code §§ 13A-11-73, 75; *Morris* v. *State*, 342 So. 2d 417, 418 (Ala. Cr. App. 1977); 11 Del. Code Ann. §§ 1441-42; *McIntyre*, 552 A.2d at 501 n.1.

(1958) ("freedoms which the Constitution guarantees" cannot be made "contingent upon the uncontrolled will of an official"). But even though unconstitutional, these regulations at least enable some people to exercise their right to bear arms, which is more than can be said for Illinois' approach.

Plaintiffs have thus not merely stated a claim for relief—they are entitled to relief.

Plaintiffs are entitled to a permanent injunction upon proof that they have "no adequate legal remedy," including circumstances where plaintiffs suffer irreparable injury, or where damages could not provide adequate compensation. *Crane* v. *Indiana High School Athletic Ass'n*, 975 F.2d 1315, 1326 (7th Cir. 1992) (citations omitted). Both conditions are satisfied here. When statutes prohibit the exercise of Second Amendment rights, "the plaintiffs' harm is properly regarded as irreparable and having no adequate remedy at law." *Ezell*, 651 F.3d at 700.

Even had the District Court not reached Plaintiffs' request for a permanent injunction, Plaintiffs would have at least been entitled to a preliminary injunction, as in addition to their lack of an adequate

remedy at law, irreparable harm, and likelihood of success on the merits, the balance of harms weigh decisively in their favor. *Ezell*, 651 F.3d at 694.

The benefits to Plaintiffs from having arms for their defense are obvious—but enumeration of the right to bear arms in our Constitution also reflects the people's policy determination that the ability to carry arms for self-defense is socially beneficial. Some people vehemently disagree with this position, but people are free to disagree with any of the Constitution's policy choices and, indeed, amendment of that document is frequently debated. The Constitution reflects other highly controversial policy choices thought by some to imperil public safety, but they must be followed as well. *McDonald*, 130 S. Ct. at 3045. A balance of harms inquiry cannot defeat the prohibition against utilizing interest-balancing to define the content of Second Amendment rights.

Of course, many individuals in Illinois should not be carrying loaded handguns in public, just as today, in Washington, D.C., and Chicago, there remain numerous dangerous or irresponsible individuals who may properly be denied the right to keep functional handguns in their homes for self-defense. This fact is in no way incompatible with *Heller* and

*McDonald*. In striking down their respective handgun bans, *Heller* and *McDonald* did not open a new era of lawful handgun possession by individuals previously disarmed for valid reasons. In both cases, the prohibitions were quickly replaced with regulatory schemes that, whatever their flaws, are not generally considered too lenient, and disarm (arguably among others) plainly dangerous individuals.

In *Ezell*, faced with the prospect of losing its total gun range ban, Chicago warned of a "regulatory vacuum" that would be left between an injunction and subsequent regulatory efforts. This Court dismissed the concerns. "[W]e note that [Chicago] faced a similar dilemma after the Supreme Court decided *McDonald*. The sky did not fall. The City Council moved with dispatch and enacted the Ordinance just four days later." *Ezell*, 651 F.3d at 711. Chicago immediately enacted its post-*Ezell* gun range regulations upon issuance of this Court's opinion, the same day, and those regulations took effect before the District Court had an opportunity to enjoin the old prohibition.

It is not for the Plaintiffs, nor for the Court, to determine precisely whether and what regulation of the right to carry guns Illinois should adopt. Forty-nine ready examples abound, most of which are not in

constitutional dispute. If new regulations replace the prohibition, they would have to be considered on their own merits. *Ezell*, 651 F.3d at 711. But for now, the state's total proscription of the people's right to bear arms must end.

CONCLUSION

The judgment below should be reversed, and the case remanded with instructions to enter a permanent injunction consistent with Plaintiffs' prayer for relief.

Dated: March 2, 2012

Respectfully submitted,

By: /s/ Alan Gura

Alan Gura
Gura & Possessky, PLLC
101 N. Columbus St., Ste. 405
Alexandria, VA 22314
703.835.9085/703.997.7665

David G. Sigale*
Law Firm of David G. Sigale, P.C.
739 Roosevelt Road, Suite 304
Glen Ellyn, IL 60137
630.452.4547/630.596.4445

David D. Jensen
David Jensen PLLC
61 Broadway, Suite 1900
New York, NY 10006
212.380.6615/917.591.1318

*Counsel of Record

Attorneys for Plaintiffs-Appellants Michael Moore, Charles Hooks, Jon Maier, Peggy Fechter, Second Amendment Foundation, Inc., and Illinois Carry

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 9,570 words, excluding the parts of the brief excluded by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Circuit Rule 32(b), and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionately spaced typeface using WordPerfect X4 in 14 point Century Schoolbook font.

/s/ Alan Gura
Alan Gura
Attorney for Plaintiffs-Appellants
Dated: March 3, 2012

# REQUIRED SHORT APPENDIX

## TABLE OF CONTENTS

CIRCUIT RULE 30(d) STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

DISTRICT COURT OPINION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-1

DISTRICT COURT JUDGMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . SA-49

# CIRCUIT RULE 30(d) STATEMENT

Pursuant to Circuit Rule 30(d), counsel certifies that all material required by Circuit Rule 30(a) are included in the required short appendix. All materials required by Circuit Rule 30(b) are included in the separate appendix pursuant to Circuit Rule 30(b)(7).

/s/ Alan Gura
Alan Gura

E-FILED
Friday, 03 February, 2012 04:31:18 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| MICHAEL MOORE, CHARLES HOOKS, PEGGY FECHTER, JON MAIER, SECOND AMENDMENT FOUNDATION, INC., and ILLINOIS CARRY, | ) | |
| Plaintiffs, | ) | |
| v. | ) | 11-cv-03134 |
| LISA MADIGAN, in her official capacity as Attorney General for the State of Illinois, and HIRAM GRAU, in his official capacity as Director of the Illinois State Police, | ) | |
| Defendants. | ) | |

## OPINION

SUE E. MYERSCOUGH, U.S. District Judge:

This matter is before the Court on the Motion for Preliminary and/or Permanent Injunction (the "Injunction Motion") of Plaintiffs Michael Moore, Charles Hooks, Peggy Fechter, Jon Maier, Second Amendment Foundation, Inc., and Illinois Carry. See d/e 13. The Court also considers Defendants Lisa Madigan and Hiram Grau's Motion to

Dismiss. See d/e 24. This Court finds that the Illinois "Unlawful Use of Weapons" and "Aggravated Unlawful Use of a Weapon" statutes do not violate Plaintiffs' Second Amendment rights. The United States Supreme Court and the Seventh Circuit have recognized only a Second Amendment core individual right to bear arms inside the home. Further, even if this Court recognized a Second Amendment right to bear arms outside of the home and an interference with that right, the statutes nonetheless survive constitutional scrutiny. Therefore, Plaintiffs cannot show a likelihood of success on the merits of their claim and thus cannot succeed on the Injunction Motion. For reasons further discussed below, the Injunction Motion is DENIED and the Motion to Dismiss is GRANTED.

