No. 12-1788

# UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

MARY SHEPARD and the ILLINOIS STATE RIFLE ASSOCIATION,

*Plaintiffs-Appellants,*

v.

LISA M. MADIGAN, et al.,

*Defendants-Appellees.*

On Appeal from United States District Court
for the Southern District of Illinois
Civil Case No. 11-CV-405-WDS (Honorable William D. Stiehl)

## BRIEF AND REQUIRED SHORT APPENDIX OF PLAINTIFFS-APPELLANTS

William N. Howard
FREEBORN & PETERS LLP
311 South Wacker Drive, Suite 3000
Chicago, IL 60606
(312) 360-6000; (312) 360-6596 Fax

Charles J. Cooper
David H. Thompson
Peter A. Patterson
COOPER AND KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
(202) 220-9600; (202) 220-9601 Fax

*Attorneys for Plaintiffs-Appellants*

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No:      **12-1788**

Short Caption:      **Mary E. Shepard, et al. v. Lisa M. Madigan, et al.**

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if his form is used.**

**[___]   PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

   **Mary E. Shepard; Illinois State Rifle Association**

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

   **Freeborn & Peters LLC**
   **Cooper & Kirk, PLLC**

(3) If the party or amicus is a corporation:

   i)   Identify all its parent corporations, if any; and

      **Illinois State Rifle Association - None**

   ii)   list any publicly held company that owns 10% or more of the party's or amicus' stock:

      **Illinois State Rifle Association - None**

---

Attorney's Signature**:   /s/ Charles J. Cooper_____**                    Date:  **April 11, 2012**

Attorney's Printed Name:  **Charles J. Cooper**

Please indicate if you are Counsel of Record for the above listed parties pursuant to Circuit Rule 3(d). Yes   **No  X**

Address:  **1523 New Hampshire Avenue NW, Washington DC  20036**

Phone Number:  **(202) 220-9660**                    Fax Number:  **(202) 220-9601**

E-Mail Address:  **ccooper@cooperkirk.com**

rev. 01/08 AK

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT

TABLE OF AUTHORITIES ........................................................................iv

JURISDICTIONAL STATEMENT .........................................................1

ISSUES PRESENTED .............................................................................1

STATEMENT OF THE CASE...................................................................2

    I.      INTRODUCTION……………………………………………….. 2

    II.     CHALLENGED PROVISIONS. ...................................................5

    III.    COURSE OF PROCEEDINGS AND DISPOSITION BELOW. ...........................7

STATEMENT OF THE FACTS .............................................................10

SUMMARY OF ARGUMENT ...............................................................11

STANDARD OF REVIEW......................................................................12

ARGUMENT .........................................................................................13

I.    FRAMEWORK FOR REVIEW. .............................................................13

    A.    *Heller* Mandates a Textual and Historical Analysis of Second
           Amendment Claims..............................................................13

    B.    Text and History Resolves this case Under *Ezell*. ..............................15

II.    FEDERAL COURTS ARE OBLIGED TO DECIDE PROPERLY PRESENTED
    SECOND AMENDMENT QUESTIONS EVEN IF THE SUPREME COURT HAS
    NOT YET ADDRESSED THEM..........................................................16

i

III.   THE SECOND AMENDMENT RIGHT TO BEAR ARMS EXTENDS BEYOND
       THE HOME.................................................................................21

       A.   Textual Analysis of the Second Amendment Refutes the District
            Court's Conclusion that the Right to Bear Arms is Confined to
            the Home. ......................................................................22

            1.   The operative clause of the Amendment guarantees—and
                 implicitly distinguishes between—"keeping" firearms in
                 one's home and "bearing" firearms.........................................22

            2.   The prefatory clause's reference to the militia confirms that
                 the right to bear arms included carrying firearms in public. ...26

       B.   The History of the Right to Bear Arms Refutes the District
            Court's Conclusion that the Right Is Confined to the Home. .............27

            1.   History confirms that the Second Amendment codified a
                 pre-existing right to armed self-defense both in the home
                 and in public...........................................................27

            2.   The Framers' goal of protecting private use of firearms for
                 hunting confirms that the Second Amendment codified a
                 pre-existing right to carry firearms outside the home. .............36

       C.   Heller's Discussion of Traditional Regulations of the Right to
            Bear Arms Refutes the District Court's Holding that the Right is
            Confined to the Home. ....................................................37

       D.   Heller's Discussion of Nineteenth Century Precedents on the
            Carrying of Concealed Firearms Refutes the District Court's
            Conclusion that the Right to Bear Arms is Confined to the Home.....42

V.    ILLINOIS'S TOTAL PROHIBITION ON THE RIGHT TO BEAR ARMS FOR SELF-
      DEFENSE OUTSIDE THE HOME IS CATEGORICALLY UNCONSTITUTIONAL. ......46

VI.   ILLINOIS'S TOTAL PROHIBITION ON THE RIGHT TO BEAR ARMS FOR SELF-
      DEFENSE OUTSIDE THE HOME IS UNCONSTITUTIONAL UNDER ANY LEVEL
      OF HEIGHTENED SCRUTINY...........................................................47

A.    Statutes That Infringe Fundamental Second Amendment
Rights Must Satisfy Strict Scrutiny. ...................................................48

B.    Illinois's Ban Fails Any Level of Heightened Scrutiny. .....................50

VII.   CONDITIONAL REQUEST FOR PRELIMINARY INJUNCTION. ...............................59

A.    The Plaintiffs Will Be Irreparably Harmed Unless
An Injunction Issues. ............................................................................60

B.    The Deprivation of Plaintiffs' Second Amendment
Rights Outweighs Any Speculative Harm to the Public
or the State of Illinois. .........................................................................61

CONCLUSION ...................................................................................................64

CERTIFICATE OF COMPLIANCE

REQUIRED SHORT APPENDIX

CIRCUIT RULE 30(d) STATEMENT

# TABLE OF AUTHORITIES

## Cases                                                                    Page

*Alden v. Maine*, 527 U.S. 706 (1999) ....................................................29

*Biblia Abierta v. Banks*, 129 F.3d 899 (7th Cir. 1997)............................12

*Bliss v. Commonwealth*, 2 Litt. 90, 92 (Ky. 1822) ................................32

*Bowers v. NCAA*, 475 F.3d 524 (3d Cir. 2007) .....................................20

*Burdick v. Takushi*, 504 U.S. 428 (1992).............................................49

*Cohens v. Virginia*, 19 U.S. 264 (1821)................................................20

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .................... *passim*

*Dred Scott v. Sandford*, 60 U.S. 393 (1857) .........................................35

*E.I. Du Pont de Nemours & Co. v. Train*, 430 U.S. 112 (1997)..............21

*Elrod v. Burns*, 427 U.S. 347 (1976) ....................................................60

*Ezell v. City of Chicago,* 651 F.3d 684 (7th Cir. 2011) ................... *passim*

*FCC v. Fox Television*, 129 S.Ct. 1800 (2009)........................................20

*Heller v. District of Columbia*, ___ F.3d ___, 2011 WL 4551558
    (D.C. Cir. Oct. 4, 2011) .................................................................16

*Houston v. City of New Orleans*, ___ F.3d ___, 2012 WL 834099
    (5th Cir. March 15, 2012) ..............................................................16

*Johnson v. Tompkins*, 13 F. Cas. 840 (CC Pa. 1833) ............................39

*King v. Dewhurst*, 1 St. Tr. 529 (Lancaster Assize 1820) ......................31

*Kolbe & Kolbe Health & Welfare Benefit Plan v. Med. College of Wisconsin*,
    657 F.3d 496 (7th Cir. 2011) ...........................................................12

*McDonald v. City of Chicago*, 130 S.Ct. 3020 (2010) ................... *passim*

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995) ....................57

*Moore v. Madigan*, No. 11-3134, 2012 WL 344760 (C.D. Ill. Feb. 3, 2012),
    *on appeal*, No. 12-1269 ................................................................ *passim*

*Muscarello v. United States*, 524 U.S. 125 (1998) ......................... *passim*

*Nunn v. State*, 1 Ga. 243 (1846)................................................26, 43, 44

*Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007)..............30

*Payton v. New York*, 455 U.S. 573 (1980) ................................................................39

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983).........48, 53

*Rex v. Knight*, 90 Eng. Rep. 330 (1686) ...................................................................30

*Roland Machinery Co. v. Dresser Industries*, 749 F.2d 380 (7th Cir. 1984) ..........62

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973) ..............................48

*Schick v. United States*, 195 U.S. 65 (1904) ............................................................29

*Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1996) ............................................17

*Stanley v. Georgia*, 394 U.S. 557 (1969) .................................................................39

*State v. Chandler*, 5 La. Ann. 489 (1850) .................................................................44

*State v. Reid*, 1 Ala. 612 (1840) ...........................................................................32, 44
*State v. Schoultz*, 25 Mo. 128, 155 (1857)................................................................32

*Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180 (1997) ............................................49

*United States v. Bloom*, 149 F.3d 649 (7th Cir. 1998)..............................................17

*United States v. Booker*, 375 F.3d 508 (7th Cir. 2004),
   *aff'd*, 543 U.S. 220 (2005) ..................................................................................20

*United States v. Emerson*, 270 F.3d 203 (5th Cir. 2001).........................................24

*United States v. Kaun*, 827 F.2d 1144 (7th Cir. 1987) .............................................12

*United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011)......................... *passim*

*United States v. Orito*, 413 U.S. 139 (1973)............................................................39

*United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) ........................16, 17, 21, 45

*United States v. Virginia*, 518 U.S. 515 (1996) .......................................................53

*United States v. Weaver*, No. 2:09-cr-00222, 2012 WL 727488
   (S.D. W. Va. Mar. 6, 2012)............................................................................19, 28

*Williams v. State*, 10 A.3d 1167 (Md. 2011) ...........................................................19

*Woollard v. Sheridan*, Civil No. L-10-2068, 2012 WL 695674
   (D. Md. Mar. 2, 2012).......................................................................... *passim*

*Wright v. United States*, 302 U.S. 583 (1938) .........................................................23

*Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985).........................49

## Statutes and Legislative Materials

U.S. CONST. amend. II ...............................................................................................1

U.S. CONST. amend. XIV ...................................................................1

18 U.S.C. § 922(g)(9)........................................................................51

28 U.S.C. § 1291 .................................................................................1

28 U.S.C. § 1331 .................................................................................1

28 U.S.C. § 2201 .................................................................................1

28 U.S.C. § 2202 .................................................................................1

42 U.S.C. § 1983 .................................................................................1

FED. R. APP. P. 4(a)(1)(A) ...................................................................1

FED. R. APP. P. 12(b)(6) ......................................................................1

430 ILCS 65/2....................................................................................63

430 ILCS 65/4....................................................................................63

430 ILCS 65/8....................................................................................63

720 ILCS 5/24-1.............................................................................2, 6

720 ILCS 5/24-1(a)(4) .........................................................................6

720 ILCS 5/24-1(a)(10) .......................................................................6

720 ILCS 5/24-1(b) ..............................................................................6

720 ILCS 5/24-1.6(d) ...........................................................................6

720 ILCS 5/24-2(a)-(b) ........................................................................7

720 ILCS 5/24-1.6...........................................................................2, 5

720 ILCS 5/24-1.6(a)(1) .......................................................................5

720 ILCS 5/24-1.6(a)(3)(A) ..................................................................5

720 ILCS 5/24-1.6(a)(3)(B) ..................................................................5

## **Other**

An Act for the Better Security of the Inhabitants, By Obliging the Male White
    Persons to Carry Fire Arms To Places of Public Worship (Ga. 1770)
    *in* A DIGEST OF THE LAWS OF THE STATE OF GEORGIA 157-58 (1800) ..............34

*Appendix A:  State Firearms Laws, in* STEPHEN P. HALBROOK, FIREARMS
    LAW DESKBOOK (West 2011) ........................................................42

1 BLACKSTONE COMMENTARIES................................................................29

2 BLACKSTONE COMMENTARIES (Christian ed., 1794)..............................................30

4 BLACKSTONE COMMENTARIES (St. George Tucker ed., 1803) .............................29

5 BLACKSTONE COMMENTARIES (St. George Tucker ed., 1803) .............................32

1 DOCUMENTARY OF HISTORY OF RECONSTRUCTION ................................................36

1 W. HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN 72 (1716) ....................29

2 J. KENT, COMMENTARIES ON AMERICAN LAW (O. Holmes ed., 12th ed. 1873)....45

BENJAMIN OGLE TAYLOE, IN MEMORIAM: ANECDOTES AND REMINISCENCES 95
    (Washington, D.C., 1872)......................................................................................33

CHARLES F. WELLFORD, JOHN V. PEPPER & CAROL V. PETRIE (eds.),
    FIREARMS AND VIOLENCE: A CRITICAL REVIEW 103 (2004) .............................58

2 COLLECTED WORKS OF JAMES WILSON 1142, at n.x (K. Hall & M. Hall
    eds., 2007) ..........................................................................................................31

DAVID MCCULLOUGH, JOHN ADAMS 177 (2001) ......................................................33

GARY KLECK & DON B. KATES, ARMED 222 (2001) .................................................58

H. Sterling Burnett, National Center for Policy Analysis, *Texas Concealed
    Handgun Carriers:  Law-Abiding Public Benefactors* 1 (2000), *available
    at* http://www.ncpa.org/pub/ba324 .....................................................................56

John Adams, *First Day's Speech in Defence of the British Soldiers Accused
    of Murdering Attucks, Gray and Others, in the Boston Riot of 1770,
    in* 6 MASTERPIECES OF ELOQUENCE 2569 (Hazeltine et al. eds. 1905)...............33

3 JAMES WILSON, WORKS OF THE HONORABLE JAMES WILSON 84-85 (1804) .........31

JOYCE LEE MALCOLM, TO KEEP AND BEAR ARMS 139 (1994)..................................34

*Legality of the London Military Foot-Association* (1780), *reprinted in*
    William Blizzard, Desultory Reflections on Police 59 (1785) ....................30

Philip J. Cook, Jens Ludwig, & Adam M. Samaha, *Gun Control After* Heller*:
    Threats and Sideshows from a Social Welfare Perspective*,
    56 U.C.L.A. L. REV. 1041 (2009) ................................................................54, 56

RICHARD FROTHINGHAM, LIFE AND TIMES OF JOSEPH WARREN 452
    (Boston: Little, Brown, & Co., 1865)................................................................33

Robert Hahn et al., *Firearms Laws and the Reduction of Violence: A
    Systematic Review,* 28 AM. J. PREV. MED. 40 (2005)....................................55, 63

*State v. Wash Lowe*, *reprinted in* New York Times, Oct. 26, 1866
(*quoted in* STEPHEN P. HALBROOK, FREEDMEN, THE FOURTEENTH
AMENDMENT, AND THE RIGHT TO BEAR ARMS, 1866-1876 (1998)....................34

Stephen P. Halbrook, *What the Framers Intended:  A Linguistic Analysis
of the Right to Bear Arms*, 49 L. & CONTEMP. PROBS. 151 (1986)..................57

THOMAS JEFFERSON, WRITINGS 816–17 (letter of August 19, 1785)
(Merrill D. Peterson ed., 1984) ..........................................................................33

## JURISDICTIONAL STATEMENT

Plaintiffs-Appellants ("Plaintiffs") challenge Illinois laws that prohibit carrying firearms for self-defense, and they seek declaratory and injunctive relief barring enforcement of those laws. *See* 42 U.S.C. § 1983; U.S. CONST. amends. II & XIV; 28 U.S.C. §§ 2201 & 2202. The district court had subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claim arises under federal law.

This Court has jurisdiction pursuant to 28 U.S.C. § 1291.  The appeal is from a final decision that disposed of all claims under Fed. R. Civ. P. 12(b)(6) for failure to state a claim and dismissed Plaintiffs' complaint.  The district court entered its decision on March 30, 2012.  Plaintiffs timely noticed this appeal on April 2, 2012.  *See* FED. R. APP. P. 4(a)(1)(A).

## ISSUES PRESENTED

Whether Illinois's wholesale ban on law-abiding citizens bearing firearms in public for self-defense violates the Second and Fourteenth Amendments to the United States Constitution.

## STATEMENT OF THE CASE

### I.   INTRODUCTION

Illinois is the *only* State in the Union that flatly forbids law-abiding citizens from carrying operable firearms in public for self-defense.  Two Illinois statutes—720 ILCS 5/24-1 (the "Unlawful Use of Weapons" law) and 720 ILCS 5/24-1.6 (the "Aggravated Unlawful Use of a Weapon" law)— impose a categorical ban on the carrying of operable firearms in public by law-abiding citizens who are otherwise qualified to possess them.  Illinois attempts to defend this ban as a public safety measure, asserting that mayhem would ensue if law-abiding citizens were licensed to bear weapons in public.  The district court below, however, did not address the State's defense, for it held that Plaintiffs' Second Amendment claim fails at the threshold:  the individual right to armed self defense applies only *within the home*, according to the district court, and Illinois thus has absolute discretion to ban carriage of firearms outside the home.

The district court's facially implausible decision cannot be reconciled with the Second Amendment's command that "the right of the people to keep and bear Arms shall not be infringed," a command that applies to Illinois by virtue of the Fourteenth Amendment.  *See McDonald v. City of Chi-*

2

*cago*, 130 S.Ct. 3020 (2010).  In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that questions involving the meaning of the Second Amendment are to be resolved "on the basis of both text and history," with the goal of determining "*the public understanding* of [the] legal text" at the time the Second Amendment right to bear arms was ratified. *Id.* at 595, 605 (original emphasis).   The text and history of the Second Amendment leave no doubt—none at all—that the individual right to armed self defense extends beyond the home.  "At the time of the Founding, as now, to 'bear' meant to 'carry,' " and therefore the Supreme Court has declared that "the natural meaning of 'bear arms' " is to " 'wear, bear, or carry … upon the person or in the clothing or in a pocket, for the purpose … of being armed and ready for offensive or defensive action in a case of conflict with another person.' " *Id*. at 584 (citations omitted).  The Court below thus plainly erred in holding that a law-abiding citizen has a right to bear arms only when moving from room to room within his home.

