No. 12-1788

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

------------------------------------------------------

MARY SHEPARD *et al.*,

*Plaintiffs-Appellants*,

v.

LISA M. MADIGAN, *et al.*,

*Defendants-Appellee*s.

------------------------------------------------------

On Appeal from the United States District Court for the Southern District
of Illinois Civil Case No. 11-CV-405-WDS (Hon. William D. Stiehl)

------------------------------------------------------

BRIEF *AMICI CURIAE* OF MICHAEL HALL, KENNETH PACHOLSKI,
KATHRYN TYLER AND THE NATIONAL RIFLE ASSOCIATION OF
AMERICA, INC., IN SUPPORT OF PLAINTIFFS-APPELLANTS

------------------------------------------------------

David Lehman
Deputy Executive Director and
General Counsel
NRA-ILA
11250 Waples Mill Road
Fairfax, VA 22030
Tel: (703) 267-1163
Fax: (703) 267-3973

Brian Stuart Koukoutchos
28 Eagle Trace
Mandeville, LA 70471
Tel: (985) 626-5052

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.................................................................ii

INTEREST OF *AMICI CURIAE* ..........................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .............................…..3

ARGUMENT.................................................................................5

FIREARMS CARRIAGE IN PUBLIC BY LAW-ABIDING CITIZENS
PROMOTES, RATHER THAN THREATENS, PUBLIC SAFETY. .................5

    I.    ARMED SELF-DEFENSE IN PUBLIC IS PREVALENT IN THE 49
        STATES THAT, UNLIKE ILLINOIS, DO NOT OUTLAW THAT
        CONSTITUTIONAL RIGHT. ....................................................5

    II.   PRIVATE CITIZENS LICENSED TO CARRY WEAPONS DO NOT
        THREATEN PUBLIC SAFETY. ...............................................13

    III.  CONTRARY TO THE DEFENDANTS' ASSERTION, PERMITTING
        LAW-ABIDING CITIZENS TO CARRY FIREARMS IN PUBLIC DOES
        NOT INCREASE—BUT MAY DECREASE—VIOLENT CRIME..............22

CONCLUSION ............................................................................29

i

# TABLE OF AUTHORITIES

**Cases**                                                                                  **Page**

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ...........................................3, 6

*Ezell v. City of Chicago,* 651 F.3d 684 (7th Cir. 2011) ........................................4, 5

    **Other**

13 Vt. Stat. § 4003 ...............................................................................28

A.L. Kellerman & D.T. Reay, *Protection or Peril? An Analysis of Firearm-related Deaths in the Home,* 314 New England J. of Med. 1557-60 (1986) .14

A.L. Kellerman *et al.*, *Gun Ownership as a Risk Factor for Homicide in the Home*, 329 New England J. of Med. 1084-91 (1993) ....................................14

A.L. Kellerman *et al.*, *Injuries and Deaths Due to Firearms in the Home*, 45 Journal of Trauma 263-67 (1998) ...............................................................14

Charles C. Branas, et al., *Investigating the Link Between Gun Possession and Gun Assault*, 99 AMER. J. PUB. HEALTH 2034 (Nov. 2009) ....................11, 12

Charles F. Wellford, John V. Pepper & Carol V. Petrie (eds.), FIREARMS AND VIOLENCE: A CRITICAL REVIEW (2005) ...........................*passim*

Daniel D. Polsby & Don B. Kates, Jr., *American Homicide Exceptionalism*, 69 U. Colo. L. Rev. 969 (1998) .......................................................................20

David B. Mustard, *Comment*, *in* EVALUATING GUN POLICY 326 (Jens Ludwig and Philip J. Cook eds. 2003) .....................................19, 20, 23

David B. Mustard, *The Impact of Gun Laws on Police Deaths*, 44 J.L. & ECON. 635 (2001) .........................................................................19, 21

David Hemenway & Deborah Azrael, *The Relative Frequency of Offensive and Defensive Gun Uses: Results from a National Survey*, 15 VIOLENCE & VICTIMS 257 (2000) .........................................................................6, 7, 13, 14

David McDowall *et al.*, *Easing Concealed Firearms Laws: Effects on Homicide in Three States*, 86 J. CRIM. L. & CRIMINOLOGY 193 (1995)............25

*First Reports Evaluating the Effectiveness of Strategies for Preventing Violence: Firearms Laws*, 52 MORBIDITY & MORTALITY WEEKLY REPORT 11 (CDC Oct. 3, 2003).................................................................25, 26

Gary Kleck & Don B. Kates, Jr., ARMED:
    NEW PERSPECTIVES ON GUN CONTROL (2001)................................................6, 7

Gary Kleck, TARGETING GUNS: FIREARMS AND THEIR CONTROL (1997) ...6, 9, 10

James D. Wright & Peter H. Rossi, ARMED AND CONSIDERED DANGEROUS
    (2d ed. 2008) ..............................................................................12

James Q. Wilson, *Dissent,* Appendix A to NATIONAL RESEARCH COUNCIL
    REVIEW........................................................................................23, 24

Jens Ludwig, *Concealed-Gun-Carrying Laws and Violent Crime: Evidence
    from State Panel Data*, 18 INT'L REV. L. & ECON. 239 (1998) ........................25

John Donohue, *The Impact of Concealed-Carry Laws, in* EVALUATING GUN
    POLICY 289 (Jens Ludwig & Philip J. Cook eds. 2003) .........................24, 25

John Donohue, *Guns, Crime and the Impact of State Right-to-Carry Laws*,
    73 FORDHAM L. REV. 623, 630-39 (2004) ...........................................24

John Lott, *Responding to Jack D'Aurora's piece in the Columbus Dispatch*,
    (available at http://johnrlott.blogspot.com/2011/08/responding-to-
    jack-dauroras-piece-in.html) ...........................................................18

John R. Lott, Jr., MORE GUNS LESS CRIME:
    UNDERSTANDING CRIME AND GUN CONTROL LAWS (3d ed. 2010).........10, 22

Lawrence Messina, *Gun Permit Seekers Not the Criminal Type,*
    CHARLESTON GAZETTE, P. C1 (July 28, 1997)................................................18

