No. 12-1788

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

_____

MARY SHEPARD and the ILLINOIS STATE RIFLE ASSOCIATION,

*Plaintiffs-Appellants,*

v.

LISA M. MADIGAN, et al.,

*Defendants-Appellees.*

_____

On Appeal from United States District Court
for the Southern District of Illinois
Civil Case No. 11-CV-405-WDS (Honorable William D. Stiehl)

_____

**REPLY BRIEF OF PLAINTIFFS-APPELLANTS**
_____

William N. Howard                    Charles J. Cooper
FREEBORN & PETERS LLP                David H. Thompson
311 South Wacker Drive, Suite 3000   Peter A. Patterson
Chicago, IL 60606                    COOPER AND KIRK, PLLC
(312) 360-6000; (312) 360-6596 Fax   1523 New Hampshire Ave., N.W.
                                     Washington, D.C. 20036
                                     (202) 220-9600; (202) 220-9601 Fax

*Attorneys for Plaintiffs-Appellants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................... ii

ARGUMENT ...........................................................................................1

I.    THE SECOND AMENDMENT RIGHT TO BEAR A FIREARM FOR PERSONAL
      PROTECTION IS NOT LIMITED TO THE HOME. ................................1

II.   IF NOT CATEGORICALLY UNCONSTITUTIONAL, ILLINOIS'S CARRIAGE
      BAN IS SUBJECT TO STRICT SCRUTINY. ........................................17

III.  THE CARRIAGE BAN FAILS ANY FORM OF HEIGHTENED SCRUTINY. ..........21

IV.   THIS CASE IS RIPE FOR FINAL ADJUDICATION. ..............................29

CONCLUSION ......................................................................................31

# TABLE OF AUTHORITIES

**Cases**                                                                     **Page**

*Andrews v. State*, 50 Tenn. 165 (1871) ...............................................................3, 16

*Annex Books, Inc. v. City of Indianapolis*, 581 F.3d 460 (7th Cir. 2009) .......22, 24

*Atwater v. Lago Vista*, 532 U.S. 318 (2001) ............................................................9

*Aymette v. State*, 21 Tenn. 154 (1840) ............................................................3, 15

*Bliss v. Commonwealth*, 2 Litt. 90 (Ky. 1822) ......................................................15

*Carey v. Brown*, 447 U.S. 455 (1980) ....................................................................23

*City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002) ..................24, 29

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .....................................*passim*

*Downing/Salt Pond Partners, L.P. v. Rhode Island & Providence Plantations*,
    643 F.3d 16 (1st Cir. 2011) ................................................................................20

*English v. State*, 35 Tex. 473 (1871) ......................................................................15

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ........... 14, 16, 17, 18, 19, 21

*Fife v. State*, 31 Ark. 455 (1876) ............................................................................16

*Free v. Peters*, 12 F.3d 700 (7th Cir. 1993) ...........................................................30

*Hill v. State*, 53 Ga. 472 (1874) .............................................................................16

*Jones v. Hulick*, 449 F.3d 784 (7th Cir. 2006) .......................................................20

*King v. Dewhurst*, 1 St. Tr. 529 (Lancaster Assize 1820) ...................................10

*McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010) .................2, 4, 5, 18, 19, 21

*Menora v. Illinois High Sch. Ass'n* 683 F.2d 1030 (7th Cir. 1982) ......................30

*People v. Marin*, 795 N.E.2d 953 (Ill. Ct. App. 2003) .........................................23

*Queen v. Soley*, 88 Eng. Rep. 935 (Q.B. 1701) .....................................................10

*Rubin v. Coors Brewing Co.*, 514 U.S. 476 (1995) ...............................................22

*Semayne's Case*, 77 Eng. Rep. 194 (1603) ...........................................................10

*Shields v. Burge*, 874 F.2d 1201 (7th Cir. 1989) ..................................................20

*Simpson v. State*, 13 Tenn. 356 (1833) ..................................................................11

*Sir John Knight's Case*, 87 Eng. Rep. 75 (1686) ....................................................9

*State v. Buzzard*, 4 Ark. 18 (1842) ........................................................................15

*State v. Huntly*, 25 N.C. (3 Ired.) 418 (1843) .......................................................11

*State v. Jumel*, 13 La. Ann. 399 (1858) .................................................................16

*State v. Workman*, 14 S.E. 9 (W. Va. 1891) .......................................................... 15

*Turner v. FCC*, 512 U.S. 622 (1994) .....................................................................22

*United States v. Black*, 525 F.3d 359 (4th Cir. 2008) .....................................27, 28

*United States v. Virginia*, 518 U.S. 515 (1996)......................................................19

*United States v. Williams*, 616 F.3d 685 (7th Cir. 2010) .....................................22

*Woollard v. Sheridan*, No. L-10-2068, 2012 WL 695674
   (D. Md. Mar. 2, 2012) ...................................................................................... 23

## **Statutes and Legislative Materials**

Ark. Act of Apr. 1, 1881, ch.96, § 1.......................................................................16

IC 35-47-2-1 *et seq*. (1997) ....................................................................................28

430 ILCS 65/2...................................................................................................28, 29

430 ILCS 65/4..........................................................................................................29

430 ILCS 65/8..........................................................................................................29

18 Pa. Cons. Stat. Ann. § 6109 (1989)....................................................................28

1879 Tenn. Pub. Acts ch. 186, § 1 .........................................................................16

FED. R. EVID. 201 1972 advisory committee note................................................29

## **Other**

1 BLACKSTONE COMMENTARIES.....................................................................4, 5, 7

2 BLACKSTONE COMMENTARIES (Tucker ed. 1803) ...........................................10

4 BLACKSTONE COMMENTARIES.....................................................................6, 7, 8

5 BLACKSTONE COMMENTARIES App. n.B (Tucker ed., 1803)...........................13

1 HAWKINS, TREATISE OF THE PLEAS OF THE CROWN 136 (1716) ......................10

1 HISTORIA PLACITORUM CORONAE 481 (Sollum Emlyn ed. 1736) ...................6

1 JOURNAL OF THE FIRST SESSION OF THE SENATE 77 (1820) ..................................8

1 TIFFANY, A TREATISE ON THE UNCONSTITUTIONALITY OF AMERICAN
SLAVERY 117..............................................................................................6

2 J. DE LOLME, THE RISE AND PROGRESS OF THE ENGLISH CONSTITUTION
886-87 (1784) (A. Stephens ed. 1838) ..................................................5

