UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | ) | |
|---|---|---|
| TOM G. PALMER, *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 09-01482 (FJS) |
| | ) | |
| DISTRICT OF COLUMBIA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

DEFENDANTS' REPLY

Pursuant to Fed. R. Civ. P. 7(d), defendants the District of Columbia and Cathy Lanier hereby reply in support of their Motion to Stay.

The Court should grant a stay pending appeal here or, in the alternative, for 180 days pursuant to the Court's inherent authority, for District officials to craft responsive legislation. Contrary to plaintiffs' implications, the District's elected officials and law-enforcement officers began work on legislation that is consistent with this Court's initial decision immediately after the Court's decision, and continue to work on the legislation in hopes of its being introduced when the full Council of the District of Columbia convenes in September. While, as discussed herein, the equities all favor a stay, plaintiffs have provided no basis for the Court to conclude that the additional time requested will impose any substantial burden on them.

Plaintiffs do not contest the *need* for a stay, as they did not oppose a 90-day stay, but only the appropriate length of a stay. But nothing supports plaintiffs' chosen figure of 90 days except the *ipse dixit* of opposing counsel. Thus, the question that remains is the *extent* of the stay requested, not its propriety *per se*. *See Nken v. Holder*, 556 U.S. 418, 421 (2009) ("[A]s part of its traditional equipment for the administration of justice, a federal court can stay the

enforcement of a judgment pending the outcome of an appeal.") (quoting *Scripps–Howard Radio, Inc. v. FCC*, 316 U.S. 4, 9–10 (1942)).

Preliminarily, plaintiffs assert that Rule 62(c) only allows a stay pending appeal "upon the filing of an actual notice of appeal, or at least some commitment by the movant to do so." P.Mem. at 1. Plaintiffs do not attempt to cite any controlling case for the proposition and the cases they do cite instead undercut their argument. "Although no notice of appeal has yet been filed, that is not a prerequisite for relief under this Rule so long as there is reason to believe an appeal will be taken." *Loving v. IRS*, 920 F.Supp.2d 108, 110 (D.D.C. 2013) (citing *Common Cause v. Judicial Ethics Comm.*, 473 F.Supp. 1251, 1254 (D.D.C. 1979) (Rule 62(c) "permits the issuance of [a stay] whenever there is reason to believe that an appeal will be taken, *even before the actual notice of appeal has been filed*.") (emphasis added) (citing Wright & Miller, 11 *Fed. Prac. & Proc.* § 2904, at 324 (1973)).

As the District previously indicated, it intends to file timely a motion for reconsideration. Thus, any filing of a notice of appeal before that motion would be premature until the Court's resolution of that motion. *Nichols v. Board of Trustees of Asbestos Workers Local 24 Pension Plan*, 835 F.2d 881, 888 (D.C. Cir. 1987) (notice of appeal was ineffective as prematurely filed before district court ruled on motion for reconsideration, but deficiency was cured after disposition of motion, by further filing). *See also Sacks v. Rothberg*, 845 F.2d 1098, 1099 (D.C. Cir. 1988) (*per curiam*) (premature notice of appeal vests appellate court with jurisdiction "once the district court disposes, finally, of all matters pending before it.").

Indeed, not only would it be premature to file an appeal now, but self-defeating to even commit to a stay, given the possibility that the Court may change its rulings based on defendants' to-be-filed Rule 59 Motion.   At a minimum, given the current 90-day stay, the Court could wait

to rule on the broader stay pending appeal until after it resolves the impending motion for reconsideration (assuming it does so within the 90-day stay).

Thus, the Court should issue a stay in its discretion, as plaintiffs concede, P.Mem. at 1, pursuant to the Court's inherent authority to allow the legislative process to proceed, or else issue a standard stay pending appeal.

