UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| TOM G. PALMER, *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 09-01482 (FJS) |
| | ) | |
| DISTRICT OF COLUMBIA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

_____)

## DEFENDANTS' MOTION FOR RECONSIDERATION

Pursuant to Fed. R. Civ. P. 59(e), defendants (collectively, "the District") hereby move this Honorable Court to reconsider its Memorandum-Decision and Order of July 26, 2014 (Doc. No. 51).

The Court should grant the motion for reconsideration because of a number of errors of law. Specifically, the Court failed to conduct the analysis required by controlling law, and relied on flawed, non-controlling decisions from other jurisdictions.

A Memorandum of Points and Authorities pursuant to LCvR 7(a) and a proposed order pursuant to LCvR 7(c) are submitted herewith.

Pursuant to LCvR 7(m), undersigned counsel discussed the instant motion with opposing counsel, who declined to consent to the relief requested.

DATE: August 25, 2014             Respectfully submitted,

IRVIN B. NATHAN
Attorney General for the District of Columbia

ELLEN A. EFROS
Deputy Attorney General
Public Interest Division

_____/s/ Grace Graham_____

GRACE GRAHAM, D.C. Bar No. 472878
Chief, Equity Section
441 Fourth Street, NW, 6th Floor South
Washington, DC 20001
Telephone: (202) 442-9784
Facsimile: (202) 741-8892
Email: grace.graham@dc.gov


_____/s/ Andrew J. Saindon_____

ANDREW J. SAINDON, D.C. Bar No. 456987
Senior Assistant Attorney General
Equity Section I
441 Fourth Street, N.W., 6th Floor South
Washington, D.C. 20001
Telephone: (202) 724-6643
Facsimile: (202) 730-1470
E-mail: andy.saindon@dc.gov

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
TOM G. PALMER, *et al.*                 )
                                        )
                    Plaintiffs,         )
                                        )
        v.                              )        Civil Action No. 09-01482 (FJS)
                                        )
DISTRICT OF COLUMBIA, *et al.*,         )
                                        )
                    Defendants.         )
_____)

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANTS' MOTION FOR RECONSIDERATION

Defendants (collectively, "the District"), by and through undersigned counsel, hereby submit this Memorandum of Points and Authorities in Support of their Motion for Reconsideration, in accordance with Rule 59(e) and LCvR 7(b) and (d).

The Court's Memorandum-Decision and Order of July 26, 2014 (Doc. No. 51), contains a number of legal errors. The Court relied largely on the logic of *Peruta v. Cnty. of San Diego*, 742 F.3d 1144, 1166 (9th Cir. 2014) and *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012), but those cases rest, at best, on questionable logical and legal foundations, and represent a view that is distinctly in the minority.[1] No controlling court decision has found that the Second Amendment protects a right to carry firearms in public. The D.C. Circuit, in *Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) ("*Heller II*"), set forth the analysis to be conducted when

_____

[1]     The Court's conclusion that "other circuits" in addition to the Ninth in *Peruta* "have reached the same result" Order at 14, *i.e.*, found that the Second Amendment encompasses a right to bear arms outside the home, is simply incorrect, as the cases cited demonstrate. As discussed herein, only one other circuit—the Seventh (*Moore*)—has explicitly held that the rights articulated in the Second Amendment exist outside the home. The Second (*Kachalsky*), Third (*Drake*), and Fourth (*Woollard*) Circuits have all simply *assumed* that such a right exists, and analyzed the challenged laws accordingly.

constitutional challenges are brought to firearms regulation, but this Court failed to follow that guidance.

The two underlying errors here, which serve as the bases for the District's motion, are the Court's (1) finding the right to carry firearms in public to be at the core of the Second Amendment and (2) relying only on cases which are not controlling precedent to support that conclusion. The Court then compounded its error by not addressing or considering the justifications presented by the District for the law. Admittedly, when this case started, the legislative record was thin and the parties did not have the history of *Heller II* to draw upon, nor Judge Boasberg's thoughtful decision after remand, during which the record was considerably augmented.  But, even in the first instance, this Court did not engage in an intermediate scrutiny analysis and, if it did and found the record wanting, based on the *Heller II* remand, it should have ordered additional briefing on the District's justifications which, as shown herein, need not be confined to the legislative record. At a minimum, this Court should follow the *Heller II* paradigm, which is precedent in this Circuit, and stay the matter pending supplementation of the record.

For these reasons, as amplified herein, the District requests that the Court reconsider and set aside its order and grant summary judgment to the District. Alternatively, the Court should stay this matter to allow for further development of the record, as the D.C. Circuit recently indicated was the appropriate course. *See Heller II*, 670 F.3d at 1259–60.

## I. Background

Plaintiffs filed their complaint in August 2009. The parties then filed motions for summary judgment, and oral argument was held on January 22, 2010.

