IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| TOM G. PALMER, et al., | ) | Case No. 09-CV-1482-FJS |
| | ) | |
| Plaintiffs, | ) | MEMORANDUM OF POINTS AND |
| | ) | AUTHORITIES IN OPPOSITION |
| v. | ) | TO DEFENDANTS' MOTION FOR |
| | ) | RECONSIDERATION |
| DISTRICT OF COLUMBIA, et al., | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION FOR RECONSIDERATION

PRELIMINARY STATEMENT

Defendants' motion for reconsideration of this Court's judgment is frivolous. Motions for

reconsideration "are disfavored and relief from judgment is granted only when the moving party

establishes extraordinary circumstances." *Bristol-Myers Squibb Co.* v. *Kappos*, 891 F. Supp. 2d

135, 138 (D.D.C. 2012) (citations omitted). But as this Court already explained, "[i]n light of

*Heller*, *McDonald*, and their progeny, there is no longer any basis on which this Court can conclude

that the District of Columbia's total ban on the public carrying of ready- to-use handguns outside the

home is constitutional under any level of scrutiny." Opinion, Dkt. 51, at 16. Indeed, Defendants are

unlikely to demonstrate a likelihood of success on the merits of any appeal. Order, Dkt. 53, at 3 n.2.

As this motion serves, at additional cost under 42 U.S.C. § 1988, only to delay the noticing

of any appeal, Fed. R. App. P. 4(a)(4)(A)(iv), the Court should deny the motion expeditiously.[1]

---

[1] The pendency of Defendants' motion for reconsideration would divest the Court of Appeals of jurisdiction over any appeal. See Fed. R. App. P. 4(a)(4)(B)(i) (notice of appeal "effective" only upon an "order disposing" of Rule 59 motion); cf. *United States* v. *DeFries*, 129 F.3d 1293, 1302-03 (D.C. Cir. 1997). Thus, the filing of this motion may frustrate Defendants' ability to seek any additional stay of this Court's decision from the Court of Appeals.

SUMMARY OF ARGUMENT

"A Rule 59(e) motion is discretionary and need not be granted unless the district court finds that there is an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Dyson* v. *District of Columbia*, 710 F.3d 415, 420 (D.C. Cir. 2013).

Defendants begin by suggesting that this Court clearly erred by following the Seventh and Ninth Circuits in *Moore* v. *Madigan*, 702 F.3d 933 (7th Cir. 2012) and *Peruta* v. *County of San Diego*, 742 F.3d 1144 (9th Cir. 2014), respectively, but their reasoning is vague. Defendants suggest that those courts "found" or "held" that the Second Amendment secures the right to bear arms outside the home, while three other courts "assumed" that such a right exists, Def. Mot at 3 n.1, but they do not explain why following one line or the other would be clearly erroneous, or what difference it makes in the context of a total carry ban. Defendants also suggest that this Court "failed to follow" *Heller* v. *District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) ("*Heller II*"), but that case had nothing to do with carrying handguns outside the home, and it is unclear why Defendants believe that it conflicts with *Moore* or *Peruta*.

Defendants then explain that their motion assigns error to the Court's decision in "(1) finding the right to carry firearms in public to be at the core of the Second Amendment and (2) relying only on cases which are not controlling precedent to support that conclusion." Def. Mot. at 4. Defendants thereafter allege that this Court "compounded its error by not addressing or considering the justifications presented by the District for the law." *Id*. And incredibly, for the first time at this exceedingly late stage, Defendants claim that a three year-old decision—which they have briefed and argued, and which the Court fully considered—entitles them to present new evidence on reconsideration to the effect that they may wholly disregard a constitutional provision.

2

* * *

Defendants fail to present, let alone prevail on, any of the grounds for relief under Rule 59(e). There has been no intervening change of controlling law. *Heller II* is now three years old, the Defendants have argued it, and the Court considered it. Defendants are flatly wrong in claiming that this Court did not follow *Heller II*. This Court applied *Heller II*, failing only to misinterpret the case in the manner Defendants prefer. *Heller II* simply does not contain the holdings that Defendants would like for it to contain. Nor is evidence, new or old, an issue. The case concerns only a question of law. Whether the Constitution guarantees a right to carry handguns for self-defense does not turn on any evidentiary development.

