UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

TOM G. PALMER, *et al.*                    )
                                           )
                    Plaintiffs,            )
                                           )
          v.                               )        Civil Action No. 09-01482 (FJS)
                                           )
DISTRICT OF COLUMBIA, *et al.*,            )
                                           )
                    Defendants.            )
_____)

**DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR RECONSIDERATION**

Pursuant to Fed. R. Civ. P. 7(d), defendants the District of Columbia and Cathy Lanier hereby reply in support of their Motion for Reconsideration.

While plaintiffs characterize the District's motion as "frivolous" or "highly frivolous," they fail to rebut the simple proposition upon which the motion is based—no controlling court decision has held that the Second Amendment encompasses a right to carry firearms for self-defense outside the home. Plaintiffs argue that the Court need not engage in intermediate scrutiny because "the right" exists as they frame it. But that puts the cart before the horse—plaintiffs assume that which no controlling court has decided.

Indeed, plaintiffs baldly state "Defendants fail to cite any controlling authority—and none exists—denying the existence of the right to bear arms outside the home for self-defense." Opp. at 8. But the District here was not required to (and could not, as a matter of logic) prove a negative. It was error for this Court to definitively hold that such a right exists.

Plaintiffs cite only *Morris v. United States Army Corps of Eng'rs*, 990 F.Supp.2d 1082, 1087 (D. Idaho 2014) for the proposition that the right to carry a handgun in public for self-defense is at the core of the Second Amendment. Even if that proposition were correct or

controlling,[1] the Court would *still* have been required to engage in the means-ends scrutiny mandated by *Heller v. District of Columbia*, 670 F.3d 1244, 1257 (D.C. Cir. 2011) ("*Heller II*"). It was error for the Court not to do so, no matter how strongly plaintiffs argue that such analysis is simply not required.[2]

And plaintiffs' threats regarding any new licensing legislation, *see* Opp. at 15–16, and their casual dismissal of the analysis conducted in *Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013), are manifestly unhelpful in advancing this Court's resolution of the instant motion.[3]

"A district court by definition abuses its discretion when it makes an error of law." *Koon v. United States*, 518 U.S. 81, 100 (1996) (citing *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990)). Respectfully, this Court "did not apply the correct legal standard or

---

[1]     It is not: The court in *GeorgiaCarry.Org, Inc. v. United State Army Corps of Engineers*, ___ F.Supp.2d ____, 2014 WL 4059375 (N.D. Ga. Aug. 18, 2014) reached the opposite conclusion, holding that the Army Corps' prohibition on firearms on its properties withstood intermediate scrutiny and did not violate the Second Amendment. *See id.* at n.4 (distinguishing *Morris*) ("Respectfully, this Court finds that the pre-existing right encompassed by the Second Amendment was not free from locational restrictions.").

[2]     Plaintiffs argue that a means-ends scrutiny is unnecessary here because the District's prohibition "literally conflicts with a constitutional requirement[.]" Opp. at 5. But this is incorrect—the scope of the Second Amendment was quite literally unknown before *Heller I*, and remains incompletely defined. For plaintiffs to continue to insist that their newfound "right" has always existed in the Constitution, and that the District's law "blatantly contradict[s]" it, Opp. at 6, is to ignore the plain text of that document.

[3]     While the District expects compliant, emergency legislation to be enacted soon, the granting of a longer stay would inure to the benefit of all parties, as another court recently determined in a similar challenge. On Monday, August 25, 2014, the United States District Court for the Eastern District of California issued a decision in *Silvester v. Harris*, ___ F.Supp.2d ____, 2014 WL 4209563 (E.D. Cal. Aug. 25, 2014), concluding that certain provisions of California law (mandating 10-day waiting periods for some categories of firearms purchasers) violate the Second Amendment. The court found "[*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012)]'s approach to be appropriate[,]" *Silvester, supra* at *36, and accordingly stayed its judgment for 180 days.

misapprehended the underlying substantive law." *Smalls v. United States*, 471 F.3d 186, 191 (D.C. Cir. 2006).

