IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| TOM G. PALMER, et al., | ) | Case No. 09-CV-1482-FJS |
| | ) | |
| Plaintiffs, | ) | MEMORANDUM OF POINTS AND |
| | ) | AUTHORITIES IN SUPPORT OF |
| v. | ) | PLAINTIFFS' MOTION FOR |
| | ) | PERMANENT INJUNCTION |
| DISTRICT OF COLUMBIA, et al., | ) | |
| | ) | |
| Defendants. | ) | |

COME NOW the Plaintiffs, Tom G. Palmer, George Lyon, Edward Raymond, Amy

McVey, and the Second Amendment Foundation, Inc., by and through undersigned counsel, and

submit their Memorandum of Points and Authorities in Support of their Motion for Permanent

Injunction.

Dated: October 2, 2014          Respectfully submitted,

Alan Gura (D.C. Bar No. 453449)
Gura & Possessky, PLLC
105 Oronoco Street, Suite 305
Alexandria, VA 22314
703.835.9085/Fax 703.997.7665


By:  /s/ Alan Gura
     Alan Gura
     Attorney for Plaintiffs

## TABLE OF CONTENTS

Preliminary Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    1.    The Relevant Statutory Regime. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    2.    The Statutory Regime's Application Against Plaintiffs. . . . . . . . . . . . . . . . . . . 8

    3.    Plaintiffs' Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    4.    This Court's Judgment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Summary of Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    I.    Legislation That Merely Reformulates a Practice Enjoined
        by the Court Does Not Entitle Defendants to Relief. . . . . . . . . . . . . . . . . . . . . 13

    II.    Defendants Persist in their Essential Prohibition of the Right to Bear Arms. . . . . . 15

    III.    Defendants' Revived Licensing Regime Imposes an Impermissible
        Prior Restraint. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    IV.    The District's Licensing Regime Would Fail Any Level of
        Means-Ends Scrutiny. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    V.    The Court Should Accept the City Council's Commitment to Obstructing
        the Right to Bear Arms at Face Value. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

i

TABLE OF AUTHORITIES

Cases

*Bateman* v. *Perdue*,
    881 F. Supp. 2d 709 (E.D.N.C. 2012)........................................... 23

*Beal* v. *Stern*,
    184 F.3d 117 (2d Cir. 1999) ................................................. 22

*Bsharah* v. *United States*,
    646 A.2d 993 (D.C. 1994)................................................. 1, 4

*City of Lakewood* v. *Plain Dealer Publishing Co.*,
    486 U.S. 750 (1988)...................................................... 22

*City of Mesquite* v. *Aladdin's Castle, Inc.*,
    455 U.S. 283 (1982)...................................................... 24

*District of Columbia* v. *Heller*,
    554 U.S. 570 (2008)........................................... 11, 12, 15, 18, 20

*Drake* v. *Filko*,
    724 F.3d 426 (3d Cir. 2013) ............................................. 17, 20

*Ezell* v. *City of Chicago*,
    651 F.3d 684 (7th Cir. 2011) ............................................. 1, 22

*Fletcher* v. *Haas*,
    851 F. Supp. 2d 287 (D. Mass. 2012)....................................... 23

*Isaacson* v. *Horne*,
    716 F.3d 1213 (9th Cir. 2013)........................................... 20, 21

*Kachalsky* v. *Cnty. of Westchester*,
    701 F.3d 81 (2d Cir. 2012) .............................................. 17, 22

*Largent* v. *Texas*,
    318 U.S. 418 (1943) ...................................................... 22

*McDonald* v. *City of Chicago*,
    130 S. Ct. 3020 (2010).................................................. 11, 12

*Moore* v. *Madigan*,
    702 F.3d 933 (7th Cir. 2012)............................................... 13

ii

*Mosby* v. *Devine*,
    851 A.2d 1031 (R.I. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 19, 21

*Muscarello v. United States*,
    524 U.S. 125 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*National Black Police Ass'n* v. *District of Columbia*,
    108 F.3d 346 (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Northeastern Fla. Chapter of Associated Gen. Contractors of Am.* v. *City of Jacksonville*,
    508 U.S. 656 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 24

*Parker* v. *District of Columbia*,
    478 F.3d 370 (D.C. Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*People* v. *Zerillo*,
    219 Mich. 635, 189 N.W. 927 (1922). . . . . . . . . . . . . . . . . . . . . . . . . . 17, 19, 21

*Peruta* v. *Cnty. of San Diego*,
    742 F.3d 1144 (9th Cir. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 17, 18, 21-23

*Reed* v. *Town of Gilbert*,
    707 F.3d 1057 (9th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Schubert* v. *De Bard*,
    398 N.E.2d 1339 (Ind. App. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 19, 21

*Speiser* v. *Randall*,
    357 U.S. 513 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*State* v. *Reid*,
    1 Ala. 612 (1840). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Staub* v. *City of Baxley*,
    355 U.S. 313 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*United States* v. *Verdugo-Urquidez*,
    494 U.S. 259 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Woollard* v. *Gallagher*,
    712 F.3d 865 (4th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 22

Constitutional Provisions

U.S. Const. amend. I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

U.S. Const. amend. II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

U.S. Const. amend. IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

U.S. Const. amend. IX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Statutes

Ariz. H.B. 2036 § 9(B)(1), (2012), available at http://www.azleg.gov/
    legtext/50leg/2r/bills/ hb2036s.pdf, archived at http://perma.cc/
    KA77-TMQ8 (last visited Oct. 1, 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

D.C. Act 17-690, 56 D.C. Reg. 1162 (Jan. 16, 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

D.C. Act 19-366, 59 D.C. Reg. 5691 (May 25, 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

D.C. Code § 22-4504(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 4, 8, 10, 11, 13, 15, 24

D.C. Code § 22-4506(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 9

D.C. Code § 7-2502.01(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 8

D.C. Code § 7-2509.02(a)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

D.C. Code § 7-2509.08(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

D.C. Code § 7-2509.08(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

D.C. Code § 7-2509.08(l)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

D.C. Code § 7-2509.10(a)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 15

D.C. Code § 7-2509.10(a)(1)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 16

Other Authorities

Andrea Noble, *Lawmakers grudgingly draft bill to authorize concealed
      carry of guns in D.C.*, Washington Times, Sept. 17, 2014,
      available at http://www.washingtontimes.com/news/
      2014/sep/17/lawmakers-grudgingly-introduce-bill-authorize-
      conc/?page=1 (last visited Sept. 24, 2014).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Black's Law Dictionary (6th ed. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

L.A. Powe, Jr., *Guns, Words, and Constitutional Interpretation*,
      38 Wm. & Mary L. Rev. 1311 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Mayor Gray, Chairman Mendelson and Councilmember
      Wells Propose Emergency Firearm Legislation*, available at
      http://mayor.dc.gov/release/mayor- gray-chairman-mendelson-
      and-councilmember-wells-propose-emergency-firearm-legislation
      (last visited Sept. 23, 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Video, D.C. City Council, Twenty-Ninth (Additional) Legislative Meeting,
      Sept. 23, 2014. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-8

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
MOTION FOR PERMANENT INJUNCTION

PRELIMINARY STATEMENT

This Court ordered that the District of Columbia's handgun carry prohibition will remain

permanently enjoined "unless and until such time as the District of Columbia adopts a licensing

mechanism consistent with constitutional standards enabling people to exercise their Second

Amendment right to bear arms." Memorandum Decision & Order, Dkt. 51, at 16 (footnote omitted).

