## UNITED STATES DISTRICT COURT
## OF THE DISTRICT OF COLUMBIA

_____

)
**TOM G. PALMER,** *et al.*              )
                                   )
               **Plaintiffs,**      )
                                   )
     **v.**                          )          **Civil Action No. 09-01482 (FJS)**
                                   )
**DISTRICT OF COLUMBIA,** *et al.*,     )
                                   )
               **Defendants.**      )
_____)

### DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
### IN OPPOSITION TO
### PLAINTIFFS' MOTION FOR PERMANENT INJUNCTION

Defendants (collectively, "the District"), by and through undersigned counsel, hereby submit this Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Permanent Injunction, in accordance with LCvR 7(b). A proposed Order denying the requested relief has also been provided.

Plaintiffs' motion for another injunction, after they have already secured a permanent injunction on the claims raised in the original Complaint, must be denied because this case is over. Plaintiffs' motion is procedurally improper; the Court should not reach the merits of their challenge.

Plaintiffs are now complaining about a statute that did not exist when their Complaint was filed. Plaintiffs have not sought to comply with the new law, have not exhausted the administrative remedies created by the new statute, and have not brought a cognizable challenge to the recently passed legislation.

After plaintiffs have exhausted their administrative remedies, they may, if they wish, bring a separate suit, but they have no right to attempt to amend their Complaint after having obtained the final relief they sought in their original suit.

Defendants are entitled to pursue an appeal in the Circuit of this Court's final rulings that have already been rendered in this case. That appeal should not be encumbered by a premature challenge to an entirely different law that the District has passed.

Plaintiffs' motion should be denied as untimely, having been filed after a final judgment was entered by this Court, and where no further issues remain to be included within the defendants' appeal as of right. Plaintiffs have gotten all the relief they asked for.

The Court's Order enjoins the District from prohibiting the public carrying of firearms "unless and until such time as the District of Columbia adopts a licensing mechanism consistent with constitutional standards enabling people to exercise their Second Amendment right to bear arms." Order at 16. Notwithstanding that the Court left that important phrase undefined, the District has complied with the Court's direction to adopt such a "licensing mechanism," with key features that have been upheld by no less than three (3) United States Circuit Courts of Appeal.[1]

Plaintiffs cannot use their instant motion, in the guise of a request for a permanent injunction, to "enforce" the Order, because the District has changed the law. If plaintiffs are unhappy with the new regime, they need to file a new lawsuit.

Other plaintiffs elsewhere have tried to do the same thing, *i.e.*, tried to challenge a new law enacted after a Second Amendment challenge. Courts have universally rejected such challenges, as should this Court. *See, e.g., Nat'l Rifle Ass'n v. Chicago*, 393 Fed.Appx. 390, *1

---

[1]     *Kachalsky v. County of Westchester*, 701 F.3d 81 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 1806 (2013); *Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013), *cert. denied*, 134 S. Ct. 422 (2013); *Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013), *cert. denied*, 134 S. Ct. 2134 (2013).

(7th Cir. 2010) ("Plaintiffs are entitled to pursue those contentions in new suits. The subject matter of this litigation, however, no longer exists."); *Shepard v. Madigan*, 958 F.Supp.2d 996, 1000 (S.D. Ill. 2013) ("[T]o the extent that plaintiffs now challenge the [new law], that challenge is a matter which *must* be considered in a new lawsuit[.]") (emphasis in original); *Queen v. Alvarez*, 979 F.Supp.2d 845, 849–50 (N.D. Ill. 2013) (dismissing challenge to Illinois' ban on public carrying of firearms, after enactment of new law).

## I. Background

On August 6, 2009, plaintiffs filed their Complaint in this matter, pursuant to 42 U.S.C. § 1983, alleging, *inter alia*, that the "Defendants' laws, customs, practices and policies generally banning the carrying of handguns in public violate the Second Amendment to the United States Constitution, facially and as applied[.]" Complaint ¶ 40. In their Prayer for Relief, plaintiffs sought an order permanently enjoining the District from enforcing D.C. Official Code § 7-2502.02(a)(4). *See* Complaint at 9. Plaintiffs also sought an order permanently enjoining the District from enforcing D.C. Official Code § 22-4504(a) "or, in the alternative, [an order] ordering defendants to issue licenses to carry handguns to all individuals who desire such licenses and who have satisfied the existing requirements, aside from the residence requirements, for the registration of a handgun[.]" Complaint at 9. Plaintiffs also sought an order permanently enjoining the District "from denying firearm registration and handgun carry permit applications made by otherwise qualified individuals on account of lack of residence within the District of Columbia[.]" *Id*.

