## UNITED STATES DISTRICT COURT
## OF THE DISTRICT OF COLUMBIA

_____

|  |  |
|---|---|
| TOM G. PALMER, *et al.* | ) |
|  | ) |
| **Plaintiffs,** | ) |
|  | ) |
| **v.** | )    **Civil Action No. 09-01482 (FJS)** |
|  | ) |
| DISTRICT OF COLUMBIA, *et al.*, | ) |
|  | ) |
| **Defendants.** | ) |

_____)

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO
PLAINTIFFS' MOTION TO HOLD DEFENDANTS IN CONTEMPT

Defendants (collectively, "the District"), by and through undersigned counsel, hereby submit this Memorandum of Points and Authorities in Opposition to plaintiffs' Motion to Hold Defendants in Contempt, in accordance with LCvR 7(b) and (d). Because plaintiffs cannot meet their burden of demonstrating by clear and convincing evidence that the District violated the Court's order, plaintiffs' motion must fail.

A proposed Order denying the requested relief is attached hereto.

I. Background

On July 26, 2014, this Court issued a Memorandum Decision and Order entering judgment in favor of the plaintiffs (Doc. No. 51) ("the Order"). The Order enjoined the District from enforcing D.C. Official Code § 7-2502.02(a)(4) which bans "registration of handguns to be carried in public for self-defense by law-abiding citizens," from enforcing D.C. Official Code § 22-4504(a), which bans carrying a weapon in public without a license, and from enforcing either statute "against individuals based solely on the fact that they are not residents of the District of

Columbia." Order at 18–19. In its memorandum opinion, this Court also stated that the District was enjoined from enforcing the statutes "unless and until such time as the District of Columbia adopts a licensing mechanism consistent with constitutional standards enabling people to exercise their Second Amendment right to bear arms." Order at 16 (footnote omitted).

Moving swiftly to comply, on September 23, 2014, the Council of the District of Columbia voted unanimously to pass Bill 20-926, the License to Carry a Pistol Emergency Amendment Act of 2014 ("the Emergency Act"). *See* http://lims.dccouncil.us/Legislation/B20-0926?FromSearchResults=true (all websites last visited as of December 2, 2014). The bill was signed by the Mayor on October 9, became effective on signing, and will remain effective for 90 days as emergency legislation. *See* 61 D.C. REG. 10765 (Oct. 17, 2014); D.C. Official Code § 1-204.12(a) (2014 Supp.).[1]

The Council also introduced permanent legislation, the "License to Carry a Pistol Amendment Act of 2014," Bill 20-930, which was referred to the Committee on the Judiciary and Public Safety. *See* http://lims.dccouncil.us/Legislation/B20-0930?FromSearchResults=true. The Council conducted a public hearing on the permanent legislation on October 16, 2014. *See* 61 D.C. REG. 9791 (Sep. 26, 2014). Committee mark-up occurred on November 25, 2014. *See* "Bill History," *http://lims.dccouncil.us/Legislation/B20-0930?FromSearchResults=true*. The

---

[1]       *See, e.g., United States v. Alston*, 580 A.2d 587, 590–91 (D.C. 1990) (discussing differences between emergency, temporary, and permanent legislation). The temporary version of the legislation passed by the Council, Act 20-462, was signed by the Mayor on October 31, 2014, transmitted to Congress for review on November 19, 2014, and projected to become law on January 3, 2015. *See* 61 D.C. Reg. 11814 (Nov. 14, 2014).

first reading on the permanent legislation occurred on December 2, 2014, and the second reading

is scheduled for December 16, 2014. *See* http://dccouncil.us/calendar/day/2014/12/16.[2]

## II.  Summary of Argument

The Court should deny the motion because the District has complied fully with the

Court's Order, currently on appeal to the D.C. Circuit.

To justify a finding of contempt, plaintiffs must show that the District violated an order

that was "clear and unambiguous" by "clear and convincing evidence," and that the District has

failed to make a good-faith substantial effort to comply with the Order.  Plaintiffs have failed to

marshal the significant evidence required to make such a showing. Indeed, the District has

faithfully complied with the Order and has not enforced D.C. Official Code §§ 7-2502.02(a)(4)

and 22-4504(a)—as those provisions existed at that time—against any individual since the stay

expired. Instead, the District has enacted an entirely new statutory scheme modeled after firearm

laws that have been constitutionally approved by a majority of the United States Circuit Courts

of Appeal that have ruled on the issue.[3] There is no evidence, much less the clear and convincing

evidence required for a finding of contempt, that the District has failed to comply with the

Court's Order.   And, to the extent the Order can be read to require the District to enact a

---

[2]      Pursuant to the Home Rule Act, District permanent legislation becomes effective
after a 30-day period (for most laws) or a 60-day period (for criminal laws) of passive review by
Congress, the days being counted only when both Houses of Congress are in session. D.C.
Official Code § 1-206.02(c) (2014 Supp.).

[3]      *Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013), *cert. denied*, 134 S. Ct. 2134 (2013);
*Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013), *cert. denied*, 134 S. Ct. 422 (2013);
*Kachalsky v. County of Westchester*, 701 F.3d 81 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 1806
(2013).

licensing scheme that is compliant with the Second Amendment (without specifying the details of that scheme), the District has done so.[4]

Moreover, this Court lacks jurisdiction to pass judgment on the legislation that the city enacted *after* the Court entered judgment in this case, which is now final, having resolved all of the issues before it. The permanent version of that legislation is still undergoing the legislative process, and will then sit before Congress for passive review pursuant to the Home Rule Act. But it would be inappropriate for the Court to opine on even the emergency version of that legislation (now in effect) since that legislation was enacted after the Court entered final judgment in this matter and the District, in compliance with the Order, has not enforced the prior Code provisions declared to be unconstitutional. This Court's jurisdiction ended when it declared the then-existing ban on carrying handguns unconstitutional and the District appealed that final judgment. More than a century of case law confirms that an Article III court cannot enjoin a legislature from enacting legislation, or preemptively enjoin pending legislation.

