IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| TOM G. PALMER, et al., | ) | Case No. 09-CV-1482-FJS |
| | ) | |
| Plaintiffs, | ) | MEMORANDUM OF POINTS |
| | ) | AND AUTHORITIES IN REPLY |
| v. | ) | TO DEFENDANTS' OPPOSITION |
| | ) | TO PLAINTIFFS' MOTION TO |
| DISTRICT OF COLUMBIA, et al., | ) | HOLD DEFENDANTS IN |
| | ) | CONTEMPT |
| Defendants. | ) | |

COME NOW the Plaintiffs, Tom G. Palmer, George Lyon, Edward Raymond, Amy

McVey, and the Second Amendment Foundation, Inc., by and through undersigned counsel, and

submit their Memorandum of Points and Authorities in Reply to Defendants' Opposition to

Plaintiffs' Motion to Hold Defendants in Contempt.

Dated: December 11, 2014                    Respectfully submitted,

                                            Alan Gura (D.C. Bar No. 453449)
                                            Gura & Possessky, PLLC
                                            105 Oronoco Street, Suite 305
                                            Alexandria, VA 22314
                                            703.835.9085/Fax 703.997.7665

                                    By:   /s/ Alan Gura
                                            Alan Gura
                                            Attorney for Plaintiffs

TABLE OF CONTENTS

Preliminary Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Summary of Argument.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    I.      Defendants Have Failed to Comply with the Court's Injunction.. . . . . . . . . . . . . 3

    II.     The Injunction Satisfies Rule 65(d)'s Specificity Requirement. . . . . . . . . . . . . . 7

    III.    This Court Has Jurisdiction To Consider the District's Revived Scheme.. . . . . . 10

    IV.    The District's Law Fails to Comply with Constitutional Standards. . . . . . . . . . . 18

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

TABLE OF AUTHORITIES

Cases

*Associated Gen. Contractors of Am.* v. *City of Columbus*,
    172 F.3d 411 (6th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 15, 16

*Bivens* v. *Six Unknown Named Agents of Fed. Bureau of Narcotics*,
    403 U.S. 388 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 15

*Brown* v. *Bd. of Education*,
    349 U.S. 294 (1955) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Bsharah* v. *United States*,
    646 A.2d 993 (D.C. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Cantu* v. *United States*,
    565 Fed. Appx. 7 (D.C. Cir. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Cobell* v. *Norton*,
    240 F.3d 1081 (D.C. Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-13, 15

*Cobell* v. *Norton*,
    391 F.3d 251 (D.C. Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15

*Cobell* v. *Norton*,
    392 F.3d 461 (D.C. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 15

*Common Cause* v. *Nuclear Regulatory Com.*,
    674 F.2d 921 (D.C. Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-9

*Common Cause* v. *Pennsylvania*,
    447 F. Supp. 2d 415 (M.D. Pa. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Community for Creative Non-Violence* v. *Unknown Agents of United States Marshals Service*,
    797 F. Supp. 7 (D.D.C. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Denius* v. *Dunlap*,
    330 F.3d 919 (7th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Dickens* v. *Ryan*,
    688 F.3d 1054 (9th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*District of Columbia* v. *Heller*,
554 U.S. 570 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Gas & Electric Sec. Co.* v. *Manhattan & Queens Traction Corp.*,
266 F. 625 (2d Cir. 1920).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Hague* v. *Committee for Indus. Org.*,
307 U.S. 496 (1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 20

*Hecht Co.* v. *Bowles*,
321 U.S. 321 (1944).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Landmark Legal Found.* v. *EPA*,
272 F. Supp. 2d 70 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*McChord* v. *Louisville & N. R. Co.*,
183 U.S. 483 (1902).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*McComb* v. *Jacksonville Paper Co.*,
336 U.S. 187 (1949) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*McDonald* v. *City of Chicago*,
561 U.S. 742 (2010).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*New Orleans Water Works Co.* v. *City of New Orleans*,
164 U.S. 471 (1896).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*NLRB* v. *Express Pub. Co.*,
312 U.S. 426 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 13

*Northeastern Fla. Chapter of Associated Gen. Contractors of Am.* v. *City of Jacksonville*,
508 U.S. 656 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Peruta* v. *County of San Diego*,
742 F.3d 1144 (9th Cir. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 19, 20

*Reed* v. *Town of Gilbert*,
707 F.3d 1057 (9th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Reno Air Racing Ass'n* v. *McCord*,
452 F.3d 1126 (9th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

iii

*SEC* v. *Savoy Industries, Inc.*,
    665 F.2d 1310 (D.C. Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Spallone* v. *United States*,
    493 U.S. 265 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Sullivan* v. *Murphy*,
    478 F.2d 938 (D.C. Cir. 1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Swann* v. *Charlotte- Mecklenburg Bd. of Educ.*,
    402 U.S. 1 (1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 15

*United States* v. *Philip Morris USA, Inc.*,
    566 F.3d 1095 (D.C. Cir. 2009) (per curiam) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-9

*Younger* v. *Harris*,
    401 U.S. 37 (1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15


Statutes and Rules

D.C. Act 19-366, 59 D.C. Reg. 5691 (May 25, 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

D.C. Code § 22-4504(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4, 5, 9, 18

D.C. Code § 22-4506(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Fed. R. App. P. 4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. Civ. P. 65. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 7, 8


Other Authorities

*Current Valid Tennessee Handgun Permits by County*, available at
    http://www.tn.gov/safety/stats/DL_Handgun/Handgun/
    Current_HG_PermitHolders.pdf (last visited Dec. 11, 2014). . . . . . . . . . . . . . . . . . . . . . 23

FBI, *Uniform Crime Reports: Crime in the United States 2013*, Table 4,
    available at http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2013/
    crime-in-the-u.s.-2013/tables/4tabledatadecoverviewpdf/table_4_
    crime_in_the_united_states_by_region_geographic_division_and_
    state_2012-2013.xls (last visited Dec. 11, 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Florida Department of Agriculture and Consumer Services
    Division of Licensing, *Concealed Weapon or Firearm
    License Summary Report October 1, 1987 - June 30, 2014*,
    available at http://www.freshfromflorida.com/content/download/
    7499/118851/cw_monthly.pdf (last visited Dec. 11, 2014).. . . . . . . . . . . . . . . . . . . . . . 24