## I. BACKGROUND

On May 19, 2011, Plaintiffs filed a one-count Amended Complaint alleging that the Illinois Unlawful Use of Weapons ("UUW") statute (720 ILCS 5/24-1) and the Aggravated Unlawful Use of a Weapon ("AUUW") statute (720 ILCS 5/24-1.6) violate the Second Amendment.

Specifically, Plaintiffs allege that 720 ILCS 5/24-1(a)(4), 720 ILCS 5/24-1(a)(10), and 720 ILCS 5/24-1.6(a) are unconstitutional as applied because the statutes prohibit the carry of loaded and operable firearms in public and thereby violate Plaintiffs' rights under the Second Amendment as recognized by District of Columbia v. Heller, 554 U.S. 570, 592 (2008), and made applicable to the States by McDonald v. Chicago, 130 S. Ct. 3020, 3026 (2010). Plaintiffs argue that the Second Amendment, as interpreted by the Supreme Court, allows Plaintiffs to carry firearms, concealed or otherwise, in public.

Plaintiffs first challenge the Illinois "Unlawful Use of Weapons" statute, 720 ILCS 5/24-1, which criminalizes the carrying or possession of a firearm outside of the home except under certain circumstances. The statute provides, in pertinent part:

> (a) A person commits the offense of unlawful use of weapons when he knowingly:
>
> * * *
>
> > (4) Carries or possesses in any vehicle or concealed on or about his person except when on his land or in his own abode, legal dwelling, or fixed place of business, or on the land or in the legal dwelling of another person as an invitee with that person's permission, any pistol,

> revolver, stun gun or taser or other firearm, except that this subsection (a) (4) does not apply to or affect transportation of weapons that meet one of the following conditions:
>
> > (i) are broken down in a non-functioning state; or
> > (ii) are not immediately accessible; or
> > (iii) are unloaded and enclosed in a case, firearm carrying box, shipping box, or other container by a person who has been issued a currently valid Firearm Owner's Identification Card; or . . .
>
> * * *
>
> (10) Carries or possesses on or about his person, upon any public street, alley, or other public lands within the corporate limits of a city, village or incorporated town, except when an invitee thereon or therein, for the purpose of the display of such weapon or the lawful commerce in weapons, or except when on his land or in his own abode, legal dwelling, or fixed place of business, or on the land or in the legal dwelling of another person as an invitee with that person's permission, any pistol, revolver, stun gun or taser or other firearm. . . .
>
> (b) Sentence. A person convicted of a violation of subsection 24-1(a)(1) through (5), subsection 24-1(a)(10), subsection 24-1(a)(11), or subsection 24-1(a)(13) commits a Class A misdemeanor. . . .

Plaintiffs also challenge the Illinois "Aggravated Unlawful Use of a Weapon" statute, 720 ILCS 5/24-1.6, which criminalizes the carrying or possession of a firearm outside of the home when the firearm is loaded

and accessible or when the firearm is unloaded but ammunition is immediately accessible. The statute provides, in pertinent part:

> (a) A person commits the offense of aggravated unlawful use of a weapon when he or she knowingly:
>
> > (1) Carries on or about his or her person or in any vehicle or concealed on or about his or her person except when on his or her land or in his or her abode, legal dwelling, or fixed place of business, or on the land or in the legal dwelling of another person as an invitee with that person's permission, any pistol, revolver, stun gun or taser or other firearm; or
> >
> > (2) Carries or possesses on or about his or her person, upon any public street, alley, or other public lands within the corporate limits of a city, village or incorporated town, except when an invitee thereon or therein, for the purpose of the display of such weapon or the lawful commerce in weapons, or except when on his or her own land or in his or her own abode, legal dwelling, or fixed place of business, or on the land or in the legal dwelling of another person as an invitee with that person's permission, any pistol, revolver, stun gun or taser or other firearm; and
> >
> > (3) One of the following factors is present:
> >
> > > (A) the firearm possessed was uncased, loaded and immediately accessible at the time of the offense; or
> > > (B) the firearm possessed was uncased, unloaded and the ammunition for the weapon was

immediately accessible at the time of the offense

* * *

(d) Sentence.

(1) Aggravated unlawful use of a weapon is a Class 4 felony; a second or subsequent offense is a Class 2 felony for which the person shall be sentenced to a term of imprisonment of not less than 3 years and not more than 7 years.

Plaintiffs claim that the UUW and AUUW statutes criminalize the carrying of a functional firearm on one's person in public and, therefore, violate their Second Amendment right to bear arms.

On July 7, 2011, Plaintiffs filed the Injunction Motion. Plaintiffs argue the Supreme Court ruled in Heller, 554 U.S. at 592, that the Second Amendment "guarantee[s] the right to possess and carry weapons in case of confrontation." See Pls.' Mem. Supp. Prelim. and/or Perm. Inj. (d/e 14) at 1. Plaintiffs cite McDonald, 130 S. Ct. at 3026, for the proposition that the Supreme Court incorporated that right "fully" against the States. Plaintiffs further contend that, because Illinois' prohibitions on the carrying of guns necessarily violates Plaintiffs' Second Amendment rights, an injunction must be issued against Defendants

according to Ezell v. City of Chicago, 651 F.3d 684 (7th Cir. 2011).

At the August 4, 2011 hearing on the Injunction Motion, Defense counsel stated that they do not contest Plaintiffs' assertion that Lisa Madigan and Hiram Grau are properly named as Defendants. See Prelim. Inj. Hr'g Tr. (d/e 37) at 33-34, Aug. 4, 2011. Additionally, Defendants offered as evidence reports about the efficacy of firearms control. Id. at 4. Plaintiffs objected to the reports' relevance under Federal Rule of Evidence 401, and this Court reserved ruling. Id. This Court now finds that the reports offered by Defendants at the August 4, 2011 hearing are relevant to the Injunction Motion in that they affect this Court's analysis of whether the UUW and AUUW statutes survive constitutional scrutiny. Therefore, the Court accepts the reports into evidence and now rules on the remaining issues.

## II. JURISDICTION & VENUE

The federal question posed by Plaintiffs' claimed violation of their Second Amendment rights gives this Court subject matter jurisdiction. See 28 U.S.C. § 1331. Personal jurisdiction and venue requirements are

satisfied because the relevant acts occurred in this judicial district. See World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980) (stating that personal jurisdiction exists where a defendant "purposefully avail[ed] [himself or herself] of the privilege of conducting activities" in the forum state); 28 U.S.C. §1391(b) (providing that venue in non-diversity cases is proper in a judicial district where any defendant resides, if all defendants reside in the same State).