Nor can Illinois's categorical ban on bearing arms in public be sustained as a valid public safety measure.  *First*, as this Court has recognized, *Heller* and *McDonald* "suggest that broadly prohibitory laws restricting the core Second Amendment right … are *categorically* unconstitutional." *Ezell v.*

3

*City of Chicago,* 651 F.3d 684, 703 (7th Cir. 2011) (emphasis added).  The weighing of the supposed social costs of complying with the Second Amendment, as Illinois proposes, is simply inadmissible.  In *McDonald*, the Supreme Court expressly rejected judicial assessment of "the costs and benefits of firearms restrictions," spurning the suggestion that incorporating the Second Amendment would require the judiciary to make "difficult empirical judgments" about the efficacy of particular gun regulations. 130 S.Ct. at 3050 (plurality opinion).

*Second,* even if Illinois's carriage ban was not categorically unconstitutional, the State at a minimum would have to meet a standard of proof that has been described by this Court as "rigorous, … if not quite 'strict scrutiny.' " *Ezell*, 651 F.3d at 708.  Under this standard, the State "must demonstrate" that the bearing of firearms in public by law-abiding citizens "creates such genuine and serious risks to public safety that prohibiting" the carrying of operable firearms by *any and all* such citizens "is justified." *Id.* at 709.  The inconvenient truth that every other State in the nation allows some form of public carriage of firearms by at least some private, law-abiding citizens—and does so without fostering the mayhem forecast by the Defendants here—gives the lie to Illinois's pleas that firearms in the

4

hands of any and all law-abiding citizens are uniquely a threat to public

safety in this State, even if nowhere else in America.

## II.    CHALLENGED PROVISIONS.

Taken together, the provisions challenged in this action ban the car-

riage in public of operable firearms anywhere in the State of Illinois.  The

provision with the broadest scope is in Illinois's Aggravated Unlawful Use

of a Weapon law, codified at 720 ILCS 5/24-1.6, which prohibits a person

from "[c]arr[ying] on or about his or her person…any…firearm [if]…the

firearm possessed [is] uncased, loaded and immediately accessible at the

time of the offense; or…the firearm possessed [is] uncased, unloaded and

the ammunition for the weapon [is] immediately accessible at the time of

the offense."  720 ILCS 5/24-1.6(a)(1), (a)(3)(A)&(B).[1]  The prohibition does

not apply to a person "on his or her land or in his or her legal dwelling, or

fixed place of business, or on the land or in the legal dwelling of another

person as an invitee with that person's permission," *id.* 5/24-1.6(a)(1), but it

plainly bars public carriage of an operable (*i.e.*, loaded or readily loadable)

firearm anywhere in the State of Illinois.

---

[1] Relevant parts of the challenged statues are reproduced at SA-42.

The remaining challenged provisions add up to a similarly broad prohibition.  Subject to the same carve-outs as the Aggravated Unlawful Use of a Weapon law, the Unlawful Use of Weapons law, codified at 720 ILCS 5/24-1, prohibits an individual from carrying a firearm (a) "concealed on or about his or her person" and (b) "on or about his or her person" – whether concealed or not – "upon any public street, alley, or other public lands within the corporate limits of a city, village, or incorporated town." *Id.* 5/24-1(a)(4)&(10).[2]  These prohibitions apply even if a weapon is unloaded with no accessible ammunition.  *Id.*[3]

A first-time violation of the Unlawful Use of Weapons law is a Class A misdemeanor, and a repeat offense is a Class 3 felony.  *Id.* 5/24-1(b).  A first-time violation of the Aggravated Unlawful Use of a Weapon law is a Class 4 felony, and a repeat offense (or an offense by a convicted felon) is a Class 2 felony carrying a mandatory minimum 3-year prison sentence.  *Id.*

---

[2] The latter provision contains an additional carve-out for a person who is "an invitee thereon or therein, for the purpose of the display of such weapon or the lawful commerce in weapons."  *Id.* 5/24-1(a)(10).

[3] For the law not to apply, a firearm must be "broken down in a non-functioning state; … not immediately accessible; or … unloaded and enclosed in a container by a person who has been issued a currently valid Firearm Owner's Identification card."  *Id.*

5/24-1.6(d).  (Hereinafter, these provisions are collectively referred to as the "Illinois Gun Carry Ban.")

Individuals acting in certain capacities, *e.g.*, as a peace officer or soldier, are exempt from the Illinois Gun Carry Ban, as are individuals engaging in certain activities such as shooting at a shooting range or hunting with a hunting license.  *See id.* 5/24-2(a)-(b).  There is no exemption, however, for law-abiding individuals who wish to carry firearms for self-defense.

## III.   COURSE OF PROCEEDINGS AND DISPOSITION BELOW.

Plaintiffs filed this action on May 13, 2011, contending that the Illinois Gun Carry Ban violates the Second Amendment, as incorporated against the states by the Fourteenth Amendment.  Plaintiffs sought a declaration that the ban is unconstitutional and an injunction prohibiting its enforcement.  On July 8, Plaintiffs filed a motion for preliminary and/or permanent injunctive relief.  The Defendants moved to dismiss the case on July 22, and Plaintiffs moved for summary judgment on August 8.

The district court resolved each of these motions on March 30, 2012, disposing of them in a single ruling because "the issues [raised by the motions were] basically identical and [could] be resolved together."  SA-4.

The district court began its analysis by discussing *Heller* and *McDonald*. Those cases, the district court recognized, found that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation," "stated that the inherent right of self-defense has been central to the Second Amendment right," and directed "that the scope of the Second Amendment right is determined by textual and historical inquiry." SA-11-13 (quotation marks omitted).

Turning to the historical analysis mandated by *Heller* and *McDonald*, the district court concluded that its "review of relevant history is such that the Court cannot find that history supports plaintiffs' claim that the Second Amendment *necessarily* extends the right to bear arms to the unfettered right to carry weapons in public." SA-14 (emphasis in original). The district court framed the issue incorrectly, however, for Plaintiffs have never claimed that the Second Amendment guarantees an "unfettered right to carry weapons in public." In any event, the district court did not itself discuss the relevant history; it instead "adopt[ed], but [did] not repeat, [the Central District of Illinois's] review of the historical approach to the Second Amendment rights raised here" in *Moore v. Madigan*, a recent decision upholding the validity of the Illinois Gun Carry Ban. SA-14 n.7 (citing

8

*Moore v. Madigan*, No. 11-3134, 2012 WL 344760, at *5 (C.D. Ill. Feb. 3, 2012)). *Moore*, however, focused on case law, not history. It concluded that the Second Amendment does not "protect[] a general right to carry guns that includes a right to carry operable guns in public" because, in the court's view, "neither the United States Supreme Court nor any United States Court of Appeals has recognized such a right." *Moore*, 2012 WL 344760, at *5; *see also id.* at *11 ("The absence of any controlling authority which finds that the UUW or AUUW statutes violate the Second Amendment prevents Plaintiffs from showing any likelihood of success on the merits.").

The court below then proceeded to discuss the standard of review. SA-16-18. Citing *Ezell*, the district court held that the State must satisfy intermediate scrutiny. And although the court found that Illinois has a substantial interest in "safeguarding the welfare of the public at large from the inherent dangers in a loaded firearm," SA-17, it did not address whether the Illinois Gun Carry ban is reasonably related to that interest. Instead, the district court held that Plaintiffs had not "raised a cognizable Second Amendment claim" at all. *Id.* "This court is persuaded that neither *Heller*

9

nor *McDonald* requires the State of Illinois to extend the right to possess

and carry a firearm to the area outside the home." SA-18

The court thus held that the Illinois Gun Carry Ban is constitutional

and accordingly granted Defendants' motion to dismiss, dismissed the

complaint, and denied Plaintiffs' motions for a preliminary and/or perma-

nent injunction and summary judgment. SA-19.

On April 2, 2012, Plaintiffs filed a timely notice of appeal.

## STATEMENT OF THE FACTS

On September 28, 2009, 69-year-old Mary Shepard was unarmed and

working at the First Baptist Church in Anna, Illinois. SA-21, ¶ 12. At 3:00

p.m., a man broke into the church and beat Ms. Shepard and another elder-

ly woman nearly to death. SA-21-22, ¶¶ 12-15. Ms. Shepard sustained

four skull fractures, multiple fractures of her face, shattered teeth, a con-

cussion, crushed vertebrae, two torn rotator cuffs, and a mangled arm. SA-

21-22, ¶ 13. She has lost the hearing in her left ear and now suffers blind-

ing recurrent headaches. SA-22, ¶ 14.

Ms. Shepard has a valid Illinois Firearms Owner Identification ("FO-

ID") Card and has no criminal record. SA-21, ¶ 3. She has completed no

fewer than five firearms safety and self-defense courses and is licensed to

carry a handgun in both Pennsylvania and Florida.  SA 20-21,  ¶¶ 4, 6, 8.

But Illinois law prohibits Ms. Shepard from carrying an operable firearm in

public for her own protection.  Forty-nine states recognize some form of

self-defense carriage, whether through the granting of permits or other-

wise; Illinois alone refuses to allow its citizens the right of armed self-

defense in public.  SA-21, ¶ 5.

The Illinois State Rifle Association is also a plaintiff in this case.  The

organization has many members who are legally qualified to possess fire-

arms and who, like Ms. Shepard, would carry firearms in public for per-

sonal protection but for the Illinois Gun Carry Ban.  SA-41, ¶ 5.

## SUMMARY OF ARGUMENT

1.  The Supreme Court's decision in *Heller* instructs that Second

Amendment claims are to be evaluated in light of the constitutional text

and the historical practices of the American people at the founding.  Tex-

tual and historical analysis also suffices to resolve this case under this

Court's decision in *Ezell*.

2.  The textual and historical analysis mandated by *Heller* demon-

strates that the fundamental right to carry a firearm for self-defense ex-

tends to carrying an operable gun in public.  Illinois's flat ban on such bear-

11

ing of arms, and its criminalization of such acts as a felony, therefore violate the Second Amendment, incorporated against the States through the Fourteenth Amendment.

3. If this Court decides that a levels-of-scrutiny analysis is appropriate, strict scrutiny should apply. But in any event, Illinois's ban cannot meet any form of heightened constitutional scrutiny, much less strict scrutiny.

## STANDARD OF REVIEW

This Court reviews the "grant of a motion to dismiss for failure to state a claim *de novo*." *Kolbe & Kolbe Health & Welfare Benefit Plan v. Medical College of Wisconsin*, 657 F.3d 496, 502 (7th Cir. 2011). This Court also reviews "a district court's decision to grant or deny summary judgment *de novo*." *Biblia Abierta v. Banks*, 129 F.3d 899, 902 (7th Cir. 1997). Legal conclusions underlying the denial of a preliminary or a permanent injunction are likewise subject to *de novo* review. *See United States v. Kaun*, 827 F.2d 1144, 1148 (7th Cir. 1987) ("When we review the grant or denial of a preliminary or permanent injunction … the necessary legal conclusions are given *de novo* review.") (quotation marks omitted).

# ARGUMENT

## I.    FRAMEWORK FOR REVIEW.

### A.    *Heller* Mandates a Textual and Historical Analysis of Second Amendment Claims.

In *Heller,* the United States invited the Supreme Court to forego a "categorical approach" to Second Amendment claims in favor of a multi-tiered standard of review "that balances the impact of the challenged restrictions on protected conduct and the strength of the government's interest in enforcement of the relevant restriction."  *See* Brief for the United States as *Amicus Curiae* at 27, *Heller*, No. 07-290 (Jan. 2008); *see also id.* at 8-9, 22-28. But the Supreme Court spurned that invitation and instead decided the case solely "on the basis of both text and history."  *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008).  *See also id.* at 626-27.  The historical inquiry involves "examination of a variety of legal and other sources to determine *the public understanding* of [the] legal text," *id.* at 605 (original emphasis), with particular stress on the understanding of the Second Amendment dur-

ing "the founding period." *Id*. at 604.[4] "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*, whether or not future legislatures or (yes) even future judges think that scope too broad." *Id*. at 634-35 (emphasis added). Therefore, as this Court has noted, "*Heller* focused almost exclusively on the original public meaning of the Second Amendment, consulting the text and relevant historical materials to determine how the Amendment was understood at the time of ratification." *Ezell v. City of Chicago,* 651 F.3d 684, 700 (7th Cir. 2011).

Similarly, in *McDonald v. City of Chicago*, 130 S.Ct. 3020 (2010), the controlling opinion reaffirmed that the original public meaning of the text of the Amendment controls, not any judicially created "interest-balancing test," by expressly rejecting the suggestion that incorporating the Second Amendment against the States "will require judges to assess the costs and benefits of firearms restrictions and thus to make difficult empirical judgments in an area in which they lack expertise." *Id*. at 3050 (plurality).

---

[4] The Chief Justice, a member of the *Heller* majority, remarked during oral argument that any inquiry into levels of scrutiny would have been both atextual and unhelpful. *See* Tr. of Oral Argument at 44, *Heller*, No. 07-290. Rather, the focus should be on "restrictions that existed at the time the [Second] Amendment was adopted" and "lineal descendants" of such restrictions. *Id.* at 77.

**B.**    **Text and History Resolves this case Under** *Ezell***.**

Text and history also suffices to resolve this case under *Ezell*.  In *Ezell*,

this Court established a two-step framework for reviewing Second

Amendment claims.  The first step consists of "textual and historical in-

quiry into original meaning" to determine whether a challenged law re-

stricts activity within the Second Amendment's scope.  *Ezell*, 651 F.3d at

701.[5]  The second step consists of "evaluat[ing] the regulatory means the

government has chosen and the public-benefits end it seeks to achieve."  *Id.*

at 703.

*Ezell*'s second step is unnecessary, however, when, as here, the statu-

tory restriction at issue flatly bans protected conduct.  Indeed, consistent

---

[5] *Ezell* states that "the Second Amendment's scope as a limitation on
the States depends on how the right was understood when the Fourteenth
Amendment was ratified" in 1868.  *Id.* at 702.  But *McDonald* held "that the
Second Amendment right is *fully applicable* to the States," *McDonald v. City
of Chicago*, 130 S.Ct. 3020, 3035 (2010) (emphasis added), and *Heller* instructs
that the scope of this right was established when it was ratified in 1791, *see
District of Columbia v. Heller*, 554 U.S. 570,  634-35 (2008).  This distinction is
ultimately immaterial here:  Both in 1791 and in 1868, the Second Amend-
ment right to bear arms plainly was understood to include the right to car-
ry firearms in public for self-defense.

with our analysis above, this Court recognized that "[b]oth *Heller* and *McDonald* suggest that broadly prohibitory laws restricting the core Second Amendment right … are categorically unconstitutional." *Id.* Thus, under *Heller*, *McDonald*, and *Ezell* judicial review of Illinois's total ban on bearing arms for self-defense in public will not require exploration of what this Court has dubbed the " 'levels of scrutiny' quagmire." *United States v. Skoien*, 614 F.3d 638, 641-42 (7th Cir. 2010) (*en banc*).[6]

## II.   FEDERAL COURTS ARE OBLIGED TO DECIDE PROPERLY PRESENTED SECOND AMENDMENT QUESTIONS EVEN IF THE SUPREME COURT HAS NOT YET ADDRESSED THEM.

In *Heller*, the Supreme Court concluded (a) that the Second Amendment "guarantee[s] the individual right to possess *and carry* weapons in case of confrontation, 554 U.S. at 592 (emphasis added); (b) that the "core" or "central component" of this right is "self-defense," *id.* at 599, 630; and (c) that the right is "enshrined with the scope [it was] understood to have

_____

[6] Indeed, under *Heller* and *McDonald* all Second Amendment cases, not just those involving broadly prohibitory laws, are to be resolved on the basis of text and history and without recourse to means-ends scrutiny.  *See Heller v. District of Columbia*, ___ F.3d ___, 2011 WL 4551558, at *22-*35 (D.C. Cir. Oct. 4, 2011) (Kavanaugh, J., dissenting); *Houston v. City of New Orleans*, ___ F.3d ___, 2012 WL 834099, at *6 (5th Cir. Mar. 15, 2012) (Elrod, J., dissenting).  But because this case *does* concern a broadly prohibitory law, any tension between the Supreme Court's approach and *Ezell*'s second step is immaterial here.

when the people adopted [it]," *id.* at 634-35. Each of these conclusions was
essential to the *Heller* Court's decision to strike down D.C.'s handgun ban,
and thus each of these conclusions is binding on lower courts. *See Seminole*
*Tribe of Fla. v. Florida*, 517 U.S. 44, 67 (1996) ("When an opinion issues for
the Court, it is not only the result but also those portions of the opinion ne-
cessary to that result" that are binding.); *United States v. Bloom*, 149 F.3d
649, 653 (7th Cir. 1998) (a statement that "explains the Court's rationale" is
"part of the holding").

 *Heller*, then, leaves no doubt that the Second Amendment protects the
individual right to carry a firearm for self-defense and that the scope of this
right is to be determined by a textual and historical analysis aimed at iden-
tifying original understanding. And while *Heller* did not purport to "un-
dertake an exhaustive historical analysis … of the full scope of the Second
Amendment" right to carry, it made unmistakably clear that the right ex-
tends beyond the home. For example, the Court noted that "nothing in our
opinion should be taken to cast doubt on … laws forbidding the carrying of
firearms *in sensitive places such as schools or government buildings*," and that
the right was valued not just for self defense but also for "hunting." *Id.* at
599, 626; *see Skoien*, 614 F.3d at 641 (recognizing "Supreme Court's entitle-

17

ment to speak through its opinions as well as through its technical hold-ings"). At any rate, at a bare minimum a court confronted with a Second Amendment claim is duty-bound to perform the textual and historical analysis that is necessary to resolve that claim.