North Carolina Department of Justice, "North Carolina Concealed
    Handgun Permit Statistics By County, 12/1/1995 thru 6/30/2011,"
    *available at* http://www.ncdoj.gov/CHPStats.aspx
    (last visited April 17, 2012). .........................................................19

Matt Hanley and Dave Gathman, *Local police give support to conceal carry,*
    THE COURIER NEWS, Aug. 6, 2011 (available at
    http://couriernews.suntimes.com/news/6899128-418/local-police-
    give-support-to-conceal-carry.html) (last visited 8/10/11) .....................21

Nick Paulson, *Police Not Fretting Over Looming Concealed Carry Law*, STEVENS POINT JOURNAL, Aug. 6, 2011 (available at http://www.stevenspointjournal.com/article/20110806/SPJ0101/108060501/Police-not-fretting-over-looming-concealed-carry-law) .......20

Philip Cook, *et al., Gun Control After* Heller*: Threats and Sideshows From a Social Welfare Perspective*, 56 U.C.L.A. L. REV. 1041 (2009).........................12

Robert Hahn, *et al., Firearms Laws and the Reduction of Violence: A Systematic Review* 28 AM.J.PREV. MED. 40 (2005) ................................26, 27

Florida Department of Agriculture and Consumer Services, Division of Licensing, "Concealed Weapon or Firearm License Summary Report," *available at* http://licgweb.doacs.state.fl.us/stats/cw_monthly.pdf (last visited April 17, 2012). ...........................................................................17

Tennessee Department of Safety and Homeland Security, "Handgun Carry Permit Statistics Calendar Year 2011" at 5, *available at* http://www.tn.gov/safety/stats/DL_Handgun/Handgun/HandgunReport2011Full.pdf (last visited April 17, 2012)........................18

Terry Flynn, *Gun-toting Kentuckians Hold Their Fire*, CINCINNATI ENQUIRER (June 16, 1997) (*available at* http://www.enquirer.com/editions/1997/06/16/loc_kycarry.html). ....................................................................................20

Texas Department of Public Safety, Regulatory Services Division, Concealed Handgun Licensing Bureau, "Demographic Information by Race/Sex," *available at* http://www.txdps.state.tx.us/administration/crime_records/chl/PDF/2010Calendar/ByRace/CY10RaceSexLicAppIssued.pdf and http://www.txdps.state.tx.us/administration/crime_records/chl/PDF/2010Calendar/ByRace/CY10RaceSexLicRevoked.pdf (last visited April 17, 2012) ...........................................................................18

Violence Policy Center, "Concealed Carry Killers," website, *available at* www.vpc.org/ccwkillers.htm. ......................................15, 16, 17

http://www.guardian.co.uk/news/datablog/2011/jan/10/gun-crime-us-state..................................................................................27

## INTEREST OF *AMICI CURIAE*

Proposed *Amici* Kenneth Pacholski, Kathryn Tyler and Michael Hall are residents of the City of Chicago and are plaintiffs in *Illinois Association of Firearms Retailers v. City of Chicago*, No. 1:10-cv-04184 ("*ILAFR*"), currently pending in the United States District Court for the Northern District of Illinois.  That suit challenges several provisions of Chicago's gun ordinance pursuant to the Second and Fourteenth Amendments to the United States Constitution. *See* Second Amended Complaint, *ILAFR*, Doc. No. 80 at 11-16.  In defense of its gun ordinance, Chicago has argued, among other things, that the Second Amendment right does not extend beyond the home and that the risks of public mayhem outweigh the right to keep and bear arms.  Both of these arguments have likewise been raised by the Defendants in this case.  This *amicus* brief addresses in particular the latter issue—the supposed threat to public safety posed by citizens exercising their Second Amendment rights—and canvases the scientific literature on the subject that has been ignored almost entirely by the Defendants and by the district court below.   *Amici* therefore submit that this brief will be of assistance to the Court.  *See* Fed. R. App. P. 29(b)(2); *NOW, Inc. v. Scheidler*, 223 F.3d 615, 617 (7th Cir. 2000).

1

Proposed Amicus NRA is America's foremost and oldest defender of Second Amendment rights.  Founded in 1871, the NRA today has approximately four million members and its programs reach millions more.  The NRA is America's leading provider of firearms marksmanship and safety training for both civilians and law enforcement.  The NRA's membership includes Illinois residents, including Ms. Shepard, one of the plaintiffs in this case, and proposed *amici* Ms. Tyler and Mr. Pacholski.  The rights of Illinois NRA members are infringed by the State's ban on carrying firearms for self-defense in public.  The outcome of this case is thus critically important to the NRA and its Illinois members.

The Plaintiffs-Appllants have consented to the filing of this brief.  In the district court below, none of the Defendants objected to the filing of the NRA's *amicus* brief in a timely fashion.  Consent was sought from the Illinois State Defendants (Madigan, Quinn and Edmonds), whose counsel have informed counsel for *amici* that they take no position on the filing of *amicus* briefs and that we are free to convey their lack of a position to this Court.  Communications to counsel for Defendant Livesay have not been returned.  A motion for leave to file therefore accompanies this brief.

No party's counsel contributed any funding to the submission and

preparation of the brief, which was funded here, as it was in the district court below, entirely by *amicus* NRA.  A substantially similar brief submitted on behalf of the NRA in the district court was authored by undersigned counsel and by Cooper & Kirk, which is counsel for Plaintiffs-Appellants in this Court.  Cooper & Kirk does not represent *amici* in connection with this appeal.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Second Amendment "guarantee[s] the individual right to … carry weapons in case of confrontation"—that is, to "wear, bear, or carry … upon the person or in the clothing or in a pocket, for the purpose … of being armed and ready for offensive or defensive action in a case of conflict with another person." *District of Columbia v. Heller*, 554 U.S. 570, 592, 584 (2008) (citation and quotation marks omitted).   The Supreme Court explained in *Heller* that this right to armed self-defense is no longer "subject[] to a freestanding 'interest-balancing' approach.  The very enumeration of the right" in the Constitution "necessarily takes certain policy choices off the table." *Heller*, 554 U.S. at 634-35, 636.  The National Rifle Association respectfully submits that the *categorical* public

3

disarmament of *all* law-abiding citizens is one policy choice that is no

longer available to the State of Illinois.  *See Ezell v. City of Chicago*, 651 F.3d

684, 703 (7th Cir. 2011) (noting that the Supreme Court's decisions "suggest

that broadly prohibitory laws restricting the core Second Amendment right

… are categorically unconstitutional.").