2 JOEL PRENTISS BISHOP, COMMENTARIES ON THE CRIMINAL LAW § 103
(2d ed. 1858) .......................................................................................15

3 EDWARD COKE, INSTITUTES OF THE LAWS OF ENGLAND 55
(E.&R. Brooke 1797) ...........................................................................7

3 JAMES WILSON, WORKS OF THE HONORABLE JAMES WILSON 84-85 (1804) .......7

A VIEW OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA 123
(1825) ...................................................................................................12

Adam Winkler, *Scrutinizing the Second Amendment*, 105 Mich. L. Rev.
683 (2007) ......................................................................................20, 21

C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*,
32 HARV. J.L. PUB. POL'Y 696 (2009)..................................................9

CHARLES HUMPHREYS, A COMPENDIUM OF THE COMMON LAW IN FORCE
IN KENTUCKY 482 (1822) ....................................................................12

E.F. MCGARRELL, ET AL., REDUCING GUN VIOLENCE (2002) ..............................28

Gary Kleck & Marc Gertz, *Armed Resistance to Crime*, J. CRIM. L.
& CRIMINOLOGY 150 (1995) ...............................................................27

GARY KLECK, TARGETING GUNS, FIREARMS AND THEIR CONTROL (1997) .........27

Gary Kleck, *The Frequency of Defensive Gun Use, in* ARMED: NEW
PERSPECTIVES ON GUN CONTROL 213 (Kleck et al., eds. 2001) ....................26

http://www.cdc.gov/injury/wisqars/fatal_injury_reports.html ...............26

J. Cohen & J. Ludwig, *Policing Crime Guns, in* J. LUDWIG & P. COOK, EDS.,
EVALUATING GUN POLICY 217 (2003) ..............................................28

J. WRIGHT & P. ROSSI, ARMED AND CONSIDERED DANGEROUS xxxii
(2d ed. 2008) .......................................................................................28

JAMES PARKER, CONDUCTOR GENERALIS 11 (1788)...............................................12

John J. Donohue, *The Impact of Concealed-Carry Laws*, in EVALUATING GUN POLICY EFFECTS ON CRIME VIOLENCE 289 (2003)..................................27

JOYCE LEE MALCOLM, TO KEEP AND TO BEAR ARMS:  THE ORIGINS OF AN ANGLO-AMERICAN RIGHT 104-05 (1994)....................................................9, 14

Lawrence Southwick, Jr., *Guns and Justifiable Homicide:  Deterrence and Defense*, 18 ST. LOUIS U. PUB. L. REV. 217 (1999)............................................25

NICHOLAS J. JOHNSON & DAVID B. KOPEL ET AL., FIREARMS LAW & THE SECOND AMENDMENT 106-08 (2012) ..............................................13, 14

Patrick Charles, *The Faces of the Second Amendment Outside the Home*, 60 CLEVELAND ST. L.R. 1 (forthcoming 2012) ..................................................4

Philip J. Cook, *et al.*, *Criminal Records of Homicide Offenders*, 294 JAMA 598 (2005) .......................................................................................28

ROBERT & GEORGE WATKINS, EDS., A DIGEST OF THE LAWS OF THE STATE OF GEORGIA 153-54 (1800) .................................................................................13

SAMUEL PUFENDORF, OF THE LAW OF NATURE AND NATIONS, bk. 2, ch. 5, §§ 3-4 (Basil Kennet trans., 3d ed. 1717) .........................................................7

## ARGUMENT

### I.   THE SECOND AMENDMENT RIGHT TO BEAR A FIREARM FOR PERSONAL PROTECTION IS NOT LIMITED TO THE HOME.

1.    The State's primary defense of its unique law banning all carrying of operable firearms in public is that the Second Amendment does not guarantee an *individual* right to bear a firearm outside one's home for *personal* defense.  State Br. at 8, 14.  Rather, the Second Amendment right to bear a firearm in public is *collective* in nature, tied exclusively to service in the militia and arising only when necessary for the *common* defense against "an oppressive military force if the constitutional order [breaks] down." State Br. 17, quoting *District of Columbia v. Heller*, 554 U.S. 570, 599 (2008). The State's position (and with it, the decision below) is flatly at odds with the Supreme Court's interpretation of the Second Amendment in *Heller*, and with the constitutional text and history on which it relies.

*Heller* expressly held that neither of the pivotal terms in the operative text of the Second Amendment—"keep" and "bear"—is tied in any way to militia service or collective defense.  The term "keep" arms means, simply, "possessing arms, for militiamen *and everyone else*," *Heller*, 554 U.S. at 583, and "there is *no evidence whatsoever* to support a military reading of 'keep

1

arms,' " *id.* at 591 (emphasis added). The term "bear" arms, likewise,

"means . . . simply the carrying of arms," *id.* at 589, and "it in no way

connotes participation in a structured military organization." *Id.* at 584.

*See also id.* at 586. Thus the Supreme Court held that, taken together, the

operative terms of the Second Amendment "guarantee the *individual* right

to possess and carry weapons in case of confrontation." *Id.* at 592

(emphasis added). *Period*.

The *Heller* Court thus flatly rejected a reading of the Second

Amendment that restricted its scope *in any way* to the bearing of arms for

the *common* defense against an opposing military force. To the contrary,

the Court emphasized that the Second Amendment guarantees an

individual right to arms for *self*-defense in case of confrontation threatened

by "both public and private violence," *id.* at 594, and that, indeed,

"individual self-defense is 'the *central component*' of the Second

Amendment," *McDonald v. City of Chicago*, 130 S.Ct. 3020, 3036 (2010)

(quoting *Heller*, 554 U.S. at 599) (emphasis by the Court in *Heller*).

*Heller* thus forecloses the State's argument that the meaning of the

Second Amendment somehow changes depending on whether the right to

arms is exercised inside or outside the home. Under the State's reading,

2

the Amendment protects an *individual* right to armed *self-defense* within the home, but is transformed into an exclusively *collective* right to armed militia service for the *common defense* when the individual ventures outside his home.  Even apart from the *Heller* decision, the notion that the State's reading reflects the "public understanding" of the constitutional right to keep and bear arms at the time of its ratification is facially implausible. Indeed, *Heller* specifically rejected a similar (though less extreme) interpretation of the Second Amendment espoused by the Tennessee Supreme Court in *Aymette v. State*, 21 Tenn. 154 (1840), "whereby citizens were permitted to carry arms openly, unconnected with any service in a formal militia, but were given the right to use them only for the military purpose of banding together to oppose tyranny." *Heller*, 554 U.S. at 613. "This *odd reading of the right*," the Court stated, "is, to be sure, *not* the one we adopt." *Id.* (emphasis added).  Rather, the Court cited with approval a later statement of the Tennessee Supreme Court *rejecting* the proposition that the right to arms " 'was guaranteed to, and to be exercised and enjoyed by the citizen … in defense solely of his political rights.' " *Id.* at 608 (quoting *Andrews v. State*, 50 Tenn. 165, 183 (1871)).