Plaintiffs also contend that the District has "misstated" the standard for issuing a stay pending appeal, asserting that the "serious legal question formulation" did not survive *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008). Here, too, plaintiffs are incorrect, as their own cases demonstrate. *Winter* "could be read to create a more demanding burden," but the Circuit has not yet done so. *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (employing "sliding-scale approach" and finding that plaintiffs had raised "a 'very serious legal question' on the merits.") (citing *Wash. Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843–44 (D.C. Cir. 1977)). *See also Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014) (after *Winter*, "[i]n this circuit, it remains an open question whether the 'likelihood of success' factor is an independent, free-standing requirement,' or whether, in cases where the three other factors strongly favor issuing an injunction, a plaintiff need only raise a 'serious legal question' on the merits.") (quoting *Sherley*, 644 F.3d at 393, 398)); *Akiachak Native Community v. Jewell*, ___ F.Supp.2d ___, 2014 WL 2885910, *3 (D.D.C. Jun. 26, 2014) (granting in part stay pending appeal) ("Though the Court disagrees with Alaska's position, and finds there to be a low likelihood of success on the merits, it recognizes that the case presented difficult and substantial legal questions . . . .").

The Circuit has explained that a court "is not required to find that ultimate success by the movant is a mathematical probability, and indeed, as in this case, may grant a stay even though

its own approach may be contrary to the movant's view of the merits." *Holiday Tours,* 559 F.2d at 843. Courts may issue a stay "when they have ruled on an admittedly difficult legal question and when the equities of the case suggest that the status quo should be maintained." *Id*. at 844–45. Although the Court disagrees, *see* Doc. No. 51 at 15 ("This question is not difficult to answer."), the District respectfully avers that the legal question here is difficult and serious, and thus a stay is appropriate to maintain the status quo.[1] *See also Al Maqaleh v. Gates*, 620 F.Supp.2d 51, 56 (D.D.C. 2009) ("the moving party need not establish 'an absolute certainty of success,' rather, '[i]t will ordinarily be enough that the [movant] has raised questions going to the merits so serious, substantial, difficult as to make them a fair ground for litigation . . . .'") (quoting *Population Inst. v. McPherson*, 797 F.2d 1062, 1078 (D.C. Cir. 1986) (quoting *Holiday Tours*, 559 F.2d at 844)). "This Court's interpretation of [*Heller I*] was not the mechanical application of an established test. Rather, reasonable courts could differ as to how certain factors should be interpreted and what weight each factor is due. The constitutional issues presented are consequential and fundamental . . . ." *Id*. at 58. This conclusion "squarely favors" a stay. *Id*.

*Likelihood of Success*

Respectfully, there can be no doubt that the District has raised a very serious question on the merits. Neither the Supreme Court nor the D.C. Circuit has determined that the Second Amendment extends beyond the home. Plaintiffs appear to contend otherwise, *see* P.Mem. 4, but refer only to the implications of various Supreme Court dicta and, subsequently, implicitly concede the point by discussing what the Supreme Court "would" do in the future on that

---

[1] Respectfully, the fact that two different judges wrestled with the question for almost five full years itself shows the difficulty it presents.

specific issue. *Id.* at 6. *See, e.g., Williams v. State*, 10 A.3d 1167, 1177 (Md. 2011) ("[I]t is clear that prohibition of firearms in the home was the gravamen of the certiorari questions in both [*District of Columbia v. Heller*, 554 U.S. 570 (2008) ("*Heller I*")] and [*McDonald v. Chicago*, 130 S. Ct. 3020 (2010)] and their answers. If the Supreme Court, in this dicta, meant its holding to extend beyond home possession, it will need to say so more plainly."), *cert. denied*, 132 S. Ct. 93 (2011).[2]

Plaintiffs additionally argue that the District's arguments regarding *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012), are "disingenuous." P.Mem. at 6. Here, too, plaintiffs are incorrect. Only one circuit—the Seventh—has extended the Second Amendment right beyond the home in a jurisdiction (Illinois) that had not already, historically, recognized some form of public carrying. No court has addressed a ban on public carrying as unique as the District's—a point plaintiffs do not rebut. The fact that the District's law is "exceedingly rare" does not mean it is unconstitutional.