On March 26, 2010, the District alerted the Court to the decision in *Heller v. District of Columbia*, 698 F.Supp.2d 179 (D.D.C. Mar 26, 2010), which applied "intermediate scrutiny" and upheld the District's firearms-registration scheme. *See* Doc. No. 17. Over the next two years, the parties filed various notices of supplemental authority and responses. *See* Doc. Nos. 19, 23, 24–32.

On October 4, 2011, the D.C. Circuit issued its decision in *Heller II*, which upheld, in large part, the District's firearms-registration scheme and remanded for further development of the factual record.

On May 24, 2012, the District filed a Supplemental Memorandum (Doc. No. 33), and the appellate briefs of Illinois and *amici curiae*[2] in the consolidated appeals of *Moore v. Madigan*, No. 12-1269 and *Shepard v. Madigan*, No. 12-1788, before the Seventh Circuit (Doc. Nos. 33-1, 33-2, and 33-3). That same day, plaintiffs moved to strike the supplemental memo, *see* Doc. No. 34, and provided the appellate and reply briefs of the plaintiffs in *Moore* and *Shepard*, *supra*, and *amicus curiae* the National Rifle Association. *See* Doc. Nos. 34-2 to 34–6.

The parties continued to file notices of supplemental authority and responses, both before and after an additional motions hearing on October 1, 2012. On May 15, 2014, Judge Boasberg issued his decision on the remand in *Heller v. District of Columbia*, ___ F.Supp.2d ___, 2014 WL 1978073 (D.D.C. May 15, 2014).

---

[2]     The City of Chicago, Legal Community Against Gun Violence, Major Cities Chiefs Association, Board of Education of the City of Chicago, Chicago Transportation Authority, the Brady Center To Prevent Gun Violence, International Brotherhood of Police Officers, National Association of Women Law Enforcement Executives, National Black Police Association, and the Police Foundation.

On March 31, 2014, the Court denied plaintiffs' motion to strike (Doc. No. 34), and on July 26, 2014, the Court issued its Memorandum Decision and Order (Doc. No. 51) ("Order") granting summary judgment to plaintiffs.

The Court determined that the Second Amendment protects "the carrying of an operable handgun outside the home for the lawful purpose of self-defense . . . ." Order at 14 (quoting *Peruta*, 742 F.3d at 1166). The Court subsequently concluded that "the District of Columbia's complete ban on the carrying of handguns in public is unconstitutional." *Id*. at 16. The Court permanently enjoined the defendants "from enforcing the home limitations of D.C. Code § 7-2502.02(a)(4) and enforcing D.C. Code § 22-4504(a) unless and until such time as the District adopts a licensing mechanism consistent with constitutional standards enabling people to exercise the Second Amendment right to bear arms." *Id.* (citation omitted).

By Order dated July 29, 2014, the Court granted the District's partial consent motion, staying its judgment *nunc pro tunc* until October 22, 2014. Doc. No. 53.

## II. Argument

As discussed herein, the bases for the District's Rule 59(e) motion is that the Court failed to abide by the requirements of controlling law, and failed to evaluate the evidence and justifications put forth by the District.

### A. *Standards for Reconsideration*

Motions under Fed. R. Civ. P. 59(e) are "discretionary and need not be granted unless the district court finds that there is an intervening change in controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Ciralsky v. CIA*, 355

F.3d 661, 671 (D.C. Cir. 2004) (quoting *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996)). Rule 59(e) motions "are intended to permit the court to correct errors of fact appearing on the face of the record, or errors of law." *Koch v. White*, 2014 WL 717483, *1 (D.D.C. Feb. 26, 2014) (citations omitted).

Reconsideration may be required where the court has "'patently misunderstood the parties, made a decision beyond the adversarial issues presented, [or] made an error in failing to consider controlling decisions or data, or [where] a controlling or significant change in the law has occurred.'" *Arias v. DynCorp,* 856 F.Supp.2d 46, 51 (D.D.C. 2012) (quoting *Negley v. FBI,* 825 F.Supp.2d 58, 60 (D.D.C. 2011)). A Rule 59(e) motion is "aimed at reconsideration, not initial consideration' and may not be used to raise arguments or present evidence that could have been raised before the entry of judgment." *Cobell v. Jewell*, ___ F.Supp.2d ___, 2014 WL 1064038, *4 (D.D.C. Mar. 20, 2014) (quoting *GSS Group, Ltd. v. Nat'l Port Auth.*, 680 F.3d 805, 812 (D.C. Cir. 2012)).

Here, the District does not raise any new arguments or evidence, but points to several errors in law, where the Court failed to obey controlling decisions. The Court unnecessarily determined that the right to carry a handgun in public is at the core of the Second Amendment, and failed to consider both the historical pedigree of prohibitions on public carrying and the District's important justifications for its prohibition.