Defendants are thus left with "clear error or manifest injustice," neither of which are remotely in play. "A motion for reconsideration is not a second opportunity to present argument upon which the court has already ruled." *Bristol-Myers*, 891 F. Supp. 2d at 138; *Michilin Prosperity* Co. v. *Fellowes Mfg. Co.*, No. 04-1025, 2006 U.S. Dist. LEXIS 83098, at *2 n.1 (D.D.C. Nov. 7, 2006); *W.C. & A.N. Miller Cos*. v. *United States*, 173 F.R.D. 1, 3 (D.D.C. 1997); *Kattan* v. *District of Columbia*, 995 F.2d 274, 276 (D.C. Cir. 1993).

There is nothing new here. The motion should be denied.

### ARGUMENT

I.   THIS COURT DID NOT FAIL TO CONSIDER CONTROLLING PRECEDENT.

Contrary to Defendants' claims, this Court has not "failed to obey controlling decisions." Def. Mot. at 7. Defendants may not agree with how this Court interpreted the relevant precedent—losing parties never agree with the outcome—but that is a very far cry from claiming that the Court "made an error in failing to consider controlling decisions." *Id.* (quoting *Arias* v. *DynCorp*, 856 F. Supp. 2d 46, 51 (D.D.C. 2012) (other citation omitted)).

3

The Court's opinion plainly discusses and applies the relevant controlling decisions. Mere disagreement with how it did so is not a valid ground for reconsideration. There should be no dispute as to what constitutes controlling precedent. This litigation is controlled primarily by Supreme Court decisions interpreting the relevant constitutional text, and by valid and relevant D.C. Circuit precedent to the extent not in conflict with higher (Supreme Court) precedent. Beyond this controlling authority, the Court may consider as persuasive decisions of other courts. The D.C. Circuit's published opinions are operative until and unless overruled by either the Supreme Court, or by the D.C. Circuit sitting en banc.

Accordingly, the most direct "controlling" precedents here are: *McDonald* v. *City of Chicago*, 130 S. Ct. 3020 (2010); *District of Columbia* v. *Heller*, 554 U.S. 570 (2008); *Heller II*, supra; and *Parker* v. *District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007), *aff'd sub nom Heller*. This Court considered and applied the first three. *Parker*, which is still good circuit law, also confirms the correctness of the Court's decision.

Defendants suggest that *Heller II* requires the full completion of a "two step" analysis in all Second Amendment cases, and apparently suggest that the standard of review in applying the second step must be intermediate scrutiny. This, apparently, is the "controlling" precedent overlooked by this Court. Both suggestions are false.

A.    The Supreme Court and the D.C. Circuit Have Both Confirmed That Categorical Second Amendment Violations Do Not Trigger Means-Ends Scrutiny.

Nowhere does *Heller II* claim that the "two step" analysis is mandatory in all cases, such that a district court *must* proceed to apply means-ends scrutiny following the determination that a law implicates Second Amendment rights. Nor could it. The *Heller II* panel did not purport to overrule either the D.C. Circuit's earlier decision in *Parker*, nor the Supreme Court's decision in

*Heller* that affirmed it, wherein both the D.C. Circuit and the Supreme Court famously struck down the city's handgun, home carriage, and functional firearms bans without applying any level of scrutiny whatsoever:

- "Once it is determined—as we have done—that handguns are 'Arms' referred to in the Second Amendment, it is not open to the District to ban them." *Parker*, 478 F.3d at 400 (citation omitted).

- "It is sufficient for us to conclude that just as the District may not flatly ban the keeping of a handgun in the home, obviously it may not prevent it from being moved throughout one's house." *Id.*

- "Section 7-2507.02, like the bar on carrying a pistol within the home, amounts to a complete prohibition on the lawful use of handguns for self-defense. As such, we hold it unconstitutional." *Id.* at 401.

- "Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home 'the most preferred firearm in the nation to 'keep' and use for protection of one's home and family' would fail constitutional muster." *Heller*, 554 U.S. at 628-29 (quoting *Parker*, 478 F.3d at 400) (footnote omitted); "[A] complete prohibition of [handguns'] use is invalid." *Id.* at 629.

- The functional firearms ban "makes it impossible for citizens to use [guns] for the core lawful purpose of self-defense and is hence unconstitutional." *Id.* at 630.