Plaintiffs insist that "[n]o circuit court applying a two-step Second Amendment inquiry has confined itself to intermediate scrutiny in all cases." Opp. at 6. Leaving aside that awkward phrasing, plaintiffs provide no support for that proposition. *Heller II* mandates the two-step approach, which the Court failed to do, even for regulations that impinge on the "core" right protected under the Second Amendment. 670 F.3d at 1257. *Cf. Hunters United for Sunday Hunting v. Pennsylvania Game Comm'n*, ___ F.Supp.2d ____, 2014 WL 2770228, *5 (M.D. Pa. 2014) ("Because the Court can find no legal support for Plaintiffs' argument that Second Amendment protections extend to recreational hunting . . . [it] need not proceed to evaluate [the provision banning Sunday hunting] under any means-based test.").

The Court's failure to conduct *Heller II*'s mandated two-step, intermediate scrutiny analysis is especially egregious considering the evidence the District's put forth about its uniqueness. *See, e.g.*, Doc. No. 6 at 4–5, 28; Doc. No. 7 at 23–28; Doc. No. 12 at 10–12 & n.9. [4]

---

[4] Plaintiffs state categorically that "the record cannot be re-opened." Opp. at 16. But this, too, is incorrect as a matter of law. *Heller II* remanded with directions to re-open the record, directing the parties to supplement their previous showings. 670 F.3d at 1259–60. But plaintiffs' brief reads as if *Heller II* does not exist. As the District argued at the motions hearing in this matter, if the Court has any doubts about the adequacy of the District's justifications for its public-carry ban, it should allow discovery to proceed. Plaintiffs contend that "[i]f [defendants] believed that *Heller II* entitled or required them to present evidence in this case, they should have done so when that decision issued." Opp. at 16. But given that plaintiffs filed their motion to strike (the District's supplemental memorandum) one day after the District's filing, their preference for hindsight should be viewed with skepticism. Moreover, given the recognized importance of the issue before the Court, it certainly would be well within its discretion, and more prudent, to reopen the record if the Court had any doubts at all about the adequacy of the District's justifications and the history of the challenged statute. *See, e.g., United States v. Walker*, 380 A.2d 1388, 1390 ("Implicit in the statutory proscription of carrying a pistol without a license outside the possessor's 'dwelling house or place of business' is a congressional recognition of the inherent risk of harm to the public of such dangerous instrumentality being carried about the community and away from the residence or business of the possessor.").

There are untold indications in the public record about the unique nature of this jurisdiction; the Court need only look at the arguments made against making the District a state at last week's hearing on Capitol Hill. *See, e.g.*, Michael McGough, "D.C. Statehood: An appropriately lost cause," LOS ANGELES TIMES (Sep. 17, 2014);[5] Robert McCartney, "Critics of D.C. statehood cite specious objections, such as Grave Snowplow Threat," WASH. POST (Sep. 17, 2014) ("[A] self-governing District might intimidate Congress through its control of basic services for Capitol Hill.") (discussing testimony of Roger Pilon of the Cato Institute).[6] "Washington is a wholly urban, one-industry town dependent on the federal government far in excess of any other state[.] Moreover, with Congress no longer having authority over [an independent District] but dependent on it, [an independent District] could exert influence on the federal government far in excess of any other state." *Id. See also* Roger Pilon, Cato Institute, *Statement Before the Committee on Homeland Security and Governmental Affairs, United States Senate, re: S. 132, the New Columbia Admission Act of 2013* (Sep. 15, 2014).[7]

> Nearly every foreign embassy would be beyond federal jurisdiction and dependent mainly on the services of this new and effectively untested state. Ambulances, police and fire equipment, diplomatic entourages, members of Congress, and ordinary citizens would be constantly moving over state boundaries in their daily affairs and in and out of jurisdictions, potentially increasing jurisdictional problems exponentially.