Defendants have responded not with "appropriate legislation consistent with the Court's

ruling," Order, Dkt. 53, at 2 (footnote omitted), but with "a thumbing of the municipal nose at the

[court]." Ezell v. City of Chicago, 651 F.3d 684, 712 (7th Cir. 2011) (Rovner, J., concurring).[1]

They have merely dusted off their earlier statute restricting handgun carry licenses at the police

chief's pleasure, a licensing regime which explicitly rejects the notion that people have a right to

carry handguns for self-defense. Beyond that, the operative language of the enjoined carry ban, D.C.

Code § 22-4504(a), having been modified non-substantively in September, 2012, was reverted to

substantially the same form it had on the day this lawsuit was filed. This is the same regime under

which it was "common knowledge" that licenses were "virtually unobtainable" "for many years."

Bsharah v. United States, 646 A.2d 993, 996 n.12 (D.C. 1994). Authority this Court followed

struck down a practically identical law.

This is not "progress [Defendants] have made to comply with the Court's decision." Order,

Dkt. 66, at 2. It is resistance. Indeed, various D.C. City Councilmembers emphatically declared that

_____

[1]License to Carry a Pistol Emergency Amendment Act of 2014, D.C. Bill B20-0926 (passed
Sept. 23, 2014) attached hereto as Exhibit A. Considering that the Court's stay of its order is nearing
expiration, briefing the question of whether this legislation complies with the Court's ruling should
not await the Mayor's inevitable signature by the October 10 deadline (considering he proposed the
legislation) or veto override (considering passage was unanimous).

1

the legislation does not moot this dispute, and urged the Attorney General to pursue the appeal he believes remains available. And some within the city, including the City Council Chairman, believe that individuals might be prosecuted under the enjoined statute upon the stay's expiration, owing simply to the recent legislation. The Court should thus clarify that the injunction remains in place, notwithstanding the minor technical changes to the enjoined provision.

To be sure, some of the restrictions on the right to bear arms that Defendants are enacting in reaction to this Court's opinions are merely objectionable, but not unconstitutional. Others are constitutionally dubious, but qualify as truly "new laws" that do not fall within the ambit of the complaint, or this Court's decision, as they do not rise to the level of destroying the right to bear arms. These might be addressed in future litigation. Yet other provisions are ambiguous absent clarifying regulations or practice.[2]

Accordingly, Plaintiffs' motion is narrow, directed only to the defiant centerpiece of Defendants' legislative response. The Court's order specifically instructed, in accordance with Supreme Court precedent, that the *right* to carry handguns is rooted in a constitutional self-defense interest. Yet Defendants have replaced their "no permits are available" handgun carry regime with "no permits are available merely for self-defense, and not unless we think, in our complete discretion, that it's a good idea."

---

[2]For example, Plaintiffs have no idea what to make of the requirement that an applicant "demonstrate to the satisfaction of the Chief" that she "[d]oes not currently suffer nor has suffered in the previous 5 years from any mental illness or condition that creates a substantial risk that he or she is a danger to himself or others." See Exh. A, at 2, Sec. 902(a)(3), forthcoming D.C. Code § 7-2509.02(a)(3). It cannot possibly be constitutional to require a psychiatric examination to exercise a fundamental right, nor is it possible for anyone to prove the negative proposition that they were not mentally ill during the preceding five year period. But implementing this provision by conducting a quick background check through any existing mental health records, or asking the applicant to sign a declaration attesting to the absence of illness, should be unobjectionable.

2

Defendants having failed to enact "a licensing mechanism consistent with constitutional standards enabling people to exercise their Second Amendment right to bear arms," the Court should remove all doubt that D.C. Code § 22-4504(a) remains enjoined in its "new," old form.

STATEMENT OF FACTS

1.      *The Relevant Statutory Regime*

When this lawsuit began, D.C. Code § 22-4504(a) (2008) provided that "[n]o person shall carry within the District of Columbia either openly or concealed on or about their person, a pistol, without a license issued pursuant to District of Columbia law, or any deadly or dangerous weapon capable of being so concealed." D.C. Code § 7-2502.01(a) mandated handgun registration. Handgun registration applicants were required to provide a "brief statement of your intended use of the firearm and where the firearm will be kept," and Defendant Lanier could—and did—deny registration based on unsatisfactory statements. See Summ. Judgment Exhibits A, B, and C.

D.C. Code § 22-4506(a) (2008) had provided that

> The Chief of Police of the District of Columbia may, upon the application of any person having a bona fide residence or place of business within the District of Columbia or of any person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his or her person issued by the lawful authorities of any State or subdivision of the United States, issue a license to such person to carry a pistol within the District of Columbia for not more than 1 year from date of issue, if it appears that the applicant has good reason to fear injury to his or her person or property or has any other proper reason for carrying a pistol and that he or she is a suitable person to be so licensed.

This section was repealed, effective May 20, 2009. See Inoperable Pistol Amendment Act of 2008, D.C. Act 17-690, 56 D.C. Reg. 1162, 1165 (Jan. 16, 2009). An amendment effective September 26, 2012—two weeks before this case was last argued—struck the reference to a handgun carry license from Section 22-4504(a). See D.C. Act 19-366, 59 D.C. Reg. 5691, 5697 (May 25, 2012).

3

On September 23, 2014, the City Council unanimously passed emergency legislation, valid for 90 days upon the Mayor's signature, restoring D.C. Code § 22-4504(a)'s pre-September, 2012 reference to a handgun carry license. Aside from omitting reference to non-concealable weapons, the provision now reads just as it did on the day this lawsuit was filed.[3]

The legislation also revives, nearly verbatim, the previous D.C. Code § 22-4506(a). The only differences between the new and immediately preceding versions of this section are: (1) "The Chief of Police of the District of Columbia" is shortened to "the Chief;" (2) the licenses authorize not "carry" but "carry concealed;" and (3) licenses are valid for two years, not one. Critically, the legislation restores—word for word—the old "standard" guiding the issuance of licenses. The police chief "may" issue a license "if it appears that the applicant has good reason to fear injury to his or her person or property or has any other proper reason for carrying a pistol, and that he or she is a suitable person to be so licensed."