By Memorandum-Decision and Order dated July 26, 2014 ("Order"), the Court determined that the Second Amendment protects "the carrying of an operable handgun outside

the home for the lawful purpose of self-defense . . . ." Order at 14 (quoting *Peruta v. Cnty. of San Diego*, 742 F.3d 1144, 1166 (9th Cir. 2014)).[2] The Court subsequently concluded that "the District of Columbia's complete ban on the carrying of handguns in public is unconstitutional." *Id*. at 16. The Court permanently enjoined the defendants "from enforcing the home limitations of D.C. Code § 7-2502.02(a)(4) and enforcing D.C. Code § 22-4504(a) unless and until such time as the District adopts a licensing mechanism consistent with constitutional standards enabling people to exercise the Second Amendment right to bear arms." *Id.* (citation omitted).[3]

On September 23, 2014, the Council of the District of Columbia voted unanimously to pass Bill 20-926, the License to Carry a Pistol Emergency Amendment Act of 2014 ("the Emergency Act"). *See* http://lims.dccouncil.us/Legislation/B20-0926?FromSearchResults=true (all websites last visited as of Oct.20, 2014 unless otherwise noted).[4] The bill was signed by the Mayor on October 9, became effective on signing, and will remain effective for 90 days as emergency legislation. *See* Exhibit No. 1; D.C. Official Code § 1-204.12(a) (2014 Supp.).

---

[2]     The State of California has moved to intervene in *Peruta*, and a petition for rehearing *en banc* has been filed. *See* Docket, *Peruta v. County of San Diego*, No. 10-56971 (9th Cir.) (available online at *http://www.ca9.uscourts.gov/content/view.php?pk_id=0000000722*).

[3]     Thereafter, on Defendants' Partial Consent Motion, the Court stayed its Order until October 22, 2014. Doc. No. 53. The Court subsequently denied the Defendants' Motion to Stay Pending Appeal, Doc. No. 66, and, after hearing argument, denied the Defendants' Motion for Reconsideration. *See* Minute Entry (Oct. 17, 2014).

[4]     The text of the legislation may be found at *http://lims.dccouncil.us/_layouts/15/uploader/Download.aspx?legislationid=32566&filename=B 20-0926-Enrollment.pdf*. On October 7, 2014, the Council passed the License to Carry a Pistol Emergency Clarification Amendment Act of 2014, Bill 20-965, to delete Section 4 ("Applicability") from the Emergency Act, which had caused "confusion for prosecutors and law enforcement." P.R. 20-1070, the License to Carry a Pistol Clarification Emergency Declaration Resolution of 2014 (available online at *http://lims.dccouncil.us/_layouts/15/uploader/ Download.aspx?legislationid=32659&filename=PR20-1070-Introduction.pdf*). *See* Exhibit No. 1 (copy of enrolled versions of the Emergency Act and the License to Carry a Pistol Emergency Clarification Amendment Act of 2014).

The Council has also introduced permanent legislation, the "License to Carry a Pistol Amendment Act of 2014," Bill 20-930, which was referred to the Committee on the Judiciary and Public Safety. *See* http://lims.dccouncil.us/Legislation/B20-0930?FromSearchResults=true. The permanent legislation will be subject to the requirements of all non-emergency legislation under the Home Rule Act, *i.e.*, it "shall be read twice in substantially the same form, with at least 12 days intervening between each reading." *See* D.C. Official Code § 1-204.12(a).[5] The Council conducted a public hearing on the permanent legislation on October 16, 2014. *See* 61 D.C. Reg. 9791 (Sep. 26, 2014).

The legislation establishes a regime for granting licenses to carry concealed handguns in the District. It sets forth, *inter alia*, substantive requirements for applicants, including training in firearm safety, usage, and storage. Emergency Act, § 2(e) (adding a new Title IX, §§ 901–910, to the Firearms Control Regulations Act of 1975, *codified as amended at* D.C. Official Code §§ 7-2501.01 *et seq.*). The legislation requires that applicants for a license must show "a good reason to fear injury to his or her person, which shall at a minimum require a showing of a special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks which demonstrate a special danger to the applicant's life[.]" *Id.*, § 910(a)(1)(A) (*to be codified at* D.C. Official Code § 7-2509.10(a)(1)(A)).