This Court's jurisdiction did not somehow return with the passage of the Emergency Act; that legislation was not the subject of the Complaint—it could not have been, because it did not exist and courts cannot exercise jurisdiction over statutes not yet enacted. Unless the plaintiffs amend their complaint to challenge the Emergency Act (which the plaintiffs cannot do without seeking vacatur of the judgment), the Court is without jurisdiction to evaluate its constitutionality.

---

[4]        As discussed below, it is not clear that the Court ordered the District to do anything but refrain from enforcing the then-existing statutes.

<u>III.  Argument</u>

*1. Plaintiffs Have Utterly Failed to Present the "Clear and Convincing Evidence" of Disobedience Required for Contempt.*

"Because of their very potency," courts should exercise their contempt powers "with restraint and discretion." *Shepherd v. American Broadcasting Co., Inc.*, 62 F.3d 1469, 1475 (D.C. Cir. 1995) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991) and *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764 (1980)). "Civil contempt is an extraordinary sanction that should be imposed with caution." *Al-Qahtani v. Obama*, 604 F.Supp.2d 101, 103–104 (D.D.C. 2009) (citing *Joshi v. Professional Health Servs., Inc.*, 817 F.2d 877, 879 n.2 (D.C. Cir. 1987)).

Accordingly, to justify a finding of contempt, plaintiffs were required to show that the District violated an order that was "clear and unambiguous" by "clear and convincing evidence, and ambiguities in the underlying order should be resolved in favor of [the District]." *Teamster Local Union No. 96 v. Washington Gas Light Co.*, 466 F.Supp.2d 360, 362 (D.D.C. 2006) (quoting and citing *Armstrong v. Executive Office of the President*, 1 F.3d 1274, 1289 (D.C. Cir. 1993) (*per curiam*) and *Food Lion, Inc. v. United Food & Commercial Workers Int'l Union*, 103 F.3d 1007, 1016 (D.C. Cir. 1997)). *See also, e.g., Shepherd*, 62 F.3d at 1477 (party seeking to show contempt bears "a heavy burden of proof") (quoting *Washington-Balt. Newspaper Guild, Local 35 v. Washington Post*, 626 F.2d 1029, 1031 (D.C. Cir. 1980)). As the discussion below demonstrates, plaintiffs have failed to meet this considerable burden.

Moreover, while a party's good faith alone is not a defense to contempt, "a party may raise good faith substantial compliance as a defense." *LaShawn A. ex rel. Moore v. Fenty*, 701 F. Supp. 2d 84, 90 (D.D.C. 2010). To establish good faith substantial compliance, the party "must show that it took all reasonable steps within [its] power to comply." *Int'l Painters & Allied*

*Trades Indus. Pension Fund v. ZAK Architectural Metal & Glass LLC*, 736 F. Supp. 2d 35, 40

(D.D.C. 2010) (internal quotations omitted). Here, it would be an abuse of discretion for the

Court to hold the District in contempt, given the District's good-faith efforts to comply with the

Order in every respect.


      A.     The District has complied with this Court's injunction.

      Pursuant to Federal Rule of Civil Procedure 65(d)(1), an injunctive order "must: . . . state

its terms specifically" and "describe in reasonable detail—and not by referring to the complaint

or other document—the act or acts restrained or required." FED. R. CIV. P. 65(d)(1).

      The Order specifically directs that "Defendants, their officers, agents, servants,

employees and all persons in active concert or participation with them who receive actual notice

of this Memorandum-Decision and Order, are permanently enjoined from:

> [1] enforcing D.C. Code § 7-2502.02(a)(4) to ban registration of handguns to be carried in public for self-defense by law-abiding citizens …
>
> [2] enforcing D.C. Code § 22-4504(a); and …
>
> [3] enforcing D.C. Code § 7-2502.02(a)(4) and D.C. Code § 22-4504(a) against individuals based solely on the fact that they are not residents of the District of Columbia."

Order at 18–19.

      There is no question that the District has fully complied with these injunctions.  As soon

as the Order was issued (and the subsequent stay expired), the District ceased its enforcement of

§§ 7-2502.02(a)(4) and 22-4504(a) as they existed at the time.  Plaintiffs argue that, by enacting

new legislation, the District is "still enforcing D.C. Code § 22-4504(a)."  Doc. No. 83 at 4.  But

this is not so, because the new legislation is substantively different from the old. The District's

new statutes create a licensing scheme that *allows* qualifying individuals to carry a concealed

weapon. *See* Emergency Act, §§ 2(e), 3(b).   And this Court apparently recognized that a licensing scheme was not the same as an absolute ban, given its suggestion that the District could enact a scheme that would satisfy the Second Amendment.

To be sure, the Order also enjoins the District from enforcing §§ 7-2502.02(a)(4) and 22-4504(a) "unless and until such time as the District of Columbia adopts a licensing mechanism consistent with constitutional standards enabling people to exercise their Second Amendment right to bear arms." Order at 16 (footnote omitted). But the conduct this phrase enjoins is the "enforcing" of the statutes that ban the carrying of handguns in the District, and the District has refrained from such enforcement.   Nothing in the plain language of the injunction requires the District to enact a licensing scheme at all.

Indeed, the very phrasing of the "licensing" clause of the injunction makes its directive unclear.   It states that the District cannot enforce its then-existing ban on the carrying of handguns "until" it enacts a constitutionally adequate licensing scheme.   But the Court could not have meant that, once the District enacted such a scheme, it could revert to the ban the Court found unconstitutional—mooting the licensing scheme the moment it was enacted.   At best, this phrase should be read as *dicta* indicting this Court's belief that, although a ban on carrying of handguns was unconstitutional, it was possible for the District to enact a constitutionally permissible licensing scheme regulating this conduct.