Gary Kleck & Marc Gertz, *Armed Resistance to Crime:
    The Prevalence and Nature of Self- Defense with a Gun*,
    86 J. CRIM. L. & CRIMINOLOGY 150 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

John R. Lott, *Problems with the Washington Post's and Huffington Post's
    "more guns, more crime" claims*, CRIME PREVENTION RESEARCH
    CENTER, http://crimepreventionresearchcenter.org/2014/11/problems-
    with-the-washington- posts-and-huffington-posts-more-guns-more-
    crime-claims/ (last visited Dec. 11, 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Michigan State Police Criminal Justice Information Center,
    *Concealed Pistol License Annual Report, July 1, 2012
    to June 30, 2013*, available at http://www.michigan.gov/
    documents/msp/CPLAnnual_Report2013_463317_7.pdf
    (last visited Dec. 11, 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Moody, Carlisle E., Lott, John R., Marvell, Thomas B. and Zimmerman, Paul R.,
    *Trust But Verify: Lessons for the Empirical Evaluation of Law and Policy*
    (Jan. 25, 2012), available at http://ssrn.com/abstract=2026957
    (last visited Dec. 11, 2014).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Rothstein Catalog on Disaster Recovery and The Disaster Center,
    available at http://www.disastercenter.com/crime/dccrime.htm
    (last visited Dec. 11, 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Tennessee Dep't of Safety & Homeland Security, *Handgun Carry
    Permit Statistics Calendar Year 2013*, available at
    http://www.tn.gov/safety/stats/DL_Handgun/Handgun/
    HandgunReport2013Full.pdf (last visited Dec. 11, 2014). . . . . . . . . . . . . . . . . . . . . . 23

Texas Dep't of Public Safety, *Conviction Rates for Concealed Handgun
    License Holders, Reporting Period 1/1/2012-12/31/2012*, available at
    http://www.txdps.state.tx.us/RSD/CHL/Reports/ConvictionRates
    Report2012.pdf (last visited Dec. 11, 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

U.S. BUREAU OF THE CENSUS, STATISTICAL ABSTRACTS OF THE UNITED STATES. . . . . . . . . . . 21

v

MEMORANDUM OF POINTS AND AUTHORITIES IN REPLY TO DEFENDANTS' OPPOSITION
TO PLAINTIFFS' MOTION TO HOLD DEFENDANTS IN CONTEMPT

PRELIMINARY STATEMENT

Defendants do not deny that they are enforcing D.C. Code § 22-4504(a), arresting and causing the prosecution of individuals for carrying handguns without a license.

As to whether this Court can do anything about that, Defendants raise various objections, some old, some novel, none persuasive. Defendants claim that (1) they have complied with the injunction by completely abandoning their old, enjoined law, the "new" law being materially different; (2) the Court's order is void for vagueness in commanding only a general obligation to obey the law; (3) this Court's equitable powers are strictly limited to the four corners of the original violation (as Defendants construe it) and the "effects" of that violation, and (4) their "new" old licensing regime satisfies constitutional requirements and thus, the Court's order.[1]

This Court should move quickly in enforcing its order. This Court rejected as twice too long Defendants' requested 180 day stay, and yet we are at 137 days from July 26 and still Plaintiffs cannot access their fundamental right. The City Council is set to vote on making the temporary legislation permanent, and might find this Court's decision on the issue useful. And notwithstanding Fed. R. App. P. 4's enumeration of which post-judgment motions stay appellate proceedings, Defendants have asked the D.C. Circuit to hold their appeal in abeyance pending this Court's resolution of the enforcement matters. Plaintiffs, who have sought summary affirmance, oppose that motion, but resolving the contempt issue might help the appeal proceed sooner rather than later.

---

[1]This last argument is at some level intertwined with Defendants' first claim, that the current law is new and different and not at all like what the Court has enjoined.

1

SUMMARY OF ARGUMENT

If the Court finds that the "new" law does not effectively change the enjoined practice (an issue that the parties have briefed before), Defendants' current enforcement conduct constitutes contempt. After all, whatever the scope of the Court's equitable powers—another matter of significant dispute between the parties—surely, the Court can require that the City not re-enact and enforce the same law. Respectfully, this is all that Defendants have essentially done, and it suffices to support a finding of contempt.

Defendants' vagueness claims are novel, but easily disposed of, as they simply do not reflect the facts of what the Court has ordered. The Court's order does not merely ask Defendants to obey the law, but is actually quite specifically tailored to the allegations of the Complaint, the Court's specific findings, and the relief requested. There is nothing mysterious about what the Court has ordered, the injunction falling well within the boundaries of Fed. R. Civ. P. 65.

Should the Court conclude that the "new" law is, in fact, different than what was enjoined, Defendants' novel, but wrong jurisdictional claim comes into focus. This Court indeed has the power to retain jurisdiction and ensure that the City not flout its decree by pouring the wine of an old, unconstitutional prohibition into a new, illusory-licensing bottle. The claim that this Court may only remedy the old law's "effects," but not technically "new" violations, is simply untrue. Federal courts do not simply order constitutional lawbreakers to stop their lawbreaking, and then disappear while the same said violations are creatively repackaged. Were that so, one unconstitutional scheme, struck down, would be simply replaced by another, and another, and so on forever. Federal civil rights litigation is not so pointless.

2

Finally, Defendants' argument regarding the constitutionality of their "new" old licensing regime proves too much. This claim is nothing more than an assertion that carrying a handgun for self-defense, which this Court recognized as a constitutional right, is harmful to society, and therefore, the Defendants have an interest in limiting its exercise per se.

No constitutional right could survive this sort of claim. The Fourth Amendment, without question, imposes severe restrictions upon the police's ability to detect and prevent crime. Does that mean that only a select few, as opposed to the community at large, might have "good reason" to be secured against unreasonable searches and seizures? Were Defendants correct in their views regarding the public safety implications of handgun carrying, that would prove, at most, that the Framers made a terrible decision in ratifying the Second Amendment. What Defendants fail to do is show how their laws target the misuse of guns in a way that respects the fundamental right at issue. A law that deliberately targets the right's exercise cannot be constitutional, under intermediate or any other form of scrutiny, because the government cannot have an interest in eliminating a fundamental right, and targeting a right cannot be proper tailoring.