## III. STANDING

"Standing exists when the plaintiff suffers an actual or impending injury, no matter how small; the injury is caused by the defendant's acts; and a judicial decision in the plaintiff's favor would redress the injury." See Ezell, 651 F.3d at 695 (quoting Bauer v. Shepard, 620 F.3d 704, 708 (7th Cir. 2010)) (internal quotation marks omitted). By asserting that the Second Amendment gives them a right to carry firearms in public and that Illinois' UUW and AUUW statutes deprive them of that right, the four individual Plaintiffs have clearly alleged injury and causation. Because a decision enjoining enforcement of the UUW and AUUW

statutes would redress Plaintiffs' alleged injury, Plantiffs have also satisfied the requirement that a judicial decision in their favor would redress their injury.

Just as the four individual Plaintiffs have standing to seek injunctive relief, so, too, do associational Plaintiffs Second Amendment Foundation, Inc., and Illinois Carry. Second Amendment Foundation, Inc. and Illinois Carry have members who assert that they would carry firearms in Illinois but for the UUW and AUUW statutes. These two organizations meet the requirements for associational standing because: "(1) their members would otherwise have standing to sue in their own right; (2) the interests the associations seek to protect are germane to their organizational purposes; and (3) neither the claim asserted nor the relief requested requires the participation of individual association members in the lawsuit." Ezell, 651 F.3d at 696 (citing United Food & Commercial Workers Union Local 751 v. Brown Group, 517 U.S. 544, 553 (1996); Hunt v. Washington State Apple Advertising Commission, 432 U.S. 333, 343 (1977); Disability Rights Wisconsin v. Walworth

County Board of Supervisors, 522 F.3d 796, 801-02 (7th Cir. 2008)).

## IV. MOTION FOR PRELIMINARY INJUNCTION

This Court first considers Plaintiffs' Injunction Motion, rather than Defendants' Motion to Dismiss, because the Parties have more fully briefed the constitutionality of the challenged statutes with respect to the Injunction Motion and presented oral argument on the Injunction Motion at the August 5, 2011 hearing.

Plaintiffs argue that the Supreme Court in Heller determined that individuals have a Second Amendment right to carry firearms, concealed or visible, in public and, therefore, the Illinois UUW and AUUW statutes violate the Second Amendment by prohibiting individuals from carrying functioning firearms in public. See Pls.' Mem. Supp. Prelim. and/or Perm. Inj. at 1-3 (citing Heller, 554 U.S. at 584; 720 ILCS 5/24-1; 720 ILCS 5/24-1.6). To prevent further violations of these alleged rights, Plaintiffs seek a preliminary injunction or, in the alternative, a permanent injunction.

A party seeking a preliminary injunction must initially demonstrate

that: (1) the claim has some likelihood of succeeding on the merits; (2) no adequate remedy at law exists; and (3) irreparable harm will result if preliminary relief is denied. See Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of America, Inc., 549 F.3d 1079, 1086 (7th Cir. 2008). If the moving party fails to demonstrate any one of these three initial requirements, a court must deny the request for a preliminary injunction. Id. If, however, the moving party meets the initial threshold, the court then "weighs the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief." Id. In balancing the harm to each party, a court should also consider whether the preliminary injunction is in the public interest. See Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 20 (2008); Judge v. Quinn, 612 F.3d 537, 546 (7th Cir. 2010).

### A. Plaintiffs Cannot Establish a Likelihood of Success on the Merits of Their Claim.

To establish a likelihood of success on the merits, Plaintiffs must

demonstrate that they have "some prospect of prevailing on the merits" of their claim. Hoosier Energy Rural Electric Cooperative, Inc. v. John Hancock Life Insurance Co., 582 F.3d 721, 730 (7th Cir. 2009). While the UUW and AUUW statutes do not completely ban firearm possession, these statutes prevent Plaintiffs from carrying firearms outside of their homes or places of business except when the firearm is non-functioning, not immediately accessible, or unloaded and enclosed in a case. See 720 ILCS 5/24-1(a)(4). Plaintiffs contend they are likely to prevail on their challenge to the UUW and AUUW statutes because the Second Amendment gives them the right to carry firearms—concealed or otherwise—outside of their homes.

In determining whether Plaintiffs are likely to succeed on the merits of their claim, this Court will follow the framework for considering Second Amendment challenges that the Seventh Circuit adopted in Ezell. See Ezell, 651 F.3d at 701 (noting that the Third, Fourth, and Tenth Circuits have adopted a similar framework); see also Justice v. Town of Cicero, No. 10-C-5331, 2011 WL 5075870, at *9 (N.D. Ill. Oct. 25,

2011) (applying the framework adopted in Ezell).

First, "the threshold inquiry in some Second Amendment cases will be a 'scope' question: Is the restricted activity protected by the Second Amendment in the first place?" Ezell, 651 F.3d at 701. If Defendants can establish that the activity regulated by the challenged law is not within the scope of the Second Amendment, then "the activity is categorically unprotected, and the law is not subject to further Second Amendment review." Id. at 702-03.

If the regulated activity is protected, then the Court will engage in a "second inquiry into the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights." Id. at 703. In the second inquiry, the Court must determine what level of constitutional scrutiny to apply. "[T]he rigor of this judicial review will depend on how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right." Id.[1]

[1] In Ezell, the court stated that its two-step approach to Second Amendment challenges did not undermine the court's earlier decisions in United States v. Skoien, 614 F.3d 638, 643 (7th Cir. 2010), or United States v. Williams, 616 F.3d 685, 691-93 (7th Cir. 2010), "both of which touched on the historical 'scope' question before applying a form of intermediate scrutiny." Ezell, 651 F.3d at 701.

Accordingly, this Court will first analyze whether the activity restricted by the UUW and AUUW statutes—carrying loaded, uncased, and immediately accessible firearms outside of one's home or place of business—is protected by the Second Amendment.

**1. The UUW and AUUW Statutes Do Not Restrict Activity Protected by the Second Amendment.**

Plaintiffs argue that the Second Amendment protects a general right to carry guns that includes a right to carry operable guns in public. However, neither the United States Supreme Court nor any United States Court of Appeals has recognized such a right.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In Heller, the Supreme Court held that the Second Amendment "protects the right to keep and bear arms for the purpose of self-defense" and that a District of Columbia law that "banned the possession of handguns in the home" violated that right. McDonald, 130 S. Ct. at 3021 (citing Heller, 554 U.S. 570). Writing for the majority in Heller, Justice Scalia extensively

examined the text and historical background of the Second Amendment and found that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation" unconnected with service in a militia. 554 U.S. at 592. However, the Court's characterization of the right concluded with strong limiting language: "Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." Id. at 626. For example, the Court explained, "the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues." Id. The Court further explained that although it did not undertake an "exhaustive historical analysis" of the full scope of the Second Amendment, "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the

mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." Id. at 626-27 (stating that this list of "presumptively lawful regulatory measures" is not intended to be exhaustive). Finally turning to the District of Columbia law at issue in the case, the Court concluded:

> In sum, we hold that the District's ban on handgun possession *in the home* violates the Second Amendment, as does its prohibition against rendering any lawful firearm *in the home* operable for purpose of immediate self-defense. Assuming that Heller is not disqualified from the exercise of Second Amendment rights, the District must permit him to register his handgun and must issue him a license to carry it *in the home*.