The court below, however, rejected Plaintiffs' claim without examin-ing the text of the Second Amendment or citing a single primary historical source bearing on the issue, *see* SA-14-16, although the relevant history was briefed extensively by Plaintiffs below, *see, e.g.*, Doc. No. 21 at 3-13; Doc. No. 40 at 7-13. Rather, the court simply followed the Central District of Il-linois's recent decision in *Moore v. Madigan* rejecting a Second Amendment challenge to the Illinois Gun Carry Ban. *See* SA-14 n.7.

*Moore*, in turn, is also bereft of meaningful textual and historical analysis. Rather, it continues a disturbing trend of post-*Heller* decisions es-sentially confining *Heller* to its facts, and simply refusing to analyze consti-tutional issues left open by the Court in that landmark decision. The dis-trict court's ruling in *Moore* reduces to a single, peremptory sentence: "Be-cause the Supreme Court has not recognized such a right [to bear firearms outside the home], the [Illinois Gun Carry Ban] does not violate the Second Amendment as defined by the Supreme Court." *Moore v. Madigan*, No. 11-

3134, 2012 WL 344760, at *10 (C.D. Ill. Feb. 3, 2012), *on appeal*, No. 12-1269.[7]

By construing *Heller* in a forced and artificially narrow manner and openly refusing to engage in the textual and historical analysis it plainly prescribes, these lower court decisions give rise to a concern that the Second Amendment is being "singled out for special—and specially unfavorable— treatment."   *McDonald*, 130 S.Ct. at 3043. Certainly, it is difficult to imagine any other provision of the Bill of Rights, or any other Supreme Court decision construing such a provision, being met with such massive judicial resistance in the lower federal courts.

---

[7] *See also United States v. Masciandaro*, 638 F.3d 458, 475 (4th Cir. 2011) (declining to decide "whether and to what extent the Second Amendment right recognized in *Heller* applies outside the home" absent further "guidance from the nation's highest court"); *Williams v. State*, 10 A.3d 1167, 1178 (Md. 2011) ("If the Supreme Court … meant its holding [in *Heller* and *McDonald*] to extend beyond home possession, it will need to say so more plainly."); *Jennings v. McCraw*, No. 5:10-cv-00141-C, Doc. No. 82 at 11 (N.D. Tex. Jan. 19, 2012) ("Absent further guidance from controlling authority, the Court is unwilling to expound upon the meaning of the Second Amendment beyond the parameters previously recognized by the Supreme Court."), *on appeal* No. 12-10091 (5th Cir.); *see also Moore*, 2012 WL 344760 at *7 (collecting post-*Heller* cases).  *But see United States v. Weaver*, No. 2:09-cr-00222, 2012 WL 727488, at *4 (S.D. W. Va. March 6, 2012) ("The fact that courts may be reluctant to recognize the protection of the Second Amendment outside the home says more about the courts than the Second Amendment."); *Woollard v. Sheridan*, Civil No. L-10-2068, 2012 WL 695674, at *5-7 (D. Md. Mar. 2, 2012); *Bateman v. Perdue*, No. 5:10-cv-265-H, Doc. No. 87 at 9-11 (E.D.N.C. Mar. 29, 2012).

Moreover, these post-*Heller* decisions, we are constrained to say, abdicate the role of the federal judiciary, which is not permitted to "avoid a measure because it approaches the confines of the constitution. … With whatever doubts, with whatever difficulties, a case may be attended, we must decide it, if it be brought before us. … Questions may occur which we would gladly avoid; but we cannot avoid them." *Cohens v. Virginia*, 19 U.S. 264, 404 (1821). *See also Bowers v. NCAA*, 475 F.3d 524, 550 (3d Cir. 2007 ) (because the court was "squarely presented with [a] constitutional question," it was "obliged to enter the fray"); *Woollard*, 2012 WL 695674, at *5 ("Woollard has squarely presented the question [of whether Maryland's broad restriction on handgun possession outside the home burdens any Second Amendment right], and resolution of his case requires an answer.").

In particular, it is precisely the job of the lower federal courts to consider issues of law in the first instance. The Supreme Court is the tribunal of *last* resort, "not of first view," and that Court does not "rush to judgment without a lower court opinion." *FCC v. Fox Television*, 129 S.Ct. 1800, 1819 (2009). "When the Supreme Court says that it is not resolving an issue, it perforce confides the issue to the lower federal courts for the first pass at

resolution." *United States v. Booker*, 375 F.3d 508, 513 (7th Cir. 2004), *aff'd*, 543 U.S. 220 (2005).  As Judge Niemeyer of the Fourth Circuit explained, in dissenting in one of the post-*Heller* decisions cited above, "we cannot duck the issue. … [A]pplication of the broader Second Amendment right discussed in *Heller* to factual settings outside the home involves precisely the kind of 'difficult issue[]' the Supreme Court prefers to 'mature through full consideration by the courts of appeals.' " *Masciandaro*, 638 F.3d at 468 n.* (quoting *E.I. Du Pont de Nemours & Co. v. Train,* 430 U.S. 112, 135 n.26 (1977)).

## III.   THE SECOND AMENDMENT RIGHT TO BEAR ARMS EXTENDS BEYOND THE HOME.

As this Court has recognized, *Heller* and *McDonald* did not purport to provide a comprehensive field guide to every aspect of the Second Amendment's scope.  *Skoien*, 614 F.3d at 640.  *See also Heller*, 554 U.S. at 626, 635.  "[K]eeping operable handguns at home for self-defense" is but "one" of the "individual rights" guaranteed by the Second Amendment.  *Skoien*, 614 F.3d at 640.  "What other entitlements the Second Amendment creates, … were left open." *Id.*  This obvious and indisputable fact is what renders so inexplicable the plainly mistaken assertions made by the district court in

21

*Moore v. Madigan*, and adopted by the court below, SA-14 n.7, that *Heller* supposedly "warned courts not to extend" its Second Amendment analysis and "cautioned courts not to expand on its limited holding." 2012 WL 344760, at *6, *11.   As this Court noted in *Ezell*, although "[i]t's true that Second Amendment litigation is new, and [the challenged law] is unlike any firearms law that has received appellate review since *Heller* … that doesn't mean we are without a framework for how to proceed." 651 F.3d at 700.   The task of the lower federal courts is "to follow the Court's lead in resolving questions about the scope of the Second Amendment by consulting its original public meaning."  *Id*. at 702.   And compelling insights into the "original public meaning" of the Second Amendment's right to bear arms outside the home may be found in *Heller* itself.

### A.   Textual Analysis of the Second Amendment Refutes the District Court's Conclusion that the Right to Bear Arms is Confined to the Home.

#### 1.   *The operative clause of the Amendment guarantees — and implicitly distinguishes between — "keeping" firearms in one's home and "bearing" firearms.*

The substance of the Second Amendment right reposes in the twin verbs of the operative clause:  "the right of the people to *keep* and *bear* Arms shall not be infringed."  (Emphasis added).  If this assured only the right to

possess firearms in one's home, as the court below held, SA-18, a right to "keep" arms—that is, to "have weapons"—would have been sufficient and there would have been no reason for the Framers to include an explicit guarantee of the right to "bear" arms as well. *Heller*, 554 U.S. at 581-82. Yet, "the founding generation 'were for every man bearing his arms about him *and* keeping them in his house, his castle, for his own defense.' " *Id.* at 616 (emphasis added).[8]  The Supreme Court therefore concluded that " 'to bear arms implies something more than the mere keeping.' "  *Id*. at 617 (citation omitted); *see also Ezell,* 651 F.3d at 704.

Limiting Second Amendment rights to the home would effectively read the term "bear" out of the Constitution.  The explicit guarantee of the right to "bear" arms would mean little if it did not protect the right to "bear" arms outside of the home where they are "kept."  The most fundamental canons of construction forbid any interpretation that would relegate this language to the status of meaningless surplus.  *See, e.g., Wright v. United States*, 302 U.S. 583, 588 (1938). The courts are not free to ignore the

---

[8] The Court was quoting a statement of Sen. Davis regarding the Freedmen's Bureau Act.

Second Amendment's unmistakable distinction between the people's right of "keeping" arms and "bearing" them.

As the Court explained in *Heller*, "[a]t the time of the Founding, as now, to 'bear' meant to 'carry,' " and "[w]hen used with 'arms,' ... the term has a meaning that refers to carrying for a particular purpose—confrontation." 554 U.S. at 584. *See also Woollard*, 2012 WL 695674, at *6. Accordingly, the Supreme Court concluded that the Second Amendment "guarantee[s] the individual right to ... carry weapons in case of confrontation." *Heller*, 554 U.S. at 592. *See also id.* at 590 ("carrying weapons for potential violent confrontation"). Relying on prior authority interpreting federal firearms statutes, *Heller* stressed that "the natural meaning of 'bear arms' " is to " 'wear, bear, or carry ... upon the person or in the clothing or in a pocket, for the purpose ... of being armed and ready for offensive or defensive action in a case of conflict with another person.' " *Id.* at 584 (quoting *Muscarello v. United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting) (quoting BLACK'S LAW DICTIONARY); *see also United States v. Emer-*

*son*, 270 F.3d 203, 232 (5th Cir. 2001) (adopting this definition of bearing arms from *Muscarello*).[9]

One irrefutable implication of this right to armed self-defense is the right to carry firearms outside the home for training purposes.  As this Court recognized in *Ezell*, "[t]he right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that makes it effective." 651 F.3d at 704 (enjoining Chicago's ban on firing ranges).  *See also Heller*, 554 U.S. at 616, 617-18 ("[T]o bear arms … implies the right to meet for voluntary discipline in arms, observing in doing so the laws of public order."); *id.* at 619 ("No doubt, a citizen who keeps a gun or pistol under judicious precautions, practices in safe places the use of it, and in due time teaches his sons to do the same, exercises his individual right.") (quotation marks and citations omitted).

---

[9] The definition of bearing arms that *Heller* adopted from *Muscarello* has long commanded widespread support among the Justices of the Supreme Court.  The opinion in *Muscarello* from which *Heller* quoted was written by Justice Ginsburg and joined by the late Chief Justice Rehnquist and Justices Scalia and Souter.  And the authors of the two dissenting opinions in *Heller*, Justices Stevens and Breyer, embraced this definition as a *subset* of the activity described by the phrase "carrying of arms" when they joined the opinion of the Court in *Muscarello*.  *See* 524 U.S. at 130-32.

The plain language of the Second Amendment is thus irreconcilable with the facially implausible notion that the founding generation meant to guarantee a right to bear arms only within the walls of one's home.

> 2.  *The prefatory clause's reference to the militia confirms that the right to bear arms included carrying firearms in public.*

The Second Amendment's "prefatory" clause cements this interpretation of the right to bear firearms.  The prefatory clause "announces the purpose for which the right was codified: to prevent elimination of the militia" by ensuring that the citizenry could never be disarmed by the government.  *Heller*, 554 U.S. at 599.[10]  A right to bear arms limited to the home would be ill-suited to the Founders' purpose of "rearing up and qualifying a well-regulated militia," for if citizens could be prohibited from carrying arms in public, they would be disabled from serving as a militia.  The Rev-

---

[10] The *Heller* Court praised a 19th-century decision of the Georgia Supreme Court for "perfectly captur[ing] the way in which the operative clause of the Second Amendment furthers the purpose announced in the prefatory clause." 554 U.S. at 612-13 (citing *Nunn v. State*, 1 Ga. 243, 251 (1846) (emphasis omitted) ("the right of the whole people … to keep and bear arms of every description, and not such merely as are used by the militia, shall not be infringed, curtailed, or broken in upon, in the smallest degree; and all this for the important end to be attained:  the rearing up and qualifying a well-regulated militia, so vitally necessary to the security of a free State").

olution was not fought in the colonists' kitchens and living rooms; when

the Minutemen answered the call to arms on April 19, 1775, they met the

Redcoats on the village green in Lexington and at North Bridge in Con-

cord.  The home-bound right to bear arms found by the district court below

would not have permitted even militia training, let alone active service.

Militia membership, formation drills, and firearms practice are not "house-

hold activit[ies]." *Woollard*, 2012 WL 695674, at *6; *Masciandaro*, 638 F.3d at

468 (Niemeyer, J., concurring) ("membership in a militia" is not "a home-

bound activity").

**B.     The History of the Right to Bear Arms Refutes the District Court's Conclusion that the Right Is Confined to the Home.**

> 1.      *History confirms that the Second Amendment codified a pre-existing right to armed self-defense both in the home and in public.*

The core of the Second Amendment is the right of law-abiding citi-

zens to bear firearms for their own protection:  "self-defense" is the "*central*

*component* of the right itself."  *Heller*, 554 U.S. at 599 (original emphasis).

*See also id.* at 628 ("the inherent right of self-defense has been central to the

Second Amendment right"); *id.* at 630 ("core lawful purpose of self-

defense").  "Because self-defense has to take place wherever [a] person

happens to be, it follows that the right extends to public areas beyond the home." *Masciandaro,* 638 F.3d at 468 (Niemeyer, J., concurring) (quotation marks and citation omitted); *see also* Woollard, 2012 WL 695674, at *6; *Bateman*, Doc. No. 87 at 9-11; *Weaver*, 2012 WL 727488, at *4. History bears out this common-sense conclusion.

The Second Amendment did not create a new right—it "codified a *pre-existing*" one. *Heller*, 554 U.S. at 592 (emphasis in original). By the time our Constitution was written, the common-law right to bear arms "had become fundamental for English subjects" and was "understood to be an individual right protecting against both *public* and private violence." *Id.* at 593-94 (emphasis added). By this logic the Supreme Court recognized that the right of armed self-defense "extend[s] … in some form to wherever a person could become exposed to public or private violence." *Masciandaro,* 638 F.3d at 467 (Niemeyer, J., concurring). It is hardly surprising that the Second Amendment's right to bear arms extends, at least in some form and to some degree, outside the home, "just as other Amendments apply generally to protect other individual freedoms" in the public arena. *Id.*

The public scope of the right to bear arms for self-defense is apparent from the various editions of Blackstone's Commentaries. *Heller* reaffirmed

the Court's recognition that "Blackstone's … works … 'constituted the preeminent authority on English law for the founding generation.' "  554 U.S. at 593-94 (quoting *Alden v. Maine*, 527 U.S. 706, 715 (1999)); *see also Schick v. United States*, 195 U.S. 65, 69 (1904) ("Blackstone's Commentaries are accepted as the most satisfactory exposition of the common law of England.").  At common law, the right to arms was "a public allowance … of the natural right of resistance and self-preservation; when the sanctions of society and laws are found insufficient to restrain the violence of oppression."  1 BLACKSTONE COMMENTARIES *139.  As a corollary, "the subjects of England [were] entitled … to the right of having and using arms for self-preservation and defence."  *Id*. at *140.  Inasmuch as threats to one's security and property were at least as likely to occur in the public square as in the privacy of one's dwelling, a right to arms limited to the home would have been insufficient to meet its high purposes.  Hence, the common law recognized that there is "no Reason why a Person, who without Provocation, is assaulted by another *in any Place whatsoever*, in such a Manner as plainly shews an Intent to murder him, … may not justify killing such an Assailant." 1 W. HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN 72 (1716) (emphasis added); *see also* 4 BLACKSTONE COMMENTARIES *184 (at common law

the "right of natural defence" could be "legally exercise[d]" whenever "certain and immediate suffering would be the consequence of waiting for the assistance of the law").

By the late 17th century, the English courts recognized that it was the practice and privilege of "gentlemen to ride armed for their security." *Rex v. Knight*, 90 Eng. Rep. 330 (1686).  A century later, the Recorder of London— a judge and "the foremost legal advisor to the city," *Parker v. District of Columbia*, 478 F.3d 370, 382 n.8 (D.C. Cir. 2007)—opined that "the right of his majesty's Protestant subjects, to have arms for their own defense, and to use them for lawful purposes, is most clear and undeniable." *Legality of the London Military Foot-Association* (1780), *reprinted in* William Blizzard, Desultory Reflections on Police 59, 59 (1785).  These "lawful purposes, for which arms may be used," plainly were not limited to the home, for they included "immediate self-defence, … suppression of violent and felonious breaches of the peace, and assistance of the civil magistrate in the execution of the laws, and the defence of the kingdom against foreign invaders." *Id*. at 63. Edward Christian, a law professor at Cambridge, published an edition of Blackstone in which he noted that "every one is at liberty to keep or carry a gun, if he does not use it for the destruction of game."  2 BLACKSTONE

COMMENTARIES *411-12 n.2 (Christian ed., 1794).  And in 1820 an English
court explained that a "man has a clear right to protect himself [with arms]
when he is going singly or in a small party upon the road where he is trav-
eling or going for the ordinary purposes of business." *King v. Dewhurst*, 1
St. Tr. 529, 601-02 (Lancaster Assize 1820).