Even if this Court were free to rebalance the scales and to judge the

utility of the Second Amendment right to bear arms, the evidence mustered

by Illinois would be insufficient to shift the balance in favor of the State's

wholesale ban on carrying firearms in public.  In the court below, Illinois

argued that its ban on *any* law-abiding citizen carrying a loaded and

operable firearm in *any* public place is "supported by common sense and

empirical evidence." Defendants' Motion to Dismiss (Doc. No. 27) at 17

(hereafter, "Illinois Motion to Dismiss").  Any supposed "common sense"

appeal in Illinois's position is belied by the stubborn fact that *every other*

*State in the Union* permits law-abiding citizens to carry weapons in public,

and does so without suffering the mayhem that Illinois so confidently

forecasts.  As for "empirical evidence," the district court below did not

even mention, let alone review, any such evidence; it conducted no review

of empirical evidence and cited no studies, research or statistics.  That

dooms the challenged statutes under the analysis set forth in *Ezell*, where

this Court emphasized Chicago's lack of "empirical evidence" and its

"entirely speculative" claims of threats to public safety.  *Ezell*, 651 F.3d at

709.  The meager scraps of social-science evidence proffered by Illinois—

which were not even considered by the court below—are wholly

insufficient to meet even the most forgiving standard of heightened judicial

scrutiny.  The decision below should therefore be reversed.

## ARGUMENT

### FIREARMS CARRIAGE IN PUBLIC BY LAW-ABIDING CITIZENS PROMOTES, RATHER THAN THREATENS, PUBLIC SAFETY.

I.     ARMED SELF-DEFENSE IN PUBLIC IS PREVALENT IN THE 49 STATES THAT, UNLIKE ILLINOIS, DO NOT OUTLAW THAT CONSTITUTIONAL RIGHT.

Illinois contends that "logic" and "common sense" prove that

allowing properly licensed, law-abiding citizens to carry firearms in public

inevitably leads to "armed mayhem." Illinois Motion to Dismiss at 16-17.[1]

This policy argument runs headlong into two insuperable obstacles.  First,

---

[1] The Brady Center for Handgun Control made similar policy arguments in its *amicus* brief below, which we assume will be repeated in a similar filing in this Court.  Citations to the Brady Center brief, Doc. No. 37, will be styled "Brady Br."

the actual research on firearms violence refutes Illinois's facile slogans.

Second, the State's dire forecast of public carnage cannot be squared with

the experience of the 49 other States that permit their citizens to carry

firearms in public.

The right to "carry weapons in case of confrontation" that the

Supreme Court described in *Heller*, 554 U.S. at 592, promotes public safety.

Defensive gun use is a common and effective way for ordinary citizens to

defend themselves from violence.  The leading study designed specifically

to gauge the frequency of defensive gun use determined that every year

there are between 670,000 and 1,575,000 defensive gun uses associated with

carrying firearms in public places. Gary Kleck, Targeting Guns: Firearms

and Their Control 192 (1997) (describing results of the National Self-

Defense Survey); *see also* Gary Kleck & Don B. Kates, Jr., Armed: New

Perspectives on Gun Control 225-26 (2001).  Thus, of the roughly 2.5

million defensive gun uses each year, as many as 63% involve citizens

carrying a firearm while outside their homes. Kleck, Targeting Guns,

*supra,* at 179, 192.

Although Illinois did not come to grips with this evidence below, the

Brady Center contested the efficacy and frequency of defensive gun use,

relying on a study by Drs. Hemenway and Azrael.  Brady Br. 11 (citing

David Hemenway & Deborah Azrael, *The Relative Frequency of Offensive and*

*Defensive Gun Uses: Results from a National Survey*, 15 VIOLENCE & VICTIMS

257, 271 (2000)).  But Dr. Hemenway's study has been discredited for

misrepresenting its own survey results:  his actual data indicate at least *six*

*times* as many defensive gun uses as the estimates he reports in his article.

*See* Kleck & Kates, ARMED, *supra*, at 230 & n. 27.  In contrast, Dr. Kleck's

results, indicating approximately 2.5 million defensive gun uses per year

with 1.6 million of those occurring outside the home, have been replicated

and confirmed by 19 other surveys.  Many of those studies were not by

firearms advocates, but by gun-control supporters, including the federal

Centers for Disease Control, the Police Foundation, the U.S. Justice

Department, and the WASHINGTON POST.  *See* Kleck & Kates, ARMED, *supra*,

at 228-31.

  In particular, we draw the Court's attention to an exhaustive review

of the entire body of firearms-regulation literature that was conducted by

the principal research arm of the federal government:  the National

Academy of Sciences.  The National Research Council of the National

Academies of Science undertook "an assessment of the strengths and

limitations of the existing research and data on gun violence." Charles F.

Wellford, John V. Pepper & Carol V. Petrie (eds.), FIREARMS AND VIOLENCE:

A CRITICAL REVIEW 1 (2005) ("NRC REVIEW").  The NRC surveyed *all* the

extant literature on firearms regulation—hundreds of books, journal

articles, and peer-reviewed studies.  *See id.* at 22-30, 78, 130-33, 156-61, 174-

77, 186-92, 242-68.[2]  The NRC concluded that Dr. Kleck's figures on

defensive gun use have been replicated and confirmed, whereas Dr.