2.    The State's attempt to derive historical support for its strange reading of the Second Amendment is meritless.  Its argument is rooted in its misinterpretation of Blackstone's classification of the right to arms as an "auxiliary subordinate" right.  *See* 1 B LACKSTONE C OMMENTARIES *136.  The State's position echoes that of historian Patrick Charles, whose view of the Second Amendment has been presented to, and rejected by, the Supreme Court.  In a passage cited and tracked by the State in its brief, *see* State Br. 15-17, Mr. Charles argues that "Blackstone never equated auxiliary rights with individual civil rights."  *The Faces of the Second Amendment Outside the Home*, 60 C LEV . S T . L. R EV . 1, 48-49 (2012).  He therefore believes that the right to arms does not extend even to individual self-defense *inside* the home.

Indeed, an amicus brief submitted by Mr. Charles and others in *McDonald* made precisely this argument.  Adopting the "natural right of resistance and self-preservation" discussed by Blackstone, the brief argued, simply "gave individual United States citizens the right to take part in the militia to defend their political liberties," and thus *did not* protect "armed self-defense *of the home* by individuals acting for private interests."  Brief For English/Early American Historians 4, *McDonald*, 130 S.Ct. 3020

(emphasis added).  Mr. Charles argued that *Heller* was wrong, and urged the Court to "correct its error."  *Id*. at 3; *see also McDonald*, 130 S.Ct. at 3121-22 (Stevens, J., dissenting).

Blackstone's classification of the right to arms as "auxiliary" did not mean that it was unimportant.  It meant merely that it was *instrumental*, rather than an end in itself.  Blackstone understood the right to arms as a *means* of securing "the three great and primary rights, of *personal* security, *personal* liberty, and *private* property."  1 BLACKSTONE COMMENTARIES *136 (emphasis added).  Indeed, "to vindicate these rights, when actually violated or attacked, the subjects of England [were] entitled, in the first place, to the regular administration and free course of justice in the courts of law; next, to the right of petitioning the king and parliament for redress of grievances; and, lastly, to the right of having and using arms for self-preservation and defence."  *Id.* at *140.  Thus, the right to arms was "a public allowance, under due restrictions, of the natural right of resistance and *self-preservation*, when the sanctions of society and laws are found insufficient to restrain the violence of oppression."  *Id.* at *139 (emphasis added); *see also* 2 J. DE LOLME, THE RISE AND PROGRESS OF THE ENGLISH CONSTITUTION 886-87 (1784) (A. Stephens ed. 1838) (the "right of opposing

violence, in whatever shape, and from whatever quarter it may come," is "generally acknowledged") (cited by *Heller*, 554 U.S. at 594); *Heller*, 554 U.S. at 591-92 ("In a 1780 debate in the House of Lords," a "member of Parliament referred to 'the right of bearing arms for personal defence.' ").[1]

Blackstone understood the right to use defensive force to include individual self-defense in public: "homicide … committed for the prevention of any forcible and atrocious crime, is justifiable by the law of nature, and also by the law of England." 4 BLACKSTONE COMMENTARIES *180. Blackstone's discussion echoes that of another prominent English jurist, Sir Matthew Hale, who made clear that this right to self-defense was not limited to the home. *See* 1 HISTORIA PLACITORUM CORONAE 481 (Sollum Emlyn ed. 1736) ("If a thief assault a true man *either* abroad *or* in his house to rob or kill him, the true man is not bound to give back, but may kill the assailant, and it is not felony.") (emphasis added).

Ironically, the State's reliance on Blackstone's discussion of the duty to retreat is refuted by Blackstone himself, for the duty to retreat to "some

---

[1] *See also* 1 TIFFANY, A TREATISE ON THE UNCONSTITUTIONALITY OF AMERICAN SLAVERY 117 (1849) (The right "is called '*subordinate*' in reference to the great, absolute rights of man; and is accorded to every subject for the purpose of *protecting* and *defending himself*, if need be, in the enjoyment of his absolute rights to life, liberty and property.").

wall, ditch, or other impediment" applied *only* "as far as the fierceness of

the assault will permit …, without manifest danger of [the victim's] life, or

enormous bodily harm;" otherwise "in his defence he may kill his assailant

instantly."  4 BLACKSTONE COMMENTARIES *185; *see also* 3 EDWARD COKE,

INSTITUTES OF THE LAWS OF ENGLAND 55 (E.&R. Brooke 1797); SAMUEL

PUFENDORF, OF THE LAW OF NATURE AND NATIONS, bk. 2, ch. 5, §§ 3-4, 13

(Basil Kennet trans., 3d ed. 1717).

Americans in the founding generation thus correctly understood

"their rights as Englishmen to keep arms" as enabling "*individuals* to

defend *themselves*.  As the most important early American edition of

Blackstone's Commentaries (by … St. George Tucker) made clear …,

Americans understood the 'right of self-preservation' as permitting *a citizen*

to 'repe[l] force by force' when 'the intervention of society *in his behalf*, may

be too late to prevent an injury.' "  *Heller*, 554 U.S. at 594-95 (quoting 1

BLACKSTONE'S COMMENTARIES 145-46 n.42 (1803)) (emphasis added).  *See*

*also* 3 JAMES WILSON, WORKS OF THE HONORABLE JAMES WILSON 84-85, 1

(1804).  Further confirming this understanding, the Senate voted down a

proposal to amend the text of what became the Second Amendment by

inserting the phrase "for the common defence" immediately after "bear

arms." *See* 1 JOURNAL OF THE FIRST SESSION OF THE SENATE 77 (1820)

(proceedings of Sept. 9, 1789). And the Supreme Court understood the

historical sources in precisely this way in *Heller*. *See, e.g.*, 554 U.S. at 610-11

("Justice Baldwin …, sitting as a circuit judge [in a famous 1833 fugitive-

slave case] cited both the Second Amendment and the Pennsylvania

analogue for his conclusion that a citizen has 'a right to carry arms in

defense of his property or his person, and to use them, if either were

assaulted with such force, numbers or violence as made it necessary for the

protection or safety of either.' ").