The Court, ignoring the historical evidence regarding public carrying laws presented by the District, *see* Doc. Nos. 33, 33-1, found that carrying handguns in public was not only within the scope of the Second Amendment, but at its *core*, and then declined to engage in the second step of the analysis, *i.e.*, determining whether the prohibition withstands the appropriate level of

---

[2] *See also Drake v. Filko*, 724 F.3d 426, n.5 (3d Cir. 2013):

> Rather than discussing whether or not the individual right to bear arms for the purpose of self-defense articulated in [*Heller I*] "extends beyond the home," it may be more accurate to discuss whether, in the public sphere, a right similar or parallel to the right articulated in *Heller* "exists." Firearms have always been more heavily regulated in the public sphere so, undoubtedly, if the right articulated in *Heller* does "extend beyond the home," it most certainly operates in a different manner.

scrutiny. *See Heller v. District of Columbia*, 670 F.3d 1244, 1252 (D.C. Cir. 2011) ("*Heller II*"). This, respectfully, was error.

The historical evidence demonstrates that the Second Amendment's right to keep and bear arms, as understood at the time of ratification, did not include an unalloyed right to carry operable firearms in public for the purpose of self-defense. *See* Doc. No. 33-1 at 8–14; Doc. No. 33-2 at 7–14. Centuries of British statutes and common law confirm that it was illegal to carry firearms in public. Doc. No. 33 at 3–4. This was the understanding that prevailed at the time of the founding and thereafter: hence because constitutional rights "are enshrined with the scope they were understood to have when the people adopted them[,]"*District of Columbia v. Heller*, 554 U.S. at 634–5, the Second Amendment does not "at its core" encompass a right to carry an operable firearm in public.

Rather, the "core" of the Second Amendment right is "the right of law-abiding, responsible citizens to use arms in defense of hearth and home[,]" *id.* at 635, not the right to carry handguns in public. "At its core, the Second Amendment protects the right of law-abiding citizens to possess non-dangerous weapons for self-defense in the home." *United States v. Marzzarella*, 614 F.3d 85, 92 (3rd Cir. 2010) (footnote omitted); *accord United States v. Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011) ("as we move outside the home, firearm rights have always been more limited, because public safety interests often outweigh individual interests in self defense.").

Thus, even assuming some form of public carrying of handguns is protected by the Second Amendment, it is not at the *core* of the right, and, accordingly, a court must examine the

strength of the government's justifications for its regulation, pursuant to intermediate scrutiny.[3] *See Heller II*, 670 F.3d at 1252. The Court here did not do so, ignoring the many, important public safety and other reasons put forth for the District's longstanding prohibition, many of which are unique to the District of Columbia, a state-level jurisdiction with an almost completely urban makeup that as the seat of the national government is home to the White House, the U.S. Capitol, dozens of federal agencies, and hundreds of international diplomats and has, over the years, experienced attempted as well as successful assassinations of Presidents and other officials of national importance using firearms. These and the other important public safety concerns will need to be considered by the D.C. Circuit in any appeal, and will present a serious question (even assuming the Circuit concludes a balancing test is necessary), one that is of first impression in this Circuit.

The District respectfully disagrees with the Court's conclusion that "it is beyond dispute that 'the prospect of conflict . . . is just as menacing (and likely more so) beyond the front porch as it is in the living room.'" Doc. No. 51 at 12 (quoting *Peruta v. Cnty. of San Diego*, 742 F.3d 1144, 1152 (9th Cir. 2014)).[4] But the world outside of the home has something that the home lacks—armed law-enforcement officers whose duty is to preserve public safety. Surely this must

---

[3] If public carrying of weapons were indeed at the "core" of the Second Amendment right, the government still would be able to regulate it, so long as it had a "strong justification[.]" *Heller II*, 670 F.3d at 1257. The Court, however, did not address the District's justifications, or their strength.

[4] While the correctness of *Peruta* is not at issue, it must be noted that the panel there expressly conceded that its position was contrary to most of the circuits to address the issue. *See Peruta*, 742 F.3d at 1173 (rejecting decisions of Second, Third, and Fourth Circuits). This clear circuit split suggests, if nothing else, that the Court should not have broached new ground in the District in its decision, at least without further guidance by controlling courts. *See Masciandaro*, 638 F.3d at 475–76 (quoted *infra* at 14). It further suggests the difficulty of the legal issue here.

be at least an implicit reason that the Supreme Court determined that the right to self-defense in the Second Amendment is at its peak in the home. *Heller I*, 554 U.S. at 635.[5]