### B.  *The Requirements of* Heller II

When the parties first briefed this matter, the D.C. Circuit had not yet determined how to analyze Second Amendment challenges or the appropriate level of scrutiny to apply. Since then, the Circuit—like most other federal circuits—has adopted a two-step approach to determine the

constitutionality of a gun law. *Heller II*, 670 F.3d at 1252.[3] That test requires a court first to determine whether a particular regulation infringes on a right protected by the Second Amendment and then, if it does, to determine whether the provision passes constitutional muster under the appropriate level of scrutiny. *Id.*

The Court purported to apply *Heller II*'s two-part test, *see* Order at 10, but abandoned its analysis after the first step.

Laws pass intermediate scrutiny if the government can show that the laws are "substantially related to an important government objective." *Heller II*, 670 F.3d at 1258 (quoting *Clark v. Jeter*, 486 U.S. 456, 461 (1988)). *See also National Rifle Ass'n of Am., Inc. ("NRA") v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 195 (5th Cir. 2012) (intermediate scrutiny requires government to show a "reasonable fit" between the disputed regulation and an "important" government objective) (citations omitted). The Circuit in *Heller II* reiterated that intermediate scrutiny tolerates overbroad regulation, if "not broader" than the government "reasonably could have determined to be necessary." *Id.*

## C.  The History of Public Carry

If a particular firearm regulation is "longstanding," it is "presumptively lawful," *i.e.*, it is "presumed not to burden conduct within the scope of the Second Amendment." *Heller II*, 670 F.3d at 1258 (quoting *Heller v. District of Columbia*, 554 U.S. 570 (2008) ("*Heller I*")).

Here, the District presented considerable historical evidence that the public carrying of weapons has always been subject to severe restrictions, including outright prohibitions. As early

---

[3]  *See Davis v. Grimes*, ___ F.Supp.2d ___, 2014 WL 1278082, *10 (D. Mass. Mar. 26, 2014) (citing cases from the Third, Fourth, Fifth, Sixth, Seventh, Ninth, Tenth, Eleventh, and D.C. Circuits).

as 1328, statutes in Great Britain prohibited the public carrying of weapons. *See* Doc. No. 33 at

3–5, and the sources cited therein. *See also Peruta*, 742 F.3d at 1182 (Thomas, J., dissenting)

("Restrictions on the carrying of open and concealed weapons in public have a long pedigree in

England."). *Cf. Kachalsky v. County of Westchester*, 701 F.3d 81, 90–91 (2d Cir. 2012) (citing

19th century State statutes that prohibited the public carrying of handguns); *Moore*, 702 F.3d at

944 (Williams, J., dissenting) ("In contrast to inside the home, where one could largely do what

he wished, there was a long history of regulating arms in public.").

Indeed, the Supreme Court itself, in *Heller I*, considered certain laws to be

"longstanding," including the prohibition of possession of firearms by convicted felons or the

mentally ill, hence entitled to a presumption of constitutionality, even though those laws were

not enacted until the early 20th century. *Heller II*, 670 F.3d at 1253. *See also id.* at 1253–54

(early 20th century state handgun-registration laws are presumptively lawful); *Drake v. Filko*,

724 F.3d 426, 431–34 (3d Cir. 2013) (New Jersey law, enacted in 1924, requiring showing of

"justifiable need" for issuance of public-carrying license for handgun qualified as "longstanding"

and therefore did not burden conduct within the scope of the Second Amendment); Order at 11

(quoting *NRA*, 700 F.3d at 196 ("For now, we state that a longstanding presumptively lawful

regulatory measure . . . would likely [burden conduct] outside the ambit of the Second

Amendment.")).

Here, notwithstanding that "judges are not historians[,]" *Moore*, 702 F.3d at 943

(Williams, J., dissenting), the Court erred by accepting the historical analyses of judges in non-

controlling decisions, by failing to conduct its own historical analysis, and by ignoring the

extensive history and regulatory justifications cited by the District. *Cf. Peruta*, 742 F.3d at 1182

(Thomas, J., dissenting) ("Care is [r]equired to avoid the danger inherent in any exercise of historiography: that we assemble history to fit a pre-conceived theory.").

>1.   The History of the District's Prohibition

It is not entirely clear exactly *when* licenses for public carrying in the District of Columbia became practically unavailable, though that fact is not dispositive here. *See Drake*, 724 F.3d at 434 ("We discern no hint in the Second Amendment jurisprudence of either the Supreme Court or this Court that the analysis of a particular regulation in a particular jurisdiction should turn entirely on the historical experience of that jurisdiction alone.").