That means-ends scrutiny is not always required is hardly a novel concept. Where a statute or governmental policy literally conflicts with a constitutional requirement, there is simply no room for interest-balancing. The Sixth Amendment, for example, requires that the accused be afforded counsel for their defense. *Gideon* v. *Wainwright*, 372 U.S. 335 (1963). The government may

regulate this right, *e.g.*, by requiring that counsel pass the bar examination. But there is no exception for cases where the government's interest in denying the accused counsel outweigh the interests of the accused. Mandating a prayer in the government's schools literally violates the First Amendment's Establishment Clause without needing to balance the alleged merits and harms of compulsory prayer. *Engel* v. *Vitale*, 370 U.S. 421 (1962). Courts often employ means-ends scrutiny because laws blatantly contradicting the Bill of Rights' commands are thankfully rare. But then, the law here is very unusual, in keeping with Defendants' persistent denials that the right even exists.

B.  Even Were Means-Ends Scrutiny Appropriate—and It Is Not—Controlling Precedent Would Require Higher Than Intermediate Scrutiny.

Even where a case calls for application of some standard of review, *Heller II* does not prefigure that the standard would necessarily be intermediate scrutiny. "As with the First Amendment, the level of scrutiny applicable under the Second Amendment surely depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right." *Heller II*, 670 F.3d at 1257 (quotation omitted). No circuit court applying a two-step Second Amendment inquiry has confined itself to intermediate scrutiny in all cases.

Nor would *Heller II* suggest application of intermediate scrutiny to the facts of this case, assuming that it requires—and it assuredly does not—application of some standard of review. *Heller II* had nothing to do with carrying handguns outside the home, let alone a complete ban on carrying handguns for self-defense. "As between strict and intermediate scrutiny, we conclude the latter is the more appropriate standard *for review of gun registration laws*." *Id.* (emphasis added). The Court also applied intermediate scrutiny in reviewing a challenge to the prohibition of certain semi-automatic rifles and ammunition magazines, because "we are reasonably certain the prohibitions do not impose a substantial burden upon" Second Amendment rights. *Id.* at 1262.

6

Here, in contrast, the Court faces a *complete prohibition*—all people, under all circumstances, in all places and at all times, are barred from carrying any and all handguns, in any manner. Period, full stop. If, as the Court found, the right to "bear arms" includes the right to carry handguns for self-defense, the District's total prohibition extends well-beyond "substantial burden" territory. Cf. *Morris* v. *United States Army Corps of Eng'rs,* 990 F. Supp. 2d 1082, 1087 (D. Idaho 2014) ("ban on carrying firearms for self-defense may impose a burden on this core right of the Second Amendment severe enough to call for strict scrutiny").

Defendants fall back on a claim that strict scrutiny secures the Second Amendment's "core" right, which they claim to be limited to the possession of guns inside the home. The Court has heard this before. Dkt. 6, at 10-11, 15, and 21; Dkt. 12, at 6, 8-11, 13; Dkt. 33-1, at 4, 14, 34-38. The argument is wrong. Three times, *Heller* succinctly describes the Second Amendment's "core" interest, to wit: (1) the Second Amendment's "core lawful purpose [is] self-defense," *Heller*, 554 U.S. at 630; (2) "Individual self-defense . . . was the *central component* of the right itself," *id*. at 599; and (3) "the inherent right of self-defense has been central to the Second Amendment right." *Id.* at 628. Nothing in these terse definitions of the Second Amendment's "core" limits the self-defense interest to the home. As this Court noted, the Seventh and Ninth Circuits rejected Defendants' line of thinking.

Of course the Second Amendment right, like all others, has a higher salience inside the home. "[I]t is beyond dispute that the home is entitled to special protection as the center of the private lives of our people." *Minnesota* v. *Carter*, 525 U.S. 83, 99 (1998) (Kennedy, J., concurring). But that hardly means the right disappears outside one's front door. Nor does it alter the fact that *self-defense*, untethered to any particular place, is the Second Amendment's "core" interest.

7

In the end, it does not matter whether carrying a gun for self-defense is activity lying at the Second Amendment's "core" or "edge" or anywhere in between. If this is a right secured by the Second Amendment—and there is no serious doubt that it is—it cannot be entirely abolished by a city ordinance, no matter how fervently city officials believe in the desirability of that outcome.

II.   DEFENDANTS FAIL TO CITE ANY CONTROLLING AUTHORITY—AND NONE EXISTS—DENYING THE EXISTENCE OF THE RIGHT TO BEAR ARMS OUTSIDE THE HOME FOR SELF-DEFENSE.