---

[5]      Available online at *http://www.latimes.com/opinion/opinion-la/la-ol-statehood-dc-voting-20140917-story.html* (as of Sep. 22, 2014).

[6]      Available online at *http://www.washingtonpost.com/local/critics-of-dc-statehood-cite-specious-objections-such-as-grave-snowplow-threat/2014/09/17/c258ff62-3e9a-11e4-b0ea-8141703bbf6f_story.html* (as of Sep. 22, 2014).

[7]      Available online at *http://www.hsgac.senate.gov/download/?id=d0be408e-9930-4102-af5b-971eaea7cd30* (as of Sep. 22, 2014).

*Id*. at 5. *See also id*. ("The Framers knew what they were doing when they provided for the seat of government that we have. It has served us well for over two centuries. There are more pressing issues before this chamber.").

Thus, the District's uniqueness is invoked to deny its citizens their rights in the context of statehood. It is only fair that the Court consider these arguments and historic background in its Second Amendment analysis.

Plaintiffs concede that only 2 (of 13) federal circuits have held that the Second Amendment includes a right to carry a gun in public for self-defense. For this Court to so hold based on that slim authority was improper. "The federal courts spread across the country owe respect to each other's efforts and should strive to avoid conflicts, but each has an obligation to engage independently in reasoned analysis." *United States v. Sunia*, 643 F.Supp.2d 51, 74 (D.D.C. 2009) (quoting *In re Korean Airlines Disaster of Sept. 1, 1983*, 829 F.2d 1171, 1176 (D.C. Cir. 1987)).

Plaintiffs continue to cherry-pick certain *dicta* from *Heller* and *Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007) to claim that the right, under the Second Amendment, to carry a firearm in public for self-defense has been established conclusively.[8] This remains incorrect as a matter of law. *See, e.g., Williams v. State*, 10 A.3d 1167, 1177 (Md. 2011) ("[I]t is clear that prohibition of firearms in the home was the gravamen of the certiorari questions in both [*District of Columbia v. Heller*, 554 U.S. 570 (2008) ("*Heller I*")] and [*McDonald v. Chicago*, 561 U.S. 742, 130 S. Ct. 3020 (2010)] and their answers. If the Supreme Court, in this dicta, meant its holding to extend beyond home possession, it will need to say so more plainly."), *cert. denied*, 132 S. Ct. 93 (2011). *See also Burgess v. Town of Wallingford*, ___ Fed.Appx. ___,

---

[8]       Indeed, most of the citations provided for support of that proposition, *see* Opp. at 5, explicitly limit the right *to the home*.

2014 WL 2609632, *2 (2d Cir. Jun. 12, 2014) ("Even at present, we are unsure of the scope of that right.") (citing *Kachalsky v. City of Westchester*, 701 F.3d 81, 89 (2d Cir. 2012), *cert. denied sub nom.*, 133 S. Ct. 1806 (2013)).

Respectfully, these dictum are insufficient to support the weight given them by the Court. *See, e.g., Arkansas Game & Fish Comm'n v. United States*, ___ U.S. ___, 133 S. Ct. 511, 521 (Dec. 4, 2012) ("[G]eneral expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision.") (quoting *Cohens v. Virginia*, 6 Wheat. 264, 399, 5 L.Ed. 257 (1821)); *Central Virginia Community College v. Katz*, 546 U.S. 356, 363 (2006) ("[W]e are not bound to follow our dicta in a prior case in which the point now at issue was not fully debated.").

The Supreme Court, in *Heller v. District of Columbia*, 554 U.S. 570 (2008) ("*Heller I*"), "went to great lengths to emphasize the special place that the home—an individual's private property—occupies in our society." *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1259 (11th Cir. 2012).[9] The instant plaintiffs ignore this fundamental point, and thus the limitations of the *Heller* decision, failing to address the District's arguments aside from acknowledging the "special protection" to which the home is entitled. *See* Opp. at 7 (quoting *Minnesota v. Carter*, 525 U.S. 83, 99 (1998) (Kennedy, J., concurring)). But the distinction should not be so swiftly dismissed.