Defendants' intent is to "reinstate the test for carrying a firearm that was in place for many years after [the] 1931 law . . . ."[4] Under this standard, "[i]t [was] common knowledge . . . that with very rare exceptions licenses to carry pistols have not been issued in the District of Columbia for many years and are virtually unobtainable." *Bsharah*, 646 A.2d at 996 n.12.[5]

––––––––––––––––––––

[3]By deleting language that would have exempted non-concealable weapons from the section's weapons-carrying ban, the law now apparently extends to rifles, shotguns, swords, etc., which are not implicated by this litigation.

[4]See *Mayor Gray, Chairman Mendelson and Councilmember Wells Propose Emergency Firearm Legislation*, available at http://mayor.dc.gov/release/mayor- gray-chairman-mendelson-and-councilmember-wells-propose-emergency-firearm-legislation (last visited Sept. 23, 2014).

[5]As the Court may recall, however, in 1931 licenses were only required to carry concealed handguns; the licensing requirement was not extended to the open carrying of handguns until 1943.

The rules purporting to guide Defendant Lanier's discretion make clear that the general interest in self-defense is inadequate to obtain a handgun carry permit, and indeed, that the population at large is disqualified:

> Demonstrated a good reason to fear injury to his or her person . . . shall at a minimum require a *showing of a special need* for self-protection *distinguishable from the general community* as supported by evidence of specific threats or previous attacks which demonstrate a *special danger* to the applicant's life;

Exh. A, at 10, Sec. 910(a)(1)(A), forthcoming D.C. Code § 7-2509.10(a)(1)(A) (emphasis added).

> Demonstrated any other proper reason for carrying a concealed pistol . . . shall at a minimum include types of employment that require the handling of cash or other valuable objects that may be transported upon the person of the applicant . . . .

Exh. A, at 10, Sec. 910(a)(1)(B), forthcoming D.C. Code § 7-2509.10(a)(1)(B).

Rejected applicants may appeal the Chief's denial to a "Concealed Pistol Licensing Review Board," composed of five essentially political appointees. At least three of the five board members are appointed by the Mayor or Attorney General, and at least three of the five board members must have a police or prosecutorial background. Exh. A at 8-9, Sec. 908(a) & (b), forthcoming D.C. Code § 7-2509.08(a) & (b). The board's "rules shall include that the burden of production of evidence, and the burden of persuasion, at any hearing before the Board shall be upon the applicant or licensee that is challenging any denial of an application or renewal application or revocation of a license." Exh. A at 9, Sec. 908(l)(2), forthcoming D.C. Code § 7-2509.08(l)(2).

In passing this legislation, the City Council made clear its continuing hostility to the right to bear arms, and relied expressly upon the opinion given them by Defendants' counsel, the District of Columbia's Attorney General, that enactment of the bill would *not* terminate this case. The bill was enacted not to end this litigation, but in the erroneous view that the bill was required in order to revive prosecutions in the District for carrying handguns in public.

5

Notable declarations of contempt and animus for anyone who might wish to carry a handgun punctuated a discussion of whether Defendants should release the names and possibly addresses of handgun licensees. Councilmember Grosso suggested that a public database of licensed gun carriers should be available so that licensees could be shunned by others, as "this is inherently a dangerous situation."[6] Some councilmembers protested that disclosing licensing data would endanger public safety, but others were less concerned. Stated Councilmember Alexander, "Who cares about the confidentiality of a gun owner. We don't want it . . . we don't want it, so expose yourself." Video n.6, at 1:49:49.[7]

Councilmember Bowser asked, "could the attorney general still proceed with the argument that the District of Columbia is indeed a special case and people should not be permitted to carry here?" *Id*. at 1:53:54. To which Councilmember Wells responded,

> I've got a communication through the chair to you, Ms. Bowser, a communication from the Attorney General's office that it's the Attorney General's opinion that it does not in any way preclude our appeal from going forward. That's the opinion of the Attorney General, that's what we've received.

*Id*. at 1:54:10.

Councilmember Cheh then declared, "I think it's imperative that we do preserve our right to appeal." *Id*. at 1:56:27.

_____

[6]See Video, D.C. City Council, Twenty-Ninth (Additional) Legislative Meeting, Sept. 23, 2014, at 1:27:34. The video is available at the District of Columbia's Legislative Information Management System by searching for bill B20-0926. See http://lims.dccouncil.us/Legislation/B20-0926?FromSearchResults=true (last visited Sept. 29, 2014). Select the "Bill History" tab, and then any of the "View Video" icons for a pop-up video of the Council's session.

[7]Objections to disclosure focused largely on fears that criminals would know from whom to steal guns. The Council seemed uncaring or oblivious to the fact that, especially under D.C.'s restrictive standards, permits would hypothetically be obtained by people who have good reason to shield their personal information, e.g., women who fear and need protection from stalkers.

And we have to emphasize, and never give up on, because we shouldn't just lay down on this, we are a unique jurisdiction. There is a compelling justification to prohibit carry laws in the District of Columbia unmatched by any other place. And so therefore, I don't want to do anything to foreclose our ability and our opportunity to put that out there. Because I think that if properly viewed, we ought to be able to ban carry laws in the District of Columbia. So if it's indeed the case that we are not sacrificing that, and we are in a tough bind, nobody is happy up here, I'm going to vote for this but I want us to be committed to arguing in favor of a no carry rule for the District of Columbia.

*Id*. at 1:57:17.

Council Chairman Mendelson offered,

I'm of the view, we've talked about this before, that we ought to proceed with the appeal because I think that . . . Judge Scullin's opinion was broad with regard to the injunction and problematic with regard to the injunction and although the holding I think was because of the absolute ban ...  Section 22-4504(a) could not be enforced, I think there's some value to our appealing and trying to get something that's better.

*Id*. at 1:58:12.

Councilmember McDuffie noted that "we've talked a little bit about the need to appeal and there's been a question about whether or not passing this bill would essentially moot the ability of the attorney general's office to appeal." *Id*. at 2:00:16. McDuffie asked "whether or not passing this emergency bill still allows—and I tend to agree that it does—but still allows the attorney general the opportunity to appeal assuming that we get a response on the motion for reconsideration." *Id*. at 2:02:25. Councilmember Wells responded, "the Attorney General has stated that it does not impact the ability for the District to go ahead and appeal the decision . . . ." *Id*. at 2:02:41.