The Emergency Act also establishes a process by which non-residents may obtain a concealed-carry license. *Id.*, § 3(b). The law also creates a Concealed Pistol Licensing Review Board, with five (5) members to be appointed by the Mayor, the Attorney General for the District of Columbia, the United States Attorney, and the Chief Judge of the Superior Court, to review

---

[5]     *See, e.g., United States v. Alston*, 580 A.2d 587, 590–91 (D.C. 1990) (discussing differences between emergency, temporary, and permanent legislation).

appeals of license denials or revocations. *Id.*, § 908. The law also establishes a list of prohibited places and circumstances where concealed weapons cannot be carried—locations where firearms have traditionally been prohibited, such as government buildings, public transportation, premises where alcohol is sold and served, schools and universities, and in circumstances where protection of public officials, visiting dignitaries, and demonstrators is paramount. *Id.*, § 907. The law also requires the Chief to issue, by October 22, 2014, "rules to implement the provisions of this act[.]" *Id.* MPD intends to issue a Notice of Emergency and Proposed Rulemaking on or before the expiration of the Court's stay on October 22, 2014, and post detailed application instructions on the MPD website.

On October 2, 2014, plaintiffs filed their Motion for Permanent Injunction ("Motion"), seeking an order permanently enjoining the District from enforcing D.C. Official Code § 22-4504(a) as amended by the Emergency Act. Plaintiffs argue, *inter alia*, that the new legislation "merely reformulates" the District's previous practice enjoined by the Court, constitutes an impermissible "prior restraint," and violates the Second Amendment under "any level of means-ends scrutiny." Plaintiffs are incorrect on each of these theories.

## II. Argument

The Court should reject plaintiffs' Motion—it is procedurally improper. Plaintiffs have argued from the very beginning here that this case is about a complete "ban on the bearing of arms." Doc. No. 5-2 at 1. Plaintiffs are now trying to change the case, but the Court should not allow it.

The District has complied fully with the Court's judgment; it has amended District law to create a licensing mechanism consistent with the Second Amendment to allow the public,

concealed-carrying of handguns. The Court's Order did not direct the District to take any specific action, but prohibited the District from enforcing the absolute prohibition on the public carrying of concealed weapons without a license.

Although the Court should not reach the merits of plaintiffs' challenge here, the new law withstands Second Amendment scrutiny. Plaintiffs' *pro forma*, inappropriate motion should be denied.

1. *Plaintiffs' Motion is Procedurally Improper.*

This case has been finally decided. The District's Motion for Reconsideration was denied on Friday, October 17, 2014. Plaintiffs have obtained *everything* they asked for in their Complaint. To challenge the District's *new* licensing scheme, plaintiffs must file a *new* complaint. They should not be allowed to shoehorn new claims about a brand-new licensing scheme for carrying concealed weapons in public—a significant change in District law by any standard—into a five-year-old complaint which focused on the District's then-total ban on the public carrying of handguns.

Importantly, even though this Court should not reach the merits under the umbrella of this pending lawsuit, any challenge to the new licensing scheme would be premature as is plaintiffs' request for relief; no plaintiff here has applied for, much less been denied (and subsequently appealed), a public-carry license. *See, e.g., Hidalgo v. FBI*, 344 F.3d 1256, 1258 (D.C. Cir. 2003) ("Exhaustion of administrative remedies is generally required before filing suit in federal court so that the [government] has an opportunity to exercise its discretion and expertise on the matter and to make a factual record to support its decision.") (quoting *Oglesby v. United States Dep't of the Army*, 920 F.2d 57, 61 (D.C. Cir. 1990)); *ABA, Inc. v. District of*

*Columbia*, ___ F.Supp.2d ___, 2014 WL 1863944, *13 (D.D.C. May 9, 2014) ("The assertion of

a constitutional right does not excuse exhaustion.") (citing *Wallace v. Lynn*, 507 F.2d 1186, 1190

(D.C. Cir. 1974) and *Marine Mammal Conservancy v. Dep't of Agriculture*, 134 F.3d 409, 413

(D.C. Cir. 1998)).

Plaintiffs seek injunctive relief on a new claim, but have not applied for licenses under

the new law; well-settled law mandates that a claim of irreparable injury "must be certain and

great; it must be actual and not be theoretical." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674

(D.C. Cir. 1985) (*per curiam*). *See also, e.g., Wash. State Grange v. Wash. State Republican

Party*, 552 U.S. 442, 450 (2008) (noting "the fundamental principle of judicial restraint that

courts should neither anticipate a question of constitutional law in advance of the necessity of

deciding it nor formulate a rule of constitutional law broader than is required by the precise facts

to which it is to be applied" (citations and internal quotation marks omitted)).[6]  Plaintiffs have

not met this standard and thus their request for relief must fail.

Indeed, a court should be particularly careful about exercising its authority to strike down

a law under the Constitution, especially in a circumstance like the present, *i.e.*, an emergency law

with obvious and undisputed public safety concerns, where the legislature is still working on the

permanent legislation and the legislative record is still being developed, and the parties have had

an abbreviated time to brief the matter.[7] Plaintiffs' instant motion is procedurally improper and it

---

[6]     *See also id.* ("[W]e must be careful not to go beyond the statute's facial
requirements and speculate about "hypothetical" or "imaginary" cases."). "The State has had no
opportunity to implement [the new law], and its courts have had no occasion to construe the law
in the context of actual disputes arising from the [specific] context, or to accord the law a
limiting construction to avoid constitutional questions." *Id*.