In short, the only conduct this Court enjoined was the enforcement of the then-existing statutes banning the carrying of handguns.   Because the District has not enforced those statutes, it cannot be held in contempt of this Court's Order.

B.      This Court did not have the authority to order the District to enact a constitutionally permissible licensing scheme, but the District nevertheless complied in

good faith by enacting a licensing mechanism with key features that have been upheld by a majority of the United States Circuit Courts of Appeal that have ruled on the issue.

Plaintiffs argue that the Order requires the District to enact a licensing scheme that complies with the Second Amendment.  But if the existing injunction is as broad as plaintiffs suggest, and subjects the District to civil contempt regardless of whether the District's operative conduct is based on the new or old law, it would exceed the Court's discretion. Such an injunction would be too vague to comply with Rule 65(d)'s specificity requirements. "The specificity provisions of Rule 65(d) are no mere technical requirements. The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) (finding that an order that simply told defendants not to enforce "the present Wisconsin scheme" failed to meet the rule's requirements).

In keeping with this admonition, "orders simply requiring defendants to 'obey the law' uniformly are found to violate the specificity requirement." 11A Wright & Miller, Fed. Prac. & Proc. Civ. § 2955 (3d ed.) (citing cases). Thus, if this Court intended to order the District to enact new, constitutionally compliant legislation, such an order was improper. To avoid running afoul of the Rule 65(d)'s specificity requirements, the Court's Order must be understood to be limited to its terms, and not as an open-ended requirement perpetually to comply with this Court's interpretation of the Second Amendment.[5]

---

[5]     Plaintiffs attack a straw man in their motion for contempt, arguing that the District "now declare[s] for [itself] the power to determine that they are in compliance with constitutional standards." Doc. No. 83 at 2. The District has done no such thing—it is emphatically the province of the courts to say what the law is. However, that role for the Court must follow established rules of procedure, such as only examining the constitutionality of a law via a proper challenge by plaintiffs with standing, through the appropriate procedural mechanisms. As explained in the District's opposition to plaintiffs' motion for a permanent injunction, plaintiffs' *new* challenge to the District's *new* law ought to be heard through a *new* complaint. Doc. No 73

Plaintiffs have failed to demonstrate that the District is in contempt of the Order for two reasons. *First*, the Court failed to "frame its orders so that those who must obey them will know what the court intends to require and what it means to forbid." *Salazar v. District of Columbia*, 602 F.3d 431, 442 (D.C. Cir. 2010) (quoting *International Longshoremen's Ass'n Local 1291 v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 76 (1967)). *See* n.4, *supra*.

The Order specifically prohibited the District from enforcing two sections of the D.C. Official Code as they existed in July 2014. The District has fully complied with that order: It has replaced those sections of the code with new provisions that permit suitable persons to carry a concealed handgun in public consistent with the constitutionally-permissible framework upheld by the Second, Third, and Fourth Circuits. There has been no fair warning to the District that any other, specific act is required or forbidden by the Court's Order. *Cf. SEC v. Bankers Alliance Corp.*, 881 F.Supp. 673, 675 (D.D.C. 1995) (party commits contempt when it "violates a definite and specific court order requiring him to perform or refrain from performing a particular act or acts with knowledge of that order.") (quoting *Whitfield v. Pennington*, 832 F.2d 909, 913 (5th Cir. 1987)).

*Second*, for the District to be held to be in contempt, the Court's Order must leave "no reasonable doubt as to what behavior was expected" based on the "four corners of the order." *Project B.A.S.I.C. v. Kemp*, 947 F.2d 11, 17 (1st Cir. 1991) (internal quotations omitted). The four corners of the Order only address the offending code provisions which are no longer in effect. There is reasonable room for disagreement about what *other* laws and regulations—

---

at 7–10; *see Waters v. Barry*, 711 F. Supp. 1121, 1122 (D.D.C. 1989) (plaintiff filed an amended complaint to challenge an amended District law, and did not seek to hold defendants in contempt, even though defendants were enjoined by the Court from enforcing the challenged old law).

including the District's new statute—may be constitutional under the Second Amendment. *Compare Peruta v. County of San Diego*, 742 F.3d 1144 (9th Cir. 2014) with *Kachalsky*, 701 F.3d 81; *Drake*, 724 F.3d 426; and *Woollard* 712 F.3d 865. The District has made a good faith effort to substantially comply with this Court's Order by adopting a statutory approach that has been approved by most courts of appeals that have ruled on the issue.

      C.      This Court does not have jurisdiction to consider or rule on whether the District's new law actually satisfies the Second Amendment.

Plaintiffs not only suggest that this Court was authorized to order the District to enact a constitutionally permissible licensing mechanism for the carrying of handguns, they argue that the District can be held in contempt if this Court—as part of *this* lawsuit—finds the new licensing mechanism unconstitutional.  Doc. No. 83 at 4.  But, as discussed in Argument 2 below, this Court does not even have jurisdiction to consider the constitutionality of the new law, much less to hold the District in contempt if it finds that the new law violates the Second Amendment.

To be sure, this Court would be entitled—as part of a *new* lawsuit challenging the District's *new* law—to rule on the ultimate constitutionality of the District's statutory scheme. But there is no opportunity to answer that question now. The question now before the Court is whether the District is in contempt of this Court's existing order, an order that was issued before the new law was even enacted. That question must be answered in the negative because, as explained, (1) plaintiffs have failed to prove, by clear and convincing evidence, a violation of a clear order of the Court; and (2) the District has made a good faith, substantial effort to comply with the Court's Order.