This Court should compel Defendants to comply with the injunction.

ARGUMENT

I.   DEFENDANTS HAVE FAILED TO COMPLY WITH THE COURT'S INJUNCTION.

Defendants claim that "the new legislation is substantively different from the old." Def. Opp., Dkt. 85, at 6. It is not. Defendants also claim that "this Court apparently recognized that a licensing scheme was not the same as an absolute ban, given its suggestion that the District could enact a scheme that would satisfy the Second Amendment." *Id.* at 7. The Court offered no such blanket recognition, which is not logically supported by its acknowledgment that the city "*could*

3

enact" a constitutional scheme. Indeed, the opposite is true: this Court did not say that
Defendants could enforce Section 22-4504(a) upon enacting *any* licensing scheme, but only upon
enacting one that is constitutional. The obvious logic of this order is that some licensing schemes
will not remedy the violation found by the Court that merited the injunction in the first place.

So what was it, exactly, that triggered the injunction? The Court's particular dislike of an
explicit ban? Or, as the Complaint suggested, the fact that a license was required, but no
adequate licensing system was in place? Here is what the Complaint challenged:

> The District of Columbia may not *completely ban* the carrying of handguns for
> self-defense . . . *deprive individuals of the right to carry handguns in an arbitrary and
> capricious manner*, or impose regulations on the right to carry handguns that are
> *inconsistent with the Second Amendment*.

Complaint, Dkt. 1, ¶ 13 (emphasis added). Adequate licensing regimes were specifically
mentioned as a means of complying with the Second Amendment's requirements. *Id.* ¶ 14. And
how did "Defendants maintain a complete ban on the carrying of handguns in public by almost
all individuals?" *Id.* ¶ 39.

By "refusing to issue [handgun carry] permits and refusing to allow the possession of any
handgun that would be carried in public . . . ." *Id.*

This Court understood the issue. It described the provision it was enjoining as follows:
"D.C. Code § 22-4504(a) provides that '[n]o person shall carry within the District of Columbia
either openly or concealed on or about their person, a pistol, *without a license issued pursuant to
District of Columbia law*, or any deadly or dangerous weapon capable of being so concealed.'"
Memorandum Decision & Order, Dkt. 51, at 4 (emphasis added). This description does not
account for the intervening technical change to Section 22-4504(a). See D.C. Act 19-366, 59

4

D.C. Reg. 5691, 5697 (May 25, 2012) (effective date: September 26, 2012). But then, Defendants did not represent to this Court at the October 1, 2012 argument that substantive changes were made. If the change in the statute so dramatically altered the nature of the lawsuit, it would have behooved Defendants to so advise the Court.

Now, of course, Defendants have re-written Section 22-4504(a) to revert it, and conform *exactly* to the language challenged in the Complaint, and enjoined by the Court's order. It is indeed a remarkable proposition to claim that the Court's order does not today address the law on Defendants' books, when Defendants *just* amended the law to conform to the opinion's description in response to that opinion. If anything, Defendants would have had a stronger argument had they let Section 22-4504(a) alone. But they are the ones who just changed it to conform to the injunction, and they cannot now complain that the Court enjoined a different statute, which the Court never apparently considered because Defendants took the (correct) position that there is no difference between a flat prohibition and an illusory licensing requirement.

What is the difference between the language of Section 22-4504(a), that the Court described and enjoined, and the language of that provision today? Apart from the reference to non-concealable weapons, which were not part of the Complaint and not part of the Court's order, none.

Section 22-4504(a) has not materially changed from what the Court enjoined. The Court enjoined the provision *not* because the city cannot maintain a licensing system—as the Complaint acknowledged, it can. The Court enjoined the provision because no *adequate* licensing system was in place. The City cannot respond by enacting a licensing system that does

5

not treat the carrying of handguns as a right, that facially and specifically precludes the general

community from applying, and thereupon claim total compliance. Why not a licensing system

limited to vegans, or ambidextrous people, or requiring the payment of a billion dollar fee? All of

these would be different in the sense that some people could apply and obtain licenses. But the

Court must necessarily have the ability to determine whether the "new" system is materially

different in satisfying the condition previously found wanting. As the Supreme Court long ago

explained,

> It does not lie in their mouths to say that they have an immunity from civil contempt
> because the plan or scheme which they adopted was not specifically enjoined. Such a rule
> would give tremendous impetus to the program of experimentation with disobedience of
> the law which we [previously] condemned . . . . The instant case is an excellent
> illustration of how it could operate to prevent accountability for persistent contumacy.
> Civil contempt is avoided today by showing that the specific plan adopted by respondents
> was not enjoined. Hence a new decree is entered enjoining that particular plan. Thereafter
> the defendants work out a plan that was not specifically enjoined. Immunity is once more
> obtained because the new plan was not specifically enjoined. And so a whole series of
> wrongs is perpetrated and a decree of enforcement goes for naught.

*McComb* v. *Jacksonville Paper Co.*, 336 U.S. 187, 192-93 (1949) (citation omitted).

To be sure, this Court cannot "subject the defendant[s] to contempt proceedings if [they]

shall at any time in the future commit some new violation *unlike and unrelated to* that with

which [they were] originally charged." *NLRB* v. *Express Pub. Co.*, 312 U.S. 426, 435-36 (1941)

(emphasis added). But "[a] federal court has broad power to restrain acts which are of the same

type or class as unlawful acts which the court has found to have been committed or whose

commission in the future, unless enjoined, may fairly be anticipated from the defendant's

conduct in the past." *Id.* at 435; *SEC* v. *Savoy Industries, Inc.*, 665 F.2d 1310, 1317-18 (D.C. Cir.

1981). "Thus, the Court looks to the Defendants' past actions as evidence in predicting

Defendants' conduct in the future." *Community for Creative Non-Violence* v. *Unknown Agents of United States Marshals Service*, 797 F. Supp. 7, 17 (D.D.C. 1992).