Heller, 554 U.S. at 635 (emphasis added).

The Supreme Court's holding in Heller is narrow: that the Second Amendment gives qualified individuals (i.e. mentally competent persons who are not felons) the right to possess lawful firearms "in the home" for purposes of self-defense. Id. at 626, 635. The Court emphasized the limited nature of its holding, stating that "whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other

interests the right of law-abiding, responsible citizens to use arms *in defense of hearth and home.*" Id. at 635 (emphasis added). The Seventh Circuit, in an en banc opinion, has stated that the language of Heller "warns readers not to treat Heller as containing broader holdings than the Court set out to establish: that the Second Amendment creates individual rights, one of which is keeping operable handguns at home for self-defense. What other entitlements the Second Amendment creates, and what regulations legislatures may establish, were left open." Skoien, 614 F.3d at 640.

In McDonald, a plurality of the Supreme Court found that the right to possess a handgun in the home for self-defense recognized in Heller was applicable to the states through the Due Process Clause of the Fourteenth Amendment. McDonald, 130 S. Ct. at 3050 ("In Heller, we held that the Second Amendment protects the right to possess a handgun in the home for the purpose of self-defense . . . . We therefore hold that the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in Heller.").

Together, the Heller and McDonald opinions emphasize that the core of the Second Amendment right is the right of the individual to bear arms in the home for the purpose of self-defense. Neither Heller nor McDonald recognizes a Second Amendment right to bear arms outside of the home. To the contrary, the Heller Court specifically limited its holding to possession in the home and warned courts not to extend that holding beyond what the Court set out to establish. Heller, 554 U.S. at 626-27, 635; see also Skoien, 614 F.3d at 640.

The Seventh Circuit has not specifically considered the question of whether the Second Amendment right articulated in Heller includes a general right to bear arms outside of the home. Most recently, the court considered whether a city-wide ban on firing-range training, where such training was a prerequisite for lawful gun ownership, burdened the core of the Second Amendment right to possess firearms for self-defense in the home. See Ezell, 651 F.3d at 689-90. The court's finding that the ban burdened the core of the Second Amendment right was based on its reasoning that the ban, by effectively precluding lawful gun ownership,

severely interfered with "the right to keep and bear arms for defense of self, family, and home" articulated in Heller. Id. at 704. The court did not make a finding regarding the scope of the Second Amendment outside of the home. However, the Seventh Circuit's characterization of the scope of that right in Ezell and Skoien supports the conclusion that the Second Amendment right, as recognized by the Supreme Court, does not extend outside of the home. As noted earlier, the court in Skoien stated that the Heller decision set out a narrow holding: "that the Second Amendment creates individual rights, one of which is keeping operable handguns at home for self-defense." Skoien, 614 F.3d at 640.

In concluding that the Second Amendment right in Heller is limited to the right to bear arms in the home for self-defense, this Court notes that many courts in other jurisdictions have reached a similar conclusion regarding the Heller decision. See Piszczatoski v. Filko, No. 10-06110, 2012 WL 104917, at *1 (D.N.J. Jan. 12, 2012) (finding that the Second Amendment does not include a general right to carry handguns outside the home); Kachalsky v. Cacace, No. 10-cv-5413, 2011 WL 3962550, at

*19, *23 (S.D.N.Y. Sept. 2, 2011) (stating that the Heller Court's "emphasis on the Second Amendment's protection of the right to keep and bear arms for the purpose of 'self-defense in the home' permeates the Court's decision and forms the basis for its holding" and finding that both concealed and open carry of firearms in public are "outside the core Second Amendment concern articulated in Heller: self-defense in the home"); Osterweil v. Bartlett, No. 1:09-cv-825, 2011 WL 1983340, at *6 (N.D.N.Y. May 20, 2011); Gonzales v. Village of West Milwaukee, No. 09-cv-0384, 2010 WL 1904977, at *4 (E.D. Wis. May 11, 2010) ("The Supreme Court has never held that the Second Amendment protects the carrying of guns outside the home."); Moreno v. N.Y. City Police Department, No. 10-cv-6269, 2011 WL 2748652, at *3 (S.D.N.Y. May 7, 2011) (noting that "Heller has been narrowly construed, as protecting the individual right to bear arms for the specific purpose of self-defense within the home"); United States v. Tooley, 717 F. Supp. 2d 580, 596 (S.D. W. Va. 2010) ("[P]ossession of a firearm outside of the home or for purposes other than self-defense in the home are not within the 'core' of

the Second Amendment right as defined by Heller."); People v. Aguilar, 408 Ill. App. 3d 136, 143 (2011) ("[T]he decisions in Heller and McDonald were limited to interpreting the [S]econd [A]mendment's protection of the right to possess handguns in the home, not the right to possess handguns outside the home."); People v. Dawson, 403 Ill. App. 3d 499, 508 (2010) ("[T]he Heller Court ultimately limited its holding to the question presented—that the [S]econd [A]mendment right to bear arms protected the right to possess a commonly used firearm, in the home for self-defense purposes."); Williams v. State, 10 A.3d 1167, 1178 (Md. 2011) ("If the Supreme Court . . . meant its holding [in Heller and McDonald] to extend beyond home possession, it will need to say so more plainly."); Little v. United States, 989 A.2d 1096, 1101 (D.C. 2010) (holding that because the appellant was not in his home, he was "outside of the bounds identified in Heller, i.e., the possession of a firearm in one's private residence for self-defense purposes"); Mack v. Unites States, 6 A.3d 1224, 1236 (D.C. 2010) (stating that "Heller did not endorse a right to carry weapons outside the home. Nor has the

Court done so in its more recent decision in McDonald."); State v. Knight, 218 P.3d 1177, 1189 (Kan. Ct. App. 2009) (reasoning that a statute which criminalized the possession of a concealed firearm in public was outside the province of the Second Amendment, because the Supreme Court's decision in Heller "turned solely on the issue of handgun possession in the home"); but see People v. Mimes, 953 N.E.2d 55, 73 (Ill. App. Ct. 2011) (finding that the Second Amendment right is not limited to the home because the "inherent right to self-defense" that is central to the Heller decision "does not disappear outside the home" but, nonetheless, holding that the challenged Illinois AUUW statute survives intermediate scrutiny and does not violate the Second Amendment).