Early State constitutions confirmed that the right to bear arms ex-
tended into the public square and boulevards.  For example, "Justice James
Wilson interpreted the Pennsylvania Constitution's arms-bearing right …
as a recognition of the natural right of defense 'of one's person *or* house,' "
demonstrating that the right of "bearing arms" in defense of the person
was understood to extend beyond the home.  *Heller,* 554 U.S. at 585 (quot-
ing 2 COLLECTED WORKS OF JAMES WILSON 1142, at n.x (K. Hall & M. Hall
eds., 2007)) (emphasis added).[11]  Indeed, "[n]ine state constitutional provi-
sions written in the 18th century or the first two decades of the 19th … en-

---

[11] Like Blackstone, Justice Wilson emphasized the abiding link be-
tween the right to bear arms and the natural right of self-preservation:
"Homicide is enjoined, when it is necessary for the defence of one's person
or house.  With regard to the first, it is the great natural law of self-
preservation, which … cannot be repealed, or superseded, or suspended by
any human institution.  This law, however, is expressly recognized in the
constitution of Pennsylvania.  'The right of the citizens to bear arms in de-
fence of themselves shall not be questioned.' "  3 JAMES WILSON, WORKS OF
THE HONOURABLE JAMES WILSON 84-85 (1804).

shrined a right of citizens to 'bear arms in defense of themselves and the state' or 'bear arms in defense of himself and the state.' " *Heller*, 554 U.S. at 584-85 & n.8.  Just as "it is clear from those formulations that 'bear arms' did not refer only to carrying a weapon in an organized military unit," *id.* at 585, it is likewise clear that "bear arms" did not refer only to toting a weapon from room to room in one's house.  Citizens could not effectively bear arms in defense of themselves or in defense of the state if they were not free to carry their weapons where they were needed for either purpose.[12]

The practices of the Framers themselves confirm that the right to carry firearms was well-established in the early American republic.  Judge St. George Tucker observed that, "[i]n many parts of the United States, a man no more thinks, of going out of his house on any occasion, without his rifle or musket in his hand, than an European fine gentleman without his sword by his side." 5 BLACKSTONE COMMENTARIES App. n.B, at 19 (St. George Tucker ed., 1803).  George Washington carried a pistol for self-defense and

---

[12] Antebellum courts interpreting these provisions did not understand them to be limited the home.  *See Bliss v. Commonwealth*, 2 Litt. 90, 92 (Ky. 1822); *State v. Reid*, 1 Ala. 612, 616-17 (1840); *State v. Schoultz*, 25 Mo. 128, 155 (1857).

is said to have drawn it to fend off a bandit who threatened to shoot him on his ride from Mt. Vernon to Alexandria shortly after the Revolutionary War. *See* BENJAMIN OGLE TAYLOE, IN MEMORIAM: ANECDOTES AND REMINIS-CENCES 95 (Washington, D.C., 1872). John Adams likewise carried a pistol and took one with him when he sailed to France in 1778. *See* DAVID MCCULLOUGH, JOHN ADAMS 177 (2001). Thomas Jefferson advised his ne-phew, "Let your gun therefore be the constant companion of your walks." *See* THOMAS JEFFERSON, WRITINGS 816–17 (letter of August 19, 1785) (Merrill D. Peterson ed., 1984). And Dr. Joseph Warren, a prominent Boston pa-triot, carried pistols when making his rounds. RICHARD FROTHINGHAM, LIFE AND TIMES OF JOSEPH WARREN 452 (Boston: Little, Brown, & Co., 1865).[13]

*This* is the pre-existing right that was codified in the Second Amend-ment, and this right to bear arms was understood by the founding genera-tion to have not only public scope, but also a public purpose. Indeed,

---

[13] Even in defending the British soldiers who were charged with murder in the Boston Massacre, John Adams recognized that, in this coun-try, "every private person is authorized to arm himself; and on the strength of this authority I do not deny the inhabitants had a right to arm them-selves at that time for their defence." John Adams, *First Day's Speech in De-fence of the British Soldiers Accused of Murdering Attucks, Gray and Others, in the Boston Riot of 1770, in* 6 MASTERPIECES OF ELOQUENCE 2569, 2578 (Hazel-tine et al. eds. 1905).

"[m]any colonial statutes *required* individual arms-bearing for public-safety reasons." *Heller*, 554 U.S. at 601 (emphasis added).  Some colonies even required citizens to carry their firearms to church services and other public gatherings.[14]  Plainly, if the law imposed on individuals a civic *duty* to bear arms in the interest of public safety, the law necessarily conferred on those citizens a corresponding *right* to do so.

Those who wrote and ratified the Fourteenth Amendment (which applies the Second Amendment to Illinois) understood the right to bear arms in the same way.  An 1866 report to Congress from the Freedmen's Bureau stated: "There must be 'no distinction of color' in the right to carry arms, any more than in any other right." Ex. Doc. No. 70, House of Representatives, 39th Cong., 1st Sess., at 297 (1866).  A Mississippi court recognized this in 1866 when it struck down a state ban on carrying a firearm without a license: "While, therefore, the citizens of the State and other white persons are allowed to carry arms, the freedmen can have no adequate protection against acts of violence unless they are allowed the same

---

[14] *See, e.g.,* An Act for the Better Security of the Inhabitants, By Obliging the Male White Persons to Carry Fire Arms To Places of Public Worship (Ga. 1770) *in* A DIGEST OF THE LAWS OF THE STATE OF GEORGIA 157-58 (1800); *see also* JOYCE LEE MALCOLM, TO KEEP AND BEAR ARMS 139 (1994) (citing several examples of laws that "required colonists to carry weapons").

34

privilege." *State v. Wash Lowe, reprinted in* New York Times, Oct. 26, 1866, at 2 (*quoted in* STEPHEN P. HALBROOK, FREEDMEN, THE FOURTEENTH AMENDMENT, AND THE RIGHT TO BEAR ARMS, 1866-1876, 57-58 (1998)).  Thus "bearing arms" included carrying them in public for self-defense.  Indeed, it was precisely this understanding of the Second Amendment right that caused Chief Justice Taney such alarm in *Dred Scott v. Sandford*, 60 U.S. 393 (1857).  In 1857 the Chief Justice recoiled from recognizing freedmen and their descendants as part of "We the People of the United States" precisely because doing so would entitle them "to keep and carry arms wherever they went." *Id.* at 417.

By adopting the Fourteenth Amendment, the nation rejected that legacy of prejudice and established that *all* Americans, regardless of race, are entitled to carry firearms in public to defend themselves.  The Supreme Court embraced this understanding in *McDonald*, citing as an example of a law that would be nullified by the Fourteenth Amendment a statute providing that "no freedman, free negro or mulatto, not in the military service of the United States government, and not licensed so to do by the board of police of his or her county, shall keep or carry fire-arms of any kind."  130 S.Ct. at 3038.  Similarly, *McDonald* referred to "Regulations for Freedman in

35

Louisiana" which stated that no freedman "shall be allowed to carry fire-

arms, or any kind of weapons, within the parish, without the written spe-

cial permission of his employers, approved and indorsed by the nearest

and most convenient chief of patrol." 1 DOCUMENTARY OF HISTORY OF RE-

CONSTRUCTION at 279-80.

> 2.    *The Framers' goal of protecting private use of firearms for hunting confirms that the Second Amendment codified a pre-existing right to carry firearms outside the home.*

In *Heller* the Supreme Court noted that "the militia was not the only

reason Americans valued the ancient right [to bear arms]; most undoubted-

ly thought it even more important for self-defense and hunting." 554 U.S.

at 599.  "The settlers' dependence on game for food and economic livelih-

ood … undoubtedly undergirded … state constitutional guarantees" of the

right to bear arms.  *McDonald*, 130 S.Ct. at 3042 n.27.  That necessarily

means that the Framers understood the right to bear arms to extend outside

the home; hunting is not an activity that one conducts in one's parlor.  *See*

*Masciandaro*, 638 F.3d at 468 (Niemeyer, J., concurring) ("the general preex-

isting right to keep and bear arms for participation in militias, for self-

defense, and for hunting is thus not strictly limited to the home environ-

ment but extends in some form to wherever those activities or needs oc-

36

cur"); *Woollard*, 2012 WL 695674, at *6 ("[T]he right was also understood to allow for militia membership and hunting …. To secure these rights, the Second Amendment's protections must extend beyond the home; neither hunting nor militia training is a household activity.").  Indeed, during Reconstruction a congressional report denounced the disarmament of freedmen by southern states, noting that the Constitution protected their right to bear arms outdoors:  " 'they need them to kill game for subsistence, and to protect their crops from destruction by birds and animals.' " *Heller*, 554 U.S. at 615 (citation omitted).

### C.   *Heller's* Discussion of Traditional Regulations of the Right to Bear Arms Refutes the District Court's Holding that the Right is Confined to the Home.

The court below fashioned a strawman, incorrectly charging that Plaintiffs claim an "*absolute* right to carry firearms when in public" or an "*unfettered* right to carry weapons in public." SA-5, 14 (emphasis added). Plaintiffs make no such frivolous claim, nor could they, insofar as *Heller* itself explained that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited," and does not encompass a right to "carry any weapon whatsoever in any manner whatsoever and for whatever purpose." 554 U.S. at 626.   Indeed, the familiar regulations on firearms car-

riage discussed in the *Heller* opinion distinguish—and thereby subvert—Illinois's unique and total ban on bearing arms in public.

To begin with, the *Heller* Court noted that its decision should not "be taken to cast doubt on longstanding prohibitions on … laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Id*. at 626.  The court below quoted this passage, but failed to recognize its plain import.  *See* SA-13.   "If the Second Amendment right were confined to self-defense *in the home*, the Court would not have needed to express a reservation for 'sensitive places' outside of the home." *Masciandaro*, 638 F.3d at 468 (Niemeyer, J., concurring) (emphasis added).  The obvious implication is that the Second Amendment forbids Illinois from *totally banning* the carrying of firearms in *all* public spaces, but not in particularly sensitive places where such regulation is appropriate and traditional.

In *McDonald* the Supreme Court restated the "central holding in *Heller*" as  vindicating "a personal right to keep and bear arms for lawful purposes, *most notably* for self-defense within the home." 130 S.Ct. at 3044 (emphasis added).  *See also Ezell*, 651 F.3d at 700-01 (*Heller* "conclude[d] that the Second Amendment secures a pre-existing natural right to keep and bear arms … and that the 'central component of the right' is the right of armed

38

self-defense, most notably in the home."). Similarly, the Supreme Court has acknowledged that the need for armed "defense of self, family, and property is *most acute*" in the home. *Heller*, 554 U.S. at 628 (emphasis added). Both of the Court's locutions "suggest[] that some form of the right [to bear arms] applies where that need is not 'most acute.' " *Masciandaro*, 638 F.3d at 468 (Niemeyer, J., concurring); *see also Woollard*, 2012 WL 695674, at *6 ("Judge Niemeyer's reasoning … is both sound and persuasive.") (discussing this passage from *Masciandaro*). It should come as no surprise that the Court deems the right of armed self-defense in the home to be particularly "notable," because our traditions—and the Bill of Rights—have always recognized that the home bears a special status as one's sanctuary and refuge. *See, e.g., United States v. Orito*, 413 U.S. 139, 142 (1973); *Payton v. New York*, 445 U.S. 573, 589, 601 (1980); *Stanley v. Georgia*, 394 U.S. 557, 559 (1969).

*Heller* contains a host of references to historical materials affirming the right of armed self-defense both inside *and outside* the home. *See, e.g.,* 554 U.S. at 611 ("a citizen has 'a right to carry arms in defense of his property or person and to use them if either were assailed' ") (quoting *Johnson v. Tompkins*, 13 F. Cas. 840, 850, 852 (CC Pa. 1833)); *id.* at 585 (discussing "the

natural right of defense 'of one's person or house' "); *id.* at 615 (all men "have the right to keep and bear arms to defend their homes, families or themselves") (quotation marks and citation omitted); *id.* at 616 (constitutional right "to bear arms for the defense of himself and family and his homestead") (quotation marks and citation omitted); *id.* at 609 (" 'The rifle has ever been the companion of the pioneer and, under God, his tutelary protector against the red man and the beast of the forest.' ") (quoting the "Bleeding Kansas" speech of Sen. Charles Sumner); *id.* at 583 n.7 (collecting Eighteenth century sources affirming right to bear arms "upon Journeys or Hunting," or for "Hunting, Navigation, Travelling"); *id.* at 628-29 (handguns are "most preferred firearm in the nation to keep and use for protection of one's home and family") (quotation marks and citations omitted); id. at 625 (weapons used " 'in defense of person and home were one and the same' ").

At the same time, *Heller* distinguished legitimate state regulation of bearing arms in public for improper or even criminal purposes.  *See, e.g.,* 554 U.S. at 633 (distinguishing a colonial-era law that imposed a 5-shilling fine "on those who fired guns in *streets* and *taverns*") (original emphasis); *id.* at 634-35 (opining that said fine would not be imposed on a person who

40

used "a gun to protect himself or his family from violence"); *id*. at 607-08 (explaining that Framers recognized that right to bear arms could be "abused" by those "assembling with other armed individuals 'for an unlawful purpose'" and pointing out that such a regulation "ma[d]e no sense if the right does not extend to *any* individual purpose") (original emphasis); *id*. at 595 (Second Amendment does not protect right "to carry arms for *any sort* of confrontation") (original emphasis); *id*. at 632 (distinguishing legitimate state regulation of those who go from house to house discharging firearms while "intoxicated with liquor").

That the right to bear arms in public is not " absolute" or "unfettered" does not mean that it does not exist at all, and Plaintiffs make no claim that their right to bear arms is unlimited or unfettered; nor do they demand that concealed (as opposed to open) carry be permitted. But "[t]he signposts left by recent Supreme Court" decisions "all point to the conclusion" that a law-abiding citizen's claim of a right to armed self-defense "implicate[s] the Second Amendment" and that the Amendment's "protections necessarily extend outside the home." *Woollard*, 2012 WL 695674, at *7.

41

**D.** ***Heller's*** **Discussion of Nineteenth Century Precedents on the Carrying of Concealed Firearms Refutes the District Court's Conclusion that the Right to Bear Arms is Confined to the Home.**

Although the court below states that Plaintiff Mary Shepard "is not allowed to carry a *concealed* weapon for her protection in her home state of Illinois" and  notes that Illinois defends its laws on the basis of an asserted need to "limit[] an individual's ability to have ready a gun *of which the public may be unaware*," SA-2, 4 (emphasis added), the district court acknowledged that the challenged Illinois statutes outlaw the carrying of *any* assembled, operable, accessible or loaded firearm in public, *whether concealed or otherwise*. SA-6-7 (reciting the challenged laws).  Again, Illinois is the only State in the Union that absolutely forbids the carrying of firearms in public for the purpose of self-defense under any circumstances.[15]

---

[15] "Notably Illinois is the only state remaining in the United States which does not have concealed carry laws."  SA-3.  The vast majority of other states either do not require a permit to carry a firearm in some manner or require a carry permit to be issued to law-abiding citizens who meet certain objective criteria.  A handful of states unconstitutionally subject the right to carry a firearm to the discretion of licensing officials.  *See, e.g.*, *Woollard*, 2012 WL 695674, at *13 (striking down Maryland law requiring citizens to convince state licensing authority of "a 'good and substantial reason' for issuance of a handgun permit").  Unlike Illinois, however, even these states do not purport to forbid *any and all* law-abiding citizens from exercising their right to carry firearms outside of the home.  For a state-by-

The statutes here are thus remarkably parallel to those struck down in *Heller*, which "totally ban[ned] handgun possession in the home" and "also require[d] that any lawful firearm in the home be disassembled or bound by a trigger lock at all times, rendering it inoperable." 554 U.S. at 628. The Supreme Court observed that "[f]ew laws in the history of our Nation have come close to the severe restriction of the District's handgun ban. *And some of those few have been struck down*." *Id*. at 629 (emphasis added).

At first glance, Illinois might derive some comfort from the *Heller* Court's observation that a "majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues." *Heller*, 554 U.S. at 626. But *Heller* specifically emphasized that these prohibitions proscribed only *concealed* carry and *permitted* citizens to carry handguns *openly* in public. Indeed, the Court noted with particular approval the decision in *Nunn v. State*, 1 Ga. 243, 251 (1846), where "the Georgia Supreme Court struck down a prohibition on carrying pistols openly (even though it

state summary, see *Appendix A: State Firearms Laws*, *in* STEPHEN P. HAL-BROOK, FIREARMS LAW DESKBOOK (West 2011).

upheld a prohibition on carrying concealed weapons)." *Heller*, 554 U.S. at

629.  *Nunn* emphasized that a ban *only* on concealed carry "d[id] not de-

prive the citizen of his natural right of self-defense, or of his constitutional

right to keep and bear arms."  1 Ga. at 251 (emphasis omitted).

*Heller* likewise explained that "the Louisiana Supreme Court held

that citizens had a right to carry arms openly:  'This is the right guaranteed

by the Constitution of the United States, and which is calculated to incite

men to a manly and noble defense of themselves, if necessary, and of their

country, without any tendency to secret advantages and unmanly assassi-

nations.' " 554 U.S. at 613 (quoting *State v. Chandler*, 5 La. Ann. 489, 489-90

(1850).  Similarly, "[i]n *Andrews v. State*, the Tennessee Supreme Court …

held that a statute that forbade openly carrying a pistol 'publicly or private-

ly, without regard to time or place or circumstances,' 50 Tenn. at 187, vi-

olated the state constitutional provision (which the court equated with the

Second Amendment)." *Heller*, 554 U.S. at 629.  And the Alabama Supreme

Court explained in *State v. Reid* that a "statute which, under the pretence of

regulating, amounts to a destruction of the right, or which requires arms to

be so borne as to render them wholly useless for the purpose of defense,

would be clearly unconstitutional." *State v. Reid*, 1 Ala. 612, 616-17 (1840) (*quoted in Heller*, 554 U.S. at 629).[16]

The consistent thread that runs through these decisions is that some form of public carrying of firearms for self-defense must be allowed, although each state legislature has the regulatory authority to require such carriage to be open or concealed, depending on its preference and judgment as to which mode is less likely to incite unease and more likely to promote public safety.  The *Heller* Court's extensive (and favorable) discussion of these decisions cannot be squared with the decision below upholding Illinois's total ban on the carrying, whether openly or concealed, of any firearm outside the home.  Even if the Court's statements were to be classified as dicta, the district court was not free to ignore them, "given the Su-

---

[16] The fact that there was intense debate in the Nineteenth century over the validity of concealed-carry bans proves that the right to bear arms was universally understood to extend beyond the home, for otherwise the issue would have been an easy one.  *See* 2 J. KENT, COMMENTARIES ON AMERICAN LAW *340 n.2 (O. Holmes ed., 12th ed. 1873) ("As the Constitution of the United States, and the constitutions of several of the states, in terms more or less comprehensive, declare the right of the people to keep and bear arms, it has been a subject of grave discussion, in some of the state courts, whether a statute prohibiting persons … from *wearing or carrying concealed weapons,* be constitutional. There has been a great difference of opinion on the question.") (original emphasis).

preme Court's entitlement to speak through its opinions as well as through its technical holdings." *Skoien*, 614 F.3d at 641.