Hemenway's have not:  "*At least 19 other surveys* have resulted in estimated

numbers of defensive gun uses that are similar (*i.e.*, statistically

indistinguishable) to the results found by Kleck and Gertz.  *No other surveys*

---

[2] Defendants and their *amici* would like to pretend that all articles about
firearms regulation are created equal and that any given study that they
cite cancels out a study that the Plaintiffs cite.  This simplistic approach is
defeated by the fact that the NRA relies principally on *two non-partisan
reviews of the entire body of firearms literature:* the one conducted by the
National Research Council that is discussed in the text above, and another
conducted by the public-health experts at the federal government's Centers
for Disease Control, which is discussed in the text below.  These two
massive undertakings reviewed hundreds of books and articles, including
most of those cited by the Defendants and the Brady Center.  These two
reviews assessed the state of the published scientific knowledge on the
efficacy of various types of firearms regulations and whether the available
evidence was sufficient to form a basis for policy recommendations.  They
concluded that the data are utterly insufficient.  This fatally impeaches the
empirical evidence that Defendants and the Brady Center have proffered.

*have found numbers consistent with* [the figures used by Dr. Hemenway]."

NRC REVIEW at 103 (emphasis added). *See also id.* at 113.

Illinois and the Brady Center belittle the value of citizens bearing

firearms in public as a form of self-defense.  But defensive gun use is not

only common, it is also effective.  Data from the U.S. Bureau of Justice

Statistics indicate that, in confrontations with criminals, 99% of victims

maintain control of their firearms. *See* Kleck, TARGETING GUNS, *supra*, at

168-69. Numerous studies have found that robbery victims who resist with

firearms are significantly less likely to have their property taken and are

also less likely to be injured.  *See* Kleck, TARGETING GUNS, *supra*, at 170.

"Robbery and assault victims who used a gun to resist were less likely to

be attacked or to suffer an injury than those who used any other methods

of self-protection or those who did not resist at all."  *Id*. at 171.  "[V]ictim

resistance with a gun almost never provokes the criminal into inflicting

either fatal or nonfatal violence." *Id*. at 174.  Similarly, "rape victims using

armed resistance were less likely to have the rape attempt completed

against them than victims using any other mode of resistance," and

defensive gun use did not increase the victim's risk of "additional injury

beyond the rape itself." *Id*. at 175.  Justice Department statistics reveal that

the probability of serious injury from any kind of attack is 2.5 times greater

for women offering no resistance than for women resisting with a gun. *See*

John R. Lott, Jr., MORE GUNS LESS CRIME: UNDERSTANDING CRIME AND GUN

CONTROL LAWS 4 (3d ed. 2010).

Indeed, to prevent completion of a crime it is usually necessary only

for the intended victim to display the firearm rather than pull the trigger.

A national survey "indicates that about 95 percent of the time that people

use guns defensively, they merely have to brandish a weapon to break off

an attack." *See* Lott, MORE GUNS LESS CRIME, *supra*, at 3.  Fewer than one in

a thousand defensive gun uses results in a criminal being killed.  *See* Kleck,

TARGETING GUNS, *supra* at 178.[3]

---

[3] The Brady Center has argued that "firearms kept in the home are
primarily a threat to their owners."  Brady Br. 10-11 & n.5.  In the first
place, all such evidence, even if it were valid, is irrelevant to the case before
the Court, which involves only Illinois's ban on carrying weapons in *public*
places.  Illinois law permits citizens to keep firearms at home for self-
defense, so whatever risks accompany gun possession at home *already* exist
and cannot possibly be affected by the outcome of this case.
    Second, all of the Brady Center studies (or the predecessor studies on
which they relied) were reviewed by the National Research Council and
dismissed as proving absolutely nothing. *See, e.g.,* NRC REVIEW at 242, 243,
247, 248, 259.  Even when statistical *associations* between gun ownership
and homicide were found, no *causal link* could be demonstrated.  *Id.* at 5.
The NRC identified three fatal flaws in the research on which the Brady

Illinois asserted below that defensive gun use does not protect crime victims. Illinois Resp. to Plaintiffs' Prelim. Inj. Motion (Doc. No. 28) at 12 (citing Charles C. Branas, *et al.*, *Investigating the Link Between Gun Possession and Gun Assault*, 99 AMER. J. PUB. HEALTH 2034 (Nov. 2009)); *see also* Brady Br. 12 (same). But as Illinois concedes, that study found merely a statistical *association* between gun possession by "urban adults" who become crime victims and the risk of being shot—it did not purport to find a *causal link*. *See* Branas, *supra*, at 2037. Regardless of the effectiveness of defensive gun use, one would expect a positive statistical association between victim gun possession and victim injury, because those urban dwellers *most at risk of victimization* (*e.g.,* because they reside in a dangerous neighborhood) are also the *most likely to arm themselves for protection*—this is known as reverse causation. Going to the doctor has an extremely high positive association with being sick, but that hardly proves that going to the doctor causes

---

Center relies: "[T]hese studies do not adequately address the problem of self-selection. Second, these studies must rely on proxy measures of ownership that are certain to create biases of unknown magnitude and direction. Third, because the ecological correlations are at a higher geographic level of aggregation, there is no way of knowing whether the homicides or suicides occurred in the same areas in which the firearms are owned." *Id*. at 6. Therefore the studies "do not credibly demonstrate a causal relationship between the ownership of firearms and the causes or prevention of criminal violence or suicide." *Id*.

illness. In fact, the Branas study acknowledged that it "did not account for the potential of reverse causation between gun possession and gun assault." *Id*. at 2039. It further admitted that its results had no application to those citizens engaging in "regular training with guns"—precisely the training that most States reasonably require of gun-permit holders. Consequently, the study concluded with the limited advice that those bearing arms should "understand that regular possession necessitates careful safety countermeasures." *Id*. at 2039.