3.      The State's position is further plagued by a second

misinterpretation of Blackstone and the history of the "ancient right of

individuals to keep and bear arms." *Heller*, 554 U.S. at 599. Blackstone

wrote that "the offence of riding or going armed, with dangerous or

unusual weapons, is a crime against the public peace, by terrifying the

good people of the land; and is particularly prohibited by the Statute of

Northampton." 4 BLACKSTONE COMMENTARIES *148-49. Blackstone did not

thereby "specifically reject[] [the] notion" that "there was a general,

everyday right to carry arms in public places." State Br. 17. As Blackstone

indicates, and as numerous English and American authorities from the 17th

through 19th centuries make clear, the Statute of Northampton (enacted in 1328) and the corresponding common-law doctrine were understood to restrict only carrying particularly dangerous and unusual weapons or carrying weapons in a particularly terrifying manner, *not* peacefully carrying common weapons for self-defense.  *See* C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?,* 32 HARV. J.L. PUB. POL'Y 696, 716-17 (2009).

In *Sir John Knight's Case*, for example, the court explained that the "meaning of the statute … was to punish people who go armed to *terrify* the King's subjects."  87 Eng. Rep. 75, 76 (1686) (emphasis added).  And although the statute had "almost gone into desuetudinem," there yet could be an offense if the "crime shall appear to be malo animo," *i.e.*, with bad or evil intent.  90 Eng. Rep. 330, 330 (different reporter); *see also id.* (recognizing that "now there be a general connivance to gentlemen to ride armed for their security"); JOYCE LEE MALCOLM, TO KEEP AND TO BEAR ARMS 104-05 (1994).

Hawkins, in his "widely read Treatise of the Pleas of the Crown," *Atwater v. Lago Vista*, 532 U.S. 318, 331 (2001), likewise recognized that "*no wearing of Arms is within the meaning of this Statute, unless* it be accompanied

9

with such Circumstances as are apt to *terrify* the People," 1 TREATISE OF THE PLEAS OF THE CROWN 136 (1716) (emphasis added).  From this "it seems clearly to follow, That Persons of Quality are in no Danger of Offending against this Statute *by wearing common Weapons … for their Ornament or Defence*, in such places, and upon such occasions, in which it is common Fashion to make use of them, without causing the least Suspicion of an intention to commit any Act of Violence or Disturbance of the Peace."  *Id.* (emphasis added).[2]

Coke's discussion of Northampton and the opinion in *Semayne's Case*, 77 Eng. Rep. 194 (1603), are not to the contrary.  As the State's own citations of those sources make clear, they reveal that a person could not roam the streets with a gang of armed confederates to menace the public.  *See* State Br. 11.  The court in *King v. Dewhurst*, 1 St. Tr. 529, 601-02 (Lancaster Assize 1820), confirmed that a "man has a clear right to protect himself [with

---

[2] These passages do not imply that carrying arms in public was reserved for nobility, as they plainly state that a violation required an appearance of evil intent or accompanying circumstances apt to terrify the people.  But even if the English right were so limited, the Second Amendment itself negates any importation of a class-based limit on the right to arms, for it guarantees the right of "the people" to keep and bear arms.  *See* 2 BLACKSTONE COMMENTARIES *143 n.40 (Tucker ed. 1803); *Heller*, 554 U.S. at 579-81.

arms] when he is going singly or in a small party upon the road where he is

traveling or going for the ordinary purposes of business." *See also Queen v.*

*Soley*, 88 Eng. Rep. 935, 937 (1701) (Q.B.).

Early American courts and commentators evinced the same

understanding of the limitation embodied in the Statute of Northampton.

The Tennessee Supreme Court explained that, because the state

constitution "hath said the people may carry arms," it would be

impermissible to "impute to the acts thus licensed such a necessarily

consequent operation as terror to the people to be incurred thereby."

*Simpson v. State*, 13 Tenn. 356, 359-60 (1833).  The North Carolina Supreme

Court likewise explained that "the carrying of a gun *per se* constitutes no

offence," because "*for any lawful purpose … the citizen is at perfect liberty to*

*carry his gun.*  It is the wicked purpose—and the mischievous result—which

essentially constitute the crime."  *State v. Huntly*, 25 N.C. (3 Ired.) 418, 422-

23 (1843) (emphasis added).  And in his "influential treatise," William

Rawle, "a prominent lawyer who had been a member of the Pennsylvania

Assembly that ratified the Bill of Rights," *Heller*, 554 U.S. at 607, wrote that

"the carrying of arms abroad by an individual, *attended with circumstances*

*giving just reason to fear that he purposes to make an unlawful use of them,*

11

would be sufficient cause to require him to give surety of the peace." A

VIEW OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA 123 (1825)

(emphasis added); *see also, e.g.*, JAMES PARKER, CONDUCTOR GENERALIS 11

(1788); CHARLES HUMPHREYS, A COMPENDIUM OF THE COMMON LAW IN FORCE

IN KENTUCKY 482 (1822) (because "in this country the constitution

guarantees to all persons the right to bear arms; then it can only be a crime

to exercise this right in such a manner, as to terrify the people

unnecessarily").[3]

  4.  The State dismisses evidence of arms carrying by leading

founders.  But this evidence destroys the State's argument that the Framers

of our Constitution understood that the common law prohibited bearing

arms in public for self-defense.  *See* State Br. 13.  The point is brought into

sharp focus by St. George Tucker, who both (a) observed that, "in many

parts of the United States, a man no more thinks, of going out of his house

on any occasion, without his rifle or musket in hand, than an European fine

gentleman without a sword by his side," and (b) reproduced Blackstone's

discussion of the limitation on carrying dangerous and unusual weapons,

---

[3] The various guidebooks for constables, laws, and other sources
cited by the State in connection with the Statute of Northampton simply
reflect the historical understanding we have described.

while noting that Virginia had enacted a law analogous to the Statute of Northampton.  *See* 5 BLACKSTONE COMMENTARIES App. n.B, at 19 (Tucker ed., 1803); *id.* 149 & n.14.  Either the citizens of the fledgling Republic were scofflaws, or the common law and Northampton did not flatly ban carrying guns in public.

Indeed, many of the earliest Americans would have been scofflaws if they *did not* carry a weapon:  "about half the colonies had laws requiring arms-carrying in certain circumstances," such as when traveling or attending church.  *See* NICHOLAS J. JOHNSON & DAVID B. KOPEL ET AL., FIREARMS LAW & THE SECOND AMENDMENT 106-08 (2012).