"[J]udges are not historians." *Moore v. Madigan*, 702 F.3d 933, 943 (7th Cir. 2012) (Williams, J., dissenting). *See also Peruta v. Cnty of San Diego*, 742 F.3d 1144, 1182 (9th Cir. 2014) (Thomas, J., dissenting) ("Care is [r]equired to avoid the danger inherent in any exercise of historiography: that we assemble history to fit a pre-conceived theory."). Here, the Court erred by accepting the historical analyses of judges in non-controlling decisions, by failing to conduct its own historical analysis, and by ignoring the extensive history and regulatory justifications cited by the District. "Guns in public expose all nearby to risk, and the risk of accidental discharge or bad aim has lethal consequences. Allowing public carry of ready-to-use guns means that risk is borne by all in [the District], including the vast majority of its citizens who choose not to have guns." *Moore*, 702 F.3d at 953 (Williams, J., dissenting).

Circuit Judge Williams, in her dissent in *Moore*, cogently points out the logical disconnect in the assumptions made by those who extrapolate fragments of *Heller I* and *McDonald* to inexorably encompass a right to carry handguns in public. The Supreme Court in *Heller I* made clear that the government may entirely prohibit firearms from "sensitive places" like schools and government buildings, such as post offices, courthouses, libraries, and perhaps public universities and airports. *Moore*, 702 F.3d at 947–48 (citing, *inter alia*, *Heller I*, 554 U.S. at 626). But, clearly, the ban on carrying firearms in those places does not mean that a need for self-defense would *never* arise there, just that the government's (presumed) justifications for the ban *outweigh* any individual's need to carry for self-defense in those locations. "The resulting

---

[5] Indeed, as discussed below, the fact that there is ready access to armed law-enforcement in various "sensitive places" surely must underlie, at least implicitly, the long understood propriety of public-carry bans in those locations.

patchwork of places where loaded guns could and could not be carried is not only odd but could not guarantee meaningful self-defense, which suggests that the constitutional right to carry ready-to-use firearms in public for self-defense may well not exist." *Id*. at 948. *See also id*. at 947 (Thus, "any right to possess a gun for self-defense outside the home is not absolute, and it is not absolute by the Supreme Court's own terms.").

*Public Interest and Balance of Harm*

Plaintiffs, in their Opposition, argue that 90 days "mark the outer limits of what the Court should be willing to afford Defendants[,]" P.Mem. at 2, but provide no support for that proposition. Plaintiffs concede that "Defendants might 'experiment' with regulations fitting local conditions, within constitutional limitations." *Id.* at 9. That is exactly why the District needs additional time to craft an appropriate law and regulations.

Plaintiffs additionally argue that the District did not identify any injury at all beyond a "generalized interest in enforcing the law," *Id*., but fail to overcome or explain away the longstanding proposition that "any time a State is enjoined by a court from effectuating statutes enacted by the representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 133 S. Ct. 1, 3 (July 30, 2012) (Roberts, C.J., in chambers) (citation omitted).[6]

Plaintiffs make too much of the right involved here, at the expense of the public interest by stating "[t]here is simply no way to quantify or remedy the profound loss of security, and its possible consequences, when individuals are denied adequate means of self-defense." P.Mem. at 14. This statement must be tempered with the historical reality that the right plaintiffs discuss

---

[6] *Cf. Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1295 (D.C. Cir. 2009) ("[W]here one factor has been shown to a certainty, it is appropriate to apply a lower threshold on the other prongs . . . .").

was not articulated until this Court's decision.[7] As the Court has noted, "for many years" Doc. No. 51 at 4, there was no right to public carry of handguns in the District. Plaintiffs have provided no reason to think that a few months of additional delay will make the difference in whether they will encounter some situation in which public carrying will help them in self-defense.