The Act of July 8, 1932, Pub. L. No. 72-275, 47 Stat. 651, prohibited the public carrying of weapons in the District without a license. *See* Doc. No. 6 at 23–24. That law contained an exception for a person carrying such a weapon "in his dwelling house or place of business or on other land possessed by him . . . ." *See* House Rep. No. 767, at 1 (72nd Congress, 1st Sess., Mar. 11, 1932). Congress enacted the law to "provid[e] additional safeguards and more stringent restrictions concerning the sale and possession of dangerous weapons. It was introduced at the request of the Commissioners of the District of Columbia and the need for such legislation is apparent to all citizens." House Rep. No. 767, at 2.

While the Chief of Police was empowered to grant such licenses, that authority was repealed in 2008. Order at 4. *Cf. Bshara v. United States*, 646 U.S. 993, 996 n.2 (D.C. 1994) ("It is common knowledge, however, that with very rare exceptions licenses to carry pistols have not been issued in the District of Columbia for many years and are virtually unobtainable.").[4]

---

[4]      If the Court determines, as discussed elsewhere herein, to order further briefing and development of the factual record, *see infra* at 19–22, the parties will be able to further explore the legislative history behind the original law and its subsequent enforcement, and present additional evidence as to the justifications for the law.

Thus, if the District's practical ban on obtaining licenses to carry handguns in public is of "early 20th century" vintage, it is presumably constitutional, and hence no further analysis is necessary. Even if it the District's ban is *not* longstanding, however, the Court should have moved on to step two of the analysis, determined the level of scrutiny to apply, and carefully examined the District's justifications. The Court did not do so.

### D. Carrying Firearms in Public is Not at the "Core" of the Second Amendment

No controlling decision has held that the Second Amendment extends beyond the home. Only one circuit—the Seventh—has extended the Second Amendment right beyond the home in a jurisdiction (Illinois) that had not already, historically, recognized some form of public carrying.[5] The *scope* of the right nationwide is therefore still to be determined, but, as the District has argued, the history underlying the Second Amendment does not support an unlimited right to carry outside the home. *See* Doc. No. 33. Moreover, the unique situation of the District—a known terrorist target with an unfortunate history of attempted assassinations by firearm—requires a careful analysis of the rights granted under the Second Amendment that is distinctly applicable to this jurisdiction. *See* Doc. No. 7 at 23–28; Doc. No. 12 at 10–12 & n.9.

The Circuit in *Heller II* employed the "intermediate scrutiny" test because the laws at issue there "do not affect the core right protected by the Second Amendment[,]" 670 F.3d at 1266, *i.e.*, "the right of law abiding, responsible citizens to use arms in defense of hearth and home." *Schrader v. Holder*, 704 F.3d 980, 989 (D.C. Cir. 2013); *United States v. Marzzarella*,

---

[5]     The Third Circuit has criticized *Moore* as reading *Heller I* "too broadly." *Drake*, 724 F.3d at 431("*Heller's* language 'warns readers not to treat *Heller* as containing broader holdings than the Court set out to establish: that the Second Amendment created individual rights, one of which is keeping operable handguns at home for self-defense.'") (quoting *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (*en banc*)).

614 F.3d 85, 92 (3rd Cir. 2010) (same). *See also Drake*, 724 F.3d at 436 (even if Second Amendment protects the right to carry a handgun outside the home, "that right is not part of the core of the Amendment."); *Hightower v. City of Boston*, 693 F.3d 61, 72 (1st Cir. 2012) (same); *NRA*, 700 F.3d at 194 (*Heller* "identified the Second Amendment's central right as the right to defend oneself in one's home[.]"); *Heller*, 2014 WL 1978073, at *28 ("the Second Amendment has so far been read to protect only 'a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home.'") (quoting *McDonald*, 130 S. Ct. at 3044).[6] *See also, e.g., Williams v. State*, 10 A.3d 1167, 1177 (Md. 2011) ("[I]t is clear that prohibition of firearms in the home was the gravamen of the certiorari questions in both [*District of Columbia v. Heller*, 554 U.S. 570 (2008) ("*Heller I*")] and [*McDonald v. Chicago*, 561 U.S. 742, 130 S. Ct. 3020 (2010)] and their answers. If the Supreme Court, in this dicta, meant its holding to extend beyond home possession, it will need to say so more plainly."), *cert. denied*, 132 S. Ct. 93 (2011).[7]

---

[6]    As to the District's ban on assault weapons and large-capacity magazines, the D.C. Circuit noted "[a]lthough we cannot be confident the prohibitions impinge at all upon the core right protected by the Second Amendment, we are reasonably certain the prohibitions do not impose a substantial burden upon that right." *Heller II*, 670 F.3d at 1262.