No controlling precedent precludes the existence of the right to bear arms outside the home for self-defense. None.

And it can hardly be claimed that acknowledging the right to bear arms outside the home for self-defense constitutes clear error. Five federal courts of appeals—the Second, Fourth, Fifth, Seventh, and Ninth—have held or assumed that such a right exists. *Peruta*, supra;  *Moore*, supra; *Nat'l Rifle Ass'n of Am., Inc.* v. *McCraw*, 719 F.3d 338 (5th Cir. 2013) (upholding restrictions on right to carry by adults under age 21 after apparently assuming right exists); *Woollard* v. *Gallagher*, 712 F.3d 865, 876 (4th Cir. 2013); *Kachalsky* v. *Cnty. of Westchester*, 701 F.3d 81, 93 (2d. Cir. 2012); see also *id.* at 89 & n.10.

So have various District Courts throughout the country. *Morris,* 990 F. Supp. 2d at 1085 ("[t]he Second Amendment protects the right to carry a firearm for self-defense purposes") (citation omitted); *Bonidy* v. *United States Postal Serv.*, No. 10-CV-02408-RPM, 2013 U.S. Dist. LEXIS 95435 at *7 (D. Colo. July 9, 2013) ("the Second Amendment protects the right to openly carry firearms outside the home for a lawful purpose"); *United States* v. *Weaver*, No. 2:09-CR-00222, 2012 U.S. Dist. LEXIS 29613, at *13 (S.D. W. Va. Mar. 7, 2012) ("the Second Amendment, as historically understood at the time of ratification, was not limited to the home"); *Bateman* v.

8

*Perdue*, 881 F. Supp. 2d 709, 714 (E.D.N.C. 2012) ("[a]lthough considerable uncertainty exists regarding the scope of the Second Amendment right to keep and bear arms, it undoubtedly is not limited to the confines of the home").

So have various state appellate courts. *People* v. *Aguilar*, 2013 IL 112116, ¶ 20; *Hertz* v. *Bennett*, 294 Ga. 62, 65-66, 751 S.E.2d 90, 94 (2013); *State* v. *Christian*, 354 Ore. 22, 44 n.11, 307 P.3d 429, 443 n.11 (2013); *People* v. *Yanna*, 297 Mich. App. 137, 146, 824 N.W.2d 241, 246 (Mich. Ct. App. 2012) ("a total prohibition on the open carrying of a protected arm . . . is unconstitutional"); *In re Brickey*, 8 Idaho 597, 70 P. 609 (1902). At the federal appellate level, only the Third Circuit, over a strong dissent, disputed this much, and even that opinion "recognize[d] that the Second Amendment's individual right to bear arms *may* have some application beyond the home." *Drake* v. *Filko*, 724 F.3d 426, 431 (3d Cir. 2013). And while some state courts have declined to consider whether such a right exists, that option is plainly not available on the facts of a complete carry ban—and in a court that may not decline jurisdiction. *Cohens* v. *Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821).

Of course, courts are perfectly entitled to rely "only on cases which are not controlling precedent," Def. Mot. at 4, so long as they do not ignore controlling precedent. To rely exclusively on persuasive authority, or on the Court's judgment, is to decide a matter of first impression. In any event, this Court apparently agreed that the Supreme Court's two Second Amendment precedents control the outcome in Plaintiffs' favor. Defendants simply do not like the direction in which those precedents control.

III.    THE COURT CORRECTLY CONSIDERED EXTENSIVE HISTORICAL ARGUMENT.

Defendants at once criticize this Court for "accepting the historical analyses of judges in non-controlling decisions," "failing to conduct its own historical analysis," and of course, disagreeing with Defendants' creative alternative history. Def. Mot. at 9.

These arguments are all highly frivolous. The charge that the Court somehow failed to conduct an historical inquiry does not warrant much discussion. Surely the Court reviewed the Ninth Circuit's "exhaustive summary of the text and history of the Second Amendment" upon which it relied, Opinion, at 14, as well as the forests' worth of briefing on historical matters submitted by the parties. Indeed, Defendants caused *Moore*'s briefing to be placed on the docket here, "hundreds of pages of argument, in nine briefs. The main focus of these submissions is history." *Moore*, 702 F.3d at 935. In denying Plaintiffs' motion to strike what was essentially unauthorized supplemental briefing, the Court offered that the material would be consulted and might prove useful. There is no question that the Court exercised considered judgment in evaluating the material, and the exhaustive historical surveys of the Supreme Court and Ninth Circuit, in reaching its conclusion as to history.