---

[9]    The Eleventh Circuit in that case affirmed the rejection of a Second Amendment challenge to a Georgia law that prohibited the carrying of weapons in "places of worship" without the express consent of the property's owner. The circuit found that the prohibition did not impose a burden on conduct falling within the scope of the Second Amendment, hence stopped at the first step of the two-step inquiry. *GeorgiaCarry.Org*, 687 F.3d at n.34.

As the District has noted, "the home" is distinct for purposes of the Constitution, in a variety of contexts. The Supreme Court has determined that the Fourth Amendment requires a warrant prior to entry into the home for a search or an arrest, while the police can arrest a person for even minor crimes committed in public. *See, e.g., Maryland v. Pringle*, 540 U.S. 366, 369–70 (2003) (*unanimous*). That threshold is not meaningless—it allows a homeowner to use deadly force in defense of his or her "castle," but the converse is not true. *See Payton v. New York*, 445 U.S. 573, n.44 (1980) (quoting *Semayne's Case*, 77 Eng. Rep. 194, 195 (K.B. 1603) ("[E]very one may assemble his friends and neighbors to defend his house against violence: but he cannot assemble them to go with him to the market, or elsewhere for his safeguard against violence[.]")).

It takes extraordinary justification for the government to intrude on the sanctity of the home, just as a homeowner is privileged to use deadly force to defend it. Outside the home, the Constitution's protections remain, but the presence of "the public" changes the analysis.

"A special respect for liberty in the home has long been part of our culture and our law." *City of Ladue v. Gilleo*, 512 U.S. 43, 58 (1994) (*unanimous*). The Supreme Court in *Ladue* enjoined, as a violation of the First Amendment, a city ordinance which largely prohibited signs on residential property. "Whereas the government's need to mediate among various competing uses, including expressive ones, for public streets and facilities is constant and unavoidable, its need to regulate temperate speech from the home is surely much less pressing." *Id.* (citations omitted).

Moreover, "the home" is so important in American life that the Supreme Court has determined that the First Amendment is no obstacle to banning public speech entirely, if that speech is directed at an individual residence. *See Frisby v. Schultz*, 487 U.S. 474, 486 (1988). In

*Frisby*, the Court upheld a city ordinance that prohibited "focused picketing taking place solely in front of a particular residence[.]" *Id*. at 483.

> [A] special benefit of the privacy all citizens enjoy within their own walls, which the State may legislate to protect, is an ability to avoid intrusions. Thus, we have repeatedly held that individuals are not required to welcome unwanted speech into their own homes and that the government may protect this freedom.

*Id*. at 485 (citations omitted).

Accordingly, even if the Second Amendment may be analogized to the First Amendment, "regulations of form and context may strike a constitutionally appropriate balance between the advocate's right to convey a message and the recipient's interest in the quality of his environment[.]" *Bolger v. Young Drug Products Corp.*, 463 U.S. 60, 83–84 (1983) (Stevens, J., concurring in judgment). But the instant Court's judgment has negated, indeed ignored, District residents' interests in the quality of their environment. For example, while the Supreme Court has found that the government cannot criminalize the possession of obscene materials in the privacy of the home, there is no "'zone' of 'privacy' that follows a distributor or a consumer of obscene materials wherever he goes." *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 66 (1973) (discussing *Stanley v. Georgia*, 394 U.S. 557 (1969)).[10] "It is hardly necessary to catalog the myriad activities that may be lawfully conducted within the privacy and confines of the home, but may be prohibited in public." *United States v. Orito*, 413 U.S. 139, 142–43 (1973).[11]

---

[10]     While the Supreme Court held that the "protection" afforded in *Stanley* is limited to the home itself, it also noted that "the constitutionally protected privacy of family, marriage, motherhood, procreation, and child rearing" extends to such places as "the doctor's office, the hospital, the hotel room, or as otherwise required to safeguard the right to intimacy involved." *Id*. at n.13 (citations omitted).