"Councilmember Cheh is exactly right, that we don't want to cede anything off the bat . . . " *Id*. at 2:03:27. Added Council Chairman Mendelson, "I said at the breakfast this morning that I did not think this precluded the ability to appeal and I feel more strongly about that now in light of what the Attorney General has communicated that that's his view, it does not preclude his ability to appeal." *Id*. at 2:03:46.

7

Councilmember Catania was less sure about mootness, asking that the entire bill be made applicable only upon this case's final resolution. But Mendelson responded that some licensing regime must be in place in order for people to be prosecuted for carrying a handgun without a license. Of course, Chairman Mendelson was wrong: prosecutions should not resume until this Court's injunction is lifted. In any event, he stated, "I don't believe we are mooting our appeal." *Id.* at 2:09:06. "The only way that this case gets mooted is if the district asks that it be mooted because I can assure you that the plaintiffs in the case are not going to moot this." *Id.* at 2:09:46.[8] Catania's request for a more carefully reasoned legal opinion on the issue went unanswered, except to the extent that Wells offered, "It's a temporary measure, so it does not fix the problem permanently, so it continues to be an issue at question." *Id.* at 2:10:12; but see n.8.

2.    *The Statutory Regime's Application Against Plaintiffs*

As noted, D.C. Code sections 7-2502.01(a), requiring handgun registration, and 22-4504(a), prohibiting the carrying of handguns without a license, were at the time this lawsuit was filed substantially identical to their form today following the most recent legislative enactment. Section 7-2502.01(a)'s relevant portion is unchanged. Section 22-4504(a) dropped its reference to a handgun carry license in September, 2012, and that same language has just been restored.

Defendants refused Plaintiffs Palmer, McVey, and Lyon permission to carry handguns in the District, denying their handgun registration applications for declaring an intent to carry those handguns for self-defense. For example, Defendants wrote Tom Palmer:

---

[8]Mootness does not ordinarily depend on a party's request. However, as discussed infra at 24, a legislative change under these circumstances does not moot the case, as there is clear evidence that the losing government would insist upon, as Mendelson earlier put it, "trying to get something that's better."

> The intended use of the firearm as stated on your firearms registration application, "I intend to carry this firearm, loaded, in public, for self-defense, when not kept in my home" is unacceptable per the "Firearms Registration Emergency Amendment Act of 2008," which states that pistols may only be registered by D.C. residents for protection within the home.

See Summ. Judgment Exh. A; see also Exhs. B & C. Plaintiff Raymond's desire for a handgun carry permit was likewise based on his interest in self-defense, but Defendants refused him a registration application on grounds of residence. See Raymond Decl., ¶ 8. SAF members are also impacted by Defendants' policies. Gottlieb Decl., ¶ 8.

Plaintiffs' generalized interest in self-defense remains unchanged. They have nothing to add to their previous statements, which plainly do not meet Section 22-4506(a)'s revived criteria. Plaintiffs cannot articulate "a special need for self-protection distinguishable from the general community," and none of them have what the District would consider a "proper reason" for carrying a handgun. Plaintiffs were injured-in-fact when Defendants forbade them from having handguns in the District of Columbia for defensive carry, and that injury persists, notwithstanding the fact that Defendants might now hypothetically license differently-situated people.

3.   *Plaintiffs' Claims*

Plaintiffs' Complaint is not limited to any precise formulation of Defendants' practice, but targets Defendants practice itself, of generally denying the right to bear arms *for self-defense*:

> The District of Columbia may not completely ban the carrying of handguns *for self-defense*, deny individuals the right to carry handguns in non-sensitive places, *deprive individuals of the right to carry handguns in an arbitrary and capricious manner*, or impose regulations on the right to carry handguns that are *inconsistent with the Second Amendment*.

Complaint, Dkt. 1, ¶ 13 (emphasis added).

The Complaint describes how, exactly, other states regulate handgun carrying in a manner consistent with the right:

Almost all states basically respect the Second Amendment rights to carry a handgun for self-defense, in that the right to carry a handgun is either unregulated, or regulated to the extent that *individuals passing a background check and completing a gun safety course are, as a matter of course*, licensed to carry handguns.

*Id*. ¶ 14.

Plaintiffs did not complain that the District required a permit to carry a handgun. Section 22-4504(a)'s language requiring a permit stands today as it did in 2009. *Id*. ¶ 18. Rather, Plaintiffs alleged that by "refusing to issue [handgun carry] permits and refusing to allow the possession of any handgun that would be carried in public, Defendants maintain a complete ban on the carrying of handguns in public by almost all individuals." *Id*. ¶ 39. "Defendants' laws, customs, practices and policies generally banning the carrying of handguns in public violate the Second Amendment to the United States Constitution, facially *and as applied against the individual plaintiffs . . . .*" *Id*. ¶ 40 (emphasis added).

Accordingly, aside from an injunction against the registration home and residence limitations, Plaintiffs sought two forms of alternative relief: that the Court would either enjoin Section 22-4504(a)'s prohibition on carrying handguns, "OR, in the alternative, order[] defendants to issue licenses to carry handguns to all individuals who desire such licenses and who have satisfied the existing requirements, aside from residence requirements, for the registration of a handgun." *Id*., Prayer for Relief ¶ 2.

4.   *This Court's Judgment*

This Court held that the Second Amendment secures a right to carry handguns for self-defense, and held that while the right can be regulated, it cannot be entirely destroyed. This Court relied on a Ninth Circuit opinion striking down a handgun-carry licensing scheme that entrusted licensing decisions to the police's discretion, and which rejected the generalized interest in self-

defense as a basis for licensing. Rather than order the Defendants to enact some particular licensing

law, this Court enjoined Section 22-4504(a)'s carry prohibition until such time that the District

adopts a licensing mechanism that complies with constitutional requirements, and allows ordinary

people to access the right to bear arms.

"The [Supreme] Court explained that self-defense, recognized since ancient times as a 'basic

right,' was the 'central component' of the Second Amendment guarantee." Memorandum Decision

& Order, Dkt. 51, at 9 (quoting *McDonald* v. *City of Chicago*, 130 S. Ct. 3020, 3036 (2010)).

Accordingly, this Court was required to "to decide whether the restricted activity" in which Plaintiffs

would engage, "a restriction on a responsible, law-abiding citizen's ability to carry a gun outside the

home for self-defense falls within the Second Amendment right to keep and bear arms for the

purpose of self defense." *Id.* at 10.

"[A]s the Supreme Court explained . . . 'at the time of the founding, as now, to 'bear' meant

to 'carry.'" *Id.* at 11 (quoting *District of Columbia* v. *Heller*, 554 U.S. 570, 584 (2008)) (internal

punctuation omitted).