[7]     *See, e.g., Salazar v. Buono*, 559 U.S. 700, 714–15 (2010) ("Because injunctive
relief "is drafted in light of what the court believes will be the future course of events, . . . a court
must never ignore significant changes in the law or circumstances underlying an injunction lest

would be equally improper for the Court to proceed along the path chosen by plaintiffs.[8]

"Litigants are . . . not entitled to an adjudication of every question they perceive after reading

through the text of legislation." *National Family Planning & Reproductive Health Ass'n v.*

*Gonzalez*, 468 F.3d 826, 829 (D.C. Cir. 2006) (quoting *American Library Ass'n v. Barr*, 956

F.2d 1178, 1197 (D.C. Cir. 1992)). *See also Gonzalez v. Carhart*, 550 U.S. 124, 168 (2007) ("It

is neither our obligation nor within our traditional institutional role to resolve questions of

constitutionality with respect to each potential situation that might develop.").

> A party has standing to challenge the constitutionality of a statute only insofar as
> it has an adverse impact on his own rights. As a general rule, if there is no
> constitutional defect in the application of the statute to a litigant, he does not have
> standing to argue that it would be unconstitutional if applied to third parties in
> hypothetical situations.

---

the decree be turned into an 'instrument of wrong.'") (citations omitted). *See also Full Value Advisors, LLC v. SEC*, 633 F.3d 1101, 1106–1107 (D.C. Cir. 2011) ("Prudence, however, 'restrains courts from hastily intervening into matters that may best be reviewed at another time or in another setting, especially when the uncertain nature of an issue might affect a court's "ability to decide intelligently."' This is especially true when the issue is one of constitutional import.") (citations omitted). Plaintiffs' instant challenge is premature, where they have yet to actually seek to obtain a license under the new regime, let alone be rejected. *See id.* at 1107 ("A claim is not ripe where the "possibility that further consideration will actually occur before [implementation] is not theoretical, but real.") (quoting *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 735 (1998)).

[8]     Moreover, because no applications have yet been accepted or processed under the new licensing regime, plaintiffs' instant motion is a facial challenge. *See, e.g., Colorado v. Hill*, 530 U.S. 703, 710 (2000) ("Because the statute had not actually been enforced against petitioners, . . . they only raised a facial challenge."). It remains axiomatic that "[a] facial challenge to a legislative Act is . . . the most difficult to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). If the First Amendment is not implicated, a party can demonstrate that a statute is facially invalid *only* by showing that it is unconstitutional in all of its applications. *See, e.g., Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 699–700 (1995). "[A] facial challenge must fail where the statute has a "'plainly legitimate sweep.'" *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 739–40 & n.7 (1997) (Stevens, J., concurring in judgments)).

*County Court of Ulster County, N.Y. v. Allen*, 442 U.S. 140, 154–55 (1979) (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973)).

To the extent plaintiffs seek to challenge the District's newly enacted scheme, they must file a new lawsuit. *See Fund for Animals v. Norton*, 390 F.Supp.2d 12, 15 (D.D.C. 2005) ("While plaintiffs' motion is styled as one to 'enforce' the Court's [previous] Order [striking an agency Rule], it is in essence a challenge to the [new agency Rule]. Consequently, the proper avenue for plaintiffs' arguments is a new lawsuit challenging the validity of the [new agency Rule]."). Indeed, as noted earlier, numerous courts have held that plaintiffs cannot seek *new* injunctions related to, but not encompassed by, their original complaints after they have obtained all the declaratory and injunctive relief they sought. *See Nat'l Rifle Ass'n*, 393 Fed.Appx. 390 at *1; *Shepard*, 958 F.Supp.2d at 1000; *Queen*, 979 F.Supp.2d at 849–50. *Cf. Nat'l Mining Ass'n v. United States Dep't of Interior*, 251 F.3d 1007, 1011 (D.C. Cir. 2001) ("The old set of rules, which are the subject of this lawsuit, cannot be evaluated as if nothing has changed. A new system is now in place.") (citing, *inter alia*, *Kremens v. Bartley*, 431 U.S. 119, 129 (1977) ("[Plaintiffs'] concerns were eradicated with the passage of the new Act[.]")).