A contrary determination, one that held the District in contempt for enacting any statutory scheme that violated the Second Amendment, would also render the underlying injunction overbroad. *See generally Cobell v. Norton*, 392 F.3d 461 (D.C. Cir. 2004). In *Cobell*, the district court concluded that the Department of the Interior had violated certain duties owed to the beneficiaries of individual Indian money (IIM) accounts. Based on that finding, the district court required the Interior defendants to produce a "plan" that would fix the IIM trust management system—a detailed plan to fulfill all of the Department's applicable fiduciary obligations regardless of whether Interior had actually violated them. *Cobell*, 392 F.3d at 465. The district court also "propose[d] to use the 'plan' as a device for indefinitely extended all-purpose supervision of the defendants' compliance with . . . sixteen general fiduciary duties." *Id.*

The D.C. Circuit reversed, holding that the order to implement the trust management plan amounted to an overbroad "order to obey the law [in the future] in managing the trusts." *Cobell*, 392 F.3d at 475. This would impermissibly leave defendants "subject to contempt charges for every legal failing, rather than simply to the civil remedies" otherwise available to them. *Id.* (citing *NLRB v. Express Pub. Co.*, 312 U.S. 426, 435-436 (1941) ("[T]he mere fact that a court has found that a defendant has committed an act in violation of a statute does not justify an injunction broadly to obey the statute and thus subject the defendant to contempt proceedings if he shall *at any time in the future* commit some new violation unlike and unrelated to that with which he was originally charged.") (emphasis added).

The same reasoning applies here. While the Court has previously found the District to be in violation of the Second Amendment under a certain set of circumstances—*i.e.*, the old law— that fact does not justify an injunction broadly to obey the Second Amendment more generally, which would subject the District to contempt proceedings if it "shall at any time in the future

commit some new violation" of the Second Amendment even under a different set of circumstances—*i.e.*, the new law.  Thus, even if this Court had the authority to order the District to enact new legislation—and even if the Order is reasonably interpreted to order the District to do so—the question of contempt cannot be based on whether the new legislation actually satisfies the Second Amendment.

*2. The Court Lacks Jurisdiction to Grant the Requested Relief Because It Requires The Court To Rule on the Constitutionality of a Law that Was Never Properly Before This Court.*

Plaintiffs' motion for contempt rests on their belief that the District's new law is unconstitutional.  As discussed, if this Court does not reach this question, it must find that the District complied in good faith with the injunction not to enforce its then-existing laws.  And this Court cannot reach the question of the constitutionality of the new law, because it has no jurisdiction over that question.

A trial court is without jurisdiction to alter its final judgment while that judgment is on appeal. *Deering Milliken, Inc. v. FTC*, 647 F.2d 1124, 1129 (D.C. Cir. 1978).  "The filing of a notice of appeal divests this Court of jurisdiction to alter, amend or expand a declaratory judgment." *Building Indus. Ass'n of Superior Cal. v. Babbitt*, 70 F.Supp.2d 1, 2 (D.D.C. 1999) (quoting *Public Citizen v. Carlin*, 2 F.Supp.2d 18, 20 (D.D.C. 1998)).  Here, though, plaintiffs seek exactly that improper relief—a new injunction, declaring the District's new legislation unconstitutional under the Second Amendment. The Court cannot grant such relief.


A.  Article III courts cannot rule on the constitutionality of legislation before it is enacted.

"The Supreme Court consistently has held that 'a court of equity cannot properly interfere with, or in advance restrain, the discretion of a municipal body while it is in the exercise of powers that are legislative in their character.'" *Associated Gen. Contractors of Am. v. City of*

*Columbus*, 172 F.3d 411, 415 (6th Cir. 1999) (quoting *New Orleans Water Works Co. v. City of New Orleans*, 164 U.S. 471, 481 (1896)).

"The *New Orleans* Court made clear that the role of the court is to intervene, if at all, only after a legislative enactment has been passed." *Id.* (citing also *McChord v. Cincinnati, New Orleans, & Tex. Pacific R.R.*, 183 U.S. 483, 497 (1902) ("It is legislative discretion which is exercised, and that discretion, whether rightfully or wrongfully exercised, is not subject to interference by the judiciary.") and *Crafton v. Alexander*, 1986 WL 18432, *1 (6th Cir. 1986) ("Federal courts have no jurisdiction to review the constitutionality of proposed state legislation.")). [6]

> Procedures for testing the constitutionality of a statute 'on its face' . . . and for
> then enjoining all action to enforce the statute until the State can obtain court

---

[6]    In *New Orleans Water Works*, Louisiana had granted a 50-year monopoly to the plaintiff company for supplying the city with water from the Mississippi. Subsequently, the city passed an ordinance granting a hotel lessee, Robert Rivers, the privilege of laying pipes and drawing water from the Mississippi for his hotel. 164 U.S. at 473. Although the company eventually obtained an injunction against Rivers, New Orleans continued to pass ordinances granting similar privileges to other entities, and threatened to continue to do so. *Id.* at 475. The company thus sought a permanent injunction prohibiting New Orleans from passing any such ordinances. The Supreme Court rejected the challenge:

> [T]he courts will pass the line that separates judicial from legislative authority if
> by any order, or in any mode, they assume to control the discretion with which
> municipal assemblies are invested when deliberating upon the adoption or
> rejection of ordinances proposed for their adoption. The passage of ordinances by
> such bodies are legislative acts, which a court of equity will not enjoin. If an
> ordinance be passed, and is invalid, the jurisdiction of the courts may then be
> invoked for the protection of private rights that may be violated by its
> enforcement.