This Court, like Plaintiffs, was likely aware of Defendants' past conduct with respect to illusory licensing schemes. *See* Complaint, ¶ 19; *Bsharah* v. *United States*, 646 A.2d 993, 996 n.12 (D.C. 1994). This Court's language requiring an *adequate* licensing system was not accidental. Plaintiffs requested that form of relief because they are not completely naive. As the Court's opinion describes, the right can and has been destroyed by improper licensing schemes. *This* city maintained a completely illusory licensing scheme for decades. Defendants' response to this decision was predictable as far back as August, 2009, and they have met that expectation.

II.     THE INJUNCTION SATISFIES RULE 65(D)'S SPECIFICITY REQUIREMENT.

Defendants complain that the Court's requirement that they comply with constitutional standards is too vague under Fed. R. Civ. P. 65(d), imposing "an open-ended requirement perpetually to comply with this Court's interpretation of the Second Amendment." Def. Opp., Dkt. 85, at 8 (footnote omitted). This is not a fair interpretation of the order, which is perfectly valid under the law as understood in this circuit (and elsewhere).

"The D.C. Circuit has taken a practical approach to Rule 65(d), stating that 'in the context of the litigation, an injunction's language might be sufficiently specific to notify the parties of the acts the court seeks to restrain.'" *Landmark Legal Found.* v. *EPA*, 272 F. Supp. 2d 70, 74-75 (D.D.C. 2003) (quoting *Common Cause* v. *Nuclear Regulatory Com.*, 674 F.2d 921, 927 (D.C. Cir. 1982)) (holding *EPA* in contempt); *see also United States* v. *Philip Morris USA, Inc.*, 566 F.3d 1095, 1137 (D.C. Cir. 2009) (per curiam) (injunctions "sufficiently specify the activities enjoined as to provide Defendants with fair notice of the prohibited conduct").

"That is, Rule 65(d)'s fair notice requirement is to be applied 'in the light of the circumstances surrounding (the injunction's) entry: the relief sought by the moving party, the evidence produced at the hearing on the injunction, and the mischief that the injunction seeks to prevent.'" *Landmark*, 272 F. Supp. 2d at 75 (quoting *Common Cause*, 674 F.2d at 927)); *Phillip Morris*, 566 F.3d at 1137. "Ultimately, there are no magic words that automatically run afoul of Rule 65(d), and the inquiry is context-specific." *Reno Air Racing Ass'n* v. *McCord*, 452 F.3d 1126, 1133 (9th Cir. 2006). "The basic inquiry is whether the parties subject to the injunctive order understood their obligations under the order." *Landmark*, 272 F. Supp. 2d at 75 (quotation omitted).

The injunction does not merely instruct the Defendants to follow the law in some vague way, or even to avoid enacting a similar law without describing the similarity.[2] For example, the injunction cannot, and is not, being used to challenge Defendants' training requirements, sensitive place restrictions, background checks, fees, or any number of other gun carry regulations that may or may not violate the Second Amendment. Rather, "the mischief that the injunction seeks to prevent" is, quite plainly, the use of a licensing mechanism to generally bar the community from accessing the right to bear arms—and the injunction's language specifically tracks "the relief sought by the moving party." *Phillip Morris*, 566 F.3d at 1137; *Common Cause*, 674 F.2d at 927.

The injunction's text supplies the best evidence of its requirements. The injunction provides that the City cannot require a license "unless and until such time as [it] adopts *a*

---

[2]Of course, re-enacting and then enforcing a substantially similar law violates the injunction even without regard to the Court's conditional language about future licensing systems.

*licensing mechanism,"* not just any law, but a licensing mechanism, "consistent with constitutional standards *enabling people*," not just some people, but "people" as mentioned in the Second Amendment and obviously including the Plaintiffs, "to exercise their Second Amendment right to *bear* arms," not keep or do anything else with arms, but "bear" arms, as that language is defined in this Court's opinion. *See* Memorandum Decision & Order, Dkt. 51, at 16 (footnote omitted) (emphasis added).

Indeed, there is no way to read the Court's opinion and not understand that the Court held that (1) carrying a handgun for self-defense is a constitutional right of the people, and that (2) a licensing system for that right must be open to the general community. The gravamen of Plaintiffs' complaint was that Plaintiffs lacked access to the right to bear arms, and that this right was denied them because they could not access the licensing system referenced by Section 22-4504(a). This Court agreed, and even went so far as to approvingly cite the Ninth Circuit's decision in *Peruta* v. *County of San Diego*, 742 F.3d 1144 (9th Cir. 2014), describing the discretionary issuing policies there as "address[ing] statutes very similar to the ones at issue in this case." Memorandum Decision & Order, Dkt. 51, at 9.

Absolutely nothing in the Court's opinion or order, or the surrounding circumstances, indicates that the Court's actions are limited to an explicit, direct prohibition. Nor is the injunction vague. To the contrary, the literal language of the Court's order, and "the circumstances surrounding (the injunction's) entry: the relief sought by the moving party, the evidence produced at the hearing on the injunction, and the mischief that the injunction seeks to prevent," *Phillip Morris*, 566 F.3d at 1137; *Common Cause*, 674 F.2d at 927, make it perfectly clear that Defendants were not to enforce any licensing system that does not acknowledge the

status of handgun carrying as a fundamental right open to Plaintiffs. To be sure, Defendants did not agree with the injunction. They did not like the injunction. But Defendants' claim that they did not understand that they were forbidden from explicitly disqualifying the Plaintiffs, along with virtually the entirety of "the people," from carrying defensive handguns, is not credible.

III.   THIS COURT HAS JURISDICTION TO CONSIDER THE DISTRICT'S REVIVED SCHEME.

As discussed supra, this Court inherently has the power to recognize that the "new" law is really nothing other than the "old" law, and continues to be enjoined as such. Moreover, the injunction is very specific and clear indeed. Rather than command generally that Defendants obey the law, it addresses the specific problem the Court identified—the lack of a valid licensing system, and directs that any new licensing system not contain one particular defect: the disabling of Plaintiffs, and the community at large, from obtaining a license.

The case could and perhaps should end there, but Defendants imagine a that there exists a jurisdictional bar to this Court considering any aspect of their conduct after July 26, 2014. Relying largely on the Sixth Circuit's decision in *Associated Gen. Contractors of Am.* v. *City of Columbus*, 172 F.3d 411 (6th Cir. 1999), Defendants take the position that whatever the Court ordered, it could only reach the law as it existed then, and any problem with anything that Defendants have since done is "new" and different and beyond the Court's jurisdiction.