In addition to emphasizing that the core of the Second Amendment right is the right to bear arms in the home for the purpose of self-defense, the Supreme Court in Heller clearly affirmed the government's power to regulate and restrict possession of firearms outside of the home. Heller, 554 U.S. at 626-27 (approving of 19th-century prohibitions on carrying

concealed weapons and stating that "nothing in our opinion should be taken to cast doubt . . . on laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions on the qualifications on the commercial sale of arms"). The Heller Court's approval of 19th-century bans on concealed carry and other longstanding firearm regulations further indicates that Heller recognizes a Second Amendment right to bear arms that is specific to possession in the home for self-defense and does not extend to possession outside of the home. See id.

The Seventh Circuit and other courts have applied the Heller Court's language to uphold various federal gun laws, including bans on gun possession by certain types of criminal offenders and bans on possession of certain types of weapons. See Skoien, 614 F.3d at 639 (upholding 18 U.S.C. § 922(g)(9), which bans possession of firearms by a person convicted of a misdemeanor crime of domestic violence); United States v. Yancey, 621 F.3d 681, 682 (7th Cir. 2010) (upholding 18 U.S.C. § 922(g)(3), which bans possession of firearms by certain users of

unlawful controlled substances); United States v. Williams, 616 F.3d 685, 692-93 (7th Cir. 2010) (upholding 18 U.S.C. § 922(g)(1), which bans possession of firearms by a convicted felon); see also United States v. Booker, 644 F.3d 12, 13 (1st Cir. 2011) (upholding 18 U.S.C. § 922(g)(9)); United States v. Chester, 628 F.3d 673, 680 (4th Cir. 2010) (same); United States v. Reese, 627 F.3d 792, 800-01 (10th Cir. 2010) (upholding 18 U.S.C. § 922(g)(8), which bans possession of firearms by individuals subject to a domestic protection order); United States v. Mazzarella, 614 F.3d 85, 89 (3d Cir. 2010) (upholding 18 U.S.C. § 922(k), which bans possession of firearms with an obliterated serial number).

Relying on the Heller Court's implicit approval of 19th-century laws prohibiting concealed carry of weapons (see Heller, 554 U.S. at 626), many courts have held that laws restricting or banning concealed carry of weapons outside of the home do not encroach upon activity protected by the Second Amendment. See Kachalsky, 2011 WL 3962550, at *23 (upholding New York Penal Law § 400.00(2)(f), which allows concealed

carry permits to be issued only "when proper cause exists" and finding that both concealed and open carry of firearms in public are "outside the core Second Amendment concern articulated in Heller: self-defense in the home"); United States v. Hart, 726 F. Supp. 2d 56, 60 (D. Mass. 2011) ("Heller does not hold, nor even suggest, that concealed weapons laws are unconstitutional."); Richards v. County of Yolo, No. 2:09-cv-01235, 2011 WL 1885641, at *3 (E.D. Cal. May 16, 2011) (upholding a county ban on concealed carry because "the Second Amendment does not create a fundamental right to carry a concealed weapon in public"); Dorr v. Weber, 741 F. Supp. 2d 993, 1005 (N.D. Iowa 2010) (finding that "a right to carry a concealed weapon under the Second Amendment has not been recognized to date"); Mack, 6 A.3d at 1236 (stating that "Heller did not endorse a right to carry weapons outside the home" and "did not recognize a right to carry concealed weapons"); Knight, 218 P.3d at 1190 (concluding that the Heller Court considered concealed firearms prohibitions to be "presumptively constitutional").

Moreover, in Kachalsky v. Cacace, the Southern District of New

York upheld New York's handgun licensing scheme, which allows issuance of a license to carry a handgun in public only after a licensing officer's discretionary determination that "proper cause exists for the issuance thereof," which New York state courts have interpreted to mean "a special need for self-protection distinguishable from that of the general community or of persons engaged in the same profession." Kachalsky, 2011 WL 3962550, at *1 (quoting N.Y.P.L. § 400.00(2)(f)). The court held that the Second Amendment right defined in Heller does not extend to invalidate regulations such as N.Y.P.L. Section 400.00(2)(f). Kachalsky, 2011 WL 3962550, at *20. The court explained that "the language of Heller makes clear that the Court recognized 'not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose,' 554 U.S. at 626, but rather a much narrower right—namely the 'right of law-abiding, responsible citizens to use arms in defense of hearth and home,' id. at 635." Kachalsky, 2011 WL 3962550, at *20. The court further stated that "Heller's limiting language makes clear that the Supreme Court did not disturb its prior

ruling in Robertson v. Baldwin, 165 U.S. 275, 17 S. Ct. 326, 41 L. Ed. 715 (1897), where it 'recognized that the Second Amendment right to keep and bear arms is not infringed by laws prohibiting the carrying of concealed weapons.'" Kachalsky, 2011 WL 3962550, at *20 (quoting Dorr, 741 F. Supp. 2d at 1005). Because New York's law did not interfere with the right of individuals to bear arms in the home for the purpose of self-defense, the court found that the law did not impose a burden on conduct falling within the scope of the Second Amendment and rejected the plaintiffs' challenge under the first prong of the two-prong Second Amendment analysis. Kachalsky, 2011 WL 3962550, at *23.

Additionally, the District of New Jersey recently heard a similar constitutional challenge to a New Jersey law governing issuance of permits to carry handguns outside of one's home or place of business. See Piszczatoski, 2012 WL 104917, at *1. The New Jersey law requires a permit applicant to demonstrate, among other things, a "justifiable need to carry a handgun," first to a police officer and then to a Superior

Court judge. Piszczatoski, 2012 WL 104917, at *3. The plaintiffs argued that the law encroaches upon a fundamental right to carry operable handguns for self-defense under the Second Amendment. Id. The court upheld the law, finding that "[t]he Handgun Permit Law does not on its face burden protected conduct because the Second Amendment does not include a general right to carry handguns outside the home." Piszczatoski, 2012 WL 104917, at *1. The court reasoned that Heller "repeatedly and specifically limited itself to the home," and much of its reasoning "refers to the need for self-defense specifically in the home." Piszczatoski, 2012 WL 104917, at *7. The court concluded: "If the Supreme Court majority had intended to create a broader general right to carry for self-defense outside the home, Heller would have done so explicitly." Id.

This Court agrees with the Piszczatoski court's conclusion that the Supreme Court in Heller and McDonald did not explicitly recognize a general right to carry firearms in public. The Heller Court's emphasis on the right to bear arms "in defense of hearth and home" and the Court's

express approval of regulations prohibiting concealed carry of weapons in public reflect that the Court in Heller did not recognize a Second Amendment right to possess operable firearms in public. Heller, 554 U.S. at 635 (stating that "whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home."). Because the Supreme Court has not recognized such a right, the Illinois UUW and AUUW statutes' prohibition of carrying loaded, uncased, and immediately accessible firearms in public does not violate the Second Amendment as defined by the Supreme Court. The UUW and AUUW statutes, because they permit home possession, do not interfere with the core of the Second Amendment right, which is "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." Heller, 554 U.S. at 635.