## V. ILLINOIS'S TOTAL PROHIBITION ON THE RIGHT TO BEAR ARMS FOR SELF-DEFENSE OUTSIDE THE HOME IS CATEGORICALLY UNCONSTITUTIONAL.

*Heller*, as previously noted, struck down the District of Columbia's categorical ban on handguns in the home because the Second Amendment's text and history demonstrated that the ban infringed the right to armed self-defense—the core of the Second Amendment. *See* 554 U.S. at 628-29. In *McDonald*, the Supreme Court held that the Second Amendment is "fully applicable to the States" through the Fourteenth Amendment, 130 S.Ct. at 3026; *id.* at 3058 (Thomas, J., concurring in part and concurring in the judgment), and likewise struck down Chicago's handgun ban. As this Court has explained, *Heller* and *McDonald* "suggest that broadly prohibitory laws restricting the core Second Amendment right … are *categorically* unconstitutional." *Ezell*, 651 F.3d at 703 (emphasis added).

The Illinois Gun Carry Ban is equally sweeping in its proscription of what *Heller* called the Second Amendment "guarantee [of] the individual right to … carry weapons in case of confrontation." 554 U.S. at 592. The Illinois statutes are uniquely prohibitory and wholly without exceptions.

46

They do not permit even an elderly lady, thoroughly trained in handgun use and licensed to carry a handgun in two other states, to carry a pistol to defend herself against vicious assaults in the aftermath of the skull-crushing, mutilating thrashing she has already suffered.  Whatever constitutionally permissible regulations of the public carriage of firearms there might be, surely the Illinois Gun Carry Ban is not among them.  "[T]here will be time enough to expound upon the historical justifications" for less-categorical handgun-carry regimes "if and when those exceptions come before [the courts]." *Heller*, 554 U.S. at 635.  But here and now, the categorically prohibitive Illinois Gun Carry Ban is plainly at war with the Second Amendment's text and history and should be struck down.

## VI.   ILLINOIS'S TOTAL PROHIBITION ON THE RIGHT TO BEAR ARMS FOR SELF-DEFENSE OUTSIDE THE HOME IS UNCONSTITUTIONAL UNDER ANY LEVEL OF HEIGHTENED SCRUTINY.

If the Court disagrees with our submission that the challenged statutes are "categorically unconstitutional" restrictions on the right to bear arms, it must then "choose an appropriate standard of review from among the heightened standards of scrutiny the Court applies to governmental actions alleged to infringe enumerated constitutional rights."  *Ezell*, 651 F.3d at 703.  But no matter what standard of heightened scrutiny is applied, the

47

Illinois Gun Carry Ban cannot meet it as a matter of law. For no government interest is so compelling as to justify a wholesale ban on the exercise of an enumerated constitutional right. And, concomitantly, a wholesale ban on the exercise of an enumerated constitutional right cannot, as a matter of law, be an adequately tailored response to any government interest, no matter how compelling.

### A. Statutes That Infringe Fundamental Second Amendment Rights Must Satisfy Strict Scrutiny.

Judicial scrutiny of the Illinois Gun Carry Ban should be strict for several reasons. First, the right to bear arms is specifically enumerated in the constitutional text and was deemed "fundamental by those who drafted and ratified the Bill of Rights." *McDonald*, 130 S.Ct. at 3037. Indeed, *McDonald* confirmed that "*Heller* points unmistakably to [an affirmative] answer" to the question of "whether the right to keep and bear arms is fundamental to our scheme of ordered liberty." *Id.* at 3036 (emphasis omitted). And it is well established that "strict judicial scrutiny" is required" if a law "impinges upon a fundamental right explicitly or implicitly protected by the Constitution." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973). *See also, e.g.*, *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460

U.S. 37, 54 (1983); *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 n.14 (1985).  The Supreme Court has expressly rejected the notion "that the Second Amendment should be singled out for special—and specially unfavorable—treatment." *McDonald*, 130 S.Ct. at 3043.

Second, *Heller* itself forecloses the application of intermediate scrutiny here.  In his dissenting opinion, Justice Breyer argued that the proper standard of review should be drawn from "cases applying intermediate scrutiny" in the First Amendment context, such as *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180 (1997).  *Heller*, 554 U.S. at 704 (Breyer, J., dissenting); *see also id.* at 689-90, 696.  He contended that "[t]here is no cause here to depart from the standard set forth in *Turner*." *Id.* at 705.[17]  Justice Breyer called his test "interest-balancing," rather than intermediate scrutiny, not because he was adopting a less demanding test, but because of his view that the government's interest in promoting public safety would always be important or compelling.  In Justice Breyer's view, the government interest would always be sufficient and application of the test would involve a search for the

---

[17] It is equally revealing that Justice Breyer invoked *Burdick v. Takushi*, 504 U.S. 428 (1992).  *See Heller*, 554 U.S. at 690 (Breyer, J., dissenting).  That is the case on which the United States, appearing as an *amicus* in *Heller*, principally relied in unsuccessfully urging the Court to adopt intermediate scrutiny.  *See* Brief of United States, *Heller*, No. 07-290, at 8, 24, 28.

appropriate degree of fit—that is, interest-balancing.  *See Heller*, 554 U.S. at 689 ("I would simply adopt such an interest-balancing inquiry explicitly."). Thus Justice Breyer's proposed interest-balancing test was nothing other than intermediate scrutiny, and the Supreme Court rejected it, however it might be labeled.  *See id.* at 634-35; *see also McDonald*, 130 S.Ct. at 3050 (plurality).  Therefore, *Heller* forecloses the application of mere intermediate scrutiny to a regulation, such as that here, that impinges upon law-abiding adults' core Second Amendment right of armed self-defense.

Third, Illinois flatly, and uniquely, prohibits all law-abiding citizens from carrying operable firearms in public for self-defense.  If such a regime is not "categorically unconstitutional," *Ezell*, 651 F.3d at 703, at the very least it imposes "a severe burden on the core Second Amendment right of armed self-defense" and therefore "will require an extremely strong public-interest justification and a close fit between the government's means and its end."  *Id.* at 708.

## B.    Illinois's Ban Fails Any Level of Heightened Scrutiny.

 "[L]aws restricting activity lying closer to the margins of the Second Amendment right, laws that merely regulate rather than restrict, and modest burdens on the right may be more easily justified.  How much more

easily depends on the relative severity of the burden and its proximity to the core of the right." *Ezell*, 651 F.3d at 708.  In *Skoien*, this Court "required a 'form of strong showing'—a/k/a 'intermediate scrutiny'—in a Second Amendment challenge to a prosecution under 18 U.S.C. § 922(g)(9), which prohibits the possession of firearms by persons convicted of a domestic-violence misdemeanor.  614 F.3d at 641." *Id.*  This Court found that " 'logic and data' established a 'substantial relation' between disarming domestic-violence misdemeanants and the important governmental goal of " 'pre-venting armed mayhem.' " *Id*. at 642.  Therefore, "intermediate scrutiny was appropriate in *Skoien* because the claim was not made by a 'law-abiding, responsible citizen' as in *Heller*, 554 U.S. at 635 []; nor did the case involve the central self-defense component of the right." *Ezell*, 651 F.3d at 708 (citing *Skoien*, 614 F.3d at 645).

In contrast, here—as in *Ezell*—"the plaintiffs *are* the 'law-abiding, re-sponsible citizens' whose Second Amendment rights are entitled to full so-licitude under *Heller* . . . ." *Ezell*, 651 F.3d at 708 (emphasis in original).  The City's firing-range ban was not "merely regulatory; it *prohibit[ed]* the 'law-abiding, responsible citizens' of Chicago from engaging in target practice in the controlled environment of a firing range.  This is a serious encroach-

ment on the right to maintain proficiency in firearm use, an important co-

rollary to the meaningful exercise of the core right to possess firearms for

self-defense." *Id.* at 708 (emphasis in original). Illinois's total ban on the

right to armed self-defense in public is an even greater encroachment on

Second Amendment rights, and there is no question that Ms. Shepard, al-

ready licensed to carry a pistol in two other states, is a responsible and law-

abiding citizen.

At a minimum, "[a]ll this suggests that a more rigorous showing than

that applied in *Skoien* should be required, if not quite 'strict scrutiny.' To be

appropriately respectful of the individual rights at issue in this case, [Illi-

nois] bears the burden of establishing a strong public-interest justification

for its ban …. [It] must establish a close fit between the [total carriage ban]

and the actual public interests it serves, and also that the public's interests

are strong enough to justify so substantial an encumbrance on individual

Second Amendment rights." *Ezell*, 651 F.3d at 708-09. In other words, in

the face of a contrary judgment made by every other State in the Union, Il-

linois "must demonstrate" that the carrying of firearms in public by law-

abiding citizens "creates such genuine and serious risks to public safety

that prohibiting" the carrying of operable firearms by *all* such citizens "is justified." *Id.* at 709.

The Illinois Gun Carry Ban cannot possibly satisfy this standard of heightened scrutiny.  Indeed, it cannot survive even intermediate scrutiny.[18]  Although intermediate scrutiny, unlike strict scrutiny, does not require the government to employ the *least* restrictive means to achieve its stated purpose, it does require that a restriction be "narrowly tailored to serve a significant government interest."  *Perry Educ. Ass'n*, 460 U.S. at 45. In other words, a restriction must be "*substantially* related to the achievement" of the government's objective.  *United States v. Virginia*, 518 U.S. 515, 533 (1996) (emphasis added and quotation marks omitted).  "The burden of

---

[18] A federal district court recently struck down Maryland's law making the right to bear arms "more difficult to exercise" by requiring a citizen to show a "good and substantial reason" to obtain a permit to carry a handgun. *Woollard*, 2012 WL 695674, at *11-*12.  The court held that the law could not satisfy even intermediate scrutiny because "[a] citizen may not be required to offer a 'good and substantial reason' why he should be permitted to exercise his rights.  The right's existence is all the reason he needs." *Id.* at *12.  The Illinois laws at issue here are  even more constitutionally suspect than Maryland's, of course, because in Illinois *no* reason, not even a "good and substantial" one, will permit even the most qualified, most responsible, best-trained model citizen to exercise her constitutional right to carry a handgun for self-defense.

justification is demanding and it rests entirely on the State." *Id.*[19] Only the State's genuine objectives will do, not "*post hoc*" rationales "invented … in response to litigation." *Id.*

Although protecting the public from criminal violence is, of course, a compelling governmental objective, it cannot, as a matter of law, justify a flat ban on the exercise of an enumerated constitutional right by all people at all times and places.  And in any event, the notion that banning all firearms carriage in public by law-abiding citizens will substantially advance that objective rests on several demonstrably false premises.

*First*, it assumes that limiting the carrying of handguns by law-abiding citizens would reduce gun violence.  But even public health experts who zealously advocate handgun controls have concluded—in the wake of *Heller*—that, "based on available empirical data," there would be "relatively little public safety impact if courts invalidate laws that prohibit gun carrying outside the home."  Philip J. Cook, Jens Ludwig, & Adam M. Samaha, *Gun Control After* Heller*: Threats and Sideshows from a Social Welfare*

—————————

[19] The record amply demonstrates that Illinois simply *cannot* meet this burden of justification by appealing to social science research.  *See, e.g.*, Doc. No. 54 (Brief of Amicus Curiae National Rifle Association of America, Inc.).

*Perspective*, 56 U.C.L.A. L. REV. 1041, 1082 (2009).  This conclusion is consistent with the findings of other leading studies that there is little evidence that gun control regulations such as the carry ban at issue here reduce criminal violence.  *See, e.g.*, Robert Hahn, *et al.*, *Firearms Laws and the Reduction of Violence: A Systematic Review,* 28 AM. J. PREV. MED. 40, 59 (2005) ("Based on findings from national law assessments, cross-national comparisons, and index studies, evidence is insufficient to determine whether the degree or intensity of firearms regulation is associated with decreased (or increased) violence.").

*Second*, the State's public-safety rationale assumes that *all* citizens—from well-trained, licensed, law-abiding members of the community to criminal gang members—cannot be trusted to carry a firearm in public—or at least that the State could not distinguish among them.   Indeed, Illinois *expressly predicates its position* on the premise that there is *no difference* between a responsible, well-trained, and law-abiding citizen such as Ms. Shepard and a thug eager to brandish a gun in public so that he can wreak even greater havoc.  In its papers opposing the preliminary injunction sought by Ms. Shepard, Illinois said this:

> Plaintiffs insist that they are seeking relief on behalf of "law-abiding citizens."  Any workable definition of that term includes all who have not yet been convicted of a crime.  Every murderer, robber, and rapist fell within that definition at some point in their lives.

Doc. No. 28 at 19.

A permitting system involving criminal background checks and other screening methods not only has been successfully employed by many other states, it also would not indiscriminately obliterate the Second Amendment rights of the citizenry as the Illinois Gun Carry Ban does.  Indeed, Ms. Shepard is already well-trained and licensed to carry a handgun in both Pennsylvania and Florida—and in many other states as well, through the operation of state laws reciprocally honoring other states' firearms carry permits.  *See* SA-21, ¶¶ 6-8, 9.  Unsurprisingly, the various state permitting procedures have remarkable success in screening out individuals who should not be trusted to carry firearms in public.  For example, researchers have found that "concealed carry licensees [in Texas] had arrest rates far lower than the general population for every category of crime."  H. Sterling Burnett, National Center for Policy Analysis, *Texas Concealed Handgun Carriers: Law-Abiding Public Benefactors* 1 (2000), *available at*

http://www.ncpa.org/pdfs/ba324.pdf; *see also* Cook, *et al.*, *Gun Control Af-*

*ter Heller* at 1082 ("The available data about [concealed carry] permit hold-

ers … imply that they are at fairly low risk of misusing guns.").

*Third*, the State's public-safety rationale assumes that individuals

who *are* disposed toward violent crime will refrain from carrying a hand-

gun if doing so is unlawful.  This is naïve and nonsensical—individuals

willing to commit criminal armed violence exposing them to severe (and

even capital) punishment will not be deterred by the relatively minor sanc-

tion imposed for unlawfully carrying a firearm.  *Cf. McIntyre v. Ohio Elec-

tions Comm'n*, 514 U.S. 334, 352-53 (1995) (rejecting argument that "state in-

terest in preventing fraud and libel" justified law banning anonymous

campaign literature because "wrongdoers" could simply "use false names

and addresses in an attempt to avoid detection").  This is hardly a novel in-

sight.  Indeed, Thomas Jefferson copied into his personal notebook a pas-

sage by the Italian criminologist Cesare Beccaria expressing precisely this

point.  *See* Stephen P. Halbrook, *What the Framers Intended:  A Linguistic

Analysis of the Right to Bear Arms*, 49 L. & CONTEMP. PROBS. 151, 153-54

(1986).

*Fourth*, the State's rationale ignores the fact that firearms are frequent-

ly used to deter and defend against criminal violence and thereby reduce

the overall crime rate.   Although the number of defensive gun uses is diffi-
cult to measure, data from the National Self-Defense survey "indicate that
each year in the United States there are about 2.2 to 2.5 million defensive
uses of guns of all types by civilians against humans, with about 1.5 to 1.9
million of the incidents involving use of handguns."  GARY KLECK & DON B.
KATES, ARMED 222 (2001).  A comprehensive review of the entire body of
gun-control literature by the National Research Council of the federal Na-
tional Academy of Science has found that "[a]t least 19 other surveys have
resulted in [similar] estimated numbers of defensive gun uses."  CHARLES F.
WELLFORD, JOHN V. PEPPER & CAROL V. PETRIE (eds.), FIREARMS AND VI-
OLENCE: A CRITICAL REVIEW 103 (2004).  Any evaluation of the impact of the
Illinois Gun Carry Ban must take this crime-reducing effect into account
and weigh it against any speculative hope that a wholesale ban on firearm
carriage in public by law-abiding citizens would result in a decrease in
crime.

   In sum, there is no basis for concluding that the laws at issue here
substantially advance any significant governmental interest.  The founding
generation recognized what remains true today:  no shield of government
can be relied upon to provide complete protection from violence.  The Fra-

58

mers therefore inscribed in the Constitution the right of *the people*, not just

the government, to keep and bear arms.  Illinois's wholesale ban on bearing

arms outside the home cannot be reconciled with this fundamental consti-

tutional guarantee.

"[T]he enshrinement of constitutional rights necessarily takes certain

policy choices off the table."  *Heller*, 554 U.S. at 636.  The public policy

choice of denying Ms. Shepard and other law-abiding citizens the right of

armed self-defense in public is simply not available to Illinois, and the

State's policy arguments are irrelevant in deciding whether to permanently

enjoin her ban on carrying firearms in public.  Accordingly, this Court

should reverse the district court and remand the case with instructions to

enter a permanent injunction against enforcement of the Illinois Gun Carry

Ban.

## VII.   CONDITIONAL REQUEST FOR PRELIMINARY INJUNCTION.

The foregoing demonstrates that the Illinois Gun Carry Ban should

be promptly and permanently enjoined.  We have shown not merely that

Plaintiffs are likely to succeed on the merits, but that their claim succeeds

as a matter of law.  But if this Court determines that this case is not ripe for

final adjudication and that a remand for further proceedings is necessary,

we request that, as in *Ezell*, the Court order the district court to enter a pre-

liminary injunction pending entry of a final judgment on the merits.