The Brady Center further argued that carrying a firearm for self-defense merely increases one's risk of injury because it initiates a sort of arms race where criminals are more motivated to carry guns by the anticipation that their victims may be armed. Brady Br. 12 (citing Philip Cook, *et al., Gun Control After* Heller*: Threats and Sideshows from a Social Welfare Perspective*, 56 UCLA L. REV. 1041, 1081 (2009)). First, as the passage quoted by the Brady Center itself reveals, the cited statement was mere speculation based on what the survey authors learned from interviewing criminals about their thoughts on firearms. Second, far from concluding that armed victims motivated criminals to carry guns, the study actually

demonstrated that criminals were *deterred* by the prospect of facing armed resistance. *See* James D. Wright & Peter H. Rossi, ARMED AND CONSIDERED DANGEROUS 155 (2d ed. 2008).  For example, 69% of the felons interviewed said they knew a fellow criminal who had been "scared off, shot at, wounded, captured or killed by an armed victim," *id.* at 155, and 56% opined that that "a criminal is not going to mess around with a victim he knows is armed with a gun." *Id.* at 146.  None of this is surprising.  The research merely confirms the common-sense expectation that criminals prefer their victims unarmed and defenseless—which is precisely how Illinois law leaves them.

## II.    PRIVATE CITIZENS LICENSED TO CARRY WEAPONS DO NOT THREATEN PUBLIC SAFETY.

Illinois and its *amicus* would have this Court believe that law-abiding citizens who have been screened and licensed by the government to carry firearms constitute an acute threat to public safety.  In particular, the Brady Center asserted below that guns carried by private citizens for self-defense are used  " 'far more often to kill and wound innocent victims than to kill and wound criminals . . . . ' " Brady Br. 11 (quoting Hemenway & Azrael, *supra,* 15 VIOLENCE & VICTIMS at 271).  The Brady Center's use of this

13

supposed authority is quite damning.  First, the words for which the Brady

Center substituted ellipses at the end of its quotation are "particularly at

home."  *See* 15 VIOLENCE & VICTIMS at 271 (2000).  The studies being cited in

the Hemenway article focused on the use of guns for self-defense in the

home.  Presumably the Brady Center omitted those inconvenient words

because the present case involves a law banning the carrying of firearms in

public, and therefore the risks of firearms in the home are irrelevant to, and

unaffected by, this challenge to Illinois law.

Second, the research on which Dr. Hemenway relied for the

proposition quoted by the Brady Center—several articles by A. L.

Kellerman—was thoroughly discredited many years ago.[4]  Indeed, these

articles are so flawed that, when the National Research Council conducted

its review of firearms literature, it singled out these Kellerman studies for

particular censure.  The NRC concluded that: (i) the studies utterly failed to

establish that gun ownership increased the risk of violence to the owner,

---

[4] *See* A.L. Kellerman & D.T. Reay, *Protection or Peril? An Analysis of Firearm-
related Deaths in the Home,* 314 New England J. of Med. 1557-60 (1986); A.L.
Kellerman  *et al., Gun Ownership as a Risk Factor for Homicide in the Home*,
329 New England J. of Med. 1084-91 (1993); A.L. Kellerman *et al., Injuries
and Deaths Due to Firearms in the Home*, 45 Journal of Trauma 263-67 (1998).

(ii) the studies were incapable of throwing light on "the impact of firearms on homicide or the utility of firearms for self-defense," and (iii) the studies' conclusions "that owning firearms for personal protection is 'counterproductive' and that 'people should be strongly discouraged from keeping guns in the home' " were simply "not tenable."  NRC REVIEW at 118-19.  The Brady Center thus can only support Defendants' position by misrepresenting its own authorities and by relying on authorities that were discredited long ago.

Illinois asserts that "[e]vidence from other States also suggests that permitting systems consistently fail to keep guns out of the hands of dangerous people."  Illinois Motion to Dismiss 17.  The *only* evidence cited by Illinois is a webpage maintained by the Violence Policy Center ("VPC") entitled "Concealed Carry Killers," which purports to tally the number of people killed by citizens who have permits to carry firearms in public. Illinois Motion to Dismiss 17 (citing www.vpc.org/ccwkillers.htm); *see also* Brady Br. 11.  Although proffered by Illinois and the Brady Center as scholarly research, the VPC webpage does not purport to be anything of the sort.  Instead, it describes itself as a collection of "vignettes" of suicides, homicides and firearms accidents culled from news clippings, and it

15

acknowledges that it does not have "detailed information on such killings."

*See* www.vpc.org/ccwkillers.htm. If one goes to this website and clicks on

the "tally" of "Total People Killed by Concealed Carry Killers: 370," one

arrives at a 165-page document which collects the aforementioned

"vignettes," usually with one vignette per page.  (Hereafter, citations to

this document will be styled "VPC Vignettes at __"; unfortunately, the VPC

did not put page numbers in its document).[5]

   Although Illinois argues that citizens carrying guns in public pose a

threat, much of the VPC's compilation consists of incidents that took place

*in the home*, where Illinois law *already* permits people to keep guns for self-

defense.  At least 33 of the 165 pages in the VPC compilation describe

firearms-related killings in the gun-owner's home.  *See, e.g.*, VPC Vignettes

at 17, 51, 58, 63, 99, 157.   Plainly, this proves nothing about the supposed

risk presented by public carriage of firearms.

   The VPC list also includes a high percentage of incidents that

likewise prove nothing about the supposed homicide risk of allowing

---

[5] This discussion that follows pertains to the version of the VPC website
that was cited by Illinois and the Brady Center below.  The webpage's
tabulation is updated periodically but the criticisms remain the same, even
if some of the figures may have changed slightly.

citizens to carry firearms in public: (i) at least 100 incidents that involved suicide rather than the killing of another, and that do not even indicate if a firearm was the means of suicide, *see id.* at 66, 75, 79; (ii) accidental gun discharges in which nobody was charged with a crime, *see id.* at 51; (iii) incidents involving rifles and shotguns rather than concealable weapons that are more typically carried in public, *see e.g., id.* at 91, 94, 151, 155; (iv) homicide by strangulation, which hardly shows that guns constitute a unique threat, *see id.* at 40; and even (v) a "vignette" in which the gun-permit owner—whom the VPC says had just been "hailed as a hero" for rescuing an abandoned baby from a trash bin—was not charged because police found that he acted lawfully in self-defense, *see id.* at 71. The VPC's tally of "Concealed Carry Killers" is a sham and proves nothing.