Similarly, under the State's understanding, laws banning slaves from carrying firearms were utterly gratuitous and unnecessary.  Indeed, if the State were correct, many of these laws, by recognizing that a slave lawfully could carry a firearm in certain circumstances with his master's permission, would have given slaves *greater* carriage rights than the average citizen.  *See, e.g.*, ROBERT & GEORGE WATKINS, EDS., A DIGEST OF THE LAWS OF THE STATE OF GEORGIA 153-54 (1800) (1768 law made it unlawful "for any slave, unless in the presence of some white person, to carry or make use of fire arms … unless such slave shall have a ticket or license in writing from his

13

master, mistress, or overseer"); JOHNSON ET AL., FIREARMS LAW & THE

SECOND AMENDMENT 114-15; MALCOLM, TO KEEP AND TO BEAR ARMS 140-41.

     5.     The State criticizes us for citing sources from as late as the

1860's.  *See* State Br. 26 (citing Pl. Br. 34-35).  But *Ezell* noted that the

relevant "historical moment" for establishing the scope of the right to bear

arms as applied to the states is 1868.  *Ezell v. City of Chicago*, 651 F.3d 684,

702-03 (7th Cir. 2011).  *But see* Pl. Br. 15 n.5.  And *Heller* looked to "how the

Second Amendment was interpreted from immediately after its ratification

through the end of the 19th century," explaining that "examination of a

variety of legal and other sources to determine *the public understanding* of a

legal text in the period after its enactment or ratification" is "a critical tool

of constitutional interpretation."  554 U.S. at 605; *see also id*. at 614.

     Furthermore, the State's assertion that only in "the mid-Nineteenth

Century" did "some state courts and legislatures [become] more willing to

tolerate self-defense in public," State Br. 26, is based on the

misapprehension that the common law banned all public carrying of arms

at the founding.  In fact, carrying firearms in public became increasingly

regulated during the 19th Century, as the states began to enact bans on

carrying concealed guns—bans that would have been wholly unnecessary if the common law already banned *all* public carrying of arms.

As early as 1822, Kentucky's highest court struck down a concealed-carry ban for violating the state's constitution. *See Bliss v. Commonwealth*, 2 Litt. 90 (Ky. 1822). While subsequent state court decisions generally upheld concealed carry bans, the matter was not without controversy. *See* Pl. Br. 45 n.16; *see also* 2 JOEL PRENTISS BISHOP, COMMENTARIES ON THE CRIMINAL LAW § 102 (2d ed. 1858). The antebellum courts embraced by *Heller*, 554 U.S. at 612-13, 629, were much less receptive, however, to laws that purported to ban both open and concealed carry of a class of lawful weapons. *See* Pl. Br. 43-45.[4] While a small number of such laws may have

---

[4] *Heller*, by contrast, sharply criticized the reasoning of *Aymette v. State*, 21 Tenn. 154 (1840), one of two antebellum state court decisions cited by the State on this point. *See Heller*, 554 U.S. at 613-14. At any rate, *Aymette*'s holding was unremarkable, as it simply upheld a Tennessee ban on the concealed carrying of certain knives. *See* 21 Tenn. at 155. *State v. Buzzard*, 4 Ark. 18 (1842), likewise upheld a concealed carry ban, *see id.* at 18, 26-27 (Opinion of Ringo, C.J.). The two post-Civil War cases cited by the State are similarly inapposite. The indictment challenged in *State v. Workman*, 14 S.E. 9 (W. Va. 1891), was for "carrying concealed weapons," *see id.* at 10, and the prohibition on carrying pistols at issue contained an exception for at least some defensive carriage, *see id.* at 10-11. Finally, the court in *English v. State*, 35 Tex. 473, 474 (1871), upheld a ban on carrying pistols in public, but only after concluding that pistols (or at least pistols not of a type used by the military) are not "arms" protected by the Second

escaped judicial invalidation, *see* State Br. 27, these isolated outliers hardly prove that the right to bear arms was understood to be limited to private property.[5]  *See Ezell*, 651 F.3d at 706; *Heller*, 554 U.S. at 632.[6]

6.     Finally, the State appeals to the authority of "[c]ourts around the country."  State Br. 14.  These cases do not attempt to faithfully apply *Heller*, nor to meaningfully engage in the textual and historical analysis it

---

Amendment, *see id.* at 474, 476.  *Heller* makes clear that the Second Amendment protects handguns. 554 U.S. at 627, 629.

Additional cases and laws cited by the State's amici are inapposite for similar reasons.  *See State v. Jumel*, 13 La. Ann. 399, 399-400 (1858) (upholding concealed carry ban because it "prohibit[ed] only a particular mode of bearing arms"); *Hill v. State*, 53 Ga. 472, 473 (1874) (upholding indictment  for carrying a pistol in "a court of justice"); *Fife v. State*, 31 Ark. 455, 461 (1876) (upholding ban on carrying type of pistol deemed not "in ordinary use, and effective as a weapon of war, and useful and necessary for 'the common defense' "); *Andrews v. State*, 50 Tenn. 165, 186 (1871) (upholding ban on possessing certain handguns to the extent they were not "adapted to the usual equipment of the soldier, or the use of which may render him more efficient as such"); Ark. Act of Apr. 1, 1881, ch.96, § 1 (exempting "army or navy" pistols); 1879 Tenn. Pub. Acts ch. 186, § 1 (same).

[5] The extreme nature of the laws cited by the State is demonstrated by the fact that facially neither was limited to carrying arms in *public*, but instead extended to *all* carrying of the affected weapons "within the city of Washington" and "within the limits of any city, town or village" in Wyoming, respectively.  State Br. 27.

[6] Discharge laws like those cited by amici Chicago et al. do not support a narrow construction of the right to keep and bear arms.  *See Heller*, 554 U.S. at 633-34; *Ezell*, 651 F.3d at 705-07.

16

prescribes.  One district court has said of these cases that they "say[] more about the courts than the Second Amendment."  *See* Pl. Br. 19 n.7 (citing *United States v. Weaver*).  At any rate, certainly not *all* courts to have addressed the matter agree with the State.  *See id.*

## II.   IF NOT CATEGORICALLY UNCONSTITUTIONAL, ILLINOIS'S CARRIAGE BAN IS SUBJECT TO STRICT SCRUTINY.

"*Heller* and *McDonald* suggest that broadly prohibitory laws restricting the core Second Amendment right … are categorically unconstitutional."  *Ezell*, 651 F.3d at 703.  And *Ezell* establishes that laws that otherwise impose "a severe burden on the core Second Amendment right of armed self-defense will require" review akin to strict scrutiny in the First Amendment context.  *Id.* at 708.[7]  Because the core Second Amendment right of armed self-defense is not limited to the home (or a fixed place of business), Illinois's broad prohibition of defensive carriage in public is either categorically unconstitutional or subject to strict scrutiny.