As the District noted previously, the Seventh Circuit had the foresight, initially, to give the Illinois legislature six full months to develop an appropriate public-carrying scheme "that will impose reasonable limitations, consistent with the public safety[.]" *Moore*, 702 F.2d at 942. The Seventh Circuit subsequently extended the stay for an *additional* 30 days at Illinois' request. *See Shepard v. Madigan*, 734 F.3d 748, 749 (7th Cir. 2013). Moreover, the law that was enacted there gave the licensing authority a *further* 180 days to make license applications public, *id.* at 750, and 90 days for the police to review a completed application before issuing licenses to qualified applicants. *Id.* The Seventh Circuit clearly understood the important, competing

---

[7] Oddly, plaintiffs claim that "there seems little legitimate scholarly reason to doubt that defensive gun use is very common in the U.S. . . . ." P.Mem. at 13–14 (quoting Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. CRIM. L. & CRIMINOLOGY 150, 180 (1995)). To the contrary, there is extensive scholarly reason to doubt the conclusions reached by the cited study and Dr. Kleck in particular. *See, e.g.*, David Hemenway, *Survey Research and Self-Defense Gun Use: An Explanation of Extreme Over-Estimates*, 87 J. CRIM. L. & CRIMINOLOGY 1430, 1431 (1995) (discussing the "severe misestimation" of the Kleck/Gertz article, and determining that "its conclusions cannot be accepted as valid."); Anthony A. Braga, *et al.*, *Interpreting the Empirical Evidence on Illegal Gun Market Dynamics*, 89 J. URBAN HEALTH: BULL. OF THE NEW YORK ACAD. OF MED. 779 (2012) (challenging the conclusions and research done by Dr. Kleck regarding the alleged improper use of firearms trace data to understand the illegal gun market); *id.* at 792 ("The flaws in the data raise serious doubts about the reliability and validity of Kleck['s] conclusions.").

interests at issue, and determined to give Illinois sufficient time to address those issues through the normal, considered, democratic process.[8]

Indeed, the Seventh Circuit explicitly noted that what the *Shepard* plaintiffs wanted—simply allowing anyone with a previously registered gun at home to carry it in public—was "unreasonable." *Id*. The court then reiterated what it thought should have been "obvious" to all: "transition to a new regime of gun rights would require considered, complex state action, and therefore could not be instantaneous." *Id*. at 751.

Surely the District, the nation's capital, is entitled to no less consideration, even if the Court discounts the unique features of this city so minimized by plaintiffs. *See* P.Mem. at 8. The additional time will allow the input, if it chooses, of the United States, whose views would no doubt illuminate the need for a careful delineation of the Second Amendment within the public areas of the District of Columbia.

Like Illinois, the District's ban on public carrying has been in place for "many years." Without doubt, some reasonable amount of time is necessary for the District's lawmakers to fashion an appropriate response to the Court's Order. The difficulty and time and processes involved in balancing all the varied interests at stake here—the constitutional rights of the District's citizens, the public safety and the safety of law-enforcement officers, and the unique challenges accompanying the extensive presence of major federal sites like the White House and the U.S. Capitol—surely mandates a painstaking and deliberate approach.

The public interest is not served by allowing handguns to be carried in public, without reasonable restrictions first being imposed. *See Winter*, 555 U.S. at 24 ("In exercising their sound

---

[8] Plaintiffs here appear to characterize the Seventh Circuit's actions as "quite reasonable," P.Mem. at 15, but also imply that the 6 months granted *sua sponte* in *Moore* should not be extended to the District.

discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.") (quoting *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312 (1982)).

"[W]here an injunction is asked which will adversely affect a public interest for whose impairment, even temporarily, an injunction bond cannot compensate, the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff." *Weinberger*, 456 U.S. at 312 (quoting *Yakus v. United States*, 321 U.S. 414, 440 (1944) (footnote omitted)).

As noted above, plaintiffs in their Opposition downplay the important public-interest issues at stake here. The Court should not fall prey to the same mistake. *See id.; FTC v. Weyerhaeuser Co.*, 648 F.2d 739, 741 (D.C. Cir. 1981) ("While we agree that private equities may be considered in a motion for injunctive relief, we do not believe that those equities may be given conclusive effect at the nearly complete expense of the public interest also present."). While the District agrees, as a general matter, with plaintiffs that "enforcement of an unconstitutional law is always contrary to the public interest[,]" P.Mem. at 16 (quoting *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013)), the law at issue here was not found unconstitutional until this Court's decision three weeks ago, and this fact must be considered in light of the practical difficulties in enacting appropriate legislation to amend a scheme that had been in place for many years.