[7]    *See also Drake*, 724 F.3d at n.5:

Rather than discussing whether or not the individual right to bear arms for the purpose of self-defense articulated in [*Heller I*] "extends beyond the home," it may be more accurate to discuss whether, in the public sphere, a right similar or parallel to the right articulated in *Heller* "exists." Firearms have always been more heavily regulated in the public sphere so, undoubtedly, if the right articulated in *Heller* does "extend beyond the home," it most certainly operates in a different manner.

### E.  The District's Justifications for its Prohibition

Even assuming some form of public carrying of handguns is protected by the Second Amendment, there is no controlling precedent that supports the Court's conclusion that it is at the *core* of the right; accordingly, a court must examine the strength of the government's justifications for its regulation, pursuant to intermediate scrutiny.[8] *See Heller II*, 670 F.3d at 1252. The Court here did not do so, ignoring the many, important public safety and other reasons put forth for the District's longstanding prohibition.

The record here fully supports the unique character of the District of Columbia and the justification for the prohibition under intermediate scrutiny. The District, in addition to being the seat of the federal government and home to the President, is host to thousands of foreign dignitaries each year and the site of many mass demonstrations. *See* Doc. No. 6 at 4–5, 28 (citing testimony of Chief Lanier). The potential for armed mischief is thus perhaps greater in the District of Columbia than in any other American city.

The Fourth Circuit in *United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011), rejected a Second Amendment challenge to a conviction for possession of a loaded handgun within a motor vehicle in a national park, Daingerfield Island, just over the Potomac River from the District, holding that "the government has a substantial interest in providing for the safety of individuals who visit and make use of" the park. *Id*. at 473. "Moreover, because the United States Park Police patrol Daingerfield Island, the [government] could conclude that the need for armed self-defense is less acute there than in the context of one's home." *Id*. at 474. These *same*

---

[8]      If public carrying of weapons were indeed at the "core" of the Second Amendment right, the government still would be able to regulate it, so long as it had a "strong justification[.]" *Heller II*, 670 F.3d at 1257. The Court, however, did not address the District's justifications, or their strength.

justifications exist with respect to the District of Columbia, plaintiffs have not shown otherwise, and it was error for the Court to ignore them.

The justifications for the public-carrying ban in the District are the same as those put forth by other jurisdictions in strictly regulating firearms: public safety (including the protection of law-enforcement officers) and reduction of crime.[10] The District is a densely populated urban area that "shares the problem of gun violence with other dense, urban jurisdictions." *Heller II*, 670 F.3d at 1263. The District is a city, not a State. Jurisdictions with different conditions should have different gun laws; urban areas should not be governed by standards appropriate for rural areas.[11] The District's age-adjusted rate of firearms deaths—intentional and unintentional—is "significantly higher" than the national rate and those of Maryland and Virginia. *Heller*, 2014 WL 1978073, at *11 (citations omitted). Moreover, approximately 75% of all homicides in the District involve firearms. *Id.*

The District, like Illinois, has a compelling interest in preventing the discharge of firearms in public, which clearly represents a serious risk to public safety, regardless of intent.[12] Doc. No. 33-1 at 38 (citing *Skoien*, 614 F.3d at 642). Logically, "the more guns there are in

---

[10]    Plaintiffs have never disputed that public safety and crime prevention are important, if not compelling, government interests. *See, e.g., Schenk v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 376 (1997); *Schall v. Martin*, 467 U.S. 253, 264 (1984); *United States v. Salerno*, 481 U.S. 739, 750, 754–55 (1978).

[11]    Moreover, it can also be argued that the greater presence of law enforcement in a city reduces the need for public-carry for self-defense, just as the greater density of people in cities increases the threat to bystanders of public carry.

[12]    Former Justice Stevens captured the inherent tension in the two positions argued here: "Guns may be useful for self-defense, as well as for hunting and sport, but they also have a unique potential to facilitate death and destruction and thereby to destabilize ordered liberty. *Your* interest in keeping and bearing a certain firearm may diminish *my* interest in being and feeling safe from armed violence." *McDonald*, 130 S. Ct. at 3108 (Stevens, J., dissenting) (emphasis in original).

public, the greater the likelihood that one will be discharged, and the more victims of gun violence there will be." *Id*. at 44.[13] "Moreover, gun violence poses a grave risk to law enforcement officers." Doc. No. 33-2 at 18. Additionally, there is empirical evidence that, as the numbers of guns increase, so too do the number of victims of gun violence, and the intensity of that violence. *Id*. at 19 (citations omitted).[14] "The decision to regulate handgun possession was premised on the belief that it would have an appreciable impact on public safety and crime prevention." *Kachalsky*, 701 F.3d at 98. *See also id.* at 99 ("[S]tudies and data demonstrat[e] that widespread access to handguns in public increases the likelihood that felonies will result in death and fundamentally alters the safety and character of public spaces."). *Cf.* Doc. No. 6 at 3–5 and *Drake*, 724 F.3d at 437–38 (restrictive public-carry licensing "combat[s] handgun violence" and improves public safety by "combating the dangers and risks associated with the misuse and accidental use of handguns" and "reduc[ing] the use of handguns in crimes."); *id.* at 438 ("private possession of a handgun is rarely an effective means of self-protection" and "the ready accessibility of guns contributes significantly to the number of unpremeditated homicides and to the seriousness of many assaults.")[15] (quoting *Siccardi v. State*, 284 A.2d 533, 537 (N.J. 1971)).