Not that this Court needed to reinvent this particular wheel in surveying the history anew. As Judge Posner noted, lower courts cannot "repudiate the [Supreme] Court's historical analysis." *Moore*, 702 F.3d at 935. History might be important, but on this score, it is also settled by controlling authority. "[W]e are bound by the Supreme Court's historical analysis because it was central to the Court's holding in *Heller*." *Id*. at 937.

> We are disinclined to engage in another round of historical analysis to determine whether eighteenth-century America understood the Second Amendment to include a right to bear guns outside the home. The Supreme Court has decided that the amendment confers a right to bear arms for self-defense, which is as important outside the home as inside.

*Id*. at 942. Indeed,  "one doesn't have to be a historian to realize that a right to keep and bear arms

for personal self-defense in the eighteenth century could not rationally have been limited to the home." *Id.* at 936.

There is absolutely nothing new in the alternative historical fiction Defendants submit on reconsideration. As Defendants prove by citing to various docket entries, and to various opinions the Court has considered, it has all been heavily briefed and considered before. There is no point re-hashing the entire record. English courts did *not* understand the 1328 Statute of Northampton to ban the carrying of weapons per se, only the carrying of weapons in a threatening manner. See, *e.g.*, Dkt. 34-2, at 36-37; Dkt. 34-5, at 5-7; *Rex* v. *Knight*, 38 Comb., 90 Eng. Rep. 330 (K.B. 1686). Well before the American Revolution, the leading treatise on English law confirmed that

> [N]o wearing of Arms is within the meaning of this Statute, unless it be accompanied with such circumstances as are apt to terrify the People; from whence it seems clearly to follow, that Persons of Quality are in no Danger of Offending against this Statute by wearing common Weapons . . . for their Ornament or Defence, in such Places, and upon such Occasions, in which it is the common Fashion to make use of them, without causing the least Suspicion of an intention to commit any Act of Violence or Disturbance of the Peace . . . .

William Hawkins, 1 Treatise of the Pleas of the Crown, ch. 63, § 9 (1716); see Joyce Lee Malcolm, To Keep and Bear Arms: The Origins of an Anglo American Right 104-05 (Harvard Univ. Press 1994). As related in the *Moore* briefing before this Court, countless authorities cited and discussed by *Heller* related the same rule. See Dkt. 34-2, at 37-40.

Nor are post-Civil War Southern restrictions on the right to carry handguns relevant. Courts upholding these provisions did not understand the right to bear arms as the Supreme Court understands it today. *Peruta*, 742 F.3d at 1174. Moreover, far from being blanket prohibitions on the right to carry guns, these were typically Jim Crow provisions. See Dkt. 42, at 4-5. Courts and legislatures did not understand "pistol" prohibitions to bar all handguns, typically exempting "Army-Navy" models "render[ing] safe the high quality, expensive, military issue handguns that

many former Confederate soldiers still maintained but that were often out of financial reach for cash poor freedmen." Robert J. Cottrol and Raymond T. Diamond, *"Never Intended to be Applied to the White Population,"* 70 Chi.-Kent L. Rev. 1307, 1333 (1995) (footnote omitted); see, *e.g.*, *English* v. *State*, 35 Tex. 473, 476 (1871) ("holster pistols" and "side arms" protected); *Fife* v. *State*, 31 Ark. 455, 460-61 (1876) (distinguishing "army and navy repeaters" from prohibited "pistol"); *Ex parte Thomas*, 21 Okla. 770, 777-78, 97 P. 260, 263 (1908) (protected "arms" included "horseman's pistols").

Nor are historical limitations on the right of self-defense relevant. Defendants make much of the fact that there is no "duty to retreat" before resorting to self-defense inside one's home. Def. Mot. at 18. But this is irrelevant. No American jurisdiction has abolished the right of self-defense. Even where a classic duty to retreat "to the wall" applies, it does not require a duty to *submit*.

> [T]he law requires, that the person, who kills another in his own defence, should have retreated as far as he conveniently or safely can, to avoid the violence of the assault, before he turns upon his assailant . . . The party assaulted must flee as far as he conveniently can, either by reason of some wall, ditch, or other impediment; or as far as the fierceness of the assault will permit him: for it may be so fierce as not to allow him to yield a step, without manifest danger of his life, or enormous bodily harm; and then in his defence he may kill his assailant instantly.