[11]     *Cf. Nat'l Org. for the Reform of Marijuana Laws v. Bell*, 488 F.Supp. 123, 132 (D.D.C. 1980) (three-judge panel held that "[s]moking marijuana does not qualify as a fundamental right," hence the right to do so at home is not encompassed by the "right of privacy" detailed in *Stanley*).

The home is a special place that is entitled to greater protection under the Constitution. Outside the home, that protection encounters the rights of the public. To conclude that the "right" of self-defense is unaffected by crossing the threshold of one's front door is to ignore this critical distinction. "The personal constitutional rights of those like Stanley to possess and read obscenity in their homes and their freedom of mind and thought do not depend on whether the materials are obscene or whether obscenity is constitutionally protected. Their rights to have and view that material in private are independently saved by the Constitution." *United States v. Reidel*, 402 U.S. 351, 356 (1971). Those rights are saved by the Constitution, over and above the protections of the First Amendment, because they are *exercised in the home*. Because the home is almost always off limits to the government, a special need for protection arises therein, and thus the rights enshrined in the Second Amendment are at their peak there. But as we move outside the home, that special need lessens, and the potential impact of the exercise of those rights on the public must be factored into the analysis. This Court did not do so.

Even "fundamental" rights must sometimes give way to society's interests in health and safety. There is no question that there is a right to bodily integrity, hence informed consent is required for medical/surgical procedures, just as competent adults have the right to refuse treatment. *See, e.g., Cruzan v. Missouri Dep't of Health*, 497 U.S. 261, 268–69 (1990). *Cf. United States v. Weston*, 255 F.3d 873, 887 (D.C. Cir. 2001) (Circuit affirmed forcible administration of antipsychotic drugs, in order to render detainee competent to stand trial; government's interest in bringing detainee to trial outweighed defendant's interest in bodily integrity). Similarly, forcible medication may be ordered if a person represents a danger to themselves or others. *Id.*

Perhaps the most recent instance of "fundamental rights" being subverted for the greater good are where courts have rejected constitutional claims by parents who refuse to have their children vaccinated before attending public schools. *See, e.g., Workman v. Mingo County Bd. of Educ.*, 419 Fed.Appx. 348, 353 (4th Cir. 2011) (West Virginia had compelling interest in requiring children to be vaccinated before allowing them to attend public school, even if vaccination substantially burdened free exercise of religion, and even assuming that strict scrutiny applied) (citing, *inter alia, Jacobson v. Massachusetts*, 197 U.S. 11 (1905) and *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) ("The right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death.")); *Caviezel v. Great Neck Public Schools*, 739 F.Supp.2d 273 (E.D.N.Y. 2010), *affirmed*, 500 Fed.Appx. 16 (2d Cir. 2012). Thus, the exercise of even fundamental rights must sometimes be cabined by other considerations.

<u>CONCLUSION</u>

This Court, respectfully, failed to conduct the intermediate scrutiny required by *Heller II*, elevating the right to carry firearms in public above the legitimate concerns of the District, without considering the District's justifications. The Court should reconsider its decision, grant judgment to the District or, in the alternative, allow the case to proceed to discovery to complete the record.

DATE: September 22, 2014        Respectfully submitted,

IRVIN B. NATHAN
Attorney General for the District of Columbia


_____/s/_____
ELLEN A. EFROS
Deputy Attorney General
Public Interest Division

441 Fourth Street, NW, 6th Floor South
Washington, DC 20001
Telephone: (202) 442-9886
Facsimile: (202) 741-8908
Email: ellen.efros@dc.gov


       /s/ Andrew J. Saindon
_____
ANDREW J. SAINDON, D.C. Bar No. 456987
Senior Assistant Attorney General
Equity Section I
441 Fourth Street, N.W., 6th Floor South
Washington, D.C. 20001
Telephone: (202) 724-6643
Facsimile: (202) 730-1470
E-mail: andy.saindon@dc.gov