> According to the *Heller* majority, the "natural meaning of 'bear arms'" was the one that
> Justice Ginsburg provided in her dissent in *Muscarello* v. *United States*, 524 U.S. 125
> (1998), that is "'wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for
> the purpose . . . of being armed and ready for offensive or defensive action in a case of
> conflict with another person.'" *Heller*, 554 U.S. at 584 (quoting *Muscarello*, 524 U.S. at
> 143, 118 S. Ct. 1911) (Ginsburg, J., dissenting) (quoting Black's Law Dictionary 214 (6th
> ed. 1998)).

*Id.* at 11-12.

This Court further relied extensively on a Ninth Circuit decision "which addressed statutes

very similar to the ones at issue in this case"—*Peruta* v. *Cnty. of San Diego*, 742 F.3d 1144 (9th

Cir. 2014). "The *Peruta* court addressed the issue of 'whether a responsible, law-abiding citizen has

a right under the Second Amendment to carry a firearm in public for self-defense.'" Memorandum

11

Decision & Order, Dkt. 51, at 9 n.2 (quoting *Peruta*, 742 F.3d at 1147).

> [T]he *Heller* Court emphasized that the need for the right was "most acute" in the home, *Peruta*, 742 F.3d at 1153 (citing *Heller*, 554 U.S. at 628, 128 S. Ct. 2783), "thus implying that the right exists outside the home, though the need is not always as "'acute.'" *Id.* (citing *McDonald*, 130 S. Ct. at 3044 (2010) ("[T]he Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home."))

*Id.* at 12. "[B]oth *Heller* and *McDonald* identif[ied] the 'core component' of the right as self-defense, which necessarily 'take[s] place wherever [a] person happens to be,' whether in a back alley or on the back deck." *Id.* at 12-13 (quoting *Peruta*, 742 F.3d at 1153) (citations omitted).

"This Court agrees with the Ninth Circuit's statement in *Peruta* that '[t]hese passages [from *Heller* and *McDonald*] alone, though short of dispositive, strongly suggest that the Second Amendment secures a right to carry a firearm in some fashion outside the home.'" *Id.* at 13 (quoting *Peruta*, 742 F.3d at 1153). And "*Peruta* correctly pointed out" that *Heller* settled the point that "the right is, *and has always been*, oriented to the end of self-defense." *Id.* at 14 (quoting *Peruta*, 742 F.3d at 1155).

> After an exhaustive summary of the text and history of the Second Amendment, the Ninth Circuit in *Peruta* concluded that "the carrying of an operable handgun outside the home for the lawful purpose of self-defense, though subject to traditional restrictions, constitutes 'bear[ing] Arms' within the meaning of the Second Amendment." As the Ninth Circuit noted, this conclusion is not surprising in light of the fact that other circuits have reached the same result.

*Id.* (quoting *Peruta*, 742 F.3d at 1166) (citations omitted). "This Court, joining with most of the other courts that have addressed this issue, reaches this same conclusion." *Id.*

This Court then held that because the Second Amendment secures the right to carry a handgun for self-defense, "the District of Columbia's total ban on the carrying of handguns within the District 'infringes' that right." *Id.* at 15. This Court noted with approval a regulatory approach that would "limit the right to carry a gun to responsible persons," noting that "some states sensibly

12

require that an applicant for a handgun permit establish his competence in handling firearms." *Id.* at 16 (quoting *Moore* v. *Madigan*, 702 F.3d 933, 940-41 (7th Cir. 2012)).

Rather than order the Defendants to adopt a specific licensing program, this Court enjoined Defendants from, inter alia, "enforcing D.C. Code § 22-4504(a) unless and until such time as the District of Columbia adopts a licensing mechanism consistent with constitutional standards enabling people to exercise their Second Amendment right to bear arms." *Id.* (footnote omitted). This Court thereafter stayed its decision for 90 days "to provide the city council with an opportunity to enact appropriate legislation consistent with the Court's ruling." Order, Dkt. 53 at 2 (footnote omitted). This Court denied Defendants' motion for a longer stay, but left the door open for extending the stay on a motion "setting forth in detail what, if any, progress [Defendants] have made to comply with the Court's decision." Order, Dkt. 66, at 2.

### SUMMARY OF ARGUMENT

There are only three ways in which to view Defendants' resurrected licensing regime: a practical destruction of the right to bear arms, an impermissible prior restraint granting the licensing authorities unbridled discretion free of meaningful limitation, or a Second Amendment regulation failing any level of means-ends scrutiny. But in no way can the legislation be said to resolve Plaintiffs' injury or comply with this Court's judgment.

### ARGUMENT

I.   LEGISLATION THAT MERELY REFORMULATES A PRACTICE ENJOINED
     BY THE COURT DOES NOT ENTITLE DEFENDANTS TO RELIEF.

Federal courts are empowered to correct constitutional violations, and insist upon compliance with their judgments. The dispute does not disappear merely because the District enacted new legislation. The injunction was only to be lifted if the new legislation is "appropriate"

13

and "consistent with the Court's ruling." Order, Dkt. 53 at 2 (footnote omitted). The question before

the Court now is whether the District has a "licensing mechanism consistent with constitutional

standards enabling people to exercise their Second Amendment right to bear arms." Memorandum

Decision & Order, Dkt. 51, at 16 (footnote omitted).

It does not. Plaintiffs' complaint is not literary criticism. It is not directed to 2009's specific

incantation of Defendants' unconstitutional practice, or even to Defendants' more blunt 2012

reformulation of that language. This dispute concerns the Second Amendment as a practical right.

Unsurprisingly, the complaint, as well as this Court's opinion and order, all specifically address or

foresee Defendants' type of symbolic, illusory licensing system.

Mere reformulation of a challenged practice does not end a constitutional dispute. See

*Northeastern Fla. Chapter of Associated Gen. Contractors of Am.* v. *City of Jacksonville*, 508

U.S. 656 (1993). In *Northeastern Florida*, the city sought to dismiss an equal protection challenge

to an ordinance setting aside certain contracts to women and minorities. Shortly after the Court

granted certiorari, the city substantially modified its ordinance, reducing the number of preferred

groups, replacing 10% set-asides with 5 to 16% "participation goals," and creating different ways to

reach said goals. *Id.* at 660-61. The mootness argument left the Supreme Court unimpressed:

> There is no mere risk that Jacksonville will repeat its allegedly wrongful conduct; it has
> already done so. Nor does it matter that the new ordinance differs in certain respects from the
> old one. [Precedent] does not stand for the proposition that it is only the possibility that the
> *selfsame* statute will be enacted that prevents a case from being moot; if that were the rule, a
> defendant could moot a case by repealing the challenged statute and replacing it with one
> that differs only in some insignificant respect. The gravamen of petitioner's complaint is that
> its members are disadvantaged in their efforts to obtain city contracts. The new ordinance
> may disadvantage them to a lesser degree than the old one, but insofar as it accords
> preferential treatment to black- and female-owned contractors—and, in particular, insofar as
> its "Sheltered Market Plan" is a "set aside" by another name—it disadvantages them in the
> same fundamental way.