The Defendants note that plaintiffs do not cite any rule authorizing the motion they filed; to the extent they sought to file a motion pursuant to Rule 59 or 60, they should do so directly instead of attempting to continue the earlier case. *See, e.g., Fox v. District of Columbia*, 923 F.Supp.2d 302, 305 (D.D.C. 2013) ("A motion for reconsideration 'is not a vehicle for bringing before the Court theories or arguments that were not earlier advanced.' Nor is it an appropriate place to make a new claim that is not in the complaint or to make a motion to amend the complaint.") (quoting *Graves v. United States*, 967 F.Supp. 572, 573 (D.D.C. 1997)).

2. *Plaintiffs' Challenge to the New Law is Not Appropriately Subject to Review in this Case.*

Plaintiffs argue that the Districts' "intent" is to "reinstate" the old categorical ban on public carrying. P.Mot. at 4. This is incorrect; to the extent the political branches referenced the previous statutory language in a press release, it was simply for the proposition that the Chief must find "good reason" to issue a concealed-carry license, a standard nearly identical to that upheld in New York, Maryland, and New Jersey, as explained elsewhere herein. Contrary to plaintiffs' arguments, the Emergency Act is not a "mere reformulation" of the previous ban, but a sea change in the underlying regime, setting forth detailed and clear standards for the licensure of those persons who want to carry a concealed weapon in public. The District will now issue such licenses, where it did not before.[9]

Generally, a government's substantial amendment or repeal of a stricken statute will end a trial court's constitutional challenge to it where, as here, plaintiffs seek only declaratory and injunctive relief. *Northeastern Fl. Ch. of the Assoc. Gen'l Contractors of Am. v. Jacksonville*, 508 U.S. 656, 662 & n.3 (1993). *See also Daskalea v. Wash. Humane Soc'y*, 710 F.Supp.2d 32, 40 (D.D.C. 2010) (citing *Nat'l Black Police Ass'n v. District of Columbia*, 108 F.3d 346, 349 (D.C. Cir. 1997)).

Because of the District's enactment of the Emergency Act "the prior version of the statute is 'no longer in force' and there is no allegation that the pre-amendment provisions 'continue to have any residual effect.'" *Daskalea*, 710 F.Supp.2d at 40 (quoting *Nat'l Black Police*, 108 F.3d at 350)). Thus, the declaratory and injunctive relief sought by plaintiffs has already been secured

---

[9]    Although plaintiffs imply otherwise, this Court did not strike down any particular "standard" for the grant of concealed-carry licenses, but the District's "complete ban on the carrying of handguns in public[.]" Order at 16. To the extent that "good reason" remains undefined in the District, its subsequent interpretation will be informed (and cabined) by relevant Second-Amendment case law—none of which existed in 1931 (or even 1994). *See* P.Mot. at 4.

in this Court and the district court phase of this case will be over once the Court issues a written decision on the District's motion for reconsideration.

The instant motion cannot be used to challenge an entirely different legislative and regulatory scheme; because plaintiffs have failed to exhaust the remedies set forth in that scheme, their instant challenge is premature.

In *Nat'l Rifle Ass'n*, the defendant municipalities, as a result of *McDonald v. Chicago*, 561 U.S. 742 (2010), repealed their challenged firearms ordinances. The plaintiffs argued that, despite this, "the new ordinances enacted to supersede the ones challenged in these suits have constitutional flaws." 393 Fed.Appx. 390, at *1. However, the Seventh Circuit directed that the case be dismissed. *Id.*

Similarly, in *Shepard v. Madigan*, the plaintiffs contended that the new law passed by Illinois as a result of the Seventh Circuit's decision in *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) did not comport with that decision or the Second Amendment. The court rejected plaintiffs' "motion for declaration of unconstitutionality and for a preliminary and/or permanent injunction[:]"

> Here, with the passage of the Firearm Concealed Carry Act, the State of Illinois has given plaintiffs what they sought in the lawsuit filed in this Court. Illinois now has ended the per se ban on the right to carry a concealed firearm. Plaintiffs' constitutional challenge was based on that ban, asserting that their Second Amendment rights were being violated by the ban. The relief they received from the Seventh Circuit was exactly what they sought, a declaration of the unconstitutionality of that law. And, as a result of that ruling by the Court of Appeals, the State of Illinois has now passed legislation which provides for the right, once the permitting process is completed, for plaintiffs to receive a permit from the State to carry a concealed firearm.
>
> [T]he Court of Appeals recognized that the new law should have "reasonable limitations, consistent with public safety," but the court left the determination of what those measures should be to the State. Whether the public safety measures set out in the new Act are reasonable is a new claim, not subject to review in this cause of action.