*Id.* (citations omitted). *See also id.* at 482 ("[W]hen the city council shall pass an ordinance that infringes the rights of the plaintiff, and is unconstitutional and void . . . it will be time enough for equity to interfere, and by injunction prevent the execution of such ordinance."); *McChord*, 183 U.S. at 496 ("It is to be presumed [legislatures and agencies] will always act within the limits of their constitutional authority. It will be time enough to consider what may be done to prevent it when they attempt to go beyond.") (quoting *Stone v. Farmers' Loan & Trust Co.*, 116 U.S. 307, 335 (1886)).

approval for a modified version, are fundamentally at odds with the function of the federal courts in our constitutional plan. The power and duty of the judiciary to declare laws unconstitutional is in the final analysis derived from its responsibility for resolving concrete disputes brought before the courts for decision[.] But this vital responsibility, broad as it is, does not amount to an unlimited power to survey the statute books and pass judgment on laws before the courts are called upon to enforce them. [T]he combination of the relative remoteness of the controversy, the impact on the legislative process of the relief sought, and above all the speculative and amorphous nature of the required line-by-line analysis of detailed statutes, ordinarily results in a kind of case that is wholly unsatisfactory for deciding constitutional questions, whichever way they might be decided. In light of this fundamental conception of the Framers as to the proper place of the federal courts in the governmental processes of passing and enforcing laws, it can seldom be appropriate for these courts to exercise any such power of prior approval or veto over the legislative process.

*Younger v. Harris*, 401 U.S. 37, 52–53 (1971) (citations and footnote omitted).

The permanent version of the law, assuming it is enacted by the Council and signed by the Mayor, will not become effective until it has withstood passive congressional review. *See* n.2, *supra*. It would be inappropriate for the Court to use its equity powers to intervene now.

The *Associated General* case is particularly apposite here. In that case, plaintiffs challenged the City of Columbus's minority set-aside ordinance, and eventually the parties submitted an agreed order acknowledging that the ordinance was unconstitutional, and enjoining the city from enacting any similar preferences without first complying with the controlling Supreme Court opinion of *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989)). 172 F.3d at 413. The district court entered the agreed order, and a further order "retaining jurisdiction over the action to ensure that the City complied with the earlier consent order in the event that the City wished to enact any future preference ordinance." *Id*. The City appealed the district court's denial of its motion to dissolve or modify the injunction.

The Sixth Circuit held that the district court lacked jurisdiction after the entry of the order declaring the city ordinance unconstitutional, and vacated the portion of the "agreed order

purporting to give the district court continuing jurisdiction over the activities of the Council[.]" *Id*. at 414.

While acknowledging the broad equitable powers of federal courts, the Sixth Circuit noted that even in voting-rights cases—in which courts have exercised the power to approve or veto legislation before it becomes law—"continuing jurisdiction to fashion remedies is wholly dependent on there having been a violation of the Constitution or of federal law with respect to the fundamental right to vote, and the equitable powers of the federal court only extend to the rectifying of the condition that offends the Constitution or federal law." *Id*. at 416 (discussing the Voting Rights Act, 42 U.S.C. § 1973 *et seq*., whose "preclearance" authority "is triggered only by the finding, in a proceeding under the Act, that the state has engaged in invidious discrimination with regard to the fundamental right of its citizens to vote.").[7]

The Sixth Circuit also discussed school-desegregation cases, in which "the mere cessation of the particular activity or method of operation will not serve to remedy the violation[,]" hence the federal courts could permissibly retain jurisdiction to "correct the residual effects of that segregation." *Id*. at 417. In those cases, the remedial order of the trial court "was intended not merely to put a stop to the particular act or acts of the governmental entity that

---

[7]     Even when federal courts properly retain jurisdiction over voting-rights cases, they must ensure that they do not inappropriately usurp legislative prerogatives, such as redistricting and reapportionment. Those tasks are "legislative function[s] which the federal courts should make every effort not to preempt." *Wise v. Lipscomb*, 437 U.S. 535, 539 (1978). "When a federal court declares an existing apportionment scheme unconstitutional, it is therefore, appropriate, whenever practicable, to afford a reasonable opportunity for the legislature to meet constitutional requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan." *Id*. at 540. *See also Reynolds v. Sims*, 377 U.S. 533, 585–87 (1964) (approving district court's decision to first give legislature opportunity to adopt apportionment plan, and when legislature failed to remedy constitutional deficiencies, to implement interim court-ordered plan).

violated the Constitution, but to eradicate the condition resulting from the constitutional violation." *Id*. at 417–18.

In the instant matter, in contrast, once the Court declared the District's prohibition on concealed-carry unconstitutional and enjoined its enforcement, "the constitutional violation was gone, and no condition requiring repair remained. The remedy was complete." *Id*. at 418.  At that point, in absence of a new licensing scheme, individuals would have been free to carry otherwise-legal weapons in the District without any restriction whatsoever.  No further relief was needed from this Court to guarantee plaintiffs' Second Amendment rights.

The Supreme Court cases relied on by the Sixth Circuit in *Associated General*, while over a century old, remain good law. The lack of more recent citations to these cases mean simply that district courts have not attempted improperly to retain jurisdiction in the manner done here. *See, e.g., Common Cause of Pa. v. Pennsylvania*, 447 F.Supp.2d 415, 437 (M.D. Pa. 2006) (denying request to enjoin legislature from enacting future legislation granting pay raises to legislators and state judges) ("Tempting though it may be, the Court has no authority to dictate to the Pennsylvania General Assembly how that body must conduct itself when considering and enacting future state legislation, even to enter orders that would restrain Pennsylvania's elected officials from hypothetically engaging in future conduct that might violate the United States Constitution."); *id*. ("[T]o grant the relief plaintiffs seek would require that this Court abandon the modest role of the judiciary carved out by our founders for an activist posture never intended or authorized, and to ignore over a century of legal precedent."). *See also Gas & Elec. Securities Co. v. Manhattan & Queens Traction Corp.*, 266 F. 625, 635 (2d Cir. 1920) ("The general rule is that a court of equity will not issue an injunction to restrain a municipal corporation from the

exercise of legislative or governmental power, even though the contemplated action may be in disregard of constitutional restraints[.]") (citing *New Orleans Water Works*).