Defendants are wrong. First, whatever limits might exist upon a Court retaining prospective jurisdiction to enforce compliance with its orders, these do not impact a Court's ability to determine that nothing has changed. The doctrine of another, binding "contractors" case bears repeating:

[Precedent] does not stand for the proposition that it is only the possibility that the *selfsame* statute will be enacted that prevents a case from being moot; if that were the rule, a defendant could moot a case by repealing the challenged statute and replacing it with one that differs only in some insignificant respect.

*Northeastern Fla. Chapter of Associated Gen. Contractors of Am.* v. *City of Jacksonville*, 508 U.S. 656, 662 (1993) (citation and footnote omitted); *Reed* v. *Town of Gilbert*, 707 F.3d 1057, 1066-67 n.8 (9th Cir. 2013) (notwithstanding statutory change, plaintiff "has not obtained the relief it seeks and continues to be subject to the limiting ordinance"). Even were Defendants correct about the hard, bright line between an "old" violation and a "new" violation, the Court still retains jurisdiction to at least determine whether the "new" violation is new at all. Without this basic power, the Court's orders would be unenforceable.

But more essentially, Defendants' views of equitable jurisdiction are far too narrow. "Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Cobell* v. *Norton*, 240 F.3d 1081, 1108 (D.C. Cir. 2001) ("*Cobell VI*") (quoting *Swann* v. *Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971)). "[W]here federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief." *Bivens* v. *Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 392 (1971) (quotation and citations omitted).

Contrary to Defendants' suggestion, this Court's equitable powers, though certainly not without limits, are not subject to any rigid, bright-line tests. "Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs." *Cobell VI*, 240 F.3d at 1108 (quoting *Brown* v. *Bd. of*

11

*Education*, 349 U.S. 294, 300 (1955) ("*Brown II*")). As courts have often repeated:

> The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs . . . .

*Cobell VI*, 240 F.3d at 1108 (quoting *Hecht Co.* v. *Bowles*, 321 U.S. 321, 329-30 (1944));

*Sullivan* v. *Murphy*, 478 F.2d 938, 966 (D.C. Cir. 1973).

This circuit's leading case regarding equitable jurisdiction is the long-running saga concerning the Interior Department's mismanagement of Indian trust funds, a matter generating numerous, often complex decisions by this Court and the D.C. Circuit. Defendants seize upon one episode wherein the D.C. Circuit held this Court went too far in its supervision of the Interior Department, *Cobell* v. *Norton*, 392 F.3d 461 (D.C. Cir. 2004) (*"Cobell XIII"*), and from this, deduce that a finding of contempt here would exceed the Court's powers.

But *Cobell XIII* does not help Defendants. To the contrary, the D.C. Circuit there rejected claims that this Court could not order the Government to engage in remedial action. "[W]e are puzzled by the idea that the 'fixing' issues represent an expansion of the lawsuit." *Id.* at 470. It specifically upheld "the requirement to submit a plan" for compliance. *Id.* at 473. The D.C. Circuit was only concerned that the particular decision to hold defendants in contempt "exceeds the court's remedial discretion because the court failed to ground it in the defendants' statutory trust duties and in specific findings that Interior breached those duties." *Id.* at 465. This Court had not referenced the correct legal duties, relying only on common law doctrines "abstracted . . . from any statutory basis" in contravention of precedent. *Id.* at 471-72. And it made no factual findings, as required by the circumstances of that particular case. *Id.* at 475.

12

Here, in contrast, the Court is being asked only to enforce Defendants' compliance with those legal duties already determined by the judgment: carrying a handgun is a fundamental right belonging to "the people," who must be able to practically access any licensing system for that right. Nor are there any factual issues to be determined; unlike the mess that the Interior Department made of the Indian trust accounts, what the Defendants are doing here is fairly plain to see: they are arresting and prosecuting people for carrying handguns without a license. In *Cobell XIII*, this Court erred in "issu[ing] enforcement remedies . . . for trust breaches that it has not found to have occurred." *Id.* at 474. Here, the Court has identified the specific violation that occurred and that must be remedied—barring individuals from carrying handguns for self-defense by failing to have an adequate licensing system.

Indeed, only a week before deciding *Cobell XIII*, the D.C. Circuit decided *Cobell XII*, wherein it reaffirmed that this Court "retains substantial latitude . . . to fashion an equitable remedy . . . ." *Cobell* v. *Norton*, 391 F.3d 251, 257 (D.C. Cir. 2004). The reason *Cobell* generated so many opinions is precisely because the D.C. Circuit took an expansive view of equitable jurisdiction. "[T]he court should not abdicate its responsibility to ensure that its instructions are followed. This would seem particularly appropriate where, as here, there is a record of agency recalcitrance and resistance to the fulfillment of its legal duties." *Cobell VI*, 240 F.3d at 1109 (citation omitted). Indeed, Defendants cited that portion of *Cobell XIII* that quoted *NLRB* for the proposition that contempt cannot reach "some new violation *unlike and unrelated to* that with which he was originally charged." Def. Opp., Dkt. 85, at 11 (citing *Cobell XIII*, 392 F.3d at 475) (emphasis added); *NLRB*, 312 U.S. at 436.

13

It seems plain enough that Defendants current violation is not new, nor is it unlike or unrelated to that which the Court has already condemned.

Defendants nonetheless charge that the injunction is invalid for restraining the legislative function. But there is no rule that absolutely forbids federal courts from requiring or prohibiting otherwise discretionary action so as to avoid the perpetuation of a constitutional violation. One recent D.C. Circuit decision provides a useful example:

> At bottom, [plaintiffs] seek a declaration and injunction prohibiting the government from offering them a claims process tainted by racial considerations. If the government has indeed done that—and, for purposes of this appeal, we must assume it has—the district court could have granted relief by ordering the government not to act toward appellants based on unlawful racial grounds. Such an order would not, in practice, require the government to settle or dictate settlement terms. Rather, it would simply require the government to make litigation decisions based only on permissible factors, i.e., not race. Such relief, which is surely within the judicial power, would redress appellants' alleged injuries.