Because Illinois' UUW and AUUW statutes do not interfere with possession of arms in the home, these statutes are distinguishable from the regulation challenged in Ezell. In Ezell, the Seventh Circuit enjoined

the City of Chicago from enforcing a ban on live ammunition firing ranges within the City where the City also mandated firing-range training as a prerequisite to lawful gun ownership. Ezell, 651 F.3d at 689-90. The Ezell court found that because Heller and McDonald established that the right to possess firearms for self-defense in one's home is a core Second Amendment right, there is implicitly "a corresponding right to acquire and maintain proficiency in [firearm] use." See Ezell, 651 F.3d at 704. Because the range ban severely encroached on "an important corollary to the meaningful exercise of the core right to possess firearms for self-defense," the court applied a heightened scrutiny analysis and concluded that the plaintiffs' Second Amendment claim had a strong likelihood of success on the merits. See Ezell, 651 F.3d at 708-10.

The ordinance challenged in Ezell implicated the core of the Second Amendment right to possess firearms in the home for self-defense in a way that the Illinois UUW and AUUW statutes do not. The ordinance in Ezell prohibited citizens from satisfying a prerequisite to lawful gun ownership and, thereby, severely encroached upon the right to possess

guns for purposes of self-defense in the home guaranteed by Heller. See Ezell, 651 F.3d at 708. By contrast, the instant UUW and AUUW statutes do not limit possession of weapons for the purpose of self-defense in the home and only restrict possession outside of the home under limited circumstances. See 720 ILCS 5/24-1(a)(4), (10); 720 ILCS 5/24-1.6(a). Additionally, unlike the ordinance at issue in Ezell, neither the UUW statute nor the AUUW statute burdens anything that could be considered a necessary corollary to that right because the statutes do not, for example, prevent qualified individuals from purchasing a firearm, obtaining proficiency in firearm use, or transporting a firearm. See Ezell, 651 F.3d at 708-10. Therefore, the UUW and AUUW statutes do not infringe upon the core Second Amendment right recognized by the Supreme Court in Heller. See Heller, 554 U.S. at 635.

This Court finds further support for its conclusion in recent decisions of the Illinois Appellate Court, which has also concluded that Heller and McDonald affirm a Second Amendment right to bear arms in the home but not outside of the home. See People v. Williams, No. 1-

09-1667, 2011 WL 6351861, at *4 (Ill. App. Ct. Dec. 15, 2011) (finding that the AUUW statute "does not implicate the fundamental right announced by Heller and . . . McDonald, the right to possess a loaded handgun in the home for self-protection"); Aguilar, 408 Ill. App. 3d at 143; Dawson, 403 Ill. App. 3d at 508; but see Mimes, 953 N.E.2d at 73 (finding that the Second Amendment right as defined by Heller and McDonald is not limited to the home but ultimately holding that the AUUW statute's ban on the carrying of an uncased, loaded, and accessible firearm in public nevertheless passed constitutional scrutiny). The Illinois Appellate Court has held repeatedly that the Illinois UUW and AUUW statutes do not violate the Second Amendment. See Williams, 2011 WL 6351861, at *2 (holding that the AUUW statute did not violate the defendant's Second Amendment rights); People v. Montyce H., No. 1-10-1788, 2011 WL 5903448, at *5 (Ill. App. Ct. Nov. 18, 2011) (same); Mimes, 953 N.E.2d at 77 (same); People v. Ross, 407 Ill. App. 3d 931, 939-40 (2011) (same); Aguilar, 408 Ill. App. 3d at 142-50 (same); Dawson, 403 Ill. App. 3d at 510 (holding that U.S.

Supreme Court cases "do not define the fundamental right to bear arms to include activity barred by the AUUW statute").

This Court concludes that the Illinois UUW and AUUW statutes do not infringe upon a core right protected by the Second Amendment. Further, the Supreme Court has not recognized a right to bear firearms outside the home and has cautioned courts not to expand on its limited holding. See Heller, 554 U.S. at 635 (holding only that a ban that prohibits competent individuals from possessing operable handguns for self-defense in their homes violated the Second Amendment). Rather, the Supreme Court has validated the government's prerogative to implement firearm prohibitions. See id. at 626-27 (stating that "nothing in our opinion should be taken to cast doubt . . . on laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions on the qualifications on the commercial sale of arms"). Firearm regulation is the prerogative of legislatures, subject only to constitutional dictates judged by the courts. The absence of any controlling authority which finds that the UUW or

AUUW statutes violate the Second Amendment prevents Plaintiffs from showing any likelihood of success on the merits.

**2. The UUW and AUUW Statutes Survive Constitutional Scrutiny.**

Alternatively, assuming, *arguendo*, that there is a right to bear arms outside of the home, such a right is not a core Second Amendment right as defined by the Heller Court, which defined the core of the right as the right to bear arms in the home for self-defense. See Heller, 554 U.S. at 635; see also Skoien, 614 F.3d at 640. However, even if this Court were to assume that such a right exists and that the UUW and AUUW statutes interfere with that right, Plaintiffs would still be unable to show a likelihood of success on the merits of their claim because the UUW and AUUW statutes survive constitutional scrutiny.

This Court notes that the Supreme Court has not articulated the appropriate level of scrutiny that courts must apply to Second Amendment challenges, but the Supreme Court has indicated that rational basis review is not appropriate. See Heller, 554 U.S. at 629 n. 27 ("Obviously, [a rational basis] test could not be used to evaluate the

extent to which a legislature may regulate a specific, enumerated right, be it the freedom of speech, the guarantee against double jeopardy, the right to counsel, or the right to keep and bear arms."). As discussed earlier, the Seventh Circuit has stated that the level of scrutiny to be applied "will depend on how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right." Ezell, 651 F.3d at 703, 708. The court explained that "laws that merely regulate rather than restrict, and modest burdens on the right may be more easily justified" than those placing a "severe burden" on the right. Ezell, 651 F.3d at 708.

The Seventh Circuit's approach explains why the court applied heightened, but "not quite strict," scrutiny in the Ezell decision but applied only intermediate scrutiny in the Skoien decision. In Skoien, an *en banc* decision, an individual asserted that 18 U.S.C. § 922(g)(9) violated his Second Amendment right to bear arms because it barred him from possessing a weapon on account of his conviction for misdemeanor domestic violence. Skoien, 614 F.3d at 639. The court applied

intermediate scrutiny and upheld the law, finding that the goal of the law, "preventing armed mayhem," was an important governmental objective and the government had established a substantial relation between the statute and its objective. Skoien, 614 F.3d at 641-42. In Ezell, the Seventh Circuit enjoined the City of Chicago from enforcing a ban on live ammunition firing ranges within the City where the City also mandated firing-range training as a prerequisite to lawful gun ownership. Ezell, 651 F.3d at 689-90. Because the range ban severely encroached on "an important corollary to the meaningful exercise of the core right to possess firearms for self-defense," the court found that the City's ban was subject to a heightened scrutiny analysis—one that was "more rigorous" than the intermediate scrutiny applied in Skoien but was "not quite" strict scrutiny. See Id. at 708. The Ezell court emphasized that heightened scrutiny was appropriate because the plaintiffs' claim, unlike the claim in Skoien, was brought by a "law-abiding, responsible citizen" and involved "the central self-defense component of the right" as described in Heller, 554 U.S. at 635. Ezell 651 F.3d at 708.