## A.     The Plaintiffs Will Be Irreparably Harmed Unless An Injunction Issues.

No legal remedy after the fact can be adequate here because mone-

tary damages are inadequate, as a matter of law, to compensate for the de-

privation of the right to engage in conduct that is protected by the Consti-

tution. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion). This

Court has recently reconfirmed that for violations of the Second Amend-

ment, like violations of the First, "*irreparable harm is presumed*." *Ezell*, 651

F.3d at 699 (emphasis added). But quite apart from this presumption, irre-

parable harm in this case is clear.

In *Heller* the Supreme Court said that the Second Amendment "guar-

antee[s] the individual right to possess and carry weapons in case of con-

frontation." 554 U.S. at 592. "Confrontation" is a rather sterile term for de-

scribing the beating inflicted on Ms. Shepard in September 2009. She lives

day to day in mortal fear that she will once again be the victim of a savage

beating from which she will once again be entirely defenseless. This consti-

tutional injury is not an abstract legal proposition for Ms. Shepard: she

60

wants, needs, and is entitled to exercise her Second Amendment right to armed self-defense *right now*.

Although Ms. Shepard may have an after-the-fact tort remedy against her assailant for battery, only injunctive relief can provide redress for the State of Illinois's deprivation of her Second Amendment rights.  This Court in *Ezell* recognized that "[i]nfringements of this right cannot be compensated by damages" because the "Second Amendment protects … intangible and unquantifiable interests."  651 F.3d at 699 (citing *Heller*, 554 U.S. at 592-95).  Ms. Shepard and the members of the Illinois State Rifle Association are entitled to injunctive relief now.  *See id.* at 698 ("If they're right, then the range ban was unconstitutional when enacted and violates their Second Amendment rights every day it remains on the books.").

### B.  The Deprivation of Plaintiffs' Second Amendment Rights Outweighs Any Speculative Harm to the Public or the State of Illinois.

Once the threshold factors discussed above have been met, "the district court weighs the factors against one another, assessing whether the balance of harms favors the moving party or whether the harm to the nonmoving party or the public is sufficiently weighty that the injunction should be denied." *Ezell*, 651 F.3d at 694.  "The more likely the plaintiff is to

win, the less heavily need the balance of harms weigh in his favor." *Roland Machinery Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 387 (7th Cir. 1984).

As demonstrated in detail above, Plaintiffs are likely, overwhelmingly, to win this case. In any event Illinois has failed to muster the necessary evidence to support its total ban bearing arms in public, and this weighs in favor of granting Plaintiffs preliminary injunctive relief now. Again, *every other state in the Union allows some form of public carrying of firearms for self-defense*. That inconvenient truth renders futile any effort by Illinois to demonstrate that its circumstances are exceptional, and that firearms in the hands of licensed, law-abiding individuals are uniquely an intolerable threat to public safety in this State, even if nowhere else in America.

In *Ezell* this Court emphasized Chicago's lack of "empirical evidence" of dangers associated with firearms shooting ranges and its "entirely speculative" claims of public-safety harms. *Ezell*, 651 F.3d at 709. Illinois has likewise failed to prove its case here. The studies discussed above, by the advocates of gun control at the federal Centers for Disease Control and the National Research Council of the National Academies of Science—the only two comprehensive surveys of the gun violence scientific literature—both concluded that there is insufficient evidence to show that the enactment of

right-to-carry laws either decreases or increases violent crime.  *See* Hahn et al., *Firearms Laws and the Reduction of Violence,* 28 AM. J. PREV. MED. at 53-54; WELLFORD, FIREARMS AND VIOLENCE 7.  On the other side of the ledger, the evidence on defensive use of guns supports the proposition that *denying* law-abiding citizens the right to keep and bear arms would increase violence by preventing citizens from defending themselves against criminal assault.

Thus here, as in *Ezell*, "the harms invoked by the [government] are entirely speculative and in any event may be addressed by more closely tailored regulatory measures," *Ezell*, 651 F.3d at 709, such as denying gun-carry permits to felons, drug addicts, and the mentally ill, rather than to all law-abiding adult citizens.  Indeed, even if an injunction were entered and Illinois did *absolutely nothing* in response, felons, drug addicts, the mentally ill and others who cannot meet the stringent requirements for issuance of a FOID card would still be prohibited from even *possessing* a firearm in Illinois.  *See* 430 ILCS 65/2, 65/4 & 65/8.  On the other side of the scale, the "plaintiffs have established a strong likelihood that they are suffering violations of their Second Amendment rights every day" that the carry ban is in effect.  *Id.*

63

Accordingly, if this Court determines that further proceedings in this case are necessary, it should order the district  court on remand to enter a preliminary injunction against enforcement of the Illinois Gun Carry Ban, pending its decision on the merits of Plaintiffs' Second Amendment claim.

## CONCLUSION

For these reasons, this Court should REVERSE the judgment below granting the State's motion to dismiss, and REMAND with instructions to grant Plaintiff-Appellants' motion for summary judgment and to enter a permanent injunction against enforcement of the challenged statutes.  Alternatively, should the Court decide to remand the case for further proceedings, it should order the district court to enter a preliminary injunction against enforcement of the challenged statutes pending final judgment.

Dated: April 11, 2012                    Respectfully submitted,


William N. Howard                        s/ Charles J. Cooper
FREEBORN & PETERS LLP                    Charles J. Cooper
311 South Wacker Drive, Suite            David H. Thompson
3000                                     Peter A. Patterson
Chicago, IL 60606                        COOPER AND KIRK, PLLC
(312) 360-6000; (312) 360-6596 Fax       1523 New Hampshire Ave., N.W.
                                         Washington, D.C. 20036
                                         (202) 220-9600; (202) 220-9601 Fax


*Attorneys for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32 (a)(7)(B) because this brief contains 13,983 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Circuit Rule 32(b), and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionately spaced typeface using Microsoft Office Word 2007 with 14-point Book Antiqua type.


s/ Charles J. Cooper
Charles J. Cooper
*Attorney for Plaintiffs-Appellants*

Dated:  April 11, 2012

# **APPENDIX**

# REQUIRED SHORT APPENDIX

## TABLE OF CONTENTS

Circuit Rule 30(d) Statement……………………………………………….    i
District Court Opinion and Order………………………………………...    SA-1
Declaration of Mary Shepard…………………………………………...    SA-20
Declaration of Donald Moran…………………………………………...    SA-40
Challenged Provisions…………………………………………………...    SA-42

# CIRCUIT RULE 30(d) STATEMENT

Pursuant to Circuit Rule 30(d), counsel certifies that the material required by Circuit Rule 30(a) is included in the required short appendix. All material required by Circuit Rule 30(b) is also included in the required short appendix pursuant to Circuit Rule 30(b)(7).  Pursuant to Fed. R. App. P. 28(f), the short appendix also includes the relevant parts of the challenged statutes.

s/ Charles J. Cooper
Charles J. Cooper
*Attorney for Plaintiffs-Appellants*

Dated:  April 11, 2012

i

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **MARY E. SHEPARD and the ILLINOIS STATE RIFLE ASSOCIATION,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **NO. 11-CV-405-WDS** |
| | ) | |
| **LISA M. MADIGAN, solely in her official capacity as ATTORNEY GENERAL OF ILLINOIS, GOVERNOR PATRICK L. QUINN, solely in his official capacity as Governor of the State of Illinois, TYLER R. EDMONDS, solely in his official capacity as the State's Attorney of Union County, Illinois, and SHERIFF DAVID LIVESAY, solely in his official capacity as Sheriff of Union County,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### MEMORANDUM AND ORDER

**STIEHL, District Judge:**

This case is before the Court on the issue of whether the State of Illinois' Unlawful Use of a Handgun and Aggravated Unlawful Use of a Handgun statutes violate the Second Amendment to the United States Constitution. Under current Illinois law citizens are prohibited from carrying loaded, operable firearms in public. *See*, 720 ILCS §§ 5/24-1(a)(4); 5/24-1(a)(10); 5/24-1.6(a)(1)-(3)(B).

Before the Court are several pending motions, including: plaintiffs' motion for preliminary injunction (Doc. 20) to which defendants have filed replies (Docs. 28, 29, 30); defendants' motions to dismiss the complaint (Docs. 24 and 26) to which plaintiffs have

responded (Doc. 41); plaintiffs' motion for summary judgment (Doc. 38) to which defendants

have responded (seeking to defer ruling–Docs. 47 and 49) and plaintiffs have filed a reply (Doc.

51); and, defendants' motion to cite supplemental authority (Doc. 55) which the Court

**GRANTS**.

In addition, the Court has received, and reviewed, amicus briefs from The Brady Center

to Prevent Gun Violence (Doc. 33) and the National Rifle Association of America, Inc. ("NRA")

(Doc. 54), as well as other supplemental authority submitted by the parties.

### I.     BACKGROUND

Plaintiffs, Mary E. Shepard, an Illinois resident, and the Illinois State Rifle Association,

bring this action against various officials of the State of Illinois and Union County, Illinois,

seeking to have the Court declare that three provisions of the Illinois criminal code which restrict

individuals from carrying firearms for self-defense are unconstitutional in violation of the

Second Amendment.  Plaintiff Shepard is a member of the Illinois State Rifle Association (her

co-plaintiff), and she alleges that her Second Amendment rights and those of other Illinois

citizens are being violated by Illinois law because, although she possesses a valid Illinois

Firearms Owner Identification card (FOID), has completed training in the safe, lawful handling

of handguns, and has received permits to carry handguns in Florida and Pennsylvania, she is not

allowed to carry a concealed weapon for her protection in her home state of Illinois. Plaintiffs

assert that the Illinois criminal statutes are facially invalid.[1]

Defendants are the Attorney General of Illinois, Lisa Madigan; the Governor of the State,

---

[1]There is currently no federal statute or Supreme Court case directly addressing the issue of the constitutionality of conceal carry permits.  As of the date of this Order, 49 states have passed laws, of varying degree, allowing their citizens to carry certain concealed firearms.  Like Illinois, the District of Columbia also does not allow conceal carry firearms possession.

SA-2

Patrick J. Quinn; the State's Attorney for Union County, Illinois, Tyler Edmonds; and the Sheriff

of Union County, David Livesay.[2]  Notably Illinois is the only state remaining in the United

States which does not have concealed carry laws.[3]   The plaintiffs seek injunctive relief on their

claims, and the defendants seek dismissal of the claims pursuant to Fed. R. Civ. P. 12(b)(6) for

failure to state a claim.

 Plaintiff Shepard asserts that in September of  2009 she was at her church doing her

duties as treasurer when she was attacked and brutalized, beaten and left for dead.  She suffered

skull fractures, fractures to both cheeks, brain swelling, shattered teeth, a concussion, loss of

hearing, damage to her vertebrae, torn rotator cuffs, and an injured clavicle.  The complaint

alleges that she has been required to undergo numerous surgeries, including extensive

reconstruction to her shoulders, has had to have physical therapy, was unable to drive for many

months and has severe and lasting injuries to her face, head and body.  Shepard was unarmed at

the time of the attack, and asserts that if she had had the right to have been armed, she could

have protected herself and her 83 year old coworker who also was injured.  Because she was

restricted by Illinois law from the ability to carry a firearm in public, she asserts that she was

defenseless then, and remains defenseless when in public.  Further, she states that if she were

allowed, under Illinois law, she would now carry a loaded and accessible weapon in her car

and/or on her person for self-defense purposes.

---

[2]In this action defendants Madigan, Quinn and Edmonds are represented by the Attorney General of the State of Illinois. Defendant Livesay is represented by private counsel. Defendants have filed nearly identical motions and briefs. Therefore, for purposes of simplicity, the Court will refer to them collectively as "defendants" throughout this Order.

[3]*See*, listing on www.usacarry.com for current conceal carry reciprocity data.

## II.     CLAIMS AND MOTIONS

### A.     Summary of the Issues Before the Court

The plaintiffs have previously informed the Court that the factual issues are limited and they seek to proceed on the pleadings, and do not require a hearing on their motion for preliminary injunction. The Court will therefore, consider the issues raised in the plaintiffs' request for injunctive relief and defendants' motions to dismiss collectively as the issues are basically identical and can be resolved together.

The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend II.  The two sides in this action set forth differing views of the application of the Second Amendment to the validity of the current Illinois statutes. Plaintiffs assert that their Second Amendment rights are being violated by the Illinois statute because licensed handgun owners are prohibited from carrying a firearm in public.  The defendants assert that the plaintiffs currently have the right to use firearms for their self-protection when in their home,  or on their land or fixed place of business, or when on the land or legal dwelling of another as an invitee for their self protection.

But, the State of Illinois does not permit plaintiffs or any state citizens to carry those firearms in public.  The State asserts that the overriding need to protect the public by limiting an individual's ability to have ready a gun of which the public may be unaware is part of the state of Illinois' rights, and that the statutes are in compliance with the Second Amendments' protections.  Plaintiffs counter that they are not challenging the right of the State to issue permits for possessing firearms, and that the relief they seek, to have this Court strike down Illinois'

4

SA-4

public carriage ban, will have no effect on those who may legally possess a firearm in the State. They assert it poses a relatively low risk of the misuse of guns if the law were to be declared unconstitutional, and would guarantee plaintiffs' Second Amendment right to self-protection.

In an amicus brief filed with the Court, The Brady Center to Prevent Gun Violence asserts that this Court should find that the Illinois statutes in issue do not implicate protected Second Amendment freedoms because they do not have any impact on the right of Illinois citizens to bear arms in their homes. Further, that the Court should determine that the recent Supreme Court decisions of *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010), do not extend the protected Second Amendment rights to include an absolute right to carry firearms when in public. In addition, the Brady Center encourages this Court to adhere to the long-recognized principle of judicial restraint, and not read into the *Heller* and *McDonald* decisions the constitutional right to carry guns in public.

The NRA, in its amicus brief, asserts that armed self-defense is a constitutional right protected by the Second Amendment as evidenced by the fact that it is now available in 49 of the 50 states. Only the State of Illinois outlaws the right to carry a firearm, with a permit, in public. Further, the NRA asserts that the promoted activity, carrying and use of firearms by law-abiding citizens, is an effective means of self-defense, is not a threat to public safety and may result in a decrease, not an increase in crime rates.

**B.    Jurisdiction, Venue, and Standing in this Cause of Action**

Plaintiffs' complaint involves claimed violations of Second Amendment rights, thereby giving this Court subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331. The plaintiff, Shepard, is a resident of Union County, which is within the Southern District of

SA-5

Illinois.   The plaintiff Illinois State Rifle Association (ISRA) is a not-for-profit association incorporated in Illinois, with members residing throughout the State of Illinois.  Plaintiff Shepard is a member of the ISRA. With respect to standing, plaintiffs claim that they will suffer "an actual or impending injury" and that a decision by this Court in their favor would "redress the injury." *Ezell v. City of Chicago*, 651 F.3d 684, 695 (7th Cir. 2011).  The Court, therefore, **FINDS** that plaintiffs have standing to bring this action, and this Court has subject matter jurisdiction to hear and resolve these claims.[4]

### C.    Challenged Illinois Statutes

The Illinois state statutes which are at issue in this action provide, in pertinent part, as follows:  720 ILCS 5/24-1 (Unlawful Use of a Weapon – UUW):

> (a)    A person commits the offense of unlawful use of weapons when he knowingly:
> ****************
> (4)    Carries or possesses in any vehicle or concealed on or about his person except when on his land or in his own abode, legal dwelling, or fixed place of business, or on the land or in the legal dwelling of another person as an invitee with that person's permission, any pistol, revolver, stun gun or taser or other firearm, except that this subsection (a) (4) does not apply to or affect transportation of weapons that meet one of the following conditions:
> > (i)    are broken down in a non-functioning state; or
> > (ii)    are not immediately accessible; or
> > (iii)    are unloaded and enclosed in a case, firearm carrying box, shipping box, or other container by a person who has been issued a currently valid Firearm Owner's Identification Card.

---

[4]The Court notes that the defendants have not challenged the standing of plaintiffs to bring this cause of action.

6

SA-6

720 ILCS 5/24-(a)(10), further provides:

> (a)    A person commits the offense of unlawful use of weapons when he knowingly:
>
>          \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
>
> (10)   Carries or possesses on or about his person, upon any public street, alley, or other public lands within the corporate limits of a city, village or incorporated town, except when an invitee thereon or therein, for the purpose of the display of such weapon or the lawful commerce in weapons, or except when on his land or in his own abode, legal dwelling, or fixed place of business, or on the land or in the legal dwelling of another person as an invitee with that person's permission, any pistol, revolver, stun gun or taser or other firearm, except that this sub-section (a)(10) does not apply to or affect transportation of weapons that meet one of the following conditions:
>
> > (i)     are broken down in a non-functioning state; or
> >
> > (ii)    are not immediately accessible; or
> >
> > (iii)   are unloaded and enclosed in a case, firearm carrying box, shipping box, or other container by a person who has been issued a currently valid Firearm Owner's Identification Card.

And, finally, 720 ILCS 5/24-1.6(a)(1)-(3)(B) (Aggravated Unlawful Use of a Weapon–AUUW),

provides:

> (a)    A person commits the offense of aggravated unlawful use of a weapon when he or she knowingly:
>
> (1)   Carries on or about his or her person or in any vehicle or concealed on or about his or her person except when on his or her land or in his or her abode, legal dwelling, or fixed place of business, or on the land or in the legal dwelling of another person as an invitee with that person's permission, any pistol, revolver, stun gun or taser or other firearm; or,
>
> (2)   Carries or possesses on or about his or her person, upon any public street, alley, or other public lands

7

SA-7

within the corporate limits of a city, village or incorporated town, except when an invitee thereon or therein, for the purpose of the display of such weapon or the lawful commerce in weapons, or except when on his or her own land or in his or her own abode, legal dwelling, or fixed place of business, or on the land or in the legal dwelling of another person as an invitee with that person's permission, any pistol, revolver, stun gun or taser or other firearm; and

(3)     One of the following factors is present:

(A)     the firearm possessed was uncased, loaded and immediately accessible at the time of the offense; or,

(B)     the firearm possessed was uncased, unloaded and the ammunition for the weapon was immediately accessible at the time of the offense. . . .