Far more probative is the actual experience of the 49 States that permit law-abiding citizens to carry weapons in some public places in some manner. Where such carriage is allowed, few—if any—permit holders have committed offenses with their firearms. Since they all must pass background and other checks conducted by the police, it is hardly

surprising that carry-permit holders tend to be among the most law-

abiding citizens.

- Florida has perhaps the most extensive experience with a shall-
  issue statute.  In the 25 years since that State adopted its regime
  of issuing concealed-carry permits to all qualified applicants,
  Florida has issued 2,167,283 licenses and revoked just 168 due
  to firearm crimes (including non-violent crimes) by license
  holders—a revocation rate of less than .008%.  Florida
  Department of Agriculture and Consumer Services, Division of
  Licensing, "Concealed Weapon or Firearm License Summary
  Report," *available at*
  http://licgweb.doacs.state.fl.us/stats/cw_monthly.pdf (last
  visited April 17, 2012).

- In Ohio, about 178,000 people had concealed-handgun permits
  in 2010 and "just 206 — 0.1% — had their permits revoked.
  Most revocations involved people losing their permits because
  they moved out of state, died or decided not to hold their
  license anymore." John Lott, *Responding to Jack D'Aurora's piece
  in the Columbus Dispatch*, (available at
  http://johnrlott.blogspot.com/2011/08/responding-to-jack-
  dauroras-piece-in.html).

- In 2011, Tennessee issued 94,975 permits and revoked only 97.
  Tennessee Department of Safety and Homeland Security,
  "Handgun Carry Permit Statistics Calendar Year 2011" at 5,
  *available at*
  http://www.tn.gov/safety/stats/DL_Handgun/Handgun/Ha
  ndgunReport2011Full.pdf (last visited April 17, 2012).

- In 2010, Texas issued 102,133 licenses and revoked just 610 for
  any reason. Texas Department of Public Safety, Regulatory
  Services Division, Concealed Handgun Licensing Bureau,

"Demographic Information by Race/Sex," *available at* http://www.txdps.state.tx.us/administration/crime_records/chl/PDF/2010Calendar/ByRace/CY10RaceSexLicAppIssued.pdf and http://www.txdps.state.tx.us/administration/crime_records/chl/PDF/2010Calendar/ByRace/CY10RaceSexLicRevoked.pdf (last visited April 17, 2012).

- In South Carolina, between 1989 and 1997, only one permit holder was charged with a felony (a non-firearms related crime) and the charge was dropped. *See* Mustard, *Comment, in* EVALUATING GUN POLICY, *supra,* at 331.  *See also* Lawrence Messina, *Gun Permit Seekers Not the Criminal Type*, CHARLESTON GAZETTE, P. C1 (July 28, 1997) ("The sort of people who ask to carry concealed pistols legally in Kanawha County aren't the sort of people who commit felony offenses, court records show.").

- In North Carolina from December 1995 through June, 2011, 228,072 permits had been issued, and only 1,203 revoked for any reason. North Carolina Department of Justice, "North Carolina Concealed Handgun Permit Statistics By County, 12/1/1995 thru 6/30/2011," *available at* http://www.ncdoj.gov/CHPStats.aspx (last visited April 17, 2012).

As a result of this nationwide experience, "even those who vehemently opposed shall-issue laws have been forced to acknowledge that license holders are extremely law abiding and pose little threat.  The President of the Dallas Police Association, who had lobbied against the Texas concealed-carry law, admitted after it was enacted that '[a]ll the

horror stories I thought would come to pass didn't happen. No bogeyman.
I think it's worked out well, and that says good things about the citizens
who have permits.  I'm a convert.'"  David B. Mustard, *The Impact of Gun
Laws on Police Deaths*, 44 J.L. & ECON. 635, 638 (2001).  Similarly, the
"president and the executive director of the Florida Chiefs of Police and the
head of the Florida Sheriff's Association admitted that despite their best
efforts to document problems arising from the law, they were unable to do
so." Mustard, *Comment*, *in* EVALUATING GUN POLICY at 331.  *See also* Daniel
D. Polsby & Don B. Kates, Jr., *American Homicide Exceptionalism*, 69 U. Colo.
L. Rev. 969, 1007 & n.90 (1998).  Finally, "[s]peaking on behalf of the
Kentucky Chiefs of Police Association, Lt. Col. Bill Dorsey stated, 'We
haven't seen any cases where a [concealed-carry] permit holder has
committed an offense with a firearm.'" Mustard, *Comment*, *in* EVALUATING
GUN POLICY at 331 & n.63.  A sheriff in Campbell County, Kentucky
admitted that, prior to the passage of the concealed carry law, he worried
that he would be uncomfortable with the type of people who were
applying for concealed carry licenses, but after the law passed he
discovered that " '[t]hese are all just everyday citizens who feel they need
some protection.' " Terry Flynn, *Gun-toting Kentuckians Hold Their Fire*,

CINCINNATI ENQUIRER (June 16, 1997) (*available at*

http://www.enquirer.com/editions/1997/06/16/loc_kycarry.html).