---

[7] While *Ezell* applied scrutiny more rigorous than intermediate but "not quite 'strict,' " *id.*, it did not rule out strict scrutiny in future cases.

At the very least, it is subject to the "not quite" strict scrutiny applied in

*Ezell*.[8]

1.     Illinois insists that public carrying of firearms is "far removed

from the core Second Amendment purpose of permitting self-defense in

the home."  State Br. 33.  *Heller*, to be sure, recognized that the core purpose

of the Second Amendment *encompasses* armed defense of the home—after

all, that was the factual context of that case—but it did not *limit* that

purpose to armed defense of the home.  To the contrary, *Heller* recognized

that the Second Amendment's animating purpose is individual self-

defense.  Pl. Br. 27; *McDonald*, 130 S.Ct. at 3036.  Because the right to self-

defense was not understood to be limited to the home, the right to arms

was not either.  *See* Pl. Br. 27-36.[9]

---

[8] The burden imposed here is plainly greater than in *Ezell*, for here
the State flatly and directly bans any and all public exercise of the core
right of bearing arms for self-defense, while Chicago's ban on firing ranges
restricted a "corollary to the meaningful exercise" of Second Amendment
rights.  *Id*. at 708.

[9] *Ezell* repeatedly identifies the Second Amendment's core as the right
to possess firearms for self-defense.  *See* 651 F.3d at 689, 690, 708, 711.  The
Court sometimes adds "in the home" to its formulations when describing
the burden wrought by Chicago's range ban, *see, e.g., id.* at 699, but does
not suggest that the core right is *limited* to the home.  *See, e.g., id.* at 689
("*Heller* held that the Amendment secures an individual right to keep and

2.     The State additionally argues that "the Court's reasoning in *Heller* is inconsistent with applying strict scrutiny to firearms regulations" because *Heller* stated that "certain firearms regulations are 'presumptively lawful.' "  State Br. 35.  But stating that *some* firearms regulations are presumptively lawful does not mean that strict scrutiny is never appropriate.  In the First Amendment context "certain well-defined and narrowly limited classes of speech … are categorically outside the reach of the First Amendment," *Ezell*, 651 F.3d at 702 (quotation marks omitted), yet restrictions on other types of speech are still subject to strict scrutiny, *see id.* at 707.  *See also McDonald*, 130 S.Ct. 3056 (Scalia, J., concurring) ("traditional restrictions [on the right to keep and bear arms] go to show the scope of the right, not its lack of fundamental character").  And even under intermediate scrutiny the government bears the burden to prove a law's constitutionality.  *See United States v. Virginia*, 518 U.S. 515, 531 (1996).

3.     For the first time on appeal, the State argues that the Court should "apply a reasonable regulation test to firearms laws that implicate constitutional protections but lie far from the constitutional core."  State Br.

---

bear arms, the core component of which is the right to possess operable firearms … for self defense, *most notably* in the home.") (emphasis added).

40.[10]  Because the activity restricted by the State's carriage ban is not "far

from the constitutional core," this argument is beside the point.

Furthermore, the State's argument rests on a faulty foundation:

citing the scholarship of Professor Adam Winkler, the State argues that

"nearly every [state court] to address the question has held that the right

[to arms protected by the state's constitution] is subject to reasonable

regulation."  State Br. 40 (citing, *inter alia*, Adam Winkler, *Scrutinizing the*

*Second Amendment*, 105 MICH. L. REV. 683, 686-87 (2007)).  But the

reasonable regulation test simply cannot be squared with *Heller*, which

emphatically rejected mere rationality review.  *See* 554 U.S. at 628 n.27.  As

---

[10] The State insists that it has not waived this argument because (a) an amicus raised it below, and (b) this Court may affirm "on any ground supported by the record."  State Br. 40 (quotation marks omitted).  But "amici may not make up for waiver by a party."  *Downing/Salt Pond Partners, L.P. v. Rhode Island & Providence Plantations*, 643 F.3d 16, 28 (1st Cir. 2011) (alteration and quotation marks omitted).  And this court generally may affirm "on any ground that the record fairly supports *and the appellee has not waived below*."  *Shields v. Burge*, 874 F.2d 1201, 1210 n.2 (7th Cir. 1989) (emphasis added).  In *Jones v. Hulick*, 449 F.3d 784 (7th Cir. 2006), this Court did consider an argument for affirmance based on a defense raised for the first time on appeal.  In that case, however, the appellee "raised the defense at its first realistic opportunity" because the case "was dismissed in the district court prior to an answer being filed; the answer, of course, being the usual vehicle for raising the defense."  *Id.* at 787.  Here, by contrast, the State had the opportunity to raise its "reasonableness review" argument below.

even Professor Winkler has acknowledged, "[w]hile there is a difference in focus between reasonable regulation and rational basis, in ordinary practice both standards are extremely deferential," as "nearly all laws survive" both standards and both "tend[] to be … shorthand for broad judicial deference."  Winkler, *Scrutinizing the Second Amendment* at 718-19. Indeed, Professor Winkler admits that "[s]tate courts commonly use the rational basis and reasonable regulation language interchangeably."  *Id.* at 718 n.198.  And the majority in *Heller* rejected the interest-balancing approach that is common to both Professor Winkler's article and Justice Breyer's dissent.  *See Heller*, 554 U.S. at 634-35; *id.* at 689-91 (Breyer, J., dissenting); *McDonald*, 130 S.Ct. at 3130-31 (Breyer, J., dissenting).[11]

## III.   THE CARRIAGE BAN FAILS ANY FORM OF HEIGHTENED SCRUTINY.

Illinois cannot demonstrate that the carriage ban satisfies even intermediate scrutiny.