Where the government seeks an injunction, "the standards of public interest, not the requirements of private litigation, measure the propriety and need for injunctive relief[.]" *Hecht Co. v. Bowles*, 321 U.S. 321, 331 (1944). *See also SEC v. Stratton Oakmont, Inc.*, 878 F.Supp.

250, 255 (D.D.C. 1995) (same, quoting *Hecht Co.*) (government "need not demonstrate irreparable harm or an inadequacy of other remedies.").

A stay pending appeal would clearly be in the public interest. Alternatively, a stay in the Court's discretion would allow the District's elected representatives to follow the prescribed process for developing and enacting important legislation that complies with the Constitution and this Court's Order. As the Supreme Court has noted, "[i]njunctive remedies are meant to achieve a 'nice adjustment and reconciliation between the competing claims' of injury by "'mould[ing] each decree to the necessities of the case.'" *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 181 (2010) (Stevens, J., dissenting) (quoting *Weinberger*, 456 U.S. at 312 (internal quotation marks omitted)). The Court's original Order here, granting a full injunction immediately, is contrary to this teaching, and would grant full relief to the plaintiffs without considering the countervailing public interest, and the time reasonably necessary to protect that interest. *See Salazar v. Buono*, 559 U.S. 700, 714–15 (2010) ("Because injunctive relief 'is drafted in light of what the court believes will be the future course of events, . . . a court must never ignore significant changes in the law or circumstances underlying an injunction lest the decree be turned into an 'instrument of wrong.') (citations omitted).

Plaintiffs do not contest that a stay here would preserve the *status quo*, the traditional goal of injunctive relief. The *status quo* as it existed before the Court's decision of July 26 (Doc. 51) was that all unlicensed public carrying of weapons in the District had been prohibited in the District since 1932 and that even though the Chief of Police's authority to issue such licenses had not been exercised "for many years," Doc. No. 51 at 4, the Council repealed that authority late in 2008. *Id.*

Here, the District has raised a serious legal question, indeed, one that is of first impression in the District. This favors a stay. *See Center for Int'l Environmental Law v. Office of*

*the U.S. Trade Rep.*, 240 F.Supp.2d 21, 22–23 (D.D.C. 2003) (granting stay pending appeal, where, despite risks of harm to plaintiffs, case clearly presented "a serious legal question" on issue of first impression).

The cautionary words of the Fourth Circuit are appropriate here, as the Court considers whether to allow the District sufficient time to craft an appropriate response to its decision:

> To the degree that we push the right beyond what the Supreme Court in *Heller* declared to be its origin, we circumscribe the scope of popular governance, move the action into court, and encourage litigation in contexts we cannot foresee. This is serious business. We do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we miscalculated as to Second Amendment rights. It is not far-fetched to think the *Heller* Court wished to leave open the possibility that such a danger would rise exponentially as one moved the right from the home to the public square.
>
> If ever there was an occasion for restraint, this would seem to be it. There is much to be said for a course of simple caution.

*Masciandaro*, 638 F.3d at 475–76.

For all the reasons stated herein and previously, the Court should grant the District's Motion to Stay Pending Appeal or, in the Alternative, for 180 Days.

DATE: August 18, 2014         Respectfully submitted,

IRVIN B. NATHAN
Attorney General for the District of Columbia

ELLEN A. EFROS
Deputy Attorney General
Public Interest Division

　　/s/ Grace Graham
GRACE GRAHAM, D.C. Bar No. 472878
Chief, Equity Section
441 Fourth Street, NW, 6th Floor South
Washington, DC 20001
Telephone: (202) 442-9784

Facsimile: (202) 741-8892
Email: grace.graham@dc.gov


      /s/ Andrew J. Saindon
ANDREW J. SAINDON, D.C. Bar No. 456987
Senior Assistant Attorney General
Equity Section I
441 Fourth Street, N.W., 6th Floor South
Washington, D.C. 20001
Telephone: (202) 724-6643
Facsimile: (202) 730-1470
E-mail: andy.saindon@dc.gov