---

[13]     *See also Moore*, 702 F.3d at 949 (Williams, J., dissenting) ("When firearms are carried outside of the home, the safety of a broader range of citizens is at issue. The risk of being injured or killed now extends to strangers, law enforcement personnel, and other private citizens who happen to be in the area.").

[14]     *See also Woollard*, 712 F.3d at 879 (Maryland's handgun-licensing scheme "advances the objectives of protecting public safety and preventing crime because it reduces the number of handguns carried in public."). Logically, then, if those objectives are met by *reducing* the number of handguns carried in public, *prohibiting* the carrying of handguns in public must, *a fortiori*, meet those same goals.

[15]     *See id.* at 439 ("It is New Jersey's judgment that when an individual carries a handgun in public for his or her own defense, he or she necessarily exposes members of the community to a somewhat heightened risk that they will be injured by that handgun.").

The Court failed to consider *any* of these factors, simply stating that "no amount of interest-balancing" could justify the District's "blanket prohibition." Order at 15. But, the Council could reasonably believe that prohibiting the public carrying of firearms would ameliorate these problems. Intermediate scrutiny does not—like strict scrutiny—require "precision of regulation." *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 798 (1994) (quoting *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 916 (1982)). The District is thus not required to engage in the mathematical exercise of determining which parts of its territory are appropriate for public carry. *See Hutchins v. District of Columbia*, 188 F.3d 531, 543 (D.C. Cir. 1999) (*en banc*) (applying intermediate scrutiny and noting that "the District is not obliged to prove a precise fit between the nature of the problem and the legislative remedy—just a substantial relation.").

That the District is one of the most popular tourist destinations in America, attracting some 15 million visitors a year,[16] and is comprised of almost one-fourth federal land[17] further reinforces that the District's decision to prohibit the public carrying of firearms is substantially related to the important objectives of public safety and crime prevention, given the undisputed need to protect those people and places. *See Masciandaro*, *supra,* at 473–74.

---

[16]     *Edwards v. District of Columbia*, 765 F.Supp.2d 3, 18 (D.D.C. 2011), *appeal dismissed as moot*, 2014 WL 2895938 (D.C. Cir. Jun. 27, 2014).

[17]     Congressional Research Service, *Federal Land Ownership: Overview and Data*, No. R42346 (Feb. 8, 2012), at 4 (*available online at* fas.org/sgp/crs/misc/R42436.pdf (as of Aug. 20, 2014)).

F. *The Court Erred*

Here, the Court made two fundamental errors—it ignored the historical evidence regarding public carrying laws presented by the District, *see* Doc. Nos. 33, 33-1, finding that carrying handguns in public was not only within the scope of the Second Amendment, but at its *core*, and then declined to engage in the second step of the analysis, *i.e.*, determining whether the prohibition withstands the appropriate level of scrutiny. *Cf. Kachalsky*, 701 F.3d at n.23 ("[F]or Plaintiffs, handgun possession in public has the ring of an absolute constitutional right. This of course overlooks *Heller*'s careful restriction of its reach to the home[.]").

The "home" is a constitutionally significant place, requiring a different calculus within than without, in a variety of contexts, most notably in cases implicating the Fourth Amendment and the First Amendment. *See Kachalsky*, 701 F.3d at 94 ("The state's ability to regulate firearms and, for that matter, conduct, is qualitatively different in public than in the home.").[19]

Law enforcement has broad power outside the home to effect arrests based on what an officer observes or reasonably suspects. But the Fourth Amendment requires a warrant before those powers can intrude into the sanctity of the home. Because law enforcement needs such judicial permission, citizens may be thought of as *more* vulnerable to crime there, and thus, as the Supreme Court recognized, the home is the apex of the Second Amendment's protection of self-defense.

---

[19]     *See also Woollard*, 712 F.3d at 882 ("The same factors that make handguns the weapon of choice for defense in the home also make them the weapon of choice for criminals outside the home . . . . Similarly, an individual's possession of a handgun in his own home obviously does not present the same risks to public safety as does his carry of the same handgun in public.") (quoting appellants' brief). There are crucial differences between carrying guns at home and in public, which the Court ignored. At home, one can make a more accurate assessment of a threat to safety, given the greater familiarity with surroundings. Moreover, unlike people who choose to be in a home where guns are kept, innocent bystanders in public do not have the same choice.