4 William Blackstone, *Commentaries* 184-85 (1769).

In any event, as Defendants should know, the District of Columbia does not impose a duty to retreat inside *or outside* the home. The District of Columbia Court of Appeals follows a "middle ground" approach whereby the law "does not impose a duty to retreat but does allow a failure to retreat, together with all the other circumstances, to be considered by the jury in determining if there was a case of true self-defense." *Gillis* v. *United States*, 400 A.2d 311, 313 (D.C.1979); *In re Robertson*, 19 A.3d 751, 763 (D.C. 2011).

Nothing in this Court's opinion alters the District of Columbia's law of self-defense. Prior to this Court's decision, Defendants prohibited individuals from carrying handguns, not from *using* handguns in self-defense, even outside the home. Since D.C. law recognizes that people are entitled to use handguns for self-defense outside the home, Defendants should not complain about the fact that as a constitutional matter, people are also entitled to carry handguns for that purpose.

IV.   THE DISTRICT'S HANDGUN CARRY BAN IS NOT PRESUMPTIVELY VALID.

Notwithstanding their assault on the Court's historical review of the right to bear arms, Defendants suggest that history is unimportant, or at least, that understanding the history of the right to bear arms is unnecessary because allegedly "longstanding" laws are inconsistent with that right. Defendants claim that "if the District's practical ban on obtaining licenses to carry handguns in public is of 'early 20th century' vintage, it is presumably constitutional, and hence no further analysis is necessary." Def. Mot. at 11.

The argument is frivolous.

Defendants envision support for this astonishing theory from *Heller*'s statement that certain "longstanding" restrictions are presumptively constitutional, as they might inform the scope of Second Amendment rights. *Heller*, 554 U.S. at 626; see Def. Mot. at 9. While it is true that felon disarmament laws do not stretch back to the Framing Era, that might be more a function of the fact that felons at common law were usually dispossessed and hung. The Framers did, however, disarm non-condemned individuals who were thought to be dangerous or disloyal. See, *e.g.*, 4 Journals of the Continental Congress, 1774-1789, at 205 (Washington Chauncey Ford ed., 1906).

In any event, there is no need for resort to argument by analogy. Even if a law is sufficiently "longstanding" so as to have presumptive validity, most federal courts—the D.C. Circuit included—acknowledge that such presumptions are not conclusive. "A plaintiff may rebut this presumption by

13

showing the regulation does have more than a de minimis effect upon his right." *Heller II*, 670 F.3d at 1253. As discussed *supra*, the law here is not a regulation, but a total prohibition. It obviously has "more than a de minimis effect" on the right to bear arms, overcoming any presumption.

Not that there would be any presumption of validity in the first place. Defendants correctly note that the Third Circuit (which, unlike the Supreme Court, is not controlling here) found that the enactment of laws in 1913 and 1924, incompatible with a right to carry handguns, are evidence that the right was not thought to exist. But under this theory, *everything is constitutional*—if a law's enactment proves that no right was understood to be infringed, every legislative act is self-constitutionalizing. The Supreme Court did not strike down any state enactment under the First Amendment until after the "longstanding" laws *Drake* and Defendants invoke were enacted. *Gitlow* v. *New York*, 268 U.S. 652 (1925). Under Defendants' theory, *Gitlow* and virtually the entire body of First Amendment law must be wrong.

Defendants' *Drake* theory suffers from yet an additional defect. At the time New Jersey and New York enacted their laws, the Bill of Rights was not generally applicable as against the states. The last word on the Second Amendment's application against the states was *United States* v. *Cruikshank*, 92 U.S. 542 (1876), which also held that the First Amendment was inapplicable as to the states. What New Jersey and New York's legislatures understood in those days is unimportant, as the District of Columbia—a federal entity—has always been directly bound by the Second Amendment.

Defendants' theory is also too credulous of political actors, and dismissive of the courts' role "to say what the law is." *Marbury* v. *Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). It also directly contradicts *Heller*, which, as this Court noted, not only held that "bear arms" means to carry arms

for self-defense, but unequivocally held that the Second Amendment has the meaning that would

have been ascribed to it by the people who ratified it into law. This Court properly followed that

precedent, which is only logical, and in any event, controlling:

> As the Court noted in *Heller*, "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad."

Opinion, at 10 (quoting *Heller*, 554 U.S. at 634-35).