*Id.* at 662 (citation and footnote omitted); *Reed* v. *Town of Gilbert*, 707 F.3d 1057, 1066-67 n.8

14

(9th Cir. 2013) (notwithstanding statutory change, plaintiff "has not obtained the relief it seeks and continues to be subject to the limiting ordinance").

Notably, the enjoined statute proscribing Plaintiffs' carrying of handguns, D.C. Code § 22-4504(a), remains virtually unchanged. And it does not require much analysis to see the essential mismatch between this Court's announcement of the constitutional rule, and Defendants' response.

II.   DEFENDANTS PERSIST IN THEIR ESSENTIAL PROHIBITION OF THE RIGHT TO BEAR ARMS.

Constitutional rights are enjoyed by "the people." See U.S. Const. amend. II ("right of the people); U.S. Const. amend. I (same); U.S. Const. amend. IV (same); U.S. Const. amend. IX ("rights . . . retained by the people"). "[T]he term ['the people'] unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580.

> "[T]he people" protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community.

*Id.* (quoting *United States* v. *Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). Thus, a right cannot be something enjoyed only by people with a "special need . . . distinguishable from the general community." Exh. A, at 10, Sec. 910(a)(1)(A), forthcoming D.C. Code § 7-2509.10(a)(1)(A). If bearing arms is "a right of the people," it cannot possibly be denied to the "general community" absent "special need."

Obviously, Defendants' "good reason/special need" restriction does not allow licensing individuals such as Plaintiffs, who simply wish to carry handguns for self-defense against the random, violent crime that plagues this city. As D.C. Attorney General Irvin Nathan declared,

"Living in a high-crime area is not sufficient to establish the good cause."[9] Indeed, the intent is to maintain the state of affairs under which handgun carry licenses were virtually unobtainable.

Nor does the District's "proper reason" requirement comport with the constitutional self-defense interest. This rule privileges protection of money and material goods over the protection of human life. A woman in a high-crime neighborhood concerned about rape does not have a "proper reason" to carry a defensive handgun, unless she happens to hold "employment that require[s] the handling of cash or other valuable objects that may be transported upon [her] person." Exh. A, at 10, Sec. 910(a)(1)(B), forthcoming D.C. Code § 7-2509.10(a)(1)(B).

That Defendants fail to treat the carrying of handguns as a right is further confirmed by the composition of their "Concealed Pistol Licensing Review Board" and the basic rules that the Board is instructed to adopt. The Board is not independent, and its structure guarantees bias against gun owners, both by virtue of its composition and literally per its rules. The political culture in the city is absolutely hostile to the idea of handgun carrying, yet at a minimum, three of the five Board members, and possibly all five, would be appointed by the Mayor and Attorney General. Beyond that, the Board is tilted entirely toward those with a government, law enforcement, and prosecutorial background. It is almost impossible to imagine such a board ever overturning the Police Chief's decisions barring the carrying of handguns, even if the licensing standards were objective and themselves constitutional—and they are not.[10]

---

[9]Andrea Noble, *Lawmakers grudgingly draft bill to authorize concealed carry of guns in D.C.*, Washington Times, Sept. 17, 2014, available at http://www.washingtontimes.com/news/2014/sep/17/lawmakers-grudgingly-introduce-bill-authorize-conc/?page=1 (last visited Sept. 24, 2014).

[10]To be sure, Plaintiffs do not suggest that fundamental constitutional rights are subject to veto by any official or body, however composed.

Beyond its flawed composition, and the fact that the Board must apply the same right-denying guidelines exercised by the Chief, another problem lies in that the Board's rules place all the burdens upon the citizen. But it is well-established that *the government*, not the individual, must sustain a burden of proof appropriate for deprivation of fundamental rights. "[A] constitutional prohibition cannot be transgressed indirectly by the creation of a statutory presumption any more than it can be violated by direct enactment. The power to create presumptions is not a means of escape from constitutional restrictions." *Speiser* v. *Randall*, 357 U.S. 513, 526 (1958) (citation omitted).

Defendants' licensing regime simply cannot be squared with the Court's opinion and order, which anticipate ordinary people being able to access a right rooted in self-defense.

This Court is not alone in precluding the illusory licensing mechanism Defendants have adopted. Three courts have struck down this level of licensing discretion as being incompatible with a right to bear arms. *Peruta*, supra, 742 F.3d 1144; *Schubert* v. *De Bard*, 398 N.E.2d 1339 (Ind. App. 1980); *People* v. *Zerillo*, 219 Mich. 635, 189 N.W. 927 (1922). A fourth court indicated, albeit in dicta, that such a licensing scheme would be unconstitutional. *Mosby* v. *Devine*, 851 A.2d 1031 (R.I. 2004). And although three courts have upheld "may issue" licensing schemes, one of these agreed with Plaintiffs' essential point that such a scheme is incompatible with the right's existence. *Compare Drake* v. *Filko*, 724 F.3d 426 (3d Cir. 2013) (may issue scheme is evidence that right was unknown) and *Woollard* v. *Gallagher*, 712 F.3d 865 (4th Cir. 2013) (right to carry assumed); *Kachalsky* v. *Cnty. of Westchester*, 701 F.3d 81 (2d Cir. 2012) (same).

*Peruta* addressed San Diego County's "good cause" policy for the issuance of handgun carry permits. Memorandum Decision & Order, Dkt. 51, at 9 n.2. The *Peruta* appellants "place[d]

one argument at center stage . . . that by defining 'good cause' in San Diego County's permitting scheme to exclude a general desire to carry for self-defense, the County impermissibly burdens their Second Amendment right to bear arms." *Peruta*, 742 F.3d at 1149. Specifically, San Diego County defined "good cause" as

> "[A] set of circumstances that distinguish the applicant from the mainstream and causes him or her to be placed in harm's way." Good cause is "evaluated on an individual basis" and may arise in "situations related to personal protection as well as those related to individual businesses or occupations." But—important here—concern for "one's personal safety alone is not considered good cause." . . . If the applicant cannot demonstrate "circumstances that distinguish [him] from the mainstream," then he will not qualify for a concealed-carry permit.