958 F.Supp.2d at 1000–1001 (emphasis in original).

So too here: The Court has given plaintiffs *exactly* what they sought in this suit—a declaration of the unconstitutionality of the District's prohibition on the public carrying of handguns. As a result of that declaration, the District moved swiftly to pass new legislation to end that prohibition and create a detailed licensing scheme. If plaintiffs believe the new scheme does not comport with the Second Amendment, they may file a new suit. They may not challenge the new legislation via an "enforcement" motion in the instant suit. *See also, e.g., Queen*, 979 F.Supp.2d at 850 ("[B]ecause the [Illinois Firearms Concealed Carry Act] is a new statute, any challenge to its provisions . . . is a new challenge and requires a new lawsuit."). Any such challenge to the District's new law is "not subject to review in this" case. *Shepard*, 958 F.Supp.2d at 1001.

Instead, plaintiffs—if they seek to validly challenge the new law—need to first attempt to obtain licenses under the new regime and, if they are dissatisfied with the outcome, they may then have the right to seek relief in a case in this Court. That challenge is not cognizable in this case, or before their attempts at exhaustion. *See, e.g., Hidalgo*, 344 F.3d at 1258; *ABA, Inc.,* 2014 WL 1863944 at *13.

And for that independent procedural reason, the motion should be denied.


3.  *The Defendants Have Complied Fully with the Order.*

Here, the Court's Order did not direct the District to take any specific action, as plaintiffs themselves concede. *See* P.Mot. at 13 ("Rather than order the Defendants to adopt a specific licensing program, this Court enjoined the Defendants from, inter alia, 'enforcing D.C. Code § 22-4504(a) unless and until such time as the District of Columbia adopts a licensing mechanism

consistent with constitutional standards enabling people to exercise their Second Amendment right to bear arms.") (quoting Order at 16 (footnote omitted)).

Indeed, the Court *rejected* plaintiffs' explicit request to order the District to issue a license to anyone that can satisfy the handgun-registration requirements. *See* Complaint at 9. Instead, the Court enjoined the District from enforcing its preexisting absolute ban on carrying a concealed weapon without a license, and "[r]ather than order the Defendants to adopt a specific licensing program," P.Mot. at 13, left it up to the District to determine the details necessary to establish a functional licensing scheme.

Thus, notwithstanding that the District believes the Order was erroneous, the Court has properly left it to the District—in the first instance—to determine the appropriate scope and specifics of such a licensing scheme. The District has done so, by passing the Emergency Act; MPD will promulgate implementing regulations prior to the expiration of the Court's stay. The District is thus in full compliance with the Court's Order, and plaintiffs have not shown (and cannot show) otherwise. If the Court had intended to constrain the District to enacting a licensing regime of the Court's (or plaintiffs') choosing, it could have done so. Instead, it allowed the District to develop such a scheme based on the judgment of the elected bodies of the District, attuned to local conditions. Plaintiffs cannot show that the District is disobeying the Court's Order.

The only "evidence" plaintiffs present of the District's alleged disobedience are a few scattered statements of individual Councilmembers purporting to show "contempt and animus" towards those who desire to carry a concealed weapon. *See* P.Mot. at 6. The District asserts that those statements are utterly irrelevant here. What matters is the text of the Emergency Act, which complies fully with the Court's Order. The "evidence" pointed out by plaintiffs are simply the

public comments of elected officials who disagree with the Order. Nothing said was contemptuous or dismissive of this Court or its decision in any way.

It should go without saying that the best evidence of legislative purpose is the statutory text adopted. *See, e.g., W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 98–99 (1991) (where statutory language is unambiguous, "we do not permit it to be expanded or contracted by the statements of individual legislators or committees during the course of the enactment process."), *superseded by* The Civil Rights Act of 1991.[10] Plaintiffs' dire rhetoric should be rejected. *See Bryan v. United States*, 524 U.S. 184, 196 (1998) ("[T]he fears and doubts of the opposition are no authoritative guide to the construction of legislation. In their zeal to defeat a bill, they understandably tend to overstate its reach.") (citations omitted).

The Emergency Act sets forth clear, articulable standards for the grant of licenses to carry concealed handguns in public, directs the MPD to issue implementing rules, and establishes an appellate body to hear and decide appeals from denials or revocations of such licenses. The District is in full compliance with the Court's Order.

### 4.  *The "Good Reason" Requirement Withstands Second-Amendment Challenge.*

Plaintiffs' motion is procedurally improper, for the reasons discussed above, and the Court should not reach the merits of the motion until—at a minimum—it orders fuller briefing, the potential participation of *amici*, and allows discovery. Otherwise, the Court risks reaching out to address a law that could still be changed as the Council continues to work on it.

---

[10]  *See also, e.g., Goldring v. District of Columbia*, 416 F.3d 70, 75 (D.C. Cir. 2005) ("Legislative history is irrelevant to the interpretation of an unambiguous statute.") (quoting *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 808–809 (1989)).