Here, the Court found that the District's prohibition on concealed-carry violated the Second Amendment; the remedy was to invalidate that prohibition. But the Court went further, it purported to enjoin the District from enacting any *new* legislation that the Court did not approve. The Court attempted to retain jurisdiction to ensure that the new legislation complied with the Second Amendment. This was improper; the Court cannot retain jurisdiction in this manner. More recent, controlling law agrees.

In *Hague v. Committee for Indus. Org., Inc.*, 307 U.S. 496 (1939), the Supreme Court affirmed, as modified, an injunction against a municipal ordinance on First Amendment grounds, which purported to grant unlimited discretion to police officials to deny permits to hold public meetings or distribute literature. The Court agreed that the ordinance was void. *Id.* at 518. But the Circuit had gone farther, crafting the injunction to attempt to dictate how the city could exercise its licensing discretion *in the future*, and enumerating the conditions under which such a permit could be granted or denied. "We think this is wrong." *Id.* "All respondents are entitled to is a decree declaring the ordinance void and enjoining the petitioners from enforcing it." *Id.* "The courts cannot rewrite the ordinance, as the decree, in effect, does." *Id.* The Supreme Court struck the offending provisions of the injunction and, as modified, affirmed. *Id. See also Hearst v. Black*, 87 F.2d 68, 72 (D.C. Cir. 1936) (courts cannot enjoin enactment of unconstitutional laws) (citing, *inter alia*, *New Orleans Water Works* and *McChord*).

Here, the Court cannot—directly or indirectly—rewrite the law that replaces the stricken prohibition on concealed carry. Plaintiffs have received all they are entitled to, *i.e.*, the

invalidation of the prohibition, and an injunction preventing its further enforcement. Further involvement by the Court would be improper.

      B.  Plaintiffs could seek additional relief in this case only if this Court were to vacate its final judgment and permit them to amend their complaint, and this Court cannot grant this relief because jurisdiction over this case now lies in the D.C. Circuit.

This Court's jurisdiction did not spontaneously return with the passage of the Emergency Act; that legislation was not the subject of the Complaint—it could not have been, because it did not exist and courts cannot exercise jurisdiction over statutes not yet enacted. The Court cannot exercise jurisdiction over the Emergency Act unless the plaintiffs amend their complaint to challenge that law (which the plaintiffs cannot do without seeking vacatur of the judgment). *See Ciralsky v. CIA*, 355 F.3d 661, 673 (D.C. Cir. 2004) ("[O]nce a final judgment has been entered, a court cannot permit an amendment unless the plaintiff 'first satisfies Rule 59(e)'s more stringent standard' for setting aside that judgment.") (quoting *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996)).

As noted above, no relief can be added to a final judgment while that judgment is on appeal, *Deering Milliken*, 647 F.2d at 1129. But even if the Court had jurisdiction here, plaintiffs, to amend their complaint after judgment, would have to show an "intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Firestone*, 76 F.3d at 1208 (citations omitted). *See also* Doc. No. 75 at 2 (same).

      C.  Even if this Court had jurisdiction to consider a motion to vacate the award and amend the complaint, plaintiffs lack standing to seek any additional relief.

After the entry of the Order holding the District's prohibition on the carrying of concealed weapons unconstitutional and enjoining its enforcement, the plaintiffs had no continuing injury, and hence no standing to challenge the Emergency Act. In *Associated General* the Sixth Circuit found that plaintiffs lacked standing, because they could not show the "concrete and particularized" and "actual or imminent" injury required, as their chief alleged harm was the inability to compete equally on city projects. Once the set-aside ordinance was invalidated, that harm was remedied, and would not recur unless the city passed a similar ordinance and plaintiffs again sought to participate in the bidding process. *Id.* at 420.

Here, the plaintiffs lack standing to challenge the new legislation because they concede that *none* of them has even attempted to apply for a concealed-carry license. Plaintiffs cannot simply leapfrog this required step.

> Those who do not possess Art. III standing may not litigate as suitors in the courts of the United States. Article III, which is every bit as important in its circumspection of the judicial power of the United States as in its granting of that power, is not merely a troublesome hurdle to be overcome if possible so as to reach the "merits" of a lawsuit which a party desires to have adjudicated; it is part of the basic charter promulgated by the Framers of the Constitution at Philadelphia in 1787[.]

*Valley Forge Christian College v. Americans United for the Separation of Church & State, Inc.*, 454 U.S. 464, 475–76 (1982). *See also Chicago, Burlington & Quincy R. Co. v. Winnett*, 162 F. 242, 249 (8th Cir. 1908) (rejecting request for "perpetual injunction" against state agency's future ratemaking for lack of standing).

*3. If The Court Reaches The Merits Of Plaintiffs' Challenge To The District's New Law, It Should Permit The District An Opportunity To Develop An Evidentiary Record In Support Of That Law.*

For the reasons discussed above, the Court should reject plaintiffs' contempt motion without reaching the constitutionality of the District's new law. But even if it were permissible to

consider plaintiffs' constitutional challenge to the District's new law as part of a contempt proceeding, this Court should still decline to evaluate the merits of that challenge until it has permitted the District a full and fair opportunity to make an evidentiary record in support of the new law. The D.C. Circuit's 2011 decision in the *Heller* litigation compels that result, as the District has previously argued.