*Cantu* v. *United States*, 565 Fed. Appx. 7, 9-10 (D.C. Cir. 2014) (citations omitted).

Defendants make much of *New Orleans Water Works Co. v. City of New Orleans*, 164 U.S. 471 (1896), which they contend lays down an absolute rule barring interference with future legislative function. But in that case, the plaintiff had sued the city to prevent the enactment of future legislation that would impact the rights of third parties not before the court—a result that struck the Supreme Court as inequitable:

> A decree declaring the ordinances in question void would have no effect in law upon the rights of the beneficiaries named in the ordinances; for, in the absence of the parties interested and without their having an opportunity to be heard, the court would be without jurisdiction to make an adjudication affecting them. Such a decree would appear, upon the very face of the record, not to be due process of law, and could be treated everywhere as a nullity.

*Id.* at 480 (citations omitted). This is not a problem here. The City's law does not involve any

third parties whose rights might be at stake. The principle was followed in *McChord* v. *Louisville & N. R. Co.*, 183 U.S. 483 (1902), but there the issue would today be recognized as ripeness. A railroad commission could not be enjoined from enforcing rates it had not yet set.

Defendants next provide a lengthy quotation from *Younger* v. *Harris*, 401 U.S. 37 (1971), extolling the virtues of our federal system and the separation of powers. But the portion of *Younger* that Defendants quote admits that "it can seldom be appropriate" for courts to exercise "any such power of prior approval or veto over the legislative process," Def. Opp., Dkt. 85, at 14 (quoting *Younger*, 401 U.S. at 52-53). As the Sixth Circuit conceded, "'[s]eldom,' of course, does not mean 'never,' and the absolute language of *New Orleans* and *McChord* has, on occasion, been tempered." *Associated Gen*., 172 F.3d at 416.

The chief concern in *Younger* was the interference by federal courts in on-going state proceedings, which informed a well-known doctrine of abstention based on federalism and comity. Any language in *Younger* regarding the equitable power of federal courts to remedy constitutional violations in cases properly before them is pure dictum, and not at all consistent with the courts' understanding of their equitable powers before, during, and since that time. *See, e.g., Swann*; *Bivens*; *Cobell VI-XIII*. And respectfully, it is not that the language of *New Orleans* and *McChord* has "on occasion, been tempered." These superannuated relics are rarely cited for any purpose, and as noted *supra*, stand for propositions that do not relate to the subject at hand.[3]

---

[3]Defendants err in claiming that "[t]he lack of more recent citations to [*New Orleans* and *McChord*] mean [sic] simply that district courts have not attempted improperly to retain jurisdiction in the manner done here." Def. Opp., Dkt. 85, at 16 (citations omitted). It is not that federal courts have been perfectly circumspect about their jurisdiction since 1902, but that the cases, properly read, do not actually have much to say on the subject of equitable jurisdiction.

In the end, neither does *Associated General* offer Defendants much refuge. True, the Sixth Circuit attempted to fashion a bright line between the end of one violation and the beginning of another. Yet even so, it acknowledged that "[i]t is too late in the day to argue that Article III equity jurisdiction is not broad enough to authorize a federal court, once it has found a constitutional violation by a state or local governmental entity, to administer intricate and expansive remedial orders." *Associated Gen.*, 172 F.3d at 417. And even in trying to limit equity, that court continued, "This use of equitable power, however, has been confined to those circumstances in which the court has found that the state or local governmental entity has violated the Constitution, and that the mere cessation of the particular activity or method of operation will not serve to remedy the violation." *Id.*

Exactly. The mere cessation of an explicit ban, or a licensing requirement without a licensing system, will not remedy the violation of Plaintiffs being denied access to the right to bear arms when the City would merely respond with an illusory licensing system. Indeed, *Associated General* pointed to "the federal courts' continuing equitable jurisdiction in voting rights cases" as the most notable example of "the power to approve or veto legislation before it becomes law." *Id.* at 416. The analogy to this case is apt. When federal courts find that voting districts or other practices violate constitutional requirements, they are not always content merely to strike down the offending law, and have new elections proceed under whatever new methods the violators might devise, even though the "effects" of the old violation might be claimed to have dissipated with the next election under any "new" system.[4]

--------

[4]Although this Court has not done so, it is even possible for federal courts to require municipalities to enact laws, and hold them in contempt (although not their individual legislators) for failing to do so. *See Spallone* v. *United States*, 493 U.S. 265, 276 (1990).

Defendants' other cited cases are equally unhelpful. In *Common Cause* v. *Pennsylvania*, 447 F. Supp. 2d 415 (M.D. Pa. 2006), *aff'd*, 558 F.3d 249 (3d Cir. 2009), the plaintiffs challenged a law that had been repealed. Unsatisfied with the claim's essential mootness, they sought an "order making it unlawful for members of the Commonwealth's various elected branches to confer with one another regarding legislative matters that might possibly come before the Pennsylvania courts," and "permanently enjoin[ing] Defendants and their successors from any future First Amendment violations." *Id.* at 436. Obviously, nothing remotely approaching this complete commandeering of the political branches is at issue here. The legislation at issue in *Gas & Electric Sec. Co.* v. *Manhattan & Queens Traction Corp.*, 266 F. 625 (2d Cir. 1920) declared the forfeiture of a city concession upon the alleged breach of a contract. The court found that the contract had, in fact, been breached, and thus "its franchise automatically ceased and determined." *Id.* at 637.

The flaws that Defendants identify in the injunction at issue in *Hague* v. *Committee for Indus. Org.*, 307 U.S. 496 (1939) were that the order "attempt[ed] to formulate the conditions under which respondents and their sympathizers may distribute" literature, and otherwise "enumerat[ed] the conditions under which a permit may be granted or denied." *Id.* at 518. This Court has done nothing of the sort. It merely held that if a licensing system is to be imposed, it has to be consistent with the notion that the people retain a right to bear arms, and thus, actually enable "the people," including Plaintiffs, to exercise their right. Apart from not making the license a mere administrative privilege of the sort from which the people are generally excluded, this Court said nothing about the time, place, and manner of carrying handguns, or about other

17

licensing requirements, such as training, background checks, or fees. Nothing in this Court's order purports to impose any specific system on the City.