However, the heightened scrutiny analysis applied in the Ezell case is not the appropriate standard to apply in this case because the Illinois UUW and AUUW statutes, which do not prohibit home possession, do not come as close to the core of the Second Amendment right as the law challenged in Ezell. In Ezell, the range ban infringed upon the core of the right because it prohibited citizens from satisfying a prerequisite to lawful gun ownership—thereby preventing citizens from lawfully possessing guns in the home for self-defense. See Ezell, 651 F.3d at 708. By contrast, the UUW and AUUW statutes do not restrict possession of weapons for the purpose of self-defense in the home and only restrict possession outside of the home under limited circumstances. See 720 ILCS 5/24-1(a)(4), (10); 720 ILCS 5/24-1.6(a). Additionally, unlike the ordinance at issue in Ezell, neither the UUW statute nor the AUUW statute burdens a necessary corollary to that right because the statutes do not, for example, prevent qualified individuals from purchasing a firearm, transporting a firearm, or obtaining proficiency in firearm use. See Ezell, 651 F.3d at 708-10 (finding that a city ordinance that banned firing

ranges while simultaneously requiring firing-range training as a prerequisite to lawful firearm possession burdened a "necessary corollary" to the right to bear arms in the home for self-defense). Accordingly, the UUW and AUUW statutes are not subject to the heightened level of scrutiny applied in Ezell. See Ezell, 651 F.3d at 703.

Because neither the heightened scrutiny applied in Ezell nor rational basis review is the appropriate standard, this Court will apply intermediate scrutiny in this case. This Court notes that a majority of courts considering Second Amendment challenges since the Heller decision have applied intermediate scrutiny. See Skoien, 614 F.3d at 641-42 (applying intermediate scrutiny to 18 U.S.C. § 922(g)(9), which bars possession of a weapon by individuals convicted of misdemeanor domestic violence); see also Mazzarella, 614 F.3d at 89 (applying intermediate scrutiny to a law prohibiting possession of handguns with obliterated serial numbers); Chester, 628 F.3d at 680 (applying intermediate scrutiny to 18 U.S.C. § 922(g)); Reese, 627 F.3d at 800-01 (same).

In applying intermediate scrutiny, this Court will consider: (1) whether the contested law serves an important governmental objective; and (2) whether the statute is substantially related to that governmental objective. See Skoien, 614 F.3d at 641. In determining whether such a substantial relationship exists, this Court may consider both logic and data. See id. at 642 (finding that "both logic and data establish[ed] a substantial relationship" between the statute and the governmental objective at issue).

Illinois' UUW statute prohibits individuals from bearing firearms outside of one's home, legal dwelling, or place of business, except under certain circumstances. See 720 ILCS 5/24-1(a)(4). The statute provides, among other things, that individuals with valid Firearm Owner's Identification ("FOID") cards may lawfully possess firearms in public so long as the firearm is broken down in a non-functioning state, not immediately accessible, or unloaded and enclosed in a case. See 720 ILCS 5/24-1(a)(4)(iii). The AUUW statute makes it a felony to possess a firearm outside of one's home, legal dwelling, or place of business when

one of the following factors is present: "(A) the firearm possessed was uncased, loaded and immediately accessible at the time of the offense; or (B) the firearm possessed was uncased, unloaded and the ammunition for the weapon was immediately accessible at the time of the offense . . . ." 720 ILCS 5/24-1.6(a)(3)(A), (B).

Defendants' asserted basis for enacting the UUW and AUUW statutes is public safety. See Defs.' Resp. to Pls.' Mot. (d/e 26) at 13. In Skoien, the Seventh Circuit recognized that public safety is a valid governmental interest. Skoien, 614 F.3d at 641-42. The court specifically stated that "no one doubts that the goal of § 922(g), preventing armed mayhem, is an important governmental objective." Id. at 642. As such, the first factor in the intermediate scrutiny test—whether the challenged law serves an important governmental objective—is satisfied for both the UUW and AUUW statutes.

The second factor—whether the statute is substantially related to an important governmental interest—must also be satisfied. Defendants assert that the UUW and AUUW statutes are substantially related to the

government's interest in public safety because the statutes make it "more difficult to discharge firearms in public, thereby reducing the risk that guns will fire to deadly effect, either purposefully or accidentally." See Defs.' Resp. to Pls.' Mot. at 13. Defendants also argue that empirical evidence supports their assertion that the UUW and AUUW statutes are related to public safety goals, citing preliminary studies that indicate that the passage of "right to carry" laws in other states corresponds with a measurable increase in crime. See id. (citing John J. Donohue, Guns, Crime and the Impact of State Right to Carry Laws, 73 Fordham L. Rev. 623, 630-39 (2004); Concealed Carry Killers, Violence Policy Center (2009), http://www.vpc.org/ccwkillers.htm).

This Court need not decide whether a ban on the possession of loaded, uncased, and accessible firearms in public truly reduces the risk of gun violence in public. This Court need only determine whether there is a substantial relationship between the UUW and AUUW statutes and the statutes' intended effect of ensuring public safety. Under intermediate scrutiny, the fit between the challenged law and the law's

objective must be "reasonable, not perfect." Reese, 627 F.3d 792, 801 (quoting Marzzarella, 614 F.3d at 98); see also Mimes, 953 N.E.2d at 76.

This Court finds that Defendant's assertions and supporting evidence are sufficient to establish a substantial relationship between the means employed by the UUW and AUUW statutes and the government's asserted interest in public safety. One may reasonably conclude that prohibiting the possession of loaded, uncased, and immediately accessible firearms in public will make it more difficult for individuals to discharge firearms in public and will thereby diminish the public's risk of injuries and death by gunfire. See Skoien, 614 F.3d at 641-42 (stating that courts may look to logic in order to find a substantial relationship between a regulation and its objective); see also Montyce H., 2011 WL 5903448, at *6-7 (citing Mimes, 953 N.E.2d at 76-77 (applying intermediate scrutiny and finding that the fit between the challenged provisions of the AUUW statute and the government's important interest in public safety is "absolutely reasonable" in part

because the statute's prohibition of carrying loaded and accessible firearms in public "is justified by the potential deadly consequences to innocent members of the general public when someone carrying a loaded and accessible gun is either mistaken about his need for self-defense or just a poor shot")). Empirical evidence supports this conclusion. See Defs.' Resp to Pls.' Mot. at 13 (citing Donahue, at 630-39; Violence Policy Center, supra). Because there is a substantial relationship between Illinois' public safety objective and the statutes at issue, this Court finds the UUW and AUUW statutes are constitutional under an intermediate scrutiny analysis. See Skoien, 614 F.3d at 641. Plaintiffs cannot, therefore, show any prospects of prevailing on the merits of their challenge to the UUW and AUUW statutes, and their preliminary injunction motion must be denied. See Girl Scouts of Manitou Council, Inc., 549 F.3d at 1086 ("If the court determines that the moving party has failed to demonstrate any one of [the] three threshold requirements, it must deny the [preliminary] injunction.").