### D.     Motions to Dismiss

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, for failure to state a claim upon which relief can be granted. When considering a Rule 12(b)(6) motion, the Court's role is limited to determining if a plaintiff is entitled to offer evidence in support of the asserted claims. See, *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). The Court does not consider whether a plaintiff will ultimately prevail. *Id.* "A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a). The statement required by Rule 8(a)(2) must give the defendant "fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam). Detailed factual allegations are not required. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). But, merely conclusory statements, alone, are not sufficient.  "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009). A

8

SA-8

complaint must provide "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. 544, 570). Upon review the Court will construe the complaint "in the light most favorable to the plaintiff, accepting as true all well-pleaded facts alleged, and drawing all possible inferences in plaintiff's favor." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081(7th Cir. 2008) (citing *Killingsworth v. HSBC Bank Nev.*, 507 F.3d 614, 618 (7th Cir. 2007)). Dismissal is appropriate if, accepting as true all the facts alleged in the complaint, a plaintiff has not pleaded "enough facts to state a claim to relief that is plausible on its face," *Twombly*, 550 U.S. at 570. "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 129 S. Ct. at 1950.

In order to withstand a motion to dismiss plaintiffs must show that they have a cognizable claim, and further, to succeed on a preliminary injunction, plaintiffs would have to establish that they have "a claim plausible enough that . . . the entry of a preliminary injunction would be the appropriate step." *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765 (7th Cir. 2011); *see also*, *Ezell*, 651 F.3d at 693.

<u>1.</u>     <u>Motion to Dismiss of Defendants Madigan, Quinn and Edmonds</u>
        <u>(Doc. 26)</u>

Defendants Madigan, Quinn and Edmonds seek dismissal of plaintiffs' complaint on the following grounds: that Governor Quinn is not a proper party to the action; that the challenged Illinois statutes do not infringe on plaintiffs' rights to bear arms because the Second Amendment does not include a right to carry concealed weapons; and, the scope of the Second Amendment does not extend to carrying weapons outside of the home. The Court notes that plaintiffs do not address the issue of whether Governor Quinn is a proper party to this action, but assert that as to

all named defendants, the Illinois statutes which ban carrying firearms in public is

unconstitutional both on their face and in their application and that carrying firearms in public is

a core Second Amendment right.

2.  Defendant Livesay's Motion to Dismiss (Doc. 24)

Defendant Livesay seeks dismissal of the claims against him on the grounds that

plaintiffs' claims against him are barred by the Eleventh Amendment, that plaintiffs cannot seek

money damages against him, which violates the provisions of *Ex parte Young,* 209 U.S. 123

(1908), and plaintiffs' only claim against him is that he was enforcing a valid state statute.

In response, plaintiffs assert that the relief that they seek against Livesay is injunctive

relief, not money damages, and further, the state statutes which Livesay has enforced are

unconstitutional, and therefore their claims against him survive a motion to dismiss on the

grounds raised.

**E.  Preliminary Injunction Standards**

To succeed on a preliminary injunction in the Seventh Circuit, a moving party must

establish "that it has (1) no adequate remedy at law and will suffer irreparable harm if a

preliminary injunction is denied and (2) some likelihood of success on the merits." *Ezell,* 651

F.3d at 694.  Further, if the moving party "meets these threshold requirements, the district court

weighs the factors against one another, assessing whether the balance of harms favors the

moving party or whether the harm to the nonmoving party or the public is sufficiently weighty

that the injunction should be denied." *Ezell*, 651 F.3d at 694, (citing *Christian Legal Soc'y v.

Walker*, 453 F.3d 853, 859 (7th Cir. 2006)).

1.  Plaintiffs' Motion for Preliminary Injunction (Doc. 20)

SA-10

In their motion for preliminary injunction, the plaintiffs assert that they are entitled to injunctive relief because the State of Illinois' ban on carrying a firearm violates their Second Amendment rights every day that it remains in effect. Defendant Livesay adopts his co-defendants' response that plaintiffs are not entitled to a preliminary injunction because they cannot meet the threshold requirements to show that they have a likelihood of success on the merits because there is no "core" Second Amendment right to carry weapons in public for personal defense.

### III.    ANALYSIS

#### A.    Constitutional Review

Plaintiffs' claim is based upon their asserted rights under the Second Amendment to bear arms.  The Supreme Court has recently discussed the issue of possession of firearms and the rights of individuals to keep and bear arms for self-defense, particularly in the home.  *See, District of Columbia v. Heller*, 554 U.S. 570, 592-95 (2008) and *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010).   In *Heller*, the Court considered the validity of District of Columbia gun control statutes, which "generally prohibit[ed] the possession of handguns," making it a crime to carry an unregistered firearm, but, at the same time, prohibiting the registration of handguns. 554 U.S. at 574.  The Court determined that the "Second Amendment is naturally divided into two parts: its prefatory clause and its operative clause." *Id.* at 577.  The operative clause, the "right of the people" clause, was determined by the Court to be a "right that is exercised individually and belongs to all Americans." *Id.* at 581.  The "keep and bear arms" clause means "simply the carrying of arms," and was not limited in the *Heller* decision to military use.  *Id.* at 589.  Therefore, the Court found that the operative clause acted to "guarantee the individual right

SA-11

to possess and carry weapons in case of confrontation." *Id.* at 592. The prefatory clause, "A well regulated Militia, being necessary to the security of a free State. . ." was determined by the Court to have referred to males "physically capable of acting in concert for the common defense." *Id.* at 595 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)). The Court determined that "security of a free state" includes the use of a militia "in repelling invasion and suppressing insurrections," rendering "large standing armies unnecessary" and "when able-bodied men of a nation are trained in arms and organized, they are better able to resist tyranny." 554 U.S. at 597-98. Therefore, the Court determined that the "prefatory clause announces the purpose for which the right was codified: to prevent elimination of the militia." *Id.* at 599.

In *Heller* the Court undertook a lengthy review of the historical foundation of the language of the Amendment and application throughout United States history, and determined that although the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation," *id.* at 592, this right is not "unlimited." *Id.* at 626. That is, "the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.*

The Court stated that the "inherent right of self-defense has been central to the Second Amendment right." *Id.* at 628. And, handguns are "the most preferred firearm in the nation to 'keep' and use for the protection of one's home and family." *Id.* at 628-29. The Court determined that the District of Columbia prohibition on handgun possession *in the home* violated the Second Amendment, and also determined that the "prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense" was also unconstitutional. *Id.* at 635.

12

In *Ezell*, the Seventh Circuit applied the decisions in *Heller* and *McDonald* to a challenge to a City of Chicago ordinance. As *Ezell* noted, *Heller* determined that the Second Amendment "secures a pre-existing natural right to keep and bear arms; that the right is personal and not limited to militia service; and that the 'central component of the right' is the right of armed self-defense, most notably in the home." *Ezell*, 651 F.3d at 700-01 (quoting *Heller*, 554 U.S. at 595, 599-600). The Seventh Circuit[5] further recognized that the Supreme Court did not set out any "doctrinal 'test' for resolving future" Second Amendment claims. 651 F.3d at 701.[6]

In *McDonald*, the Court determined that the *Heller* decision applied to the States under the Fourteenth Amendment, but did not address the issue raised by the plaintiffs in this case, i.e. whether the right to bear arms extends beyond the home.  130 S. Ct. at 3050.  *McDonald* left in place the previous decision in *Heller* that, "nothing in our opinion should be taken to cause doubt on longstanding prohibitions on . . . laws forbidding the carrying of firearms in sensitive places such as schools and government buildings . . ." 554 U.S. at 626-27, and the list of "presumptively lawful regulatory measures" was not exhaustive.  *Id.* at 627 n.26.

In *McDonald*, the Court stated, "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) judges think that scope is too broad." 130 S. Ct. at 3047.  Further, "the scope of the Second Amendment right is determined by textual and historical inquiry, not interest-balancing." *Id.*

---

[5] *Ezell* involved a post-*Heller* challenge by residents of the City of Chicago where the City of Chicago lifted its ban on handgun possession, but imposed a "Responsible Gun Owners Ordinance" which required one hour of firearm range training to receive a permit for gun ownership in the City. At the same time, the City prohibited all firing ranges within City limits. 651 F.3d at 659-60. The Seventh Circuit held that plaintiffs were entitled to a preliminary injunction on the firing-range ban. *Id.* at 690.

[6] The *Ezell* decision noted that "the Court was not explicit about how Second Amendment challenges should be adjudicated now that the historic debate about the Amendment's status as an individual-rights guarantee has been settled."  651 F.3d at 701.

Therefore, the Court must determine, in a state-statute context, "how the right was understood when the Fourteenth Amendment was ratified." *Ezell*, 651 F.3d at 702.

### B.    Constitutionality of Illinois Statutes

### 1.    Founding Era History of the Right to Bear Arms

The Court's review of relevant history is such that the Court cannot find that history supports plaintiffs' claim that the Second Amendment *necessarily* extends the right to bear arms to the unfettered right to carry weapons in public.[7] As the Supreme Court noted in *Heller*, 554 U.S. at 599, the "Second Amendment was not intended to lay down a novel principle, but rather codified a right inherited from our English ancestors." Further, "it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right" from English law. *Id.* at 592.

Although *Heller* reviewed the historical underpinnings of the Second Amendment and found that this included the right to bear arms within the home, it simply did not go so far as to require the extension of those protected Second Amendment rights to include the vast area outside the home. As the Fourth Circuit stated in a post-*Heller* review, *Heller* creates a "dilemma faced by lower courts in the post-*Heller* world: how far to push *Heller* beyond its undisputed core holding[?]" 638 F.3d at 475 (Wilkerson, writing for the court as to Part III B). Further:

---

[7]In undertaking this review, the Court has considered decisions of courts which have preceded this Court's inquiry and analysis on the issue of the application of the *Heller* decision to Second Amendment challenges outside of the home. Most notably, this Court finds the logic and analysis of the Central District of Illinois, on basically identical issues to those raised here, to be persuasive and adopts, but does not repeat, that court's review of the historical approach to the issue of the Second Amendment rights raised here. *See, Moore v. Madigan*, No. 11-3134, 2012 WL 3447660, at *5 (C.D. Ill. Feb. 3, 2012). In addition, the Court finds instructive, the summary in *Moore* of other courts which have considered and rejected attempts to expand the decision in *Heller* to the right to bear arms outside of the home. *Id.* at *7 (collecting cases).

14

SA-14

There may or may not be a Second Amendment right in some places beyond the home, but we have no idea what those places are, what the criteria for selecting them should be, what sliding scales of scrutiny might apply to them, or any one of a number of other questions. It is not clear in what places public authorities may ban firearms altogether without shouldering the burdens of litigation. The notion that "self-defense has to take place wherever [a] person happens to be," Eugene Volokh, Implementing the Right to Keep and Bear Arms for Self–Defense: An Analytical Framework and a Research Agenda, 56 UCLA L. Rev. 1443, 1515 (2009), appears to us to portend all sorts of litigation over schools, airports, parks, public thoroughfares, and various additional government facilities. And even that may not address the place of any right in a private facility where a public officer effects an arrest. The whole matter strikes us as a vast *terra incognita* that courts should enter only upon necessity and only then by small degree.

638 F.3d at 475.

As *Ezell* stated the "threshold inquiry in some Second Amendment cases will be a 'scope' question: Is the restricted activity protected by the Second Amendment in the first place?" 651 F.3d at 701.  In making this inquiry, *Ezell* noted that, "*Heller* suggests that some federal gun laws will survive Second Amendment challenge because they regulate activity falling outside the terms of the right as publicly understood when the Bill of Rights was ratified." 651 F.3d at 702.  Further, "if the government can establish that a challenged firearms law regulates activity falling outside the scope of the Second Amendment right as it was understood at the relevant historical moment . . . then the analysis can stop there; the regulated activity is categorically unprotected, and the law is not subject to further Second Amendment review." *Id*. at 702-03. Further,

Deciding whether the government has transgressed the limits imposed by the Second Amendment--that is, whether it has "infringed" the right to keep and bear arms--requires the court to evaluate the regulatory means the government has chosen and the public-benefits end it seeks to achieve. Borrowing from the Court's First Amendment doctrine, the rigor of this judicial review will depend on how close the law comes to the core of the

15

SA-15

Second Amendment right and the severity of the law's burden on the right.
See generally, Volokh, Implementing the Right to Keep and Bear Arms for
Self–Defense, 56 UCLA L.Rev. at 1454-72 (explaining the scope, burden,
and danger-reduction justifications for firearm regulations post- Heller );
Nelson Lund, The Second Amendment, Heller, and Originalist
Jurisprudence, 56 UCLA L.Rev. 1343, 1372-75 (2009); Adam Winkler,
Heller's Catch–22, 56 UCLA L.Rev. 1551, 1571-73 (2009); Lawrence B.
Solum, District of Columbia v. Heller and Originalism, 103 Nw. U.L.Rev.
923, 979–80 (2009); Glenn H. Reynolds & Brannon P. Denning, Heller's
Future in the Lower Courts, 102 Nw. U.L.Rev. 2035, 2042-44 (2008).

<u>2.</u>     <u>Review Standard</u>

When considering a law which is challenged on constitutional grounds, there are three

possible levels of scrutiny: rational basis, intermediate level and strict scrutiny. *Heller* and

*McDonald* did not specify the level of scrutiny to apply to laws that impact the right to bear arms

*outside* the home. However, the Seventh Circuit has determined that intermediate scrutiny

would apply. See, *Ezell*, 651 F.3d at 703-04 (collecting cases applying intermediate standard in

the Third, Fourth, and Tenth Circuits). In the case before this Court, plaintiffs have, under the

Illinois laws they challenge, the right to bear arms in their homes, the very right recognized as

protected under the Second Amendment by *Heller* and its progeny.

Viewing the Second Amendment claim raised by plaintiffs, to carry the firearms in public

for the purpose of general self-defense, through the intermediate scrutiny lens, the Court is aware

that the state must establish that there is a reasonable fit between the statute and its restrictions

and a substantial governmental interest. The Court notes that in making this review, it is aware

that in cases involving federal statutes making it unlawful for a person who has a prior

conviction to carry a firearm, 18 U.S.C. §922(g), the Seventh Circuit has upheld the statute's

constitutionality under a *Heller* challenge. See, e.g. *United States v. Skoien*, 614 F.3d 638 (7th

Cir. 2010) (where the court upholding the federal statute challenged by a defendant in a criminal

action who had been indicted for possessing a firearm, after a misdemeanor conviction pursuant to 18 U.S.C. §922(g), recognized that the goal of the statute, to prevent "armed mayhem" was "an important governmental objective." 614 F.3d at 642.)

The defendants assert that the State of Illinois has significant governmental interests in protecting the safety of the public by restricting the availability and use of handguns in public. The Supreme Court has previously recognized that under intermediate scrutiny cases, the government's interest need not be compelling. *Schenck v. Pro-Choice Network,* 519 U.S. 357, 376 (1997). As the Fourth Circuit noted in *United States v. Masciandaro*, 638 F.3d 458, 473 (4th Cir. 2011), "[l]oaded firearms are surely more dangerous than unloaded firearms, as they could fire accidentally or be fired before a potential victim has the opportunity to flee." The State of Illinois has determined that, for purposes of protection of its residents, a citizen's interest in carrying a firearm in public should be subject to the governmental interest in safeguarding the welfare of the public at large from the inherent dangers in a loaded firearm. This Court **FINDS** that the state has, therefore, established a substantial interest in the regulations at issue.

Under the Supreme Court's holding in *United States v. Salerno*, 481 U.S. 739, 745 (1987) when reviewing a constitutional challenge, a law is not facially unconstitutional unless plaintiffs can show that they have raised a cognizable Second Amendment claim. The issue, post-*Heller*, is whether the right of citizens to bear arms for "self-defense" should be construed to include concealed carry and should be considered to fall with "scope" determination. If the Court determines that the activity is *not* within that scope, then the Court's inquiry is over. 651 F.3d at 702-03.

*Heller* and *McDonald* recognized that the "'central component' of the Second

17

SA-17

Amendment is the right to keep and bear arms for defense of self, family and home." 651 F.3d at

704.  As *Heller* noted, from Blackstone through the Nineteenth Century cases, courts which

considered the issue noted that the right was not intended to cover "a right to keep and carry any

weapon whatsoever in any manner whatsoever and for whatever purpose." 554 U.S. at 626.  The

holding in *Heller* is narrow, and limited to the possession of firearms in one's home for the

purpose of self-defense.  As the Seventh Circuit noted in *Skoien*, "[c]ategorical limits on the

possession of firearms would not be a constitutional anomaly. Think of the First Amendment,

which has long had categorical limits: obscenity, defamation, incitement to crime, and others."

614 F.3d at 641 (reviewing First Amendment cases).

The rights recognized in *Heller*–to possess a firearm for self-defense in the home–are

rights which plaintiffs currently enjoy in Illinois.  The plaintiffs do not assert that the statutes at

issue limit their right to *have* a firearm, if they can meet permit requirements,[8] but rather, that the

statutes limit their ability to carry that firearm, loaded, outside the home for self-protection.