Wisconsin recently passed a concealed weapons law, but law

enforcement officers there have expressed no fear that it will lead to

increased crime.  To the contrary, a police representative stated that "[t]he

majority of people carrying concealed weapons will be law-abiding people

who have proper permits and pose no threat . . . Those likely to cause

trouble might already have been concealing weapons." Nick Paulson, *Police

Not Fretting Over Looming Concealed Carry Law*, STEVENS POINT JOURNAL,

Aug. 6, 2011 (*available at*

http://www.stevenspointjournal.com/article/20110806/SPJ0101/1080605

01/Police-not-fretting-over-looming-concealed-carry-law). One sheriff

observed that, after the law passes, " 'It's pretty much going to be business

as usual for us.' " *Id.*[6]

---

[6] The Brady Center nevertheless asserts that citizens carrying licensed
firearms pose a particular threat to the police.  Brady Br. 11-12.  Yet law
enforcement officers across the nation—not just the many "converts"
quoted above—support the carrying of firearms by private citizens.  *See,
e.g.*, Mustard, *The Impact of Gun Laws on Police Deaths*, 44 J.L. & ECON. at 638
(a survey found that "76 percent of street officers and 59 percent of
managerial officers agreed that all trained, responsible adults should be

### III. CONTRARY TO THE DEFENDANTS' ASSERTION, PERMITTING LAW-ABIDING CITIZENS TO CARRY FIREARMS IN PUBLIC DOES NOT INCREASE—BUT MAY DECREASE—VIOLENT CRIME.

Numerous studies indicate that authorizing more law-abiding citizens to carry firearms either lowers rates of violent crime or has no impact at all.  Either result defeats the Illinois Gun Carry Ban because the burden is on the State to justify its restriction of the right to bear arms; Plaintiffs do not need to prove that permitting public gun carriage actually reduces crime because the justification for the right to bear arms is not that it is sound policy, but that it is an enumerated constitutional right.

---

able to obtain handgun carry permits.").  Law enforcement officers in Illinois hold similar views.  A recent survey of law enforcement officials in Fox Valley, a suburb of Chicago, found that, "[o]f the dozen area law enforcement leaders contacted by The Courier-News, none said they opposed concealed carry." Matt Hanley and Dave Gathman, *Local police give support to concealed carry*, THE COURIER NEWS, Aug. 6, 2011 (available at http://couriernews.suntimes.com/news/6899128-418/local-police-give-support-to-conceal-carry.html) (last visited 8/10/11).  One of the Illinois police chiefs stated that "[w]e don't have problems with legal guns owned by responsible, trained people." *Id.* Another police chief explained that "[t]he law-abiding citizens who will get the permits are probably people we never have any contact with anyway." *Id.*  These same views prevail throughout Illinois:  "The Illinois Sheriffs' Association long has been in favor of concealed carry. Last year, the Illinois Association of Chiefs of Police went from 'against' concealed carry to 'neutral' — a significant change after years of opposition." *Id.*

A great deal of research indicates that so-called "shall-issue" statutes requiring the issuance of carry permits to law-abiding citizens are strongly associated "with fewer murders, aggravated assaults and rapes." John Lott, MORE GUNS, LESS CRIME 57 (3rd ed., 2010).  Although some contest this point, *see* NRC REVIEW at 120-51 (reviewing the literature supporting or contradicting Lott's results), many experts find the evidence that shall-issue laws reduce murder rates to be compelling.  Consider the views of James Q. Wilson, perhaps America's most revered and influential criminologist, who was until his recent death Professor at Boston College and who previously held endowed chairs at Harvard, UCLA, and Pepperdine.  Professor Wilson was on the NRC committee and he summarized the research this way:  "with only a few exceptions, the studies … including those by Lott's critics, do not show that the passage of RTC [right to carry] laws drives the crime rates up (as might be the case if one supposed that newly armed people went about looking for someone to shoot)." James Q. Wilson, *Dissent,* Appendix A to NRC REVIEW at 270.  *See also id*. at 270 ("for people interested in RTC [right to carry] laws, the best evidence we have is that they impose no costs but may confer benefits").

23

Professor Wilson also noted that the NRC's own tabulation of the research results largely confirmed the hypothesis that shall-issue laws reduce murder rates. *Id.* He concluded that the evidence presented "suggests that RTC laws do in fact help drive down the murder rate, though their effect on other crimes is ambiguous." *Id.* at 271. It is important to remember that "no empirical research has made a case for shall-issue laws increasing crime. Instead, the literature has disputed the magnitude of the decrease and whether the estimated decreases are statistically significant." David B. Mustard, *Comment*, *in* EVALUATING GUN POLICY 326 (Jens Ludwig and Philip J. Cook eds. 2003). *See also id.* at 326 ("Even if one uncritically accepts the most negative reviews of Lott-Mustard [research] at face value, there is still more evidence that shall-issue laws reduce, rather than raise, crime.").

The majority of the members of the NRC committee found the evidence more ambiguous than did Professor Wilson, and concluded "that, with the current evidence, *it is not possible to determine that there is a causal link between the passage of right-to-carry laws and crime rates*." NRC REVIEW at 150 (emphasis added). That conclusion, without getting into the back and forth between Lott and his critics, is sufficient to dispose of the Illinois Gun

24

Carry Ban, for it is Illinois's  contention that allowing the carrying of

firearms will *increase* crime and, as noted above, the State bears the burden

of proof on that argument.[7]

---

[7] In any event, none of the studies cited by Illinois or the Brady Center actually supports the proposition that allowing law-abiding citizens to carry guns in public causes an increase in criminal violence. Illinois cited John Donohue, *Guns, Crime and the Impact of State Right-to-Carry Laws*, 73 FORDHAM L. REV. 623, 630-39 (2004). *See* Illinois Motion to Dismiss 17.  But that article did *not* link increased violence to the enactment of laws permitting more citizens to bear arms.  *See* 73 FORDHAM L. REV. at 625. Rather, the article candidly admitted that "[a]ll we can really say is that we know that there is no evidence of *reduction* in violent crime when [right to carry] laws are passed." *Id.* at 638; *see also id.* at 639 ("our statistical models are simply too blunt an instrument to ascertain the likely modest impact of [right to carry] laws on overall crime.").