1.   Under intermediate scrutiny, "[t]he government has the burden of demonstrating that its objective is an important one and that its objective

---

[11] Reasonableness review is also contrary to *Ezell*, which prescribes "[b]orrowing from the [Supreme] Court's First Amendment doctrine" to determine "the rigor of … judicial review" in Second Amendment cases. 651 F.3d at 703, 708.

is advanced by means substantially related to that objective."  *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010).  Where the State argues that its regulation serves to avert harms, "[i]t must demonstrate that the recited harms are real, not conjectural, and that the regulation will in fact alleviate those harms in a direct and material way."  *Turner v. FCC*, 512 U.S. 622, 664 (1994); *see also Rubin v. Coors Brewing Co.*, 514 U.S. 476, 487 (1995) (government cannot rely on "speculation" or "conjecture").  The State "must supply actual, reliable evidence to justify" its restriction.  *Ezell*, 651 F.3d at 709.  Because the purported "benefits" of a law must "be compared with the detriments," *Annex Books, Inc. v. City of Indianapolis*, 581 F.3d 460, 465 (7th Cir. 2009), the State's wholesale ban on carrying firearms in public demands a particularly strong justification.  The State must present "evidence that the restrictions actually have public benefits great enough to justify" their severe curtailment of protected conduct.  *Id*. at 462.

2.     The State's defense fails at the threshold, for the interest it asserts—"preventing the discharge of firearms in public," State Br. 38—is not, standing alone, an important one.  Whether or not gun-fire is harmful or beneficial depends on the circumstances.  By seeking to prevent public discharge of firearms *regardless of the circumstances*, the State equates

criminal, malicious discharges with discharges that are responsible and justified and perhaps life saving.  It essentially values the health and safety of criminals, whose firearm discharges are highly unlikely to be prevented by the State's carriage ban, over that of innocent victims, whose are.

3.    Even if the State's interest were valid, the method it has chosen to advance that interest is not.  *See Carey v. Brown*, 447 U.S. 455, 464-65 (1980) ("even the most legitimate goal may not be advanced in a constitutionally impermissible manner").  Because the Second Amendment protects the right of responsible, law-abiding citizens to carry firearms for self-protection in public, the Second Amendment also necessarily forbids the State from seeking to advance public safety simply by suppressing the exercise of that right.  *See Woollard v. Sheridan*, Civil No. L-10-2068, 2012 WL 695674, at *11 (D. Md. Mar. 2, 2012).[12]  The Second Amendment, in other words, forecloses the government from basing legislation on the theory

---

[12] The State's briefing and the cases it cites make clear that this is precisely how the ban is intended to operate.  *See* State Br. 43-44 (arguing that the legislature was focused on the "inherent dangers" of citizens carrying firearms) (quotation marks omitted); *People v. Marin*, 795 N.E.2d 953 (Ill. Ct. App. 2003) (legislative "purpose is accomplished … by prohibiting the accessibility to loaded weapons in public places by society at large").

that it simply is too dangerous to allow private citizens to carry firearms in public.  *See Heller*, 554 U.S. at 634-35, 636.

An example from First Amendment doctrine is instructive.  Courts apply a form of intermediate scrutiny to laws that aim to curtail secondary effects of adult-oriented speech.  To sustain such a measure, the government "must advance some basis to show that its regulation has the purpose and effect of suppressing secondary effects, *while leaving the quantity and accessibility of speech substantially intact*."  *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 449 (2002) (Kennedy, J., concurring in judgment) (emphasis added).[13]  A law need not be "blind to the secondary effects of adult speech, *so long as the purpose of the law is not to suppress it*"; the government "*may not* assert that it will reduce secondary effects by reducing speech in the same proportion."  *Id*. at 447, 449 (emphasis added).

Illinois may not seek to address safety issues allegedly associated with the right to bear arms by simply prohibiting the exercise of that right.

4.    At any rate, neither logic nor data support the State's wholesale ban on carrying firearms in public for self-defense.  The State blithely

---

[13] Justice Kennedy's opinion in *Alameda Books* is controlling.  *See Annex Books*, 581 F.3d at 465.

24

asserts that "[l]ogic supports the legislature's conclusion that the more

guns there are in public, the greater likelihood that one will be discharged,

and the more victims of gun violence there will be."  State Br. 44.  But the

logic is not so straightforward.  As an initial matter, the State's focus on

gun violence is myopic—*overall* violence is the more relevant metric.  But

even as to gun violence, what matters is *who* is carrying guns, not the raw

number of guns carried.  If gun carrying is largely restricted to criminals—

the certain outcome of making carriage illegal—then more gun crimes are

likely to be perpetrated against innocent, defenseless victims.  But if the

law-abiding are also armed, they stand a better chance of defending

themselves from armed attack, thus *reducing* criminal gun violence.

Indeed, some criminals are likely to be deterred from violence in the first

place if they think there is a good chance their target is armed.[14]

The evidence Illinois offers provides scant support for the

counterintuitive notion that banning the legal carrying of guns in public

---

[14] *See* Lawrence Southwick, Jr., *Guns and Justifiable Homicide: Deterrence and Defense*, 18 St. Louis U. Pub. L. Rev. 217, 244 (1999) ("there are almost certainly some two to four million fewer completed crimes each year as the result of civilian gun ownership"); NRA et al. Br. 5-29.

reduces the number of gun-carrying criminals enough to justify disarming
law-abiding, responsible citizens.

First, statistics regarding the number of gun-related deaths in Illinois
do not help Illinois's case.  *See* State Br. 38.  The fact that Illinois continues
to be plagued by gun violence despite its ban on carrying firearms in public
hardly supports the ban's effectiveness.  Indeed, from 1999-2009 Illinois
had a higher rate of gun murders (5.13 per 100,000 residents) than the
United States as a whole (4.03 per 100,000 residents).[15]

Second, even assuming, *arguendo*, that "criminal gun use is far more
common than self-defense gun use," State Br. 44; *but see* Gary Kleck, *The
Frequency of Defensive Gun Use*, *in* ARMED:  NEW PERSPECTIVES ON GUN
CONTROL 213, 269 (Kleck et al., eds. 2001) ("sounder" methods indicate that
"defensive uses are about five times more common than criminal uses"),[16]
that fact still provides little insight into the effect of a wholesale ban on

---

[15] Data available at
http://www.cdc.gov/injury/wisqars/fatal_injury_reports.html.