Thus, American law (just like its English predecessor) has long recognized no "duty to retreat" in the home, where one is privileged to use deadly force in self-defense. *See, e.g., Piszczatoski v. Filko*, 840 F.Supp.2d 813, 829 (D.N.J. 2012) ("[B]efore one can justify . . . taking life in self-defense, the law imposes no duty to retreat upon one who . . . is attacked at or in his or her own dwelling or home . . . . [T]he rule is practically universal . . . ."), *affirmed sub. nom., Drake*, 724 F.3d 426 (3d Cir. 2013); *Gillis v. United States*, 400 A.2d 311, n.4 (D.C. 1979) ("It is well settled that one who through no fault of his own is attacked in his home is under no duty to retreat therefrom.") (quoting *United States v. Peterson*, 483 F.2d 1222, 1236 (D.C. Cir. 1973)).

The Supreme Court in *Stanley v. Georgia*, 394 U.S. 557 (1969) held that private possession of obscene materials in the home could not be prosecuted, even while assuming that the *public* possession of such materials was unprotected by the First Amendment. *Id*. at 568. Although "the States retain broad power to regulate obscenity[,] that power simply does not extend to mere possession by the individual in the privacy of his own home." *Id*. Similarly, in *Lawrence v. Texas*, 539 U.S. 558, 562 (2003), "the Court emphasized that the state's efforts to regulate private sexual conduct between consulting adults is especially suspect when it intrudes into the home[.]" *Kachalsky*, 701 F.3d at 94).

These cases illustrate that the Constitution allows much greater restrictions on the exercise of constitutional rights outside the home than within it, because of the greater potential impact of the exercise of those rights on the public. A First Amendment right to free speech does not give a person the right to yell "Fire!" in a crowded theater, because the welfare of the public outweighs the interests of the individual speaker.

G.  *"Bearing Arms"*

The Court also determined, relying on *Peruta*, that the Supreme Court has stated that the Second Amendment encompasses the "bearing" of arms in public. Order at 11–12. Respectfully, the Court is incorrect.

The fact that the majority in *Heller* deemed "bear" to mean "carry" does not aid plaintiffs, as the next sentence of the holding makes clear: "Assuming that Heller is not disqualified from the exercise of Second Amendment rights, the District must permit him to register his handgun and must issue him a license to *carry it in the home*." *Heller I*, 554 U.S. at 635 (emphasis added). The fact that the *Heller* majority equated "bear" with "carry" does not imply that the right detailed in *Heller* extends beyond the home. *See also id.* at 584 (quoting *Muscarello v. United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting)). But *Muscarello* was not about "bearing" arms at all, but about whether the word "carry" in a specific criminal statute could be properly construed to include weapons in the vehicle used by the suspect.

"*Heller*'s recognition of the right to 'bear' arms as a right to 'carry' does not inexorably lead to the conclusion that there is a general right to carry arms outside the home." *Piszczatoski*, 840 F.Supp.2d at 821.

H.  *Supplementation of the Record*

Finally, as the District argued at the motions hearing in this matter, if the Court determines that the factual record is inadequate to show that the District's prohibition on public carrying of weapons is substantially related to important government interests, it should stay the matter and allow further evidentiary proceedings.

The Supreme Court has set forth a roadmap in how to proceed in these circumstances, an approach which the D.C. Circuit recently mandated in another Second Amendment challenge. The D.C. Circuit in *Heller II* upheld the "basic" firearms-registration requirements, but remanded the challenges as to the "novel requirements," finding that "the record is inadequate for us confidently to hold the registration requirements are narrowly tailored." 670 F.3d at 1258. The Circuit held that "in light of these evidentiary deficiencies and 'the importance of the issues' at stake in this case, taking our cue from the Supreme Court in [*Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622 (1994) ("*Turner I*")], we believe the parties should have an opportunity 'to develop a more thorough factual record." *Heller II*, 670 F.3d at 1259–60 (quoting *Turner I*, 512 U.S. at 664–68). "Rather than invalidate a legislative judgment based upon" an inadequate record, the D.C. Circuit followed the lead of the Supreme Court in *Turner I* and remanded "for further evidentiary proceedings." *Id*. at 1260.

*Turner I* and *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195–96 (1997) ("*Turner II*") involved a First Amendment challenge to cable-television regulation. The Supreme Court determined that it could not decide the significant questions presented on the then-existing record, thus, owing to the fact that "the standard for summary judgment is high, and no less so when First Amendment values are at stake and the issue is of far-reaching importance[,]" *Turner I*, 512 U.S. at 669 (Blackmun, J., concurring), the case was remanded for further factual development.