While Defendants' argument lacks merit, that is not to say that it lacks value. The *Drake*

theory Defendants endorse is rooted upon one central truth: a scheme allowing individuals to carry

handguns only where they have a "justifiable need" to do so, N.J. Stat. Ann. § 2C:58-4(c), as

determined at the police's discretion, is incompatible with a *right* to carry handguns. The Third

Circuit acknowledged the conflict, but decided that the 1924 statute negates the existence of the

right ratified in 1791.

This Court has indicated it will not make the same error should the District seek to evade the

ruling by enacting a discretionary licensing scheme that destroys the right. This Court required "a

licensing mechanism consistent with constitutional standards enabling people to exercise their

Second Amendment right to bear arms," assuming that Defendants would wish to license the

carrying of handguns (they are not obligated to require a license). Opinion, at 16; see also Order,

Dkt. 53, at 2 ("appropriate legislation consistent with the Court's ruling"). This Court's requirement

is especially apt considering Defendants' repeated admissions that its pre-2008 discretionary

licensing scheme was, for all intents and purposes, indistinguishable from the flat ban this Court

enjoined. See, *e.g.*, Def. Mot. at 10 ("[i]t is not entirely clear exactly *when* licenses for public

carrying in the District of Columbia became practically unavailable"); *id.* at 11 (suggesting ban is

"of early 20th century vintage"); *id.* at 22 (District "decided to stop issuing public-carry licenses"

"'many years' before 1994"). In crafting a response to the Court's order, the City Council should

know that "a thumbing of the municipal nose at the [court]" is addressed by injunctive relief.

*Ezell* v. *City of Chicago*, 651 F.3d 684, 712 (7th Cir. 2011) (Rovner, J., concurring).

IV.    THE RECORD CANNOT BE RE-OPENED.

As Defendants aptly note, "a Rule 59(e) motion is 'aimed at reconsideration, not initial

consideration' and may not be used to raise arguments or present evidence that could have been

raised before the entry of judgment." *Cobell* v. *Jewell*, No. 9-1285, 2014 U.S. Dist. LEXIS 36351,

at *17 (D.D.C. Mar. 20, 2014) (quoting *GSS Group, Ltd.* v. *Nat'l Port Auth.*, 680 F.3d 805, 812

(D.C. Cir. 2012)).

Defendants shared strong views about *Heller II* when that decision was announced three

years ago, and ever since. If they believed that *Heller II* entitled or required them to present evidence

in this case, they should have done so when that decision issued. But *Heller II* does no such thing.

Means-ends scrutiny is only available where a court must balance a right (after it determines that a

right is implicated, as well as the right's scope) against some regulatory interest. The process is *not*

available to balance the considerations of whether to recognize a right in the first instance. That

much is Framers' job in ratifying constitutional text.

This Court could not in any event consider evidence as to the desirability of banning the

carrying of handguns, because it simply does not matter whether the Second Amendment makes for

good policy. It's the law. There are other forums in which to argue about whether there *should* be a

right to bear arms. It is not the Court's job to determine whether the Framers acted properly in

ratifying the Second Amendment. The Second Amendment does not "require judges to assess the

costs and benefits of firearms restrictions and thus to make difficult empirical judgments in an area

in which they lack expertise." *McDonald,* 130 S. Ct. at 3050.

16

Not long ago, the District of Columbia made the same arguments with respect to the right to "keep" handguns—that the city is different, that handguns are too dangerous to keep, that the social costs of handgun possession outweigh any benefits, etc. and so on. The Supreme Court's answer then is relevant now:

> The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon. A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all.

*Heller*, 554 U.S. at 634; *McDonald*, 130 S. Ct. at 3050; *Peruta*, 742 F.3d at 1167; Opinion, at 15.

It is, however, "really worth insisting" that the Defendants cease resisting the constitutional reality, accept the fact that the Constitution does not always reflect their favorite policies, and stop interfering with the people's enjoyment of fundamental rights.

CONCLUSION

The motion should be denied.

Dated: September 11, 2014          Respectfully submitted,

                                   Alan Gura (D.C. Bar No. 453449)
                                   Gura & Possessky, PLLC
                                   105 Oronoco Street, Suite 305
                                   Alexandria, VA 22314
                                   703.835.9085/Fax 703.997.7665

                           By:     /s/ Alan Gura
                                   Alan Gura

                                   Attorney for Plaintiffs