*Peruta*, 742 F.3d at 1148. "Given this requirement, the 'typical' responsible, law-abiding citizen in San Diego County cannot bear arms in public for self-defense; a *typical* citizen fearing for his 'personal safety'—by definition—cannot '*distinguish [himself] from the mainstream*.'" *Id*. at 1169.

This Court held that *Peruta* "addressed statutes very similar to the ones at issue in this case," Memorandum Decision & Order, Dkt. 51, at 9, and indeed, there is no now practical daylight between San Diego County's "good cause" policies and Defendants' "good reason/special need" and "proper reason" guidelines. Moreover, in *Peruta*, as here, a license to carry a concealed handgun was the exclusive legal mode of bearing arms. The legal regime, as a whole, did "not cover the scope of the right, which includes the right to carry *in case of public confrontation* . . . ." *Peruta*, 742 F.3d at 1169. The Second Amendment "is, in effect, destroyed when exercise of the right [to bear arms] is limited to a few people, in a few places, at a few times." *Id*. at 1170.

"A statute which, under the pretence of regulating, amounts to a destruction of the right . . . would be clearly unconstitutional." *Id*. (quoting *Heller*, 554 U.S. at 629); *State* v. *Reid*, 1 Ala. 612,

616-17 (1840). "*Heller* teaches that a near-total prohibition on keeping arms (*Heller*) is hardly better than a near-total prohibition on bearing them (this case), and vice versa. Both go too far." *Peruta*, 742 F.3d at 1170.

In *Schubert*, the Indiana Court of Appeals rejected a licensing official's claim that a statutory "proper reason" requirement allowed him to reject handgun carry license applications for an applicant's insufficient self-defense interest. The court rejected the notion that the licensing official had "the power and duty to subjectively evaluate an assignment of 'self-defense' as a reason for desiring a license and the ability to grant or deny the license upon the basis of whether the applicant 'needed' to defend himself." *Schubert*, 398 N.E.2d at 1341.

> Such an approach contravenes the essential nature of the constitutional guarantee. It would supplant a right with a mere administrative privilege which might be withheld simply on the basis that such matters as the use of firearms are better left to the organized military and police forces even where defense of the individual citizen is involved.

*Id.* (footnote omitted).

In *Zerillo*, Michigan's Supreme Court struck down a statute prohibiting aliens from possessing revolvers without their Sheriff's consent. There, too, the licensing discretion was viewed as a destruction of a constitutional right to bear arms. "The exercise of a right guaranteed by the Constitution cannot be made subject to the will of the sheriff. The part of the act under which the prosecution was planted is not one of regulation but is one of prohibition and confiscation." *Zerillo*, 219 Mich. at 639, 189 N.W. at 928. "The [provision] making it a crime for an unnaturalized, foreign-born resident to possess a revolver, unless so permitted by the sheriff, contravenes the guaranty of such right in the Constitution of the State and is void." *Id.* at 642, 189 N.W.2d at 928.

Albeit in dicta, Rhode Island's Supreme Court was in accord:

[T]his Court will not countenance any system of permitting . . . that would be committed to the unfettered discretion of an executive agency. . . One does not need to be an expert in

> American history to understand the fault inherent in a gun-permitting system that would allow a licensing body carte blanche authority to decide who is worthy of carrying a concealed weapon. The constitutional right to bear arms would be illusory, of course, if it could be abrogated entirely on the basis of an unreviewable unrestricted licensing scheme.

*Mosby*, 851 A.2d at 1050.

The Third Circuit's opinion upholding such a licensing regime is also instructive. *Drake* reasoned that 1913 and 1924 state laws mirroring Defendants' practice are "longstanding" and thus evidence that the carrying of handguns itself falls outside the Second Amendment's scope. *Drake*, 724 F.3d at 433-34. Of course, *Drake* cannot be right on this point. "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Heller*, 554 U.S. at 634-35. But *Drake* is essentially correct in acknowledging that a "justifiable need" licensing standard is not compatible with the concept of a right.

The notion that a right is destroyed, and thus violated, by schemes that allow authorities the discretion to determine whether an individual is entitled to exercise the right, is hardly limited to the right to bear arms. Recently, for example, Arizona barred abortion at 20 weeks of gestation absent a doctor's certificate of "medical emergency," invoking "documented risks to women's health and the strong medical evidence that unborn children feel pain during an abortion at that gestational age." Ariz. H.B. 2036 § 9(B)(1), (2012), available at http://www.azleg.gov/legtext/50leg/2r/bills/hb2036s.pdf, archived at http://perma.cc/KA77-TMQ8 (last visited Oct. 1, 2014). The Ninth Circuit did not defer to the legislature's oversight of the medical profession, or the expert medical judgment of each doctor under the circumstances of each case.

> Allowing a *physician* to decide if abortion is medically necessary is not the same as allowing a *woman* to decide whether to carry her own pregnancy to term. Moreover, regulations involve limitations as to the mode and manner of abortion, not preclusion of the choice to terminate a pregnancy altogether.

20

*Isaacson* v. *Horne*, 716 F.3d 1213, 1217 (9th Cir. 2013).

Adapted to present circumstances, the holding would read:

Allowing *Defendant Lanier* to decide if carrying a handgun is necessary for self-defense is not the same as allowing *Amy McVey* to decide whether to carry her handgun. Moreover, regulations involve limitations as to the mode and manner of carrying handguns, not preclusion of the choice to carry a handgun altogether.

The Ninth Circuit continued, explaining that "[t]he presence of a medical exception does not make an otherwise impermissible prohibition constitutional. The adequacy of the medical exception has no bearing on whether the prohibition is permissible in the first place." *Id.* at 1227. Likewise, here, the presence of a "good reason" exception does not make constitutional the prohibition on bearing arms for the core purpose of self-defense. In *Isaacson*, a woman may not have had grounds for a medical exception, but she had Supreme Court precedent securing post-20 week abortions. Plaintiffs here plainly lack a "good" or "proper" reason, but they have a right to carry handguns for self-defense. Of course, the D.C. City Council would never prohibit abortions in this manner (or create databases to better ostracize and harass women who have had abortions), but that is only because councilmembers personally favor that right.

III.   DEFENDANTS' REVIVED LICENSING REGIME IMPOSES AN IMPERMISSIBLE PRIOR RESTRAINT.

Although *Peruta*, *Zerillo*, *Schubert*, *Mosby* and *Isaacson* did not expressly say as much, the common-sense proposition that a right becomes something else, of lesser stature, if it exists only at the government's pleasure, has an established legal definition:

It is settled by a long line of recent decisions of this Court that an ordinance which . . . makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official—is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms.