Notwithstanding this, and without conceding that this Court currently has jurisdiction to determine the issue, if it were inclined to do so, the Court should reject plaintiffs' premature Second Amendment challenge to the Emergency Act, because three different Circuits have upheld similar schemes.

The District's Emergency Act requires applicants for licenses to carry concealed handguns to demonstrate a "good reason" for the issuance of a license. *See* Emergency Act, § 910(a)(1)(A) (applicant must show "a good reason to fear injury to his or her person, which shall at a minimum require a showing of a special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks which demonstrate a special danger to the applicant's life[.]").

The plaintiffs complain that this "good reason" licensure standard violates the Second Amendment because it will not allow licensing of those persons "who simply wish to carry handguns for self-defense against the random, violent crime that plagues this city." P.Mot. at 15.[11] But the Second, Third, and Fourth Circuits have all rejected identical arguments in upholding similar licensure standards. Moreover, each of those courts has found that those standards do *not* implicate a right at the core of the Second Amendment, and hence the challenged laws withstand intermediate scrutiny.

In *Kachalsky*, the Second Circuit upheld New York's licensing scheme for concealed carrying of hanguns, which requires, *inter alia*, that applicants must show "proper cause," *i.e.*,

---

[11] Plaintiffs also contend that the "'proper reason' [sic] requirement" P.Mot. at 16, does not comport with "the constitutional self-defense interest." *Id*. But as the District has argued previously, the scope of that interest has never been defined by any controlling court decision to encompass what plaintiffs claim here.

must "demonstrate a special need for self-protection distinguishable from that of the general community or of persons engaged in the same profession." 701 F.3d at 86 (citation omitted).

"'[A] generalized desire to carry a concealed weapon to protect one's person and property does not constitute 'proper cause.' Good moral character plus a simple desire to carry a weapon is not enough. Nor is living or being employed in a 'high crime area[.]'" *Id.* at 87 (citations omitted). The Second Circuit found that New York's "proper cause" requirement "falls outside the core Second Amendment protections identified in *Heller*." *Id.* at 94. New York's determination that "limiting handgun possession to persons who have an articulable basis for believing they will need the weapon for self-defense is in the best interest of public safety and outweighs the need to have a handgun for an unexpected confrontation." *Id.* at 100.

Similarly, the Fourth Circuit in *Woollard* upheld Maryland's licensing scheme for concealed-carry, which requires that applicants demonstrate "good and substantial reason," *i.e.*, they must show some "apprehended danger," which is "an objective inquiry [that] cannot be established by, inter alia, a 'vague threat' or a general fear of 'liv[ing] in a dangerous society.'" 712 F.3d at 870 (citations omitted). The Fourth Circuit found that Maryland's good-and-substantial-reason requirement "strikes an appropriate balance between granting handgun permits to those persons known to be in need of self-protection and precluding a dangerous proliferation of handguns on the streets of Maryland." *Id.* at 881.

Likewise, the Third Circuit in *Drake* upheld New Jersey's scheme for issuing licenses to those who wish to carry a handgun in public, which requires applicants to demonstrate a "justifiable need," which is defined as "[t]he urgent necessity for self-protection, as evidenced by specific threats or previous attacks which demonstrate a special danger to the applicant's life that cannot be avoided by means other than by issuance of a permit to carry a handgun." 724 F.3d at

428 (quoting N.J. Admin. Code 13:54-2.4(d)(1)). The Third Circuit found that, even assuming that the Second Amendment confers some right to carry firearms outside the home, New Jersey's "justifiable need" requirement "regulates conduct falling outside the scope of the Second Amendment's guarantee." *Id*. at 434.

> New Jersey engages in an individualized consideration of each person's circumstances and his or her objective, rather than subjective, need to carry a handgun in public. This measured approach neither bans public handgun carrying nor allows public carrying by all firearm owners; instead, the New Jersey Legislature left room for public carrying by those citizens who can demonstrate a "justifiable need" to do so. We refuse Appellants' invitation to intrude upon the sound judgment and discretion of the State of New Jersey, and we conclude that the "justifiable need" standard withstands intermediate scrutiny.

*Id*. at 439–40 (footnote omitted).

The Third Circuit upheld New Jersey's determination that "it can best determine when the individual benefit outweighs the increased risk to the community through careful case-by-case scrutiny of each application[.]" *Id*. at 439.

Although the District contends that plaintiffs' motion is procedurally improper and the new law is not subject to review in this case, if this Court were inclined to examine the constitutionality of the "good reason" requirement, it should reach the same conclusion as the Second, Third, and Fourth Circuits.