In response to the Supreme Court's invalidation in 2008 of the District's ban on possessing firearms, the District amended its laws to permit the possession of most firearms in the home so long as they are properly registered with the District's law enforcement authorities. When Heller challenged that registration scheme, the D.C. Circuit concluded that intermediate scrutiny applied. *Heller v. District of Columbia*, 670 F.3d 1244, 1256–58 (D.C. Cir. 2011) ("*Heller II*"). The D.C. Circuit then remanded the case for further factual development because "the record [wa]s inadequate for us confidently to hold the registration requirements are narrowly tailored". *Id.* at 1258. On remand, the parties offered extensive, additional evidence, including expert evidence, on why the new law appropriately balances the right of self-defense and the protection of public safety in the specific context of the District of Columbia. *See Heller v. District of Columbia*, __ F. Supp. 2d __, 2014 WL 1978073, at *3–*5, *17–*22 (D.D.C. May 15, 2014) (appeal pending). Based on that evidence, the district court rejected Heller's challenge. *Id.*

The same principles of procedural regularity recognized and applied in *Heller II* would require an opportunity to develop an evidentiary record in support of the constitutionality of the District's new law in this case. And, consistent with *Heller II*, the evidence that the District could offer in this case might include, for example, expert testimony explaining why, given the special

circumstances in the District of Columbia, the new law appropriately balances the right of self-defense and the protection of public safety.

The District avers that the Court lacks jurisdiction to grant plaintiffs' requested relief, for all the reasons stated herein and previously. The Court at the last hearing inquired as to the District's "evidence" in support of its new regime; if the Court nevertheless determines to examine the incipient legislation, the current legislative record contains sufficient evidence for the Court to uphold the new law.

*4. The District's New Law Withstands Intermediate Scrutiny.*

The District's Emergency Act requires applicants for licenses to carry concealed handguns to demonstrate a "good reason" for the issuance of a license. *See* Emergency Act, § 910(a)(1)(A). The plaintiffs complain that this "good reason" licensure standard violates the Second Amendment because it will not allow licensing of those persons "who simply wish to carry handguns for self-defense against the random, violent crime that plagues this city." Doc. No. 71 at 15. But the Second, Third, and Fourth Circuits have all rejected identical arguments in upholding similar licensure standards. *See* n.3, *supra*. Moreover, each of those courts has found that those standards do *not* implicate a right at the core of the Second Amendment, and hence the challenged laws withstand intermediate scrutiny. *See also Peterson v. Martinez*, 707 F.3d 1197, 1201 (10th Cir. 2013) ("In light of our nation's extensive practice of restricting citizens' freedom to carry firearms in a concealed manner, we hold that this activity does not fall within the scope of the Second Amendment's protections.").

The Second Circuit found that New York's "proper cause" requirement met intermediate scrutiny: "Restricting handgun possession in public to those who have a reason to possess the weapon for a lawful purpose is substantially related to New York's interests in public safety and

crime prevention." *Kachalsky*, 701 F.3d at 98. "The decision to regulate handgun possession was premised on the belief that it would have an appreciable impact on public safety and crime prevention." *Id. See also id.* at 99 ("[S]tudies and data demonstrat[e] that widespread access to handguns in public increases the likelihood that felonies will result in death and fundamentally alters the safety and character of public spaces."). *Cf., e.g., United States v. Walker*, 380 A.2d 1388, 1390 (D.C. 1977) ("Implicit in the statutory proscription of carrying a pistol without a license outside the possessor's 'dwelling house or place of business' is a congressional recognition of the inherent risk of harm to the public of such dangerous instrumentality being carried about the community and away from the residence or business of the possessor.").

Similarly, the Fourth Circuit upheld Maryland's comparable scheme because "there is a reasonable fit between the good-and-substantial-reason requirement and Maryland's objectives of protecting public safety and preventing crime." *Woollard*, 712 F.3d at 880. The Fourth Circuit found that Maryland's statutory criterion "strikes an appropriate balance between granting handgun permits to those persons known to be in need of self-protection and precluding a dangerous proliferation of handguns on the streets of Maryland." *Id.* at 881. *See also id.* at 879 (handgun-licensing scheme "advances the objectives of protecting public safety and preventing crime because it reduces the number of handguns carried in public.").

Likewise, the Third Circuit upheld New Jersey's determination that "it can best determine when the individual benefit outweighs the increased risk to the community through careful case-by-case scrutiny of each application[.]" *Drake*, 724 F.3d at 439. *See also id.* at 437–38 (licensing scheme "combat[s] handgun violence" and improves public safety by "combating the dangers and risks associated with the misuse and accidental use of handguns" and "reduc[ing] the use of handguns in crimes."); *id.* at 438 ("private possession of a handgun is

rarely an effective means of self-protection" and "the ready accessibility of guns contributes significantly to the number of unpremeditated homicides and to the seriousness of many assaults.") (citation omitted).

Here, the legislative record is sufficient to withstand plaintiffs' purported facial attack under intermediate scrutiny. Even if the District could be required in these proceedings to justify the law, it need only present "some meaningful evidence" that its concealed-carry requirements "can reasonably be expected to promote" an important governmental interest. *Heller II*, 670 F.3d at 1259.[8] As discussed below, the existing record contains such evidence.

The Council's Committee on the Judiciary and Public Safety, last week, issued a report on the permanent legislation, explaining in detail the background and need for the legislation. *See* COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON PUBLIC SAFETY & THE JUDICIARY, REPORT ON BILL 20-930, "License to Carry a Pistol Amendment Act of 2014," Nov. 25, 2014 ("Comm.Rep.").[9] The new law was enacted specifically in response to the Court's Order. *See* Comm.Rep. at 1, n.2. "The executive and the Council worked closely on the District's legislative response to *Palmer*, in order to ensure that the District's laws and regulations would be in compliance with the decision while also balancing the government's interest in public safety." *Id*. at 2. The Report noted that the law was based on similar licensing schemes from New York, New Jersey, and Maryland, and concluded that the legislation "will enhance public safety in the

---

[8]    *See also Heller*, 2014 WL 1978073, at *9 ("The proper standard, the Supreme Court has suggested, is that the government may rely on "whatever evidence . . . is reasonably believed to be relevant to the problem that [the government is] address[ing].") (quoting *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 51–52 (1986)).