Finally on this point, Defendants offer a strange argument to the effect that their present appeal bars the Plaintiffs from amending their Complaint to cover the "new" law. But no amendment is being sought, or is necessary. The Complaint—and the injunction—reach D.C. Code § 22-4504(a), which has not been altered in any material way. Plaintiffs are not seeking an order barring the Defendants from issuing licenses under D.C. Code § 22-4506(a), or doing anything else under that provision. Rather, the point of this exercise is that Defendants' enforcement of Section 22-4504(a), the enjoined provision, continues to harm Plaintiffs in the exact same way, because they are not eligible for any license. Holding Defendants in contempt would not force them to do anything but adhere to that which the Court has already ordered.[5]

This Court has the power to determine that the Defendants have not materially altered their behavior. And it can craft equitable remedies reaching beyond the precise molecular structure of the violation as it existed on the day of the judgment. In 2014, it is simply not that easy for civil rights violators to evade injunctive relief.

IV.   THE DISTRICT'S LAW FAILS TO COMPLY WITH CONSTITUTIONAL STANDARDS

Defendants again argue that their revived licensing standards are constitutional, primarily because the Second, Third, and Fourth Circuits have upheld similar laws. However, as this Court has already indicated, it did not accept the logic of these opinions, which are grounded on not

---

[5]Defendants repeated claims that Plaintiffs lack standing because they did not seek to complete an application which they cannot fill out, and did not otherwise engage in a futile, ritualistic act, have been fully addressed and refuted and require no further annotation here. See Dkt. 74, at 12-20.

acknowledging that the right to bear arms falls within the Second Amendment's core. The

Seventh and Ninth Circuits, which this Court has instead followed, have taken a different

approach, and neither of those courts would uphold Defendants' illusory licensing scheme.

Indeed, *Peruta* struck down policies "very similar to the ones at issue in this case." Memorandum

Decision & Order, Dkt. 51, at 9.

Plaintiffs have already briefed, at great length, their arguments for why the District's

revived licensing scheme fails constitutional standards, and there is no point in repeating that

material here, which is already before the Court. Suffice to say, the District's revived scheme

amounts to a destruction of the right, see Dkt. 71-1, at 15-21; an impermissible prior restraint,

Dkt. 71-1, at 21-23; and fails any level of scrutiny, including intermediate scrutiny, Dkt. 71-1, at

23-25; *see also* Dkt. 74, at 21-23.

Plaintiffs do, however, take this opportunity to reply to Defendants' new arguments,

rooted in alleged empiricism. Defendants assert that they may ration the right to bear arms to a

select few; they need not deign to allow the "right" to all who may have it, but only to those

whom Defendants believe have an exceptional case for enjoying their "right." And it can do this,

allegedly, because the right itself is harmful. In other words, where a court, applying means-ends

scrutiny, would expect to see the governmental interest being claimed as public safety, with the

regulation carefully tailored to avoid trenching on the right, Defendants instead offer that the

governmental interest is the suppression of the right itself, and they measure success by the

degree to which they stifle, not preserve, the right's exercise.

The argument should end there, because it is completely unacceptable that the

government would have any interest whatsoever in suppressing the exercise of a fundamental

right as an end in itself. *Cf. Hague*, 307 U.S. at 516 ("uncontrolled official suppression of the privilege cannot be made a substitute for the duty to maintain order in connection with the exercise of the right.").

Defendants nonetheless persist—the right, they can "prove," is a bad idea, and they would like to attempt to do this with "expert" evidence showing as much. But the Second Amendment does not "require judges to assess the costs and benefits of firearms restrictions and thus to make difficult empirical judgments in an area in which they lack expertise." *McDonald* v. *City of Chicago*, 561 U.S. 742, 790-91 (2010). The familiar admonition bears recalling:

> The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon. A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all.

*District of Columbia* v. *Heller*, 554 U.S. 570, 634 (2008); *McDonald*, 561 U.S. at 791; *Peruta*, 742 F.3d at 1167; Memorandum Decision & Order, Dkt. 51, at 15. For what it's worth, "there seems little legitimate scholarly reason to doubt that defensive gun use is very common in the U.S., and that it probably is substantially more common than criminal gun use." Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self- Defense with a Gun*, 86 J. Crim. L. & Criminology 150, 180 (1995).

In any event, the evidence said to support a rationing of the right to bear arms is, at best, highly debatable. Defendants reference a City Council report that "examines the available empirical evidence on concealed-carry laws, noting that the best, most recent evidence on more lax 'right-to-carry,' a.k.a 'shall issue' laws are associated with substantially higher rates" of violent crime. Def. Opp., Dkt. 85, at 24 (citations and internal quotation marks omitted). But this

report has already been seriously challenged.[6] Indeed, the City's study appears to be an update of one published in 2011, which other criminologists hotly dispute.[7]

The other centerpiece of Defendants' study is highly persuasive—for Plaintiffs. Defendants again recite the familiar 1991 paper by Loftin, et al., purporting to show how well the District's handgun ban "worked" by correlating *raw* numbers of murders and suicides to the gun ban. This study was the primary evidence on the city's summary judgment motion in *Heller*, where neither the D.C. Circuit nor Supreme Court believed it relevant to examine whether keeping handguns was a good or bad idea. The result would be no different when the question is bearing handguns.

In any event, the study is deeply flawed. Putting aside that correlation does not equal causation, even the correlative relationship is dubious. The study measures death with raw numbers rather than rates, thus ignoring the city's dramatic depopulation through the studied period. Between the two ten-year periods examined in the study, Washington's annual population declined 15%. U.S. BUREAU OF THE CENSUS, STATISTICAL ABSTRACTS OF THE UNITED STATES. When one examines homicide *rates*, the supposed benefits disappear. The suicide prevention benefits are likewise overstated. Moreover, the study ends in 1988, a year in which the murder rate doubled pre-ban levels—hardly an improvement—and one year before a severe crime

---

[6]*See* John R. Lott, *Problems with the Washington Post's and Huffington Post's "more guns, more crime" claims*, CRIME PREVENTION RESEARCH CENTER, http://crimepreventionresearchcenter.org/2014/11/problems-with-the-washington-posts-and-huffington-posts-more-guns-more-crime-claims/ (last visited Dec. 11, 2014).