B. Inadequacy of a Legal Remedy, Irreparable Harm, and Balancing of Harms

Because this Court has determined that Plaintiffs have failed to demonstrate a likelihood of success on the merits, this Court may deny the injunction without analyzing the remaining preliminary injunction factors. See Girl Scouts of Manitou Council, Inc., 549 F.3d at 1086. Nevertheless, this Court will briefly address the remaining threshold factors—inadequacy of a legal remedy and irreparable harm. See id. Rather than analyze inadequacy of a legal remedy and irreparable harm as separate factors, courts may consider the two factors jointly. See Ezell, 651 F.3d at 697. This Court will do so and then briefly discuss the balancing of harms factor.

The Second Amendment's central component is the right to possess firearms for self-defense in the home, and infringements of this right cannot be compensated by money damages. Ezell, 651 F.3d at 699 (citing Heller, 554 U.S. at 592–95). As such, harm resulting from a Second Amendment violation is "properly regarded as irreparable and having no adequate remedy at law." Ezell, 651 F.3d at 699.

Had Plaintiffs been able to prove a violation of their Second Amendment right to bear arms, Plaintiffs would have necessarily been able to establish irreparable harm and a lack of adequate legal remedy. However, Plaintiffs' inability to prove a Second Amendment violation prevents them from establishing these elements.

Furthermore, the State undoubtedly has the authority to regulate firearms in order to ensure public safety. See Heller, 554 U.S. at 626-27. Striking down the UUW and AUUW statutes would jeopardize Illinois' public safety objectives. By contrast, continued enforcement of the statutes poses no harm to Plaintiffs, as the statutes do not violate Plaintiffs' Second Amendment rights. The public's significant interest in general safety outweighs Plaintiffs' interest in carrying firearms outside of the home for Plaintiffs' own safety. To the extent it is necessary to analyze factors aside from the likelihood of success on the merits, the Court finds the foregoing preliminary injunction factors militate against issuing injunctive relief.

## V. MOTION TO DISMISS

A motion to dismiss is subject to review under the standard set forth in Federal Rule of Civil Procedure 12(b)(6). When reviewing a motion to dismiss, a court looks at the sufficiency of the complaint and not whether the plaintiff has a winning claim. See McCormick v. City of Chicago, 230 F.3d 319, 323-26 (7th Cir. 2000). Still, a complaint must do more than merely "avoid foreclosing possible bases for relief." Tamayo v. Blagojevich, 526 F.3d 1074, 1084 (7th Cir. 2008) (internal quotation marks omitted). A complaint "must actually suggest that the plaintiff has a right to relief, by providing allegations that raise a right to relief above the speculative level." Id. (internal quotation marks omitted). "Rule 12(b)(6) should be employed only when the complaint does not present a legal claim." Smith v. Cash Store Management, Inc., 195 F.3d 325, 327 (7th Cir. 1999) (internal quotation marks omitted).

Plaintiffs' Amended Complaint contains a single cause of action. It alleges that the UUW and AUUW statutes violate Plaintiffs' Second Amendment right to carry firearms, concealed or otherwise, outside their

homes. See Am. Compl. at 10. Because this Court has determined that individuals do not have a Second Amendment right to bear arms outside of the home, this Court finds that the UUW and the AUUW statutes—which only regulate firearm possession outside of the home—do not infringe on Plaintiffs' Second Amendment rights. See Heller, 554 U.S. at 635 (holding only that the Second Amendment affords individuals a right to bear arms "in the home" and explaining that the Second Amendment "elevates above all other interests the right of . . . citizens to use arms in defense of hearth and home"). Therefore, Plaintiffs' Amended Complaint does not present a viable Second Amendment claim.

Alternatively, as discussed earlier in this Opinion, even if this Court were to assume that there is a Second Amendment right to bear arms outside of the home and the challenged statutes interfere with that right, the statutes survive constitutional scrutiny. Consequently, Plaintiffs' Second Amendment challenge to the UUW and AUUW statutes is not sufficient to state a claim. See Fed. R. Civ. P. 12(b)(6). Plaintiffs' claim

must be dismissed. See Tamayo, 526 F.3d at 1084.

## VI. CONCLUSION

For the reasons stated above, Plaintiffs' Motion for Preliminary and/or Permanent Injunction (d/e 13) is DENIED and Defendants' Motion to Dismiss (d/e 24) is GRANTED. This case is CLOSED.

IT IS SO ORDERED.

ENTERED: February 3, 2012

FOR THE COURT:

s/ Sue E. Myerscough
SUE E. MYERSCOUGH
UNITED STATES DISTRICT JUDGE

3:11-cv-03134-SEM-BGC # 30 Page 1 of 1
Case: 12-1269 Document: 10 Filed: 03/02/2012 Pages: 115
E-FILED
Friday, 03 February, 2012 04:42:48 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT

for the
Central District of Illinois

MICHAEL MOORE, CHARLES HOOKS, PEGGY FECHTER, JON MAIER, SECOND AMENDMENT FOUNDATION, INC., and ILLINOIS CARRY, )
)
)
vs. ) Case Number: **11-3134**
)
)
LISA MADIGAN, in her official capacity as Attorney General for the State of Illinois, and HIRAM GRAU, in his official capacity as Director of the Illinois State Police,

## JUDGMENT IN A CIVIL CASE

**JURY VERDICT**. This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

**XXX DECISION BY THE COURT**. This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

**IT IS ORDERED AND ADJUDGED** pursuant to an order entered by the Honorable Sue E. Myerscough: Defendants' Motion to Dismiss (d/e 24) is Granted. Case Closed .

**Dated:** 2/3/2012

s/ Pamela E. Robinson
Pamela E. Robinson
Clerk, U.S. District Court



# CERTIFICATE OF SERVICE

## Certificate of Service When All Case Participants Are CM/ECF Participants

I hereby certify that on March 3, 2012, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ David G. Sigale

# CERTIFICATE OF SERVICE

## Certificate of Service When Not All Case Participants Are CM/ECF Participants

I hereby certify that on ____________________, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I further certify that some of the participants in the case are not CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third-party commercial carrier for delivery within 3 calendar days, to the following non-CM/ECF participants:

| counsel / party: | address: |
| --- | --- |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

s/______________________________

Reset Save Print