*Heller* specifically affirmed the government's power to regulate the use of firearms outside the

home.  554 U.S. at 626-27.  Therefore, this Court is persuaded that neither *Heller* nor *McDonald*,

requires the State of Illinois to extend the right to possess and carry a firearm to the area outside

the home.  *Heller* clearly speaks of the need to defend "hearth and home" but does not go beyond

that area in recognizing Second Amendment protections. 554 U.S. at 635.

Finally, the Court notes that the *Ezell* decision is completely in harmony with this

finding. In *Ezell* the Seventh Circuit was concerned with a city-wide ban on firearm ranges

which had the impact of limiting potential firearm permit applicants from effectively protecting

---

[8]Of course, this is not a case where the plaintiffs have challenged a permit requirement.

18

their homes because they could not, "acquire and maintain proficiency in [their firearm] use."

651 F.3d at 704.

### IV.    CONCLUSION

Accordingly, the Court **FINDS** that the plaintiffs' claim that the provisions of the State of Illinois' Unlawful Use of a Handgun and Aggravated Unlawful Use of a Handgun statutes do not violate the Second Amendment to the United States Constitution because the bearing of a firearm outside the home is not a core right protected by the Second Amendment.

Therefore, the Court **GRANTS** defendants' motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim, and plaintiffs' complaint is **DISMISSED**. The Court **GRANTS** defendants' motion to cite supplemental authority (Doc. 55). All remaining motions are **DENIED** as moot.


**IT IS SO ORDERED.**

**DATE:    30 March , 2012**

<div align="center">

**/s/  WILLIAM D. STIEHL** 
**DISTRICT JUDGE**

</div>

SA-19

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS
BENTON DIVISION

| | | |
|---|---|---|
| MARY E. SHEPARD and the ILLINOIS STATE RIFLE ASSOCIATION, | ) ) ) | |
| Plaintiffs, | ) ) | No. 3:11-cv-00405-WDS-PMF |
| v. | ) ) ) | Honorable Judge William D. Stiehl |
| LISA M. MADIGAN, solely in her official capacity as ATTORNEY GENERAL OF ILLINOIS, GOVERNOR PATRICK J. QUINN, solely in his official capacity as Governor of the State of Illinois, TYLER R. EDMONDS, solely in his official capacity as the State's Attorney of Union County, Illinois, and SHERIFF DAVID LIVESAY, solely in his official capacity as Sheriff of Union County, | ) ) ) ) ) ) ) ) ) ) ) ) | Magistrate Judge Philip M. Frazier |
| Defendants. | ) ) | |

**DECLARATION OF MARY E. SHEPARD**
**IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

I, Mary Shepard, declare as follows:

1.      My name is Ms. Mary E. Shepard and I reside in the town of Cobden in Union County, Illinois.  I am 71 years old and five feet, two inches tall.

2.      I am a citizen of the United States and a member of the National Rifle Association.

3.      I possess a valid Illinois Firearms Owner Identification card and I have no criminal record.

4.      I have received training in the safe handling and firing of handguns in five safety and self-defense courses and I hold a certification from each of those courses.

SA-20

5.      I have a valid Illinois Firearm Owner's Identification Card, a true and correct copy of which is attached as Exhibit A.

6.      I am licensed to carry a handgun in the State of Florida.  Attached as Exhibit B is a true and correct copy of my Florida Concealed Weapons License.

7.      I am licensed to carry a handgun in the Commonwealth of Pennsylvania. Attached as Exhibit C is a true and correct copy of my Pennsylvania Concealed Weapons Permit.

8.      I have received training in the safe handling and firing of handguns in five safety and self-defense courses and I hold a certification from each of those courses.  Attached as Exhibits D through H are true and correct copies of my certifications for successfully completing safety and self-defense course including training in the safe handling and firing of handguns.

9.      Those handgun-carry licenses are also recognized in many other states – but not in Illinois.

10.     Carrying a firearm in public to protect myself would make me a criminal in my home State of Illinois.  Forty-nine states recognize some form of carriage for self-defense, but Illinois law makes carrying a loaded gun a felony.

11.     That legal inability to protect myself with a firearm when in public in my home State changed my life forever at 3 p.m. on September 28, 2009.

12.      On that afternoon I was viciously attacked by a man who was six feet, three inches tall and weighed 245 pounds.  I was performing my duties as treasurer at the First Baptist Church when this man entered the church.

13.     He beat me senseless and left me for dead. I sustained four skull fractures, fractures of both cheeks, shattered teeth, a concussion, and crushed vertebrae in my spine when

SA-21

he beat me with his fists and kicked me once I was on the ground. I suffered two torn rotator cuffs and a mangled arm when he hurled me about my arms.

14.    I underwent multiple surgeries, including the reconstruction of my arm, repair of my clavicle, and  the rebuilding of four discs in my spine and the placement of surgical screws.  I have lost the hearing in my left ear.  I was unable to drive for more than a year and a half, and I now suffering blinding, recurrent headaches and other enduring injuries.

15.    On this occasion, my assailant also savagely attacked an 84-year-old-woman who was at the church performing custodial duties.

16.    A YouTube video containing photographs of me after this assault is available at: http://www.youtube.com/watch?v=B_2JwRo5K4o.

17.    If I had been in Pennsylvania or Florida, where I am licensed to carry a firearm for self-defense, or had I been in any of dozens of other states that reciprocally recognize one of my two firearms-carry permits, I would have been armed and could have protected myself.  But if I had had my gun with me that day in Union County, the State of Illinois would have treated *me* as the criminal.

18.    But for the Illinois ban on carrying a firearm for self-defense, I would have been armed that day and capable of defending myself against a hulking brute twice my size.  But Illinois law forbade me from defending myself.  Illinois law commanded that I be at the mercy of a thug who just walked into my church and nearly beat me to death.

19.    I could just as easily have been assaulted on the sidewalk outside the church or car-jacked in my vehicle on my way to church – or any of the other ten thousand public places where other states permit a licensed, trained, law-abiding citizen to carry a gun for self-defense,

SA-22

but here Illinois law mandates that even elderly ladies who are five-foot-two must go about defenseless and unarmed.

20.    I live in fear, in each and every waking moment, that I may be attacked in public again. If the sanctity of God's House in a peaceful town in the middle of the afternoon is not safe, then no place is. The Lord gave me the good sense to take precautions and to take responsibility for my own safety, and I have done just that by purchasing a firearm and taking instruction in five separate firearms courses. But Illinois law forbids me to carry the only instrument of self-defense that would give me a fighting chance against criminal predators like the man who attacked me and the other elderly lady in our church.

21.    If the Illinois law were struck down or repealed, I would carry my firearm for self-defense. Without that legal right, which I believe to be not only my constitutional right under the Second Amendment, but also my natural right as a human being, I live in mortal fear and I am irreparably harmed every time I set foot out of the front door of my home.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_Mary E. Shepard_
Mary Shepard

Dated this _8th_ day of August, 2011.

2334140v1/26457-0016

4

SA-23

# EXHIBIT "A"

FIREARM OWNER'S IDENTIFICATION CARD

FOID NUMBER 7660065

MARY E SHEPARD
2330 KAOLIN RD
COBDEN IL 62920

DOB:11/07/1939
Female 5' 02" 115lbs Hair:BLN Eyes:BLU

Expires 09/01/2012

CAUTION: [illegible]

ILLINOIS STATE POLICE

# EXHIBIT "B"



# EXHIBIT "C"

RP-4 122 (12-29.3)
**PENNSYLVANIA LICENSE TO CARRY FIREARMS**
Valid until expiration date indicated unless revoked.

☒ NEW ☐ RENEW
☐ DUPLICATE

**NO. 14 029 142**

| 3. DOB | 4. DATE ISSUED | 5. DATE EXPIRES | 6. REASON TO CARRY |
|---|---|---|---|
| 11/07/39 | 11/13/2008 | 11/13/2013 | Self-Defense |

| 7. SSN | 8. HGT | 9. WGT | 10. EYES | 11. HAIR |
|---|---|---|---|---|
| XXX-XX-XXXX | 502 | 115 | Blue | Blonde |

**VALID
WITHOUT
PHOTO**

| 12. SEX | 13. RACE | 14. US CITIZEN | 15. COUNTRY OF CITIZENSHIP |
|---|---|---|---|
| F | W | ☒ YES ☐ NO | USA |

16. IMMIGRATION ID NUMBER (IF APPL)

17. SIGNATURE OF LICENSEE
X Mary E. Shepard

18. SIGNATURE OF ISSUING AUTHORITY

19. SHERIFF OR CHIEF OF POLICE TO
Centre County

| f. (LAST) | (FIRST) | (MIDDLE) | (JR., ETC.) |
|---|---|---|---|
| Shepard | Mary | Elizabeth | |

f. ADDRESS
2330 Kaolin Road   Cobden IL 62920

SA-29

# EXHIBIT "D"



# EXHIBIT "E"

NATIONAL RIFLE
ASSOCIATION OF AMERICA

Mary Shepard

has completed training in the basics of

Pistol

Mike Carter
Instructor

4/5/08
Date

# EXHIBIT "F"

Case 3:11-cv-00405-DRH-PMR Document 39-3 Filed 05/24/12 Page 114 of 124 Page ID #275
Case: 12-1788 Document: 12 Filed: 04/11/2012 Pages: 124

Aug.05.2011 03:00 AM PAGE. 4/ 6



# EXHIBIT "G"



**John E. Logan College**

CARTERVILLE, ILLINOIS 62918

*This is to certify that*

**MARY E. SHEPARD**

**2330 KAOLIN RD.**

**COBDEN, IL 62920**

*has satisfactorily completed a specialized course of instruction in:*

**DEFENSIVE SHOOTING FOR MEN AND WOMEN (BASIC)(ACE 232 01)**

*This Certificate of Participation is awarded this* ____29 TH____ *day*

*of* ____JULY____ *,* 20 08

_____
*Associate Dean for Community Education*

_____
*Instructor*

SA-37

# EXHIBIT "H"



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS
BENTON DIVISION

MARY E. SHEPARD and the ILLINOIS )
STATE RIFLE ASSOCIATION, )
)
    Plaintiffs, )  No. 3:11-cv-00405-WDS-PMF
)
    v. )
)  Honorable Judge William D. Stiehl
LISA M. MADIGAN, solely in her official )  Magistrate Judge Philip M. Frazier
capacity as ATTORNEY GENERAL OF )
ILLINOIS, GOVERNOR PATRICK J. )
QUINN, solely in his official capacity as )
Governor of the State of Illinois, TYLER R. )
EDMONDS, solely in his official capacity )
as the State's Attorney of Union County, )
Illinois, and SHERIFF DAVID LIVESAY, )
solely in his official capacity as Sheriff of )
Union County, )
)
    Defendants. )

**DECLARATION OF DONALD MORAN**
**IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

I, Donald Moran, make the following declaration pursuant to 28 U.S.C. § 1746:

    1.    My name is Donald Moran. I am President of the Illinois State Rifle Association.

    2.    Illinois State Rifle Association ("ISRA") is a non-profit association incorporated under the laws of Illinois in 1913, with its principal place of business in Chatsworth, Illinois.

    3.    ISRA has members residing throughout the State of Illinois. The purposes of the ISRA include the protection of the right of citizens to bear arms for the lawful defense of their families, persons and property, and to promote public safety and law and order.

    4.    The State of Illinois prohibits members of the ISRA and other law-abiding citizens from the public possession and carrying of a firearm pursuant to 720 ILCS 5/24-1 and 720 ILCS 5/24-1.6.

1

5.      ISRA has many members who are legally qualified to possess a firearm and who, but for Illinois's ban, would carry firearms in public for personal protection.

6.      I, for example, am one such member:  I am a resident of Illinois, I am a member of ISRA, I have a valid Illinois Firearm Owner's Identification Card, and I desire to carry a firearm in public for self defense and would do so if Illinois law did not prohibit it.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

**DONALD MORAN**

Dated this **8th** day of **August, 2011.**

SA-41

Case 1:09-cv-01482-FJS   Document 34-3   Filed 05/24/12   Page 121 of 124
Case: 12-1788   Document: 12   Filed: 04/11/2012   Pages: 124

5/24-1. Unlawful Use of Weapons, IL ST CH 720 § 5/24-1

§ 24-1. Unlawful Use of Weapons.

(a) A person commits the offense of unlawful use of weapons when he knowingly:

…

(4) Carries or possesses in any vehicle or concealed on or about his person except when on his land or in his own abode, legal dwelling, or fixed place of business, or on the land or in the legal dwelling of another person as an invitee with that person's permission, any pistol, revolver, stun gun or taser or other firearm, except that this subsection (a) (4) does not apply to or affect transportation of weapons that meet one of the following conditions:

(i) are broken down in a non-functioning state; or

(ii) are not immediately accessible; or

(iii) are unloaded and enclosed in a case, firearm carrying box, shipping box, or other container by a person who has been issued a currently valid Firearm Owner's Identification Card; or

…

(10) Carries or possesses on or about his person, upon any public street, alley, or other public lands within the corporate limits of a city, village or incorporated town, except when an invitee thereon or therein, for the purpose of the display of such weapon or the lawful commerce in weapons, or except when on his land or in his own abode, legal dwelling, or fixed place of business, or on the land or in the legal dwelling of another person as an invitee with that person's permission, any pistol, revolver, stun gun or taser or other firearm, except that this subsection (a)(10) does not apply to or affect transportation of weapons that meet one of the following conditions:

(i) are broken down in a non-functioning state; or

(ii) are not immediately accessible; or

(iii) are unloaded and enclosed in a case, firearm carrying box, shipping box, or other container by a person who has been issued a currently valid Firearm Owner's Identification Card.

…

(b) Sentence. A person convicted of a violation of subsection 24-1(a)(1) through (5), subsection 24-1(a)(10), subsection 24-1(a)(11), or subsection 24-1(a)(13) commits a Class A misdemeanor. A person convicted of a violation of subsection 24-1(a)(8) or 24-1(a)(9) commits a Class 4 felony; a person convicted of a violation of subsection 24-1(a)(6) or 24-1(a)(7)(ii) or (iii) commits a Class 3 felony. A person convicted of a violation of subsection 24-1(a)(7)(i) commits a Class 2 felony and shall be sentenced to a term of imprisonment of not less than 3 years and not more than 7 years, unless the weapon is possessed in the passenger compartment of a motor vehicle as defined in Section 1-146 of the Illinois Vehicle Code,1 or on the person, while the weapon is loaded, in which case it shall be a Class X felony. A person convicted of a second or subsequent violation of subsection 24-1(a)(4), 24-1(a)(8), 24-1(a)(9), or 24-1(a)(10) commits a Class 3 felony. The possession of each weapon in violation of this Section constitutes a single and separate violation.

Case 1:09-cv-01482-FJS   Document 34-3   Filed 05/24/12   Page 122 of 124
Case: 12-1788    Document: 12    Filed: 04/11/2012    Pages: 124

5/24-1.6. Aggravated unlawful use of a weapon, IL ST CH 720 § 5/24-1.6

§ 24-1.6. Aggravated unlawful use of a weapon.

(a) A person commits the offense of aggravated unlawful use of a weapon when he or she knowingly:

(1) Carries on or about his or her person or in any vehicle or concealed on or about his or her person except when on his or her land or in his or her abode, legal dwelling, or fixed place of business, or on the land or in the legal dwelling of another person as an invitee with that person's permission, any pistol, revolver, stun gun or taser or other firearm; or

(2) Carries or possesses on or about his or her person, upon any public street, alley, or other public lands within the corporate limits of a city, village or incorporated town, except when an invitee thereon or therein, for the purpose of the display of such weapon or the lawful commerce in weapons, or except when on his or her own land or in his or her own abode, legal dwelling, or fixed place of business, or on the land or in the legal dwelling of another person as an invitee with that person's permission, any pistol, revolver, stun gun or taser or other firearm; and

(3) One of the following factors is present:

(A) the firearm possessed was uncased, loaded and immediately accessible at the time of the offense; or

(B) the firearm possessed was uncased, unloaded and the ammunition for the weapon was immediately accessible at the time of the offense; or

…

(c) This Section does not apply to or affect the transportation or possession of weapons that:

(i) are broken down in a non-functioning state; or

(ii) are not immediately accessible; or

(iii) are unloaded and enclosed in a case, firearm carrying box, shipping box, or other container by a person who has been issued a currently valid Firearm Owner's Identification Card.

(d) Sentence.

(1) Aggravated unlawful use of a weapon is a Class 4 felony; a second or subsequent offense is a Class 2 felony for which the person shall be sentenced to a term of imprisonment of not less than 3 years and not more than 7 years.

(2) Except as otherwise provided in paragraphs (3) and (4) of this subsection (d), a first offense of aggravated unlawful use of a weapon committed with a firearm by a person 18 years of age or older where the factors listed in both items (A) and (C) of paragraph (3) of subsection (a) are present is a Class 4 felony, for which the person shall be sentenced to a term of imprisonment of not less than one year and not more than 3 years.

(3) Aggravated unlawful use of a weapon by a person who has been previously convicted of a felony in this State or

another jurisdiction is a Class 2 felony for which the person shall be sentenced to a term of imprisonment of not less than 3 years and not more than 7 years.

(4) Aggravated unlawful use of a weapon while wearing or in possession of body armor as defined in Section 33F-1 by a person who has not been issued a valid Firearms Owner's Identification Card in accordance with Section 5 of the Firearm Owners Identification Card Act is a Class X felony.

(e) The possession of each firearm in violation of this Section constitutes a single and separate violation.

## CERTIFICATE OF SERVICE

I hereby certify that on April 11, 2012, I electronically filed the

foregoing with the Clerk of the Court for the United States Court of

Appeals for the Seventh Circuit by using the appellate CM/ECF system.  I

certify that all participants in the case are registered CM/ECF users and

that service will be accomplished by the CM/ECF system.


s/ Charles J. Cooper
Charles J. Cooper
*Attorney for Plaintiffs-Appellants*