The Brady Center also cited an earlier article by the same author: John Donohue, *The Impact of Concealed-Carry Laws, in* EVALUATING GUN POLICY 289, 320 (Jens Ludwig & Philip J. Cook eds. 2003).  Brady Br. 11. But the Brady Center misrepresents the article by quoting a snippet out of context. Donohue did *not* conclude that concealed carry laws increase crime.  In fact, he disavowed as "implausible" the findings of the regression analysis to which the Brady Center refers, *id.* at 324, and he concluded, *contrary* to the Brady Center, that one cannot draw conclusions regarding how concealed carry laws affect crime.  *Id.* at 324-25.

The Brady Center's remaining citations likewise fail to establish a causal connection between enactment of shall-issue laws and an increase in violent crime.  *See* Jens Ludwig, *Concealed-Gun-Carrying Laws and Violent Crime: Evidence from State Panel Data*, 18 INT'L REV. L. & ECON. 239, 248-49 (1998) (conceding that the data are so incomplete and the sample so small that any supposed increase in homicide is "not statistically significant"); David McDowall *et al., Easing Concealed Firearms Laws: Effects on Homicide in Three States*, 86 J. CRIM. L. & CRIMINOLOGY 193, 203 (1995) (acknowledging

The federal Centers for Disease Control ("CDC") likewise reviewed the entire corpus of firearms literature and found that it does not support the proposition that increasing the number of citizens permitted to carry firearms in public increases gun violence.  The CDC convened an independent Task Force and conducted "a systematic review of scientific evidence regarding the effectiveness of firearms laws in preventing violence, including violent crimes, suicide and unintentional injury." *First Reports Evaluating the Effectiveness of Strategies for Preventing Violence: Firearms Laws*, 52 Morbidity & Mortality Weekly Report 11 (CDC Oct. 3, 2003) ("MMWR").[8]  The CDC took pains to note that, unlike other research—including the studies on which Illinois relies here—the CDC's review involved "systemic epidemiological evaluations and syntheses of all available scientific literature meeting specified criteria." Robert Hahn, *et al.*, *Firearms Laws and the Reduction of Violence: A Systematic Review* 28 Am.J.Prev. Med. 40, 42 (2005).  Nearly all the members of the Task Force

---

that the limited data are varied and inconsistent and disavowing the conclusion "that shall issue licensing leads to more firearms murders"); *see also id.* at 204 ("our analysis does not allow a firm conclusion that shall issue licensing increases firearms homicides").

[8] The CDC report is available at http://www.cdc.gov/mmwr/PDF/rr/rr5214.pdf.

were physicians or epidemiologists rather than criminologists or lawyers.
MMWR at 11.  The Task Force reviewed *all* the firearms studies from
eleven different databases of public health, medical, sociological,
psychological, criminal justice, legal, economics, and public policy
research.  *See* 28 AM.J.PREV. MED. at 44.

The CDC Task Force concluded that there simply were insufficient
data to support the hypothesis "that the presence of more firearms" being
carried in public by licensed citizens "increases rates of unintended and
intended injury in interpersonal confrontations." *Id*. at 53.  The CDC noted
that, if anything, the more reliable studies—those of "greatest design
suitability"—indicated that homicide rates went *down* when more carry
permits were issued.  *Id*. at 54.  But in the end it found that the data
employed suffered from "important systemic flaws that preclude reliable
conclusions" and that no policy recommendation could be made about
increasing the issuance of gun permits without "further research." *Id*. at 54.

Finally, it is instructive to compare the rate of violent crime in Illinois,
the only State that flatly forbids citizens to carry firearms in public, with
the rates in other States, all of which permit at least some law-abiding

27

citizens to carry firearms in public on some basis.  Illinois's fantasy that its

ban prevents Illinois residents from committing mayhem with firearms is

exploded by the fact that Illinois leads the nation in the percentage of

murders that are committed with firearms:  the figure in Illinois is 80.35%,

well above the national average.  *See*

http://www.guardian.co.uk/news/datablog/2011/jan/10/gun-crime-us-

state.  The rate of murder by firearms in Illinois is 2.81 per 100,000

population.  *Id.* Thus Illinois, despite its total ban on carrying firearms in

public, has a gun-murder rate higher than that of 23 States where the law

mandates that carry-permits be issued to law-abiding citizens who pass the

government's background checks and other criteria.  *See id.* Vermont,

which does not even require anyone—whether a Vermont resident or just a

visitor—to obtain a permit to carry a concealed weapon in public,[9] has a

gun-murder rate about one-ninth that of Illinois.  *Id.*  That hardly supports

the proposition that preventing law-abiding citizens from carrying guns

will result in fewer homicides.

---

[9] *See* 13 Vt. Stat. § 4003.

Neither Plaintiff Mary Shepard nor the NRA has predicated the challenge to Illinois's law on any argument that allowing carriage in public would *reduce* gun violence.  Whichever way the debate goes on that issue, the *constitutional right* to bear arms remains the same, and it cannot be trumped by *policy* considerations, especially on the basis of evidence that the *only* two comprehensive and authoritative reviews of the literature—those of the National Research Council and the Centers for Disease Control—have found to be too ambiguous and inconclusive to serve as a basis for firearms policy.

## CONCLUSION

For the reasons given above, *amici curiae* Hall, Pacholski, Tyler and the NRA respectfully submit that the decision below should be reversed and the case remanded with instructions to issue an injunction against the challenged statutes.

Dated: April 18, 2012                    Respectfully submitted,

David Lehman                             s/ Brian Stuart Koukoutchos
Deputy Executive Director and            28 Eagle Trace
General Counsel                          Mandeville, LA  70471
NRA-ILA                                  Tel: (985) 626-5052
11250 Waples Mill Road                   Email: bskoukoutchos@gmail.com
Fairfax, VA 22030
Tel: (703) 267-1163
Fax: (703) 267-3973


                                         *Counsel for Amici Curiae Michael*
                                         *Hall, et. al.*

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32 (a)(7)(B) because this brief contains 6,386 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Circuit Rule 32(b), and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionately spaced typeface using Microsoft Office Word 2007 with 14-point Book Antiqua type.

s/ Brian Stuart Koukoutchos
Brian Stuart Koukoutchos
*Attorney for Amici Curiae*

Dated:  April 18, 2012