[16] While the State attempts to cast doubt on Professor Kleck's
defensive gun use estimates, other surveys are nearly unanimously in
accord with his findings.  And the lone data source yielding a significantly
lower estimate has a multitude of problems, not the least of which is that
"interviewers never directly ask respondents about defensive gun use."
ARMED 231.

carrying guns in public.  Indeed, given that "gun control measures

theoretically applicable equally to criminals and noncriminals are almost

certain to reduce gun possession more among the latter than the former,"

GARY KLECK, TARGETING GUNS, FIREARMS AND THEIR CONTROL 185 (1997),

banning carriage will surely reduce defensive uses far more than criminal

ones.[17]

Third, the State has not pointed to evidence from any of the

multitude of jurisdictions with laws permitting law-abiding citizens to

carry firearms in public indicating that such laws frustrate the efforts of

"police officers to take illegal guns off of the streets."  State Br. 45.  The

cases the State cites to support its argument relate to States that *allow*

licensed, law-abiding citizens to carry firearms in public, *see United States v.*

---

[17] A study cited by the State reported a correlation between passage
of concealed carry laws and increased crime in some jurisdictions.  *See* John
J. Donohue, *The Impact of Concealed-Carry Laws*, in EVALUATING GUN POLICY
EFFECTS ON CRIME VIOLENCE 289, 324 (2003).  Its ultimate conclusion,
however, was that "broad (and conflicting) crime swings that occurred in
the late 1980s and 1990s happened to correlate with the passage of shall-
issue laws," thus "obscur[ing] what the true effect of these laws on crime
has been."  *Id*. at 325.  The State also cites statistics indicating that justifiable
homicides are rare, *see* State Br. 45, but this is hardly surprising given that
only a small fraction of defensive gun uses "involve anyone actually being
wounded, even nonfatally," KLECK, TARGETING GUNS 162.  *See also* Gary
Kleck & Marc Gertz, *Armed Resistance to Crime*, J. CRIM. L. & CRIMINOLOGY
150, 181 (1995).

*Black*, 525 F.3d 359, 364-65 (4th Cir. 2008); 18 Pa. Cons. Stat. Ann. § 6109 (1989), as do studies cited by the State's amici, *see* J. Cohen & J. Ludwig, *Policing Crime Guns*, *in* J. LUDWIG & P. COOK, EDS., EVALUATING GUN POLICY 217, 238 (2003) ("Pittsburgh's targeted policing program against illegal gun carrying may have reduced shots fired by 34 percent and gunshot injuries by as much as 71 percent in the targeted areas."); 18 Pa. Cons. Stat. Ann. § 6109 (1998); E.F. MCGARRELL, ET AL., REDUCING GUN VIOLENCE 2 (2002); IC 35-47-2-1 *et seq.* (1997); *see* Chi. et al. Br. 21.

Fourth, the State argues that "strategies for preventing gun violence are under-inclusive when they target only prior offenders."  State Br. 47.  The study the State cites, however, does not lend much support to its thesis, for it merely found that 43 percent of adults arrested for murder in Illinois had a felony conviction *in Illinois in the decade prior to their arrest*.  *See* Philip J. Cook, *et al.*, *Criminal Records of Homicide Offenders*, 294 JAMA 598, 599 (2005); *see also* J. WRIGHT & P. ROSSI, ARMED AND CONSIDERED DANGEROUS xxxii (2d ed. 2008) ("70-80% of firearms offenders have criminal records with an average of four major felony arrests prior to the commission of a homicide").  Furthermore, Illinois's existing gun licensing scheme is not limited to targeting only prior offenders.  *See* 430 ILCS 65/2,

28

65/4, & 65/8 (in addition to convicted felons, drug addicts, the mentally

disabled, and illegal aliens, among others, cannot legally possess guns in

Illinois).  And even if some number of violent criminals could qualify for a

license to carry a firearm, Illinois has failed to demonstrate that any

significant number of them will go to the time and expense to obtain the

necessary license and thereby advertise to the authorities that they own a

firearm.  *See id.*; Pl. Br. 55-57, 63.

In sum, the State strains to support the notion that its wholesale ban

on carrying arms in public will lead to even a trivial decrease in the harms

alleged to arise from exercise of that right.  Even under intermediate

scrutiny, this does not remotely suffice.  *See Alameda Books*, 535 U.S. at 445

(Kennedy, J., concurring in judgment) (measure aimed at secondary effects

of adult speech "can be consistent with the First Amendment if it is likely

to cause a *significant* decrease in secondary effects and a *trivial* decrease in

the quantity of speech") (emphasis added).

## IV.   THIS CASE IS RIPE FOR FINAL ADJUDICATION.

In the alternative, the State asks for a "remand to permit the district

courts in the first instance to make the factual findings necessary to

determine whether the State can demonstrate a sufficient fit between the

challenged statutes and their public-safety purpose." State Br. 52.  No
remand is necessary.  "A fact that goes to the reasonableness of a rule or
other enactment is a classic example of a legislative fact."  *Menora v. Illinois
High Sch. Ass'n*, 683 F.2d 1030, 1036 (7th Cir. 1982).  Judicial consideration
of legislative facts is not limited by "any formal requirements of notice
other than those already inherent in affording opportunity to hear and be
heard and exchanging briefs," nor by "any requirement of formal findings
at any level."  FED. R. EVID. 201, 1972 advisory committee note.  The State
has had an opportunity to be heard, and it does not suggest that it has held
anything back in its presentation to this Court.  The practical result of a
remand for further proceedings would be to delay resolution both of this
case and the *Moore* case to allow for proceedings before two different
district courts, only to end up back before this Court exercising "plenary"
review of any findings of legislative facts entered below.  *See Free v. Peters*,
12 F.3d 700, 706 (7th Cir. 1993).  This Court should forego such a pointless
exercise and decide this case now.

30

## CONCLUSION

This Court should REVERSE the judgment below granting the State's motion to dismiss, and REMAND with instructions to grant Plaintiffs' motion for summary judgment and to enter a permanent injunction against enforcement of the challenged statutes.  Alternatively, should the Court decide to remand the case for further proceedings, it should order the district court to enter a preliminary injunction against enforcement of the challenged statutes pending final judgment.

Dated: May 23, 2012              Respectfully submitted,


William N. Howard              s/ Charles J. Cooper
FREEBORN & PETERS LLP          Charles J. Cooper
311 South Wacker Drive, Suite  David H. Thompson
3000                           Peter A. Patterson
Chicago, IL 60606              COOPER AND KIRK, PLLC
(312) 360-6000; (312) 360-6596 Fax   1523 New Hampshire Ave., N.W.
                               Washington, D.C. 20036
                               (202) 220-9600; (202) 220-9601 Fax


*Attorneys for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32 (a)(7)(B) because this brief contains 6,992 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Circuit Rule 32(b), and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionately spaced typeface using Microsoft Office Word 2007 with 14-point Book Antiqua type.

s/ Charles J. Cooper
Charles J. Cooper
*Attorney for Plaintiffs-Appellants*

Dated:  May 23, 2012

## CERTIFICATE OF SERVICE

I hereby certify that on May 23, 2012, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>s/ Charles J. Cooper</u>
Charles J. Cooper
*Attorney for Plaintiffs-Appellants*