Those cases instruct, among other things, that intermediate scrutiny can be satisfied with evidence not before the legislature at the time of enactment. *See Turner Broad. Sys. v. FCC*, 910 F.Supp. 734, 742–55 (D.D.C. 1995) ("Additional evidence produced during the remand proceedings confirms Congress' judgments.") (footnote omitted). On remand to supplement the

record, the parties before the district court in *Turner* generated "tens of thousands of pages" of additional evidence, comprising, *inter alia*, information acquired by Congress during hearings about the challenged legislation, additional expert declarations and testimony, documents from the regulated industry, and other "studies and anecdotal evidence . . . ." *Turner II*, 520 U.S. at 187 (citing *Turner Broad. Sys. v. FCC*, 910 F.Supp. 734, 742–55 (D.D.C. 1995)).

Like other forms of constitutional analysis, this Court is to use intermediate scrutiny to determine whether a narrow fit exists between the means chosen and the important government objective, not whether the Council (or Congress in 1932) knew all these facts. The Court is not deciding whether the Council was making a smart decision, but whether the law itself is constitutional. *See Turner II*, 520 U.S. at 211 ("The question is not whether [the legislature], as an objective matter, was correct to determine [that the disputed law] is necessary to prevent [the feared harms]. Rather, the question is whether the legislative conclusion was reasonable and supported by substantial evidence in the record . . . .") (quoting *Turner I*, 512 U.S., at 665–66).

Moreover, "[t]he [Supreme] Court has emphasized that '[the legislature's] predictive judgments are entitled to substantial deference[.]'"*Heller*, 2014 WL 1978073, at *8 (quoting *Turner I*, 512 U.S. at 665). *See also id*. ("The Court has stressed, furthermore, that when the evidence regarding a law's probable effect is in conflict, the judiciary should defer to the legislature.") (citing *Turner II*, 520 U.S. at 199, 207–208, 211); *see also City of Los Angeles v. Alameda Books, Inc*., 535 U.S. 425, 437 (2002) (government "does not bear the burden of providing evidence that rules out every theory . . . that is inconsistent with its own")).

Although the Court here did not address (or even mention) the sufficiency of the District's evidentiary showing, which was error in and of itself, to the extent that showing might be thought insufficient, that fact should be "unsurprising." *Drake*, 724 F.3d at 437. Neither

Congress, in 1932, nor the District "many years" before 1994 (when it decided to stop issuing public-carry licenses) could "have foreseen that restrictions on carrying a firearm outside the home could run afoul of a Second Amendment that had not yet been held to protect an *individual* right to bear arms, given that the teachings of *Heller* were not available until that landmark case was decided in 2008." *Id.* at 438 (emphasis in original). Simply put, neither Congress nor the District could have known "that they were potentially burdening protected Second Amendment conduct," hence the Court should not hold that the "fit" between the prohibition and the substantial government interests in public safety and crime prevention here is unreasonable merely because it is based on an admittedly skimpy legislative record. *Id.*

Judge Boasberg, on remand, determined that the additional evidence adduced by the District showed that the District's firearms-registration scheme was substantially related to the important government interests of protecting police officers, controlling crime, and promoting public safety. *Heller*, 2014 WL 1978073, at *10. This Court, if it determines not to grant the instant motion, should give the District the same opportunity here, and allow it to adduce additional evidence in support of its prohibition on the public carrying of firearms.

## III. Conclusion

The District's motion should be granted for all the reasons discussed herein. The Court should find that the District's prohibition on the public carrying of firearms is constitutional, in that "it does not seriously impact a person's ability to defend himself in the home, the Second Amendment's core protection. It does not ban the quintessential weapon—the handgun—used for self-defense in the home. Nor does it prevent an individual from keeping a suitable weapon

for protection in the home." *Kolbe v. O'Malley*, ___ F.Supp.2d ____, 2014 WL 3955361, *13

(D. Md. Aug. 12, 2014).


DATE: August 25, 2014             Respectfully submitted,

                                  IRVIN B. NATHAN
                                  Attorney General for the District of Columbia

                                  ELLEN A. EFROS
                                  Deputy Attorney General
                                  Public Interest Division


                                  _____/s/ Grace Graham_____
                                  GRACE GRAHAM, D.C. Bar No. 472878
                                  Chief, Equity Section
                                  441 Fourth Street, NW, 6th Floor South
                                  Washington, DC 20001
                                  Telephone: (202) 442-9784
                                  Facsimile: (202) 741-8892
                                  Email: grace.graham@dc.gov


                                  _____/s/ Andrew J. Saindon_____
                                  ANDREW J. SAINDON, D.C. Bar No. 456987
                                  Senior Assistant Attorney General
                                  Equity Section I
                                  441 Fourth Street, N.W., 6th Floor South
                                  Washington, D.C. 20001
                                  Telephone: (202) 724-6643
                                  Facsimile: (202) 730-1470
                                  E-mail: andy.saindon@dc.gov