*Staub* v. *City of Baxley*, 355 U.S. 313, 322 (1958) (citations omitted). Indeed, long before *Heller*,

21

Prof. Powe reasoned that "[p]ossibly the Second Amendment can best be understood to incorporate a common law rule against prior restraints." L.A. Powe, Jr., *Guns, Words, and Constitutional Interpretation*, 38 Wm. & Mary L. Rev. 1311, 1384 (1997); see also *id.* at 1402 ("the rule against prior restraints offers a sound meaning [for the Second Amendment]").

Some authorities have erroneously asserted that prior restraint is exclusively a First Amendment doctrine, and on that ground hesitated to extend it to the Second Amendment context. See, *e.g.*, *Kachalsky*, 701 F.3d at 91-92. But courts "have already begun to adapt First Amendment doctrine to the Second Amendment context." *Ezell*, 651 F.3d at 706-07 (citations omitted); see also *Parker* v. *District of Columbia*, 478 F.3d 370, 399 (D.C. Cir. 2007). And as the right to bear arms stands among "the freedoms which the Constitution guarantees," *Staub*, 355 U.S. at 322, Defendants' "good reason"/"proper reason" requirement is among the impermissible "illusory 'constraints'" on licensing discretion amounting to "little more than a high-sounding ideal." *City of Lakewood* v. *Plain Dealer Publishing Co.*, 486 U.S. 750, 769-70 (1988); see, *e.g. Largent* v. *Texas*, 318 U.S. 418, 422 (1943) (striking down ordinance allowing speech permit where mayor "deems it proper or advisable"). It is not that Plaintiffs merely dislike the "standard." Plaintiffs dislike the "standard" because it is meaningless, and effectively supplants their *entitlement* to exercise a fundamental right for the purpose of self-defense with an administrative privilege dispensed at the Chief's boundless discretion.

> The existence of standards does not in itself preclude a finding of unbridled discretion, for the existence of discretion may turn on the looseness of the standards or the existence of a condition that effectively renders the standards meaningless as to some or all persons subject to the prior restraint.

*Beal* v. *Stern*, 184 F.3d 117, 126 n.6 (2d Cir. 1999).

IV.     THE DISTRICT'S LICENSING REGIME WOULD FAIL ANY LEVEL OF MEANS-ENDS SCRUTINY.

Assuming the revived licensing regime were subjected to the familiar "two-step" process, the

Court could not balance interests to determine whether there *should* be a right to bear arms.

Certainly the Court could not hold that a right inherently contradicts the public interest, the odd

implication of decisions such as *Kachalsky* and *Woollard*. While crediting the government's public

safety interest, the Court could not credit an interest in suppressing the right, as that would

essentially have the Court engage in the sort of interest-balancing *Heller* precluded. See *Peruta*, 742

F.3d at 1176-77.

Nor is the "good reason/special need/proper reason" regime adequately tailored to the public

safety rationale under any level of scrutiny. This licensing "standard" is not directed at dangerous

people, nor does it regulate the manner of carrying handguns, or impose any sensitive place

restrictions. It amounts to nothing more than a rationing system. See *Peruta*, 742 F.3d at 1177-78.

Courts have had little trouble striking down safety-based firearms laws that do not focus on

dangerousness. For example, the District of Massachusetts struck down a state law barring lawful

resident aliens from possessing guns "regardless of whether intermediate scrutiny or strict scrutiny

applies." *Fletcher* v. *Haas*, 851 F. Supp. 2d 287, 303 (D. Mass. 2012).

> [T]he statute here fails to distinguish between dangerous non-citizens and those non-citizens
> who would pose no particular threat if allowed to possess handguns. Nor does it distinguish
> between temporary non-immigrant residents and permanent residents. Any classification
> based on the assumption that lawful permanent residents are categorically dangerous and
> that all American citizens by contrast are trustworthy lacks even a reasonable basis.

*Id.* And applying strict scrutiny, the Eastern District of North Carolina struck down, inter alia, laws

barring handgun carrying during so-called "states of emergency," finding the laws

> do not target dangerous individuals or dangerous conduct. Nor do they seek to impose
> reasonable time, place and manner restrictions by, for example, imposing a curfew to allow
> the exercise of Second Amendment rights during circumscribed times. Rather, the statutes

23

here excessively intrude upon plaintiffs' Second Amendment rights by effectively banning them (and the public at large) from engaging in conduct that is at the very core of the Second Amendment at a time when the need for self-defense may be at its very greatest . . . .

*Bateman* v. *Perdue*, 881 F. Supp. 2d 709, 716 (E.D.N.C. 2012).

Plaintiffs have no objection to standards that are actually aimed at ferreting out dangerous and irresponsible people, and which do not trample on rights in the process of so doing. But rationing the right only to those whom the Chief believes are especially deserving violates individual rights without advancing any legitimate government interest.

V.    THE COURT SHOULD ACCEPT THE CITY COUNCIL'S COMMITMENT TO OBSTRUCTING THE RIGHT TO BEAR ARMS AT FACE VALUE.

Defendants could theoretically thread the jurisdictional needle in simultaneously arguing that their recent legislation complies with the Court's order (although plainly it does not), while preserving their right of appeal. On the latter point, they need only convince the D.C. Circuit that the City Council would overturn its illusory licensing scheme at the first opportunity upon a successful appeal. If the City Council has done anything, it has left a videotaped record replete with evidence that this is precisely what it would do if given the chance. *Northeastern Fla.*, 508 U.S. at 662 (citing *City of Mesquite* v. *Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)); *compare National Black Police Ass'n* v. *District of Columbia*, 108 F.3d 346, 349 (D.C. Cir. 1997) ("[t]here is no evidence in the record to suggest that the D.C. Council might repeal the new legislation and reenact strict contribution limits. The Council has not 'announced … such an intention'") (citing *Mesquite*, 455 U.S. at 289 n.11).

But the City could have also maintained its appellate option by making the same vow upon enacting a "shall issue" licensing scheme that complies with this Court's judgment. Defendants' unyielding hostility to the right to bear arms, and their commitment to appealing their loss here, only

24

serve to underscore their intent to obstruct and frustrate the carrying of defensive handguns to the greatest possible extent. It is not difficult to view the illusory licensing regime in that light.

CONCLUSION

Defendants have failed to comply with this Court's judgment. By its own terms, the injunction against enforcement of D.C. Code § 22-4504(a), notwithstanding its technical amendment, should remain in place. If the minor alterations to the enjoined provision require a new injunction, that injunction should be issued now.

Dated: October 2, 2014     Respectfully submitted,

             Alan Gura (D.C. Bar No. 453449)
             Gura & Possessky, PLLC
             105 Oronoco Street, Suite 305
             Alexandria, VA 22314
             703.835.9085/Fax 703.997.7665

          By: /s/ Alan Gura       
             Alan Gura
             Attorney for Plaintiffs