Aside from *Peruta*, the only authority plaintiffs cite striking down a "good reason" licensing standard are a case from an Indiana intermediate appellate court from 1980, and a Michigan Supreme Court case from 1922. *See* P.Mot. at 17. On the other side of the scale is *Drake*, *Woollard*, and *Kachalsky*, all decided in the last two years. Plaintiffs' arguments fail.

5. *"Prior Restraint" is Inapplicable Here.*

Finally, plaintiffs argue that the District's new licensing scheme is an impermissible "prior restraint," granting the licensing authorities "unbridled discretion free of meaningful limitation[.]" P.Mot. at 13. While some courts have drawn analogies between the First and Second Amendments, no court has accepted plaintiffs' novel prior-restraint theory. *See Ghantous v. Illinois Concealed Carry Licensing Review Bd.*, ___ F.Supp.2d ___, 2014 WL 4914802, *3 (N.D. Ill. Sep. 30, 2014) ("[N]either the Supreme Court nor the Seventh Circuit (nor any other jurisdiction that the Court is aware of) has extended prior restraint analysis into the Second Amendment context."). "The concerns regarding prior restraints are historically unique to the First Amendment." *Id.*

Indeed, the Second, Third, and Fourth Circuits, in the cases just discussed, all explicitly rejected plaintiffs' prior-restraint arguments. *See Kachalsky*, 701 F.3d at 91 ("We are hesitant to import *substantive* First Amendment principles wholesale into Second Amendment jurisprudence. Indeed, no court has done so.") (emphasis in original).

> We recognize that analogies between the First and Second Amendment were made often in *Heller*, 554 U.S. at 582, 595, 606, 635. Similar analogies have been made since the Founding. Notably, these analogies often used the states' power to regulate firearms, which was taken as unassailably obvious, to support arguments in favor of upholding limitations on First Amendment rights. But it would be as imprudent to assume that the principles and doctrines developed in connection with the First Amendment apply equally to the Second, as to assume that rules developed in the Second Amendment context could be transferred without modification to the First. Endorsing that approach would be an incautious equation of the two amendments and could well result in the erosion of hard-won First Amendment rights. As discussed throughout, there are salient differences between the state's ability to regulate each of these rights.

*Id.* at 92 (citations omitted).

"Plaintiffs' complaint is not that the proper cause requirement is *standardless*; rather, they simply do like the *standard*—that licenses are limited to those with a special need for self-

protection. This is not an argument that licensing officials have unbridled discretion in granting full-carry permits." *Id.* (emphasis in original).

The same holds true here—the District's new scheme lays out a specific, articulable standard for applicants to demonstrate a "good reason" to carry a concealed handgun in public, but plaintiffs do not like the standard. *See also Woollard*, 712 F.3d at n.11 (rejecting plaintiffs' prior-restrain theory because "it is premised on an uncorroborated assertion that the good-and-substantial-reason requirement vests the State 'with virtually unbridled and absolute power to deny permits.'") (citations omitted).

> Even if we were to apply the prior restraint doctrine, it would not compel the result sought by Appellants because New Jersey's Handgun Permit Law does not vest licensing officials with "unbridled discretion." Appellants incorrectly characterize the "justifiable need" standard as a highly discretionary, seat-of-the-pants determination. On the contrary, the standards to be applied by licensing officials are clear and specific, as they are codified in New Jersey's administrative code and have been explained and applied in numerous New Jersey court opinions. Moreover, they are accompanied by specific procedures that provide "safeguards against arbitrary official action."

*Drake*, 724 F.3d at 435 (footnote and citation omitted).

Identically here, even assuming plaintiffs' challenge was ripe, the District's new scheme has clear and specific standards, defined in the law (and to be further elaborated in the implementing regulations and procedures) that will provide safeguards against arbitrary action. *See* Emergency Act §§ 908, 910.

### III. Conclusion

For the reasons cited herein, plaintiffs' motion for a permanent injunction should be denied.

DATE: October 20, 2014               Respectfully submitted,

                                     IRVIN B. NATHAN
                                     Attorney General for the District of Columbia

_____/s/_____

ELLEN A. EFROS
Deputy Attorney General
Public Interest Division
441 Fourth Street, NW, 6th Floor South
Washington, DC 20001
Telephone: (202) 442-9886
Facsimile: (202) 741-8908
Email: ellen.efros@dc.gov


_____/s/ Andrew J. Saindon_____

ANDREW J. SAINDON, D.C. Bar No. 456987
Senior Assistant Attorney General
Equity Section
441 Fourth Street, N.W., 6th Floor South
Washington, D.C. 20001
Telephone: (202) 724-6643
Facsimile: (202) 730-1470
E-mail: andy.saindon@dc.gov