[9]    The Committee Report (188 pages long, including attachments) is available online at *http://lims.dccouncil.us/Download/32576/B20-0930-CommitteeReport1.pdf*.

District, while comporting with the requirements of the Second Amendment of the U.S. Constitution." *Id*.

The Report emphasizes in detail the uniqueness of the District and its public-safety and security needs, a point invoked repeatedly by defendant Lanier, the United States Secret Service, and others. *Id*. at 4–7. "The circumstances unique to the District require a regulatory system different than perhaps any other jurisdiction, and especially, far different than what would be necessary for public safety in a rural place." *Id*. at 7. The Report also discusses the rationale behind the law's "good reason" requirement, and how it compares to the standards used in other jurisdictions, and describes the reasoning behind the law's specific requirements in detail. *Id*. at 8–17.

Finally, the Report examines the available empirical evidence on concealed-carry laws, noting that the best, most recent evidence on more lax "right-to-carry," a.k.a "shall issue" laws "'are associated with substantially higher rates' of aggravated assault, rape, robbery and murder." *Id*. at 17 (quoting Clifton B. Parker, *Right-to-carry gun laws linked to increase in violent crime, Stanford research shows*, STANFORD REPORT, Nov. 14, 2014) (available online at *http://news.stanford.edu/news/2014/november/donohue-guns-study-111414.html*).[10] The Report also cited a study that examined the District's 1976 prohibition on handguns (overturned in *Heller*) and found that that "[r]estrictive licensing of handguns was associated with a prompt decline in homicides and suicides in the District of Columbia. [N]o [such] decline was seen in adjacent metropolitan areas where restrictive licensing did not apply." *Id*. at 18 (quoting Colin

---

[10]     The research cited is an updated version of a comprehensive study first conducted in 2011. *See* Abhay Aneja, John J. Donohue, and Alexandra Zhang, *The Impact of Right to Carry Laws and the NRC Report: The Latest Lessons for the Empirical Evaluation of Law and Policy* (Sep. 4, 2014), Stanford Law and Economics Olin Working Paper No. 461, *available online at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2443681.

Loftin, David McDowell, Brian Wiersema, and Talbert J. Cotley, *Effects of Restrictive Licensing of Handguns on Homicide and Suicide in the District of Columbia*, 325 THE NEW ENGLAND JOURNAL OF MEDICINE 1615 (1991)).[11]

The Report concludes that "[w]hen considering concealed carry in a densely populated city, it is clear that the balancing equation must include the District's substantial governmental interest in public safety and crime prevention." *Id.* The Report then summarizes the testimony and written statements received in response to the legislation. *See id.* at 21–26. The witnesses' testimony and written statements are also online, as is a video of the public hearing of October 16, 2014, on the legislation. *See* http://lims.dccouncil.us/Download/32576/B20-0930-HearingRecord1.pdf ("Hrg.Rec.").

The Committee heard that allowing law enforcement the ability to ascertain an applicant's "good reason," to carry a concealed handgun, as in the cases of New York, New Jersey, and Maryland, is important:

> [B]ecause of the significant risks associated with a dangerous person carrying a concealed handgun in public. Numerous studies have shown that the unfettered carrying of firearms in public places augments the risks associated with gun violence. Studies analyzing the connection between increased gun prevalence and crime indicate that most states that broadly allow concealed firearms in public—that is states that don't provide law enforcement with discretion—appear to "experience increases in violent crime, murder, and robbery when [those] laws are adopted." Importantly, "guns did not seem to protect [even] those who possessed them from being shot in an assault."

Hrg.Rec. at 14 (statement of Brian Malte, Senior National Policy Director, Brady Campaign to Prevent Gun Violence) (quoting John Donohue, *The Impact of Concealed-Carry Laws, Evaluating Gun Policy: Effects on Crime and Violence*, 289, 320 (Jens Ludwig & Phillip Cook

---

[11]    The study is attached to the Committee Report, at 112, and also available elsewhere online at *http://www.nejm.org/doi/full/10.1056/NEJM199112053252305*. "Our data suggest that restrictions on access to guns in the District of Columbia prevented an average of 47 deaths each year after the law was implemented." *Id.*

eds. 2003) and Charles C. Branas, *et al*., *Investigating the Link Between Gun Possession and Gun Assault*, 99 AM. J. PUB. HEALTH 2034 (2009)).

The evidence already in the record here is more than sufficient to demonstrate that the District's new law meets intermediate scrutiny. That evidence, detailed above, shows that the District's concealed-carry requirements can reasonably be expected to promote the compelling and undisputed governmental interests in public safety and crime prevention, by limiting the concealed-carry of handguns in public to suitable persons who have a demonstrated need to carry weapons for protection, after careful, case-by-case scrutiny of each application. The District's "good reason" requirement "strikes an appropriate balance between granting handgun permits to those persons known to be in need of self-protection and precluding a dangerous proliferation of handguns on the streets of" the District. *Woollard*, 712 F.3d at 881.

III. Conclusion

For the reasons stated above, plaintiffs' motion should be denied.

DATE: December 4, 2014          Respectfully submitted,

EUGENE A. ADAMS
Interim Attorney General for the District of Columbia

ELLEN A. EFROS
Deputy Attorney General
Public Interest Division

          /s/ Andrew J. Saindon
ANDREW J. SAINDON, D.C. Bar No. 456987
Senior Assistant Attorney General
Equity Section
441 Fourth Street, N.W., 6th Floor South
Washington, D.C. 20001
Telephone: (202) 724-6643
Facsimile: (202) 730-1470
E-mail: andy.saindon@dc.gov