[7]*See* Moody, Carlisle E., Lott, John R., Marvell, Thomas B. and Zimmerman, Paul R., *Trust But Verify: Lessons for the Empirical Evaluation of Law and Policy* (Jan. 25, 2012), available at http://ssrn.com/abstract=2026957 (last visited Dec. 11, 2014).

increase. In 1991, the peak year, the homicide rate tripled pre-ban levels. *See* FBI UCR Data

compiled by Rothstein Catalog on Disaster Recovery and The Disaster Center, available at

http://www.disastercenter.com/crime/dccrime.htm (last visited Dec. 11, 2014).

There are, of course, other measures that might indicate whether handgun carrying

benefits or harms society. Again, while correlation is not causation, one might expect higher

violent crime rates in jurisdictions respecting the right to bear arms if such laws create crime.

Alas, the data indicates the opposite. According to the latest FBI crime rate figures, for 2013,[8] the

United States as a whole experienced 367.9 violent crimes per 100,000 people.[9] But the average

violent crime rates of those jurisdictions where the carrying of handguns was tightly restricted on

a "may issue" basis or completely forbidden was 456.46.[10]

Perhaps the best evidence on the question of whether licensing people to carry defensive

handguns creates crime lies in the outcomes of people so licensed. Do they behave responsibly?

Or are they all incipient killers? *Cf. Dickens* v. *Ryan*, 688 F.3d 1054, 1085 (9th Cir. 2012)

(Reinhardt, J., dissenting) ("Carrying a gun, which is a Second Amendment right . . . cannot

---

[8]The Court should take judicial notice of information contained on government websites. *Denius* v. *Dunlap*, 330 F.3d 919, 926 (7th Cir. 2003).

[9]*See* FBI, *Uniform Crime Reports: Crime in the United States 2013*, Table 4, available at http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2013/crime-in-the-u.s.-2013/tables/4tabled atadecoverviewpdf/table_4_crime_in_the_united_states_by_region_geographic_division_and_sta te_2012-2013.xls (last visited Dec. 11, 2014).

[10]*Id.* (averaging Massachusetts, 404.0; New Jersey, 285.6; New York, 389.8; Illinois, 372.5; **District of Columbia, 1289.1**; Maryland, 467.8; California, 396.2; Hawaii, 245.3; and Puerto Rico, 257.8. Plaintiffs excluded Delaware (479.1), where concealed carry permits are generally unavailable but open carrying is permissible).

legally lead to a finding that the individual is likely to murder someone; if it could, half or even more of the people in some of our states would qualify as likely murderers").

Hard data confirms that law-abiding, responsible American adults who have undergone the type of licensing to which Defendants already subject mere handgun possessors are quite safe and responsible in carrying handguns for self-defense. Through June 30, 2013, Michigan has issued 118,025 handgun carry licenses and revoked only 1402, barely over 1%, for *any* reason.[11] Tennessee, which currently has 482,073 handgun carry permits, revoked just 367 last year for any reason.[12] These revocations did not necessarily involve misuse of a firearm.

Texas and Florida, highly populated states with significant urban populations, who have issued handgun carry licenses for many years, provide additional information regarding the outcomes for licensed handgun carriers. For 2012, of 63,272 total serious criminal convictions in Texas, only 120—or 0.1897%—involved individuals licensed to carry defensive handguns, though not necessarily involving handguns or their public carriage.[13] Since 1987, Florida has issued 2,759,918 handgun carry licenses, and has revoked only 9,220 for any reason—barely over a third of one percent—of which at least 934 were later reinstated. Through 2010, only 168

---

[11]Michigan State Police Criminal Justice Information Center, *Concealed Pistol License Annual Report, July 1, 2012 to June 30, 2013*, available at http://www.michigan.gov/documents/msp/CPLAnnual_Report2013_463317_7.pdf (last visited Dec. 11, 2014).

[12]*Current Valid Tennessee Handgun Permits by County*, available at http://www.tn.gov/safety/stats/DL_Handgun/Handgun/Current_HG_PermitHolders.pdf (last visited Dec. 11, 2014); Tennessee Dep't of Safety & Homeland Security, *Handgun Carry Permit Statistics Calendar Year 2013*, available at http://www.tn.gov/safety/stats/DL_Handgun/Handgun/HandgunReport2013Full.pdf (last visited Dec.11, 2014).

[13]Texas Dep't of Public Safety, *Conviction Rates for Concealed Handgun License Holders, Reporting Period 1/1/2012-12/31/2012*, available at http://www.txdps.state.tx.us/RSD/CHL/Reports/Conviction RatesReport2012.pdf (last visited Dec. 11, 2014).

revocations in that state involved the use of a firearm, though not necessarily in a public setting or involving violence.[14]

Apart from their claim that the right itself is dangerous, Defendants do not attempt to show that their "good reason" requirements target any specifically dangerous people or behavior. And since Defendants admit that they are targeting the right itself, it is difficult to see how they might prove that the measure is properly tailored under any level of scrutiny. In sum, Defendants are merely trying to do again what they failed to do in *Heller*: "prove" that a fundamental Second Amendment right harms society, and thereby justify its violation. Even were Defendants able to prove their point, it would not legally justify their conduct.

## CONCLUSION

Defendants are violating this Court's injunction. The Court should take whatever steps it deems necessary and appropriate to bring them into compliance.

Dated: December 11, 2014                    Respectfully submitted,

                                            Alan Gura (D.C. Bar No. 453449)
                                            Gura & Possessky, PLLC
                                            105 Oronoco Street, Suite 305
                                            Alexandria, VA 22314
                                            703.835.9085/Fax 703.997.7665

                              By:   /s/ Alan Gura
                                    Alan Gura
                                    Attorney for Plaintiffs

---

[14]Florida Department of Agriculture and Consumer Services Division of Licensing, *Concealed Weapon or Firearm License Summary Report October 1, 1987 - June 30, 2014*, available at http://www.freshfromflorida.com/content/download/7499/118851/cw_monthly.pdf (last visited Dec. 11, 2014).

24